Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
-------------------------------------------
JESSICA TISCHER, individually and
as Personal Representative For the
Spouse and Children of Jacob Tischer,
Decedent,

        Plaintiff,             VIDEO
                           DEPOSITION
                           Case No.
      vs.             3:19-cv-00166-jdp
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,

        Defendant.
-------------------------------------------
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,
        Defendant/Third-Party Plaintiff,
             vs.
PROFESSIONAL TRANSPORTATION, INC.,
        Third-Party Defendant.
-------------------------------------------

     The video deposition of JESSICA TISCHER, taken
under and pursuant to the provisions of Chapter 804
of the Wisconsin Statutes and the acts amendatory
thereof and supplementary thereto, before Stephanie
J. Peil, Notary Public in and for the State of
Wisconsin, at Q & A Court Reporters, Inc., 303 Main
Street, Eau Claire, Wisconsin, on the 25th day of
September, 2019, commencing at approximately
10:02 a.m.
     ORIGINAL TRANSCRIPT FILED AT THE

Page 2

1             APPEARANCES:
2     Paul Banker, Esq., of Hunegs, LeNeave & Kvas,
3  1000 Twelve Oaks Center Drive, Suite 101, Wayzata,
4  Minnesota, 55391, appeared representing the
5  Plaintiff.
6     Thomas A.P. Hayden, Esq., of Union Pacific
7  Railroad Corporation, 101 North Wacker Drive, Room
8  1920, Chicago, Illinois, 60606, appeared
9  representing the Defendant and Third-Party
10  Plaintiff, Union Pacific Railroad Corporation.
11     Michael B. Cohen, Esq., of Quintairos, Prieto,
12  Wood & Boyer, P.A., 233 South Wacker Drive, 70th
13  Floor, Chicago, Illinois, 60606, appeared
14  representing the Third-Party Defendant, Professional
15  Transportation, Inc.
16     Videographer: Jacob Arvold.
17     Also present: Jamie Lukehart.

Page 3

1          EXAMINATION INDEX
2  JESSICA TISCHER:
3  By Mr. Hayden               5
4  By Mr. Cohen            148
5
6
7             EXHIBITS
8  NO EXHIBITS WERE MARKED.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1         P R O C E E D I N G S
2     VIDEOGRAPHER:  This is the video
3  deposition of Jessica Tischer taken by the
4  Plaintiffs (sic) in the matter of Jessica
5  Tischer versus Union Pacific -- versus Union
6  Pacific Railroad Company versus Professional
7  Transportation, Inc., Case No. 19-CV-166, filed
8  in the United States District Court for the
9  Western District of Wisconsin.  This deposition
10  is being held at 303 Main Street, Eau Claire,
11  Wisconsin, on September 25th, 2019.  The court
12  reporter is Stephanie Peil, and I am Jacob
13  Arvold, the videographer.  We're going on the
14  record at 10:02 a.m.
15     Counsel will now please state their
16  appearance for the record.
17     MR. BANKER:  Paul Banker, B-A-N-K-E-R, on
18  behalf of Plaintiff.
19     MR. HAYDEN:  Thomas Hayden, H-A-Y-D-E-N
20  on behalf of Defendant Union Pacific.
21     MR. COHEN:  Michael Cohen, C-O-H-E-N, on
22  behalf of Third-Party Defendant Professional
23  Transportation, Incorporated.
24     VIDEOGRAPHER:  And also present.
25     MS. LUKEHART:  Jamie Lukehart with Union

OFFICES OF ATTORNEY THOMAS A.P. HAYDEN
Q & A COURT REPORTERS, INC.

Page 5

1    Pacific Railroad.
2         VIDEOGRAPHER:  The court reporter will now
3    swear in the witness.
4              JESSICA TISCHER,
5    being first duly sworn, testified as follows:
6         THE WITNESS:  I do.
7    BY MR. HAYDEN:
8    Q.  Good morning, Mrs. Tischer.
9    A.  Good morning.
10   Q.  As we've been introduced before, my name is Tom
11       Hayden.  I'm an attorney representing and work
12       for the Union Pacific Railroad.  I'm here to
13       take your deposition as a result of a lawsuit
14       that's been filed against the railroad.  So as
15       we get started, I'll just go through some
16       preliminary suggestions for how to make it go
17       as smoothly as possible.  I know you've had a
18       chance to talk to your lawyer, but one of the
19       things that's important -- most important
20       maybe -- is that we speak individually; in
21       other words, we don't speak over each other as
22       we might in sort of a casual conversation.  The
23       court reporter records everything that we say,
24       so if we start to do that, if we get -- if we
25       lapse into that, that's going to make her job

Page 6

1        even more difficult than it already is.
2             Also important to keep your voice up
3        loudly -- loud and clear so that it can be
4        heard.  I will try to do the same thing.  Along
5        the way, if you need a break for any reason --
6        it doesn't matter what the reason is -- just
7        let us know, and we'll accommodate that.  And
8        finally, if I ask a question that you don't
9        understand or you'd like me to rephrase in some
10       way, please ask me to do that.  Because if I --
11       if you go ahead and answer, I'll just assume
12       that you understood it in the manner that I
13       asked it.  Do you understand all that?
14   A.  Yes.
15   Q.  Okay.  Are you on any medications or anything
16       that might influence your ability to give your
17       best testimony here this morning?
18   A.  No.
19   Q.  Okay.  Can you state your -- now, finally, I'm
20       going to ask you to state your name for the
21       record.
22   A.  Jessica Elizabeth Tischer.
23   Q.  All right.  When were you born, ma'am?
24   A.  April 13th, 1993.
25   Q.  And where were you born?

Page 7

1    A.  Twin Cities, Minnesota.
2    Q.  Okay.  Did you go to high school there?
3    A.  No.
4    Q.  Okay.  Where did you go to high school?
5    A.  I went to high school in Pillager, Minnesota.
6    Q.  Okay.  Help me -- help me -- wherever that is
7        in relation to --
8    A.  It's a few hours north of the Twin Cities.
9    Q.  Okay.  And what year did you graduate?
10   A.  2011.
11   Q.  And have you received any additional education,
12       college, vocational training, anything like
13       that?
14   A.  Yes.
15   Q.  Okay.  Where did -- where did -- where did you
16       go?
17   A.  During my last two years of high school, I
18       attended the local community college in
19       Brainerd, Minnesota, called Central Lakes
20       College, and I did the majority of my classes
21       there my last two years of high school.  And
22       then I had a few classes left after I graduated
23       from high school, so then I did those that
24       summer.  I have an Associate's of Arts Degree,
25       I think it is.  Just my generals.

Page 8

1    Q.  Okay.  So if I followed you correctly that when
2        you graduated high school, you also had -- also
3        earned your Associate's Degree?
4    A.  I was a few classes short.
5    Q.  Which you then finished up with?
6    A.  Yep.  I believe it was that summer that I
7        finished those up.
8    Q.  Okay.  And then after that, attaining your
9        Associate's Degree in the summer of 2000 --
10   A.  '11.
11   Q.  -- '11, did you receive any additional formal
12       education?
13   A.  No, other than a CNA license.  I'm -- I believe
14       it's called a license.
15   Q.  Okay.
16   A.  I think that was when I was in high school I
17       did that.
18   Q.  Okay.  Certified nursing assistant?
19   A.  Yes.
20   Q.  Do you still have that licensure?
21   A.  Not -- I believe it expires after a few years,
22       and I never renewed it.
23   Q.  Did you ever work in the health care industry
24       using that CNA license?
25   A.  Yes.

2 (Pages 5 to 8)

Page 9

1  Q.  Where did you work?
2  A.  I worked at May Creek Cottages in Walker,
3      Minnesota.  That was after I graduated.  During
4      the process to attain the certificate, I did
5      kind of like hands-on learning.  I'm not sure
6      where it was.  There was a nursing home, and I
7      believe it was just a nursing home.
8  Q.  And was that while you were still in high
9      school?
10 A.  Yes.
11 Q.  After high school, did you ever work again in
12     the health care industry?
13 A.  I worked for a few months after high school
14     with that degree.
15 Q.  Okay.
16 A.  I believe it -- I stopped in, like, the fall
17     after I graduated.
18 Q.  So just a few months?
19 A.  Yeah, it wasn't very long.
20 Q.  Where was that you were working?
21 A.  At that May Creek Cottages.
22 Q.  Same -- same --
23 A.  In Walker, yep.
24 Q.  Is that a personal care facility?
25 A.  Yeah.  It's a -- I worked in the dementia unit,

Page 10

1      a locked facility.
2  Q.  Okay.  Then what was your first job after
3      leaving the May Creek Cottages?
4  A.  After I left there, I went out to Idaho with
5      Jake, and I worked at a ski resort out in
6      Idaho.
7  Q.  When did you first meet Jake?
8  A.  2010.  It was in my senior year of high school.
9  Q.  So you guys went to high school together?
10 A.  No.
11 Q.  Oh, okay.  He went to a different high school?
12 A.  He was graduated and had moved up to Brainerd.
13 Q.  Oh, I gotcha.  Okay.  So then -- then you guys
14     moved out to Idaho.  Where -- whereabouts?
15 A.  Coeur d'Alene.
16 Q.  Oh, yeah.  Okay.  What's the ski resort out
17     there?
18 A.  Schweitzer Mountain Resort.  That was up in
19     Sandpoint.
20 Q.  Okay.  And is that where you guys worked?
21 A.  I worked there.  He did not work there.
22 Q.  Okay.  What did he do?
23 A.  He worked at Love's Travel Stop in, I think it
24     was, Spokane.
25 Q.  Is that what it sounds like, a -- a -- a rest

Page 11

1      stop?
2  A.  Yeah.
3  Q.  Gas and mini mart, that kind of a place?
4  A.  Yes.
5  Q.  Okay.  How long were you guys out in -- in
6      Idaho?
7  A.  Just for a few months.
8  Q.  And did you -- what did you do at the ski
9      resort?
10 A.  I worked at the tubing hill as a tubing
11     attendant.
12 Q.  Okay.  And then after your stay in Idaho, where
13     did you guys go to?
14 A.  Then we moved back to Brainerd, Minnesota.
15 Q.  Do you happen to remember your address in
16     Idaho, by chance?
17 A.  No, I don't.
18 Q.  Okay.  Was it in Coeur d'Alene?
19 A.  I know we had a P.O. Box.  I'm not sure where
20     the -- it was in the general area.
21 Q.  Okay.  And then you moved back to Brainerd in
22     2012?
23 A.  Yes.
24 Q.  Or still 2000 --
25 A.  The Brainerd area.

Page 12

1  Q.  Yeah.
2  A.  Yeah.
3  Q.  And so you worked -- I'm going to just guess --
4      the ski season probably in 2011-2012 in Idaho?
5  A.  Came back before it was --
6  Q.  Before --
7  A.  -- before it was over.
8  Q.  Okay.  And in Brainerd, where did you live?  Do
9      you remember the address there?
10 A.  We moved back in with my parents.  I -- well, I
11     moved back in with my parents.  He had never
12     lived there prior.  The address, 2697 Green
13     Bass Lake Lane Southwest, Nisswa, Minnesota.
14     Don't remember the zip code.
15 Q.  Okay.  When you got re -- came back to
16     Brainerd, got re-established, did you get a job
17     then in Brainerd?
18 A.  Yes.  While I was still in Idaho, I contacted a
19     previous employer in Baxter, Minnesota, and
20     they were -- were happy to have me come back
21     and work there.
22 Q.  What was that employer?
23 A.  Lakeland Veterinary Hospital.
24 Q.  Okay.  So you were able to use some of your CNA
25     training, I suppose?  A tiny bit at least?

Page 13

1    A.  No, not too much.  I mean, I -- I worked mostly
2        in the kennel and helping the --
3    Q.  Oh, okay.
4    A.  -- groomers, and I'd occasionally help the vets
5        on the weekends.  But no, none of the -- none
6        of the CNA training pertained to the -- the vet
7        job.
8    Q.  Okay.  And then Jake, how -- how -- what type
9        of a work -- of work did he find in late --
10       late 2011, early 2012 upon moving back?
11   A.  Right.  At that point he was looking for a
12       career position, and he worked at the temp
13       agency out of Brainerd/Baxter area.  I'm not
14       sure specifically where it was.
15   Q.  Do you remember the temp agency's name, by
16       chance?
17   A.  I don't.
18   Q.  And then he was called for various assignments,
19       temporary assignments, then through that
20       agency?
21   A.  Yes.
22   Q.  What type of industry or what type of work was
23       he doing; in other words, was it office work,
24       or was it manufacturing or industrial or...
25   A.  Right.  It really varied.  I mean, the only one

Page 14

1        that I can remember him working -- I don't know
2        what he did, but I know it was at Cragun's
3        Resort.
4    Q.  When did you guys get married?
5    A.  We got married February 23rd, 2013.
6    Q.  Did you stay in your parents' home until the
7        time that you got married?
8    A.  No.
9    Q.  Where did you move when you left your parents'
10       home?
11   A.  We moved to Iron River, Wisconsin, once he got
12       hired with the railroad.
13   Q.  Okay.  And when was it -- when was it that he
14       got hired again?
15   A.  I'm not -- I'm not certain.
16   Q.  Yeah.  I think it was 2 -- I want to say 2012.
17       Does that sound right?
18   A.  Yeah.  He didn't work at the temp agency for
19       very long before he got hired.
20   Q.  At the railroad; is that right?
21   A.  Yes, at the railroad.
22   Q.  Yeah.  Once he got hired at the railroad, did
23       he have any other job on the side?  That is,
24       some guys can -- you know, their work schedules
25       allows that.  Did he ever do that?

Page 15

1    A.  No.
2    Q.  Okay.  And so his first assignment was where
3        then?
4    A.  I don't remember.
5    Q.  But you moved to -- and I'm sorry.  You said it
6        already, and I've forgotten it.
7    A.  Iron River, Wisconsin.
8    Q.  Where is that in relation to here?
9    A.  A few hours north.
10   Q.  Straight --
11   A.  We could see Lake Superior from our house.
12   Q.  Oh, okay.
13   A.  So it was about an -- an hour-ish east of
14       Superior.
15   Q.  Got it.  And then how long did you guys live in
16       Iron River?
17   A.  We lived there -- I can't remember when we
18       moved in.  It was in relation to when he
19       started working for the railroad, and we moved
20       when we bought our first house in August of
21       2013.
22   Q.  And where was that first house that you bought?
23   A.  Cameron, Wisconsin.
24   Q.  Is that in the Iron River, Wisconsin, area?
25   A.  No.

Page 16

1    Q.  Okay.  Where is it in relation to here?
2    A.  About an hour north.
3    Q.  Okay.  A little closer?
4    A.  Yes.
5    Q.  Was he working -- when he first hired out, was
6        he working out of Altoona?
7    A.  No.
8    Q.  He was working up there?
9    A.  Yes.  His job changed a lot, so I can't
10       remember when -- he worked where when he
11       started, but I don't believe it was out of
12       Altoona.
13   Q.  Okay.  Yeah.  And we have all those records, so
14       I won't quiz you on that.  But -- so your first
15       house is in Cameron, Wisconsin.  Do you
16       remember the address there?
17   A.  Yes.
18   Q.  What was that?
19   A.  2429 14½ Avenue, Cameron, Wisconsin, 54822.
20   Q.  How long did you live there?
21   A.  I presently live there still.
22   Q.  Oh, okay.  When you said you bought your first
23       house, I thought there was a second one behind
24       that.  But that literally was just your --
25   A.  Yes.

4 (Pages 13 to 16)

Page 17

```
 1    Q.  -- first house?  Okay.  You had three children
 2         together?
 3    A.  Yes.
 4    Q.  Have you have -- have you have -- had children
 5         from any other relationship?
 6    A.  No.
 7    Q.  Did Jake?
 8    A.  No.
 9    Q.  How old are your children now?
10    A.  My oldest, Brooke, is five.  My middle just
11         turned three.
12    Q.  What's his or her name?
13    A.  The oldest is Brooke, the second is Sadie, and
14         the youngest, Daisy, just turned two.  Well,
15         she turned two in June.
16    Q.  They obviously all live with you?
17    A.  Yes.
18    Q.  Do you have anyone else living with you who
19         assists -- well, just period.  Does anyone else
20         live with you --
21    A.  Yes.
22    Q.  -- besides you and the children?
23    A.  Sorry.  Yes.
24    Q.  Who else?  Who is that?
25    A.  Andrew.
```

Page 18

```
 1    Q.  Andrew.  And what's your relationship to
 2         Andrew?
 3    A.  Significant other.
 4    Q.  Okay.  And how long has Andrew lived with you
 5         guys?
 6    A.  Approximately a year.
 7    Q.  Okay.  What's Andrew's last name?
 8    A.  Janson.
 9    Q.  J-A-N-S-E-N?
10    A.  O-N.
11    Q.  O-N.  I'm sorry.  Does Andrew have any children
12         that -- or does he have any other children?
13    A.  No.
14    Q.  Okay.  Other than Andrew, the three kids, and
15         you, is there anyone else at the house?
16    A.  No.  Some animals, but I don't think that
17         counts.
18    Q.  Depends on how big they are.  Do you have
19         anyone that you employ to assist you with child
20         care?
21    A.  No.
22    Q.  Are your parents still living?
23    A.  Yes.
24    Q.  Where are they?  They still in Brainerd?
25    A.  They live in Cameron.
```

Page 19

```
 1    Q.  In Cameron.  They've moved --
 2    A.  Yes.
 3    Q.  -- to -- from Brainerd at some point?
 4    A.  Yes.
 5    Q.  When did they move?
 6    A.  It was in the months after Brooke was born.
 7         I'm not sure how long it was, but...
 8    Q.  So she being five years old, roughly five years
 9         ago?
10    A.  Approximately, yeah.
11    Q.  Okay.  Did they move close to help you and Jake
12         with child care among other reasons just to be
13         --
14    A.  No.
15    Q.  Okay.  Why did they move?
16    A.  They moved just to be closer to their first
17         grandbaby.
18    Q.  Sure.  Are Jake's parents still alive?
19    A.  Yes.
20    Q.  And where do they live?
21    A.  I'm not sure where their technical residence
22         is.  They have a house in Morris, Illinois, and
23         they have a house in Chetek, Wisconsin.
24    Q.  Okay.
25    A.  They go back and forth.
```

Page 20

```
 1    Q.  How often do you see them?
 2    A.  It really varies based on how much -- how long
 3         they're up here.
 4    Q.  When's the last time you saw them?
 5    A.  Not yesterday, but the day before.
 6    Q.  Okay.  Do you have any brothers and sisters who
 7         live in the area?
 8    A.  Yes.
 9    Q.  How many?
10    A.  I have one sister, Tara, and she lives in
11         Spooner, Wisconsin.
12    Q.  Okay.  What does Andrew do?
13    A.  He is a truck driver.
14    Q.  Who does he work for, or is he self-employed?
15    A.  He works for a company called TSU Trucking out
16         of Shell Lake, Wisconsin.
17    Q.  And when would you say your relationship with
18         Andrew began?
19    A.  In the winter of 2018.
20    Q.  Been kind of talking about you and Jake in
21         parallel in terms of your backgrounds and
22         things.  So I want to ask a few more questions
23         about -- about you, and then we'll shift to --
24         to -- to him and -- and his work at the
25         railroad.  Do you -- are you currently
```

Page 21

1   employed?
2   A. I'm a stay-at-home mom.
3   Q. Okay. Have you -- let's go back to your time
4      in Iron River when you guys lived there for a
5      little bit. Were you employed there?
6   A. No.
7   Q. Okay. Were you -- maybe a good marker is
8      the -- is your -- is your date of marriage,
9      February 23, 2013. From that point forward,
10     were you employed?
11  A. Not after our marriage, no. But it was a
12     significant period of time before we got
13     married that I wasn't working.
14  Q. Oh, okay.
15  A. As soon as we moved to Iron River, I did not
16     have a job.
17  Q. Okay. That's a little easier to -- probably
18     would have been a better question. Since that
19     time, you haven't been employed, and since --
20     obviously since you started to have children,
21     you were a stay -- a stay-at-home mom?
22  A. Yes.
23  Q. Okay. And still are?
24  A. Yes.
25  Q. Did Jake like his job at the railroad?

Page 22

1   A. Yes.
2   Q. When did he start working out of Altoona? And,
3      again, I -- I -- we have these records, but if
4      you remember that.
5   A. I don't know. He bounced --
6   Q. Yeah.
7   A. -- bounced around a lot, so I'm not sure.
8   Q. Okay. What did he like about the job, if
9      you -- if you know?
10  A. I know that he really liked the -- the
11     flexibility.
12  Q. In terms of the hours and the days --
13  A. Um-hum.
14  Q. -- that -- that he could work?
15  A. Yeah. And just that he loved working on the
16     extra board when he could so that, you know, we
17     could have a lot of family time together.
18  Q. And at the time that he suffered his stroke, he
19     was working extra board still; is that right?
20  A. I'm not sure what he was working.
21  Q. Okay. In -- something I should have asked you
22     earlier. In preparation for today's
23     deposition, did you review any documents?
24  A. No.
25  Q. At any time in -- since the litigation has been

Page 23

1   filed, have you reviewed any documents?
2   A. Yes.
3   Q. Okay. What are those?
4   A. I'm not certain what -- what the titles of them
5      were.
6   Q. Okay. Have you ever reviewed the medical
7      records of -- of Jake's care and treatment?
8   A. I've seen a few things, but not in its
9      entirety.
10  Q. Okay. Have you reviewed the autopsy report?
11  A. Yes.
12  Q. What other things can you remember reviewing
13     besides those -- the -- some perhaps legal
14     documents and then some selected medical
15     records and the autopsy report?
16  A. That's really about it.
17  Q. But to be clear, you didn't review anything
18     in -- to refresh your memory in preparation for
19     today?
20  A. No.
21  Q. I assume you talked to your lawyer; is that
22     right?
23  A. Yes.
24  Q. Did you talk to anyone in the -- in the weeks
25     leading up to this deposition about your

Page 24

1   testimony other than your lawyer?
2   A. Can you be more specific?
3   Q. Yeah. Did you talk to any of Jake's co-workers
4      in the days and weeks leading up to this
5      deposition?
6   A. Neil reached out to me after his deposition,
7      but that was it.
8   Q. Did you talk to Neil after your dep -- after
9      his deposition?
10  A. I just -- he sent me a communication, and I
11     just replied back a -- a very -- it didn't
12     really contain any information, just an
13     acknowledgment that he sent -- that he sent --
14     sent me something, and that was it.
15  Q. What did he send you?
16  A. I -- I can't remember specifically what it
17     said.
18  Q. Just so I'm clear, did he send you something,
19     or did he send you a message?
20  A. He sent me a Facebook message.
21  Q. A Facebook message. I see. And do you
22     remember what he said?
23  A. I don't know. Just -- he just said that it was
24     difficult to have to do, but I don't remember
25     really anything else or the specific words that

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 25

1   he used.
2   Q.  I can't recall.  I know that you participated
3       in -- or observed some of the depositions.
4       Were you there for Neil's?
5   A.  Yes.
6   Q.  Okay.  And you responded to Neil's comments on
7       Facebook?
8   A.  Yes.
9   Q.  And -- but you don't recall what you said?
10  A.  You know, I just -- I can't remember
11      specifically.  I remember all I had -- the gist
12      of what I said was, you know, that the honesty
13      is the best thing and -- you know, and that I
14      understand it's difficult, and that was about
15      it.  There was no talking about what he said or
16      anything.  It was just that.
17  Q.  When is the first time you ever met Neil
18      Franchuk?
19  A.  I believe it was the day of his deposition.
20  Q.  Okay.  Had you ever heard -- did you ever hear
21      Jake speak about Neil Franchuk to you?
22  A.  Yes.
23  Q.  Do you remember any of -- any of what Jake said
24      about Neil?
25  A.  He generally only talked about the employees

Page 26

1       that he liked, so, you know, he -- I don't
2       remember specifically what he said, just
3       that -- you know, that Neil was -- was a good
4       guy.
5   Q.  So you met -- your testimony is you met Neil
6       for the first time on the day of his
7       deposition?
8   A.  Yes.
9   Q.  Had you ever talked to him by phone prior to
10      his deposition?
11  A.  I don't believe so.
12  Q.  Had you ever -- had he ever reached out to you
13      on Facebook or email or any other social media
14      prior to his deposition?
15  A.  He might have, but I don't remember.
16  Q.  And you never spoke to him on the phone before
17      the deposition?
18  A.  No.
19  Q.  How about afterwards, have you spoken to him --
20      other than the one communication on Facebook
21      after his deposition, any other communications
22      with Neil, either oral or phone or -- or --  or
23      digital, after the deposition?
24  A.  I don't believe so, no.
25  Q.  Okay.  Have you spoken to any other of -- of

Page 27

1       Jake's co-workers?  I'll -- I'll put parameters
2       on it so it's maybe easier to think about.
3       From the time of the incident with Jake at work
4       until -- until today, have you spoken with any
5       other of Jake's co-workers either by phone, in
6       person, or via some sort of digital medium?
7   A.  Yes.
8   Q.  Okay.  How many others?
9   A.  Less than 10.
10  Q.  Okay.  Can you take a stab at remembering who
11      they were by name?
12  A.  The most recent was Bryan Tribbey, I believe
13      was his name, and he sent me a text message
14      stating that he had found some note or
15      something of Jake's in his locker, and he was
16      asking for my address to return them to me.
17  Q.  Okay.  And did he do that?
18  A.  I replied with my address and thanked him for
19      thinking of me and sending them, but no, I have
20      not received them yet.
21  Q.  Okay.  Did he characterize what those things
22      were beyond just notes?
23  A.  No, he didn't.
24  Q.  Have you at any time gone to the yard to -- to
25      meet or talk with anyone --

Page 28

1   A.  No.
2   Q.  -- since Jake's incident?
3   A.  No.
4   Q.  Have you personally gone to retrieve any in --
5       any of Jake's things from his locker?
6   A.  No.
7   Q.  Were those things returned to you?
8   A.  Yes.
9   Q.  Do you know who did that for you?
10  A.  I don't know.  It happened while we were in the
11      hospital.
12  Q.  Okay.  But it sounds like some notes were left
13      behind, and -- and -- and this fella reached
14      out to you to -- to -- to return them?
15  A.  From my understanding, yes.
16  Q.  Okay.  All right.  And you're not sure what
17      those notes are or what they say or anything
18      because you haven't received them?
19  A.  No.  Yeah, I have not received them.  No.
20  Q.  That's one fella.  Who -- who else?  And that's
21      the first and only communication you had with
22      that person, Tribbey?
23  A.  He had reached out after Jake passed just like
24      several people did.
25  Q.  Sure.  Okay.  Beyond that, though, you can't

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 29

```
 1      remember any conversations or -- or
 2      communications?
 3   A.  No.
 4   Q.  Who else have you communicated with since
 5      Jake's incident, co-workers?
 6   A.  I can't remember names.  I can't.
 7   Q.  Okay.  Have you talked to anyone -- again,
 8      besides your lawyer, anybody, whether it's
 9      co-worker, family member, anyone associated
10      with the railroad, physicians, anybody like
11      that for the purposes of getting ready for your
12      deposition today?
13   A.  No.
14   Q.   Were you aware of any health conditions that --
15      that Jake had prior to his incident in the
16      years and months leading up to the incident?
17   A.  Health conditions, no.  Health symptoms, yes.
18   Q.   Okay.  Tell me about the -- I'll define health
19      conditions a little more broadly, and then
20      we'll talk about the issues you raised.  Health
21      conditions, I meant things like chronic
22      diseases or conditions that he had to be
23      medicated for.  Something like, for example,
24      high blood pressure, diabetes, something like
25      that.
```

Page 30

```
 1   A.  No.
 2   Q.  Okay.  Health issues, what health issues or
 3      symptoms were you aware of since the time you
 4      -- well, let me ask you first a question that
 5      will be a better foundation for -- for this
 6      discussion.  When's the first time you laid
 7      eyes on him and started the relationship?
 8      Well, those are two different questions.  When
 9      did -- when did you -- yeah.  When did your
10      relationship with him begin?
11   A.  Our -- pretty much as soon as we met.
12   Q.  Okay.  Which was -- which was when?
13   A.  I believe that it was the summer or early of my
14      senior year.  It was like August, September
15      time.  I remember it was hot outside.
16   Q.  So the -- August or September either beginning
17      of your -- at the beginning of your senior
18      year?
19   A.  Yes.
20   Q.  Okay.  And he had graduated just that year
21      before?
22   A.  No.
23   Q.  Oh.  When did he graduate high school?
24   A.  I'm not sure the year of when he graduated.
25   Q.  How many years older than you was he?
```

Page 31

```
 1   A.  Six-ish.
 2   Q.  Six.  Okay.
 3   A.  Yeah.
 4   Q.  What was he doing when you met him work-wise?
 5   A.  He was working at Gander Mountain in Baxter,
 6      Minnesota.
 7   Q.  So from the August, September of 2010 through
 8      your senior year, and then the rest of the
 9      story is you've -- as you -- as you've told me,
10      you were -- you had a close relationship
11      with -- with Jake?
12   A.  Yes.
13   Q.  Okay.  So you could speak to -- when I -- we
14      talk about health concerns and issues and so --
15      so forth, you can speak firsthand to things
16      from the late summer, early fall of 2010?
17   A.  Yes.  Assuming that he informed me of them, but
18      --
19   Q.  Sure.
20   A.  -- yes, I would believe so.
21   Q.  Okay.
22   A.  We didn't live together obviously --
23   Q.  Sure.
24   A.  -- in those early days, so obviously --
25   Q.  Yeah.
```

Page 32

```
 1   A.  -- there were times when we weren't together.
 2   Q.  Right.  So what health issues did you become
 3      aware of that -- that Jake had?
 4   A.  There was a -- a small handful of times that he
 5      would complain of left-sided numbness and
 6      tingling.
 7   Q.  Now, when you say "a small number of times,"
 8      can you be more specific about -- less than
 9      five?  Less --
10   A.  Yes.
11   Q.  -- than 10?  Less than five?
12   A.  Yes.
13   Q.  And were those episodes compressed together
14      over a couple of weeks or month period, or were
15      they spread out over the time that you knew
16      him?
17   A.  Spread out.
18   Q.  Those were things that you observed in your --
19      with your own eyes when you were with him?
20   A.  No, it was just him telling me.
21   Q.  But they were contemporaneous; in other words,
22      he told you, Hey, this morning or today or
23      whatever I -- this is -- these are some
24      symptoms I felt?  That was a really bad
25      question.  It's not like he was saying, Six
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 33

1    months ago I had these symptoms; it was when he
2    told you about those symptoms when you guys
3    were together, it was because of something that
4    was --
5  A.  Recent.
6  Q.  Recent.
7  A.  Yes.
8  Q.  Yeah.  Thank you.
9  A.  Yes.
10  Q.  Did he describe those symptoms more
11     specifically than numbness and tingling?
12  A.  No.  And it wasn't ever something that was
13     very, like, serious.  He just -- you know, he
14     just acknowledged them, and that was pretty
15     much it.  It wasn't -- it didn't, like, change
16     his -- his daily life for him or anything.
17  Q.  Did -- did -- did you know him to be unable to
18     work because of those symptoms?
19  A.  Never.
20  Q.  Did you ever -- and -- and, again, just so I'm
21     clear, did you ever observe him at the same
22     time that he said he was having the symptoms?
23  A.  I don't recall.
24  Q.  Okay.  And did he describe it as numbness and
25     tingling throughout the entire left arm and the

Page 34

1     entire left leg?
2  A.  I don't recall.
3  Q.  Did he seek medical attention for any of those
4     several episodes that -- that you were aware of
5     while you guys were together?
6  A.  Can you say that again?
7  Q.  Yeah.  Did he seek medical attention for those
8     symptoms during the time that you guys were
9     together?
10  A.  Yes.
11  Q.  How often did he do that?
12  A.  One time.
13  Q.  Is that when he had the MRI of his brain?
14  A.  In Idaho, I -- yes.
15  Q.  Yeah.  In 2012?
16  A.  Probably.
17  Q.  Do you remember specific -- any more specifics
18     about the in -- the symptoms in -- that
19     occurred in Idaho?  Do you remember
20     specifically what he told you about them or
21     whether you observed them?
22  A.  There wasn't anything to observe.  I mean, it's
23     not like he was, like, having a -- you know, a
24     condition where you, like, shake or -- you
25     know.  I mean, he would -- he would just say

Page 35

1     that he felt it.  There wasn't anything to see.
2  Q.  Okay.  And was it you or he who -- strike that.
3     Was -- did you encourage him to seek medical
4     attention?
5  A.  Yes.
6  Q.  Was he reluctant to?
7  A.  No.
8  Q.  Did he go to the emergency room?
9  A.  No.
10  Q.  Who did he go to?
11  A.  I'm not sure of who he saw.  And I -- I should
12     say I -- I don't know if it was the emergency
13     room.  I don't believe so.  I believe he saw a
14     clinic doctor, but I --
15  Q.  Okay.
16  A.  -- I could be mistaken.
17  Q.  Okay.  And you don't remember one way or the
18     other whether he got an MRI?
19  A.  I don't remember, no.
20  Q.  Okay.  Was he given treatment for that that you
21     can remember?
22  A.  Treatment for what?
23  Q.  For the symptoms.
24  A.  No.  They said that he was fine.
25  Q.  Okay.  Did they -- that was going to be my next

Page 36

1     question.  Did they tell him -- did they give
2     him a diagnosis or say what was wrong, why it
3     was being -- why the symptoms were being
4     caused?
5  A.  No.  They said that he was fine.
6  Q.  Okay.  The other episodes of the -- of the
7     symptoms on the left side that you were aware
8     of, subsequently did he seek medical treatment
9     for any of those?
10  A.  Not that I can recall.
11  Q.  Okay.  Are there any other health issues beyond
12     that which you've just described that you can
13     recall when -- in the time you guys were
14     together?
15  A.  Can you define health issues?
16  Q.  Sure.  Any other symptoms of numbness and
17     tingling maybe on the other side of his body,
18     recurrent headaches, balance issues, anything
19     like that.
20  A.  None.  It was only ever his left side.
21  Q.  Okay.  Were there any other symptoms other than
22     the numbness and tingling on his left side that
23     you were aware of?
24  A.  Nothing besides the occasional cold or
25     something.

9 (Pages 33 to 36)

Page 37

1  Q.  Okay.
2  A.  But nothing that was -- you know, that wasn't
3      short-lived like that.
4  Q.  Okay.  Any other thing you can think of that
5      was a health issue or a health concern or a
6      symptom of something that Jake experienced
7      during the time that you guys were together?
8      And I'm not talking about that week or so
9      leading up to his -- his stroke.
10 A.  No.
11 Q.  Okay.  Did he seek medical attention for any
12     issue, again, during that period of time that
13     you guys were close?
14 A.  I'm not sure other than that Idaho time.  I
15     remember that time, but I don't recall after --
16     besides that.
17 Q.  Do you ever remember going -- him going to an
18     emergency room for any other occasion for any
19     other reason after the Idaho incident?
20 A.  No.
21 Q.  Was he doing something at the time that his
22     symptoms began in Idaho; in other words, was
23     he -- was he doing any physical activity, was
24     he -- was he at work?
25 A.  I don't recall where he was at or if he did

Page 38

1      something that -- that started it.  I don't
2      know.
3  Q.  Okay.  We've talked about the time that you --
4      can you remember anything else besides what
5      we've talked about in terms of any health
6      issues, symptoms of any kind and any sort that
7      he experienced during the time that you guys
8      were -- you had a relationship together?
9  A.  I remember going to a hospital in Duluth -- I
10     believe it was Duluth -- to have an ultrasound
11     done.
12 Q.  He -- he -- he went to a hospital to have an
13     ultrasound done?
14 A.  Yes.
15 Q.  Okay.  When was that?
16 A.  I don't recall.  Sometime after he was working
17     for the railroad, but I don't remember after
18     that.
19 Q.  And do you remember --
20 A.  I take that back.  I -- I don't -- we had to
21     have been in the area, but I -- I mean, I'm --
22     I'm not sure when it was.
23 Q.  Okay.  And did -- do -- do you recall what the
24     purpose of the ultrasound was?
25 A.  It was on his testicles for -- I don't remember

Page 39

1      what it was for, no, besides that.
2  Q.  Okay.  What were the symptoms that caused him
3      to do -- to seek care for that?
4  A.  I don't remember.
5  Q.  Okay.  Do you remember if there was a diagnosis
6      or treatment that was given him?
7  A.  Not that I recall.
8  Q.  Anything else you can remember about any other
9      visits to doctors or hospitals or emergency
10     rooms or urgent care clinics?
11 A.  No.  I mean, he went for his physicals for the
12     railroad, but that was it.
13 Q.  Did Jake have a primary care physician?
14 A.  No.
15 Q.  So if he had a cold or a flu kind of thing and
16     he went to -- to -- to be treated for it, where
17     would he go?
18 A.  I honestly don't know that he ever did go.
19 Q.  Okay.
20 A.  He was very, very -- it look a lot to -- you
21     know, to affect him.
22 Q.  So we've talked about the time since your
23     relationship commenced with him up until his
24     passing.  How about before, so as you got to
25     know him, did he discuss with you any health

Page 40

1      issues that he had as a kid or as a teenager or
2      any -- at any point up to the time that you
3      started dating him?
4  A.  Can you say that again?
5  Q.  Yeah.  So as you got to know Jake and got
6      closer to Jake, did he ever discuss with you
7      issues that he had with his health prior to him
8      meeting you?
9  A.  No.
10 Q.  So you're not aware of any hospital visits or
11     testing or anything that he received prior to
12     his -- prior to you dating him?
13 A.  Be -- I became aware of stuff after we were
14     married.
15 Q.  Okay.
16 A.  But not in those early days, no.
17 Q.  Okay.  That's a good clarification.  So after
18     you got married, what kinds of things did he
19     share with you about his health prior to you
20     guys knowing each other?
21 A.  I became aware of one -- a time.  I don't know
22     how many times it was.  I remember hearing
23     about a time of him down in Illinois doing the
24     same thing we did in Idaho of having symptoms
25     of the left side and trying to find treatment

10  (Pages 37 to 40)

Page 41

1    for it.  And I'm not sure what else they did,
2    but they told him that he was fine.
3    Q.  Okay.  And that occurred before you -- you knew
4       him?
5    A.  Yeah.
6    Q.  Okay.  But he shared that --
7    A.  That was when he lived at home, yeah.
8    Q.  Okay.  Anything else you can remember that he
9       shared with you that happened to him or health
10      issues he dealt with prior to your
11      relationship?
12   A.  He had a -- an episode of some sort that he
13      went to the emergency room in Brainerd for.
14      I -- that was before we met.
15   Q.  Okay.  Do you remember more specifics about
16      that?
17   A.  Nothing other than it being anxiety related.
18   Q.  Okay.  Was he at the hospital for that?
19   A.  Yes.
20   Q.  In Brainerd?
21   A.  Brainerd/Baxter area, yes.  They're kind of --
22      they're right next to each other --
23   Q.  Okay.
24   A.  -- so I'm not sure what town specifically
25      it's --

Page 42

1    Q.  Do you remember the hospital?  Did he share
2       with you the hospital that he went to?
3    A.  I believe there's only one in town --
4    Q.  Okay.
5    A.  -- so...
6    Q.  All right.  Did you ever know Jake to use
7       illegal drugs?
8    A.  Never.
9    Q.  Never in your presence?
10   A.  Never in my presence, and --
11   Q.  Okay.
12   A.  -- that was not what he stood for at all.
13   Q.  Okay.  Was Jake ever on -- as long as you knew
14      him, on any chronic medications for anything?
15   A.  Not while I knew him, no.
16   Q.  Did you ever know Jake to be diagnosed with
17      deep vein thrombosis in his leg or DVT?
18   A.  He was not, no.
19   Q.  Okay.
20   A.  Not before his incident.
21   Q.  Okay.  All right.  I want to move forward then
22      to the -- the -- the -- Jake's incident at work
23      occurred on August -- as you're obviously
24      aware, August 12th of 2017.  I just want to do
25      that for the record's purposes.  For the -- in

Page 43

1    the previous week -- weeks, let's say, leading
2    up to that, was Jake working full time or was
3    he -- did he have any off time?
4    A.  Our youngest daughter was born recently, and so
5    I know he had taken time off.  She was born
6    June 29th.  I'm not sure specifically how long
7    he had been back to work and what he was
8    working.  I don't know that.
9    Q.  Okay.  Daisy?
10   A.  Yes, Daisy.
11   Q.  Daisy was born June 29th, 20 --
12   A.  '17.
13   Q.  -- 17.  So Jake was off subsequent to that for
14      a period that you can't recall?
15   A.  Right.
16   Q.  Okay.  In the period -- the date of Jake's
17      incident was a Saturday; is that correct?
18   A.  I don't recall.
19   Q.  Okay.  In the prior week leading up to that
20      incident, was Jake on duty in the -- in the --
21      in the week leading up to the incident?
22   A.  I know at one point he was at work, so I'm not
23      sure what specifically the labels are for that.
24      But I know that he had worked the day before
25      his incident.  I'm not sure of the other days

Page 44

1    of that week, but I know that the day before
2    the incident he was, yes.
3    Q.  Okay.  So on August 12th he worked the -- the
4       shift that commenced at 2 p.m., is that right,
5       the date of his incident?
6    A.  Right.  I know that he got called, and his call
7       got busted.  I'm not sure what time he was
8       supposed to start work at.
9    Q.  Okay.  And the day before, August 11, your --
10      your recollection is that he was working that
11      day?
12   A.  Yes.
13   Q.  Do you remember what shift he was working that
14      day?
15   A.  No.
16   Q.  Do you remember if it was in the morning?  Did
17      he leave the home in the morning or the
18      afternoon?
19   A.  I don't recall when he left, no.
20   Q.  Okay.  Do you remember when he came back?
21   A.  No.
22   Q.  Okay.  Was he home on the evening of -- the
23      evening before the day of his incident?
24   A.  I'm not sure if it was evening or late evening,
25      but there was -- at some point I remember him

11 (Pages 41 to 44)

Page 45

1   being home. I don't know if the kids were in
2   bed or what time it was, but --
3   Q.  Okay.
4   A.  -- at some point, yes.
5   Q.  Okay. What time do your kids usually go down
6       at that time? (Indiscernible.)
7   A.  I don't remember.
8   Q.  Yeah. Sure. I -- that's understandable. Just
9       trying to get a better flavor for when it was
10      that he was -- was in your presence on that --
11      that evening before the incident.
12  A.  We've fluctuated the kids' bedtimes so many
13      times, I don't remember when it was.
14  Q.  Okay. But you remember him -- you remember
15      seeing him and talking to him that --
16      evening before the day of his incident?
17  A.  Vaguely, yes.
18  Q.  Okay. This is -- in light of the fact that
19      your daughter had just been born, this is sort
20      of an absurd question, so I apologize already.
21      I just want to ask it just for the record. Had
22      you -- had -- had -- had there been any times
23      when you guys had gone away or been away from
24      the home for a series of days in the -- in the
25      weeks leading up to the incident?

Page 46

1   A.  Can you be more specific?
2   Q.  Yeah. Did you -- did you guys -- did you and
3       Jake -- and, again, I apologize given the
4       timing here, but I'm just going to ask it just
5       for the record. Do -- did you go away on
6       vacation? Did you go away for a weekend? Did
7       you go anywhere away from your home in the --
8       in the weeks leading up to the day of Jake's
9       incident?
10  A.  Ever since Daisy was born, we were pretty much
11      home because we had a newborn. I mean, we'd
12      leave to, like, go fishing locally or
13      something, but, I mean, nothing, like, out of
14      the state or --
15  Q.  Okay.
16  A.  -- anything.
17  Q.  Do you remember when the last time you went
18      fishing locally with Jake was?
19  A.  A few days before August 12th. I don't
20      remember the specific date --
21  Q.  Okay.
22  A.  -- but I remember a picture that I took.
23  Q.  Okay. It was on a day that he obviously was
24      not working?
25  A.  I'm not -- I'm not sure. I mean, obviously he

Page 47

1   wasn't at work because we were fishing.
2   Q.  Right.
3   A.  But I'm not sure if he had worked earlier or
4       was going to work later. I don't recall that.
5   Q.  Okay. Was it just a day trip to do fish -- to
6       fish?
7   A.  Yes, it was during the day.
8   Q.  Okay. Where did you go?
9   A.  I believe it was Poskin Lake.
10  Q.  Okay. How do you remember Jake being, you
11      know, physically health-wise the evening of
12      August 11th?
13  A.  He was his normal self. I mean, he usually
14      came home from work tired. It was a pretty
15      strenuous job. And then, of course, having the
16      baby up in the night and stuff, he -- it
17      wasn't, you know, an ideal sleeping -- I mean,
18      I woke up with the baby. I'm not sure if -- he
19      seemed like he kind of stayed asleep. But
20      either way, he was tired and ready to eat and
21      go to bed just like he was any other day. He
22      complained of having a leg cramp.
23  Q.  In his left leg?
24  A.  I'm not sure what leg it was.
25  Q.  Okay. Did he complain about headaches that

Page 48

1   night?
2   A.  Not that I recall.
3   Q.  Did he complain about anything else beyond the
4       leg cramps that you can recall?
5   A.  No.
6   Q.  Did he do anything for the leg clamps --
7       cramps, like eat or drink certain things or use
8       a heating pad or anything or -- or massage it
9       or anything? Do you remember anything like
10      that?
11  A.  He didn't do anything, no. I told him he
12      should eat some bananas because I had leg
13      cramps from pregnancy, and that helped, but --
14  Q.  Potassium?
15  A.  Yeah.
16  Q.  Yeah.
17  A.  But he didn't do -- do anything for it, no.
18  Q.  Okay. Were they leg cramps that were -- that
19      made him limp?
20  A.  No.
21  Q.  Okay. And you don't remember if it was in one
22      leg or both legs?
23  A.  I don't recall.
24  Q.  Anything else you can recall about his state of
25      being or his physical status that evening

12 (Pages 45 to 48)

Page 49

1    before he went to bed?
2  A.  No, nothing that I haven't said.
3  Q.  Do you remember when he went to bed that night?
4  A.  No.
5  Q.  And you recall -- I think you testified you
6    recall that evening you likely got up a few
7    times to attend to your daughter?
8  A.  Yes.
9  Q.  But he did not?
10 A.  Per usual, no.
11 Q.  Okay.
12 A.  That was kind of our -- our deal.  I -- I was
13   breastfeeding, so, I mean, there was not
14   really --
15 Q.  Sure.
16 A.  -- much that he could do.
17 Q.  Yeah.
18 A.  But...
19 Q.  Okay.  So you got up several -- a few times
20   during that evening; is that --
21 A.  I'm sorry.  What was that?
22 Q.  Did you get up a few times that evening then to
23   attend to your daughter?
24 A.  Most likely, no.
25 Q.  And at any time did you notice Jake in bed

Page 50

1    being any different than normal?
2  A.  No.
3  Q.  Okay.  All right.  At -- now look -- I wanted
4    to look forward now, but one more backward
5    question.  From that point, from that evening
6    of August 11th back a couple of days, including
7    when you were fishing, do you remember anything
8    that Jake brought to your attention about
9    cramps, headaches, numbness and tingling, or
10   any other symptoms that were -- you know, that
11   rang a bell to you now --
12 A.  Nothing.
13 Q.  -- in retrospect?
14 A.  No.
15 Q.  Okay.  The morning of August 12th then, do you
16   remember what time Jake got up?
17 A.  He was up before I was.
18 Q.  And what time would that have been?
19   Obviously you didn't know literally because you
20   were still -- still sleeping.  But do you
21   remember when it was roughly that he was up?
22 A.  I imagine he probably got up with the other two
23   kids, which -- I mean, anywhere between five to
24   six probably is --
25 Q.  Okay.

Page 51

1  A.  -- when they generally wake up.
2  Q.  On the evening of August 11th what -- what was
3    Jake anticipating working the next day?
4  A.  He anticipated being off.
5  Q.  He anticipated being off.  Okay.
6  A.  He had no indication that he was going to work.
7  Q.  Gotcha.
8  A.  I mean, he was on, I believe it was, an extra
9    board, so he could get called.  But he -- I
10   believe he was -- he wasn't first out.  I know
11   that.
12 Q.  Okay.  And he knew that?
13 A.  Yes.
14 Q.  And you knew that?
15 A.  Yes.
16 Q.  Did -- did you have plans to do something that
17   day because he was going to be around?
18   Anything different than --
19 A.  No.
20 Q.  Okay.  Was there any visitors to your home on
21   the evening of August 11th?  Anybody share
22   dinner with you guys or come -- come by to say
23   hello or...
24 A.  No.
25 Q.  Okay.  Did he talk -- do you remember if he

Page 52

1    talked to anyone that evening on the phone or
2    by -- start there.
3  A.  I don't know.
4  Q.  And do you happen to know if he was texting
5    with anyone that night?
6  A.  I don't know.
7  Q.  In the morning of the 12th of August up and to
8    the time that Jake left for work, were there
9    any visitors to the home?
10 A.  No.
11 Q.  No family members or neighbors or anybody?
12 A.  No.
13 Q.  Okay.  No other kids came over with their
14   parents to play with your kids?
15 A.  No.
16 Q.  Okay.  Do you know if he spoke to anyone for
17   any reason at all on the phone on the morning
18   of August 12th up to the time that he left for
19   work?
20 A.  He got a call from CMS.
21 Q.  Okay.  That's the crew management services, the
22   dispatching network; is that correct?
23 A.  I believe so.
24 Q.  Okay.  That's the call that comes in to -- to
25   assign him work; is --

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 53

```
 1   A.  Yes.
 2   Q.  -- that right?  When did the CMS call come in?
 3   A.  I'm not sure of the exact time.
 4   Q.  Okay.  Other than the CMS call, what -- what,
 5       if any -- or strike that.  Other than the CMS
 6       call, do you recall him speaking with anyone
 7       else on the phone that morning before leaving
 8       for work?
 9   A.  The phone -- on the phone, no.
10   Q.  Okay.  Anyone else in person?
11   A.  Not in person, no.
12   Q.  And do you know if he texted with anyone that
13       morning?
14   A.  Yes.
15   Q.  Who?
16   A.  I believe his name is Lesik, last -- last name,
17       I'm assuming.
18   Q.  L-E-S-I-K?
19   A.  Yes.
20   Q.  Who is -- who is that?
21   A.  A co-worker.
22   Q.  And do you know the first name?
23   A.  I don't.
24   Q.  How do you know he texted with Mr. Lesik?
25   A.  After he got the CMS call, he got a text from
```

Page 54

```
 1       Lesik saying, Sorry that I had to lay off,
 2       something about it being a -- he had to lay off
 3       last minute.  I can't remember.  Something --
 4   Q.  That's why Jake --
 5   A.  -- about a funeral or something.
 6   Q.  I broke the rule.  I didn't also let you
 7       finish.  Go ahead.
 8   A.  Yeah.  Lesik just said, Sorry I had to lay off
 9       last minute.  Usually his co-workers would, if
10       -- if they're going to lay off, like, you send
11       a courtesy text or call, you know, let someone
12       know like, Hey, I'm laying off tonight, just so
13       they can prepare themself for sleep and
14       otherwise to go to work.  So he just apologized
15       for laying off last minute, which then made
16       Jake get called, which he wasn't expecting.
17   Q.  Jake moved up in -- on the extra board because
18       Mr. Lesik had called off?
19   A.  Yes.  I believe that Lesik was first and Jake
20       was second because Lesik laid off, and then
21       Jake got called.
22   Q.  So when you referred to earlier as Jake's
23       call -- his call being busted, that's what --
24       what you've just described is what happened?
25   A.  No.
```

Page 55

```
 1   Q.  No.  Okay.  Go ahead.  Explain that.
 2   A.  No.  His --
 3   Q.  Let me ask you one more question, though, for
 4       timeline purposes.  Do you remember when that
 5       was that CM -- I think I asked you this, but
 6       I've forgotten already -- when CMS called?
 7   A.  I don't.  I mean, it was before 8 in the
 8       morning.
 9   Q.  Before 8?
10   A.  Well, 8:30.  I mean, it was --
11   Q.  Okay.
12   A.  -- it was pretty early.
13   Q.  Okay.
14   A.  I -- I was awake, though.
15   Q.  Okay.  What time do you remember awakening that
16       morning?  It was before 8:30 when the call came
17       in?
18   A.  Yeah.
19   Q.  Okay.  And then Lesik texted him shortly
20       thereafter?
21   A.  Yes.
22   Q.  Okay.  Apologizing?
23   A.  Yes.
24   Q.  Okay.  And then explain the busted call now.
25   A.  How I became aware of the busted call was I
```

Page 56

```
 1       called Jake later in the morning after he had
 2       left.
 3   Q.  What time did he leave?
 4   A.  I'm not sure what time he left.  He always left
 5       early so that in case anything happened on his
 6       way to work that he wouldn't be late.  He was
 7       very punctual.
 8   Q.  How far from your home to work was it?
 9   A.  About 50 minutes.
10   Q.  Okay.  So he'd typically leave an hour and a
11       half or so before work?
12   A.  If he was -- yeah, hour and a half to two
13       hours.  I mean, he liked to give himself --
14       served him -- served him well over the years,
15       so...
16   Q.  Sure.  Okay.  So explain how the call was
17       busted then.
18   A.  I just became aware of it when I called him
19       later in the morning.  I just wanted to make
20       sure that he got to work okay.  And I assumed
21       for his phone to be off, which would then tell
22       me obviously yes, he got to work fine, like
23       he -- he turned off his phone at work.  But he
24       answered his phone, and he --
25   Q.  Okay.
```

14 (Pages 53 to 56)

Q & A COURT REPORTERS, INC.
(715) 834-9812

1   A.  -- said that he -- that his call got busted, so
2       he was taking a nap.
3   Q.  And what did that mean to you, the call got
4       busted?
5   A.  Like what does it technically mean?
6   Q.  Yeah.
7   A.  That they pushed the call back.
8   Q.  His start time was pushed back?
9   A.  Yes.
10  Q.  Yeah.  To when?
11  A.  I'm not sure.
12  Q.  Okay.  When was the original start time?
13  A.  I'm not sure.
14  Q.  And you're not sure when he left the home?
15  A.  No.
16  Q.  So if he got the call around 8:30 from CMS, can
17      you estimate how much time it was that he was
18      still at home before he left?
19  A.  I imagine he probably got the call in the 7
20      o'clock hour.
21  Q.  Okay.
22  A.  I'm just not specific on the time.  I mean, it
23      was --
24  Q.  Okay.
25  A.  -- it was certainly before 8:30, but, you know,

1       from like 6:30 to 8:30 or something.  I'm not
2       --
3   Q.  Okay.
4   A.  I would imagine was prob -- probably was in the
5       7 o'clock hour.
6   Q.  Okay.  And then he left how many hours
7       thereafter?
8   A.  After he got the call, he probably left
9       approximately 45 minutes after he got the call.
10  Q.  Okay.  But you were up by then.  You saw him
11      that morning?
12  A.  Yes.
13  Q.  Okay.  And when you contacted him to see if he
14      had made it to work okay and he told you that
15      his call had been busted and he was napping,
16      where was it that he was napping?
17  A.  He said Kwik Trip.
18  Q.  Do you remember which one?
19  A.  I don't know.  There's several between our
20      house and the yard in Altoona.
21  Q.  Okay.  And had you had -- did you have any
22      other conversations, phone conversations, with
23      Jake until he arrived at work at the later
24      call, the later start time?
25  A.  I don't remember.

1   Q.  Okay.  So you were awake and with Jake for a
2       couple hours on -- on that morning before he
3       left or -- or less?
4   A.  Yeah, probably two hours, approximately.
5   Q.  Okay.  And during that time, Jake had an -- an
6       incident in your kitchen; is that right?
7   A.  Yes.
8   Q.  And he collapsed in your kitchen onto the
9       floor; is that right?
10  A.  I don't know if I would use the word
11      "collapsed."  I didn't see him do it, so...
12  Q.  Okay.  Did you hear him fall?
13  A.  Yes.
14  Q.  And was -- was he with the kids, the -- the two
15      older kids at the time?
16  A.  They were in the proximity, yes.  I'm -- I'm
17      not -- there were kids.  I'm not sure which
18      ones they were.
19  Q.  I understand.  You were already awake, or were
20      you awakened by him falling?
21  A.  I was already awake.
22  Q.  Okay.  And you heard him fall, and you came
23      running over to see what happened?
24  A.  No.
25  Q.  Okay.  What happened?

1   A.  He was behind me, and I was standing towards
2       the kitchen table talking to the kid, child,
3       kids.  I don't know how many there were.
4   Q.  So you were both in the kitchen?
5   A.  Yes.
6   Q.  But your backs were towards each other; yours
7       towards the kitchen table, his towards the sink
8       or whatever?
9   A.  Say that again, please.
10  Q.  Your backs were toward each other even though
11      you were both in the kitchen; you're looking
12      away from him and he's looking away from you?
13  A.  He was kind of looking -- he was looking
14      towards the side.  I was facing the kids.  So
15      the countertop runs this way (indicating), and
16      I was standing facing, so my -- he was
17      completely towards my back, but, I -- I mean,
18      out of -- I mean, he could see me, I suppose.
19  Q.  Okay.  But you --
20  A.  He wasn't directly -- we weren't directly
21      back-to-back, no.
22  Q.  Right.  So you didn't -- you didn't see him
23      fall?
24  A.  No.
25  Q.  Okay.  So -- but you heard him, and so you

Page 61

```
 1        turned around?
 2   A.  Yes.
 3   Q.  And you went to his side.  Was he conscious?
 4   A.  Can you define conscious?
 5   Q.  Was he speaking to you?
 6   A.  Not at the beginning, no.
 7   Q.  Because you asked him what happened?
 8   A.  Yes.
 9   Q.  Are you okay, I would imagine; is that right?
10   A.  Yes.
11   Q.  And he didn't respond?
12   A.  Yes.
13   Q.  Is that correct, he did not respond?
14   A.  He did not respond, no.
15   Q.  For how long was he unresponsive to you?
16   A.  In the time it seems like a lifetime.
17   Q.  Sure.
18   A.  Or in the moment it seems like a lifetime.  10,
19        15 seconds.
20   Q.  Okay.  Did you have to slap his face or -- or
21        shake him or do something to get him to be
22        responsive?
23   A.  No.
24   Q.  Did he become re -- back to being responsive on
25        his own then?
```

Page 62

```
 1   A.  Yes.
 2   Q.  Did he have any gashes or cuts or anything on
 3        his body from the fall?
 4   A.  Not that I'm aware of.
 5   Q.  Do you know if he hit the -- was the countertop
 6        between you and Jake?
 7   A.  No.
 8   Q.  Was there anything that you -- having seen the
 9        scene, is there anything that he would have hit
10        on his way to the ground, the floor?
11   A.  No.  I mean, there was no obstacles or -- I
12        mean, it was just -- it was just the countertop
13        where -- where he was standing at.
14   Q.  Do you have any reason -- do you have any
15        knowledge one way or the other whether his head
16        hit the countertop?
17   A.  I don't know.
18   Q.  Okay.  And what type of a floor -- flooring was
19        it there at the time?
20   A.  Tile.
21   Q.  Okay.  Ceramic tile?
22   A.  I'm not sure of the kind.
23   Q.  Okay.  And when you -- when -- when you -- when
24        you saw him, was he facedown or faceup?
25   A.  Faceup.
```

Page 63

```
 1   Q.  On his back laying --
 2   A.  Yes.
 3   Q.  When he -- after that period of time where he
 4        was unresponsive and then came to, did you ask
 5        him what happened?
 6   A.  Yes.
 7   Q.  What did he say?
 8   A.  I don't know.  That's what he said.
 9   Q.  He said -- okay.
10   A.  Yeah.
11   Q.  Was he able -- was he feeling any symptoms --
12        when he came to, was he feeling any symptoms in
13        his body that he -- that he shared with you?
14   A.  He just said that he felt nauseous.
15   Q.  Okay.  Did he throw up?
16   A.  Yes.
17   Q.  Right there?
18   A.  No.
19   Q.  He got up?
20   A.  Yes.
21   Q.  He went to the bathroom?
22   A.  Yes.  I'm not sure -- I -- he stood up.  He
23        jumped up.  I'm not sure.  He might have stood
24        at the countertop continuing to make his
25        smoothie.
```

Page 64

```
 1   Q.  Is that what he was doing?
 2   A.  Yes.
 3   Q.  Okay.
 4   A.  Making a green smoothie.
 5   Q.  Okay.
 6   A.  I believe he was probably there for a short
 7        period of time, and then he felt like he was
 8        going to throw up, so he ran to the -- well, he
 9        got to the bathroom.  I don't know the speed he
10        went, but --
11   Q.  Okay.
12   A.  I don't remember the speed he --
13   Q.  And I think the records indicate that he was
14        throwing up some blood.
15   A.  No.
16   Q.  No.  Did you observe that?
17   A.  It -- there was red, and I --
18   Q.  Yeah.
19   A.  Of course, I was concerned that it was blood,
20        but --
21   Q.  Right.
22   A.  -- he said, No, I ate a bunch of watermelon.
23        And then when I looked closer at it, it very
24        much looked like watermelon.  It did not at all
25        look like blood to me.
```

16 (Pages 61 to 64)

Page 65

1  Q.  Okay.  Did he throw up again before he left for
2      work?
3  A.  No.
4  Q.  Was he bleeding anywhere else, like in his ears
5      or from his nose or in his mouth or anything
6      like that, that you could tell?
7  A.  No.
8  Q.  When he -- you know, there was some indication
9      in the medical records that when he -- when he
10     had this episode, he was -- he was shaking.  Do
11     you remember that?
12 A.  I don't remember that, no.
13 Q.  Okay.  It's like non-spontaneous jittering or
14     shaking.  You don't remember that?
15 A.  I don't remember that, no.
16 Q.  Okay.
17 A.  I'm not saying it didn't happen.  I just don't
18     remember.
19 Q.  As you sit here today, you don't re --
20 A.  Yeah, I just remember him -- I can see him
21     laying on the floor, but I don't remember him
22     --
23 Q.  Did it scare you?
24 A.  Of course, yes.
25 Q.  Had you ever seen this happen before?

Page 66

1  A.  No.
2  Q.  Once he got up and threw up, what happened
3      next?  Did he sit down?  Did he lay down?  Did
4      he...
5  A.  He went to the bedroom, which was across the
6      hall, to lay down.  He wanted to take a rest
7      before he went to work.
8  Q.  Okay.  He knew he was going to work at this
9      time -- at -- at the time this -- this
10     occurred, he knew he was going to work?
11 A.  Yes.  The call from CMS and the text message
12     from Lesik happened before this incident, which
13     he was very upset about.
14 Q.  Was he -- was he upset about going to work?
15 A.  Yes.
16 Q.  Why?
17 A.  Because he felt like he was coming down with a
18     cold or something.  He just didn't feel right.
19     That's why he was making a green smoothie, to
20     try to get a lot of vitamins and stuff so that
21     he would feel better.
22 Q.  Okay.  And he -- and he told you the night
23     before that he didn't feel bet -- feel well
24     either?
25 A.  No, he did not say the night before.

Page 67

1  Q.  Okay.
2  A.  He just said that he -- his leg -- he had a leg
3      cramp.
4  Q.  Okay.  But the morning of August 12th, he --
5      had he told you he wasn't feeling well even
6      before he collapsed?
7  A.  Yes, because the CMS call came before he -- and
8      I wouldn't -- I don't know that I would say the
9      word "collapsed."  I mean, he was on the
10     ground.  I don't --
11 Q.  You didn't see it, but somehow he --
12 A.  Somehow he got to the floor, yes.
13 Q.  Right.  And after he got the CMS call that you
14     believe was probably around 6:30 or 7, after
15     you had awakened, he shared with you that he
16     didn't feel well?
17 A.  I was there when he got the CMS call.
18 Q.  I'm sorry.  You were there when he -- when he
19     got the CMS call, and so you were already
20     awakened at that time, and so you heard --
21     you -- you heard him talking to CMS?
22 A.  Yes.
23 Q.  And then he hangs up from CMS and probably at
24     that point is when he says to you -- expresses
25     to you his -- his -- him being upset that he

Page 68

1      has to go to work that day?
2  A.  Yes.
3  Q.  Because he's not feeling well?
4  A.  Yes.
5  Q.  And he told you that?
6  A.  He -- I don't remember specifically what he
7      said, but he said that if he knew that he was
8      going to get called, he would have laid off.
9      But now that he got called, you can't lay off
10     once you get called or you're penalized.  So he
11     had to go to work, and he was pretty upset
12     about it because he wanted to stay home.
13 Q.  Okay.  So your testimony is that even if you're
14     sick and you receive a call, that you can't --
15     you can't lay off?
16 A.  Correct.
17 Q.  Even though you're aware that Mr. Lesik or
18     Lasik had done the same thing?
19 A.  I don't know what Lesik laid off for.
20 Q.  Okay.
21 A.  I know that he had said that he had already had
22     one strike -- I don't know what the term is --
23     on his record, and you get three, and you're
24     fired.  And this -- if you lay off -- if CMS
25     calls you -- I don't know if it's -- what the

17 (Pages 65 to 68)

Page 69

```
1    specific terms are, but if CMS -- CMS calls you
2    and you tell them no for whatever reason that
3    then you get another strike, and he would have
4    gotten -- if he got one more, then he would
5    have been fired.
6    Q.   And it's your understanding that if -- it's
7         your understanding -- or it's your memory,
8         first of all, that you -- that he was not
9         feeling well before he got the call from CMS;
10        is that right?
11   A.   I had woken up very shortly before he got the
12        CMS call.  I don't believe that he had
13        expressed to me that he wasn't feeling well
14        before he got the call.
15   Q.   But you know in talking to him after the call
16        that he did not feel well?
17   A.   Yes.
18   Q.   At the time he got the call?
19   A.   Yes.
20   Q.   And your testimony is that he did not tell
21        them -- tell CMS that he did -- that he wasn't
22        going to accept the call because he felt like
23        he could not refuse it?
24   A.   Correct.  Well, he -- he could have refused it,
25        but it would have given him a second strike on
```

Page 70

```
1    his record, and he wasn't -- you know, he had
2    a -- he had a wife and three kids that were
3    depending on him.
4    Q.   And your testimony is that if you're sick and
5         you receive a call from CMS, you're not
6         permitted to refuse the call for that reason?
7    A.   Without repercussions, yes.
8    Q.   That's your understanding?
9    A.   Yes.
10   Q.   How did you come to that understanding?
11   A.   Jake told me that.
12   Q.   When?
13   A.   It was kind of common knowledge because he --
14        we had to plan out a lot of -- he liked to work
15        the extra board because he got a decent
16        paycheck, and he got to be home with me and the
17        kids a lot.  But we, of course, always had to
18        plan our life, what we were going to do, where
19        we were going to go based off of when he was
20        going to get called.  And you can kind of tell
21        based on what trains are going out and where
22        you are on the board who is going to lay off.
23        Generally people tell you when they're going to
24        lay off, when you're going to go to -- excuse
25        me -- when you're going to go to work.  I'm
```

Page 71

```
1    sorry.  I forgot your original question.
2    Q.   That's okay.  I was asking when it was that --
3         that Jake told you that those -- there were
4         repercussions for not accepting a call even if
5         you're sick.
6    A.   Yeah.  So, yeah, I mean, that was just kind of
7         common knowledge that we have to be within
8         three hours of wherever he was working because
9         once he got called, he had to leave.  And then
10        it was discussed that morning because I was
11        very much trying to convince him to stay home,
12        and he said, I can't, I have to go to work.
13   Q.   And, again, did you know that he was -- you --
14        you knew that he was not feeling well prior to
15        his incident in the kitchen where he fell?
16   A.   Yes, because the CMS call came before he fell.
17   Q.   And about how long was it after the CMS call
18        that he fell?
19   A.   Approximately within a half an hour.
20   Q.   Okay.  And then, of course, you discussed it
21        with him after the -- after he had fallen,
22        after he had thrown up, and now he's resting?
23   A.   Oh, yes.
24   Q.   What did you -- what do you remember talking to
25        him about with respect to work?
```

Page 72

```
1    A.   I was very much trying to convince him to not
2         go to work.
3    Q.   Okay.
4    A.   I said -- I was asking him what happened, and
5         he just said, I don't know, and I didn't know.
6         I mean, sometimes you fall, and you just get
7         the wind knocked out of you.  You know, I mean,
8         that's happened to me several times, and you
9         can't -- you can't like -- you can't catch your
10        breath.  You can't -- I mean, that very -- I --
11        I didn't know what happened in the kitchen, and
12        so -- but, of course, I was concerned.  And I'm
13        usually generally a little overcautious, and so
14        I was like, Well, let -- well, let's just go to
15        the doctor, let's go to the doctor.  Really,
16        like we can go to the doctor quick before work.
17        Like, let's just go to the clinic and, like,
18        see if they have any thoughts or -- and he
19        said, No.  He's like, I just -- I just want to
20        take a nap, just, you know, let me sleep.  I
21        just want to get a little nap in before I go to
22        work.  And -- and he was very -- I mean, it was
23        kind of an argument of me saying, I want -- I
24        want you to go to the doctor, and him saying,
25        No, I can't.  I have to go to work.  I already
```

18 (Pages 69 to 72)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 73

```
 1      got called.  I had to take the call because I
 2      got called.  I don't have a choice.  I have to
 3      go to work.  I don't have time to go to the
 4      doctor.  I have to go to work.
 5   Q.  And did he nap then?
 6   A.  Not really.  I mean, his eyes were closed while
 7      I was talking with him trying to sleep.  He was
 8      trying to, like, shoo me out of the room so he
 9      could take a nap, and I was like, No, like I --
10      we need to talk about this.  Like, what --
11      what's going on.  Like, we got to figure this
12      out, you know.  And he's like -- you know, was
13      very adamant that, I don't have any options
14      here because I have to go to work.  I accepted
15      the call.  I have to go, so just let me take a
16      nap.
17   Q.  Did you consider calling 911?
18   A.  Yes.
19   Q.  Did you?
20   A.  No.
21   Q.  Why not?
22   A.  Because he got up right before I was going to
23      call 911.  I was turning to go grab my phone,
24      and he got up and started talking.
25   Q.  Oh, you're talking about when he -- when you
```

Page 74

```
 1      found him on the ground in -- or on the floor
 2      of the kitchen is when you were going to call
 3      911 when he non --
 4   A.  Yes.
 5   Q.  -- when he was nonresponsive.  That's what --
 6      that's what prompted you to think you should
 7      call 911?
 8   A.  Yeah.  I mean, I don't know what the term of --
 9      of what he was.  I mean, he was just -- he was
10      laying there not talking to me.
11   Q.  He wasn't answering your questions?
12   A.  Right.
13   Q.  And I imagine they were at a pretty high volume
14      when you were probably trying to --
15   A.  Not at first because I --
16   Q.  Yeah.
17   A.  -- thought maybe he would just -- you know,
18      joking around or, I mean, I was just like what
19      happened, you know.
20   Q.  Right.
21   A.  And then I, like, went over to him, and I'm
22      standing above him looking at him, and he
23      was just -- he was just looking straight up.
24      And I was like, Are you okay, and he didn't --
25      he didn't respond.  Then I was -- obviously
```

Page 75

```
 1      then I started getting as -- as time was going
 2      on and he wasn't responding, I mean, I -- I
 3      tried to give him a little bit of time.  I
 4      mean, like I said, it was probably 10 or 15
 5      seconds because I thought, I don't want to
 6      overreact and call an ambulance if he just got
 7      the wind knocked out of him.  Like, I have no
 8      idea what happened.
 9   Q.  But as time went on, when those 10 or 15
10      seconds went on, that's when you thought, I --
11      geez, I better call 911?
12   A.  Yeah.  Towards the end of the 10 to 15 seconds,
13      I was like, I don't know what this is, but I
14      don't want to take a chance, like if it's --
15   Q.  And --
16   A.  -- something serious.  And so I was turning to
17      go get my phone, and then he stood up and
18      started talking.
19   Q.  And nothing you were doing or saying to him
20      was -- was -- was -- was helping him come to;
21      he came to naturally?
22   A.  Yes.
23   Q.  Okay.
24   A.  I -- I -- yes.
25   Q.  How long from the time that he got up and from
```

Page 76

```
 1      the -- from falling until he left for work?
 2   A.  I don't know.  Approximately like 40, 45
 3      minutes or so.
 4   Q.  During that time, did -- did -- did -- did --
 5      you were -- you probably never strayed too far
 6      from him?
 7   A.  No.
 8   Q.  Okay.
 9   A.  No.
10   Q.  And -- and you continued to talk to him?
11   A.  Yes.
12   Q.  Talking to -- trying to convince him not to go
13      to work, among other things?
14   A.  Yes.
15   Q.  Did he ever say to you, This has happened
16      before, I can re -- this -- it'll -- at some
17      point in my life I've had this same thing so
18      I'll be okay?
19   A.  He never said that, no.  And --
20   Q.  Okay.
21   A.  -- I was never aware of anything like that
22      happening then or now.
23   Q.  Okay.  Did you feel he was okay to drive to
24      work?
25   A.  Yes.
```

19 (Pages 73 to 76)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 77

1   Q.  Why?  How did you make that determination?
2   A.  He was able to talk to me.  He was walking.  He
3       was thinking.  I mean, he just seemed like he
4       had a cold or something.  I mean, everybody
5       when they're getting sick just, you know, acts
6       like that.
7   Q.  Did he say -- after the incident in the kitchen
8       but before he left, did he -- he said he didn't
9       know what caused him to fall in the kitchen and
10      have that episode, but did he say anything else
11      about what he thought was wrong with him?
12  A.  No.
13  Q.  Other --
14  A.  He just said, I don't know.
15  Q.  And he -- but he continued to say he didn't
16      feel well?
17  A.  I don't know that he specifically said that he
18      still didn't feel well.  It was evident he
19      didn't feel well, and he just said, I just want
20      to take a nap before I have to go to work.
21  Q.  And when you say "it was evident he didn't feel
22      well," what was evident to you that he did not
23      feel well?
24  A.  That he was wanting to go take a nap while I'm
25      trying to have a conversation with him.

Page 78

1   Q.  He seemed excessively sleepy?
2   A.  I mean, I guess if you're trying to take a nap,
3       you close your eyes, so I don't -- I don't know
4       if it was excessive sleepiness or he was just
5       really adamant that he wanted me to leave him
6       alone, but...
7   Q.  Nevertheless, you observed -- having known him
8       so well, you observed in -- that he was not
9       well, he was not himself?
10  A.  Yes, to the extent I -- I didn't know, but I
11      knew obviously he wasn't his normal self.
12  Q.  I want to continue with the timeline, but I --
13      I want to fast-forward a minute to later that
14      evening at the Mayo Clinic when you -- in
15      Eau Claire where Jake was cared for.  Do you
16      remember that?
17  A.  Yes.
18  Q.  Do you remember being there?
19  A.  Yes.
20  Q.  And you were with Jake, I would imagine, at all
21      times during his stay that evening at
22      Mayo-Eau Claire?
23  A.  No.  They would not let me in the room.
24  Q.  Okay.  At all?
25  A.  Eventually they did, but not for a long while.

Page 79

1   Q.  Okay.  When did you arrive at Mayo-Eau Claire
2       that evening?
3   A.  I'm not sure of the time.  I mean, I -- he had
4       been there a decent while.  I mean, it takes --
5       I -- the kids were all sleeping.  I was waiting
6       for him to come home, and --
7   Q.  Right.
8   A.  -- that was when I'd -- I had to get all the
9       kids in the car and --
10  Q.  Okay.
11  A.  -- get down there.  So, I mean --
12  Q.  Yeah.
13  A.  -- it probably took me about an hour to get
14      down there.
15  Q.  Okay.  And at Mayo-Eau Claire you would have
16      had communications with the doctors and the
17      nurses throughout the time there; correct?
18  A.  Yes.
19  Q.  And at all times did you tell the truth to the
20      doctors, the nurses, and the health care
21      professionals at the Mayo-Eau Claire?
22  A.  Yes, of course.
23  Q.  You told -- when they asked you things about
24      Jake's history and things of that nature, told them
25      you -- you accurately and truthfully told them

Page 80

1       what you could recall; is that true?
2   A.  I wouldn't have lied.
3   Q.  Right.
4   A.  I don't -- I mean, I don't remember then what I
5       said specifically, but I -- I would not have
6       lied, no.  I would have been -- I mean,
7       obviously my husband is in a dire situation.
8       I'm going to do anything and everything I can
9       to help him.
10  Q.  Including telling an accurate story about -- an
11      accurate picture for the health care providers
12      about what happened to Jake that morning?
13  A.  Of course, yes.
14  Q.  And so if in the medical records it says that
15      you told the health care professionals there
16      that Jake had complained of a headache and
17      nausea the day before, that would be accurate?
18  A.  I don't recall that sitting here today that he
19      complained of that, no.
20  Q.  But you have no reason to doubt the medical
21      professionals recording you telling them that?
22  A.  Well, I would have told them the truth.  If
23      they wrote it down accurately, I don't know.
24  Q.  Okay.  And then you would have no reason to --
25      to dispute the accuracy of the health care

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 81

1      providers' recording that you told them that
2      that morning of August 12th Jake told you that
3      he, quote, felt weird, end quote; is that
4      right?  You have no reason to doubt that that's
5      accurately recorded here in the medical
6      records?
7  A.  I don't recall saying that.  Again, I would not
8      have lied to them.  I would have told them
9      anything and everything I could.  Again, if
10     they interpreted that or wrote that down
11     correctly I am not sure of.
12 Q.  And further, you have -- you would have no
13     reason to doubt the accuracy of the health care
14     providers who recorded you telling them on the
15     evening of August 12th that that morning you
16     recall Jake's -- one of Jake's eyes was,
17     quote/unquote, weird, it looked weird, it was
18     reacting weirdly?  You don't have any reason to
19     doubt the accuracy of that report; correct?
20 A.  Sitting here today, I don't remember that being
21     a symptom.  Again, I would have told them
22     complete honesty.  Again, if they interpreted
23     that correctly, wrote that down correctly, I'm
24     not sure.
25 Q.  And then you went on to tell the health care

Page 82

1      providers at Mayo-Eau Claire that Jake fell at
2      home, and we've discussed that fall; correct?
3  A.  Yes, he fell at home.
4  Q.  Is there anything else you can remember about
5      the episode Jake had before leaving for work
6      that morning, either discussions you had with
7      him or observations you made of him?
8  A.  Observations, no.  You know, I mean, I was --
9      very much as soon as he got up from laying on
10     the floor, I was constantly asking him what
11     happened, like, because I -- I didn't even know
12     if he -- I mean, he could have slipped on some
13     water.  The fridge is right there.  I mean, I
14     didn't know why he was on the ground.  I didn't
15     know if it was a medical condition or if it was
16     just, you know, clumsiness or he slipped, and
17     so I was trying to find that out from him.  And
18     he just said, I don't know, I -- I need to
19     sleep before I have to go to work, and I was
20     just trying to convince him, like, Forget work,
21     like, let's just make sure that you're okay,
22     and he said, I'm -- you know, he said, No, I
23     have to go to work, I can't miss work.  I
24     followed him out to his car when he was
25     leaving, you know, to -- still trying to

Page 83

1      convince him that, Let's just go to the doctor
2      quick, you know, let's try to do something,
3      let's just call the nurse, or let's do
4      something.  And he said, No, I have to go to
5      work, I don't have a choice.  And that -- that
6      was the extent of it.
7  Q.  Were you present at any time with Jake that
8      evening of August 12th when he was relating --
9      when he was discussing his symptom history with
10     the health care professionals at Mayo?
11 A.  They let me see him for a very brief period of
12     time before the Life Flight took him to tell
13     him I loved him, give him a hug and a kiss, let
14     the kids see him.  I don't know if he was
15     discussing anything with them.  I don't
16     remember that.
17 Q.  So you don't recall one way or the other
18     hearing or being part of a conversation on the
19     evening of August 12th with Jake and the health
20     care providers about his --
21 A.  Like me, Jake, and the providers?
22 Q.  Exactly.
23 A.  No.  I mean, they came and asked me questions
24     of --
25 Q.  Privately?

Page 84

1  A.  -- what I knew.
2  Q.  Separately?
3  A.  Right.
4  Q.  Okay.
5  A.  But, I mean, I could hear -- the back waiting
6      room where they brought me and the girls to, I
7      could see his feet on the bed.  They had the
8      curtain closed partway, but I could see him,
9      and I could see that there was people around
10     him, and I could hear voices, but I don't -- I
11     was certainly not involved in those
12     conversations.
13 Q.  Do you remember Dr. English (phonetic) at -- at
14     Mayo, a neurologist?
15 A.  I met so many doctors.
16 Q.  I'm sure you did.
17 A.  I -- they all work on teams and stuff, so
18     there's -- there's tons of them.
19 Q.  Did your -- you continued to tell physicians
20     and nurses and health care providers throughout
21     Jake's remaining days the truth about what you
22     knew about his symptoms and about his issues;
23     correct?
24 A.  Yes, of course.
25 Q.  And so you would have no reason to -- to doubt

21 (Pages 81 to 84)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 85

```
 1        Dr. English's report of a conversation he had
 2    with you where you told him that on Friday
 3    evening, the night before Jake falling in the
 4    kitchen, that Jake told you he felt nauseated
 5    and had a dull headache; is that correct?
 6  A.  I don't remember that symptom.
 7  Q.  Okay.
 8  A.  All I remember from the night before the
 9    incident was him complaining of a leg cramp.
10  Q.  But you have no reason to doubt the accuracy of
11    Dr. English's reporting of what you told him?
12  A.  Again, I always would have told the truth to
13    the doctors because that is what was best for
14    Jake, and I'm an honest person.  Again, if --
15  Q.  Sure.
16  A.  -- they interpreted that correctly and wrote it
17    down correctly --
18  Q.  Sure.
19  A.  -- I -- I can't vouch for that.
20  Q.  Same question.  You have no reason to doubt
21    Dr. English's recording of conversation that --
22    or record of a conversation he had with you
23    where he says that you told him that Jake was,
24    quote, A little off compared to his usual self
25    the night before the incident?
```

Page 86

```
 1  A.  I don't --
 2  Q.  No reason to doubt the accuracy of that?
 3  A.  I don't recall him being a little off.  I
 4    remember him being tired like he generally was
 5    when he got home from work and complaining of a
 6    leg cramp.  And I -- again, I would have always
 7    told the truth to the doctors.
 8  Q.  Okay.
 9  A.  If they wrote it down right, I -- I don't know.
10  Q.  And so you also would have told the truth to
11    the -- to Dr. English when he recorded -- or it
12    would have been the truth that he recorded you
13    telling him that Jake seemed a little slower
14    Saturday morning, little slower than normal; is
15    that correct?  That would have been the truth
16    that you told?
17  A.  I would have always told the truth, yes.  I --
18    I mean, anybody that's sick is slower than
19    their normal self.
20  Q.  And it would have been the truth when you
21    told -- or you would have been telling the
22    truth when you told Dr. English that Jake after
23    the fall had experienced some bilateral arm
24    tremors; is that correct?
25  A.  I don't recall that being a symptom.
```

Page 87

```
 1  Q.  But you always told the doctors the truth;
 2    correct?
 3  A.  Yes, I've always told the doctors the truth.
 4  Q.  Looking back now to midday of the 12th of
 5    August, Jake's left your home, you've called to
 6    check on him.  That's one of the reasons you
 7    called to check on him was because of the
 8    episode and his -- that morning at -- at -- in
 9    the kitchen; is that correct?
10  A.  Yes.  And, I mean, I generally would talk to
11    him before he went to work just --
12  Q.  Okay.
13  A.  -- to make sure he got there safely.
14  Q.  Sure.  It's a long drive and --
15  A.  Right.
16  Q.  -- just to make sure?
17  A.  Yeah.
18  Q.  That's when he told you that his call had been
19    busted and he was -- he was resting, napping at
20    the -- at the Kick Stop?
21  A.  Kwik Trip, yes.
22  Q.  Kwik Trip.  I'm sorry.  In the interim had he
23    texted you or tried to reach out to you at all
24    until the time you connected with him?
25  A.  Not that I recall.
```

Page 88

```
 1  Q.  Then did he tell you at the Kwik Trip when it
 2    was he was now supposed to start working?
 3  A.  I don't know.
 4  Q.  Did you check in with him or did he check in
 5    with you again before he arrived at the
 6    terminal and began his workday?
 7  A.  I don't recall.
 8  Q.  Based on what you had observed him -- happening
 9    to him that morning and the observations you
10    made about him not being well, did you ask him
11    when you spoke to him how he was feeling?
12  A.  I don't recall what I asked him, no, or if I
13    asked him that.
14  Q.  Okay.  From that moment all the way until he
15    called you to come get him at work later that
16    evening, had -- did you speak with him again?
17  A.  No.
18  Q.  Did you text with him at all during that period
19    of time?
20  A.  No.  His phone was off when he was at work.
21  Q.  Sure.  Did anyone else reach out to you, any of
22    his co-workers or managers, during the shift
23    all the way up until the -- the -- the time
24    that Jake called you to come get him?
25  A.  No.
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 89

1  Q.  Any text messages or any other manner in which
2      anybody reached out to you that -- during
3      Jake's shift?
4  A.  No.  I -- no, not before he called me.
5  Q.  Okay.  Were you concerned about him going to
6      work, about his ability to work?
7  A.  I didn't specifically think about his ability
8      to work.  I was just worried about him and his
9      health.
10 Q.  You were concerned about his health?
11 A.  Yeah.  That's why I was trying to get him to go
12     to the doctor.
13 Q.  Sure.
14 A.  I was concerned because I didn't -- I didn't
15     know what it was --
16 Q.  Right.
17 A.  -- you know.
18 Q.  Did you reach out to any of his co-workers or
19     his manager to -- to say to them, I don't
20     believe Jake should be at work today, can you
21     keep an eye out on him?
22 A.  No.  I don't believe I have any of their
23     contact information.  I mean, he might have had
24     a -- a few numbers in my phone, but I --
25     there's so many people that work there and so

Page 90

1      many different man -- I mean, I -- I would have
2      no idea who to call.
3  Q.  Had you ever met any of his managers prior to
4      the time that you -- that you -- prior to
5      the -- to August 12th, had you ever met any of
6      his managers or co-workers?
7  A.  Possibly.
8  Q.  At some point that night did you call Jake's
9      brother?
10 A.  Yes.
11 Q.  Was that after Jake had called you?
12 A.  Yes.
13 Q.  Was that the first call you made after Jake
14     called you?
15 A.  There was several calls between mine and Jake's
16     phone.
17 Q.  Okay.  Do you still have the -- the phone -- or
18     is -- is the number the same -- is the number
19     on your cell phone the same as it was then on
20     the date of the incident?
21 A.  Yes.
22 Q.  Who is your carrier?
23 A.  Then it was AT&T.
24 Q.  And what's the phone number?
25 A.  (715)205-7765.

Page 91

1  Q.  And what was Jake's phone number, if you
2      remember?
3  A.  (715)205-7764.
4  Q.  And who was his carrier on that day?
5  A.  Verizon.  I'm sorry.  AT&T.
6  Q.  Okay.  What's Jake's brother's name?  Is it
7      Steve?
8  A.  His oldest brother is Josh.
9  Q.  Josh.  I'm sorry.
10 A.  And his young -- his younger -- younger brother
11     is Joe.
12 Q.  Joe.  And Josh worked -- works for the
13     railroad?
14 A.  Previously he did.
15 Q.  Were you -- were -- your communications with
16     your husband at the end of his shift when he
17     called to get you, were they only by -- by
18     voice or were they -- were there any texts?
19 A.  I don't recall.
20 Q.  So tell -- tell me -- I'm kind of bouncing
21     around this.  I'm not doing it in a linear way.
22     So tell me when -- when it is that you recall
23     -- well, strike that.  Is the first notice that
24     you received of any problems with Jake Jake's
25     own call to you?

Page 92

1  A.  Yes.
2  Q.  And when was that call?
3  A.  In the 8 o'clock hour in the evening.
4  Q.  8 o'clock?
5  A.  I believe so.  I mean, could have been as early
6      as 7, but I know it didn't go past, like, 9:15.
7  Q.  Anywhere between 7 and 9:15?
8  A.  Yeah.
9  Q.  When Jake called you, what did he say?
10 A.  He said, They're sending me home early, and
11     they want you to come get me.
12 Q.  Do you still have -- strike that.  Did you at
13     any point ever go back and look at your phone
14     to determine when it was that call from Jake
15     came in to you?
16 A.  I looked at it, yes, but I don't -- I don't
17     remember.
18 Q.  Did you ever share that information with
19     anyone?  The time at which Jake called you, did
20     you ever share that with anyone?
21 A.  Yes.
22 Q.  Who?
23 A.  My attorneys.
24 Q.  Okay.  When?
25 A.  I don't know.

23  (Pages 89 to 92)

Page 93

1   Q.  Is that the only conversation you had with Jake
2       before then seeing him at the hospital?
3   A.  No.
4   Q.  Okay.  So Jake calls you and says, best -- best
5       you can recall, They're sending me home, can
6       you come and get me; is that right?
7   A.  He said, They're sending me home early, and
8       they want you to come get me.  He wasn't asking
9       me to come get him.  He was informing me that
10      they were telling him that I needed to come
11      pick him up.
12  Q.  Okay.  And what else did he say?
13  A.  That's as -- that's all I can remember from --
14  Q.  What did you say?
15  A.  I said, Well, why do -- why can't you drive
16      yourself?  What's wrong?
17  Q.  And what did he say to that?
18  A.  That was when the I don't knows started.
19  Q.  Okay.  He said, I don't know why they're
20      sending me home?
21  A.  Yeah.
22  Q.  And I don't know why you have to come get me
23      and I can't drive home?
24  A.  It wasn't a very coherent conversation.  I was
25      very much -- he was very specific.  He was very

Page 94

1       clear when he -- when I answered and he -- I
2       said, you know, I -- I just answered the phone,
3       and he said, They're sending me home early, and
4       they want you to come get me.  And after that
5       point, I was like, Well, why?  Like, that's --
6   Q.  Yeah.
7   A.  -- really unusual.
8   Q.  Um-hum.
9   A.  I -- I -- I don't remember specifically what I
10      said, but I asked him about, Well, what's going
11      on?  Like, where are you?  What's wrong?  Why
12      do I have to come get you?
13  Q.  Right.  And he couldn't -- he -- he said he
14      didn't know the answers to all those questions?
15  A.  It was either an I don't know or there was just
16      no reply.
17  Q.  Okay.  Could you understand him?
18  A.  When he -- when he told me that I needed
19      to come get him, yes, I could understand him.
20  Q.  Was there any part of the conversation you
21      didn't understand?
22  A.  As far as him speaking?
23  Q.  Yeah.
24  A.  Yes.  I mean, there was a lot of -- a lot of
25      people in the background and --

Page 95

1   Q.  A lot of background noise?
2   A.  Yeah, back -- and I couldn't -- you know, I
3       didn't know what was going on or who was there
4       or...
5   Q.  Okay.  But when he spoke, you could understand
6       him?
7   A.  Yeah.  But --
8   Q.  (Indiscernible.)
9   A.  -- then it -- I mean, it started kind of --
10      after his first initial, They're sending me
11      home, they want you to come get me, after that,
12      it was just -- it was kind of more of like a --
13      like a drawn out -- you know, like a, I don't
14      know, and like...
15  Q.  What did you think right away?
16  A.  I thought something was very wrong.
17  Q.  Okay.  Did you harken back to that morning's
18      episode and him not feeling well when he went
19      to work?
20  A.  Did it -- I -- can you --
21  Q.  Did you --
22  A.  -- repeat that?
23  Q.  Yeah.  The -- let me ask it a different way.
24      Did you think back to what happened that
25      morning and him being not well when he went to

Page 96

1       work?
2   A.  I don't remember specifically what I was
3       thinking.  I was just --
4   Q.  I understand.
5   A.  I'm sure I was just thinking about what was
6       right now.  I mean --
7   Q.  Right.  And so what did you tell him?  I'm
8       on -- I -- I will get the kids -- get somebody
9       to watch the kids, or take them with?  What was
10      your plan?  What did -- did you indicate to him
11      what your -- what your next steps were going to
12      be?
13  A.  I told him, yeah.  I said, I'll -- I told him
14      that I would come down there.  It was kind of
15      like in a series of what's going on, and then
16      as -- as soon as I realized that he wasn't
17      getting -- after that first initial conver --
18      or that, They're sending me home, come pick --
19      they want you to come pick me up, or, They said
20      you need to come pick me up -- it was something
21      like that -- and I was like, Well, like, of
22      course, I'll come get you.  And then, like,
23      when I started asking more questions and I
24      realized that he wasn't communicating
25      appropriately, that was when I told him -- and

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 97

```
 1      there was dropped calls and me calling him back
 2      and --
 3   Q.  Because of poor reception?
 4   A.  No.  I don't know what --
 5   Q.  You just didn't --
 6   A.  -- it was.
 7   Q.  Okay.
 8   A.  But I eventually got to the point where I told
 9      him, I said -- I knew there were people
10      standing around, so I said, You need to tell
11      them to call 911, and then he was like,
12      (descriptive sound).  And I don't really -- I
13      mean, sounds that I was hearing from him.
14   Q.  Okay.
15   A.  But it wasn't words.
16   Q.  Okay.
17   A.  And then I started getting pretty firm with
18      him, and I said, Hand the phone to somebody
19      that you're with, and he --
20   Q.  Did he?
21   A.  -- didn't.  I don't -- I know I said it to him
22      several times, and each time I started getting
23      more and more upset with him, thinking that
24      that would -- you know, he wasn't real
25      coherent.  Maybe if I'm expressing more concern
```

Page 98

```
 1      in my voice that he'll get the picture of what
 2      I'm saying.  I don't remember if he gave the
 3      phone to anybody.
 4   Q.  Okay.  And then who did you -- then what did
 5      you do next?  Who did you talk to next?
 6   A.  At some point one of the calls dropped, and I'm
 7      just thinking like, I have no -- I have no idea
 8      what's going on.  I have no idea if anybody's
 9      doing what they're supposed to be doing to take
10      care of him.  I need to get the kids and get in
11      the car and start driving, and that was when
12      Josh called me.
13   Q.  Oh.  So you didn't call Josh?  Some -- somebody
14      had -- had reached out to Josh, so Josh called
15      you.  Is that your understanding?
16   A.  Somebody did reach out to Josh, yes.
17   Q.  Okay.
18   A.  I believe that Josh is who called me, yes.
19   Q.  And then what did Josh tell you?
20   A.  He said, Have you talked to Jake.
21   Q.  And you told him you had?
22   A.  Yes.
23   Q.  What else did you guys discuss?
24   A.  I asked him what was going on, and he said -- I
25      can't remember specifically what he said, but
```

Page 99

```
 1      he just said that there was a problem with Jake
 2      and that Neil had called him and --
 3   Q.  Neil Franchuk?  Neil Franchuk?
 4   A.  That would be the name, yes.  But I --
 5   Q.  You're not sure?
 6   A.  Somebody called him.  I guess I don't -- I -- I
 7      don't know who the -- who it was that called
 8      him, but somebody called him.
 9   Q.  Okay.
10   A.  And --
11   Q.  Did -- did he tell -- did Josh tell you what
12      that person told him, Neil, if you -- if you
13      remember?
14   A.  I don't remember, no.
15   Q.  Okay.  And what else did Josh tell you in that
16      conver -- first conversation you had with him?
17   A.  Well, it was more of me telling him.
18   Q.  What were you telling him?
19   A.  I told him -- so he called me.  He said, Did --
20      have you talked to Jake, and I said, Yes,
21      something's wrong.  What's going on?  He said
22      he had gotten a call from somebody that was
23      with Jake, and I said, You need to -- I said,
24      Get off the phone with me, call whoever that
25      was back and tell them to call 911.  He said,
```

Page 100

```
 1      I'm on it, bye, and hung up.
 2   Q.  Okay.  And then who did you talk to next?
 3   A.  I don't know who it was next.  I mean, I know
 4      at some point in the mix I called my mom.
 5   Q.  Okay.  To tell her what's going on and ask her
 6      for her help maybe with your kids?
 7   A.  I -- I just asked her to come down to the
 8      hospital because I knew that I didn't have time
 9      for her to drive over to my house.  I said,
10      Just come meet me at the hospital, like --
11   Q.  Quicker that way?
12   A.  Yeah.
13   Q.  Did you talk to Jake again before you saw him
14      at the hospital?
15   A.  Yes.
16   Q.  How many more times before you saw him in the
17      hospital?
18   A.  As far as I can remember, once.
19   Q.  Okay.  Have you exhausted your memory of what
20      you and Josh first talked about?
21   A.  He called me back a second time.
22   Q.  Okay.  But for the first call, you exhausted --
23   A.  Oh, for the first call?
24   Q.  Yeah.
25   A.  Yeah.  That's --
```

25 (Pages 97 to 100)

Page 101

```
 1   Q.  Okay.
 2   A.  Yeah.
 3   Q.  All right.  And I've got two questions hanging
 4       out there now.  Let's finish the first one.  My
 5       fault.  How many times did you talk to Jake
 6       before you saw him in the hospital after the
 7       first call?
 8   A.  Like I said, there was a lot of back and forth.
 9   Q.  Okay.
10   A.  Like, the phone hanging up and me calling --
11   Q.  Yeah.
12   A.  -- there was several of those within a short
13       time frame, but that was the only -- before he
14       was in the ambulance, that was the only part
15       that he was actually, like, communicating with
16       me when he said, They're sending me home early,
17       you need -- they said you need to come pick me
18       up.
19   Q.  The others were calls that were dropped or
20       missed or somehow --
21   A.  Yeah.  And me --
22   Q.  -- you didn't connect?
23   A.  -- like telling him, like -- you know, telling
24       him all these things.
25   Q.  Okay.  Have you exhausted all you can remember
```

Page 102

```
 1       about what Jake said to you or how he said it
 2       to you in those calls before the ambulance
 3       showed up?
 4   A.  Yes.  I mean, I don't -- he was very adamant
 5       that they were sending him home and that they
 6       said I need to come pick him up.
 7   Q.  Okay.  Then the subsequent calls with Josh, how
 8       many more calls with Josh?
 9   A.  I believe -- well, I mean, like, right
10       surrounding the --
11   Q.  Yeah.
12   A.  -- incident, I believe that there were two,
13       maybe three.
14   Q.  Okay.  And can you share with me what you
15       remember about those call -- calls?
16   A.  He --
17   Q.  Are those -- let me -- let me ask you one more
18       question.  Did those occur before the ambulance
19       showed up or after?
20   A.  I do not know.
21   Q.  Okay.  Do you know when -- as you sit here
22       today, when the ambulance came?
23   A.  I don't know.
24   Q.  Okay.  Go ahead.
25   A.  He called me back after he had called whoever
```

Page 103

```
 1       he had spoken to at UP, and he just said, All
 2       right, he said, I called, they're -- they
 3       called an ambulance.  And then I told him to
 4       call them back and to inform the paramedics to
 5       take him to Mayo Clinic because I knew -- we
 6       have a long history with Mayo Clinic with one
 7       of our daughters who has medical problems, and
 8       I knew that Rochester was the best place.  The
 9       other area hospitals we have not had such good
10       luck with, so I wanted him going somewhere that
11       was going to do the best that they could.
12   Q.  Had you ever had any experience with Mayo at
13       Eau Claire?
14   A.  Yes.
15   Q.  Was it a good experience?
16   A.  Yes.
17   Q.  Was that where you had requested that he go to
18       is to Mayo-Eau Claire or Mayo
19       generally -- and then they would figure it out
20       there?
21   A.  I don't know that I specified Eau Claire.  I
22       mean, obviously they're going to take him --
23       they're not --
24   Q.  Sure.
25   A.  -- going to drive him all the way down to
```

Page 104

```
 1       Rochester.
 2   Q.  Sure.
 3   A.  But I --
 4   Q.  Sure.
 5   A.  -- knew -- you know, my brain just immediately
 6       thought, like, Mayo because then they have the
 7       doctors from Rochester to --
 8   Q.  The best --
 9   A.  -- consult with and --
10   Q.  Yeah.
11   A.  Yeah.
12   Q.  Okay.  And which of your daughters suffers from
13       the medical condition?
14   A.  Sadie.
15   Q.  What is -- just generally can you describe
16       Sadie's health condition.
17   A.  She has a very rare form of hemolytic anemia
18       called Hemoglobin Evans.
19   Q.  Okay.
20   A.  Not to be confused with Evans syndrome.
21   Q.  Sure.
22   A.  She has Hemoglobin Evans.
23   Q.  Okay.  What extra -- what specialized or extra
24       care do you have to provide for Sadie because
25       of her condition?
```

26 (Pages 101 to 104)

Page 105

1  A.  Presently it's more of just a -- watching her.
2     She currently leads a pretty healthy life.  She
3     hasn't needed any blood -- blood transfusions,
4     which are a possibility with her condition.
5     She cannot travel.  Her pediatrician said she
6     cannot travel by airplane, and she cannot --
7     her hematologist in Rochester has stated that
8     she can't travel above a couple -- like 3 to
9     4,000 feet in elevation.  But there was a time
10    after Jake's death that she was also labeled
11    with functional asplenia, which was very
12    difficult.  Anytime she had a fever of 100.4 or
13    over, she had to be seen in an emergency room.
14    If the clinic was closed, she had to have labs
15    drawn.  Depending on the outcome of the labs,
16    she would be hospitalized, and that could have
17    proven fatal.  That has since been lifted from
18    her diagnosis list.  She just currently has the
19    Hemoglobin Evans, and she takes a -- like a
20    daily vitamin too.
21 Q.  Okay.  Had Jake ever been --
22       MR. HAYDEN:  We're going to give you a
23    break in a second.  I'm sorry.
24       COURT REPORTER:  I'm sorry.  I just had to
25    move.

Page 106

1       MR. HAYDEN:  My -- my fault.
2  BY MR. HAYDEN:
3  Q.  Had Jake ever been to the Mayo Clinics for any
4     reason prior to -- prior to August 12th, 2017?
5  A.  Not that I know of that -- not that I can
6     remember.
7  Q.  So it was your decision to -- or your -- your
8     command to make sure he gets to -- goes to --
9     to the -- to Mayo, and you -- and you expressed
10    that to -- to Josh, who you believe then
11    relayed that to someone at the railroad?
12 A.  Yes.  I told Josh, I said, Call back whoever
13    you just spoke to, tell them that when the
14    ambulance gets there to take him to Mayo.  And
15    he said, I'm on it, hung up.
16 Q.  Do you remember -- did you ever come to find
17    out who it was Josh was talking to at the
18    railroad?
19 A.  I don't know.
20 Q.  Okay.  Anything else about any other
21    conversations you had -- you had with Josh
22    at the time of the incident related to the
23    incident or his -- or which hospital he was
24    going to go to?  I'm sure you've talked to him
25    since.  I'm trying to narrow it to that -- to

Page 107

1     that evening.
2  A.  I might have called him.  There might have been
3     another communication while I was driving down
4     to the hospital because he and his -- he and
5     his wife came down to the hospital in
6     Eau Claire.
7  Q.  Okay.
8  A.  I -- yeah, I -- I don't --
9  Q.  What's her name, Josh's wife?
10 A.  Kristin Tisch --
11 Q.  Kristin -- Kristin with a C?
12 A.  K-R-I-S-T-I-N.
13 Q.  And so you can't remember anything -- any other
14    specifics about conversations with Josh that
15    evening other than what we've discussed so far
16    on phone conversations?
17 A.  Specifically relating to his...
18 Q.  To anything about the incident.  How it
19    happened, when it happened, and where he was to
20    be transported, his health conditions, anything
21    like that.
22 A.  We had a conversation about him reminding me to
23    not allow Union Pacific into the hospital and
24    to call an attorney.
25 Q.  Okay.  And that was relayed to you on the phone

Page 108

1     or in person when he came to the hospital?
2  A.  On phone.
3  Q.  Okay.  And you were not even at the hospital
4     yet when that conversation happened?
5  A.  Correct.
6  Q.  Okay.  Why did he say that he -- that you
7     should not allow anybody from Union Pacific to
8     come to the hospital?
9  A.  Because that is what is instructed by the union
10    to --
11 Q.  Okay.
12 A.  -- protect the employee.
13 Q.  Josh is a -- was a union official?
14 A.  He was a fellow co-worker.  He did not
15    currently work for the railroad at the time of
16    the incident.
17 Q.  Okay.  Who did he work for at the time of the
18    incident?
19 A.  I don't know.
20 Q.  Okay.  And he -- on your way to the hospital he
21    had recommended to you that you call a lawyer?
22 A.  Some sort of, you know, counsel or whatever.
23 Q.  Okay.
24 A.  I don't know if --
25 Q.  Did he give you the -- I'm sorry.  Did you --

27 (Pages 105 to 108)

Page 109

```
 1      did he give you -- did he give you the name of
 2      a lawyer to call?
 3   A.  I don't recall if he did.  I actually had
 4      attended a union meeting with Jake concerning
 5      this exact topic at some point, so I actually
 6      had a business card from the law firm --
 7   Q.  Okay.
 8   A.  -- that I had.  I -- someone at some point gave
 9      me a name for somebody, but I don't recall.
10   Q.  When was the meeting that you attended that you
11      just described?
12   A.  Before we had children.
13   Q.  So about five years be -- or three years before
14      the incident at least?
15   A.  I mean, it was when we were living in Iron
16      River.
17   Q.  Okay.
18   A.  It was held in Superior, so...
19   Q.  Okay.  And who conducted the -- the meeting?
20   A.  I don't recall.
21   Q.  Was it Mr. Banker's firm?
22   A.  Probably.
23   Q.  And you still had the business card from that?
24   A.  Yes.
25   Q.  Or more -- some --
```

Page 110

```
 1   A.  I don't -- I don't know that it was someone
 2      from his firm, but it was somebody from the
 3      union that was representing their
 4      information --
 5   Q.  Okay.
 6   A.  -- as far as obviously business cards and
 7      stuff.
 8   Q.  Do you remember any of the people that spoke or
 9      presented information at that meeting?
10   A.  No.
11   Q.  Do you remember who else was at -- how many
12      other people were at that meeting?
13   A.  I don't remember, no.
14   Q.  Do you remember how many people were at that
15      meeting?
16   A.  What was your question before that?
17   Q.  Do you remember any of the people who were at
18      the meeting.
19   A.  The -- no, not who they were.  No.
20   Q.  Okay.  Do you remember any -- how many people
21      were at the meeting?
22   A.  (Indicating.)
23   Q.  You said -- you testified that at this meeting
24      the same issues were discussed then as what
25      happened to Jake.  What do you mean by that?
```

Page 111

```
 1   A.  Just that if -- if there is any incident,
 2      injury that happens while on duty, to just take
 3      precautionary measures and to -- I'm sorry.
 4      Can you repeat your question?
 5   Q.  Sure.  You -- you testified that what was
 6      discussed at the meeting was the same
 7      circumstances that had happened to Jake, and my
 8      question was what do you -- what do you mean by
 9      that.
10   A.  It -- it wasn't, like, specific to Jake's
11      situation.  It was just if something happens
12      while you were on duty to, you know, do
13      everything you can do to protect yourself.
14   Q.  Okay.  So anything, any --
15   A.  Yeah.
16   Q.  Any --
17   A.  I --
18   Q.  Any --
19   A.  I apologize.  It was not specifically about --
20   Q.  A stroke.
21   A.  Yeah.  It was just about anything that happens
22      while you're on duty.
23   Q.  Okay.  And did Josh recommend the -- the -- the
24      lawyer to call?
25   A.  Who to call?
```

Page 112

```
 1   Q.  Yeah.
 2   A.  I don't remember who -- who -- if he or who he
 3      said.  He just said to don't let anybody from
 4      UP in, and, you know, we'll have to figure -- I
 5      don't -- I don't remember specifically what
 6      he -- sorry -- what he said about who to call
 7      or --
 8   Q.  Okay.  But at some point you called Mr.
 9      Banker's firm?
10   A.  I don't recall how it all happened.
11   Q.  Okay.  Did Josh call on your behalf?
12   A.  I don't know.
13   Q.  Okay.  You don't remember anything about how
14      you retained Mr. Banker's firm?
15   A.  I remember meeting with somebody at the
16      hospital from the firm, but -- and those are
17      all in the very early days of a very traumatic
18      event, so --
19   Q.  Sure.
20   A.  -- no, I don't re --
21   Q.  Was it within the first day or so?
22   A.  I don't remember how long it was.
23          MR. BANKER:  Okay.
24          VIDEOGRAPHER:  Excuse me.  Can we change
25   media?
```

28 (Pages 109 to 112)

Page 113

1        MR. BANKER:  Yeah.  Perfect timing to take
2    a break.
3        VIDEOGRAPHER:  This is the end of Media
4    No. 1 in the deposition of Jessica Tischer.
5    We're off the record at 12:02.
6        (A break was taken.)
7        VIDEOGRAPHER:  This is the beginning of
8    Media No. 2 in the deposition of Jessica
9    Tischer.  We're on the record at 12:14.
10   BY MR. HAYDEN:
11   Q.  What other conversations did you have with Josh
12       at the hospital that evening?
13   A.  I never saw Josh at the hospital.
14   Q.  Okay.  I thought you said he and his --  his
15       wife came to the hospital?
16   A.  Yes, but I was already gone --
17   Q.  Okay.
18   A.  -- down to Rochester by the time they got
19       there.
20   Q.  When Jake got transferred to Rochester, you
21       obviously followed him down there?
22   A.  He was taken by helicopter.  My dad drove me
23       and Daisy.
24   Q.  Okay.  Was there anyone else who came to the
25       hospital that evening in Eau Claire besides

Page 114

1        you?
2    A.  My mom and my dad and my daughters were there.
3    Q.  Sure.  All three?
4    A.  All three, yes.
5    Q.  And in Rochester in the first couple of days,
6        was there anyone else who came to see you and
7        Jake besides your parents?
8    A.  There was a lot of people, yes.
9    Q.  Okay.  A lot of people from work?
10   A.  Nobody from work, no.
11   Q.  Nobody from work.  Okay.  Friends from outside
12       work of yours and Jake's?
13   A.  No.
14   Q.  Okay.  Who?
15   A.  Family.
16   Q.  Okay.  Was there ever a time when anyone from
17       work, co-worker, manager, anybody from Union
18       Pacific, came to see Jake either in Eau Claire
19       or in Rochester?
20   A.  I know that -- I don't know how many people,
21       but I know that there was at least one person
22       that attempted to come to Eau Claire.  But, no,
23       they did not have contact with him.  They were
24       asked to leave.  And nobody came down to
25       Rochester.

Page 115

1    Q.  And you don't know who that was who attempted
2        to come and see Jake in Eau Claire?
3    A.  I don't know.
4    Q.  Do you know if it was a management official or
5        a co -- co-worker?
6    A.  I don't know who it was.
7    Q.  Okay.  At some point you -- at some point did
8        you discuss with Jake when he was stabilized
9        what happened?
10   A.  He was not of a state of mind to do that.
11   Q.  Ever until he passed?
12   A.  Not really, no.
13   Q.  Okay.  So your testimony is from the time that
14       you saw Jake at the hospital until the time he
15       passed, you did not have a conversation with
16       him where he told you what happened at work
17       that day?
18   A.  No, he never told me that.
19   Q.  Okay.  So just some more detailed questions.  I
20       think I know the answers to them.  I'm just
21       going to ask them anyway just for -- just so we
22       have it on the record.  So you never discussed
23       with Jake the timing of his various symptoms
24       throughout the course of August 12th at work?
25   A.  No, I did not.

Page 116

1    Q.  And you never discussed, nor did Jake discuss
2        with you, anything that Jake believed the
3        railroad did wrong to him that day?
4    A.  We did not discuss that, no.  He was not of the
5        mental capacity to be able to have much of any
6        conversation.
7    Q.  Okay.  Describe his mental capacity in the
8        first few days, August 13th, 14th, 15th.
9    A.  There wasn't much more than crying and him
10       saying I love you.  I mean, there -- there
11       really wasn't -- there wasn't -- he just was
12       resting.  I mean, there -- it wasn't -- from
13       him interacting with the doctors, I mean, he
14       could answer, like, yes, no questions
15       sometimes.  But they were giving him, like,
16       stroke chart -- I believe they were a stroke
17       chart, like a sheet of paper that they would
18       ask him to, like, point out specific things.
19       Like, they'd be like, Where is -- where is the
20       kitchen sink, and sometimes it would be like a
21       picture of a woman doing dishes at the sink and
22       kids playing, and, like, there's many different
23       things going on in the picture, and sometimes,
24       you know, I mean, he would get those things
25       wrong.  Like, he wouldn't even be able to do

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 117

1    that, so he wasn't...
2  Q.  And there was -- like you testified earlier
3    today, there was a lot of times that you
4    weren't in the room with Jake; is that correct?
5  A.  At the hospital?
6  Q.  Correct.
7  A.  I was by his side 99 percent of the time. I
8    never left the hospital.
9  Q.  Okay. So when -- when --
10  A.  I take that back. I left once to literally
11    walk across the street to get Caribou Coffee.
12  Q.  Okay.
13  A.  But I did not leave him --
14  Q.  And so --
15  A.  -- for two weeks.
16  Q.  -- you were -- when you testified earlier that
17    there -- you were not permitted to see him, is
18    that at the Eau Claire facility?
19  A.  Yes.
20  Q.  Okay. When you went to Rochester, you were
21    able to see him and stay with him?
22  A.  They let me see him in Eau Claire. It just
23    wasn't for a while. They were working on him,
24    assessing him. The nurse came out and told me
25    in Eau Claire they're going to Life Flight,

Page 118

1    and I'm like, What do you mean you're going to
2    -- like, he's here. What do you mean you're
3    going to Life Flight him, and that was -- she's
4    like, I'm sure you heard the helicopter land,
5    and I could hear it. And then she said, We're
6    going to let you -- like, the Life Flight crew
7    will be down here to take him. Like, you can
8    take the kids in and say goodbye to him. That
9    was -- that was pretty much all -- all the
10    contact that I had with him --
11  Q.  Okay.
12  A.  -- in Eau Claire.
13  Q.  By the way, do you take issue with any of the
14    care that was provided to Mr. Tischer in -- in
15    Eau Claire or Rochester?
16  A.  Do I have any issues?
17  Q.  Yeah.
18  A.  I mean, obviously I'm -- was hopeful that his
19    life would not have been lost and -- you know,
20    but Eau Claire, not that I can think of. The
21    only thing that comes to mind is in Rochester
22    they had these leg puffers on his legs. I
23    don't remember the reasoning and what was said,
24    but I know that they were on when they
25    shouldn't have been on, and the nurse was

Page 119

1    supposed to take them off, and she apologized
2    for not having taken them off when I brought it
3    to her attention, Is he still supposed to
4    have them, and she forgot to take them off.
5    But other than that, I -- the only other thing
6    would be when they transferred him from his
7    wheelchair to his bed the day that he died, it
8    was a very rough transfer, and that seemed --
9    it was, like, at that point when he started
10    having problems breathing. So I have no idea
11    what that means, but obviously I want people
12    taking care of my husband and not transferring
13    him roughly.
14  Q.  Do you think that that lead -- do you -- do you
15    have an -- do you -- do you hold Mayo-Rochester
16    responsible for your husband's death?
17  A.  No.
18  Q.  Do you hold anyone responsible for your
19    husband's death?
20  A.  I wish that things had -- would have been done
21    differently at his work to get him the care
22    that he needed when he needed it, and I don't
23    think that was done, no.
24  Q.  How did you come to understand what was or was
25    not done at the workplace if you did not talk

Page 120

1    about it with Jake?
2  A.  From -- just learning stuff from after the
3    fact.
4  Q.  From who?
5  A.  Josh has told me his account of what has
6    happened.
7  Q.  But Josh wasn't there; correct?
8  A.  Right. It's just --
9  Q.  Yeah.
10  A.  -- from what he -- he was not there, no.
11  Q.  Okay. Is there anyone else -- or I'd like to
12    know all the information you have, whether it
13    was communication with someone or documents or
14    anything you have, that leads you to the belief
15    that you wish there was something different
16    done at the workplace.
17  A.  Well, I just know that there was, in my
18    opinion, a delay in -- in getting him help.
19  Q.  And where does that -- is there any other
20    belief you have about what was done or not done
21    at the workplace other than the delay in
22    calling -- as you described it, a delay in
23    getting him help?
24  A.  Any -- I'm sorry. Can you repeat that?
25  Q.  Yeah. I'd like to know all the -- do you

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 121

1    believe the railroad did something wrong that
2    led to your husband's death?
3    A.  Yes.
4    Q.  And what is that specifically?
5    A.  I believe that if he had gotten care when he
6       needed it, that he would have been able to be
7       on anticlotting medication if he had gotten --
8       let me start over.  If he had gotten help in an
9       appropriate amount of time, his stroke would
10      have not have been as severe, he would not have
11      had the brain bleed that prevented him from
12      having anticoagulation medicine, and had he
13      been taking that medicine, assumably he would
14      have no clots in his body, therefore, he would
15      not have died.
16   Q.  Anything else that you believe the railroad did
17      wrong other than what you've described as a
18      delay in getting him help?
19   A.  No.
20   Q.  Where does the information come from that the
21      railroad delayed getting your husband help?
22   A.  From hearing things from Josh and from my
23      attorneys.
24   Q.  Okay.  So other than from Josh, your
25      brother-in-law, who wasn't on the scene, and

Page 122

1    your attorneys, who likewise weren't on the
2    scene, there's nothing you've been provided
3    that -- as evidence that the railroad delayed
4    any care to your husband; is that -- is that
5    correct?
6    A.  I have listened in on depositions.
7    Q.  Okay.  Anything else?
8    A.  No.
9    Q.  Are there any documents that you've reviewed
10      that support your belief the that railroad
11      delayed the care you think was -- that you
12      think delayed care for your husband?
13   A.  I've not reviewed any documents like that, no.
14   Q.  Have you told me everything that -- on which
15      you base that belief, that the railroad delayed
16      providing help to your husband?
17   A.  Yes.
18   Q.  What has Josh told you specifically other than
19      what you've testified to already about any
20      delay in care or help that the railroad was
21      responsible for?
22   A.  I don't really recall.  It was just -- it was
23      just a -- I don't know -- just a general
24      conversation about it.
25   Q.  Okay.  So you don't recall any specifics about

Page 123

1    it?
2    A.  No, I don't.
3    Q.  When -- was that one conversation or more?
4    A.  I mean, we probably -- we have discussed it a
5       few times, but...
6    Q.  At the time -- at the time your husband was
7       still alive?
8    A.  I don't recall.
9    Q.  Okay.  And in these couple of conversations --
10      well, strike that.  You don't recall any
11      specifics about what was discussed between you
12      and Josh?
13   A.  About that, no.
14   Q.  And about any supposed delay in the railroad
15      getting your husband any help, you don't
16      remember any specifics about what Josh told
17      you; is that correct?
18   A.  Correct.
19   Q.  And have your lawyers told you anything that
20      you can remember specifically about that?
21      MR. BANKER: Objection.  Call -- calls for
22      attorney-client privileged communication, and I
23      instruct the witness not to answer.
24   BY MR. HAYDEN:
25   Q.  At what time -- at what point should the

Page 124

1    railroad have provided help to Mr. Tischer,
2    your husband, Jake Tischer?
3    A.  I wasn't present to know what he was like at
4       work.  I can only go off of information that
5       I've learned.
6    Q.  What is the information you've learned?
7    A.  I mean, I can't remember specific times of when
8       things have happened and when people have said
9       what, but...
10   Q.  What is the help that you believe the railroad
11      did not provide your husband?
12   A.  I believe that they should have called 911
13      sooner.
14   Q.  How sooner?
15   A.  Knowing what I know now, obviously not then
16      because I wasn't present, but I would say that
17      as soon as Neil noticed that something was off
18      in the train.
19   Q.  You believe Neil should have called 911 at the
20      --
21   A.  I don't know who should have called 911.  I
22      just know that 911 should have been called.
23   Q.  And what was it that you believed Neil
24      observed?
25   A.  I don't know what Neil observed.  I've heard

31 (Pages 121 to 124)

Page 125

1    him say what he thinks that he's -- that -- or
2    I've heard him say what he has -- what -- that
3    he observed, but I don't know what he observed.
4    Q.  You heard him testify in this very room about
5       what he observed; is that right?
6    A.  Yes.
7    Q.  That's what you're referring to?
8    A.  Yes.
9    Q.  No other conversations with Neil?
10   A.  No.
11   Q.  But you're not sure at what point what Neil
12      observed --
13   A.  I'm --
14   Q.  -- rose to the level of something that should
15      be called -- or -- or 911 should be called?
16   A.  I don't have a clear enough recollection of
17      every specific thing that has been said at
18      every deposition to be able to make that --
19   Q.  Okay.
20   A.  -- answer.
21   Q.  So as you sit here today, you are unable to
22      answer the question when it is that Union
23      Pacific should have called 911 for your
24      husband?
25   A.  Like I said, I believe that they should have

Page 126

1    called when it was noted by Neil that he was
2    having significant problems in the train on the
3    way back to Altoona.
4    Q.  And you're not -- you're not going to testify
5       that Neil should have called -- or didn't
6       matter who should have called, but somebody
7       should have called?
8    A.  Somebody should have called.  I mean, if I -- I
9       mean, I'm not saying -- I don't know how Neil
10      would be able to call because they're not
11      allowed to have phones.
12   Q.  You're aware that they're allowed to use phones
13      for emergencies, are you not?
14   A.  I'm -- no, I'm not aware.
15   Q.  Okay.  You don't know anything about the
16      railroad's operational rules as they relate to
17      cell phone use; is that fair?
18   A.  I know that Jake has said that he is not
19      allowed to have his phone.
20   Q.  Okay.  Beyond --
21   A.  While on duty.
22   Q.  -- that -- beyond that, you're not aware of the
23      cell phone policy of the railroad; is that
24      correct?
25   A.  Correct.

Page 127

1    Q.  Okay.  And the timing of -- of when you believe
2       that Union Pacific should have called 911 is
3       just something you can't pinpoint; is that --
4       is that fair?
5    A.  Well, it 100 percent should have been called as
6       soon as the train landed and Neil expressed his
7       concern to the manager.
8    Q.  When did --
9    A.  But I -- I mean, if someone can't be turning a
10      dial on their radio, I mean, that's -- that's a
11      pretty big problem.
12   Q.  When did you learn that Mr. Franchuk believed
13      that your husband was experiencing these
14      symptoms?  Was that when he testified at his
15      deposition?
16   A.  Yes.
17   Q.  As a CNA, were you trained in recognizing the
18      signs and symptoms of a stroke?
19   A.  No.
20   Q.  Were you trained in recognizing the signs and
21      symptoms of a cardiac event, a heart attack,
22      or...
23   A.  Not that I can recall, no.  I mean, if there
24      was ever any issues, there was always an RN on
25      staff, and it was to be brought to the RN's

Page 128

1    attention.
2    Q.  What else forms your belief that the Union
3       Pacific failed to provide help to your husband
4       in a timely manner?
5    A.  Things that I've spoken with my attorneys
6       about, the depositions.  That's about it.
7    Q.  Prior to the lawsuit being filed, which you
8       authorized your attorneys to go ahead and file,
9       you had not talked to Neil about his version of
10      what signs and symptoms he saw in your husband;
11      is that fair?
12   A.  I've not talked to Neil other than what I've
13      already stated today.
14   Q.  And you hadn't talked to -- prior to the filing
15      of the lawsuit, you hadn't talked to anyone at
16      the railroad who had witnessed your husband's
17      condition while at work; is that -- is that
18      fair?
19   A.  I did not speak to anybody about the incident
20      that day.  There were several people that
21      reached out to me to provide sympathy and --
22   Q.  Right.
23   A.  -- you know, say...
24   Q.  They provided sympathy, but as you testified
25      earlier under oath, there was no one who

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 129

```
 1      provided you any timeline of events or any --
 2      any indication of what went on at the -- at the
 3      workplace; is that correct?
 4   A.  Correct.
 5   Q.  Until you observed the depositions of Neil
 6      Franchuk and Mark -- and Mark Marvin?
 7   A.  Correct.
 8   Q.  Having heard Mr. Marvin's deposition testimony,
 9      and you were in here in the room for it, what
10      was your reaction to his testimony?
11   A.  It just very much surprised me that he didn't
12      call 911 sooner and that he would go to a gas
13      station and get him something to eat and drink
14      instead of getting him the actual care that he
15      needed.  Even if he was having a diabetic
16      episode, that's still a hospital situation.
17   Q.  And you've heard nobody testify in the
18      depositions you've observed -- whether it was
19      Mr. Lux or Mr. Marvin or Mr. Franchuk, you
20      heard nobody testify that on -- on August 12th
21      at the Union -- on the Union Pacific property
22      that your husband exhibited signs and symptoms
23      of a stroke at any time before the moment when
24      911 was called by Mr. Marvin; isn't that
25      correct?
```

Page 130

```
 1   A.  I can't remember specifically what everybody
 2      said.
 3   Q.  Okay.  You said that the delay in getting -- in
 4      calling 911 for your husband resulted in a
 5      delay in him receiving the anticoagulant
 6      medication; is that correct?
 7   A.  I don't know specifically what they would have
 8      done, if it was a procedure or the medicine,
 9      but I know that every second matters in a
10      stroke.  And the severity of his stroke was
11      about as bad as it gets; and, therefore, he had
12      a brain bleed; therefore, he could not receive
13      anticoagulation drugs because it would make him
14      bleed out.
15   Q.  Is your testimony that your husband -- the
16      reason he didn't receive the -- we'll call it
17      the clot busting medication, I think is -- is
18      the common term, common description of it.  You
19      understand that?
20   A.  Yes.
21   Q.  Okay.  If I use that word.  And your testimony
22      is -- your understanding is is that the reason
23      he didn't receive the clot busting medication
24      is because he had a brain breed; is that
25      correct?
```

Page 131

```
 1   A.  No.  I'm talking about in the hospital.
 2   Q.  That's correct.  That's what I'm talking about.
 3      So you -- is your testimony that while your
 4      husband was in the hospital, he could not
 5      receive -- he could not benefit from the clot
 6      busting medication because of a brain bleed he
 7      was undergoing?
 8   A.  No, that's not what I'm saying.
 9   Q.  What are you saying?
10   A.  The clot busting drug that is given when
11      somebody is having a stroke is different than
12      anticlotting medications they give them.  If
13      somebody has a clot, they're put on blood
14      thinners for the rest of their life.  That's
15      the -- the drug that I'm referring to.
16   Q.  Okay.  So you're not referring to so-called tPA
17      or the drug that's administered within several
18      hours of the onset of stroke symptoms?  That's
19      not what you're referring to?
20   A.  No.  I'm referring to that he could not be put
21      on continual blood thinners that he needed
22      because he had a brain bleed, and that would
23      have made him bleed out.
24   Q.  Okay.  And why did he have the brain -- what --
25      what did Union Pacific cause to -- how did
```

Page 132

```
 1      Union Pacific cause the brain bleed?
 2   A.  The -- the brain bleed was caused by the
 3      severity of the stroke, and the stroke wouldn't
 4      have been as severe if he had received medical
 5      attention promptly.
 6   Q.  And what is the basis for that which you just
 7      said?  Is that your medical background, or is
 8      that from some other source?
 9   A.  No, I have no medical background --
10   Q.  Okay.
11   A.  -- for that.
12   Q.  Okay.  So what's the source or the -- or the
13      re -- what -- on what do you base that opinion
14      you just gave?
15   A.  Well, most of it comes from the doctors at Mayo
16      Clinic that --
17   Q.  Okay.
18   A.  -- say that he has a brain bleed; therefore, he
19      cannot receive blood thinners.  And when they
20      found that he had more clots in his body, they
21      said, We can't give him anything because of his
22      brain bleed.
23   Q.  And your testimony is that that's because of
24      the brain bleed and not the congenital
25      anticoagulation disease that he suffered from;
```

33 (Pages 129 to 132)

Page 133

1    is that correct?
2    A.  I am not aware of any condition that he had
3        suffered from.  He had never been diagnosed, to
4        my knowledge, of any condition.
5    Q.  And you have not read the entire set of Mayo
6        Clinic records.  I think you've established
7        that; correct?
8    A.  No, I have not.
9    Q.  Okay.  You read some excerpts; is that right?
10   A.  I have only read, like, documents that they
11       have given me.
12   Q.  They, the lawyers?
13   A.  No.  Like Mayo Clinic.
14   Q.  Okay.
15   A.  When he was -- when he was -- passed away and
16       they sent me home with his re -- you know, with
17       --
18   Q.  Sure.
19   A.  -- things that had been traveling around with
20       him --
21   Q.  Right.
22   A.  -- between the different rooms and the
23       occasional things that I've -- that I've just
24       received from my attorneys from just, like,
25       going to the clinic and asking for something.

Page 134

1        But I -- I mean, I'm not an expert in medicine.
2        I don't really know --
3    Q.  Okay.
4    A.  -- what the majority of it means.
5    Q.  So the statement that the severity of the
6        stroke was because of the delay in calling 911,
7        and the severity of the stroke led to the
8        brain -- brain bleed, which then during Mr.
9        Tischer's stay in the hospital prevented him
10       from getting anticoagulants to stop the clots
11       in his leg, which ultimately took his life,
12       that comes from your recollection of talking to
13       physicians?
14   A.  Yes.  I mean, they -- they didn't say anything
15       about work.
16   Q.  Right.
17   A.  It just started at -- it started at that he
18       cannot receive -- I mean, anybody that has a
19       blood clot or a stroke, they're put on blood
20       thinners.
21   Q.  Right.
22   A.  So that would have been normal practice for
23       them to put him on -- in ICU that first night
24       it would have been normal practice for them to
25       put him on blood thinners.

Page 135

1    Q.  How do you know that?
2    A.  Because they've told me that.
3    Q.  Okay.  Who -- who told you that specifically?
4    A.  The doctors.
5    Q.  You can't remember their names?
6    A.  No.  There's --
7    Q.  The doctors at Eau Claire?
8    A.  -- tons of them.
9    Q.  The doctors at Eau Claire?
10   A.  In Rochester.
11   Q.  In Rochester.
12   A.  Yeah.
13   Q.  Okay.
14   A.  And my -- my mom has an LPN, and she's talked
15       about the patients that come in in general
16       about that, as soon as you have a -- a blood
17       clot that you're put on blood thinners --
18   Q.  Okay.
19   A.  -- for the rest of your life.  It's -- I mean,
20       it's managed and everything, but...
21   Q.  Okay.  And so no -- no physician has ever told
22       you that because of some delay in calling 911
23       at his workplace he suffered a brain bleed; is
24       that correct?
25   A.  To my knowledge, the doctors don't know

Page 136

1        anything about work.
2    Q.  Okay.
3    A.  They don't know where he was.  They don't know
4        how -- who called 911.  All they know is that
5        he came into the emergency room.  That's --
6        that's, to my knowledge, where their knowledge
7        starts.
8    Q.  Okay.  So just -- okay.  And, again, when did
9        his -- when did his -- what's your testimony,
10       if you know, about when he exhibited first any
11       signs and symptoms of a stroke?
12   A.  I don't necessarily think that you can only
13       call 911 for symptoms of a stroke.
14   Q.  Okay.
15   A.  I believe that in the train with Neil that --
16   Q.  He wasn't feeling well?
17   A.  -- there should have been -- when he was not
18       able to turn a knob on his dial, that that
19       should have been taken very seriously.  I mean,
20       someone doesn't just have to have a stroke to
21       go to the hospital.  If someone -- if something
22       is really off, just like that morning when I
23       was turning -- if he was still laying on the
24       ground, and I was going to call 911.  Like,
25       there's many reasons to call an ambulance or

Page 137

```
 1    someone bringing him to the hospital.
 2    Q.  Do you feel guilty for not calling 911 the
 3       morning of August 12th after your husband
 4       collapsed on the floor?
 5    A.  No, because he got up.  I gave him a reasonable
 6       amount of time to try to figure out what was
 7       going on.  Like I said, I mean, 10, 15 seconds,
 8       if you fall and get the wind knocked out of
 9       you.  I mean, I've fallen several times ice
10       skating on different occasions that you get the
11       wind knocked out of you, and it's like a
12       paralyzing type of experience, you know.  I
13       had -- I had no idea what it was.  I still have
14       no idea what it was.
15    Q.  No one's told you that had Union Pacific called
16       911 at the time that the train arrived back in
17       Altoona that your husband would still be alive?
18       No one's told you that; is that correct?
19    A.  No.
20    Q.  It is correct that --
21    A.  Yes, it's correct.
22    Q.  -- that you've never been told that?
23    A.  I've never been told that, no.
24    Q.  And, again, I -- I think you -- I -- I
25       appreciate your answer, but it wasn't directly
```

Page 138

```
 1       responsive to my question.  When did your hus
 2       -- if you know, when did your husband first
 3       exhibit signs and symptoms of a stroke?
 4    A.  I don't recall.  In listening to all the
 5       depositions and stuff, I don't --
 6    Q.  So --
 7    A.  -- I can't remember.
 8    Q.  How long had Jake intended to work at the
 9       railroad?  Did you ever have a conversation
10       with him about that?
11    A.  Yeah.  It was a career, life --
12    Q.  Okay.
13    A.  -- long.
14    Q.  30 -- how many -- how many years?  20?  25?
15    A.  I mean, whenever.  65 or whatever requirement
16       age is.  But he was planning on working there
17       for his -- for his career and then, you know,
18       retiring after that.
19    Q.  But no specific amount -- no -- no specific
20       target date was discussed between you and he;
21       is that fair?
22    A.  Retirement age.
23    Q.  Okay.  But you don't know what the retirement
24       age is?
25    A.  I know that it's between 60 and 65.
```

Page 139

```
 1    Q.  Okay.  But you --
 2    A.  I mean, it was a -- it was just a career --
 3    Q.  Yeah.
 4    A.  -- thing.  Like, it was a lifelong career that
 5       he was going to do until he retired.
 6    Q.  Okay.
 7    A.  Which is -- I mean, people generally retire
 8       between 60 and 65.
 9    Q.  But you had -- you and he had not established
10       in a conversation that it would be 61, 62, 63,
11       60, just --
12    A.  No.
13    Q.  -- that rough --
14    A.  Just in general.
15    Q.  Other than your -- your -- your daughter -- the
16       one --
17    A.  Sadie.
18    Q.  Sadie.  Other than Sadie and the medical
19       condition that -- that you've shared with us,
20       do either of your other children have any
21       special needs or any -- any unique health
22       conditions?
23    A.  Brooke, no.  Sad -- or -- excuse me -- Daisy
24       goes to speech therapy.  She -- she's just a
25       little stubborn on talking, but nothing --
```

Page 140

```
 1       nothing other than that.  And they have been
 2       tested for what Sadie has, and they don't have
 3       it.  Well, they've been tested for markers that
 4       would indicate they could have it.
 5    Q.  Does the disease that Sadie suffers from, is it
 6       a lifelong disease that she'll have?
 7    A.  Yes.
 8    Q.  And has it -- does it -- have you been told
 9       that it will shorten her life expectancy?
10    A.  No.  They said, I mean, as long as -- as long
11       as she receives treatment if she were to
12       need -- if she were to need treatment, if she
13       received it, as far as like a -- a blood
14       transfusion.  The only new development that has
15       come recently is this elevation situation, and
16       that would prove fatal to her if she were to
17       travel an elevation -- higher in elevation.
18    Q.  Oh, altitude elevation?
19    A.  Yes.
20    Q.  I see.  I see.  That's why she can't be on a
21       plane, for example?
22    A.  Yes.
23    Q.  I see.  Is that true the rest of her life?
24    A.  Yes.
25    Q.  Okay.  Are there any medications that she has
```

35 (Pages 137 to 140)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 141

1    to take on a daily basis?
2  A.  Yes.
3  Q.  And what are those?
4  A.  Folic acid.
5  Q.  Okay.
6  A.  It's just a vitamin.
7  Q.  Yeah.  Anything else besides that?
8  A.  No, not currently.  She did receive a different
9      medication when it -- she had that functional
10     asplenia.  But she doesn't take that anymore
11     because that's not -- no longer a diagnosis.
12 Q.  Have any of your children been diagnosed or
13     treated for any -- any conditions, mental or
14     physical, as a result of your husband's
15     passing?
16 A.  Can you repeat that again?
17 Q.  Yeah.  Have any of your three children been
18     treated for any mental or physical conditions
19     suffered as a result of your husband's passing?
20 A.  No.
21 Q.  Have you?
22 A.  Can you repeat it?
23 Q.  Sure.  Have you been treated for any mental or
24     physical condition that is a -- that a
25     physician or a practitioner believes is a

Page 142

1      result of your husband's passing?
2  A.  Yes.
3  Q.  Can you explain.
4  A.  I've recently started seeing a therapist.
5  Q.  What is the name of your therapist?
6  A.  Heather.  I'm not sure how you pronounce her
7      last name.  It's B-E-E-V-E-S.
8  Q.  Where is Heather -- is Heather a social worker?
9  A.  I believe she's a licensed marriage and family
10     therapist.
11 Q.  Okay.  Have you seen anyone else for anything
12     re -- any men -- mental, emotional, or physical
13     reaction to your husband's passing?
14 A.  No.
15 Q.  And you started to see Heather about -- what
16     did you say? -- a month ago or so?
17 A.  No.  This summer.
18 Q.  This summer, 2019?
19 A.  Yes.
20 Q.  At whose direct -- or at whose recommendation
21     did you see -- start to see Heather?
22 A.  My own.
23 Q.  Okay.  Why did you choose Heather?
24 A.  She's trained in special trauma therapies.
25     She's not just a normal therapist where you

Page 143

1      just go in and talk.  She's trained in a
2      specific trauma training.
3  Q.  Okay.  And where is her office located?
4  A.  I see her in Rice Lake.
5  Q.  Does she have other offices besides that?
6  A.  Yes.
7  Q.  Where?
8  A.  Osceola --
9  Q.  Okay.
10 A.  -- Wisconsin.
11 Q.  Do you go alone for your therapy with Heather?
12 A.  Yes.
13 Q.  Has she diagnosed you with anything?
14 A.  No.
15 Q.  I take it she can't prescribe any medications
16     or anything like that, so it's -- right now at
17     this point it's just a -- purely therapeutic
18     sessions you have with her?
19 A.  Correct.
20 Q.  Do you have any plans -- do you and Andrew have
21     any plans to marry?
22 A.  I don't know.  I mean, it's...
23 Q.  Have you --
24 A.  I don't know what the future holds.
25 Q.  Have you discussed marriage with Andrew?

Page 144

1  A.  Yes.
2  Q.  And you're not engaged?
3  A.  We are engaged.
4  Q.  You are engaged?
5  A.  (Indicating.)
6  Q.  Okay.  When did you get engaged?
7  A.  I don't remember specifically.  Not this
8      summer, but the summer before.
9  Q.  Summer of 2018?
10 A.  Yes.
11 Q.  Okay.  So you're just deciding when to
12     schedule -- when to schedule and plan the
13     wedding then?
14 A.  No.  I mean, I have quite a bit of trauma that
15     I need to work through and be in a much -- you
16     know, a healthier state of mind.  And, I mean,
17     no, we're not -- we're not talking about dates
18     or anything.  We're just -- just a sign of
19     commitment.
20 Q.  Is that why you sought the care of a -- of
21     Heather, who happens to be a marriage and --
22     and family counselor as well?
23 A.  Can you rephrase that?
24 Q.  Sure.  Is that why -- is -- is your
25     relationship with Andrew and your plans with

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 145

```
 1      Andrew going forward, is that part of the
 2      reason that you sought therapy from Heather,
 3      who has a marriage and family specialty?
 4  A.  Oh, no.  I mean, like I said, Heather's -- me
 5      picking Heather was because she's trained in
 6      trauma, and I am just looking for a -- you
 7      know, I mean, I suppose you could include what
 8      my future could hold as part of why I am
 9      seeking care.  But I'm just -- I'm just feeling
10      that I am not in a very trauma-centered
11      response right now, and I want to get back to
12      somewhat of a normal resemblance of a life.
13  Q.  Okay.  And I think this is my last question or
14      two.  But on that subject, have you -- what can
15      you -- how can you describe for us the -- how
16      the trauma -- trauma is obvious -- how the
17      trauma has affected you and -- and -- and why,
18      for example, you sought the care of Heather.
19  A.  Losing Jake has affected every single day of my
20      life.  We could not have been more happily
21      married, perfect for each other, perfect dad.
22      It's just affected everything, and I'm left to
23      raise three kids by myself.  It's just -- it's
24      just affected everything.
25  Q.  I don't want to put you through more trauma.
```

Page 146

```
 1      But can you think of specifics of how it's
 2      affected you?
 3  A.  I mean, try -- trying to figure out how to
 4      parent the kids.  I mean, that was -- that was
 5      Jake.  He was very much -- very much into
 6      figuring out how do we raise them now when
 7      they're babies, they're toddlers, and how is
 8      that going to affect them when they're adults
 9      and how to have positive, healthy relationships
10      with them.  I mean, he was -- he was the rock
11      of our family.  He was the one that -- you
12      know, I mean, we made decisions together, but,
13      I mean, he was the man of the house, and he --
14      you know, he did the hard stuff.  He'd -- you
15      know, he was everything to me and who I leaned
16      on for everything, you know.  And it's -- it's
17      just -- I'm constantly thinking about what
18      would life feel like if he was here, you know.
19      My life before he died was so simple.
20          It was so simple, and now I've got 10
21      million directions that I'm being pulled, and
22      I'm only one person, and that is why I have
23      sought out Heather and because I'm just living
24      in a trauma response of -- of having to
25      survive.  I don't want my kids to see me upset
```

Page 147

```
 1      and laying in bed all day, and then they get
 2      taken from me and have to go somewhere else
 3      because I can't care for them.  Like, I have to
 4      get up, and I have to live and not be super
 5      upset all the time, but all that does to me is
 6      it makes me internalize all of it.  And I'm not
 7      any -- anywhere near the person I was before he
 8      died, the amount of stress and the amount of
 9      anger and sadness and everything.
10  Q.  Financially, what is -- is Andrew helping out
11      with the finances of --
12  A.  No.  He has a house at his -- where he used to
13      live in Minnesota, so he takes care of his
14      stuff.  But, no, he does -- he doesn't help me
15      with --
16  Q.  Okay.
17  A.  -- my house.
18  Q.  How do you make ends meet for your household
19      requirements?
20  A.  We have railroad retirement board income.
21  Q.  How much is that a month?
22  A.  4,000 something.  I'm not sure of the specific
23      dollar amount.
24  Q.  Okay.  Any other sources of income?
25  A.  Not like on a monthly sort, no.
```

Page 148

```
 1  Q.  How about on an irregular basis?
 2  A.  Jake had life insurance.
 3  Q.  That paid out initially in one lump sum?
 4  A.  Yes.  And there were a few other small things
 5      that came up along the way that --
 6  Q.  Okay.
 7  A.  -- we were able to get, the kids and I.
 8  Q.  Such as?
 9  A.  I don't remember.  I think -- I think there
10      might have been something from the union or
11      some -- I don't...
12  Q.  A benefit of some sort?
13  A.  Yeah, just a very small, small something.
14          MR. HAYDEN:  Okay.  Those are my
15      questions.
16          MR. COHEN:  I just have a -- very few
17      questions.  And my name is, again, Mike Cohen,
18      and I represent Professional Transportation,
19      Incorporated.
20  BY MR. COHEN:
21  Q.  And I want to go through a little bit of Jake's
22      medical history, some of the things that
23      perhaps weren't covered or weren't covered
24      enough.  First thing I want to ask you about is
25      Jake's father.  What's Jake's father's name?
```

37 (Pages 145 to 148)

Page 149

1  A.  Stanley Tischer.
2  Q.  Okay.  Would it be fair to say before Jake's
3      death you saw Stanley fairly frequently?
4  A.  No.  I mean, we maybe saw them -- they were
5      teachers in Illinois, so we rarely saw them
6      during the school year, and then we'd see them
7      once in a while during the summer.
8  Q.  Okay.  And how often would they come to their
9      house in Wisconsin during the summer?
10 A.  It really varied.  They're -- they were pretty
11     involved in their life down there.  I mean, I
12     think they were usually here -- they were here
13     off and on, but, I mean, a couple mon -- or a
14     couple weeks at the longest at -- like in one
15     stretch.
16 Q.  Were Jake and his father close?
17 A.  Yes.
18 Q.  Okay.  And would it be fair to say that Jake's
19     father and Jake's mother were involved in their
20     grandchildren's lives and your lives?
21 A.  Yeah.
22 Q.  Okay.
23 A.  I mean, they didn't provide, like, child care
24     or anything, but they were -- yeah, I mean, we
25     were -- we all talked and had a good

Page 150

1      relationship.
2  Q.  Sure.  Are you aware whether Jake's father,
3      Stanley, had any chronic medical conditions or
4      illnesses?
5  A.  At the time of the incident, no, I was not.
6  Q.  Are you now aware of that?
7  A.  Yes.
8  Q.  Okay.  What is that chronic illness or
9      condition?
10 A.  I just know that he has blood clots.
11 Q.  Okay.
12 A.  And he receives, like, the -- a blood thinner.
13 Q.  Okay.  And do you know if Jake was aware of his
14     father's condition?
15 A.  I don't know if he was aware of it or not, no.
16     They kept that stuff kind of private.
17 Q.  Okay.  Now, I know you spoke -- we spoke at
18     length about what occurred on August 12th of
19     2017.  I want to talk about the time before
20     August 12th, and I want you to assume for the
21     sake of argument that August 12th was a
22     Saturday.
23 A.  Okay.
24 Q.  And then, of course, August 11th would be a
25     Friday, and August 10th would be Thursday.  Do

Page 151

1      you recall at all, do you have any memory, of
2      what Jake did during the day of August 10th,
3      that Thursday?
4  A.  I don't know.
5  Q.  Okay.  Did Jake ever report to you at any time
6      that on August 10th, that Thursday, that he had
7      been feeling nauseated?
8  A.  I don't recall that, no.
9  Q.  Okay.  At any time before August 10th did --
10     did Jake ever report to you in the -- that he
11     had been having a dull headache for the last
12     several months?
13 A.  No.
14 Q.  Okay.  Did he have chronic neck pain?
15 A.  No.
16 Q.  Did he report to you that he had -- he had been
17     having right-sided neck pain for the past three
18     or four months prior to August of 2017?
19 A.  No.
20 Q.  Is it fair to say that Jake was a pretty hardy
21     individual?
22 A.  Yes.
23 Q.  And he wouldn't go to a doctor for things like
24     hangnails; right?
25 A.  Right.

Page 152

1  Q.  And he didn't have a primary care physician, I
2      think you mentioned?
3  A.  No.  I mean, he was a very healthy person,
4      so...
5  Q.  Would he go to a -- would he go to a doctor on
6      a yearly basis for checkups?
7  A.  I don't -- I don't recall.
8  Q.  Did you get the feeling after having known him
9      for several years that he didn't enjoy going to
10     doctors?
11 A.  Can you repeat that, please?
12 Q.  Did you get the feeling after knowing him for
13     several years that he didn't enjoy going to
14     doctors?
15 A.  I don't think anybody enjoys it.  I mean, I
16     don't recall him specifically saying that,
17     but...
18 Q.  Would it be fair to say that he avoided going
19     to doctors?
20 A.  No, he didn't avoid going to the doctor.
21 Q.  Okay.  Would it be fair to say that he only
22     would go to a doctor if something serious
23     arose?
24 A.  Well, serious is a pretty broad term.  But, I
25     mean, he'd go to the doctor if it -- if he

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 153

1    seemed -- if he -- if it seemed necessary.
2  Q.  Okay.  But from time to time if you suggested
3      he go to the doctor, he wouldn't sometimes; is
4      that correct?
5  A.  I don't know that I ever suggested he go to the
6      doctor.
7  Q.  Okay.
8  A.  I mean, there might have been some conversation
9      about it in Idaho that he should go, and he
10     went.  But, I mean, he rarely got sick.  I
11     mean, he was pretty healthy.
12 Q.  Okay.
13 A.  And even still, I mean, most doctors can't do
14     anything for a cold or, you know, things like
15     that.
16 Q.  Are you familiar with the name Dr. Jerry
17     Basford?
18 A.  No.
19 Q.  Okay.  If your husband reported to Dr. Jerry
20     Basford that on August 10th he began feeling
21     ill and slower, do you have any reason to
22     disbelieve that your husband said that?
23 A.  I mean, I didn't witness him being those
24     things.  I have no -- I have no idea who that
25     is or if he talked to him.

Page 154

1  Q.  Okay.  I take it that throughout this, your
2      husband's presence at hospitals, that you had
3      occasion to talk to several doctors; is that
4      correct?
5  A.  Yes.
6  Q.  All right.  And you talked to those doctors
7      about your hus -- husband's medical history and
8      condition; is that right?
9  A.  Yes.
10 Q.  All right.  And you understood that the purpose
11     of -- that the doctors were asking you for
12     information was to treat your husband; right?
13 A.  Yes.
14 Q.  And you understand that doctors base their
15     decisions in part on a patient's medical
16     history and what the family members tell them
17     regarding the patient's medical condition and
18     medical history?
19 A.  Yes.  That's why I've always been very honest
20     with the doctors.
21 Q.  Absolutely.  Are you aware of a -- a Dr.
22     Jennifer Foo-gate or Fugate?
23 A.  That name sounds familiar.
24 Q.  All right.  Did you tell Dr. Fugate on
25     August 13th that Jake had been feeling

Page 155

1    nauseated on August 10th and that he had a dull
2    headache for several months?
3  A.  I do not recall saying that, no.  I mean, I --
4      I don't remember having a conversation with
5      that specific doctor sitting here.  I -- I
6      don't recall those being symptoms of his, no.
7  Q.  Okay.  If your husband told that to Dr. Fugate,
8      would you have any reason to disbelieve that he
9      said that?
10 A.  I mean, again, I don't know if it was a
11     conversation that he had with somebody.  I
12     personally don't really know how he can be in
13     any kind of right state of mind to be giving
14     medical history.  I mean, he didn't really talk
15     and --
16 Q.  Okay.
17 A.  -- a lot of times it was mis -- you know, it
18     was -- I don't know.  It just -- he just didn't
19     really talk, and the doctors told me that that
20     was to be expected.  So I -- I have no idea how
21     he would have the capacity to be talking to the
22     doctors.
23 Q.  Okay.  If he wasn't talking to the doctors
24     regarding his medical history, who was?
25 A.  I'm sure -- I mean, I gave doctors medical

Page 156

1    history, and they probably at some point spoke
2    to his mom and his dad, Stan and Janice
3    Tischer.
4  Q.  Okay.
5  A.  Because they would know his -- you know, his
6      childhood history and everything.
7  Q.  All right.  Do you recall stating to Dr. Seibel
8      that on the morning of August 12th your husband
9      seemed fatigued and passed out, landing flat on
10     his back?
11 A.  I don't recall specifically what I said, but
12     that -- yeah, I mean, he fell on the floor.  I
13     mean, he was -- I shouldn't say he fell.  He
14     was on the floor.  I don't know if he sat on
15     the floor.  I mean, I don't -- all I know is he
16     was standing up, I turned my back to him, I
17     looked back, and he was laying on the floor.
18 Q.  Okay.  You have no reason to believe that Dr.
19     Seibel made an error in transcribing her
20     conversation with you, do you?
21 A.  I don't remember specifically what I said to
22     that doctor.  And, again, I mean, doctors can
23     always put things down wrong or interpret them
24     wrong.  I don't -- I don't know.
25 Q.  Okay.  And this was a -- obviously a tough time

39 (Pages 153 to 156)

Page 157

1   for you; correct?  There's a lot of --
2   A.  Oh, extremely.  I had my six-week-old baby at
3       the hospital with me while my husband is
4       paralyzed laying in a hospital bed.
5   Q.  Things were happening very quickly?
6   A.  Yeah.
7   Q.  Yeah.  Did you tell Dr. Seibel that after he
8       passed out, you went to him and his hands were
9       shaking and his jaw was rigid?
10  A.  I don't recall saying that, and sitting here
11      today, I don't remember those being symptoms of
12      his at that time when he was on the floor.
13  Q.  And, again, I apologize for being formulaic
14      here, but there's no reason you have, sitting
15      here today, to believe that Dr. Seibel made an
16      error in transcribing your conversation with
17      her?
18  A.  Again, I don't know.  I don't re -- recall
19      sitting here saying that again, and I don't
20      recall -- I don't know if she did her job
21      appropriately.  I mean, I don't -- I don't
22      know.  If -- if she transcribed it properly, I
23      don't know.
24  Q.  As you sit here today, do you have any reason
25      to believe she didn't do her job appropriately?

Page 158

1   A.  No.  But they talk to a lot of people.  I'm --
2       I'm just saying I don't know -- I don't recall
3       saying that, so I can't say, Yes, she did it
4       correctly, because I don't even know what I
5       said, so how can I say that she wrote it down
6       correctly.  I don't remember what she said --
7       or I don't remember what I said to her.
8   Q.  When you were talking to Dr. Seibel and as you
9       sit here today, you understand that Dr. Seibel
10      was asking you these questions and was noting
11      your answers for the purpose of treating your
12      husband who was suffering from an extremely
13      serious medical condition?
14  A.  I -- I don't know if she was taking notes or
15      not.  I don't know.
16  Q.  Okay.
17  A.  I had a lot of doctors talking to me about a
18      lot of different things.  And I -- all I gave
19      them was honesty.  That's the extent that I
20      know of what they wrote down.
21  Q.  All right.
22  A.  I mean, I don't...
23  Q.  Dr. Seibel noted that, The patient was able to
24      get up and go to the bathroom where he vomited
25      blood.  I want you to assume that that's what

Page 159

1   Dr. Seibel noted for the purpose of the next
2   few questions.
3   A.  And I'm assuming that that's meaning at the
4       house.
5   Q.  Sure.  I think that's a good assumption.
6   A.  Okay.
7   Q.  I want to take -- take you back to when your
8       husband was vomiting at the house.  How soon
9       after he got up from passing out did he -- did
10      he go into the bathroom and vomit?
11  A.  I mean, it wasn't an extremely long period of
12      time.
13  Q.  Did he vomit a lot or a little?  How would you
14      characterize that?
15  A.  I don't really recall.
16  Q.  Okay.
17  A.  It was enough to see it, but I -- I don't
18      really remember more than that.
19  Q.  Okay.  You -- after he began vomiting, did you
20      go into the bathroom?
21  A.  Yes, I followed him down the hallway.
22  Q.  Okay.  And you watched him vomit?
23  A.  Yes.
24  Q.  And what did you notice, if anything, about his
25      vomit?

Page 160

1   A.  I noticed red in the toilet bowl, and that was
2       when I was concerned.  I said, Is that blood,
3       and that was when he said he ate a ton of
4       watermelon, which was consistent with what we
5       had in the fridge at that time, and it looked
6       like digested watermelon.  It didn't look like
7       bright red blood.  It's just when you see red
8       in a toilet, obviously you automatically think
9       of blood or I do, so...
10  Q.  Did he agree with your observation that it is
11      watermelon, not blood?
12  A.  Yes.
13  Q.  All right.  Do you recall discussing with
14      Dr. Seibel that your husband had vomited blood?
15  A.  I don't recall that conversation, no.
16  Q.  Do you recall hearing your husband discuss with
17      Dr. Seibel that he had vomited blood?
18  A.  Again, I -- I never really heard him talk to
19      the doctor as much when he was a -- in a pretty
20      bad state where he -- he didn't really do a
21      whole lot of talking.
22  Q.  Did you discuss with anybody else or are you
23      aware of whether he discussed with anybody else
24      whether or not he had vomited blood that
25      morning?

40 (Pages 157 to 160)

Page 161

1    A.  I don't know.
2    Q.  That's to say you -- you don't recall dis --
3        that there's no reason for anybody else to know
4        whether or not he had vomited blood?
5    A.  Like, did I -- what do you mean?
6    Q.  So had you discussed with anybody else other
7        than your husband whether or not he had vomited
8        blood that morning?
9    A.  Well, I'm sure I told it to the doctors.
10   Q.  Okay.  How about other than the doctors?
11   A.  I don't know.  I mean, I might have said when
12       his parents got there and stuff.  I mean,
13       everybody's kind of like, What's going on, what
14       happened, like, you know.  I -- I don't
15       remember what I -- what I said to all of these
16       people that are trying to figure out what
17       happened and what's going on.
18   Q.  I understand.  Okay.  Is it fair to say that
19       you observed that on the morning of
20       August 12th, 2017, your husband was confused
21       that morning?
22   A.  I'm sorry.  Can you say that again?
23   Q.  Is it fair to say that -- that the morning of
24       August 12th you observed that your husband was
25       confused, acting confused?

Page 162

1    A.  I don't know if I would say he was confused.
2        He just -- he was tired, and he -- he didn't
3        know what happened.  I mean, I haven't, like,
4        sat down and thought about a term to define
5        that as.  But, I mean, he was able to -- to
6        walk and was talking to me and...
7    Q.  Do you recall reporting to Dr. Seibel that you
8        observed that he seemed confused that morning?
9    A.  I don't recall that, no.
10   Q.  Okay.  And you have no -- do you have any
11       reason to believe that she erred in -- in
12       taking that down, that observation down?
13   A.  I don't -- I don't recall saying it, and I
14       don't know -- I don't know if she wrote it down
15       appropriately.  I don't know.
16       MR. COHEN:  Okay.  I don't have any
17       further questions.  Thank you.
18       MR. BANKER:  No questions.  We will read
19       and sign.
20       VIDEOGRAPHER:  Please hold.  This
21       concludes today's deposition of Jessica Tischer
22       consisting of two media.  We are off the record
23       at 1:15 p.m.
24       (Proceedings concluded at approximately
25       1:15 p.m.)

Page 163

1    STATE OF WISCONSIN   )
                          )ss
2    COUNTY OF EAU CLAIRE )
3
4        I, Stephanie Peil, Notary Public in and for the
5    State of Wisconsin, certify there came before me the
6    deponent herein, namely Jessica Tischer, who was by
7    me duly sworn to testify to the truth and
8    nothing but the truth concerning the matters in this
9    cause.
10       I further certify that the foregoing transcript
11   is a true and correct transcript of my original
12   stenographic notes.
13       I further certify that I am neither attorney or
14   counsel for, nor related to or employed by any of
15   the parties to the action in which this deposition
16   is taken; furthermore, that I am not a relative or
17   employee of any attorney or counsel employed by the
18   parties hereto or financially interested in the
19   action.
20       IN WITNESS WHEREOF, I have unto set my hand and
21   affixed my Notarial Seal this 3rd day of October,
22   2019.
23
24   _____
25   Stephanie J. Peil, Notary Public

Q & A COURT REPORTERS, INC.
(715) 834-9812