Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
------------------------------------------------
JESSICA TISCHER, individually and
as Personal Representative For the
Spouse and Children of Jacob Tischer,
Decedent,
　　　　　　　Plaintiff,　　　　DEPOSITION
　　　　　　　　　　　　　　　　　Case No.
　　　　vs.　　　　　　　　　3:19-cv-00166-jdp
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,

　　　　　　　Defendant.
------------------------------------------------
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,
　　　　　　　Defendant/Third-Party Plaintiff,
　　　　　　　　　　　vs.
PROFESSIONAL TRANSPORTATION, INC.,
　　　　　　　Third-Party Defendant.
------------------------------------------------

　　　The deposition of MICHAEL SWENTIK, taken under
and pursuant to the provisions of Chapter 804 of the
Wisconsin Statutes and the acts amendatory thereof
and supplementary thereto, before Stephanie J. Peil,
Notary Public in and for the State of Wisconsin, at
Q & A Court Reporters, Inc., 303 Main Street, Eau
Claire, Wisconsin, on the 3rd day of December, 2019,
commencing at approximately 9:53 a.m.

　　　　　ORIGINAL TRANSCRIPT FILED AT THE

Page 2

1　　　　　　　APPEARANCES:
2　　　　Paul Banker, Esq., of Hunegs, LeNeave & Kvas,
3　　1000 Twelve Oaks Center Drive, Suite 101, Wayzata,
4　　Minnesota, 55391, appeared representing the
5　　Plaintiff.
6　　　　Thomas A.P. Hayden, Esq., of Union Pacific
7　　Railroad Corporation, 101 North Wacker Drive, Room
8　　1920, Chicago, Illinois, 60606, appeared
9　　representing the Defendant and Third-Party
10　Plaintiff, Union Pacific Railroad Corporation.
11　　　Michael B. Cohen, Esq., of Quintairos, Prieto,
12　Wood & Boyer, P.A., 233 South Wacker Drive, 70th
13　Floor, Chicago, Illinois, 60606, appeared
14　representing the Third-Party Defendant, Professional
15　Transportation, Inc.
16　　　Also present:　Jamie Lukehart Hobbs.
17
18
19
20
21
22
23
24
25

Page 3

1　　　　　　EXAMINATION INDEX
2　MICHAEL SWENTIK:
3　By Mr. Banker　　　　　　　4
4　By Mr. Cohen　　　　　　　62
5　By Mr. Hayden　　　　　　　68
6
7
8
9
10　　　　　　　EXHIBITS
11　Marked for
　　Identification　　　　　　Page
12
　　36 - Marvin Verizon Cell Phone Records　58
13
14　ORIGINAL EXHIBIT WITH ORIGINAL TRANSCRIPT
　　COPIES SUPPLIED TO THE ATTORNEYS
15
16
17
18
19
20
21
22
23
24
25

Page 4

1　　　　　P R O C E E D I N G S
2　　　　　　MICHAEL SWENTIK,
3　being first duly sworn, testified as follows:
4　　　　　　EXAMINATION
5　BY MR. BANKER:
6　Q.　Good morning.　Could you please state your name
7　　　for the record.
8　A.　George Michael Swentik, Junior.
9　Q.　And how do you spell your last name?
10　A.　S-W-E-N-T-I-K.
11　Q.　And do you -- do you go by Mike?
12　A.　Yes.
13　Q.　Mr. Swentik, have you had your deposition taken
14　　　before?
15　A.　No.
16　Q.　Let me just go over some of the -- kind of the
17　　　procedural for what we're going to do here
18　　　today just so we're all on the same page.　The
19　　　court reporter here is taking down everything
20　　　that gets said, and so in order for us to have
21　　　a clear record of the communication today, it's
22　　　important that you answer audibly.　That means
23　　　no shaking of the head or saying huh-uh or
24　　　um-hum because that won't show up clearly on
25　　　the record.　Do you understand?

1 (Pages 1 to 4)

Page 5

1   A.  Yes.
2   Q.  Also, it's important procedurally that we not
3       talk over each other.  So I'll make an effort
4       to ask a question, stop, give you a chance to
5       answer so that we're not talking at the same
6       time.
7   A.  Okay.
8   Q.  Also, if during the deposition today if I ask a
9       question and you don't understand it, please
10      feel free to ask me for clarification.  I'll do
11      what I can to rephrase the question.
12  A.  Okay.
13  Q.  What, if anything, did you do to prepare for
14      your deposition today?
15  A.  Met with Tom, and I went over two documents.
16  Q.  Other than conversations with your counsel, did
17      you have any other conversations with anybody?
18  A.  Nope.
19  Q.  And then you mentioned that you looked at two
20      documents.  What documents did you look at?
21  A.  RMCC and another one, which I don't know.
22          MR. HAYDEN:  Form 98.
23          THE WITNESS:  Form 98.
24  BY MR. BANKER:
25  Q.  What was the first --

Page 6

1   A.  RMCC.
2   Q.  RMCC?
3   A.  Yeah.
4   Q.  What is the RMCC document?
5   A.  Risk management that I called in that evening
6       after the event.
7   Q.  And then the second one was a form --
8   A.  Form 98 that I had no information -- I was no
9       part of that form.
10          MR. HAYDEN:  It's these two, Paul, just to
11      be clear (indicating).
12          MR. BANKER:  Thank you.  Okay.
13  BY MR. BANKER:
14  Q.  Did you look at any other documents to prepare
15      for your --
16  A.  No, sir.
17  Q.  -- deposition today?  Okay.  Let me just switch
18      gears and get a little bit of background
19      information about you.  Where do you currently
20      live?
21  A.  Eau Claire, Wisconsin.
22  Q.  What is your address there?
23  A.  My personal address?
24  Q.  Yes.
25  A.  311 Hewitt Street.

Page 7

1   Q.  In Eau Claire?
2   A.  In Eau Claire.
3   Q.  Do you live or -- do you rent or own there?
4   A.  Own.
5   Q.  Do you live there with anyone?
6   A.  Wife and children.
7   Q.  And your children, are there any of them that
8       are over the age of 18?
9   A.  No.
10  Q.  Are you a high school graduate?
11  A.  Yes.
12  Q.  When did you graduate from high school?
13  A.  1986.
14  Q.  And where did you go to high school?
15  A.  Lake of the Woods High School, Baudette,
16      Minnesota.
17  Q.  And then do you have any post-high school
18      education?
19  A.  I have a four-year degree.
20  Q.  And where did you get --
21  A.  The University of Minnesota-Crookston.
22  Q.  And what was your degree?
23  A.  Agricultural degree.
24  Q.  A Bachelor's Degree?
25  A.  Yes.

Page 8

1   Q.  And then any post-college formal education?
2   A.  12 credits towards a Master's.
3   Q.  And what were you pursuing a Master's in?
4   A.  They were just generals just to get some --
5       some classes started.
6   Q.  Do you hold any professional licenses or
7       certifications?
8   A.  Remote control license.
9   Q.  And that's a railroad remote control?
10  A.  Yes, sir.
11  Q.  And are you also trained as either a conductor
12      or an engineer?
13  A.  Conductor, not engineer.
14  Q.  Are you currently employed?
15  A.  Yes.
16  Q.  Who are you employed by?
17  A.  Union Pacific Railroad.
18  Q.  How long have you worked for -- well, what do
19      you do for Union Pacific Railroad right now?
20  A.  Right now I'm the senior manager of terminal
21      operations based out of Altoona, but I cover
22      Adams, Itasca, and Winona.
23  Q.  How long have you worked for UP?
24  A.  Be 18 years in July.
25  Q.  So let me get kind of a general overview of

2 (Pages 5 to 8)

Page 9

1  what you've done for UP.  When you first hired
2  on with UP, how did you -- what was your title?
3  A.  I was a brakeman, 2002.
4  Q.  And how long did you do that?
5  A.  Five years.
6  Q.  And was --
7  A.  Brakeman/conductor.
8  Q.  Was there a particular location that you --
9  A.  Denver.
10  Q.  Denver.  And then after that, what did you do?
11  A.  Became a manager and MYO in St. Paul for
12  several years and then MTO in Valley Park,
13  Minnesota, and then senior MTO in Altoona,
14  Wisconsin.
15  Q.  And so how long have you been a senior MTO in
16  Altoona?
17  A.  Started January 1st, 2017, I believe.
18  Q.  Okay.  As an MTO in the Altoona yard, what
19  does -- is MTO the same as manager of terminal
20  operations?
21  A.  Yes.
22  Q.  As an MTO in the Altoona yard, could you just
23  give me a sense of your -- of your general
24  responsibilities.
25  A.  Head of safety, head of train movement, calling

Page 10

1  trains, driving crews, yeah.
2  Q.  Are there other MTOs in the Altoona yard?
3  A.  No.
4  Q.  Have there ever been other MTOs in the Altoona
5  yard during the time that you have been the
6  senior MTO?
7  A.  No.
8  Q.  And I want to make sure.  You had worked
9  previously as an MYO?
10  A.  In St. Paul.
11  Q.  In St. Paul.  Is that a manager of yard
12  operations?
13  A.  Yes.
14  Q.  How does -- can you explain the difference to
15  me between what an MYO does versus an MTO.
16  A.  MTO has a bigger territory, bigger area, and
17  then as a senior even an expanded territory.
18  Q.  In the Altoona yard are there MYOs?
19  A.  Yes.
20  Q.  Do the MYOs report directly to you?
21  A.  Yes.
22  Q.  So let's shift gears here again.  Did you know
23  Jacob Tischer?
24  A.  Yes.
25  Q.  How did you know Jacob Tischer?

Page 11

1  A.  He was a conductor for me.
2  Q.  Was he working as a conductor for you before
3  January 1st of 2017 when you became a senior
4  MTO for Altoona?
5  A.  Had he ever worked for me before?
6  Q.  Yes.
7  A.  No.
8  Q.  So your first contact with him was in that
9  capacity as a senior MTO at Altoona?
10  A.  Correct.
11  Q.  Did you ever work with him directly?
12  A.  I would give him his job expectations when he
13  came to work, so yes.
14  Q.  So you would kind of provide the plan for the
15  day and the --
16  A.  Correct.
17  Q.  -- kind of task assignments sometimes?
18  A.  Correct.
19  Q.  Did you have an opinion about Mr. Tischer as an
20  employee?
21  A.  No.
22  Q.  One way or the other?
23  A.  No.  He was a good employee.
24  Q.  Did you ever take issue with any of his work?
25  A.  Never.

Page 12

1  Q.  Were there ever any safety issues that you
2  dealt with him on?
3  A.  Not that I was aware of.
4  Q.  Was there ever any discipline that you were
5  involved in with Mr. Tischer?
6  A.  No.
7  Q.  Did you ever do any training directly with Mr.
8  Tischer?
9  A.  I don't recall.
10  Q.  How about any operations testing?
11  A.  I'm sure I did.
12  Q.  What -- how would you come in -- as a senior
13  MTO at Altoona, how would you come in contact
14  with someone in the conductor craft to do
15  operations testing?
16  A.  I would maybe set up a structured test or do an
17  RCO ride with them or just observe them
18  working.
19  Q.  Do you have any specific recollection of doing
20  that with Mr. Tischer, or are you just assuming
21  that you would have?
22  A.  I don't have a -- a recollection of doing that
23  with him, but I'm guessing I did in the time
24  that I was there.
25  Q.  Do you have a -- did you ever take issue with

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 13

1    any of those operations testing?
2  A.  I don't recall.
3  Q.  I want to direct your attention to August 12th,
4    2017, the date of Mr. Tischer's incident.  Are
5    you aware there was an incident on August 12th,
6    2017?
7  A.  Yes.
8  Q.  I want to kind of take it -- take you through
9    the chronological explanation of the
10    information that you have, so let's start here.
11    Were you working on August 12th, 2017?
12  A.  I was not.
13  Q.  I believe that was a Saturday.  Do you have a
14    different recollection?
15  A.  No, I believe it was Saturday.
16  Q.  Did you have a regular work schedule that you
17    maintained as a -- as the senior MTO at
18    Altoona?
19  A.  Yes.
20  Q.  Was that a Monday through Friday?
21  A.  Monday -- Sunday through Thursday.
22  Q.  Sunday through Thursday.
23  A.  Friday, Saturday off days; on call 24 hours a
24    day, 365 days a year.
25  Q.  But if this happened on -- if that was a

Page 14

1    Saturday, then you -- that was an off day for
2    you?
3  A.  It was an off day, yes.
4  Q.  Do you know who was working in the Altoona yard
5    at the time of -- let me put it this way.  Do
6    you know who was -- when you're not working in
7    the Altoona yard, who is sort of the ranking
8    person?
9  A.  It depends on the -- I have two managers, if
10    they were on the night or the day shift.
11  Q.  On that day, August 12th, 2017, who were the
12    two people who were the managers?
13  A.  It would have been Mark Marvin.
14  Q.  What was the name of other person who was a
15    manager?
16  A.  Jerome Chess, but I do not believe he was on
17    duty.
18  Q.  Do you have reason to believe that Mark Marvin
19    was on duty?
20  A.  Yes.
21  Q.  What is your basis for that?
22  A.  Because he was on the schedule, and then I
23    received a call from him that evening.
24  Q.  Was receiving a call from Mr. Marvin the first
25    you heard about an incident with Mr. Tischer?

Page 15

1  A.  Yes.
2  Q.  Okay.  So let's -- let's start there.  Do you
3    know what time of day it was that you received
4    that call?
5  A.  It was dusk or late evening or late afternoon.
6    It was sometime probably 8 o'clock-ish.  I'm
7    not sure.
8  Q.  And how did you receive that call?  Was it on a
9    personal cell phone or a company cell phone?
10  A.  Company cell phone.
11  Q.  And it was from Mr. Marvin?
12  A.  Yes.
13  Q.  Do you recall the specifics of that
14    conversation?
15  A.  Called and said that we had a crew member who
16    wasn't feeling well, and he was thinking about
17    sending him home.
18  Q.  Did he tell you -- in this first part of the
19    call that we've talked about, did he tell you
20    who the crew member was?
21  A.  I don't think he gave me a name at the start.
22  Q.  Okay.  What did you say in response to that?
23  A.  I said, Have you spoken with him yet?  And he
24    said that he had, and I said, Does he want to
25    go home?  And he said no.  I said, Well, if

Page 16

1    he -- if you feel he needs to go home, it's
2    okay to send him home.
3  Q.  Let me just back up a step in the chronology.
4    Do you have an understanding of why it was that
5    Mark Marvin was calling you about this issue
6    while on -- while on a day that you weren't
7    working?
8  A.  I get calls all the time when I'm not working
9    about all kinds of things that happen or issues
10    in the yard or questions.
11  Q.  Was this something that you needed -- this idea
12    of sending a crew member home because he wasn't
13    feeling well, is that something that you would
14    need to give approval to as the senior MTO or
15    was that something that Mr. Marvin could have
16    decided on his own?
17  A.  I think he was probably concerned because we
18    had a yard full of cars.
19  Q.  If you weren't working that day, how did you
20    understand that there was a yard full of cars?
21  A.  Even though I wasn't working, I know my yard.
22    I know what trains are coming and how heavy we
23    are daily.  It's...
24  Q.  You're on --
25  A.  It's a standard practice.

4  (Pages 13 to 16)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 17

1  Q.  You're on call all the time?
2  A.  Yeah.
3  Q.  And so on August 12th, 2017, there were a lot
4     of cars in the Altoona yard needing to be
5     moved?
6  A.  There was -- sand business was booming, and
7     there was trains coming in, and we had a yard
8     full of cars, correct.
9  Q.  Now, when you say "the sand business is
10    booming," there was a sand plant up in Norma;
11    correct?
12  A.  There's several sand plants.
13  Q.  Okay.  Several sand plants that UP services?
14  A.  No.  UP just pulls cars from a WN, a shortline
15    railroad.
16  Q.  What is that sand used for; do you know?
17  A.  Fracking in the oil fields.
18  Q.  Did Marvin express a concern to you that he had
19    a yard full of cars or are you just inferring
20    that?
21  A.  No.  He did say that, We won't be able -- if
22    we -- if he goes home, we won't be able to move
23    the cars, and I said, Well, either find another
24    crew or we'll do it tomorrow.
25  Q.  What -- when you said that, what did Mr. Marvin

Page 18

1     say back?
2  A.  He says, Okay, I'll -- I'll talk to the
3     employee.
4  Q.  And was that the end of the conversation?
5  A.  I believe so.
6  Q.  And has that taken us through everything that
7     you remember about this first conversation with
8     Mr. Marvin that evening?
9  A.  Yes.
10  Q.  Okay.  When you say -- you know, you commented
11    that one of your suggestions to Mr. Marvin was
12    find another crew or do it tomorrow.  Help me
13    to understand, you know, if an employee goes
14    off of a crew that's been called, does that
15    invalidate the crew from doing more work?
16  A.  Yes.
17  Q.  Is it possible to just sub somebody into that
18    crew, or --
19  A.  No.
20  Q.  -- do you have to call an entirely different
21    crew?
22  A.  Would have to call an entirely different crew.
23  Q.  Can you help me understand why that is.
24  A.  With the -- there was probably -- the only
25    other crew, there was the RCO crew on the lead

Page 19

1     job, and with cars to switch you would not take
2     anybody off of another job to put on another
3     job.
4  Q.  When you say "there was an RCO crew," you're
5     talking about in the Altoona yard?
6  A.  Yes.
7  Q.  And RCO is an abbreviation for remote --
8  A.  Remote control operations.
9         MR. HAYDEN:  Mike, just let him finish his
10    question before you begin your answer.  You're
11    jumping in a little bit.
12         MR. BANKER:  It's a natural enough thing
13    to do when you start talking, but we'll try
14    to -- try to break it up.
15  BY MR. BANKER:
16  Q.  So the RCO -- RCO is an abbreviation, and
17    that's for remote control operation, and
18    they're working in the Altoona yard that night?
19  A.  Correct.
20  Q.  Do you know who it was that was working on the
21    RCO crew in the Altoona yard that --
22  A.  I do not.
23  Q.  But you were aware that there -- there was an
24    RCO crew?
25  A.  Yes.

Page 20

1  Q.  And so if Mr. Marvin is sending an employee --
2     well, did you have an understanding from Mr.
3     Marvin's call about what crew had someone who
4     wasn't feeling well?
5  A.  Yes, he did tell me it was the -- I believe it
6     was in the LTS83 or 83X, but I -- I'm not a
7     hundred percent sure if I have the right crew
8     ID.
9  Q.  And what -- what does LTS83 signify to you?
10  A.  That is just the job ID.
11  Q.  And what is that job, the LTS83?
12  A.  Transfer job from Altoona yard to the WN,
13    Wisconsin Northern Railroad.
14  Q.  And so in this first call you had an
15    appreciation that one of the people who wasn't
16    feeling -- the -- the person who wasn't feeling
17    well was working on the LTS83 job?
18  A.  Correct.
19  Q.  And if a crew member goes off the LTS83 job,
20    you would need to pull an entirely different
21    crew to pick that job up?
22  A.  Yes.
23  Q.  Am I understanding that correctly?
24  A.  That is correct.
25  Q.  And then -- and so why is that?  Is that

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 21

```
 1    because of hours of service, or is that because
 2    of union rules, or why can't you just call
 3    somebody else in?
 4  A. Hours of service, and they get a three-hour
 5    call to come to work. So if that job went on
 6    duty at noon and it's the time frame now 9
 7    o'clock, the engineer wouldn't have enough time
 8    to -- to do any work hardly.
 9  Q. I see. Okay. So the engineer would probably
10    run out of his hours of service by the time you
11    could get a new person in?
12  A. Yes.
13  Q. Got it. So you have this call with Mr. Marvin.
14    Where are you when you take this call?
15  A. I'm at a campfire.
16  Q. A campfire at your home or camping?
17  A. In the neighborhood.
18  Q. Neighborhood campfire. Was anything asked of
19    you by Mr. Marvin, or was he just consulting
20    with you in that first call?
21  A. Just consulting.
22  Q. What happened next?
23  A. I told the wife and kids that I was going to
24    head to the house and probably going to --
25    going to go into work to see if we could come
```

Page 22

```
 1    up with a plan to move some cars.
 2  Q. Do you remember what time of day that was?
 3  A. That was -- that phone conversation was -- like
 4    I say, it was dusk or dark, after 7, 8 o'clock
 5    sometime, so I'm going to say if that's --
 6    8:30-ish, maybe. I'm not sure.
 7  Q. So you explained this to your family. What
 8    happens next?
 9  A. I go to the house, change clothes, get in my
10    truck to head towards the office.
11  Q. How far away do you live from the office,
12    roughly speaking?
13  A. 18, 20 minutes somewhere.
14  Q. What happens next?
15  A. I received a phone call, and I don't remember
16    who called me first, if it was the engineer on
17    the job or if it was the conductor's brother.
18    They were telling me that 911 needed to be
19    called for the employee.
20  Q. Did you receive two calls, or you're saying you
21    received one call and it was from either of two
22    people?
23  A. I received two calls.
24  Q. And you don't remember who --
25  A. Correct.
```

Page 23

```
 1  Q. -- called first?
 2  A. Correct.
 3  Q. The substance of the first call was that 911
 4    needed to be called for the employee?
 5  A. Yes, they felt that 911 needed to be called.
 6  Q. And the substance of the second call was that
 7    911 needed to be called for the employee?
 8  A. Yes, that's correct.
 9  Q. Was there any more -- let's approach it this
10    way. Do you believe that you spoke with both
11    the engineer on the job as well as the
12    conductor's brother over the course of two
13    calls?
14  A. Yes.
15  Q. Do you know who the engineer was that you spoke
16    to?
17  A. Yes, Neil Franchuk.
18  Q. Do you know who the conductor's brother was?
19  A. I can't recall.
20  Q. Is Josh Tischer a name that's familiar to you?
21  A. Tischer name is. Honestly, I don't know if it
22    was Josh who called.
23  Q. So if I say it -- it was his brother?
24  A. He said it was his brother.
25  Q. Do you know how they had your contact
```

Page 24

```
 1    information?
 2  A. I have no idea how Josh, I believe you called
 3    him, had my phone number at all. And Neil is
 4    an employee on the railroad. Most employees
 5    have my -- have my work number.
 6  Q. When you spoke with Neil, Mr. Franchuk, and he
 7    told you that 911 needed to be called for the
 8    employee, what did you say?
 9  A. I said, I will take care of it or -- or get
10    ahold of Marvin to see if 911 has been called.
11  Q. When you spoke with the conductor's brother and
12    he said 911 needed to be called, what did you
13    say?
14  A. I said, I will find out if 911 has been called
15    with Marvin.
16  Q. And do you know what time it was that these
17    two -- these two phone conversations took
18    place?
19  A. Somewhere between that time that -- what did I
20    say? -- 8:30-ish and -- so it would be
21    somewhere between there and 9 o'clock.
22  Q. Were these calls also calls that you received
23    on a company cell phone?
24  A. Yes.
25  Q. What is the number for the company cell phone?
```

6 (Pages 21 to 24)

Page 25

```
 1   A.  (651)295-3665.
 2   Q.  And is that -- was that the same number in 2017
 3       as it is today?
 4   A.  Yes.
 5   Q.  The 651 area code, is that a Twin Cities area
 6       code?
 7   A.  Yes.
 8   Q.  Is that a remnant from when you worked in the
 9       St. Paul --
10   A.  Yes.
11   Q.  So did you have these two phone conversations,
12       one with Mr. Franchuk and one with the
13       conductor's brother, before you did anything
14       else?
15   A.  I tried to call Marvin in the meantime and
16       could not get through.
17   Q.  So in between -- so the two calls that you've
18       described, the Franchuk on the one hand and the
19       conductor's brother on the other hand,
20       regardless of what order they came in, you
21       tried to call Marvin in between them?
22   A.  I believe so, yes.
23   Q.  And you weren't able to get ahold of Marvin?
24   A.  Yes.
25   Q.  Were you calling him on a -- on his cell phone?
```

Page 26

```
 1   A.  Yes.
 2   Q.  And was that a personal cell phone or a company
 3       cell phone?
 4   A.  Company cell phone.
 5   Q.  Do you recall the number offhand?
 6   A.  I would have to look. I don't recall.
 7   Q.  Did you leave a message when you called Mr.
 8       Marvin?
 9   A.  I don't believe I did.
10   Q.  Was there the capability to leave a message or
11       --
12   A.  Yes.
13   Q.  Why did you not choose to leave a message?
14   A.  Because I was just going to continue to call
15       him.
16   Q.  So now we've talked about a call with Mr.
17       Franchuk, a call with the conductor's brother,
18       and a call to Marvin where Marvin didn't pick
19       up. What happened next?
20   A.  Either I called Mr. Marvin back or he called me
21       to say that he had called 911.
22   Q.  What did you say in response to Mr. Marvin?
23   A.  I said okay.
24   Q.  Was there anything more to that communication?
25   A.  I don't recall.
```

Page 27

```
 1   Q.  Where were you when you had this
 2       communication -- second call with Mr. Marvin
 3       where you spoke?
 4   A.  I was in my vehicle driving to the office.
 5   Q.  So you're still en route from --
 6   A.  Yes.
 7   Q.  -- home to the office?
 8   A.  Yes.
 9   Q.  Do you remember what time the second call from
10       Mr. Marvin when you spoke was?
11   A.  I do not.
12   Q.  Was there anything more said in that call?
13   A.  I don't recall.
14   Q.  Okay. What happened next?
15   A.  I got to the office and -- well, in the -- in
16       the meantime I believe I called either Neil or
17       his brother back and said 911 had been called.
18   Q.  Okay. Then what happens?
19   A.  Then I went to the office, and the ambulance
20       had already left with the employee, and there
21       was a few crew members in the office. Neil
22       Franchuk was one of them and Harold Lowe. I
23       talked briefly to them, went into my office,
24       and headed to the hospital.
25   Q.  Let me just back up a step. When you're in the
```

Page 28

```
 1       office and Mr. Lowe and Mr. Franchuk were
 2       there, what, if anything, do you recall about
 3       speaking with them? Let's take Mr. Lowe first.
 4   A.  Just asked -- I asked if -- what was going on,
 5       and they just said that he left in an
 6       ambulance.
 7   Q.  Okay. And Mr. Lowe didn't provide any more
 8       specifics?
 9   A.  No. No, sir.
10   Q.  How about Mr. Franchuk? When you're in the
11       office and you've gotten there in person and
12       you speak with Mr. Franchuk in person, what, if
13       anything, did he say to you?
14   A.  I don't recall. It was brief, whatever it was.
15       I was more concerned to get to the hospital.
16   Q.  Were there -- do you remember that there were
17       anyone -- any other people there at the office
18       other than Mr. Lowe and Mr. Franchuk?
19   A.  I don't recall.
20   Q.  Let's approach it this way. Do you remember
21       whether Mr. Marvin was still there?
22   A.  I don't remember if Mr. Marvin was in the
23       office or not. He was not in with the crews.
24   Q.  Did you talk with anyone else before you left
25       the office and headed to the hospital?
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

1  A.  I called RMCC.
2  Q.  What does RMCC stand for?
3  A.  Risk management -- drawing a blank.
4       MR. HAYDEN:  Communication center.
5       THE WITNESS:  Yeah.
6       MR. HAYDEN:  Response management
7  communication center.
8  A.  Response management communication center.
9  BY MR. BANKER:
10  Q.  What was your reason for calling the RMCC?
11  A.  Because we had an employee that was put in an
12       ambulance so they could get it documented so
13       they could let everybody know, and risk -- risk
14       management would be involved.
15  Q.  Did you talk with anyone in particular at the
16       RMCC?
17  A.  Whoever was manning the phone at that time.
18  Q.  So is that like a 24-hour --
19  A.  20 --
20  Q.  -- dispatch line?
21  A.  Yes, 24-hour manned.
22  Q.  Do you know whether a record is created of that
23       call when you make that call?
24  A.  Yes.
25  Q.  What kind of record is created?

1  A.  I don't know what kind of record, but it's the
2       one that I viewed earlier today.
3  Q.  The record -- the RMCC document that you looked
4       at before your deposition contains the
5       information that you communicated to the RMCC?
6  A.  Correct.
7  Q.  So that's not necessarily a document that you
8       type up, but it is a document that you provide
9       information to populate?
10  A.  Yes.
11  Q.  What happened -- so you -- you're at the
12       office.  You call RMCC before you leave the
13       office?
14  A.  I was probably driving when I called RMCC.
15  Q.  What happens next?
16  A.  And then I called my superintendent to say that
17       we had an employee taken by ambulance to a
18       hospital or emergency room.
19  Q.  What was your superintendent's name at that
20       time?
21  A.  Erik Erikson.
22  Q.  And where was Mr. Erikson located out of?
23  A.  St. Paul, Minnesota.
24  Q.  What was your reason for calling Mr. Erikson?
25  A.  Notify him that there was an employee that was

1       taken by an ambulance.
2  Q.  Was that sort of an established protocol, if an
3       employee is transported by ambulance, you would
4       report it to certain places?
5  A.  Yes, that would be protocol for any type of
6       incident.
7  Q.  What, if anything, did Mr. Erikson say when you
8       communicated that to him?
9  A.  He said, Thank you, keep me updated.
10  Q.  Was there anything more said in that
11       conversation?
12  A.  No, sir.
13  Q.  And when you're having that conversation with
14       Mr. Erikson, are you still en route to the --
15  A.  I believe --
16  Q.  -- hospital?
17  A.  Yes.
18  Q.  What happens next?
19  A.  I got to Mayo Hospital in Eau Claire and went
20       to the front desk and said, I'm with the
21       railroad, and there's an employee of mine that
22       was just taken here; if them or the family
23       needs anything, let me know, and I sat there a
24       good two hours before I was notified by the
25       hospital that the family did not want me on

1       site.
2  Q.  How did you know to go to the Mayo Hospital?
3  A.  Received a call from his brother that said to
4       take him -- put him in an ambulance and take
5       him to Mayo Hospital.
6  Q.  Okay.  Let me make sure I understand.  Where
7       did that communication from the -- was that
8       back before you got to the office?
9  A.  That was either the original call was his
10       brother or when I called either him or Neil
11       back that the ambulance or 911 had been called.
12  Q.  So in one of the points when you talked with
13       the conductor's brother, he told you that Mayo
14       Hospital was where they wanted to send him?
15  A.  He had to go to Mayo Hospital, yes.
16  Q.  Did you talk with anyone else at the Mayo
17       Hospital -- well, let me -- let me back up a
18       step.  How far is the Mayo Hospital from the
19       Altoona depot?
20  A.  10 minutes in traffic, maybe.
21  Q.  And do you know what time it was that you left
22       the depot to travel to the Mayo Hospital?
23  A.  Shortly after 9 o'clock in the evening.
24  Q.  Had you spoken to Mr. Marvin before you went
25       to -- before you left the office?

Page 33

1    A.  Honestly, I don't recall.
2    Q.  Did you travel -- were you traveling alone in
3         your vehicle to the Mayo Hospital?
4    A.  Yes.
5    Q.  And when you got there, you've described
6         communications with -- you've described some
7         communications with the staff at the hospital.
8         Did you talk with anyone connected with the
9         railroad while you were at the hospital?
10   A.  I don't recall.
11   Q.  Did you ever speak with anyone that was part of
12       Mr. Tischer's family while you were at the
13       hospital?
14   A.  No.
15   Q.  Other than the two phone conversations you've
16       described with Mr. Tischer's brother, did you
17       ever have any further conversations with him?
18   A.  I believe he called later on in the week to say
19       that somebody would be there to pick up his --
20       his brother's vehicle.
21   Q.  How about focusing on that night at the
22       hospital, did you have any other conversations
23       or communications with anyone, either in person
24       or by phone, during that time when you're
25       there?

Page 34

1    A.  From the family or...
2    Q.  Just in general.
3    A.  No, I don't believe I did.
4    Q.  Did you at some point connect or make contact
5         with Mr. Marvin?
6    A.  I believe there was contact with Mr. Marvin
7         sometime in there that I was at the hospital.
8    Q.  Was that you talking by phone to Mr. Marvin?
9    A.  I would recollect it was by phone.
10   Q.  Was Mr. Marvin ever at the hospital?
11   A.  I don't recall.
12   Q.  Was there ever anyone else from the railroad at
13       the hospital during the time that you were
14       there?
15   A.  Not that I recall.
16   Q.  Did you learn anything about kind of the
17       situation while you were at the hospital?
18   A.  No.
19   Q.  So as you're sitting there, what -- is the sum
20       total of your information that Mr. Tischer has
21       been transported by ambulance?
22   A.  Yes.
23   Q.  At that point in time did you have any
24       appreciation of what had happened earlier in
25       the day or earlier in the evening?

Page 35

1    A.  No.
2    Q.  Did that change that day on August 12th, 2017?
3         Did you develop an appreciation of what had
4         happened?
5    A.  That evening?
6    Q.  Well, take the 24-hour period that is
7         August 12th, 2017, and if you're going to the
8         hospital at roughly 9 o'clock from -- I guess
9         really from 9 to the end of day then to
10       midnight, did you have -- did you develop an
11       understanding?
12   A.  No, I had no more information on why he was
13       taken to the hospital.
14   Q.  Then going forward from there into the 13th,
15       did you ever develop an understanding of what
16       had happened that evening?
17   A.  I don't think I found out any information until
18       later on that week.
19   Q.  How did you find out more information later on
20       that week?
21   A.  I believe crew members were talking about it.
22   Q.  And when you say "crew members," who are we
23       talking about?
24   A.  Just crews.  Don't remember names or -- just
25       hearsay.

Page 36

1    Q.  So people are talking about this incident, and
2         you're picking up on it secondhand.  What did
3         you hear secondhand?
4    A.  That he was at -- still at Mayo and had a
5         stroke.
6    Q.  Any other specifics that you picked up
7         secondhand?
8    A.  No.
9    Q.  Did you ever learn any more about it as time
10       went on?
11   A.  About that night or...
12   Q.  Yes.  About that -- about what had happened on
13       August 12th, 2017.
14   A.  Just that Marvin had talked to him and asked
15       him if he wanted to see a doctor or to go home,
16       and the employee had said no.
17   Q.  And how did you reach that understanding that
18       Marvin had talked to him and he had said those
19       things?
20   A.  From talking to Marvin.
21   Q.  When was it that you were talking to Marvin
22       about that?
23   A.  I don't remember if it was the next day or the
24       day after.
25   Q.  What did you say in response to Marvin when he

9 (Pages 33 to 36)

Page 37

1   told you that?
2   A.  That the employee said he didn't want to go
3       home or see a doctor that -- okay, that's
4       understandable.
5   Q.  Did you understand at any point that Mr. Marvin
6       had decided to send Mr. Tischer home after you
7       had the con -- the first conversation with Mr.
8       Marvin by phone that night?
9   A.  Yeah, that was the plan was he was going to get
10      him to the depot and make sure that he could
11      make it home okay.
12  Q.  Why was Mr. Marvin sending Mr. Tischer home if
13      he had talked to Mr. Tischer and Mr. Tischer
14      didn't want to go home?
15  A.  Because he wasn't feeling well, and it
16      wasn't -- yeah, he just wasn't feeling well.
17  Q.  How do you know Mr. Tischer wasn't feeling
18      well?
19  A.  From what Marvin had said.
20  Q.  So Marvin had communicated to you his
21      understanding that Tischer wasn't feeling well
22      despite the fact that Tischer said he didn't
23      want to go home and Marvin was sending him
24      home?
25  A.  Or to see a doctor, correct.

Page 38

1   Q.  Or to see a doctor.
2   A.  Yes.
3   Q.  Did you have an understanding of which path
4       Marvin was taking when the first phone call
5       ended?
6   A.  Yeah, that he was going to send him home.
7   Q.  His plan was to send him home?
8   A.  Yes.
9   Q.  Did you have an understanding of how Mr.
10      Tischer was going to get home based on your
11      discussions with Mr. Marvin?
12  A.  He -- we were going to put him in a cab to get
13      him home or he would get himself home depending
14      on how he felt.
15  Q.  Did you discuss the specifics of that with Mr.
16      Marvin?
17  A.  I believe we did talk about if he needed a
18      ride, we'd get him a ride.
19  Q.  Did you reach a conclusion about that as -- in
20      your conversation with Mr. Marvin?
21  A.  No.
22  Q.  So that was left to Mr. Marvin to figure that
23      out, how Mr. Tischer was going to get home?
24  A.  Yes.
25  Q.  Have you ever as a supervisor working for UP

Page 39

1   had an experience with an employee who gets
2   sick while they're working?
3   A.  Multiple times.
4   Q.  And have you ever decided to send an employee
5       home because of that?
6   A.  Yes.
7   Q.  Have you ever sent an employee home where they
8       said that they didn't want to go home?
9   A.  Yes.
10  Q.  And have you ever sent an -- following up in
11      that situation where they don't -- say they
12      don't want to go home, you've decided to send
13      them home, have you ever decided to not let
14      them drive themselves?
15  A.  Yes.
16  Q.  How many times has that happened?
17  A.  Once.
18  Q.  How do you -- how did you make that
19      determination, that the employee that you were
20      sending home wasn't capable of driving himself
21      or herself?
22  A.  He had thrown up several times.
23  Q.  Have you had situations where you've had to
24      call 911 for employees as a supervisor?
25  A.  No, I have not.

Page 40

1   Q.  How would you as a supervisor make the
2       determination between sending someone home on
3       the one hand versus calling 911?
4   A.  If they asked me to call 911 or if it didn't
5       appear they could care for themselves.
6   Q.  But haven't had that experience personally?
7   A.  No, I've never had to call 911.
8   Q.  Did you have any discussions with Mr. Marvin
9       about that issue, about the differentiation
10      between on the one hand sending Mr. Tischer
11      home versus sending him home but not letting
12      him drive himself, versus calling 911, along
13      that spectrum?
14  A.  Can you repeat that?
15  Q.  Sure.  In a world where we've got a couple
16      different options:  one end of the spectrum
17      being send him home and he drives himself, and
18      the other option being call 911, did you have
19      any conversations with Mr. Marvin about where
20      on the spectrum Mr. Tischer fell?
21  A.  Yeah.  911 wasn't talked about on that original
22      call.
23  Q.  Was there -- let's focus on the time before you
24      got into your truck to drive to the hospital.
25      Was there ever any mention to you before you

10 (Pages 37 to 40)

Page 41

1    drove your truck to the hospital that someone
2    was thinking Mr. Tischer was having a stroke?
3  A.  No.
4  Q.  When was the first time that you heard the
5    concept of stroke being mentioned?
6  A.  Probably when I got to the office.
7  Q.  And who was it at the office that first
8    mentioned the concept of stroke?
9  A.  I don't recall.
10 Q.  Have you as a supervisor ever had experience
11   with an employee who is having a stroke?
12 A.  No.
13 Q.  Have any of the people that you -- so you as a
14   senior MTO have managers underneath you. Do
15   you know whether your -- setting aside Mr.
16   Tischer's incident, do you know whether any of
17   your managers have ever had experience with an
18   employee who was having a stroke?
19 A.  None that I'm aware of.
20 Q.  So just to close out this line of questions, I
21   take it from your testimony here today that you
22   don't have any personal knowledge of the
23   specifics of the timeline that was involved
24   that evening as to who was where and when and
25   what they did?

Page 42

1  A.  Correct.
2  Q.  That what you know is what you've described,
3    kind of Mr. Marvin's communications to you, Mr.
4    Franchuk's communications to you, and the
5    conductor's communications to you, plus what
6    you learned when you got to -- on site at the
7    office?
8  A.  Correct.
9  Q.  Did you make any -- well, let me -- let me back
10   up a step. Did you ever have any further
11   conversations with anyone else about the
12   Tischer incident? As we move past August 12th,
13   the day of the incident, going forward, did you
14   ever have any other conversations about the
15   Tischer incident that we haven't talked about?
16 A.  On Mondays we have a safety call, and it was
17   brought up that there was an employee that was
18   put in an ambulance. So it was brought up on
19   that Monday's safety call.
20 Q.  And the safety call, is that something that's a
21   standing Monday morning call?
22 A.  Yes.
23 Q.  And who participates in that call?
24 A.  Basically every HR manager on the service unit,
25   the superintendent, and the DROs.

Page 43

1  Q.  Is Altoona part of the Twin Cities service
2    unit?
3  A.  Yes.
4  Q.  And so the Monday call that you're describing
5    is a call of managers on the Twin Cities
6    service unit?
7  A.  Yes.
8  Q.  And so that would be the Monday after the
9    Saturday that was August 12th, 2017?
10 A.  Yes.
11 Q.  And was anything more said about it other than
12   an ambulance was called?
13 A.  That we -- I believe it was talked about that
14   we had an employee who wasn't feeling well, and
15   we ended up calling an ambulance and taking him
16   to the hospital.
17 Q.  What was the purpose of bringing that up in the
18   safety call?
19 A.  Just because it was an incident. All incidents
20   are talked about.
21 Q.  Was there any further discussion about this
22   Tischer incident where the ambulance had been
23   called?
24 A.  I don't recall anything more than just the
25   information that I believe I spoke about.

Page 44

1  Q.  Setting that call aside, did you have any
2    further conversations about the Tischer
3    incident moving forward in time?
4  A.  Not that I'm aware of, no.
5  Q.  Did you at any point learn anything more about
6    Mr. Tischer's situation or what became of him?
7  A.  Crew members told me what had happened to him.
8  Q.  What was your understanding?
9  A.  That he had passed away.
10 Q.  And when -- do you have -- do you know when it
11   was that you learned that?
12 A.  Whatever day that probably would have happened
13   is when somebody would have let me know.
14 Q.  Did you make any notes regarding this Tischer
15   incident?
16 A.  Nope.
17 Q.  Did you take any pictures?
18 A.  Nope.
19 Q.  Make any measurements?
20 A.  No.
21 Q.  Draw any diagrams?
22 A.  No.
23 Q.  Did anyone ever tell you any more specifics
24   about how Mr. Tischer had been acting before
25   911 was called?

11 (Pages 41 to 44)

Page 45

```
 1   A.  Nope.
 2   Q.  Did you ever do anything to better understand
 3       the timeline here in terms of what Mr. Tischer
 4       had been doing that day and when and where he
 5       was working during the day?
 6   A.  I did find out that they had brought a train
 7       back and that he had -- they pulled the train
 8       in.  I don't recall the track.  And then he had
 9       walked -- secured his train and walked to the
10       head end, so he walked from west to the east,
11       and that is where I believe Mr. Marvin talked
12       with the employee.
13   Q.  Is there a shanty in the Altoona yard?
14   A.  On the east end of the yard there is a shanty
15       where we have a computer, water, fridge, and --
16       and heat and a telephone.
17   Q.  Do you know whether any of the interactions
18       between Mr. Tischer and anyone else occurred --
19       where they occurred that night?
20   A.  Somewhere in that area.
21   Q.  But you can't be more specific than that?
22   A.  Nope.  No.
23   Q.  In talking with Mr. Marvin about the idea that
24       he was going to send somebody home, did Mr.
25       Marvin ever express any resistance to that
```

Page 46

```
 1       idea?
 2   A.  No.
 3   Q.  Was it his idea to send Mr. Tischer home as
 4       opposed to your idea?
 5   A.  I believe he asked if it was okay if we had to
 6       send him home.
 7   Q.  In your mind did Mr. Marvin have discretion to
 8       make that decision on his own?
 9   A.  Yes.
10   Q.  Do you know why Mr. Marvin was looking for your
11       approval of that decision?
12   A.  I don't think he was --
13           MR. HAYDEN:  Lacks foundation.  Go ahead.
14       Go ahead.
15   A.  I don't think he was looking for approval.  I
16       just think he was letting me know that was what
17       he was probably going to do.  More of a heads
18       up than anything.
19   BY MR. BANKER:
20   Q.  Okay.  That conversation -- the conversation
21       that you described between you and Mr. Marvin
22       where he called you to inform you of this
23       issue, do you know how long that conversation
24       took?
25   A.  Couple minutes, probably.
```

Page 47

```
 1   Q.  Were you putting any pressure on Mr. Marvin to
 2       get another crew back up to the sand plant to
 3       pick up additional cars?
 4   A.  No.  Like I said earlier, that we would either
 5       get a new crew or we would do it the next day.
 6   Q.  Do you -- have you ever received any first-aid
 7       training from Union Pacific?
 8   A.  Yes.
 9   Q.  What did your first-aid training consist of?
10   A.  CPR.  You get a booklet.  I don't know.  It's a
11       blue book, it's fairly thick, and it talks --
12       there's CPR, and then there's bee stings,
13       and -- and I'm trying to remember the whole
14       gamut.  But there's -- it talks about bee
15       stings and heart attacks and strokes and I
16       believe bruises or things like that.
17   Q.  Do you know how many times you received that
18       training from Union Pacific?
19   A.  I'm going to say I've had that training four --
20       at least four times.
21   Q.  You mentioned one of the topics that the
22       training covers is strokes.  What do you
23       remember that training touching upon with
24       respect to strokes?
25   A.  There's a pamphlet or page of things to look
```

Page 48

```
 1       for.
 2   Q.  Do you remember any of the things that you're
 3       looking for in the context of a stroke?
 4   A.  Remember the droopy-face thing and some
 5       paralysis, things like that.
 6   Q.  When you -- was that an awareness that you had
 7       as part of your general knowledge before you
 8       had the UP first-aid training with respect to
 9       strokes?
10   A.  Yes.
11   Q.  Just from kind of common experience?
12   A.  My wife's an RN, so it's just things that she's
13       taught me what to look for.
14   Q.  Things you just picked up in conversation?
15   A.  Yes.
16   Q.  Does she have any particular experience --
17       firsthand experience with strokes?
18   A.  I -- I'm sure she does, but I --
19   Q.  That you know of.
20   A.  Not that I know of, no.
21   Q.  Do you have any particular firsthand experience
22       with strokes?
23   A.  No.
24   Q.  The first-aid training that you referenced, do
25       you know, how was that made available to you?
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 49

1   A.  It's a class offered by the nurse, and you can
2       sign up and take it if you so choose to.
3   Q.  So it's a -- it's an optional training?
4   A.  Yes.
5   Q.  How often is it offered?
6   A.  It's offered every -- quite often.  Every six
7       months or so, I'm guessing.  But your -- once
8       you get CPR qualified, I think it's good for
9       three years.  Two or three years.  I can't
10      remember.
11  Q.  Are you CPR qualified?
12  A.  Yes.
13  Q.  Was the training -- so the training was an
14      optional training for you?
15  A.  I believe I was required to have the training.
16  Q.  Is there a distinction that management
17      employees are required to have it versus other
18      people it's optional?
19  A.  Yes.
20  Q.  How is the option of having that first-aid
21      training communicated to employees?
22  A.  That I don't know.
23  Q.  Where did -- where did you physically take the
24      training?  Is that in Altoona.
25  A.  No.  I took training in St. Paul.

Page 50

1   Q.  And I mean -- by this I mean the first-aid
2       training itself.
3   A.  Yes.  Yeah, the first -- yeah, I took the class
4       in St. Paul.
5   Q.  Did you ever take it in Altoona?
6   A.  No.
7   Q.  Do you know whether it's ever been offered in
8       Altoona?
9   A.  I don't know.
10  Q.  When the training -- when the first-aid
11      training was offered in St. Paul, were there
12      any employees there from the Altoona yard who
13      were taking it with you?
14  A.  I don't recall.
15  Q.  Is there any record of who attends that
16      training that's maintained?
17  A.  I don't know.  I'm sure somebody would know
18      that, but I -- I don't.
19  Q.  Did you ever speak with the 911 first
20      responders in any way relating to the Tischer
21      incident?
22  A.  No.
23  Q.  Were -- you know, the -- there was some police
24      officers who were called to the scene.  Did you
25      ever speak with them?

Page 51

1   A.  I don't recall talking to police officers.
2   Q.  Do you know whether there were any radio
3       communications involving you regarding the
4       Tischer incident on the day of the incident?
5   A.  I don't believe there was any.
6   Q.  Is there a protocol for how UP wants 911 to be
7       contacted?
8       MR. HAYDEN:  Asked and answered.  Go
9       ahead, if you understand it.
10  A.  No, I --
11  BY MR. BANKER:
12  Q.  Sure.  Let me -- let me try to rephrase it.  So
13      is there a rule or a guideline that UP has that
14      says they want management employees to call
15      911?
16  A.  No, not that I'm aware of.
17  Q.  So is it your understanding that anyone could
18      call 911 if they needed to?
19  A.  Yes.
20  Q.  How would -- is there a preferred means of
21      calling 911?
22  A.  No, I would say there's not.
23  Q.  So by any means that are available?
24  A.  Yes.
25  Q.  Does UP have a rule regarding whether employees

Page 52

1       can have cell phones while they're working?
2   A.  Yes.
3   Q.  What is -- what is the rule, generally
4       speaking?
5   A.  They have to be off and stowed.
6   Q.  Is there an exception for an emergency
7       situation?
8   A.  Yes.
9   Q.  And in an emergency situation even a cell phone
10      that's off and stowed could be accessed and
11      used?
12  A.  Yes.
13  Q.  How about if the employees didn't have the cell
14      phones accessible to them, can radios be used
15      to -- can UP radios be used to call 911?
16  A.  Yes.
17  Q.  Where would that -- who would that
18      communication be to?  If an employee was using
19      the radio to call 911, would that be to a
20      dispatcher or would that be a local
21      communication to someone else within range?
22  A.  Dispatcher.
23  Q.  And where -- where are UP's dispatchers
24      located?
25  A.  Omaha.

13 (Pages 49 to 52)

Q & A COURT REPORTERS, INC.
(715) 834-9812

1    Q.  And the radios are communicating --
2    A.  Yeah.
3    Q.  -- to Omaha?  And I'm assuming that that's
4        manned 24 hours a day?
5    A.  24 hours a day by several people.
6    Q.  If a train crew was out on a job on the main
7        line and needed to call 911, what -- would
8        there be a preferred means of doing that?
9    A.  They would probably use the radio.
10   Q.  How about within a yard situation, would the
11       preferred means ever be to call the dispatcher?
12   A.  Depends upon the situation, but that would be
13       the option, yes.
14   Q.  Is it your understanding that Mr. Marvin, in
15       fact, was the person that called 911 for Mr.
16       Tischer's incident on August 12th, 2017?
17   A.  Yes, that's what I believe.
18   Q.  And you, in fact, did not?
19   A.  I did not.
20   Q.  And what was your reasoning for that?  After
21       Mr. Franchuk and Mr. Tischer's brother had said
22       that they thought 911 needed to be called and
23       you were calling Marvin, what was your reason
24       for calling Marvin as opposed to calling 911
25       yourself?

1    A.  I didn't even know where the crew was, so I
2        would -- it would be wasting more time.
3    Q.  So you'd be calling 911 to say, I have a
4        problem, but I don't know where it is?
5    A.  Exactly.
6    Q.  So you're trying to get in touch with Marvin in
7        the hope that he has more information?
8    A.  Yes.
9    Q.  Did you have an understanding -- say, between
10       your first call with Mr. Marvin and the time
11       that you got to the depot, did you have an
12       understanding of where Mr. Marvin was
13       physically?
14   A.  Yeah.  The last time I had talked to him he was
15       at the depot.
16   Q.  When you talked to him on the phone?
17   A.  When he said that he had called 911.
18   Q.  How about -- do you know where he was when you
19       first talked to him on the phone?
20   A.  I believe he was in the yard with the crew.
21   Q.  Are you familiar with someone by the name of
22       Tim Dold, D-O-L-D?
23   A.  Yes, he works out of the Altoona yard.
24   Q.  Do you know whether he was working on the
25       evening of August 12th, 2017?

1    A.  I don't know.
2    Q.  Do you know -- did you ever find out who was
3        working in addition to Mr. Lowe, Mr. Franchuk,
4        and Mr. Marvin?  Were there any other people
5        that you were aware of working that day?
6    A.  There should have been another person, but I
7        don't know who that was.
8    Q.  Did you ever talk -- do you know who Jessica
9        Carson is?
10   A.  Yes.
11   Q.  Who is she?
12   A.  She is the occupational nurse.
13   Q.  Did you ever talk with Ms. Carson about the
14       Tischer incident?
15   A.  I don't believe I did.
16   Q.  Do you know whether Mr. Marvin has had the
17       first-aid training that you received?
18   A.  I don't know for sure.
19   Q.  If it was a mandatory training for you, do you
20       believe it would have also been a mandatory
21       training for him?
22   A.  Yes.
23   Q.  By virtue of the fact that you're both
24       managers?
25   A.  Yes.

1    Q.  You familiar with the concept of AEI readers?
2    A.  Yes.
3    Q.  Is there an AEI reader for the Altoona yard?
4    A.  Yes.
5    Q.  Where is that located relative to the yard
6        itself?
7    A.  Which AEI reader?
8    Q.  Altoona west.
9    A.  That is on the west end of the yard outside of
10       town.
11   Q.  How far from the yard is the Altoona west A --
12   A.  Couple -- sorry.
13   Q.  -- AEI reader?
14   A.  A couple of miles.
15   Q.  Let me show you what's been previously marked
16       as Deposition Exhibit 9.  Have you seen this
17       document before?
18   A.  Yeah, I believe I have.
19   Q.  And I'll -- you had mentioned previously when
20       you were talking about the first-aid training
21       that you thought it was a book and it was blue.
22       I'll represent to you that this in color is --
23       it's a blue cover, and what I've done here is
24       I've extracted out the table of contents and
25       some particular pages from it.  But with that

Q & A COURT REPORTERS, INC.
(715) 834-9812

1  qualification, do you recognize this as being
2  from the first-aid book that you were
3  referencing?
4  A.  I do believe that is the book.
5  Q.  And if you turn to -- on the lower right-hand
6  corner of the document you'll see an
7  identifier, and it starts with a UP prefix.  Do
8  you see that?
9  A.  Yes.
10  Q.  So I'm looking at Page UP001392, which is about
11  three pages from the back.
12  A.  Okay.
13  Q.  And on that page about halfway down there's a
14  subtitle or a heading that says Stroke, and it
15  goes onto the next page, UP1393.  Have you seen
16  that section of this book before, the Stroke
17  section?
18  A.  Yeah, that's the book -- yes, I've seen that in
19  the book.
20  Q.  And, you know, when you had talked about this
21  previously, you had mentioned that you thought
22  there was some symptoms or an acronym.  On the
23  next page, the UP1393, do you see there it's
24  got some symptoms or things to look for?
25  A.  Yes.

1  Q.  And is that what you were referring to earlier?
2  A.  I don't remember referring to anything earlier,
3  but I did -- I do remember saying, yes, the
4  drooping face, yes.
5  Q.  And some paralysis?
6  A.  Yes.
7       MR. BANKER:  Let me mark this as a new
8  exhibit.
9       (Exhibit 36 marked for identification.)
10  BY MR. BANKER:
11  Q.  Let me see if I can put this in context for
12  you.  I'll represent to you that this is a
13  document that was obtained in discovery for Mr.
14  Marvin's cell phone.  Looking at the top of
15  that page, you see Detail for Stephen Marvin,
16  colon, 402-658-3517.  Do you see that?
17  A.  Yes.
18  Q.  Do you recognize that as being Mr. Marvin's UP
19  telephone number?
20  A.  Honestly, I don't, but I'm sure it is.
21  Everything is saved to the phone.
22  Q.  And I want to focus on -- let me just make sure
23  I get this right.  So you told me earlier your
24  telephone number is (651)295-3665?
25  A.  Yes.

1  Q.  And if you look at what's been marked as
2  Exhibit 36, focusing from 7:26 p.m. and later,
3  I'm seeing a call to your number at 8:28 p.m.
4  Do you see where that's represented there?
5  A.  Yes.
6  Q.  Does that do anything to refresh your
7  recollection about what time it was that Mr.
8  Marvin first called you?
9  A.  Yeah.  It was late evening, so that would be
10  pretty -- pretty accurate.
11  Q.  So you think 8:28 --
12  A.  Yes.
13  Q.  -- would have been the first call that you've
14  described from Mr. Marvin?
15  A.  Yes.
16  Q.  Then if you look -- if you follow further down
17  that, your telephone number appears again at
18  9:02 p.m.
19  A.  Okay.
20  Q.  Do you see that?
21  A.  Yep.
22  Q.  And do you believe that -- that 9:02 p.m. would
23  have been the time of the second call that
24  you've described with Mr. Marvin where you
25  actually reached him and spoke with him?

1  A.  Yes.
2  Q.  Where he told you that 911 had been called?
3  A.  Yes.
4  Q.  And then it looks like there's another call at
5  9:09 p.m. to your number.
6  A.  Yes, I see that.
7  Q.  Do you have a recollection of a third call with
8  Mr. --
9  A.  I believe that might be the one when I said I'm
10  on the way to the hospital or at the hospital.
11  Q.  Okay.  So that at 9:02 he's told you that 911
12  has been called, and at 9:09 you're telling him
13  you're at the hospital?
14  A.  Or headed that --
15  Q.  Or headed that direction?
16  A.  Yes.
17  Q.  During this time frame, between 8:28 and 9:09,
18  did you ever speak to Mr. Marvin face-to-face?
19  A.  I don't believe I did.
20  Q.  And Mr. Marvin never came to the hospital?
21  A.  No, I don't recall him doing that.
22  Q.  Let me just take a moment and review my notes.
23  I just want to back up a step.  With respect to
24  the job that Mr. Tischer was doing that day,
25  the LTS83 job, once the decision was made to

Page 61

1      send Mr. Tischer home, do you know whether that
2      meant that there was going to be a second trip
3      to the sand plant that night or not?
4   A.  I -- I don't believe a decision had been made
5      yet.
6   Q.  Do you know whether there was ever another trip
7      taken that day to the sand plant?
8   A.  I don't believe there was another trip taken
9      that day.
10   Q.  Was the -- was the job that -- the rest of Mr.
11      Tischer's crew's job, was that, in fact,
12      completed the next day on August 13th?
13   A.  Yes, I believe it was.
14   Q.  Do you have any criticism of how Mr. Marvin
15      handled the Tischer incident?
16   A.  No.
17   Q.  Do you wish he had done anything differently?
18   A.  No.
19   Q.  After Mr. Tischer's incident, was there ever
20      any discussion among UP management for the Twin
21      Cities service unit about how to deal with
22      stroke or stroke symptoms?
23   A.  I don't believe there was.
24   Q.  How about any training or stroke awareness for
25      the employees and crews?

Page 62

1   A.  I don't think so.
2        MR. BANKER:  Thank you.  I don't have any
3      further questions.
4   BY MR. COHEN:
5   Q.  Good -- I'll call it afternoon at this point,
6      Mr. Swentik.  My name is Michael Cohen.  We
7      introduced ourselves earlier, and I represent
8      Professional Transportation, Incorporated, in
9      this matter.  Are you familiar with
10      Professional Transportation, Incorporated?
11   A.  With -- I'm sorry.  Who was that?
12   Q.  Professional Transportation, Incorporated.
13   A.  Yes.
14   Q.  I'll call Professional Transportation
15      Incorporated, PTI.  Is that okay?
16   A.  Yes, that's fine.
17   Q.  How are you familiar with PTI?
18   A.  I work with them daily.
19   Q.  Okay.  Could you explain to me your
20      understanding of the relationship between Union
21      Pacific Railroad and PTI?
22   A.  They are -- are contracted to haul our crews.
23   Q.  And when you say they're contracted, is that
24      pursuant to a written contract?
25   A.  That I don't know, but...

Page 63

1   Q.  That was going to be my next question.  Have
2      you ever seen any written contract between
3      Union Pacific or PTI?
4   A.  No.
5   Q.  And PTI.  No.  Okay.  Is it your understanding,
6      however, that such an agreement exists?
7   A.  Yes.
8   Q.  And just to be clear, you're not aware, as you
9      sit here today, what the details or -- of that
10      agreement are or what that agreement contains?
11   A.  Correct.
12   Q.  What is PTI's responsibility, as you understand
13      it, on a day-to-day basis at the Altoona yards?
14   A.  Transport crews from the depot to trains or
15      from trains back to the depot.
16   Q.  And is it your understanding that PTI was
17      performing services for Union Pacific on
18      August 12th, 2017, at the Altoona yards?
19   A.  Yes.
20   Q.  Do you know how many PTI employees were present
21      in or around the Altoona yards on that day?
22   A.  I don't.
23   Q.  Is it your understanding that PTI operates one
24      or more vans in the area on any given day?
25   A.  Yes, then -- yes.

Page 64

1   Q.  Is it one van, do you know, or more than one
2      van in or around the Altoona yards?
3   A.  Then it would have been two vans.
4   Q.  Do you know the identity of either of -- any
5      PTI driver in or around the Altoona yards on
6      August 12th of 2017?
7   A.  I don't.
8   Q.  Have you ever heard the name Charles or Chaz
9      Lux?
10   A.  I don't.
11   Q.  Do you know one way or the -- or another
12      whether any PTI driver was transporting Mr.
13      Tischer on the date of the incident?
14   A.  I do know PTI transported him.
15   Q.  How do you know that?
16   A.  Marvin told me that he was putting Mr. Tischer
17      in the PTI van to bring him to the depot.
18   Q.  Is it your understanding that Mr. Marvin
19      directed a PTI driver to bring Mr. Tischer to
20      the depot?
21   A.  I don't know if Marvin directed him to, but
22      somebody, either the employee or Marvin, said,
23      Take me to the depot.
24   Q.  I see.  So it's your understanding that either
25      Mr. Tischer or Mr. Marvin directed the PTI

16 (Pages 61 to 64)

Page 65

```
 1        driver to take Mr. Tischer to the depot?
 2    A.  Yes.  Because we as managers don't tell PTI
 3        every move.  When there's crews out in the
 4        yard, they -- they direct them where they need
 5        to go and things like that.
 6    Q.  I'm sorry.  Who directs --
 7    A.  The employees.
 8    Q.  To be clear, the Union Pacific employees direct
 9        the PTI drivers where to go?
10    A.  Yeah.
11    Q.  And you wouldn't expect the PTI drivers, would
12        you -- let me strike that.  You wouldn't expect
13        that the PTI drivers would go places that the
14        Union Pacific employees did not tell them to
15        go; is that correct?
16    A.  Correct.
17    Q.  Are you aware one way or the other what any PTI
18        driver saw or did not see that day?
19    A.  No.
20    Q.  Are you aware one way or the other what any PTI
21        driver said or did not say to any Union Pacific
22        employee on August 12th, 2017, in relation to
23        Mr. Tischer?
24    A.  No.
25    Q.  You mentioned earlier that Mr. Tischer's
```

Page 66

```
 1        brother and Neil Franchuk called you on the day
 2        of the incident and asked you to call 911; is
 3        that correct?
 4    A.  Yes.
 5    Q.  Is there any policy or procedure for Union
 6        Pacific that you're aware of that prevented Mr.
 7        Franchuk from calling 911 himself?
 8    A.  No.
 9    Q.  And are you aware of anything that prevented
10        Mr. Tischer's brother from calling 911 himself?
11    A.  No.
12    Q.  Do you have any understanding as to why either
13        Mr. Franchuk or Mr. Tischer's brother called
14        you to request that you call 911 rather than
15        calling 911 themselves?
16    A.  No idea.
17    Q.  Are you aware one way or the other as to any of
18        PTI's policies or procedures internally?
19    A.  No.
20    Q.  Do you have any criticism one way or the other
21        -- strike that.  Do you have any criticism
22        whatsoever of PTI or any of its employees in
23        relation to what occurred on August 12th of
24        2017?
25    A.  No.
```

Page 67

```
 1    Q.  You mentioned that you had undergone some
 2        first-aid or stroke detection training offered
 3        by UP; is that correct?
 4    A.  CPR training.
 5    Q.  CPR training.  As part of CPR training, were
 6        you trained how to determine or detect the
 7        signs of a stroke?
 8    A.  It's in the booklet.
 9    Q.  Are you aware which of your employees operating
10        at the Altoona yards have underwent or
11        undergone that training?
12    A.  No, I don't know.
13    Q.  You are aware, however, that all the managers
14        go through the training?
15    A.  Yes.
16    Q.  But you're not aware as to whether or not any
17        of the nonmanagerial employees have taken that
18        training; is that correct?
19    A.  That's correct.
20    Q.  And I believe you testified earlier that the --
21        it is voluntary for the nonmanagerial employees
22        of Union Pacific to undergo that first-aid
23        training?
24    A.  I believe so.
25    Q.  And what do you base that belief on?
```

Page 68

```
 1    A.  That it's a voluntary program they can sign up
 2        for if the class is available.
 3    Q.  Did somebody tell you that, or how did --
 4        how -- what -- how did you come to that
 5        understanding?
 6    A.  I believe I had heard that in the -- trainmen
 7        asked the question if they could become
 8        qualified.
 9    Q.  I see.  So nonmanagerial employees have asked
10        you whether they could become qualified?
11    A.  They haven't asked me.  They've asked the
12        question to see if they could.
13    Q.  Are you empowered at all by Union Pacific to
14        require all of the employees under you to take
15        that first-aid training?
16    A.  No, I'm not.
17    Q.  Do you know who determines at Union Pacific who
18        is required to and who's not required to take
19        that training?
20    A.  I don't.
21            MR. COHEN:  I don't have any further
22        questions.
23            MR. HAYDEN:  I have a few questions for
24        you, sir.
25    BY MR. HAYDEN:
```

17 (Pages 65 to 68)

Page 69

1 Q. Looking at the cell phone records of Mr.
2 Marvin, which were identified as Exhibit 36,
3 you'll see that there's a call I think, if I'm
4 reading this correctly, from Mr. Marvin to
5 you -- to your number at 11:27 a.m. on
6 August 12th.
7 A. Yes, that's my number.
8 Q. And it appears to be a two-minute-long call.
9 Do you remember the substance of that call?
10 A. I don't remember.
11 Q. Okay. And then just a follow-up on the
12 8:28 p.m. call, which you testified was Mr.
13 Marvin calling you. And the length of the call
14 is indicated to be four minutes by this
15 document; is that correct?
16 A. Yeah. That's what it shows, yes.
17 Q. Does that sound accurate, that it was a
18 four-minute-long conversation you had with Mr.
19 Marvin about the condition of Mr. Tischer?
20 A. Yeah. I thought it was a couple minutes, but
21 yeah, that, you know...
22 Q. No reason to believe that four minutes is not
23 accurate?
24 A. Correct.
25 Q. During the call that you had with Mr. Marvin at

Page 70

1 8 -- from 8:28 to 8:32 p.m. on August 12th, did
2 Mr. Marvin ever tell you that Mr. Tischer asked
3 him to call 911?
4 A. He -- he said -- he never did say that he
5 needed to call -- or had asked to call 911.
6 Q. Did Mr. Marvin tell you during that call that
7 Mr. Tischer refused the idea of seeing a
8 doctor?
9 A. Yeah, he said he didn't want to see a doctor.
10 Q. Did Mr. Marvin communicate to you during that
11 four-minute-long telephone call that he had
12 observed any numbness or weakness of Mr.
13 Tischer's face, arm, or leg?
14 A. None.
15 Q. Did Mr. Marvin indicate to you during that
16 conversation that he observed Mr. Tischer
17 experience any confusion?
18 A. No.
19 Q. In fact, did he tell you that Mr. Tischer was
20 communicating coherently and easily with Mr.
21 Marvin?
22 A. Yes.
23 Q. During that conversation with Mr. Marvin, did
24 he indicate to you that he observed in Mr.
25 Tischer any changes in his sight or his

Page 71

1 balance?
2 A. No.
3 Q. In fact, he told you, did he not, that Mr.
4 Tis -- Mr. Tischer -- strike that. He told
5 you, did he not, that he observed Mr. Tischer
6 walking without any difficulty?
7 A. Yes.
8 Q. And did Mr. Marvin in that four-minute
9 conversation you had with him indicate to you
10 that Mr. Tischer described any other symptoms
11 --
12 A. No.
13 Q. -- himself?
14 A. No.
15 Q. But you testified earlier Mr. Marvin did
16 indicate to you that the employee was obviously
17 not feeling well?
18 A. Yes.
19 Q. By his own -- even by Mr. Marvin's own
20 observation?
21 A. Yes, yes.
22 Q. The Monday morning call that followed this
23 Saturday incident described as the safety call,
24 was it described on that call by Mr. Erikson
25 that Mr. Tischer had suffered a stroke?

Page 72

1 A. I don't believe that was talked about.
2 Q. The call you had with Mr. Franchuk when he
3 called you is a matter that Mr. Franchuk has
4 testified to himself, and looking at his
5 transcript he indicates that what he said to
6 you -- or what he asked you was to make sure
7 that 911 was called. Does that help refresh
8 your recollection of what Mr. Franchuk asked
9 you?
10 A. Yeah. He wanted me to follow up with Mr.
11 Marvin to make sure 911 had been called.
12 Q. So it was more retrospective; he wasn't
13 asking -- is that correct?
14 A. Yeah, yeah.
15 Q. He wasn't asking you to call 911; he was asking
16 you in the position that you held to make sure
17 that it had been called?
18 A. Yes.
19 Q. Which you did?
20 A. Yes.
21 Q. By calling Mr. Marvin; is that right?
22 A. Yes, called Mr. Marvin, and he confirmed that
23 911 had been called.
24 Q. You're familiar with the Medical Rules Training
25 which is given at Union Pacific that sets

18 (Pages 69 to 72)

Page 73

```
 1    forward fitness for duty qualifications?
 2  A.  Yes.
 3  Q.  And among those rules under the Medical Rules
 4    Training is that if an employee has an episode
 5    where he or she has lost consciousness, that
 6    they are to report that to their manager under
 7    the fitness for duty rules?
 8  A.  Yes, that is correct.
 9  Q.  The failure to do that, to report to a manager
10    an episode where an employee had lost
11    consciousness, would be a violation of that
12    rule; correct?
13  A.  Yes, correct.
14  Q.  And at no time during August 12th of 2017 did
15    Mr. Tischer ever communicate with you or Mr.
16    Marvin that he had suffered a
17    loss-of-consciousness episode that very
18    morning; is that correct?
19  A.  Correct.  Not that I'm aware of.
20  Q.  Yet he did mark up and come to work as you came
21    to understand that afternoon; is that correct?
22  A.  Yes.
23  Q.  If Mr. Tischer or any employee had called their
24    manager to say that they had had a
25    loss-of-consciousness episode, therefore,
```

Page 74

```
 1    pursuant to the rules, they were not going to
 2    report to -- for duty, would there be any
 3    discipline for an employee?
 4  A.  No.
 5  Q.  In answer to Mr. Banker's question about
 6    whether you believe Mr. Marvin had done
 7    anything wrong in handling the situation on
 8    August 12th, 2017, you said that you did not
 9    believe he did anything wrong; is that correct?
10  A.  That's correct.
11  Q.  How about with respect to Mr. Tischer -- or I'm
12    sorry -- Mr. Franchuk, do you believe he did
13    anything wrong that day?
14  A.  No.
15  Q.  Do you believe that any of the employees as you
16    came to be aware --
17  A.  No.
18  Q.  -- did anything wrong?
19  A.  I don't believe any of them did anything wrong.
20      MR. HAYDEN:  Thank you.  Those are all my
21    questions.
22      MR. BANKER:  I don't have any more
23    questions.
24      MR. COHEN:  Nothing here.
25      MR. HAYDEN:  Okay.  We're done then.
```

Page 75

```
 1        (Proceedings concluded at approximately
 2    11:23 a.m.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 76

```
 1  STATE OF WISCONSIN   )
                          )ss
 2  COUNTY OF EAU CLAIRE )
 3
 4      I, Stephanie Peil, Notary Public in and for the
 5    State of Wisconsin, certify there came before me the
 6    deponent herein, namely Michael Swentik, who was by
 7    me duly sworn to testify to the truth and
 8    nothing but the truth concerning the matters in this
 9    cause.
10      I further certify that the foregoing transcript
11    is a true and correct transcript of my original
12    stenographic notes.
13      I further certify that I am neither attorney or
14    counsel for, nor related to or employed by any of
15    the parties to the action in which this deposition
16    is taken; furthermore, that I am not a relative or
17    employee of any attorney or counsel employed by the
18    parties hereto or financially interested in the
19    action.
20      IN WITNESS WHEREOF, I have unto set my hand and
21    affixed my Notarial Seal this 8th day of December,
22    2019.
23
24    _____
25    Stephanie J. Peil, Notary Public
```

19 (Pages 73 to 76)