Page 1

```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF WISCONSIN
-------------------------------------------------
JESSICA TISCHER, individually and
as Personal Representative For the
Spouse and Children of Jacob Tischer,
Decedent,
             Plaintiff,              DEPOSITION
                                     Case No.
       vs.                           3:19-cv-00166-jdp
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,

             Defendant.
-------------------------------------------------
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,
             Defendant/Third-Party Plaintiff,
       vs.
PROFESSIONAL TRANSPORTATION, INC.,
             Third-Party Defendant.
-------------------------------------------------

    The deposition of MICHAEL LINSTEDT, taken under
and pursuant to the provisions of Chapter 804 of the
Wisconsin Statutes and the acts amendatory thereof
and supplementary thereto, before Stephanie J. Peil,
Notary Public in and for the State of Wisconsin, at
the City of Eau Claire Fire & Rescue, 216 S. Dewey
Street, Eau Claire, Wisconsin, on the 25th day of
September, 2019, commencing at approximately
1:39 p.m.
           ORIGINAL TRANSCRIPT FILED AT THE
```

Page 2

```
 1            APPEARANCES:
 2     Paul Banker, Esq., of Hunegs, LeNeave & Kvas,
 3  1000 Twelve Oaks Center Drive, Suite 101, Wayzata,
 4  Minnesota, 55391, appeared representing the
 5  Plaintiff.
 6     Thomas A.P. Hayden, Esq., of Union Pacific
 7  Railroad Corporation, 101 North Wacker Drive, Room
 8  1920, Chicago, Illinois, 60606, appeared
 9  representing the Defendant and Third-Party
10  Plaintiff, Union Pacific Railroad Corporation.
11     Michael B. Cohen, Esq., of Quintairos, Prieto,
12  Wood & Boyer, P.A., 233 South Wacker Drive, 70th
13  Floor, Chicago, Illinois, 60606, appeared
14  representing the Third-Party Defendant, Professional
15  Transportation, Inc.
16     Also present:  Jessica Tischer and Todd Nutter.
```

Page 3

```
 1              EXAMINATION INDEX
 2  MICHAEL LINSTEDT:
 3  By Mr. Hayden                         4,31
 4  By Mr. Banker                         20
 5
 6
 7                 EXHIBITS
 8    Marked for
      Identification                      Page
 9
    22 - Life Quest Ambulance Report       4
10
11  ORIGINAL EXHIBIT WITH ORIGINAL TRANSCRIPT
    COPIES SUPPLIED TO THE ATTORNEYS
```

Page 4

```
 1              P R O C E E D I N G S
 2        (Exhibit 22 marked for identification.)
 3             MICHAEL LINSTEDT,
 4  being first duly sworn, testified as follows:
 5                EXAMINATION
 6  BY MR. HAYDEN:
 7  Q.  Sir, can you state your name for the record.
 8  A.  Michael Linstedt.  M-I-C-H-A-E-L,
 9      L-I-N-S-T-E-D-T.
10  Q.  And, sir, by whom are you employed?
11  A.  City of Eau Claire with Eau Claire Fire.
12  Q.  Okay.  Have you ever given your deposition
13      before?
14  A.  I have not.
15  Q.  Okay.  Hopefully it will be a short process.
16      We are -- I am going to ask you about the
17      records of your response to a patient a couple
18      of years ago in August of 2017.  Before you,
19      I've shown you what's been marked as Exhibit 23
20      (sic).  Is that -- have you had a chance to
21      review the records of that treatment of Jake
22      Tischer --
23  A.  I have.
24  Q.  -- Exhibit 23?  Before we get into talking a
25      little bit about that, can you just explain for
```

1 (Pages 1 to 4)

OFFICES OF ATTORNEY THOMAS A.P. HAYDEN
Q & A COURT REPORTERS, INC.

Page 5

```
 1   us the background -- your background, your
 2   training, what experience brought you to -- to
 3   August of 2017.
 4   A. Sure. Would you like my experience to this
 5   date or what the report said?
 6   Q. Let's take you up to that point, and then I'll
 7   ask you what you're currently doing.
 8   A. Okay. I've been -- I've worked for Eau Claire
 9   Fire since January 18th of 2016.
10   Q. Okay.
11   A. I've been an EMS for about eight years and
12   firefighting probably about -- about ten.
13   Q. When did you first -- or was this the first EMT
14   position you had, or have you worked for other
15   companies anywhere else?
16   A. I was a paramedic in Baldwin.
17   Q. For how long?
18   A. About a year and a half.
19   Q. And what training did you have to receive
20   before becoming an EMT in Baldwin?
21   A. You have to go to a two-year program at CVTC or
22   any other technical college to get your
23   paramedic degree and then a bunch of on --
24   on-job training and certifications.
25   Q. Did you get a paramedic degree?
```

Page 6

```
 1   A. I did.
 2   Q. From that institution?
 3   A. Correct.
 4   Q. And when was that?
 5   A. Approximately August 7th of 2015.
 6   Q. Other than Baldwin and -- and this company,
 7   have you worked for any others as a
 8   paramedic/EMT?
 9   A. Paramedic, just Baldwin.
10   Q. Okay. At the time of this -- your care of Mr.
11   Tischer in August of 2017, had you obtained any
12   licensures or certifications?
13   A. Could you repeat that again?
14   Q. Yeah. At the -- in August of 2017, the subject
15   of this deposition, had you up to that point
16   received any certifications or licensures?
17   A. I've received -- previous before that date I
18   have.
19   Q. They were still active at the time?
20   A. Correct.
21   Q. What had you received?
22   A. Paramedic Associate Degree; paramedic technical
23   certification; advanced cardiac life support
24   certification; PALS, pediatric life support
25   certification; and a CPR certification with
```

Page 7

```
 1   that.
 2   Q. Okay. And currently what's your -- can you
 3   describe your position here at the company and
 4   how, if any -- how, if at all, it's different
 5   from what it was in October -- I'm sorry --
 6   August of 2017.
 7   A. Firefighter/paramedic for the City of
 8   Eau Claire and has been the same since that
 9   date.
10   Q. When you get calls, do you go out in teams of
11   two or depending on what it is?
12   A. Depending on the call.
13   Q. On this date is there evidence you did go out
14   with another person?
15   A. We have -- according to this report, we had a
16   student riding with us.
17   Q. And who was that?
18   A. To my knowledge, I can't remember her name.
19   Q. Okay. Was there anyone else with you on that
20   call other than you and the student?
21   A. I can't recall other than what was in the
22   report.
23   Q. Okay. Todd Nutter is another gentleman who has
24   signed the report. Is that the gentleman who
25   is sitting with us today?
```

Page 8

```
 1   A. Correct.
 2   Q. Was Mr. Nutter on the call with you?
 3   A. He was.
 4   Q. Okay. So other than Mr. Nutter and the student
 5   and you, was there anyone else on the call?
 6   A. Other than -- I can't remember.
 7   Q. From the records?
 8   A. From -- other than the records, I can't
 9   remember.
10   Q. Okay. But the records do indicate Mr. Nutter
11   was with you on the call?
12   A. Correct.
13   Q. And along with an unnamed -- a student whose
14   name you can't remember?
15   A. Correct.
16   Q. Did the student -- do the records indicate
17   whether the student had done any of the work
18   upon arriving at the scene and treating Mr.
19   Tischer?
20   A. Could you repeat that again?
21   Q. Yeah. It's a bad question. Did the student
22   perform any work or provide any care to Mr.
23   Tischer from the time you all arrived at the
24   scene until Mr. Tischer was delivered to the
25   hospital?
```

Page 9

1  A. She was working with us, so she was assisting
2     with our skills and our assessment.
3  Q. Okay. Did the records indicate whether she,
4     the student, performed any of the testing or
5     any of the care?
6  A. Do you mind if I check quick?
7  Q. Sure.
8  A. (Reading document.) According to the report,
9     she received the 12 lead.
10 Q. Okay. That's the EKG?
11 A. Correct.
12 Q. Other than that, did -- did she provide any
13    care to Mr. Tischer?
14 A. It appears the 12 lead was her only skill for
15    that call.
16 Q. Okay. In looking at the record, does it -- in
17    particular the 12-lead record, does that
18    indicate what her name is, by chance?
19 A. It shouldn't.
20 Q. In looking at it does it?
21 A. It -- one second. We have a crew number of
22    99905.
23 Q. Okay. All right. Let's look at that exhibit a
24    little further then. Do you have any knowledge
25    of whether there's any other records of the

Page 10

1     care of Mr. Tischer other than the one we have
2     before you as Exhibit 22?
3  A. To my best knowledge, this is the care report.
4  Q. Okay. This is a common care report that's done
5     after every call?
6  A. Correct.
7  Q. Can you tell us from the record when it was
8     that the call came in?
9  A. Dispatched 8/12 of '17 at 21:00:35.
10 Q. And right above that in the listing of times
11    there is an indication that at 20:56:27 or 8:56
12    and 27 seconds PSAP was recorded. What is
13    that?
14       MR. NUTTER: That's what -- sorry.
15 BY MR. HAYDEN:
16 Q. Do you know that, Mike?
17 A. According to the report -- I don't see it on
18    here, but I'm not entirely sure what that
19    means.
20 Q. Okay. And then you arrived at the patient at
21    21:07:52?
22 A. There we go. Could you repeat that last thing?
23 Q. Did you guys arrive at the patient at 27 -- I'm
24    sorry -- 21:07:52?
25 A. Correct.

Page 11

1  Q. And then got Mr. Tischer to the hospital at
2     21:24:24?
3  A. Correct.
4  Q. How were those -- how were those times
5     recorded? Where do you get those times from in
6     order to enter them into your report?
7  A. So each of those times is when we make a
8     communication with the Eau Claire Comm Center.
9  Q. Okay.
10 A. So when we get dispatched, they dispatch at
11    this time, and then when we go en route, that's
12    the next time we make communication with them.
13 Q. And so is this report then -- do those times
14    get populated by the dispatch center into the
15    report because of their marking that particular
16    time?
17 A. Correct.
18 Q. If you look at the Narrative part of the
19    patient report, it shows that you were the
20    author. You're the PCR author. Does that mean
21    you're the -- the author of this report?
22 A. Correct.
23 Q. Okay. The narrative then states a description
24    of what -- of what you did and what you saw.
25    And is that something that you yourself typed

Page 12

1     in?
2  A. Correct, this is what I've typed.
3  Q. Okay. Because we know you're the author?
4  A. Correct.
5  Q. And it says that, Medic 5 -- that was your unit
6     on that day?
7  A. Correct.
8  Q. -- responded immediately for a Charlie
9     response. What's a Charlie response?
10 A. We have a designation for each call depending
11    on the heighth of the level and what
12    information is told from the initial caller to
13    the dispatch, so they kind of make a response
14    and resources needed for that call.
15 Q. Okay. And where does Charlie fall in the
16    range?
17 A. Charlie is the third dispatch of four.
18 Q. Okay. What's the first?
19 A. Alpha.
20 Q. Is that the lowest?
21 A. Correct.
22 Q. And what is next?
23 A. Alpha, Bravo, Charlie, and Delta.
24 Q. Delta being the highest level of -- of response
25    priority?

**Page 13**

1  A. Correct.
2  Q. Are -- is there only certain EMTs who are
3     qualified to respond to a Charlie?
4  A. Everyone can respond to all designations. It
5     just depends on what response goes.
6  Q. And it's reported that you were responding to a
7     31-year-old male for stroke-like symptoms; is
8     that correct?
9  A. Correct.
10 Q. And he was feeling -- according to the
11    communication center, the patient was feeling
12    weakness in his left leg; is that right?
13 A. Correct.
14 Q. Then a history is taken, and that was taken by
15    you?
16 A. Yep. Correct. Sorry.
17 Q. That's okay. And is there any indication here
18    in the chart that Mr. Tischer was communicating
19    with you without any problems?
20 A. According to the chart, he was having slurred
21    speech.
22 Q. Okay. But you were still able to understand
23    him and communicate back and forth with him?
24 A. I can't entirely remember the level of speech.
25 Q. Okay. If you put something down in the

**Page 14**

1     history, that would be something that you were
2     confident that you understood correctly from
3     the patient; is that fair?
4  A. Correct.
5  Q. So when you wrote that, The patient stated
6     about an hour before calling 911 he was having
7     really bad left leg and arm weakness, that
8     would be something that the patient reported to
9     you?
10 A. Correct.
11 Q. He states about an hour. Was he any more
12    specific beyond that?
13 A. According to the report, it says, Patient
14    stated about an hour before calling 911.
15 Q. Nothing more specific besides that estimate of
16    about an hour?
17 A. Correct.
18 Q. Okay. Patient's friend, you report then,
19    stated that he was acting different all day.
20    Do you have any identifiers about who patient's
21    friend was?
22 A. I would think co-worker.
23 Q. Okay. But that would be an assumption?
24 A. Correct.
25 Q. Do you have any -- should have asked you this

**Page 15**

1     earlier. Do you have any recollection of this
2     incident in your mind's eye, this call?
3  A. It was a couple years ago, so kind of what was
4     written on the report is kind of my best
5     knowledge right now.
6  Q. Okay. There's nothing else on this -- that's
7     not on the report that you remember; is that
8     fair?
9  A. Correct.
10 Q. Do you remember how many people were there at
11    the time that you responded?
12 A. That I'm unaware of.
13 Q. If it's not recorded here, it's just unaware to
14    you?
15 A. Correct.
16 Q. Nevertheless, whoever the patient's friend was
17    stated -- told you and you recorded it here
18    that he was -- he, Mr. Tischer, was acting
19    different all day; is that right?
20 A. Correct.
21 Q. And that he was -- patient's friend stated that
22    he was last seen normal at approximately 0700
23    or 7 a.m. that day; is that correct?
24 A. Correct.
25 Q. Do you have any other additional information

**Page 16**

1     about how those people came to know that?
2  A. That I am not aware of.
3  Q. Did Mr. Tischer tell you and did you record
4     that he felt like he was having a bad headache?
5  A. According to the report, it says, Patient said
6     he felt like he was having a very bad headache.
7  Q. Okay. And he told you that he had vomited
8     earlier?
9  A. Correct.
10 Q. And did you assess him as being alert,
11    oriented, and able to answer your questions?
12 A. Correct.
13 Q. Inside the ambulance a stroke scale was
14    performed, and he had a positive left-sided
15    stroke assessment; is that right?
16 A. Correct.
17 Q. What is the stroke scale? How do you -- how is
18    it -- what is your technique for performing
19    that?
20 A. So we go off of the -- Eau Claire Fire goes off
21    the Cincinnati scroll -- scale, so that would
22    be grip strength, facial droop, and speech.
23 Q. And you reported that he had no grip strength
24    on his left hand; is that right?
25 A. Correct.

Page 17

1  Q. And a left facial -- left-sided facial droop
2     and was also slurring his words; is that
3     correct?
4  A. Correct.
5  Q. And did you have any -- did you record any
6     information about how long those three symptoms
7     were present specifically?
8  A. To my best knowledge is what was in the report
9     about those symptoms.
10 Q. Nothing else other than what's in your report;
11    is that -- is that fair?
12 A. Correct.
13 Q. Are you in -- were you in -- before getting Mr.
14    Tischer to the hospital -- and, by the way,
15    which hospital was it that you took him to by
16    this report?
17 A. According to the report, Mayo Hospital in
18    Eau Claire.
19 Q. Okay. And from -- at any time from the point
20    that you were at his side in response to the
21    point where you delivered Mr. Tischer to the
22    Eau Claire Mayo facility, were you in contact
23    with any physicians relaying or communicating
24    his symptoms?
25 A. We contact -- correction. I contacted medical

Page 18

1     control as seen as in -- as seen in the last
2     sentence of the RN A chart. It says, Medical
3     control was contacted and the stroke team was
4     activated.
5  Q. Where is medical control?
6  A. Medical control is located in the ER.
7  Q. Of the hospital that you're intending to take
8     the patient?
9  A. Correct.
10 Q. And what's recorded, if anything, about the
11    communication between you guys and medical
12    control?
13 A. What's recorded relating to the report?
14 Q. Um-hum.
15 A. Could you repeat that one more time?
16 Q. Sure. What was recorded in your report about
17    any communications or instructions that were
18    relayed between you and medical control?
19 A. According to my control, he was contacted and
20    the stroke team was activated.
21 Q. Okay. Stroke team at the hospital was
22    waiting -- was activated, waiting for Mr.
23    Tischer to arrive?
24 A. Correct.
25 Q. Did the medical control request or command you

Page 19

1     to perform any particular testing or administer
2     any drugs?
3  A. According to my report, I just have the contact
4     and the activation of the team.
5  Q. Okay. And if you had administered any drugs at
6     their command, it would have been -- it would
7     be so noted?
8  A. Correct.
9  Q. Okay. Was it you or Todd who took the vital
10    signs that are recorded here?
11 A. There is no marking of the person who recorded
12    the vitals.
13 Q. Okay. They were -- you'd agree with me they
14    were taken at 21:19:00 and then again at
15    21:21:41?
16 A. Correct.
17 Q. Okay. And both times a Glasgow Comma -- Coma
18    Scale was -- was done; is that right?
19 A. Correct.
20 Q. Okay. His eyes opened spontaneously on both
21    occasions that the vitals were taken; is that
22    right?
23 A. Correct.
24 Q. He was oriented, he was smiling -- he was able
25    to smile, I should say, he was oriented to

Page 20

1     sounds, following objects, and interacts; is
2     that right?
3  A. Correct.
4  Q. On both occasions he obeyed commands and gave
5     appropriate responses to stimulation; is that
6     correct?
7  A. Correct.
8  Q. He never lost consciousness during the period
9     of time that you were with him; is that fair?
10 A. Correct.
11    MR. HAYDEN: Those are all the questions I
12    have for you, sir.
13    MR. COHEN: No questions.
14    MR. BANKER: If I could -- is that Exhibit
15    23 in front of you?
16    MR. HAYDEN: It's 23 or 2. 22.
17    MR. BANKER: 22.
18 BY MR. BANKER:
19 Q. So on Exhibit 22, I just want to go back to the
20    Narrative.
21 A. Okay.
22 Q. And looking at the History section there's a
23    comment there on the second line of, I guess,
24    the third sentence. It says, Patient's friend
25    stated he thought he might have had a stroke.

Page 21

1   Other than what's written there, do you have
2   any identifying information about who the
3   patient's friend was that made that statement?
4   A.  I do not.
5   Q.  And then in the next sentence it says,
6   Patient's friend stated he was last seen normal
7   at approximately 0700.  Do you see that?
8   A.  Correct.
9   Q.  Same question there.  Do you have any
10  additional information other than what's in the
11  report to identify that person?
12  A.  Just what's in the report.
13  Q.  So there's three statements in the History
14  section of the report talking about the
15  patient's friend stated, patient's friend
16  stated, and patient's friend stated.  Do you
17  recall whether that was one person speaking or
18  more than one person speaking?
19  A.  I do not recall.
20  Q.  Did you assume that whoever was speaking about
21  those things, the patient's friend, was a
22  co-worker?
23  A.  I do not recall.
24  Q.  Once you had performed the stroke scale
25  assessment, what is indicated in terms of

Page 22

1   paramedic treatment for a stroke patient that's
2   been assessed with a -- with a stroke?
3   A.  According to the Chippewa Valley protocols, we
4   look for the last seen normal, when they were
5   not showing any symptoms, and then about when
6   the symptoms start, and if they have a history
7   of anticoagulant medication or not, they would
8   prefer an IV and a 12 lead, depending on the
9   hospital a lab draw or not, and then a medical
10  control contact.
11  Q.  So I was -- I was taking some notes.  I got
12  last seen -- you're looking for last seen
13  normal, when the symptoms start.  Was it last
14  seen normal?
15  A.  Could you repeat that again?
16  Q.  So I was -- I was making some notes about --
17  you kind of went through a list.
18  A.  Sure.
19  Q.  And I got last seen normal, when the symptoms
20  start, and then I think I missed one.
21  A.  History of anticoagulant medication.
22  Q.  And then a medical control contact?
23  A.  Correct.
24  Q.  So do you know why you're looking for the
25  information about when a patient was last seen

Page 23

1   normal?
2   A.  That identifies when they were last seen normal
3   and functioning normal.
4   Q.  And what use do you make of that information in
5   your assessment?
6   A.  Accounts from people on scene or a person
7   ask -- asking the -- the patient too.
8   Q.  I guess I'm not -- I'm not following.
9   A.  So when you justify a last seen normal, it's
10  people that are around him the whole day or
11  himself.
12  Q.  Okay.  That's who you get it from?
13  A.  Correct.
14  Q.  What purpose does that information serve in
15  your mind?  Why do you want to know that?
16  A.  To identify about what time the stroke symptoms
17  started.
18  Q.  Okay.  And that is, as I understood it, the
19  second thing you're looking for.  So there's
20  last seen normal and when did the symptoms
21  start?
22  A.  Correct.
23  Q.  Why differentiate between those two times?
24  A.  There's a window in stroke for treatment,
25  depending on how far apart the stroke is, what

Page 24

1   treatment will be done at the hospital.
2   Q.  So you're trying to make an initial assessment
3   and gather some additional information to
4   provide it on to medical control?
5   A.  Correct.
6   Q.  And so were you able to make that assessment in
7   the case of Mr. Tischer?
8   A.  Could you repeat that again?
9   Q.  Yeah.  Were you able to make the assessment of
10  those three categories of information with
11  respect to Mr. Tischer?
12  A.  Correct.
13  Q.  It looks like from your report that he had no
14  history of anticoagulant, and it looks like
15  you've got a last seen normal.  Do you have a
16  when the symptoms start here in the report?
17  A.  According to the report, the patient said about
18  an hour before calling 911 he was having really
19  bad left leg and arm weakness.
20  Q.  So that's speaking to that category of
21  information?
22  A.  Correct.
23  Q.  Okay.  And then did you forward those three
24  pieces of information:  last seen normal,
25  when symptoms start, and history of

Page 25

1    anticoagulants, on to medical control?
2  A.  Correct.
3  Q.  Is there anything more than making that
4    assessment of those four steps you've described
5    that you provide in terms of paramedic
6    treatment for a possible stroke patient?
7  A.  12 lead to see how the heart is doing, and then
8    depending on the rest of the vitals possibly a
9    blood pressure medication.
10 Q.  And was Mr. Tischer's 12 lead, was that -- did
11    that show any issues with his heart?
12 A.  No sign of STEMI or cardiac arrest.
13 Q.  Okay.  And with respect to his vitals, did that
14    provide any different path for responding?
15 A.  One second.  Could you repeat the question one
16    more time?
17 Q.  Sure.  You had -- you had talked about the four
18    criteria, and then you mentioned two other
19    possible things that you look at:  the 12
20    lead to assess the heart and then the vitals to
21    see whether you need to give, I think it was,
22    blood pressure medication.
23 A.  Correct.
24 Q.  Did you need to give Mr. Tischer blood pressure
25    medication based on his vital signs?

Page 26

1  A.  No.
2  Q.  When you do the stroke scale that's discussed
3    in your narrative, is that -- are you making a
4    diagnosis of a stroke, or are you just doing a
5    preliminary assessment against a scale, or how
6    do you use that scale?
7  A.  An assessment to see if symptoms are leading
8    towards a stroke.
9  Q.  And I take it by the statement in your -- what
10    are the abbreviations in the narrative?
11    There's an A, a C, H, A, R, T.  Do you see
12    that?
13 A.  Yes.
14 Q.  What are -- what are those?  I'm assuming those
15    are different sections of the report.
16 A.  It's a mnemonic that depends on information
17    that should be in each category.
18 Q.  Okay.  So what does the -- what does the A
19    stand for?
20 A.  So the A is arrival.
21 Q.  Okay.
22 A.  Or leading up to the arrival.  The C is the
23    chief complaint, H is the history, A is the
24    assessment, treatment on scene, and then
25    transport of the patient.

Page 27

1  Q.  What does the R stand for?
2  A.  Oh, sorry.  R would stand for the treatment.
3  Q.  R is for the treatment, and T is for transport?
4  A.  Correct.
5  Q.  And so in -- after you perform the stroke scale
6    in the R section, you say that, Patient had a
7    positive left-sided stroke assessment.  And so
8    is that as far as you go in -- as you -- as
9    part of your paramedic treatment?
10 A.  For the most part, and then you'll reassess.
11 Q.  Are you -- are you -- is that being used to
12    diagnose that he's had a stroke, or are you
13    just doing some screening procedures, I guess?
14 A.  Screening procedures and to prep the hospital
15    for further treatment.
16 Q.  Okay.  I guess another way of asking it is did
17    you know whether Mr. Tischer had had a stroke
18    as you were treating him or were you just
19    suspecting it?
20 A.  Performing a test for a stroke.
21 Q.  Okay.  And advising the medical control to
22    expect a stroke patient to do whatever
23    additional diagnostic tests they have?
24 A.  Correct.
25 Q.  Okay.  I want to go -- you mentioned something

Page 28

1    that when we were talking about the four -- the
2    three criteria of information that you provide
3    to the medical control, you mentioned something
4    that I wanted to come back to.  You said the
5    reason why you want to know last seen normal
6    and when the symptoms start is that there's a
7    window for treatment.  Can you explain what you
8    mean by that.
9  A.  Depending on the guidelines for stroke -- it
10    has changed multiple times over the last couple
11    of years -- depending on what medications they
12    will use, depending on if it's a medication to
13    break the clot up or if it's a mechanical clot
14    retrieval.
15 Q.  Okay.  Do you know what the guidelines would
16    have said on August 12th, 2017?
17 A.  Do you care if I look at the times quick?
18 Q.  Sure.
19 A.  There we go.  (Reading document.)  Looks from
20    the notification to the arrival at the
21    hospital, a little under an hour.
22 Q.  Sure.  But -- so you were -- you were
23    explaining that there's a window for treatment
24    and the guidelines have changed over time.
25 A.  Correct.

Page 29

1  Q. And so I'm wondering do you know on
2     August 12th, 2017, what the time window was
3     that you're comparing against the guidelines?
4  A. I can't 100 percent say exactly what it was
5     back in 2017.
6  Q. Okay. Do you have a sense of how long that
7     window is, generally speaking?
8  A. Approximately about 6 hours to 12.
9  Q. Six hours to -- so that if a person was last
10    seen normal more than 12 hours beyond when you
11    arrive, what does that indicate?
12 A. If it's 6 to 12 hours, they use clot busting
13    medication to help the stroke. Usually after
14    12 to 24 beyond, they usually use a clot
15    retrieval.
16 Q. And when you say "they," you're referring to
17    people actually at the hospital?
18 A. Correct.
19 Q. So as part of your paramedic response, you
20    would not be applying either a clot busting
21    drug or a clot retrieval drug as part of the
22    paramedic response?
23 A. Correct.
24 Q. Okay. And so if I understand it, you were
25    the -- you were the primary -- EMS primary care

Page 30

1     provider for this particular event for Mr.
2     Tischer?
3  A. Correct.
4  Q. Does that mean that you are -- and Mr. Nutter
5     was driving the ambulance?
6  A. Correct.
7  Q. And does that mean that you are kind of with
8     Mr. Tischer in the back of the ambulance as
9     he's being transported?
10 A. Correct.
11 Q. Was there any other communication that you
12    recall with Mr. Tischer other than what's
13    reflected in your report?
14 A. To my best knowledge is what is in the report.
15 Q. Okay. I guess the same -- let me ask the
16    question a different way. Did you have any
17    communication with anyone other than Mr.
18    Tischer at any time pertaining to this incident
19    other than what's requested -- other than
20    what's reflected in this report?
21 A. It would be crews and people related to the
22    scene.
23 Q. When you say "crews," what do you mean?
24 A. Crew members. Sorry.
25 Q. Crew members of --

Page 31

1  A. Todd Nutter.
2  Q. Okay. So other people on your paramedic team?
3  A. Correct.
4  Q. How about anyone outside your paramedic team,
5     would you have any communications with anyone
6     else other than what's reflected in the report?
7  A. What -- whatever's reflected in the report is
8     what I have the best knowledge of.
9        MR. BANKER: I don't have any further
10    questions.
11       MR. HAYDEN: Mike?
12       MR. COHEN: I have nothing.
13       MR. HAYDEN: Just a follow-up.
14 BY MR. HAYDEN:
15 Q. There's nothing in your report, sir, that
16    indicates when the slurring of Mr. Tischer's
17    speech began; is that correct?
18 A. Correct.
19 Q. And there's no indication, no report in your
20    report, Exhibit 22, of when the onset of the
21    left-sided face droop was?
22 A. Do you care if I look at my report?
23 Q. Sure. I mean you're welcome to. I didn't mean
24    to say I didn't care. You're welcome to.
25 A. Could you repeat the question again?

Page 32

1  Q. Yep. There's no recording in your -- in your
2     narrative report of when the left-sided face
3     droop began; is that correct?
4  A. Correct.
5        MR. HAYDEN: Thanks. Those are my
6     questions.
7        MR. BANKER: Nothing further.
8        (Proceedings concluded at approximately
9     2:13 p.m.)

```
                                              Page 33
 1   STATE OF WISCONSIN   )
                          )ss
 2   COUNTY OF EAU CLAIRE )
 3
 4      I, Stephanie Peil, Notary Public in and for the
 5   State of Wisconsin, certify there came before me the
 6   deponent herein, namely Michael Linstedt, who was by
 7   me duly sworn to testify to the truth and
 8   nothing but the truth concerning the matters in this
 9   cause.
10      I further certify that the foregoing transcript
11   is a true and correct transcript of my original
12   stenographic notes.
13      I further certify that I am neither attorney or
14   counsel for, nor related to or employed by any of
15   the parties to the action in which this deposition
16   is taken; furthermore, that I am not a relative or
17   employee of any attorney or counsel employed by the
18   parties hereto or financially interested in the
19   action.
20      IN WITNESS WHEREOF, I have unto set my hand and
21   affixed my Notarial Seal this 3rd day of October,
22   2019.
23
24   _____
25   Stephanie J. Peil, Notary Public
```

9 (Page 33)

My commission expires 1/30/2022
Q & A COURT REPORTERS, INC.