Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
------------------------------------------
JESSICA TISCHER, individually and
as Personal Representative For the
Spouse and Children of Jacob Tischer,
Decedent,

      Plaintiff,         DEPOSITION
                        Case No.
   vs.            3:19-cv-00166-jdp
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,

      Defendant.
------------------------------------------
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,
      Defendant/Third-Party Plaintiff,
      vs.
PROFESSIONAL TRANSPORTATION, INC.,
      Third-Party Defendant.
------------------------------------------

The deposition of NEIL FRANCHUK, taken under
and pursuant to the provisions of Chapter 804 of the
Wisconsin Statutes and the acts amendatory thereof
and supplementary thereto, before Stephanie J. Peil,
Notary Public in and for the State of Wisconsin, at
Q & A Court Reporters, Inc., 303 Main Street, Eau
Claire, Wisconsin, on the 19th day of July, 2019,
commencing at approximately 8:56 a.m.

ORIGINAL TRANSCRIPT FILED AT THE

---

Page 2

1           APPEARANCES:
2      Paul Banker, Esq., of Hunegs, LeNeave & Kvas,
3  1000 Twelve Oaks Center Drive, Suite 101, Wayzata,
4  Minnesota, 55391, appeared representing the
5  Plaintiff.
6      Thomas A.P. Hayden, Esq., of Union Pacific
7  Railroad Corporation, 101 North Wacker Drive, Room
8  1920, Chicago, Illinois, 60606, appeared
9  representing the Defendant and Third-Party
10  Plaintiff, Union Pacific Railroad Corporation.
11      Michael B. Cohen, Esq., of Quintairos, Prieto,
12  Wood & Boyer, P.A., 233 South Wacker Drive, 70th
13  Floor, Chicago, Illinois, 60606, appeared
14  representing the Third-Party Defendant, Professional
15  Transportation, Inc.
16      Also present:  Jamie Lukehart Hobbs, Jessica
17  Tischer, and Stephen Mark Marvin.
18
19
20
21
22
23
24
25

---

Page 3

1        EXAMINATION INDEX
2  NEIL FRANCHUK:
3  By Mr. Banker          4,126
4  By Mr. Hayden       95,129
5  By Mr. Cohen        118
6
7
8         EXHIBITS
9  Marked for
   Identification         Page
10
  7 - Altoona Track Chart       79
11
  8 - UP LTS83 Job Description/Responsibilities   81
12
  9 - UP BasicPlus CPR, AED, and First Aid
13    for Adults Student Book      84
14  10 - Locomotive Video Screenshot, 4:26 p.m.   86
15  11 - Locomotive Video Screenshot, 4:30 p.m.   88
16  12 - Locomotive Video Screenshot, 5:29 p.m.   89
17  13 - Franchuk Handwritten Call Time Notes   90
18
  ORIGINAL EXHIBITS WITH ORIGINAL TRANSCRIPT
19  COPIES SUPPLIED TO THE ATTORNEYS
20
21
22
23
24
25

---

Page 4

1       P R O C E E D I N G S
2       NEIL FRANCHUK,
3  being first duly sworn, testified as follows:
4       EXAMINATION
5  BY MR. BANKER:
6  Q.  Good morning.
7  A.  Morning.
8  Q.  Could you state your name for the record,
9  please.
10  A.  Neil Franchuk.  Can I have a second?
11      MR. BANKER:  Sure.
12      (A break was taken.)
13  BY MR. BANKER:
14  Q.  Okay.  Could you state your name for the
15  record, please.
16  A.  Neil Franchuk.
17  Q.  How do you spell Franchuk?
18  A.  F-R-A-N-C-H-U-K.
19  Q.  Mr. Franchuk, have you ever had your deposition
20  taken before?
21  A.  Yes.
22  Q.  How many times?
23  A.  For the railroad?
24  Q.  Yeah.
25  A.  Once.

OFFICES OF ATTORNEY PAUL BANKER
Q & A COURT REPORTERS, INC.

Page 5

1   Q.  Let me just go over some ground rules today
2       just so we're clear about the process. The
3       court reporter here is taking down everything
4       that gets said, so in order to have a clear
5       record, it's important that only one of us talk
6       at a time. So I'll watch for that, and if we
7       start talking over each other, I'm going to
8       remind you of that. Okay?
9   A.  Okay.
10  Q.  Also, it's important to answer audibly because
11      if you say um-hum or huh-uh, which is easy to
12      do once we start talking, we don't get a clear
13      record. So if I notice that happening, I'll
14      also give you a reminder about that. Okay?
15  A.  Yes.
16  Q.  If I ask a question today that you don't
17      understand, please feel free to ask me for
18      clarification. I'll do what I can to explain
19      what I'm asking. If you don't do that, I'm
20      going to assume that you understood the
21      question. Is that a fair assumption?
22  A.  Yes.
23  Q.  If you need to take a break at some point
24      today, just let me know, and we'll try to
25      accommodate that. Okay? Is that okay?

Page 6

1   A.  Yes.
2   Q.  Okay. The deposition that you previously gave
3       while you were employed by the railroad --
4   A.  Yes.
5   Q.  -- what was the context of that?
6   A.  That was a train incident that had -- in
7       Wyoming.
8   Q.  Where was that?
9   A.  A train accident in Wyoming.
10  Q.  In Wyoming. Okay. Do you know when that was?
11  A.  1996.
12  Q.  Were you injured in that incident, or were you
13      just a fact witness?
14  A.  No, I was not injured. It was just fact based.
15  Q.  What, if anything, did you do to prepare for
16      your deposition today?
17  A.  Nothing.
18  Q.  And by that I mean did you have any
19      conversations with anyone to get ready?
20  A.  When I came in here at 8 o'clock, I talked to
21      the railroad attorney.
22  Q.  Other than that, did you talk to anyone about
23      this?
24  A.  Not about this deposition, no.
25  Q.  Did you look at any documents to get ready for

Page 7

1       this deposition?
2   A.  I had some notes that I wrote when -- you know,
3       when it happened of my call log. I got them.
4       That's -- that's it.
5   Q.  Is that something that you have with you today?
6   A.  Yes.
7   Q.  Do you mind if I take a look at that?
8   A.  It's messy.
9   Q.  Sure.
10  A.  Some of the stuff. It's just my notes.
11  Q.  Would it be all right if we took a copy of
12      this?
13  A.  Yes.
14  Q.  Why don't we do that at some point on a break
15      because I would like to ask you some questions
16      about that, but we can do that a little bit
17      later on. Let me ask you just some background
18      questions. So how old are you?
19  A.  52.
20  Q.  And where do you live?
21  A.  Eau Claire.
22  Q.  What is your address there?
23  A.  E3233 Jennifer Lane.
24  Q.  And how long have you lived there?
25  A.  Five years.

Page 8

1   Q.  Do you rent or own?
2   A.  Own.
3   Q.  Do you live there with anyone else?
4   A.  Wife and my son.
5   Q.  Do you have any plans to move inside the next
6       12 months?
7   A.  No.
8   Q.  I'd like to just briefly go over your
9       education. I assume you're a high school
10      graduate?
11  A.  Yes.
12  Q.  How about post-high school, any formal
13      education?
14  A.  Some college.
15  Q.  Some college. Did you obtain a degree from the
16      college that you attended?
17  A.  No.
18  Q.  Where did you go?
19  A.  Casper, Wyoming.
20  Q.  And what did you do after you finished college
21      in Casper, Wyoming?
22  A.  Worked in the oil field.
23  Q.  Was there a particular company that you worked
24      for?
25  A.  I worked for a few of them, not -- not

2 (Pages 5 to 8)

Page 9

1    particularly.  There's probably three or four I
2    worked for.
3    Q.  How long did you do that?
4    A.  18 years old towards -- until I was 26.
5    Q.  What did you do after that?
6    A.  Hired on the railroad.
7    Q.  What railroad did you hire on to?
8    A.  Chicago Northwestern.
9    Q.  Do you remember what -- when that was?
10   A.  January '95.
11   Q.  What craft did you hire on to?
12   A.  As a conductor.
13   Q.  How long did you work for the Chicago Northwest
14       as a conductor?
15   A.  They got sold out, I think, in '96.  I think
16       that's when the UP bought us.
17   Q.  And then did you begin working for the UP?
18   A.  Yes.
19   Q.  And were you still in a conductor capacity?
20   A.  Yes.
21   Q.  How long did you do that?
22   A.  I transferred to the -- to the northern four,
23       they call it, the seniority district, in '96.
24   Q.  Didn't quite get it.  You said the northern --
25   A.  Four is the seniority district.  I transferred

Page 10

1    from Wyoming to Minnesota, Wisconsin area.
2    Q.  So is the northern -- is that the number four?
3    A.  Yes.
4    Q.  Northern four.  Does that stand for four
5        states, or what is the four?
6    A.  I don't know what it stands for.
7    Q.  But you were in the northern four seniority
8        district?
9    A.  Now I am.
10   Q.  And you transferred to the northern four as a
11       conductor?
12   A.  Yes.
13   Q.  How long did you do that?
14   A.  About six months.
15   Q.  Was there a particular geographic location you
16       were working out of?
17   A.  Itasca.
18   Q.  In Minnesota?
19   A.  It's in Wisconsin.
20   Q.  In Wisconsin.  And how long -- what did you do
21       after that?
22   A.  I became an engineer in 1997.
23   Q.  And have you been an engineer ever since?
24   A.  Yes.
25   Q.  For the UP?

Page 11

1    A.  Yes.
2    Q.  And have you been working out of Itasca,
3        Wisconsin, since that time or did that change?
4    A.  No.  I've been bumped all around.  I've worked
5        in North Platte -- Bailey Yard in North Platte,
6        Nebraska, for 18 months.  I worked Itasca,
7        Minneapolis, Altoona.  I worked all the
8        different ones.  I worked in Altoona for the
9        last probably eight, ten years.
10   Q.  Was there -- is there a particular job that
11       you've been doing in Altoona on a regular
12       basis?
13   A.  No, not a particular one.  I've -- just
14       basically the locos and the yard jobs in
15       Altoona.
16   Q.  We're here today because of an incident
17       involving Jacob Tischer on August 12th, 2017.
18   A.  Yes.
19   Q.  Do you know Jacob Tischer?
20   A.  Yes.
21   Q.  Tell me, how did you know Jacob Tischer?
22   A.  Through work.
23   Q.  Did you work together as an engineer and
24       conductor crew?
25   A.  Every once in a while, yes.

Page 12

1    Q.  How many times would you say that you worked
2        with Jacob Tischer?
3    A.  I -- I can't give you an exact.  I'm guessing
4        30 times, maybe.  I -- I don't know for a fact.
5    Q.  Did you develop an opinion about working with
6        Jacob Tischer?
7    A.  Yes.
8    Q.  What was the opinion?
9    A.  Hard worker.
10   Q.  Did you enjoy working with him?
11   A.  Yes.
12   Q.  Did you ever take issue with how he performed
13       his job duties?
14   A.  No.
15   Q.  I want to focus on August 12th, 2017.  Okay.
16       What was your first contact with Jacob Tischer
17       on that day?
18   A.  I think when we got to work, we meet at our
19       yard office, get our paperwork together, get
20       our orders.
21   Q.  And when you say "yard office," what yard
22       office are you talking about?
23   A.  Altoona.
24   Q.  Do you remember what time of day you were
25       starting work?

Page 13

1  A.  1402 was our on duty time.
2  Q.  1402 using military --
3  A.  Yes, 2 --
4  Q.  -- so 2:02 --
5  A.  -- p.m.
6  Q.  -- p.m.?  What was your job going to be that
7     day?
8  A.  It was Job 83, which goes to Chippewa -- we
9     call it Norma -- and take cars up there, get
10    another train, bring it back down to Altoona.
11 Q.  You mentioned paperwork.  What -- what sort of
12    paperwork do you get?
13 A.  Train lists, bulletins, work orders.
14 Q.  Are those documents that you get as the
15    engineer, or are they documents that you both
16    get as engineer and conductor?
17 A.  We both get them.
18 Q.  Okay.  So you go on duty 1402.  You get your
19    paperwork in the Altoona yard office.  You're
20    working with Jake Tischer that day.  What
21    happens next?
22 A.  We got on the train on the main line and waited
23    for permission to go up to Chippewa.
24 Q.  Was there any work that you had to do
25    beforehand in the Altoona yard before you left,

Page 14

1     or were you just boarding an outbound train?
2  A.  Just boarding the outbound train.
3  Q.  Do you recall -- back up.  So at the start of
4     your job, is there any sort of briefing that
5     takes place?
6  A.  Him and I talked about the -- what we're going
7     to do during the day.
8  Q.  Is there anybody else who participates in that
9     or is it just the two of you?
10 A.  Just the two of us.  He might have talked to
11    the managers.  I don't know.  He just tells me
12    what we're going to do.
13 Q.  Do you recall any conversation with Jake
14    Tischer before you got onto the locomotive?
15 A.  Our -- I don't recall.  I know I talked to him,
16    you know, just what we're going to do, but I
17    don't talk about anything else.  I don't
18    remember anything.
19 Q.  So you get on the locomotive.  What happens
20    next?
21 A.  We had to wait to go up to Norma, and I don't
22    know how long we waited.
23 Q.  But some amount of time?
24 A.  Yes.
25 Q.  What are you doing while you -- are you both

Page 15

1     together while you're waiting, or are you...
2  A.  We're together.  Another conductor was walking
3     her train, and she climbed up and talked to us
4     for a while too.
5  Q.  Do you know who that was?
6  A.  Jessica Huff.
7  Q.  Is that H-U-F-F?
8  A.  I think so.
9  Q.  Did you have any conversations with Jacob
10    Tischer while you're on the train waiting to
11    depart?
12 A.  Yes, just small talk.  I don't remember what we
13    talked about.
14 Q.  What happened next?
15 A.  We went up to Norma or Chippewa, same thing,
16    delivered cars up there, put our power on a
17    different train, and got ready to come down.
18    He -- he was in the cab most of the time.
19 Q.  When you're going up to Norma, how was your
20    outbound train configured in terms of power?
21 A.  It was all in the head end.
22 Q.  So you had how many locomotives on the head
23    end?
24 A.  I don't remember.  Probably -- I don't remember
25    for sure.  I can't -- not sure.

Page 16

1  Q.  You and Mr. Tischer are riding in the same lead
2     locomotive --
3  A.  That's correct.
4  Q.  -- on the way up to Norma?
5  A.  Yes.
6  Q.  When you say you delivered cars, could you
7     explain what that means in layperson's terms.
8  A.  We take cars up to a yard up in Chippewa and
9     set those cars in an empty track, cut away from
10    those cars, and tie them down and then cut
11    away, of course.
12 Q.  How do you know what cars go on what track?
13 A.  Through the orders talking to -- it's another
14    railroad we talk to up there, Wisconsin
15    Northern.  So we talk to them, they tell us
16    where they want it, or Jake knew from the
17    manager.  I don't remember how it went, but
18    that's how it goes.
19 Q.  So the cars that you're pulling from Altoona to
20    Norma are being delivered to Norma and put onto
21    empty tracks?
22 A.  Yes.
23 Q.  And is that the entire consist is being
24    distributed that way?
25 A.  The entire train.

4  (Pages 13 to 16)

Page 17

1  Q.  The entire train.
2  A.  The power stayed with us, the engines stayed
3       with us.
4  Q.  So during that process of delivering cars, I
5       take it you're in the locomotive?
6  A.  Yes.
7  Q.  Where is Mr. Tischer during that time?
8  A.  On -- on the way up there he's in the
9       locomotive.
10 Q.  How about once you get to Norma?
11 A.  He gets in a cab.
12 Q.  And when you say "a cab," do you mean a PTI
13      vehicle?
14 A.  Yes.
15 Q.  Do you remember the name of the driver of the
16      PTI vehicle?
17 A.  Chaz.  I don't know his last name.  I don't
18      know.
19 Q.  Okay.  Does the name Chaz Lux -- Lux ring a
20      bell?
21 A.  I don't know his last name.  I know it's Chaz.
22 Q.  Had you worked with Chaz before as a -- as a
23      cab driver?
24 A.  Yes.
25 Q.  So when you say Mr. Tischer gets in the cab,

Page 18

1       what is he getting in the cab to do?
2  A.  I have to pull the train into a track, and he
3       has to tell me when I'm in the clear.  He
4       sometimes takes the EOT off and the -- and the
5       train device, takes that off, puts it on our
6       new train.  I don't know if he did that that
7       day or not.  I -- I don't remember.  And then
8       he'll cab up to the head in and cut -- and tie
9       it down, of course, and then we do a securement
10      check and then -- then pull the power off it,
11      engines.
12 Q.  And you're pulling the power off to where?
13      Where are you taking the power?
14 A.  To another track where there's car loads.  We
15      took empties up there, bring loads down.
16 Q.  So has someone already gone through the process
17      of coupling the loaded cars and preparing them
18      for departure?
19 A.  They were all coupled.  We have to do an air --
20      it's called an air test.
21 Q.  Is that something that you're doing or
22      something that Mr. Tischer is doing?
23 A.  Mr. Tischer.
24 Q.  While that's taking place, are you in a
25      position to observe Mr. Tischer doing his work

Page 19

1       tasks?
2  A.  No.
3  Q.  Are you communicating with him by radio at all?
4  A.  Yes.
5  Q.  What kind of radio is that?  Is that a handheld
6       radio?  Is that a radio built into the train?
7  A.  He has a handheld.  I have a built-in radio.
8  Q.  Is there a particular channel that you use?
9  A.  Yes.
10 Q.  What channel is that?
11 A.  If we're up in Norma, we're probably on 16.
12 Q.  So you're going through this process of
13      delivering cars, uncoupling the power, and
14      coupling the power to loaded cars for
15      departure.  What happened next?
16 A.  We got our train together, called for a warrant
17      to come back down to Altoona.  He takes the
18      track -- Jake takes the track warrant to get
19      into Altoona.
20 Q.  When you say calls for a track warrant, is
21      that -- has Mr. Tischer returned to the lead
22      locomotive on the outbound train?
23 A.  After we've done our air test that -- you know,
24      he walks his air test, and then we depart
25      Altoona.  He's on the head end.  We get to

Page 20

1       Altoona, and then he'll have to -- he'll get
2       off and set those cars out in Altoona yard.
3  Q.  So for the ride back from Norma to Altoona,
4       both you and Mr. Tischer are in the cab of the
5       lead locomotive?
6  A.  Yes.
7  Q.  Do you know what time it was that you arrived
8       in Norma?
9  A.  I don't have them times written down.  I can't
10      remember exactly.
11 Q.  In terms of the notes that you have, does that
12      contain any time notations?
13 A.  No, not for that.  That's all been in -- it's
14      been a while, so they have that from the
15      other -- from our paperwork when they took our
16      paperwork.
17 Q.  What sort of paperwork would record the times
18      of arrival, departure, that sort of thing?
19 A.  A conductor's log.  There's a reader -- car
20      reader that they -- you can look up and know
21      when we arrived and depart.
22 Q.  Do you know whether there's a car reader in
23      Norma?
24 A.  There's a reader -- I don't know if it works or
25      not, but there's a reader before we get to

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 21

1    Norma, and then there's a reader right before
2  we get to Altoona.
3  Q.  And is your understanding that that reader is
4    recording locomotive or cars as they go by?
5  A.  Both.
6  Q.  What is -- the conductor's log, is that
7    something that Mr. Tischer maintained?
8  A.  Yes.
9  Q.  What is it physically?  It is like a notebook
10    or --
11  A.  It's a -- yeah, it's a notebook with -- you
12    know, it says conductor's log on it, and you
13    put your times and everything in there.
14  Q.  And what -- do you know what happens to a
15    conductor's log at the end of a -- of a shift?
16  A.  He keeps them.
17  Q.  The conductor keeps them?
18  A.  Yes.
19  Q.  I thought you had said, They took it away from
20    us.  Who is the "they"?
21  A.  No, I didn't say they took it from us.  I said
22    the times and stuff have been recorded in a
23    different deposition or different questioning
24    or whatever.
25  Q.  What different questioning are you referring

Page 22

1    to?
2  A.  When Jamie talked to us.
3      THE WITNESS:  Did you get our paperwork?
4      MR. BANKER:  Here -- here's the thing
5    about how this works.  You can't --
6      THE WITNESS:  Okay.
7      MR. BANKER:  -- ask questions of other
8    people even if she would have information that
9    could illuminate for you and help you.  It has
10    got to be based on what you --
11      THE WITNESS:  I don't know where it went.
12  BY MR. BANKER:
13  Q.  So are you able to estimate when you got to
14    Norma?
15  A.  No.
16  Q.  How about when you departed Norma?
17  A.  Not accurately.
18  Q.  Is there -- do you know whether there's GPS
19    information on the locomotive?
20  A.  I think there is.  I don't know for fact, but I
21    think there is.
22  Q.  Have you ever seen a report off of a locomotive
23    GPS?
24  A.  No.
25  Q.  How is it then that you say, Well, I think

Page 23

1    there's this GPS capability?
2  A.  I've heard some of them got bubbles on top of
3    them.  I -- I don't know for a fact.  I don't.
4  Q.  Sure.  So I want to take a step back in kind of
5    your chronology of this and focus on -- we've
6    talked about before you left Altoona.  How
7    about while you're en route from Altoona to
8    Norma, did you have any conversations with Mr.
9    Tischer?
10  A.  Yes, but I don't remember exact -- just small
11    talk.
12  Q.  Did you have an opportunity to make any
13    observations of Mr. Tischer and how he was
14    behaving as you rode up to Norma?
15  A.  Yes.
16  Q.  Tell me about that.
17  A.  He just looked tired.
18  Q.  Did you have any conversation about him being
19    tired?
20  A.  Yeah, we talked a little bit about it.  He -- I
21    wasn't rested until the time we went on duty,
22    so I think they called him earlier, and they
23    busted his call and --
24  Q.  When is this conversation taking place in the
25    chronology?

Page 24

1  A.  On the way up.
2  Q.  What do -- what do you mean when you say they
3    busted his call?
4  A.  They -- they called him earlier in the day for
5    this job, but there was no engineers available.
6    And as soon as I became federally rested, they
7    called me.
8  Q.  And so what is the -- when they call him but
9    there's no engineer available, is that a busted
10    call?
11  A.  They call him back, tell him, Don't go in until
12    the engineer is ready, I guess.
13  Q.  And so what you were relating to me is he
14    looked tired, and he told you about this busted
15    call?
16  A.  Yes.
17  Q.  Do you remember anything more about that
18    conversation?
19  A.  No, I don't.  Just small talk.  We just talked.
20  Q.  How about observing him physically?  Did you
21    make any physical -- memorable physical
22    observations of him while you were on your way
23    to Norma?
24  A.  Just looked tired.  That's all.
25  Q.  While you're at Norma, did you have an

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 25

```
 1    opportunity to talk with Mr. Tischer that you
 2    remember the contents of the conversation?
 3  A.  No.
 4  Q.  How about an opportunity to observe him
 5    physically?
 6  A.  He was in the cab most of the time.
 7  Q.  While you're at Norma?
 8  A.  Yes.
 9  Q.  Maybe I misunderstood.  So at some point he got
10    out of the cab, and he was doing work tasks at
11    Norma?
12  A.  Yes.
13  Q.  So when you say he's in the cab most of the
14    time at Norma, help me understand that.  Oh,
15    wait.  So you're -- you're saying cab as in a
16    PTI cab?
17  A.  Yes.
18  Q.  And I was thinking locomotive cab.  So let
19    me --
20  A.  Okay.
21  Q.  -- make sure I understand.  When you say he's
22    in the cab most of the time, you mean he's in
23    the PTI cab most of the time?
24  A.  That's correct.
25  Q.  So you're not able to observe him?
```

Page 26

```
 1  A.  Not observe him, no.
 2  Q.  So then on the way back from Norma to Altoona,
 3    did you have any conversations with Mr. Tischer
 4    that you recall?
 5  A.  Not that I recall.  I remember talking to him,
 6    but just small talk again.
 7  Q.  Did you have any opportunity to observe his
 8    physical behavior at that point?
 9  A.  Yes.
10  Q.  And did you -- tell me about that.
11  A.  He looked sick.
12  Q.  When you say "looked sick," is that a change
13    from before when you said he looked tired?
14  A.  Yes.
15  Q.  Tell me what had changed.
16  A.  He looked kind of disorientated.  He just...
17  Q.  Take your time.
18  A.  Sorry.
19  Q.  That's all right.
20  A.  I knew something was wrong.  He just wasn't
21    himself.  When we got to Altoona, he was still
22    talking to me, but he was disorientated.  I
23    asked him if he could do this; he said he
24    could.  He was looking at his radio, couldn't
25    figure out how to change the channel because we
```

Page 27

```
 1    switched channels.  I just asked him if he was
 2    okay, and he said he was.  And we pulled into
 3    Altoona yard, he counted me down, did his job,
 4    tied the train down.  I don't know how many
 5    brakes he tied down, but he tied a lot of
 6    brakes on the train because it slowed.  But I
 7    knew -- I knew he was sick.
 8  Q.  Anything else that you want to add to that
 9    before I ask some follow-up questions?
10  A.  No.
11  Q.  So when you say he's disoriented, what do you
12    mean by disoriented?
13  A.  Hard to explain, but he couldn't figure out how
14    to change the channel on the radio.
15  Q.  Is that -- that's something, I take it, you'd
16    seen him do before?
17  A.  Yes.
18  Q.  And so what you're observing as you're coming
19    back into Norma --
20  A.  Back into Altoona.
21  Q.  I'm sorry.
22    -- back to Altoona was different than what
23    you'd seen in the past?
24  A.  Yes.
25  Q.  And when you say "he wasn't himself," I take it
```

Page 28

```
 1    that's based on the 30-some times that you'd
 2    worked with him before?
 3  A.  Yes.
 4  Q.  Had you -- and you -- and you said you knew he
 5    was sick, and that's different from what you
 6    said earlier when you said that he looked
 7    tired.  So by the time you say he's sick, what
 8    is in your mind in terms of the sickness that
 9    he has?
10  A.  He's a tough kid.  He just kept on saying he
11    was all right.  I knew he wasn't.
12  Q.  So had you had any conversations before coming
13    back into Altoona about him feeling sick?
14  A.  Not really.  He just looked tired.  We didn't
15    really talk about it.  You know, everybody is
16    tired.  It gets -- on the railroad.
17  Q.  Sure.  How -- how long a trip is it from Norma
18    to Altoona?
19  A.  45 minutes, probably.  45 minutes to an hour.
20    Depends on everything.
21  Q.  So where in the course of that return trip to
22    Altoona did you think in your mind something is
23    wrong?
24  A.  On the way down.
25  Q.  But, like, at the beginning of the trip?  In
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 29

1    the middle of the trip?  The end of the trip?
2    A.  During the trip just talking to him.  He was
3        still talking to me and stuff, saying he's
4        fine, but...
5    Q.  What happened when you got to Altoona?  I think
6        you -- you had mentioned he tied some
7        handbrakes?
8    A.  Yeah.
9    Q.  So to do that he's got to get off the
10       locomotive?
11   A.  Yeah.
12   Q.  So walk me through your -- you were coming into
13       Altoona.
14   A.  Coming into Altoona, we stopped at Track 5, and
15       he has to get out.  I stopped the train; he
16       gets out.  And then I have to pull the train
17       the rest of the way in, tie the brakes down on
18       the low end, and then do a securement check.
19       Like I said, when we stopped at Track 5, I knew
20       he wasn't right.  He was -- he was talking to
21       me and everything, but he was having trouble
22       with his radio, and I just kept on asking him,
23       Are you okay to do this, and he said, Yeah.
24   Q.  Where -- as you come into Altoona, do you know
25       where Chaz, the cab driver, is?

Page 30

1    A.  He's waiting on the road by Track 5.
2    Q.  He was there by the time --
3    A.  In the yard.
4    Q.  -- you got to Altoona?
5    A.  Yeah.
6    Q.  So had he left Norma and driven by road with
7        his vehicle back to the Altoona yard?
8    A.  Yes.
9    Q.  Did you talk with Chaz when you got back to
10       Altoona?
11   A.  No.
12   Q.  So you stop at Track 5.  Jake Tischer gets out,
13       and he's doing some tasks, work tasks, on the
14       ground?
15   A.  As he gets out, tells me to go ahead on the
16       radio.  I pull the train in the clear in Track
17       5, and he counts me down and stops me.
18   Q.  Are you able to see Jacob Tischer as he's doing
19       that --
20   A.  No.
21   Q.  -- from your position in the locomotive?
22   A.  No.
23   Q.  So you -- you're communicating by radio?
24   A.  Correct.
25   Q.  What happens next?

Page 31

1    A.  We -- we come into -- counts me down, stops me,
2        ties brakes on the west end, we do a securement
3        check, and then I walked back, and I cut the
4        engines away from the train after we did the
5        securement check, and I pulled the engines
6        forward.  And when I seen the manager pull into
7        the yard, I got out to tell him that Jake was
8        sick.
9    Q.  Who was the manager?
10   A.  Mark Marvin.
11   Q.  When you say you saw the manager, where were
12       you in the yard at that point?
13   A.  I was on the east end of Track 5.
14   Q.  And you told Mr. Marvin that Jacob Tischer was
15       sick?
16   A.  Yes.
17   Q.  What did he say?
18   A.  He had paperwork for us to go back up to Norma.
19       We had to take another train back up.  And as
20       we were talking, Jake came up in the cab, and I
21       said, Go talk to him and then, you know, decide
22       if he's sick or not.  Something like that.  I
23       don't remember exactly what our -- our
24       conversation was, but it was -- and Mark went
25       and talked to Jacob.

Page 32

1    Q.  Was there anyone else there while you were
2        talking with Mr. Marvin?
3    A.  There was a switch -- a yard job on duty.  I
4        don't know if they were there right away or
5        what was going on.  John Thomas and his
6        switchman.
7    Q.  Do you remember the name of his switchman?
8    A.  Yeah, I -- I will here in a minute.  No, I
9        don't remember.
10   Q.  Okay.  So you told Mr. Marvin go talk to Jacob
11       Tischer?
12   A.  Yes.
13   Q.  And what happened next?
14   A.  Little while later Jake come walking towards me
15       with paperwork, and I took the paperwork from
16       him, told him he's too sick and that I'm not
17       going up there with him.  And he asked, he
18       goes, I'm sick?  And I said, Yeah, you're sick.
19   Q.  Did you see whether Mr. Marvin talked with Mr.
20       Tischer?
21   A.  Yes, he talked to him.
22   Q.  Where were you when they're having that
23       conversation?
24   A.  I was farther up on the lead talking to the
25       switch crew, I think.

8  (Pages 29 to 32)

Page 33

1 Q. Were you close enough to hear the conversation
2 between Mr. Marvin and Mr. Tischer?
3 A. No.
4 Q. Was there anyone else -- did you see anyone
5 else present at the conversation between Mr.
6 Marvin and Mr. Tischer?
7 A. I think he was still in the cab, so the cab
8 driver might have been there. I -- I don't
9 know for sure if Jake got out or not. I don't
10 know.
11 Q. What conversation are you having with the
12 switch crew while Mr. Marvin is talking to Mr.
13 Tischer?
14 A. I don't remember exactly what we talked about.
15 Q. When you say the east end of the yard, is there
16 a shanty somewhere in the yard?
17 A. Yes, east end.
18 Q. Was that near the shanty?
19 A. Yes.
20 Q. Is there also a portable toilet there?
21 A. Yes.
22 Q. Is that in the same vicinity?
23 A. Yes.
24 Q. Do you know what time it was that you first had
25 conversations with Mr. Marvin?

Page 34

1 A. No.
2 Q. How long did you speak with Mr. Marvin?
3 A. I don't know the exact time, so I can't say.
4 Q. Did you observe how long Mr. Marvin talked with
5 Mr. Tischer?
6 A. I don't know the exact times, so I don't really
7 want to say.
8 Q. What happened after Mr. Tischer comes back to
9 you with the paperwork and you told him that he
10 was sick?
11 A. John Thomas took him in the shanty to get him
12 some water.
13 Q. Did you go in the shanty?
14 A. No.
15 Q. Did anyone else -- was anyone else in the
16 shanty?
17 A. I don't think so. I don't know if the
18 switchman was in the shanty or walking around.
19 I'm not -- I'm not sure.
20 Q. So what happened next?
21 A. Mark came up and talked to me. We just talked,
22 and he was on the phone, I think, talking to
23 somebody.
24 Q. Do you know who he was talking to?
25 A. Not for certain.

Page 35

1 Q. What did you -- what did you talk about?
2 A. Going to Norma.
3 Q. What was your understanding of what was going
4 to happen?
5 A. He just wanted us to go up there, said he was
6 under a lot of pressure. He was getting
7 hollered at from Martinez.
8 Q. Who is Martinez?
9 A. I don't know what his title is. It's probably
10 Mark's boss or upper management.
11 Q. What did you say?
12 A. I said I'd go up there if we had somebody else.
13 Q. Did he respond?
14 A. I don't remember our exact conversation of how
15 it went.
16 Q. How long did this conversation between you and
17 Mr. Marvin go on?
18 A. I don't know the exact times. I know he was on
19 the phone talking to somebody. I -- I -- I
20 don't remember exact times.
21 Q. Where was Mr. Tischer while this was taking
22 place?
23 A. In the shanty with John Thomas.
24 Q. What happened next?
25 A. Jake come out of the shanty, and he went into

Page 36

1 the porta potty as we're all standing around
2 there. And then he come out, and he was kind
3 of staggering, and he dropped his brake stick,
4 and I kind of caught him when he come towards
5 me, and he was just super, super hot. So
6 Thomas took him back in the shanty and -- to
7 get him some more water. And then Thomas, I
8 remember him coming out saying that his face is
9 drooping.
10 Q. What happened next?
11 A. I took off for the locomotive. I don't -- I
12 think John and Mark were kind of dealing with
13 him then. Mine was to get ahold of his family.
14 I started -- I got on the locomotive, got my
15 phone, and I started calling his brother
16 because I had his phone number, Jake -- Jake's
17 brother.
18 Q. What was his name?
19 A. Josh.
20 Q. How did you happen to have Josh's --
21 A. Josh used to work for the railroad.
22 Q. Was that the reason you were going back to the
23 locomotive was to get your phone?
24 A. Yes.
25 Q. What was your understanding at that point about

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 37

```
 1    going back to Norma?
 2  A.  I was -- I didn't think anybody thought about
 3    that anymore.
 4  Q.  Before this point -- I want to follow up on one
 5    of the things you mentioned.  You said you told
 6    Mr. Marvin that you'd be happy to go back to
 7    Norma if there was someone else to go.
 8  A.  I think -- yeah.  Yeah, John Thomas even
 9    offered to go, but he's on a different craft,
10    so it probably -- I don't know.  Just didn't
11    go.
12  Q.  And that's something I -- I don't have a good
13    understanding of.  Can you just swap somebody
14    in, or is that more difficult?
15  A.  No, you're not supposed to by agreement, but --
16    by agreements that we have between the union
17    and the railroad.
18  Q.  So to go back to if Mr. Tischer isn't going
19    back to Norma but you are, do you have to call
20    another conductor unit up, or how -- how would
21    that even theoretically happen?
22  A.  Yeah, it's basically if you wanted to go by the
23    agreements, you would call another person off
24    the extra board.
25  Q.  Did you have an -- help me understand what it
```

Page 38

```
 1    was that you'd be going back to Norma to do
 2    having just come from Norma.
 3  A.  Deliver more cars.  We were pretty busy at that
 4    time.
 5  Q.  So these are new cars that have been assembled
 6    to go to Norma after you took your train up to
 7    Norma?
 8  A.  Yes.
 9  Q.  What are the -- what are the cars carrying?
10  A.  Sand.
11  Q.  And is it being -- where -- it's being
12    delivered to what?
13  A.  Well, empties go up to Norma; loads come down
14    of sand and other things too, but mostly sand.
15  Q.  Mostly sand.  So you're taking empty cars up to
16    Norma and bringing sand back?
17  A.  Yes.
18  Q.  So was the -- after you got back to Altoona and
19    you're having this conversation with Mr. Marvin
20    about going back, was it to take more empties
21    up to Norma?
22  A.  Yes, I'm sure it was.  I mean, we never got to
23    that point, but I don't...
24  Q.  So I want to go back to focus on your call to
25    Jake Tischer's brother Josh.  Tell me about
```

Page 39

```
 1    that conversation.
 2  A.  He didn't answer the first time, so I think I
 3    called a couple times trying to get him.  Then
 4    he called me back.  I just told him get ahold
 5    of his wife, telling him he was sick.
 6  Q.  What did he say?
 7  A.  He said he'd do it.
 8  Q.  Did you have contact information for Jacob
 9    Tischer's wife?
10  A.  I did not.
11  Q.  Do you recall anything else about that
12    conversation with Josh Tischer?
13  A.  No.  I just told him he's really sick.
14  Q.  What happened next?
15  A.  I made a couple more phone calls to -- to get
16    the manager of Altoona's number.  I didn't have
17    it on my phone.  I called a friend to get Mike
18    Swentik's number.  I called Mike, just told
19    him, you know, make sure the ambulance was
20    called.
21  Q.  Mike Swentik, do you know how to spell his last
22    name?
23  A.  I don't.
24  Q.  Do you know what his job is?
25  A.  He's -- he's in charge of the Altoona yard.
```

Page 40

```
 1    He's -- he's the main boss in Altoona.
 2  Q.  And you wanted -- you were telling him what
 3    precisely?
 4  A.  Just basically what was going on and, you know,
 5    just Josh was sick -- or Jake was sick.  Sorry.
 6  Q.  Jake was sick.  And what about the 911 piece of
 7    it?
 8  A.  I -- I don't know about the 911 call.  I know
 9    nothing about it.  I didn't call it.
10  Q.  Maybe I misheard you.  I thought you said when
11    you were talking with Swentik, there was some
12    mention of 911.
13  A.  That 911 had been called.  I just told him -- I
14    just asked him if it was called -- make sure
15    it's called.
16  Q.  He was giving that information to you?
17  A.  No.  I called him.  Mike didn't know about
18    this.
19  Q.  So who --
20  A.  I don't know if he knew about it.  It didn't
21    sound like he knew about it.  I just said
22    that -- what was going on and just make sure
23    that 911 was called.
24  Q.  What did he say when you said make sure 911 was
25    called?
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 41

1  A.  He said he'd -- he'd take care of it or he
2      would -- I don't remember his exact words, how
3      it was.  He said he would take care of -- or
4      just said okay, basically.  He came in later,
5      but...
6  Q.  Had there been -- up to that point when you're
7      talking with Mike Swentik on the phone, had
8      there been any mention of calling 911?
9  A.  John Thomas said he need -- we need to get him
10     to the hospital.
11 Q.  Who did John Thomas say that to?
12 A.  All of us standing there, Mark, me.
13 Q.  And what, if any, response was there to the
14     idea of you need to get Jacob Tischer to the
15     hospital?
16 A.  I went to the engines.  I don't know what the
17     response was.
18 Q.  Did you ever hear Mark Marvin respond to that
19     idea?
20 A.  I didn't hear Mark say -- say anything.
21 Q.  Was there any more talk at this point before
22     you go get your phone about going back to
23     Norma?
24 A.  No, that was off the books by then.
25 Q.  That was off the books by then?

Page 42

1  A.  Yeah.
2  Q.  So when did that go off the books?
3  A.  I -- I don't know.  I don't think any of us
4      were worried about that anymore.  I think -- I
5      think Mark might have been talking to somebody.
6      I know he was on the phone.  I know he was
7      under a lot of pressure to get those cars
8      delivered, but I don't know.  We didn't -- we
9      just didn't talk about that.
10 Q.  Okay.  The phone that you used to call Josh
11     Tischer and Mike Swentik, was that your
12     personal phone?
13 A.  Yes.
14 Q.  Is that still a phone that you have?
15 A.  Yes.
16 Q.  Who was your phone carrier at that time?
17 A.  AT&T.
18 Q.  Did you make any other calls after you got your
19     phone out of the locomotive?
20 A.  Yes.
21 Q.  Who did you call?
22 A.  Couple friends, and I called the union
23     representation for Jake to make sure that they
24     knew that he was sick.
25 Q.  Who did you call for union representation?

Page 43

1  A.  Gary Hagert.
2  Q.  Is that H-A-G-G-E-R-T (sic)?
3  A.  I -- I think so.
4  Q.  Who were the couple friends that you called?
5  A.  I called Ray Heilman to get Mike Swentik's
6      number.  And then I talked to my good friend
7      after this was all kind of all -- after I got
8      ahold of Josh, I was kind of strung out a
9      little bit.  I called a friend and talked to
10     him.
11 Q.  Who was the friend that you called?
12 A.  Mike Blohm.
13 Q.  And when you say you're strung out, what do you
14     -- what do you mean by strung out?
15 A.  Well, shook up.
16 Q.  And this is at the point after you've left the
17     shanty and gone back to the locomotive?
18 A.  That's correct.
19 Q.  And why are you shook up?
20 A.  Knowing how sick he was.
21 Q.  At that point did you feel he was sicker than
22     he had been when you were coming back from
23     Norma to Altoona?
24 A.  Oh, yeah.  He was getting way worse.  It was
25     getting steadily worse.

Page 44

1  Q.  If I'm understanding kind of the chronology
2      that you're laying out here, it sounds like
3      before you got to Norma you'd observed Mr.
4      Tischer being tired?
5  A.  Yes.
6  Q.  After Norma, you observed him -- on the way to
7      Altoona you observed him not being himself and
8      acting sick; and then once you got to Altoona
9      he was sicker.  Is that a fair --
10 A.  He was still talking to me when we got to Track
11     5.  When we came back, he was still talking to
12     me.
13 Q.  Did that stop at some point, that he wasn't
14     really able to talk to you?
15 A.  He was talking a little bit, but he was just --
16     I -- I can't explain it.  He was disorientated.
17 Q.  Sure.
18 A.  I mean, he was going to climb on the engine and
19     go again, you know.  He just -- he was just
20     kind of -- I don't know.  He just wasn't
21     himself.
22 Q.  You didn't think that was a good idea?
23 A.  No.  I wasn't going to go.
24 Q.  You weren't going to go?
25 A.  (Indicating.)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 45

1   Q.  And when you said you weren't going to go, was
2       that the end of it?
3   A.  That was the end of it for me.
4   Q.  Okay.  Was it the end of it for Jacob Tischer
5       too?  I mean, did you speak for both of you?
6   A.  I just -- I -- I'm not speaking for anybody but
7       me.  I mean...
8   Q.  Okay.  So when you're making these calls that
9       you've talked about to Gary Hagert, Ray
10      Heilman, Josh Tischer, Mike Blohm, are you
11      still on your locomotive?
12  A.  Yes.
13  Q.  What happened next?
14  A.  I don't know.  They came and got me later.  I
15      never moved the engines again after that.  I
16      don't think I did.  I can't remember if I -- we
17      didn't do any more work.
18  Q.  Where was Jacob Tischer when you were on the
19      locomotive?
20  A.  He was -- I don't know for sure.  I think they
21      got him -- I don't know.  I can't say for --
22      for -- I -- when -- after John said that, he
23      was with John, and Marvin was there.  I thought
24      my -- best thing for me to do was get on the
25      phone.

Page 46

1   Q.  So was the last time you saw Jacob Tischer on
2       the east end of the yard near the shanty?
3   A.  Yes.
4   Q.  Did you ever hear from anyone who was present
5       what happened after you left that area?
6   A.  Yeah, I heard the story, but I -- you know, I
7       wasn't there, so I can't --
8   Q.  Sure.
9   A.  -- say anything.
10  Q.  What did you hear?
11          MR. HAYDEN:  Hearsay.
12  A.  I just heard the people talk about his trip
13      back into the yard office.  I wasn't there,
14      so...
15  BY MR. BANKER:
16  Q.  Sure.  But what did you hear people say about
17      his trip back into the yard office?
18          MR. HAYDEN:  Same objection.
19  A.  I heard that he didn't make it to the yard
20      office before he had to stop and puke.  And
21      then they got him in the cab and got him to the
22      depot, but this -- I didn't see any of this, so
23      I'm --
24  BY MR. BANKER:
25  Q.  Sure.

Page 47

1   A.  So this is just what I've heard from other
2       people.
3   Q.  Who were you hearing this account from?
4   A.  Chaz, the PTI driver.
5   Q.  When did you talk to Chaz?
6   A.  When I went to work next, when he was working,
7       we -- we talked at the yard office when we were
8       both on duty.
9   Q.  How long after August 12th was that?
10  A.  I can't tell you for certain.  I don't have it
11      written down or anything.  I don't know the
12      exact times.
13  Q.  Did Chaz share any other details with you?
14  A.  Just that he couldn't --
15          MR. COHEN:  Objection on the grounds of
16      hearsay.
17  A.  He just said that he couldn't -- he couldn't
18      handle him, so he went into the yard office to
19      get some help, and nobody was there.  And then
20      when he came back out, Jake had fallen out of
21      the cab, crawled to the rear.  That's all I --
22      but that's -- I wasn't there, so I don't -- I
23      don't know.
24  BY MR. BANKER:
25  Q.  Okay.  So on August 12th, 2017, after you've

Page 48

1       gone back to the locomotive to get your cell
2       phone and made these calls, you said you didn't
3       do any more work.  How did the night end for
4       you?
5   A.  Just going back to the yard office and -- and
6       tying up eventually, and -- and that was the
7       end.
8   Q.  Were you tying up for just yourself, or were
9       you tying up for yourself and Jacob Tischer?
10  A.  Just myself.
11  Q.  Was there any paperwork to be filed on behalf
12      of the conductor?
13  A.  I didn't do it.  I don't know if anybody else
14      did.
15  Q.  Is there usually separate paperwork that a
16      conductor has to fill out?
17  A.  I think they have computer work to do.
18  Q.  But it's separate from the computer work you
19      do?
20  A.  Yes.
21  Q.  What computer work are you doing?
22  A.  I just have to put in locomotive reports and
23      daily inspections and -- and then just report
24      when I'm done.
25  Q.  Did you talk with anyone else about this

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 49

1    incident on August 12th, 2017?
2  A.  I don't -- I don't think so.
3  Q.  After you last saw Jacob Tischer at the shanty
4      on the east end of the Altoona yard, did you
5      ever speak with him again?
6  A.  No.
7  Q.  After August 12th, 2017, did you ever talk with
8      anyone else about this incident?
9  A.  Yes.
10 Q.  Who did you talk to?
11 A.  Everybody talked about it at work.
12 Q.  Co-workers?
13 A.  Yes.
14 Q.  Did you ever make any notes about this
15     incident?
16 A.  No.
17 Q.  Did you ever give a statement about this
18     incident?
19 A.  Yes.
20 Q.  What was that?
21 A.  I had to -- just a witness statement.
22 Q.  Who did you give the witness statement to?
23 A.  Jamie, the claims agent.
24 Q.  Jamie Lukehart?
25 A.  Yes.

Page 50

1  Q.  And was that a recorded statement?
2  A.  Yes.
3  Q.  Have you ever seen a copy of that?
4  A.  No.
5  Q.  Have you ever requested a copy of that?
6  A.  I haven't, but I -- they sent paperwork to me
7      to sign something to get a copy of it, but I
8      never seen it.
9  Q.  When was that?
10 A.  Month ago, maybe.
11 Q.  Would you like to see a copy of that statement?
12 A.  Sure.
13 Q.  Okay.  So you're asking on the record for UP to
14     give you a copy of that statement?
15 A.  Yes.
16 Q.  Do you remember anything about the statement
17     that you gave to Jamie Lukehart?
18 A.  Should be the same as basically what I'm saying
19     now.  I mean, what I can remember.  I just told
20     the truth.
21 Q.  Sure.  Do you remember -- do you remember any
22     details that were included in the statement
23     that we haven't touched upon here today?
24 A.  No.
25 Q.  Did you take any pictures at any point during

Page 51

1      this incident?
2  A.  No.
3  Q.  So I'm going to jump around a little bit and
4      ask some -- drill down and ask some specific
5      questions.  When Mr. Tischer arrived at work on
6      August 12th, 2017, did he ever tell you that he
7      wasn't feeling well?
8  A.  No.
9  Q.  Or that he was moving a little slow?
10 A.  No.
11 Q.  Did Mr. Tischer ever tell you that he had a
12     headache at any time on August 12th?
13 A.  No.
14 Q.  Did he ever tell you that he had thrown up?
15 A.  No.
16 Q.  Was there any conversation with Mr. Tischer
17     about the idea of the busted call with respect
18     to the UP attendance policy?
19        MR. HAYDEN:  Objection.  Lacks foundation.
20 A.  I really don't know what -- can you repeat
21     that?
22 BY MR. BANKER:
23 Q.  Sure.  Was there ever any conversation between
24     you and Mr. Tischer on August 12th about him
25     being concerned about the UP attendance policy?

Page 52

1  A.  No.
2  Q.  Okay.
3  A.  I told him that he should have stayed on duty
4      instead of taking the call and busting his
5      call.  That way he -- if he didn't answer his
6      phone after that again, he'd only be on duty
7      for 12 hours instead of busting his call.  Now
8      he's going to have to be on duty -- I don't
9      know what time he was on duty the first time.
10     I said, Never answer your call after they call
11     and then -- then you're done in 12 hours.  Now
12     he probably would have had to work whatever it
13     was.
14 Q.  In layperson's terms it's answering the phone
15     the second time after the first call gets
16     busted?
17 A.  Yes, never answer that.
18 Q.  Did you observe Mr. Tischer sleeping at any
19     time on August 12th, 2017?
20 A.  I don't think he was sleeping.  He laid back
21     when we were waiting when we first got to work
22     on the engine, you know, waiting because we had
23     to wait to get permission to go up to -- to
24     Norma.  I don't -- he was laying back.  I don't
25     think he was sleeping.

13  (Pages 49 to 52)

Page 53

1   Q.  Did you think that that was in any way unusual
2       for him?
3   A.  That's not unusual at all for anybody.  I mean,
4       you sit there and you wait.  Sometimes you wait
5       hours.
6   Q.  So you didn't think anything of that?
7   A.  No.
8   Q.  Do you know whether there was a -- let me ask
9       generally.  Are you -- are you familiar with
10      some locomotives having the capability of
11      having a video camera -- inward-facing video
12      camera?
13  A.  Yes.
14  Q.  Was there an inward-facing video camera on the
15      locomotive that you took up to Norma?
16  A.  I don't know for sure, but all of them pretty
17      much have it now.  So I don't know if there was
18      one in there.  I'm guessing there was.
19  Q.  Did you take the same -- so the lead loc -- do
20      you remember the number of the lead locomotive
21      that you took to Norma?
22  A.  No.
23  Q.  Did you take the same lead locomotive from
24      Norma back to Altoona?
25  A.  No.

Page 54

1   Q.  So when you -- but you took the same locomotive
2       both directions?
3   A.  That's correct.
4   Q.  So when you went back to Altoona, you were
5       actually operating another locomotive as the
6       lead?
7   A.  Yes.
8   Q.  Do you know whether that locomotive had an
9       inward-facing camera?
10  A.  Like I said, they pretty much all do, so I --
11      I'm guessing it did.  I don't --
12  Q.  Okay.
13  A.  I don't remember offhand.
14  Q.  Sitting here today, you're not able --
15  A.  No, I'm not able to say.
16  Q.  Did you ever have a conversation on
17      August 12th, 2017, after you got back to
18      Altoona with Mr. -- with Chaz about Jacob
19      Tischer?
20  A.  Not that I remember.  I don't remember talking
21      to Chaz that day.  I -- I don't remember.  It's
22      been a while.
23  Q.  How about after August 12th, did you ever have
24      a conversation with Chaz about what he
25      observed?

Page 55

1   A.  Yes.
2   Q.  What did he tell you?
3           MR. COHEN:  Objection.  Hearsay.
4   A.  He told me about the cab ride in just saying
5       that they didn't make it back to Altoona.
6   BY MR. BANKER:
7   Q.  When you say "cab ride in," you mean from the
8       shanty to the depot?
9   A.  Shanty, yes.
10  Q.  Other than the specifics you've already shared,
11      did he share any other details?
12          MR. COHEN:  Same objection.
13  A.  Yes, he did, but I -- I can't remember exactly,
14      so I couldn't -- I really don't want to say
15      anything because I don't -- I -- we talked
16      about the whole incident, but I don't know
17      exactly what was said, you know --
18  BY MR. BANKER:
19  Q.  Okay.
20  A.  -- so I don't want to say.
21  Q.  If I'm understanding kind of the chronology
22      that you've laid out, the first conversation
23      with a manager about Mr. Tischer was when you
24      spoke with Mr. Marvin upon returning to the
25      Altoona yard?

Page 56

1   A.  Yes.
2   Q.  Did you have the ability to communicate with UP
3       management before returning to the UP yard?
4   A.  Did I have the ability?  I could have, yes.
5   Q.  How would you have done that?
6   A.  Radio.
7   Q.  And who would you have been talking to on the
8       radio?
9   A.  Dispatcher, probably.
10  Q.  Did you -- does the radio have the ability to
11      talk directly to the Altoona yard, or is it
12      always through the dispatcher?
13  A.  I talk to Altoona yard.
14  Q.  So you could --
15  A.  I could talk to whoever.
16  Q.  Is everybody on the same channel, or --
17  A.  No.
18  Q.  -- how does that work?
19  A.  There's two or three different channels.
20  Q.  So you can direct your communication either to
21      the dispatcher or to the Altoona yard depending
22      on who you want to talk to?
23  A.  Yes.
24  Q.  Did you do that before you got back to Altoona?
25  A.  Did -- did I talk to the dis -- about --

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 57

1  Q.  About Mr. Tischer.
2  A.  No, I didn't.
3  Q.  Why -- why did you -- why was the first
4      communication to Mr. Marvin when you got to the
5      Altoona yard?
6  A.  I just told him Jake was sick.
7  Q.  Sure.  I just want to understand the thought
8      process.  If he was sick on the way back to
9      Altoona and you could have called it in but
10     didn't, but then when you got to Altoona, you
11     spoke with Mr. Marvin, I want to understand the
12     decision-making.
13 A.  Jake was still talking to me.  I mean, it
14     was -- he just was sick.  I didn't know it was
15     serious until we got to Altoona when he -- when
16     he was -- the reason -- when it hit me that he
17     was really sick is when we stopped at Track 5
18     coming into Altoona when he couldn't find the
19     radio channel on his radio.
20 Q.  Okay.
21 A.  That's when it hit me that he was really sick.
22     So, I mean, he was talking to me on the way
23     down, so, I mean, I knew he was -- you know,
24     everybody works when they're sick, you know,
25     but it was just -- it just got worse.

Page 58

1  Q.  So for you kind of the -- the moment of
2      realization is when you're on Track 5 in the
3      Altoona yard?
4  A.  That's correct.
5  Q.  So the next person you talked to is Mark Marvin
6      about it?
7  A.  Yeah.  I talked to him and asked him if -- I
8      asked Jake if he was okay, and he said he was
9      good enough to do the -- to make the -- in
10     Altoona he could tie it down and tie the brakes
11     down on the cars, and he talked me down on the
12     radio, stopped me, tied the brakes.  It was
13     just -- I just -- yeah, I just knew he was
14     sick.
15 Q.  But you were still concerned enough at that
16     point to raise it to Mr. Marvin's attention?
17 A.  Yes.
18 Q.  Did you feel that Mr. Marvin was listening to
19     you when you were telling him that Mr. Tischer
20     was sick?
21 A.  Yes.
22 Q.  Did you feel like he reacted appropriately?
23 A.  I don't think --
24     MR. HAYDEN:  Calls for an opinion.  Calls
25     for opinion testimony, so objection.  Go ahead.

Page 59

1  A.  My opinion is is he was under a ton of pressure
2      from higher than, and he was -- he just
3      told me he got yelled at by Martinez, and he
4      needed to get those cars up.
5  BY MR. BANKER:
6  Q.  But at that point that you're having the
7      conversation, what did you want to see happen?
8  A.  Him go home.
9  Q.  Okay.  And was Mr. Marvin resisting that?
10 A.  Yes.
11 Q.  For what period of time?
12 A.  I don't know the exact time.  I can't say exact
13     time.
14 Q.  Did that change at some point?
15 A.  I think so over time.
16 Q.  And is that based on a conversation that you
17     had with Mr. Marvin or something that you heard
18     secondhand?
19 A.  It was -- it's hard to explain it.  Just he was
20     on the phone talking to people.  Jake was in
21     the -- in the shanty with John.  I don't know
22     if he was talking to somebody or -- I know he
23     wanted us to get the cars, but I -- I don't
24     know what you're trying to get me to say.
25 Q.  Sure.  When -- so when you left the shanty to

Page 60

1      go get your phone, what was your understanding
2      of what Mr. Tischer was going to be directed to
3      do?
4      MR. HAYDEN:  Calls for hearsay.
5  A.  I honestly thought 911 was called after that --
6      after John come out and said his face was
7      drooping.  I -- I -- them guys -- John was with
8      Jake, and -- and I don't know where Mark was at
9      the time.  I don't remember.  But I went back
10     to the engines, so I wasn't there.
11 BY MR. BANKER:
12 Q.  So who -- who -- in your understanding, who was
13     calling 911?
14 A.  I honestly thought Mark did.
15 Q.  Okay.  But I take it you didn't -- you didn't
16     hear him call 911?
17 A.  I did not.
18 Q.  And you don't know whether he called 911?
19 A.  I -- I don't know.  Sorry.
20 Q.  So what causes you to assume or infer that he's
21     calling 911?
22 A.  Well, John said, He's having a stroke, I think.
23     I thought we all kind of knew.
24 Q.  What was -- had there been any -- up -- up to
25     John saying he's having a stroke, had anyone

Page 61

1    ever thrown that idea out there before?
2    A.  No.  I -- he's so young.
3    Q.  Sure.  Have you ever had any personal
4        experience with someone having a stroke?
5    A.  Yep.
6    Q.  So if you left the shanty under the impression
7        that Mark Marvin was calling 911, why did you
8        call Mike Schwikert (sic) and tell him 911
9        needed to be called?
10   A.  I called Josh first.
11   Q.  Sure.
12   A.  I just wanted to make sure it was done.
13   Q.  Okay.  But --
14   A.  John kept on saying, We need to get him to the
15       hospital.
16   Q.  Sure.  But when Mike -- so Mike Swentik, when
17       you call him, he's not someone you had been
18       previously talking to?
19   A.  No.  He must have been at home.
20   Q.  If I understand what you've described, you were
21       telling him what was going on.  Had he already
22       heard of it?
23   A.  I have no idea.  I talked to him just probably
24       not even a minute.
25   Q.  And when you left that conversation with

Page 62

1        Mr. Schwikert --
2    A.  Swentik.
3    Q.  -- was it your understanding that 911 had been
4        called or that 911 was going to be called?
5    A.  I -- I didn't know.  I honest -- I -- I thought
6        it was.  My opinion was I thought it was done.
7    Q.  Did it ever occur to you to call 911?
8    A.  I thought it was done.  I should have.
9    Q.  When do you feel like you should have called
10       911?
11   A.  As soon as John Thomas said that his face was
12       drooping.
13   Q.  Did you see Jacob Tischer's face drooping?
14   A.  No.
15   Q.  Did you ever see him stumble?
16   A.  Yes.
17   Q.  When did you see him stumble?
18   A.  Coming out of the porta potty.
19   Q.  And that was when there were other people
20       gathered around the shanty?
21   A.  Yes.
22   Q.  Did -- how many people would you say were
23       there?
24   A.  There was four of us, I think, and there was a
25       couple in their vehicles.

Page 63

1    Q.  So we've talked about Mark Marvin was there?
2    A.  Yes.
3    Q.  You're there.  John Thomas is there.  His
4        switchman is there.
5    A.  Yep.
6    Q.  Who am I leaving out?
7    A.  Chaz.
8    Q.  Chaz.  Okay.
9    A.  And me.
10   Q.  Got you.  Anybody else?
11   A.  Well, there's Jake.  There's two of us on that
12       crew, and there's two on the yard crew.
13   Q.  Okay.
14   A.  And then the manager and the cab driver, six.
15   Q.  So do you think that's a complete list of -- of
16       who was there?
17   A.  As far as I can remember, yes.
18   Q.  I want to follow up.  You made a point that
19       Jacob Tischer was -- he was ready to go back up
20       to Norma?
21   A.  Yes.
22   Q.  But you didn't think that was appropriate?
23   A.  Yes.
24   Q.  Do you think -- is that -- is that an example
25       of this disorientation that you mentioned

Page 64

1    earlier?
2    A.  I could just tell.  I didn't think it was as
3        bad as it was, but he wasn't fit to work.
4    Q.  As of what time?
5    A.  I don't know the times offhand.  I didn't --
6    Q.  Sure.
7    A.  -- write anything down.
8    Q.  Would you peg it as of arriving back in Altoona
9        on Track 5?
10   A.  He was still talking.  I asked him if he was
11       okay to -- and he tied the train down, and
12       he -- he talked to me on the radio.  I mean, I
13       had a feeling that he was sick, you know.  I
14       knew he was sick, but he was still doing his
15       job.  I just didn't want to go anymore if he
16       was going to be -- I thought we were -- you
17       know, I thought we were going to be done after
18       that.
19   Q.  The person that Mark Marvin was getting
20       pressure from, was that Mike Schwi -- Swentik?
21   A.  No.
22           MR. HAYDEN:  Calls for speculation.
23   A.  No.  Mark said that Martinez is the one that
24       was pushing to get the cars.  I think his name
25       is Paul Martinez.

16 (Pages 61 to 64)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 65

BY MR. BANKER:
2  Q.  Did you ever hear Mr. Tischer, Jacob Tischer,
3      refuse medical care?
4  A.  No.
5  Q.  Did you ever hear medical care being offered to
6      him?
7  A.  No.
8  Q.  Did you have an opportunity to hear Jacob
9      speaking when you're at the shanty on the east
10     end of the yard?
11 A.  Just when I -- just when I told him I wasn't
12     going to go up there again.  I told him he's
13     sick, and he goes, Am I?  And I said yes.
14 Q.  Was he slurring his words at all?
15 A.  I don't remember.  I could -- I could
16     understand him, so, no, he wasn't slurring his
17     words.
18 Q.  Did you have any opportunity to observe whether
19     he was having any problems with his left arm at
20     that point in time?
21 A.  I did not observe that.
22 Q.  Did you ever hear Mr. -- did you ever hear Chaz
23     say anything to Mr. Marvin about going back up
24     to the Norma sand plant?
25 A.  I didn't hear Chaz's conversation with Mark at

Page 66

1      all.
2  Q.  Other than Josh Tischer, did you have any
3      conversations with any other members of Mr.
4      Tischer's family?
5  A.  No.
6  Q.  Did you ever speak with any of the first
7      responders, either the police, the fire, or the
8      paramedics?
9  A.  No.
10 Q.  Did you ever provide any information to any of
11     Mr. Tischer's medical providers after he was
12     transported by ambulance?
13 A.  No.
14 Q.  Did anyone ever ask you kind of what the, you
15     know, conversation we've had today about the
16     timeline of events for what you observed on
17     August 12th?
18 A.  On August 12th, no.
19 Q.  How about after August 12th?
20 A.  Yeah.  Superintendent and another manager
21     jumped on an engine -- I don't know -- maybe
22     couple months, a month later.  I don't know the
23     exact timeline -- told me I didn't know what I
24     was talking about and I didn't know the whole
25     story and I should keep my mouth shut.

Page 67

1  Q.  Who was the superintendent?
2  A.  Erickson.
3  Q.  Erik Erickson?
4  A.  Yes.
5  Q.  Who was the manager?
6  A.  He's not there anymore.  He was the MOP in
7      Altoona.  Sorry.  I'm kind of shook up here a
8      little bit, but can't think.  He didn't say
9      anything to me.  He just sat in the engine, and
10     Erickson just stood above me and kind of
11     harassed me for a while.
12 Q.  So I want to under -- so this is -- where is
13     this conversation taking place?
14 A.  Menomonie on the locomotive.
15 Q.  So you're on duty that day?
16 A.  Yes.
17 Q.  And you're in the Menomonie -- is there a yard
18     in Menomonie?
19 A.  Yeah, real small one.  And Mark showed up, Sam
20     Shinn was the other MOP, and Erickson showed
21     up.  And Sam Shinn and Erickson crammed on the
22     locomotive.  Mark was talking to the conductor
23     on the ground.
24 Q.  Who was the conductor?
25 A.  Mike Vagts.

Page 68

1  Q.  How do you spell his last name?
2  A.  V-A-G-T-S.
3  Q.  So this is in the Menomonie yard, and you and
4      Mike Vagts are doing what job?
5  A.  We're job 82.  We're switching out industries
6      in Menomonie.
7  Q.  Do you remember the time of day that this was?
8  A.  I don't remember exact time of day, but it was
9      daylight, so it was probably around noon.
10 Q.  Did you know Erik Erickson before he got on
11     your locomotive?
12 A.  I knew him, I mean, not personally.  I mean, I
13     had a maps class with him.  He taught a maps
14     class.  I knew who he was.
15 Q.  And how about Sam Shinn, did you know who Sam
16     --
17 A.  Yes, he was an MOP.  He was my MOP.
18 Q.  So he was a direct supervisor?
19 A.  Of mine, yeah.
20 Q.  Of yours?
21 A.  Yes.
22 Q.  So Erik Erickson and Sam Shinn climb on your
23     locomotive?
24 A.  Yes.
25 Q.  And I want to understand what you recollect of

17 (Pages 65 to 68)

Page 69

1    that conversation.  So how does it start?
2  A.  He just started in on me about this incident,
3    said I --
4  Q.  What does he say?
5  A.  Said I don't know the whole story, and I should
6    keep my mouth shut, and I don't know the facts.
7    I just kept on telling him, Why don't you trust
8    me, and that's -- Sam didn't say a word about
9    that.
10  Q.  Keep your mouth shut in what sense?  I mean,
11    who are you -- who are you talking to about
12    this?
13  A.  Erickson.
14        MR. HAYDEN:  Objection.  Speculation.
15  A.  Erickson.
16  BY MR. BANKER:
17  Q.  You're talking to Erickson about it, but if
18    Erickson is telling you to keep your mouth shut
19    --
20  A.  About this case, about Jake.
21  Q.  So who else are you talking to other than
22    Erickson?
23  A.  I don't know.  He just said that -- I don't
24    know what the deal was.  I -- I was so
25    surprised when it happened, when he started in

Page 70

1    on me, that I didn't really know what was going
2    on.
3  Q.  And so he tells you keep your mouth shut.  He
4    also tells you you don't know what you're
5    talking about?
6  A.  Says I don't -- he didn't say -- he said I
7    didn't know the whole story.
8  Q.  Did he tell you what the whole story was?
9  A.  No.
10  Q.  Did he tell you what he meant by not knowing
11    the whole story?
12  A.  No.
13  Q.  How did you interpret what was said to you by
14    Mr. Erickson?
15  A.  He just said that supposedly I was spreading --
16    saying bad stuff about Mark Marvin and that I
17    didn't know the whole story and -- and I needed
18    to keep my mouth shut.
19  Q.  Were you saying bad things about Mark Marvin?
20  A.  No.  Mark's -- Mark's a good guy.
21  Q.  So what did you say to Erik Erickson as he is
22    telling you this?
23  A.  Well, I got upset.  I just asked why he didn't
24    trust me.
25  Q.  When you say "upset," what do you mean?

Page 71

1  A.  Me?
2  Q.  Yeah.
3  A.  Why did I?  Well, superintendent is yelling at
4    you, gets you pretty nervous because it's your
5    job.
6  Q.  Sure.  But are you -- are you yelling back?
7  A.  I don't -- I wasn't yelling.  I don't --
8    neither one of us were yelling.  He was just --
9    I just asked him why he didn't trust me, and he
10    says, What do you mean by that, and I just
11    said, When I tell you somebody's sick, he's
12    sick, you know.
13  Q.  What did he say?
14  A.  You don't know the whole story.
15  Q.  Did he ever tell you -- he never told you the
16    whole story?
17  A.  No.
18  Q.  Do you know what whole story he was referring
19    to?
20  A.  No.
21  Q.  So what else was said?
22  A.  Nothing.  I didn't -- I just didn't say
23    anything after that.
24  Q.  Okay.
25  A.  Just kind of -- he just kind of went away after

Page 72

1    that.
2  Q.  So then they got off the engine?
3  A.  Yes.
4  Q.  How did you feel about the encounter?
5  A.  Shook up, of course.  But just worried that
6    they were going to come after me.
7  Q.  Did they come after you?
8  A.  I don't think so.  They haven't.
9  Q.  Did you feel intimidated by what he was saying?
10  A.  Oh, yeah.
11  Q.  Why?
12  A.  It's the superintendent yelling at you.  I
13    mean, anybody would be.
14  Q.  The way we got talking about that was did you
15    ever provide any information after August 12th
16    to Mr. Tischer's medical providers.
17  A.  No.
18  Q.  Was there anyone else that you provided to --
19    information in terms of this account we've
20    talked about today that you provided after
21    August 12th?  You talked about a statement that
22    you gave.  You talked about --
23  A.  A statement from the railroad.  That's it.
24  Q.  Anyone else in terms of co-workers or anyone
25    else like that you talked with about this?

18  (Pages 69 to 72)

1   A.  Everybody talked about it for a while.  I
2       don't -- you know, it just -- it's a railroad,
3       you know, everybody talked about it.  So, I
4       mean, we didn't go around spreading rumors or
5       anything, but everybody talked about it.
6   Q.  How long were they talking about it?
7   A.  We still talk about it.
8   Q.  Did you have any update after August 12th,
9       2017, as to Jacob Tischer's condition?
10  A.  Josh talked to me a little bit once in a while.
11  Q.  By phone?
12  A.  Yes.
13  Q.  And what did you understand?
14  A.  At one point it sounded like he was getting
15      better.  Then he told me what happened.
16  Q.  Okay.  That he had died as a result?
17  A.  (Indicating.)
18  Q.  Was there ever any radio communication, to your
19      knowledge, about this issue that you've heard?
20  A.  Not that I've heard.
21  Q.  Or that you initiated?
22  A.  No.
23  Q.  So one of the names that we've talked about --
24      I have maybe a spelling here -- Mike Swentik,
25      S-W-E-N-T-I-K.

1   A.  I don't know how to spell it.
2   Q.  Okay.  John Thomas was a name that you had
3       mentioned as someone who was at the shanty at
4       the east end of the yard.
5   A.  John Thomas probably had the most conversations
6       with Jake.
7   Q.  He was the person that took Jake into the
8       shanty to get him water?
9   A.  Yes.
10  Q.  Do you know who Harold Lowe, L-O-W-E, is?
11  A.  He's the switchman on the job with John Thomas.
12  Q.  Do you know where Erik Erickson is -- is he
13      based out of Altoona?
14  A.  I don't know where he is now.  He was in
15      Minneapolis then or St. Paul.  St. Paul, I
16      think.
17  Q.  After the conversation that you've described
18      with Mr. Erickson in Menomonie, did you ever
19      have any further conversations with him?
20  A.  Not about that.
21  Q.  How about -- about anything else?
22  A.  Just when I seen him in the yard office once.
23      Not conversations, no, just...
24  Q.  So that was the one and only time you talked
25      with Mr. Erickson about this incident?

1   A.  Yes.
2   Q.  Who is -- do you know who Tim Dold is?
3       D-O-L-D.
4   A.  Yes.
5   Q.  Who is he?
6   A.  He's a -- well, he's a setback engineer, works
7       as a conductor sometimes, and he's a friend of
8       mine, work -- co-worker.
9   Q.  Was he at the shanty on the east end of the
10      yard on August 12th?
11  A.  I don't think so.  He might have -- I don't
12      think so.
13  Q.  As part of your training either as a conductor
14      for UP or as an engineer for UP, did you ever
15      have any first-aid training?
16  A.  No.
17  Q.  Do you recall ever receiving any instruction
18      about signs of strokes?
19  A.  No.
20  Q.  Before this incident happened, did you -- did
21      you know what the signs were of a stroke?
22  A.  No, not -- not -- I mean, I knew droopy face.
23      That's it.
24  Q.  And how did you know that?  Just --
25  A.  Just -- my wife is a nurse, but, no, didn't

1       really know anything.
2   Q.  So just general life experience?
3   A.  Yes.
4   Q.  Were there ever any consequences to you for
5       refusing to go back up to Norma on August 12th,
6       2017?
7   A.  No.
8   Q.  So we've been going for about 90 minutes.  How
9       are you doing?  I'm about to switch gears and
10      show you some documents.  Would you --
11  A.  I'm okay.
12  Q.  You're okay?
13  A.  I'm okay.
14  Q.  I'd like to show you what was previously marked
15      for identification yesterday as Exhibit 3, and
16      I'll tell you a little bit about what I've come
17      to understand about it.  What I -- what's been
18      represented to me is this is a GPS report off
19      of the PTI vehicle that Mr. Chaz Lux was
20      driving August 12th, 2017.  And in particular
21      if you look through it, I mean, it begins on
22      Page 1 at 12 o'clock in the morning on
23      August 12th, and then it is -- having entries
24      for various places that the car was.  And the
25      point that I want to focus on is on Page 4 of

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 77

```
1        7.  Actually -- I'm sorry -- Page 5 of 7.  It
2    looks like towards the bottom of the page at
3    6:48 p.m. the car is parked for five minutes at
4    a landmark in Norma, Wisconsin.  Do you see
5    that?
6    A.  Yep.
7    Q.  And if you go back to Page 4 of 7, after being
8    parked at 5:30 in the morning for nine hours
9    the car starts to move at 3:07 p.m. in Altoona,
10   Wisconsin, and it's moving and making its way
11   to Norma, Wisconsin, where it gets there at
12   6:48.  Does that timeline do anything to
13   refresh your recollection of when it was that
14   you -- coming on duty and going up to Norma?
15   A.  It -- it seems right, but I -- I didn't write
16   any of the times down, so I --
17   Q.  Okay.
18   A.  -- I don't want to say exact times.
19   Q.  How about on Page 6 of 7, from the bottom of
20   Page 5 going on to Page 6, the car starts to
21   move again until it gets parked for five minutes
22   at 7:15 p.m. back in Altoona.  Does that
23   provide you any -- does that do anything to
24   refresh your recollection about when it was
25   that the train came back to Altoona?
```

Page 78

```
1    A.  Yeah.  I -- I don't know times.
2    Q.  Okay.  And so if you -- if you were to want to
3    get more specific on times, you'd go to the --
4    the readers, the train --
5    A.  The only times I have of my own are my -- my
6    call log, and I don't want -- there's plenty of
7    other things to say what -- there's the
8    readers.  There's a black box in the engines.
9    I mean, they know when we start and stop.  They
10   know everything, so --
11   Q.  Okay.
12   A.  -- I mean they're going -- I'm not going to say
13   any times because they -- they know exactly.
14   Q.  And you mentioned -- what is a call log?  Is
15   that a document that you maintain?
16   A.  That's -- that's my call log of my cell phone.
17   When I --
18   Q.  I see.  You --
19   A.  Yeah.  That's -- that's the only call -- the
20   times that I can say for sure.  Otherwise,
21   there's other things.  This -- this -- the --
22   the engines will have the times of when I
23   started and stopped and what we did.  So, I
24   mean, that's -- I don't even want to say times
25   because it's all documented on other stuff.
```

Page 79

```
1        (Exhibit 7 marked for identification.)
2    BY MR. BANKER:
3    Q.  Do you recognize this -- what this document is?
4    A.  Altoona yard.
5    Q.  And is it a track chart of the Altoona yard?
6    A.  Yes.
7    Q.  And so if we want to see the west end of the
8    Altoona yard, that's going to be on the
9    left-hand side of the track chart?
10   A.  Yes.
11   Q.  And the east end is going to be on the
12   right-hand side of the track chart?
13   A.  Yes.
14   Q.  And when you say you came back into the Altoona
15   yard after being in Norma, what track was it
16   that you said you came in on?
17   A.  We pulled into the yard, went up the lead from
18   the west end, went up track -- or the three
19   lead, and we pulled up to Track 5.
20   Q.  And when you say you pulled up to Track 5, are
21   you pulling down Track 5, or are you just
22   pulling up to Track --
23   A.  Up to Track 5.  We have to line ourselves into
24   the track.
25   Q.  After it's lined, then you --
```

Page 80

```
1    A.  Then I --
2    Q.  -- go into Track 5?
3    A.  Go in, yes.
4    Q.  And are you pulling -- you're pulling all the
5    way down Track 5 until the entire train fits on
6    Track 5?
7    A.  Correct.
8    Q.  And so that brings -- you're on the lead
9    locomotive at that point, and that's bringing
10   you to the east end of Track 5?
11   A.  Yes.
12   Q.  So where was it that you let Mr. Tischer off of
13   the locomotive as you come back into Altoona?
14   A.  West end of Track 5.
15   Q.  West end of Track 5 by the switch off of the
16   lead?
17   A.  Yes.
18   Q.  Could you maybe -- do you have a pen?
19   A.  I don't.
20   Q.  Could you make a mark with a number 1 and
21   circle it where you left Mr. Tischer off the
22   locomotive when you returned to the Altoona
23   yard, and then could you make another mark with
24   a number 2 and circle it where you brought your
25   locomotive to a stop on Track 5.
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 81

1  A.  (Complying.)
2  Q.  And then understanding that maybe this track
3      chart isn't to scale as a -- as a map, but
4      where -- relative to Track 5 and where you
5      stopped the locomotive, where is the shanty?
6      Are you able to kind of locate that?  And call
7      that number 3.
8  A.  Yeah.  That would be here (indicating).
9  Q.  So you've made a 3 there and circled it?
10 A.  Yes.
11     (Exhibit 8 marked for identification.)
12 BY MR. BANKER:
13 Q.  Showing you what's been marked for
14     identification as Exhibit 8.  Have you ever
15     seen this document before?
16 A.  Not this one.
17 Q.  Have you seen a document that describes the
18     LTS83 job?
19 A.  Yes.
20 Q.  In what form have you seen it?
21 A.  Repeat that one more time.
22 Q.  In what form have you seen it, if not this
23     form?
24 A.  I guess I never really looked at these because
25     I know the job.

Page 82

1  Q.  Okay.  Is this document describing the LTS83
2      job something that's available to you?
3  A.  I'm sure it is, but I've never seen it.  I
4      don't think this is right.
5  Q.  In what way?
6  A.  In Torrington, South Pass in Torrington.
7  Q.  What page are you on?
8  A.  Second page.
9  Q.  So you're --
10 A.  I don't know where Torrington -- the only
11     Torrington I know is in -- in Wyoming.
12 Q.  Okay.
13 A.  I don't know.
14 Q.  So the description is something that you're not
15     --
16 A.  I've -- I've never seen this.
17 Q.  Okay.  So if not through this document, how did
18     you become familiar with what the LTS83 job
19     entailed?
20 A.  By working it for years.
21 Q.  Was -- I mean, so the first time you do the
22     job, are you riding along with someone to learn
23     it --
24 A.  Yes.
25 Q.  -- or how -- how does that work?

Page 83

1  A.  Yes, you can take a -- they call it a pilot
2      trip.
3  Q.  Where you're like an observer of a locomotive
4      engineer and conductor crew?
5  A.  Yes.  I don't think I ever got one of those.
6      We didn't get them back in the day.  We just
7      did it.
8  Q.  I think when we first started talking about
9      your work on August 12th, 2017, you said very
10     specifically 1402 is when the job started.  How
11     can you be so specific that it was 1402?
12 A.  I wrote it in my notes.
13 Q.  Does it -- is that a requirement that you start
14     at 1402, or is that actually when you happened
15     to punch in?
16 A.  I was -- I think I was rested because I had
17     worked the day before.  It's when I was able to
18     go to work.
19 Q.  So that's measured in a number of hours from
20     when you last worked?
21 A.  Correct.
22 Q.  And so if you punched out at how many -- how
23     many hours do you have to be rested?
24 A.  10 hours.
25 Q.  So if 10 hours before you were off duty at two

Page 84

1      minutes after the hour, that's why --
2  A.  Well, they give you a three -- usually a
3      three-hour call.
4  Q.  Okay.
5  A.  Or hour-and-a-half call.  Usually it was --
6      before it was an hour and a half.  Now they
7      give three-hour calls.  So when your 10 -- 10
8      hours' rest is up, then they can call you.
9      They usually give a three-hour call to get to
10     work.
11 Q.  And I'm just wondering, you know, so the 02
12     isn't like you're waiting there for the rest to
13     expire; it just happens that at 02 you're
14     rested and able to start and so you start?
15 A.  Yes.
16     (Exhibit 9 marked for identification.)
17 BY MR. BANKER:
18 Q.  Showing you what's been marked for
19     identification as Exhibit 9.  I'll represent to
20     you that this is a document that UP produced in
21     this case.  Have you ever seen this document
22     before?
23 A.  No.
24 Q.  And I've made an exhibit that is an excerpt
25     from a larger student book, a BasicPlus course

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 85

```
 1      book.  I'd like to have you turn -- in the
 2      lower right-hand corner of the document there's
 3      a number that starts with UP.
 4  A.  Yep.
 5  Q.  So I'd like you to look at UP001392.  Are you
 6      on that page?
 7  A.  Yes.
 8  Q.  So on that page there's a section of this
 9      document that is -- has a heading Stroke, and
10      it goes onto the next page, UP001393.  I'd like
11      you to take a moment and just read that segment
12      of the document.
13  A.  The whole thing?
14  Q.  Just that -- the stroke section from 1392 onto
15      1393.
16  A.  Stroke or brain --
17  Q.  You don't need -- you can just read it to
18      yourself.
19  A.  Oh, okay.
20  Q.  I just want you to read it and ask you some
21      questions about it.
22          MR. HAYDEN:  Object to the use of this
23      document with this particular witness because
24      he has never seen this document.  He testified
25      to earlier he hasn't seen such a training.
```

Page 86

```
 1      Therefore, I object to questions about the
 2      document to Mr. Franchuk.
 3  A.  (Reading document.)  Okay.
 4  BY MR. BANKER:
 5  Q.  Have you ever received the information
 6      contained in this document in any form from UP
 7      before today?
 8  A.  No.
 9  Q.  Had you ever heard of the acronym FAST, F-A --
10      capital F, capital A, capital S, capital T?
11  A.  Not that I can recollect.
12  Q.  Do you recall receiving any sort of first-aid
13      training from UP as an employee?
14  A.  No.
15  Q.  Is there any information in this stroke
16      paragraph I just had you read that is new
17      information to you that you didn't know before
18      you read it?
19  A.  I know it now.
20  Q.  Okay.  But did you know it before you read it?
21  A.  No.  Well, after this incident happened, you
22      know, I looked into it a little bit.
23  Q.  Sure.  How about before the incident happened?
24  A.  No.
25          (Exhibit 10 marked for identification.)
```

Page 87

```
 1  BY MR. BANKER:
 2  Q.  Showing you what's been marked as Exhibit 10.
 3      Let me -- let me back up.  So have you ever
 4      seen any of the video from the inward-facing
 5      locomotive cameras that were recorded of your
 6      work on August 12th, 2017?
 7  A.  I have not.
 8  Q.  I will represent to you that this is a
 9      screenshot -- and I apologize it turned out
10      smaller than I had expected.  But I'll
11      represent to you that this is a screenshot from
12      one of the locomotive videos that was produced
13      in this case by UP with a time stamp that
14      appears to reflect 4:26 p.m.  Are you able to
15      identify any of the people in this screenshot?
16  A.  Jake and I.
17  Q.  And where are you located in this picture?
18  A.  Standing in the blue shirt.
19  Q.  You're standing with the blue shirt on?
20  A.  Yes.
21  Q.  I had thought that that was a woman with a
22      ponytail.
23  A.  Oh, that is Jessica.  Sorry.
24  Q.  That's the Jessica that you mentioned
25      previously?
```

Page 88

```
 1  A.  Yes.
 2  Q.  So do you see yourself in this picture?
 3  A.  No.  Is that -- I don't think so.
 4  Q.  Who else are you able to identify in this
 5      picture?
 6  A.  Jake.
 7  Q.  So do you believe that this is a video -- or
 8      screen-captured image from the locomotive
 9      camera on August 12th, 2017?
10          MR. HAYDEN:  Objection.  Foundation.
11  A.  I don't know.
12  BY MR. BANKER:
13  Q.  Are you able to identify the male in the
14      foreground of the picture?
15  A.  No.
16  Q.  Do you remember anyone else coming onto your
17      locomotive before you departed to Norma?
18  A.  I don't.  I don't remember.  I...
19          (Exhibit 11 marked for identification.)
20  BY MR. BANKER:
21  Q.  Showing you what's been marked as Exhibit 11.
22      Same idea as Exhibit 10, but this one is from a
23      different time.  This one is from 4:30:23 p.m.
24      Are you able to identify any of the people in
25      this screenshot?
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 89

1   A.  Me -- or Jake and I.
2   Q.  Where are you located in this picture?
3   A.  Left-hand side on the engineer's stand.
4   Q.  And Jake is on the right-hand side?
5   A.  Yes.
6          (Exhibit 12 marked for identification.)
7   BY MR. BANKER:
8   Q.  Showing you what's been marked for
9       identification as Exhibit 12.  Same concept as
10      with 10 and 11, this is a screenshot from
11      5:29:57 p.m.  Are you able to identify the
12      people in this screenshot?
13  A.  Jake and I.
14  Q.  And, again, you're on the left in the
15      locomotive stand, and Mr. Tischer is on the
16      right side in the conductor chair?
17  A.  Yes.
18          MR. BANKER:  Could we take a break and get
19      a copy of that -- of the note that you brought
20      with.  I have a couple of questions about that,
21      and I think I'm almost done.
22          THE WITNESS:  This is just stuff I wrote
23      down, so yeah.
24          MR. BANKER:  Sure.  Why don't we go off
25      the record.

Page 90

1          (A break was taken.)
2          (Exhibit 13 marked for identification.)
3   BY MR. BANKER:
4   Q.  I'm showing you what's been marked Exhibit 13,
5       which is a copy of a document that you brought
6       with you today consisting of some handwritten
7       notes.  So what I'd like to ask is what is --
8       what is this document making notes about?
9   A.  It's just something I -- my phone log.
10      Basically it was just notes from the trip and a
11      phone log that I made calls.
12  Q.  Okay.  So let's start with the first entry.
13      What is -- what does the entry, 11 - busted
14      call, mean?
15  A.  I'm guessing that's when Jake got called.
16      That's when the job normally went on duty at
17      the time, and I wasn't rested until 1402, so
18      I'm sure he got a busted call at 11.
19  Q.  And is this a page from, like, a notebook that
20      you keep of -- why did you make these notes in
21      the first place?
22  A.  I just wanted my call log to be -- I remember
23      when I made calls.
24  Q.  On that particular day or --
25  A.  On that day, yeah.

Page 91

1   Q.  -- or on every job that you do?
2   A.  On this day.
3   Q.  Why did you think it was important to make a
4       record of your calls on this particular day?
5   A.  I figured something like this would happen.
6   Q.  Something like this being --
7   A.  Deposition.
8   Q.  -- like a deposition?
9   A.  Yes.
10  Q.  So then the next entry says, 1402 on duty.
11  A.  Yes.
12  Q.  And that's -- we've talked about earlier that
13      that's the 1402 on duty time in the Altoona
14      yard?
15  A.  Yes.
16  Q.  So then what is the next -- there's a 2030
17      entry.
18  A.  I don't know what that is.  I just must have
19      been -- I -- I don't know for sure what it is.
20      It's just notes that I made to myself.  I
21      didn't expect anybody to see this.
22  Q.  Sure.  Below that it says, At least 30 minutes.
23      Do you know what that's a reference to?
24  A.  No, just notes to myself.
25  Q.  Gary Haggett (as written) is the next entry,

Page 92

1       and below that it says 2206.  Am I interpreting
2       that as a notation of a call to Gary Hagert at
3       2206?
4   A.  Yes.
5   Q.  And then below that a call to Clyde Larson at
6       2208?
7   A.  Yes.
8   Q.  And then below that a -- Ray at 2043?
9   A.  Yes.
10  Q.  Who is Ray?
11  A.  Ray Heilman is a friend of mine, co-worker,
12      used to be.  I called him for a -- to get Mike
13      Swentik's number.
14  Q.  So am I reading that right -- so we're going
15      down the page at 2206, 2208, and then we go
16      back to 2043.
17  A.  Yes.
18  Q.  So is that an earlier call to Ray Heilman?
19  A.  It's my first call.
20  Q.  Ray Heilman was your first call?
21  A.  Yes.
22  Q.  At 2043?
23  A.  Yes.
24  Q.  And then if we go over to the -- to the right
25      side of the page, there's a notation that says,

23 (Pages 89 to 92)

Page 93

1  Loco -- loco, L-O-C-O, help, 1526.  What is
2  that a reference to?
3  A.  I had a problem with the locomotive help desk.
4  I had a problem with a locomotive, so I called
5  them to get help with it to fix it.
6  Q.  Was 1526 the number of the locomotive?
7  A.  No, it was probably the time.
8  Q.  Problem with the -- problem -- a problem with a
9  locomotive.  Was it the lead locomotive, or was
10  it the trailing?
11  A.  I don't remember at the -- at this time.  I
12  just -- it's just notes to myself.  I never
13  expected anybody to see these, but --
14  Q.  Sure.  Then there's a note, Schwentech 2055.
15  A.  Yes.
16  Q.  So is that a call to Mike Swentik at 2055?
17  A.  Yes.
18  Q.  And Mike Blohm at 2118.  Am I reading that
19  right?
20  A.  Yes.
21  Q.  And then below that we've got a notation for
22  Jerome -- is it Chess?
23  A.  Yes.
24  Q.  -- at 2052?
25  A.  Yes.

Page 94

1  Q.  And then Josh Tischer, and then there's a
2  number of times for him at 2047, 2050, 2056,
3  2057, 210 -- is that a 2?
4  A.  I think so.
5  Q.  And then at 2108?
6  A.  Yes.
7  Q.  So one, two, three, four -- six calls to Josh
8  Tischer?
9  A.  Well, I called.  He didn't answer.  He called
10  me back.  It's probably both of our calls,
11  get -- getting in touch with each other.
12  Q.  And so do you think that this is a complete
13  list of the phone calls that you made regarding
14  this incident on August 12th, 2017?
15  A.  Yes.
16  Q.  Do you wish that you had done anything
17  differently on August 12th, 2017?
18  A.  Of course.
19  Q.  What would you have done differently?
20  A.  Just called 911 myself.
21      MR. BANKER:  I don't have any further
22  questions.
23      MR. HAYDEN:  I have some more for you,
24  Neil.  Let me just get prepared here.
25      THE WITNESS:  Okay.

Page 95

1  BY MR. HAYDEN:
2  Q.  Have you told us -- over the course of the last
3  couple of hours, have you told us all of the
4  symptoms you observed Mr. Tischer having and
5  your best estimate as to when you saw those
6  symptoms?
7  A.  Yeah.  Work -- when he came to work, he was
8  tired.  I mean, it just --
9  Q.  Tired from the start?
10  A.  Yeah, you know, it's normal.
11  Q.  Anything else you'd like to add in terms of
12  symptoms other than what you've testified to
13  or...
14  A.  I don't think so.  Just that when he fell or
15  when he come out of the -- the -- the porta
16  potty, I kind of caught him.
17  Q.  That's when you said he was really hot?
18  A.  Yeah, just -- I never felt anything like that.
19  Q.  Where did you -- where did you touch him?
20  A.  Kind of in the arms, you know.
21  Q.  Yep.  Sort of bounce around.  That's how I took
22  my notes, so I apologize.  When you thought
23  you testified that you thought Jake was sick on
24  the way back -- on the trip back from Norma to
25  Altoona; correct?

Page 96

1  A.  Yes.
2  Q.  And you asked him if he was okay, and he said
3  he was?
4  A.  Yes.
5  Q.  He never asked -- Jake never asked you to go to
6  the hospital or to a doctor; right?
7  A.  No.  Jake wasn't like that.
8  Q.  So he didn't?
9  A.  Yes.
10  Q.  Jake never asked you to call 911 on his behalf?
11  A.  He did not.
12  Q.  At no time did he; right?
13  A.  No time.
14  Q.  At no time did you hear Jake say he needed to
15  go to a hospital, is that right, throughout the
16  whole day?
17  A.  No, he did not.
18  Q.  Is that part of the reason you didn't call 911
19  yourself?
20  A.  Well, when we were -- the reason I didn't, I
21  thought it was done, but it was -- that was so
22  much later.
23  Q.  So much later.
24  A.  Yeah.  I mean, we at first -- I mean, I thought
25  he was, you know, just getting sick.  I mean,

24 (Pages 93 to 96)

Page 97

1  he was tired at first, which is normal, going
2  up there.  It didn't dawn on me until -- then I
3  could tell on the way down from Norma that he
4  wasn't, you know, well.  I thought he was sick.
5  And then when we got to Track 5 when he
6  couldn't -- couldn't change the radio channel.
7  It took -- it took -- he did it, but it took
8  him a while because usually I'll just pull up,
9  get out right away, we stopped there, and I
10 just -- I asked him if he was okay, you know.
11 I -- I just knew at that time that he was sick.
12 Q.  He, again, said he was okay?
13 A.  Yeah, he did the job.  He was doing --
14 Q.  In fact, he -- he -- he -- he called you back,
15    he counted cars for you?
16 A.  Yes, he counted the train down.
17 Q.  Counted the train down.  You understood him,
18    obviously?
19 A.  Yes.
20 Q.  Because if you didn't understand him, you
21    wouldn't have -- you wouldn't have -- you would
22    have stopped your movement; right?
23 A.  That's correct.
24 Q.  This last exhibit -- I think it's No. 13, the
25    handwritten notes of yours that you brought

Page 98

1  today -- Ray -- is it Ray Heilman that you
2  called at 2043?
3  A.  Yes.
4  Q.  Why did you call Ray Heilman at 2043?
5  A.  I thought he might know Jessica.
6  Q.  Okay.
7  A.  He lives up there by them.
8  Q.  Was Ray an employee?
9  A.  Yes, was.
10 Q.  Fellow conductor or engineer?
11 A.  Both.
12 Q.  So you called Ray for the purposes of trying to
13    get Jessica's number?
14 A.  If he knew her or -- or, you know, somehow to
15    get ahold of her, but then -- then I remembered
16    I had Josh's number.
17 Q.  You had Josh's number already in your phone?
18 A.  In my phone programmed from when he worked for
19    the UP.
20 Q.  And I'm sorry if this was asked already.  My
21    apologies.  But why did you call Jerome Chess
22    at 2052?
23 A.  He's a manager at -- in Altoona also.
24 Q.  Did you talk to him?
25 A.  No, he never answered.

Page 99

1  Q.  What was the -- do you remember what the
2     consist was of the locomotives of that day?
3  A.  I don't remember perfectly, no.
4  Q.  There was -- there was more than one unit;
5     right?
6  A.  That's correct.
7  Q.  Was there three?
8  A.  I'm -- I'm guessing so, but I'm guessing.  I
9     mean, that's normally what we have.
10 Q.  For that run that would be normal?
11 A.  Two or three, yes.
12 Q.  Do you remember anything peculiar about the --
13    about the -- the -- the freight you were taking
14    up there?  Were you taking empties up there, or
15    were you taking freight?
16 A.  I'm pretty sure it was all empties.  I -- I --
17    again, I don't have a list in front of me.
18    Usually it's empties going up.
19 Q.  That would be typical?
20 A.  Typical, usually.
21 Q.  And the number of cars that you picked up in
22    Norma, was it -- do you remember one way or the
23    other if it was an out-of-ordinary number?
24 A.  I don't remember exact numbers.  I can't say.
25 Q.  Sure.  When you got to Norma, did you rearrange

Page 100

1  the consist of locomotives or do they stay?
2  A.  I don't think so.  I think we stayed the same.
3     We just switched ends.
4  Q.  So in layman's terms you've -- terms you've got
5     a consist of two, if not three, locomotives;
6     you took the head and one to Norma, and then
7     you came around, you and Jake, and took the
8     trailing locomotive -- you made the trailing
9     locomotive the lead locomotive coming back; is
10    that --
11 A.  That's correct.
12 Q.  So that trailer going up, the trailing unit,
13    would have been facing backwards?
14 A.  Correct.
15 Q.  So you didn't have to rearrange your consist in
16    order to make that?
17 A.  I can't remember for certain, but I don't think
18    we did.  Back then we didn't.
19 Q.  Back to 13, Exhibit 13.  The only time you
20    talked to Mr. Swentik was --
21 A.  20 --
22 Q.  -- 2055; is that right?
23 A.  That's correct.
24 Q.  How long of a conversation was that; do you
25    remember?

25 (Pages 97 to 100)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 101

1  A.  Probably less than a minute or a minute.  I --
2  I don't know for sure.
3  Q.  What's your cell phone number?
4  A.  (218)343-9175.
5  Q.  That's the same cell phone number you had back
6  at -- on this day; correct?
7  A.  Yes.
8  Q.  And AT&T is your carrier?
9  A.  Yes.
10  Q.  I think I heard you say this.  I want to be
11  perfectly clear about this.  You never heard
12  any conversations between Mr. Marvin and Mr.
13  Tischer; is that --
14  A.  No, I did not.
15  Q.  At any time during that day?
16  A.  Not that I can recollect.  I don't think I did.
17  Q.  You never heard any conversations -- overheard
18  any conversations between Mr. Marvin and
19  Mr. Thomas, is that correct, directly with
20  those two?
21  A.  Directly -- them two talking directly?
22  Q.  Yeah.
23  A.  No, I don't think so.  No.
24  Q.  You never heard any conversations between Mr.
25  Marvin and Mr. Chaz Lux?

Page 102

1  A.  I did not.
2  Q.  I'll represent to you that yesterday based on
3  Exhibit 3, Mr. Lux testified that the -- his
4  van arrived at the area at the shanty at
5  8:15 p.m. and remained parked there for 20
6  minutes, so it would be 8:15 p.m. to 8:35 p.m.
7  Is -- you have no reason to question whether
8  that was the accurate timing of that period of
9  time that Mr. Lux had delivered Mr. Tischer to
10  the area of the shanty and -- and the time they
11  departed for the depot?
12  A.  I -- I have no idea on exact times.  I'm not
13  even going to say.  I -- I --
14  Q.  But you have no reason to doubt that?
15  A.  I have no reason to -- either way I have no
16  reason.  I don't know.
17  Q.  Do you have -- do you agree that there was a
18  time of 20 minutes that was from the time Mr.
19  Tischer was delivered by Mr. Lux there to that
20  area of the shanty before you left?
21  A.  I'm not going to say exact times.  I just know
22  when I started making my calls.
23  Q.  Okay.  Does that 20 minutes seem reasonable, as
24  you recall it?
25  A.  I can't -- I can't say either way.

Page 103

1  Q.  That's okay.
2  A.  I just -- I...
3  Q.  You met at -- with Mr. Lux and a gentleman
4  named Charlie Schulz at a Perkins restaurant
5  after this event; is that correct?
6  A.  Yes.
7  Q.  About how many days or weeks after August 12th
8  of 2017 did that meeting occur?
9  A.  I don't remember exactly.  I don't remember the
10  date.
11  Q.  Do you know Charlie Schulz?
12  A.  I think he's a rep.
13  Q.  Rep for whom?
14  A.  For LeNeave and --
15  Q.  What's the name?
16  A.  He comes to our -- our union meetings.
17  Q.  What's the name of the firm?
18  A.  Is it Hunegs, LeNeave & Kvas; right?
19  Q.  Mr. Banker's law firm?
20  A.  I think so.
21  Q.  When's the first time you met Charlie Schulz?
22  A.  Probably five, six years ago.
23  Q.  Did he ever work with the railroad?
24  A.  Not our railroad.  Not that I know of.
25  Q.  Is the only way that you've known Charlie

Page 104

1  Schulz is through his working for the law firm?
2  A.  Yes.
3  Q.  And have you known him to be always working for
4  the LeNeave law firm?
5  A.  I don't know how long he worked for them.  I
6  don't know.
7  Q.  During the time you've known Charles Schulz,
8  he's been working for the LeNeave law firm?
9  A.  I -- I don't know.
10  Q.  When's the first time you talked to him,
11  Mr. Schulz, starting on August -- August 12th
12  going forward?  When is the first contact you
13  had with him?
14  A.  I have no idea.
15  Q.  Was it within hours or within days?  Was it the
16  next day?
17  A.  I -- I talked to Clyde Larson.
18  Q.  Who is Clyde Larson?
19  A.  He's a friend of mine.  He's a rep for --
20  Q.  The LeNeave firm?
21  A.  Yes.
22  Q.  When did you talk to Clyde Larson on -- as
23  Exhibit 13 indicates?
24  A.  Yeah, I didn't get ahold of him that night.
25  Q.  Called Mr. Larson at 2208?

Page 105

1  A.  Yes.
2  Q.  Why did you call Mr. Larson on 2208 on
3      August 12th?
4  A.  For advice.
5  Q.  Legal advice?
6  A.  On what to do, yes.
7  Q.  Did Mr. Larson indicate that when you called
8      him that was the first he'd heard of this
9      incident?
10  A.  I don't think I got ahold of him.
11  Q.  So did you talk to -- again to Mr. Larson?
12  A.  He's passed away now.  But I've talked -- he
13      was a friend of mine, so we talked about it.
14  Q.  And when did he pass away?
15  A.  It's been probably two years ago now.  Year
16      ago.  I'm not sure exactly the date.
17  Q.  And how many times did you talk to Mr. Larson
18      about the incident after August 12th?
19  A.  I don't know.  I --
20  Q.  Okay.
21  A.  We were friends more.  We talked a lot, but it
22      wasn't about this stuff.  We were friends.
23  Q.  At some point Mr. Schulz reached out to you?
24  A.  Yes.
25  Q.  And you knew him; right?

Page 106

1  A.  Yes.
2  Q.  And, again, when -- how -- how close in time to
3      the incident was it that Mr. Schulz reached out
4      to you?
5  A.  I wish I could tell you the exact time.  I
6      don't know the exact time, if it was a week
7      after or days.  I -- I don't know the exact
8      time.
9  Q.  That's okay.  And did he -- you talked to him
10      on the phone about what happened?
11  A.  He asked questions, yes.
12  Q.  He asked about it, and you told him?
13  A.  Yes.
14  Q.  The first conversation you had with him was by
15      phone or in person?
16  A.  Phone.
17  Q.  Phone.  And he called when you were on duty or
18      off duty?
19  A.  Off duty.
20  Q.  How long did you talk to him?
21  A.  I don't remember for certain.
22  Q.  What did you tell him?
23  A.  Just asked questions about this or what
24      happened.
25  Q.  Same kind of questions?

Page 107

1  A.  Same -- same thing we're doing now.
2  Q.  Did he ask you to provide a statement, a
3      handwritten or oral statement, about what
4      happened?
5  A.  A timeline.  Not a -- not really a statement.
6      I don't think so, anyways.
7  Q.  Did you prepare a timeline for him?
8  A.  I think so.  Kind of like this one
9      (indicating).
10  Q.  Do you still have it?
11  A.  No.
12  Q.  Did you provide it to Mr. Schulz?
13  A.  I gave him a timeline like this, but that's --
14      I don't remember what I gave him exactly.
15  Q.  A handwritten timeline?
16  A.  Yes.
17  Q.  How many pages was it?
18  A.  I don't know.  One page, maybe.  I --
19  Q.  Okay.  As best as you can remember.
20  A.  That's the best -- yeah, I don't know.
21  Q.  And then when was it that you gave it to him?
22      Did you mail it to him, email it to him, or did
23      you meet him in person to give the timeline to
24      him?
25  A.  I -- when we met at Perkins that day, and he

Page 108

1      asked to meet.
2  Q.  Was that the second time that you saw -- let me
3      ask a better question.  Was that the second
4      time that you had spoken to Mr. Schulz about
5      this incident when you saw him at Perkins?
6  A.  I think -- I don't know for certain.
7  Q.  Could have been another intervening --
8  A.  Could have been.  I -- I don't remember.
9  Q.  Was it the first time you met Mr. Schulz in
10      person to talk about the incident?
11  A.  Yes.
12  Q.  And am I correct that Mr. Lux was there as well
13      when you guys met at Perkins?
14  A.  Yes.
15  Q.  And did you understand that one of the reasons
16      you were being asked to meet with Mr. Lux was
17      to help him with his recollection of the
18      events?
19  A.  Not help him.  He had his own recollections.
20      He just -- he just asked us what our
21      recollections were.  I didn't help anybody.
22  Q.  You were -- you were together?
23  A.  Yes.
24  Q.  All sitting together at the same table?
25  A.  Yes.

27 (Pages 105 to 108)

Page 109

```
 1   Q.  Were there -- were there -- were there times
 2       when you helped Mr. Lux remember an event or a
 3       sequence or anything like that, if you can
 4       recall?
 5   A.  No, I don't -- there's no way I could help him.
 6       No, I don't think I helped him.
 7   Q.  And it was at that time that you showed the --
 8       you -- you gave Mr. Schulz your timeline?
 9   A.  Yes.
10   Q.  Did Mr. Lux look at the timeline too?
11   A.  I don't know if he did or not.
12   Q.  You just don't remember?
13   A.  I just don't -- I don't remember if he looked
14       at my notes.  He had his own notes.  I --
15   Q.  Did you provide -- he had his own notes, Mr.
16       Lux did?
17   A.  He must have.  I -- I don't know.
18   Q.  Did -- when you sat down with Mr. Schulz and
19       Mr. Lux, did Mr. Schulz give you some notes or
20       anything typewritten about maybe a summary of
21       what you had told him on the phone?
22   A.  No, not that I can remember.
23   Q.  Do you remember him sharing any documents with
24       you at that time at the Perkins meeting?
25   A.  I don't think so.  Not that I can remember.
```

Page 110

```
 1   Q.  I think I may have asked.  Did Mr. Lux share
 2       any documents --
 3   A.  I don't --
 4   Q.  -- with you?
 5   A.  With me?
 6   Q.  Yeah.
 7   A.  No.
 8   Q.  Then what did you understand the purpose of
 9       that meeting to be?  To share with Mr. Schulz
10       what happened?
11   A.  Yes.
12   Q.  Help him understand better what happened?
13   A.  Yes.
14   Q.  Provide your -- your -- your version, I should
15       say, or your story about what you remember
16       happening?
17   A.  Yes.
18   Q.  And then did he ask -- did Mr. Schulz then ask
19       you to -- after you gave him the timeline to
20       then do anything else?  Write up anything else
21       or provide any more information to --
22   A.  No.
23   Q.  -- to him, I should --
24   A.  Nope.
25   Q.  When's the next -- do you remember when the
```

Page 111

```
 1       Perkins meeting was?
 2   A.  I do not.
 3   Q.  And then did -- did they -- did either Mr. Lux
 4       or -- Mr. Lux testified yesterday that there
 5       was a handwritten -- or I'm sorry -- a
 6       typewritten statement that Mr. Schulz had
 7       helped prepare.  Did they show that to you?
 8       Mr. Lux's signature.  But did they show that to
 9       you?
10   A.  I never -- I never seen any statement that he
11       wrote.
12   Q.  Then when's the next time you met Mr. Schulz or
13       talked to Mr. Schulz about this incident?
14   A.  I -- I've only talked to him once afterwards.
15       I never met him afterwards.
16   Q.  You never met him afterwards.  Did you talk to
17       him one more time?
18   A.  I -- I don't know for certain.  I -- I don't --
19       I don't -- we never met.
20   Q.  When was the next time you talked to him?
21   A.  I don't know.  We never really kept in contact
22       pretty much after that.
23   Q.  But there was at least one more conversation?
24   A.  At least once, yeah.
25   Q.  About this incident?
```

Page 112

```
 1   A.  Yes.
 2   Q.  That occurred after the Perkins meeting --
 3   A.  Yes.
 4   Q.  -- at some point?
 5   A.  Yes.  I think he went over the timeline.
 6   Q.  In the days leading up to this deposition here,
 7       in the last couple of weeks have you spoken to
 8       Mr. Schulz?
 9   A.  No.
10   Q.  Have you spoken -- I've used Mr. Schulz's name
11       in particular, but -- and then Mr. Larson.  Was
12       there any other representatives or employees of
13       the LeNeave law firm that you've spoken to
14       about this incident at any time from the day of
15       the incident?
16   A.  Just this morning I talked to Cortney.
17   Q.  You talked to Cortney this morning?
18   A.  Yeah.  He's a friend of mine, and I just --
19       after you kind of grilled me on it, I wanted to
20       talk to Cortney to see if I needed legal
21       representation.
22   Q.  What did he tell you?
23           MR. BANKER:  Objection.  Calls for
24       privileged communication.
25           MR. HAYDEN:  There's a privilege
```

28 (Pages 109 to 112)

Page 113

```
 1   established between Mr. --
 2        MR. BANKER:  That's right.
 3        MR. HAYDEN:  -- Mr. Franchuk and -- and
 4   your law firm?
 5        MR. BANKER:  That's correct.
 6        MR. HAYDEN:  Under what theory?
 7        MR. BANKER:  He's a prior client of the
 8   firm.
 9   BY MR. HAYDEN:
10   Q.  Have you been a prior client of Mr. LeNeave's
11   law firm?
12   A.  I was a union rep.  I was never a client.
13   Q.  And they've never represented you in any
14   litigation?
15   A.  No.
16   Q.  Have never represented your interests in any
17   matter?
18   A.  Any matter?  No, they --
19   Q.  Correct.
20   A.  -- they've helped me a lot, helped me with
21   advice, and I consider Cortney a friend.
22   Q.  And do you pay them for the representation they
23   provide you?
24   A.  No.
25   Q.  Do you have a letter of representation that
```

Page 114

```
 1   they've given you at any point in your
 2   relationship with them saying that you're a
 3   client of theirs?
 4   A.  No.
 5        MR. HAYDEN:  There's no attorney-client
 6   privilege here.
 7        MR. BANKER:  Well, I'm going to instruct
 8   the witness not to answer any questions with
 9   the substance of communications.  So if you ask
10   that question, I'll instruct him not to answer.
11        MR. HAYDEN:  Would it not have been
12   appropriate under the ethical rules for you to
13   disclose before this deposition was taken that
14   you are asserting that Mr. Franchuk is a client
15   of yours?
16        MR. BANKER:  I am not answering questions
17   in this deposition.
18        MR. HAYDEN:  I've asked that for a very
19   specific purpose on the record.  Are you
20   declining not to answer that?
21        MR. BANKER:  I'm not here to answer your
22   questions.
23        MR. HAYDEN:  But you've represented -- to
24   be clear, that you -- you represent -- you and
25   your firm represent Mr. Franchuk; is that
```

Page 115

```
 1   correct?
 2        MR. BANKER:  My understanding is that he
 3   has sought legal advice.
 4        MR. HAYDEN:  Over the course of years, as
 5   he's testified --
 6        MR. BANKER:  That's correct.
 7        MR. HAYDEN:  -- is that correct?
 8        MR. BANKER:  (Indicating.)
 9   BY MR. HAYDEN:
10   Q.  Are you refusing to answer the question that I
11   just posed to you, sir, that --
12   A.  I'm not refusing to answer anything.
13   Q.  Okay.  Then please answer the question.
14   A.  Can you repeat?
15   Q.  Yeah.  Sure.  What did you and Mr. -- what did
16   Mr. LeNeave advise you this morning?
17        MR. BANKER:  I would object on the basis
18   of attorney-client privilege and instruct the
19   witness not to answer.
20   A.  I just asked him because you -- you said I'd be
21   liable for this.
22   BY MR. HAYDEN:
23   Q.  I did not say that.
24   A.  Yes, you did.
25   Q.  I did not say that.
```

Page 116

```
 1   A.  Yes, you did.
 2   Q.  I did not say that.
 3        MR. BANKER:  Let the witness answer the
 4   question.
 5        MR. HAYDEN:  Sure.  Sure.
 6   A.  You said that I could be liable for this, and I
 7   was -- I got scared, and I went out, and I
 8   called Cortney.
 9   BY MR. HAYDEN:
10   Q.  Okay.  And what did Mr. LeNeave tell you?
11        MR. BANKER:  I object.  Attorney-client
12   privilege and instruct the witness not to
13   answer.
14        MR. HAYDEN:  You can answer, if you choose
15   to.
16        MR. BANKER:  But you don't have to, if you
17   don't want to.
18   A.  He just said I'm not liable for this.
19   BY MR. HAYDEN:
20   Q.  Okay.  And so the testimony you've given today
21   is -- is -- is -- strike that.  And then what
22   other communications did you have with Mr.
23   LeNeave over the last two years in preparation
24   for -- or as a result of --
25   A.  With this case, nothing.
```

29 (Pages 113 to 116)

Page 117

1  Q.  Let me ask a better question and still give the
2      same answer.  That was an awful question.  Have
3      you spoken to Mr. LeNeave about any of the
4      issues involved in this incident for the
5      last -- since it happened on August 12th, 2017?
6  A.  No, I haven't.
7  Q.  Other than this morning, obviously?
8  A.  Yes.
9  Q.  And then have you spoken to any lawyers at
10     LeNeave's law firm, including Mr. Banker, about
11     this incident?
12 A.  He's the only one I know.
13 Q.  Okay.  And I think this is my final question
14     for you at this point.  Ms. Lukehart took your
15     statement, your recorded statement.  Do you
16     recall that for Mr. Banker when he was asking
17     you questions; right?
18 A.  Yes.
19 Q.  And then about a month ago you said that -- so
20     I understand this, that Mr. LeNeave's office
21     sent you a letter for you to sign requesting a
22     copy of that statement; is that -- is that
23     accurate?
24 A.  Yes.
25 Q.  You didn't type that letter, and that was not

Page 118

1      your idea; correct?
2  A.  That's correct.
3          MR. HAYDEN:  Thank you, sir.
4  BY MR. COHEN:
5  Q.  Good morning, Mr. Franchuk.  Do you mind if I
6      call you Neil?
7  A.  Yeah, that's fine.
8  Q.  Neil, my name is Mike Cohen, and I represent
9      Professional Transportation, Incorporated,
10     third-party defendant in this lawsuit.  Can you
11     tell me what your understanding of what
12     Professional -- PTI -- I'm going to call
13     Professional -- Professional Transportation,
14     Incorporated, PTI.  Is that okay?
15 A.  Yes.
16 Q.  Do you know what PTI's relationship with Union
17     Pacific is?
18 A.  They just provide us cab service.
19 Q.  And can you tell me, if you know, what Chaz's
20     job was on August 12th?
21 A.  Just to drive railroad crews around.
22 Q.  Okay.  And I think you testified, is this
23     correct, that Chaz drove Jake around --
24 A.  Yes.
25 Q.  -- on that day?

Page 119

1  A.  Yes.
2  Q.  Who would tell Chaz where and when to drive UP
3      employees around?
4  A.  The conductor usually would tell him or the
5      managers or the conductor, usually.
6  Q.  Okay.  Had you ever worked with Chaz before?
7  A.  Yes.
8  Q.  And for how long before that day had you worked
9      with Chaz?
10 A.  I'm not sure how long he worked for PTI, but I
11     can't tell you how many months it was.  I don't
12     know.  A bunch.
13 Q.  So Jake would tell Chaz where to drive; is that
14     correct?
15 A.  Yes.
16 Q.  And would Mark Marvin tell Chaz where to drive?
17 A.  He could.
18 Q.  Have you ever told Chaz where to drive?
19 A.  Engineer usually does not.  Usually does not.
20     Engineer doesn't.
21 Q.  Okay.  Do you know one way or the -- whether --
22     one way or the other any engineers employed by
23     UP ever told Chaz where and when to drive?
24 A.  Request a ride, but I -- usually the engineers
25     don't.

Page 120

1  Q.  So is that to say that an engineer, to your
2      knowledge, has requested that Chaz give him --
3      give him or her a ride somewhere and Chaz would
4      do so?
5  A.  I have -- I have no idea.
6  Q.  Are you aware of any time where a UP employee
7      has requested that Chaz give them a ride
8      somewhere and Chaz has refused to do so?
9  A.  I don't think -- no, not to my knowledge.
10 Q.  And that's to say that anytime Chaz was
11     requested to drive somewhere by a UP employee,
12     to your knowledge, he would comply?
13 A.  Yes.
14 Q.  I just want to go through a bit of the timeline
15     that you just testified to.  When's the first
16     time you saw Chaz on August 12th?
17 A.  I'm not sure when we saw him because the train
18     was by the -- the depot, so I think we just
19     walked to the train.  So I'm not sure when I
20     actually seen Chaz.  I know he was up at Norma
21     when we got up there, but I never talked to him
22     or -- or anything.
23 Q.  So, to your recollection, the first time you
24     saw him was in Norma?
25 A.  To my recollection, yes.  I -- I don't know.

30 (Pages 117 to 120)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 121

1  Q.  And going -- is it -- would it be correct to
2      say that Chaz did not give either you or Jake a
3      ride back to Altoona?
4  A.  That's correct.
5  Q.  When is the first time that you observed that
6      Jake looked sick?
7  A.  Probably coming down from Norma.
8  Q.  Okay.  That was with you riding in the cab?
9  A.  Of the locomotive, yes.
10 Q.  And do you have any reason to believe that Chaz
11     had observed up to that point Jake looking
12     sick?
13 A.  I have no idea what -- what Chaz observed.
14 Q.  I think you also testified that at some point
15     you observed Jake looking disoriented; correct?
16 A.  Yes.
17 Q.  And, again, when was the first time you
18     observed Jake looking disoriented?
19 A.  Well, disoriented was he just wasn't right.
20     I mean, I guess if that's your definition of
21     disorientated, yeah, it -- it was after we
22     stopped and he tied the train down.  Probably
23     the first time is when he was trying to change
24     his radio channel.
25 Q.  And that was back in Altoona?

Page 122

1  A.  Yes.  I knew he wasn't -- I knew he was sick,
2      but when he couldn't change the radio channels
3      very well, I knew something.
4  Q.  And do you have any reason to believe that Chaz
5      observed Jake having difficulties changing the
6      radio channel?
7  A.  He wasn't -- that was on the locomotive.
8  Q.  So you -- you have no reason to believe that
9      Jake -- I'm sorry -- that Chaz observed --
10 A.  He couldn't have.  He was in the cab.
11 Q.  You testified that you observed Mr. -- Jake
12     trip on the way back from the porta potty; is
13     that correct?
14 A.  He was coming out of the porta potty.
15 Q.  And you observed him trip?
16 A.  He stumbled, yeah.
17 Q.  And you caught him?
18 A.  I didn't catch him falling.  He just dropped
19     his brake stick, and I kind of went up and kind
20     of grabbed him.
21 Q.  And you had an opportunity to touch his bare
22     arms at that point?
23 A.  In the -- in the shirt.
24 Q.  Did you touch his arms through his shirt, or
25     were they bare?

Page 123

1  A.  Through his shirt.
2  Q.  And you observed -- you -- you felt heat?
3  A.  Very much.
4  Q.  And that was irregular heat?
5  A.  Yes.
6  Q.  Did you tell anybody about that observation?
7  A.  Yes.  He went -- he went back into the shanty
8      to get more water with John Thomas.
9  Q.  Who did you tell that -- that Jake was running
10     hot?
11 A.  John Thomas.
12 Q.  Did you tell Chaz Lux?
13 A.  No.
14 Q.  Do you have any reason to believe that Chaz Lux
15     knew that Jake was hot?
16 A.  I have no -- no idea.  He was in the cab.
17 Q.  Do you have any reason to believe that Chaz Lux
18     knew that Jake was going to get water in the
19     shanty?
20 A.  I have no idea what Chaz thought or knew.
21 Q.  How far away was Chaz at this point when you
22     touched Jake's arms?
23 A.  I'm not for certain.  I don't know exactly
24     where he was parked at the time.
25 Q.  Fair enough.  Did you witness any

Page 124

1      communications whatsoever between Mr. Lux and
2      Jake?
3  A.  No.
4  Q.  At some point I believe you testified that John
5      Thomas reported that Mr. Tischer's face was
6      drooping; is that correct?
7  A.  Yes.
8  Q.  And who did he tell that to?
9  A.  He just stepped out of the shanty and said it.
10 Q.  And who was -- who was immediately surrounding
11     the shanty?
12 A.  I was.  I don't know if Mark was in his car or
13     if he was out.  I don't know.  John -- John and
14     I and I think -- I -- I don't know.
15 Q.  Do you have any reason to believe that Chad --
16     Chaz Lux heard Mr. Thomas convey that Jake's
17     face was drooping?
18 A.  I don't know if he heard it or not.  I don't.
19 Q.  And I apologize.  Do you have any reason to
20     believe that he actually heard it?
21     MR. HAYDEN:  Speculation.
22 A.  I don't know.  I just --
23 BY MR. COHEN:
24 Q.  Did you know -- and I -- did you know where
25     Chaz was located at this point when Mr. Thomas

31 (Pages 121 to 124)

Page 125

1    expressed that thought?
2    A.  I don't know where he was parked.  I don't
3        think Chaz ever got out of the cab.  I don't
4        know if he did or not, to tell you the truth.
5        I wasn't -- I don't remember.
6    Q.  So as far as you know, Mr. Lux never heard any
7        of the conversations that you heard; is that
8        correct?
9    A.  I don't know what Chaz heard.  I -- I don't
10       know.
11   Q.  All right.  Again, you don't know where Mr. Lux
12       was located or if he was in earshot of any of
13       the conversations; is that correct?
14   A.  I don't know if he got out of the cab or not,
15       but I -- I don't -- I don't -- I can't tell
16       you.
17   Q.  Are you aware one way or the other what medical
18       training Mr. Lux had?
19   A.  No idea.
20   Q.  Did you hear anybody ask Mr. Lux to drive Jake
21       to the hospital?
22   A.  I never heard that.
23   Q.  And you never asked Mr. Lux to drive Jake to
24       the hospital; is that correct?
25   A.  No, I didn't.

Page 126

1    Q.  Do you have any reason to believe that he
2        wouldn't have done so if he was asked?
3            MR. HAYDEN:  Speculation.
4    A.  I have no reason to believe either.  I'm sure
5        he would have if somebody would have asked him.
6        I -- I don't know.
7    BY MR. COHEN:
8    Q.  Was it Mr. Lux's job to manage or supervise
9        Union Pacific employees?
10   A.  No.
11           MR. COHEN:  I don't have any further
12       questions.
13   BY MR. BANKER:
14   Q.  I have a -- I want to follow up on one area
15       that you testified about.  I want to understand
16       this conversation that you had this morning
17       with Mr. Hayden.  What time did --
18   A.  Mr. Hayden?
19   Q.  Mr. Hayden, UP's attorney.
20   A.  Around 8:05 or so.
21   Q.  What exactly was said?
22   A.  We just talked about the case.
23   Q.  So what did -- who started the conversation?
24   A.  He did.
25   Q.  What did he tell you about the case?

Page 127

1    A.  He just started asking questions about the
2        case, just the times and stuff.
3    Q.  And what did you tell him?
4    A.  Same thing I said here, way I thought things
5        went at the -- during the -- during the time
6        period.
7    Q.  And what did he say?
8    A.  He said, Be careful what you -- when I
9        brought -- when I had this (indicating), I went
10       and got it out of the truck, told him I had
11       some times, he said, Be careful what you put in
12       there, you can be liable.
13   Q.  So when you say "this," you're referring to
14       what's been marked for identification as
15       Exhibit 13?
16   A.  Yes.
17   Q.  Did he explain to you what he meant by be
18       careful?
19   A.  No.
20   Q.  What did you understand that to mean?
21   A.  I could be liable for not calling.
22   Q.  Did you feel like he was threatening you?
23   A.  Yes.
24   Q.  Did you say anything to him about that?
25   A.  No.

Page 128

1    Q.  Did he say anything else about you being
2        liable?
3    A.  He just said it a couple times.
4    Q.  He said it a couple times?
5    A.  Yes.
6    Q.  So did you say anything in response?
7    A.  Not really.
8    Q.  So he just said it again and again?
9    A.  No, no.  It -- it was just basically be careful
10       what I -- I say in here and make sure that I --
11       I -- I know for a fact before I say anything.
12       And he said if I say the wrong thing, you know,
13       I could -- I could be liable.
14   Q.  Did he tell you what the right thing to say
15       was?
16   A.  No.
17   Q.  Did he give you the impression of what the
18       right thing to say was?
19   A.  No.
20   Q.  Has what he said to you before this deposition
21       affected your testimony here today at all?
22   A.  No.
23   Q.  Did he say anything else to you?
24   A.  Just about the -- just talked about the case
25       and just -- just about the same stuff we're

Q & A COURT REPORTERS, INC.
(715) 834-9812

```
                                                    Page 129
 1    talking now.
 2  Q.  Do you remember any other specifics of what he
 3      said?
 4  A.  Not really.
 5  Q.  Did he say anything else that left an
 6      impression on you?
 7  A.  Well, I got my impression, but no.
 8  Q.  What -- what was the impression that you were
 9      left with?
10  A.  I just -- that I better not -- be careful what
11      I say, I guess, and what I want to put into
12      this deposition, I guess.
13          MR. BANKER:  Okay.  I have nothing
14      further.
15          MR. HAYDEN:  Just one second.
16  BY MR. HAYDEN:
17  Q.  Ms. Lukehart was present when we had the
18      conversation this morning; is that correct?
19  A.  Yes.
20  Q.  We sat down for about 30 minutes or so?
21  A.  Yes.
22  Q.  I told you at the very beginning that I was not
23      your lawyer, I didn't represent you; is that
24      correct?
25  A.  That's correct.
```

```
                                                    Page 130
 1  Q.  I told you I have the right to talk to you just
 2      like anyone else does; is that correct?
 3  A.  I don't remember you saying that, but yeah.  I
 4      mean --
 5  Q.  That was your impression?
 6  A.  Yes.
 7  Q.  Mr. Cohen came in and out of the room a couple
 8      of times; is that correct?
 9  A.  I think he showed up later.
10  Q.  And we continued to talk, correct, while he sat
11      down here and getting his materials arranged on
12      the table in the seat that you're now
13      occupying; right?
14  A.  Yeah, he came in later -- at a later time.
15  Q.  And Mr. Marvin walked in as well too.  Remember
16      that?
17  A.  Yes.
18  Q.  And I instructed Mr. Marvin to leave; is that
19      correct?
20  A.  That's correct.
21  Q.  And you got -- did you interpret that to mean
22      that I didn't want Mr. Marvin to -- to
23      intimidate you as you were describing very
24      critical things against Mr. Marvin?
25  A.  Not saying anything against Mr. Marvin.
```

```
                                                    Page 131
 1  Q.  You shared with me what you would testify to
 2      today about -- with respect to Mr. Marvin's
 3      actions or inactions; is that correct?
 4  A.  I testified for everybody.
 5  Q.  Yeah.  And everything that you told me this
 6      morning is exactly what you testified to here
 7      today; correct?
 8  A.  Should be, yes.  That's...
 9  Q.  And I said to you more than once that we want
10      you to testify -- and everybody in this case to
11      testify to is the truth; is that correct?
12  A.  That's correct.
13  Q.  And you agreed with that; right?
14  A.  Yes.
15  Q.  And you said that that's what you would do?
16  A.  Yes.
17  Q.  And so that's what you just did under oath here
18      for over two hours; correct?
19  A.  Yes.
20  Q.  And nothing --
21  A.  As far as -- as far as I know.  It's been a
22      long time since this happened.
23  Q.  Sure.
24  A.  I mean, I might have made some mistakes, but
25      I'm -- basically overall I've said -- I mean,
```

```
                                                    Page 132
 1      it's the same thing.
 2  Q.  Isn't that what I asked you to do was to, to
 3      the best of your ability, rely on what you
 4      actually saw or heard opposed to looking in
 5      hindsight?
 6  A.  Yes.  And you also told me that I would be -- I
 7      could be liable, and I asked you if I should
 8      get an attorney, do I need an attorney for
 9      this.
10  Q.  And I said you're welcome to --
11  A.  Yes.
12  Q.  -- correct?  Is that correct?
13  A.  Yes.
14  Q.  When did you stop being a union representative
15      or union officer?
16  A.  Four or five years ago.
17  Q.  So what's that?  19 -- I'm sorry -- 2014?
18      2015?  Something --
19  A.  I don't know exact time, but it's been a while.
20  Q.  It was before the incident with Mr. Tischer in
21      2017; right?
22  A.  Yes.
23  Q.  In other words, you weren't an --
24  A.  I was not a local chairman at the time, yes.
25  Q.  After you gave up your local chairman position
```

33 (Pages 129 to 132)

Page 133

1    four, five years ago, have you ever held
2    another position as an officer in the -- in the
3    union since then?
4  A.  No.
5  Q.  And everything you testified to today was
6    truthful and to the best of your recollection?
7  A.  To the best of my recollection, yes.
8  Q.  Didn't hold anything back?
9  A.  I -- not that I know of.  I did not -- I did
10   not do it on purpose, by any means.
11 Q.  Sure.  And whether it was good for the company,
12   bad for the company, good for you, or bad for
13   you, you --
14 A.  I don't care about good for the company, bad
15   for the company.  It's what's the truth.
16       MR. HAYDEN:  Okay.  Thank you, sir.  And
17   thank you for that.
18       MR. COHEN:  Nothing for me.
19       MR. BANKER:  Nothing further for me.
20       MR. HAYDEN:  You're done.
21       MR. BANKER:  So as a witness in this case,
22   the court reporter has been taking down --
23       MR. HAYDEN:  It's federal court.  He
24   doesn't have an opportunity to read and sign in
25   federal court.

Page 134

1        MR. BANKER:  I'm sorry.  What?
2        MR. HAYDEN:  In federal court he does not
3    have an opportunity to read and sign a
4    transcript.
5        MR. BANKER:  I'm not certain of that.
6        MR. HAYDEN:  I am.
7        MR. COHEN:  I'm not certain.
8        MR. HAYDEN:  Then we'll allow him to, and
9    we'll check on that.  That's -- that's been
10   my -- that's been my understanding for years.
11       MR. BANKER:  Well, so in my experience, a
12   witness in a deposition has an opportunity to
13   read and sign the transcript after it's
14   prepared or waive the reading and signing and
15   rely on the transcript without reading.  And
16   that's just a choice that you have to make, and
17   you have to say what you want to do on the
18   record.
19       MR. HAYDEN:  You can't change your
20   answers.  You can -- you can -- the question is
21   whether you rely on the accuracy and the
22   abilities of the court reporter to record, you
23   know, the right things down that you said.
24       THE WITNESS:  What do you want me -- what
25   are you asking me?

Page 135

1        MR. BANKER:  Do you want to read and sign,
2    or do you want to waive the right?
3        THE WITNESS:  I don't know what's --
4        MR. HAYDEN:  We can't answer for you, so
5    --
6        THE WITNESS:  I don't know what the
7    best -- I guess it's the truth, so I can waive
8    it.
9        MR. BANKER:  There's no right or wrong
10   answer.
11       THE WITNESS:  I can waive it.  I don't --
12   I said the truth to the best of my ability.
13       MR. BANKER:  So you're waiving your --
14       THE WITNESS:  I'm waiving, yeah.
15       MR. BANKER:  -- right to read and sign?
16       THE WITNESS:  Yes.
17       MR. HAYDEN:  Okay.  You're done.
18       (Proceedings concluded at approximately
19   11:46 a.m.)
20
21
22
23
24
25

Page 136

1  STATE OF WISCONSIN   )
                         )ss
2  COUNTY OF EAU CLAIRE )
3
4        I, Stephanie Peil, Notary Public in and for the
5  State of Wisconsin, certify there came before me the
6  deponent herein, namely Neil Franchuk, who was by me
7  duly sworn to testify to the truth and
8  nothing but the truth concerning the matters in this
9  cause.
10       I further certify that the foregoing transcript
11 is a true and correct transcript of my original
12 stenographic notes.
13       I further certify that I am neither attorney or
14 counsel for, nor related to or employed by any of
15 the parties to the action in which this deposition
16 is taken; furthermore, that I am not a relative or
17 employee of any attorney or counsel employed by the
18 parties hereto or financially interested in the
19 action.
20       IN WITNESS WHEREOF, I have unto set my hand and
21 affixed my Notarial Seal this 1st day of August,
22 2019.
23
24   _____
25   Stephanie J. Peil, Notary Public