## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
------------------------------------------
JESSICA TISCHER, individually and
as Personal Representative For the
Spouse and Children of Jacob Tischer,
Decedent,

                      VIDEO
    Plaintiff,       DEPOSITION
                   Case No.
   vs.          3:19-cv-00166-jdp
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,

    Defendant.
------------------------------------------
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,
    Defendant/Third-Party Plaintiff,
        vs.
PROFESSIONAL TRANSPORTATION, INC.,
    Third-Party Defendant.
------------------------------------------

    The video deposition of CHAZ LUX, taken under
and pursuant to the provisions of Chapter 804 of the
Wisconsin Statutes and the acts amendatory thereof
and supplementary thereto, before Stephanie J. Peil,
Notary Public in and for the State of Wisconsin, at
the Fairfield Inn & Suites, 1666 Princeton Crossing,
Eau Claire, Wisconsin, on the 18th day of July,
2019, commencing at approximately 1:08 p.m.

    ORIGINAL TRANSCRIPT FILED AT THE

## Page 2

1          APPEARANCES:
2       Paul Banker, Esq., of Hunegs, LeNeave & Kvas,
3   1000 Twelve Oaks Center Drive, Suite 101, Wayzata,
4   Minnesota, 55391, appeared representing the
5   Plaintiff.
6       Thomas A.P. Hayden, Esq., of Union Pacific
7   Railroad Corporation, 101 North Wacker Drive, Room
8   1920, Chicago, Illinois, 60606, appeared
9   representing the Defendant and Third-Party
10  Plaintiff, Union Pacific Railroad Corporation.
11      Michael B. Cohen, Esq., of Quintairos, Prieto,
12  Wood & Boyer, P.A., 233 South Wacker Drive, 70th
13  Floor, Chicago, Illinois, 60606, appeared
14  representing the Third-Party Defendant, Professional
15  Transportation, Inc.
16      Videographer: Jacob Arvold.
17      Also present: Jamie Lukehart Hobbs and Jessica
18  Tischer.
19
20
21
22
23
24
25

## Page 3

1          EXAMINATION INDEX
2   CHAZ LUX:
3   By Mr. Banker          5,167
4   By Mr. Hayden        80,170
5   By Mr. Cohen       135,171
6
7
8          EXHIBITS
9    Marked for
    Identification        Page
10
    1 - 9/6/17 Lux Statement      62
11
    2 - 9/29/17 Lux Statement     64
12
    3 - PTI Vehicle Activity Detail    69
13
    4 - Track Chart       74
14
    5 - PTI Lux Application for Employment   136
15
    6 - PTI Driver's Manual     147
16
17
    ORIGINAL EXHIBITS WITH ORIGINAL TRANSCRIPT
18  COPIES SUPPLIED TO THE ATTORNEYS
19
20
21
22
23
24
25

## Page 4

1         P R O C E E D I N G S
2       VIDEOGRAPHER:  This is the video
3   deposition of Chaz Lux taken by the Plaintiff
4   in the matter of Jessica Tischer versus Union
5   Pacific Railroad Company and Union Pacific
6   Railroad Company versus Professional
7   Transportation, Inc., Case No.
8   3:19-CV-00166-jdp filed in the United States
9   District Court for the Western District of
10  Wisconsin.  This deposition is being held at
11  1666 Princeton Crossing, Eau Claire, Wisconsin,
12  on July 18th, 2019.  The court reporter is
13  Stephanie Peil, and I'm Jacob Arvold, the
14  videographer.  We're going on the record at
15  1:08 p.m.
16      Counsel will now please state their
17  appearance for the record.
18      MR. BANKER:  Paul Banker, B-A-N-K-E-R, on
19  behalf of the Plaintiff.
20      MR. COHEN:  Michael Cohen, C-O-H-E-N, on
21  behalf of Third-Party Defendant, Professional
22  Transportation, Incorporated.
23      MR. HAYDEN:  Thomas Hayden, H-A-Y-D-E-N
24  on behalf of Defendant Union Pacific Railroad.
25      THE VIDEOGRAPHER:  Also present.

Page 5

```
 1        MS. LUKEHART:  Jamie Lukehart,
 2   L-U-K-E-H-A-R-T, with Union Pacific.
 3        MS. TISCHER:  Jessica Tischer,
 4   T-I-S-C-H-E-R.
 5        VIDEOGRAPHER:  The court reporter will now
 6   swear in the witness.
 7        MR. LUX:  Excuse me.  Chaz Lux.  Ex-PTI
 8   employee.
 9             CHAZ LUX,
10   being first duly sworn, testified as follows:
11             EXAMINATION
12   BY MR. BANKER:
13   Q.  Good afternoon.
14   A.  Hi.
15   Q.  Could you state your name for the record,
16       please.
17   A.  Charles John Richard Lux.
18   Q.  Okay.  And, Mr. Lux, have you ever had your
19       deposition taken before?
20   A.  No.
21   Q.  Let me just go over a couple of ground rules
22       for what we're going to be doing.  So as you
23       see, the court reporter is taking down
24       everything that's being said and making a
25       transcript of it.  And one of the things that's
```

Page 6

```
 1       important to that is that when I ask questions
 2       and you give me an answer, you need to give
 3       that answer audibly.  So if you say um-hum or
 4       huh-uh, we don't get a clear record.  Do you
 5       understand?
 6   A.  Yes.
 7   Q.  Thank you.  Also, it's important, in order to
 8       get a clear record, that we not talk over each
 9       other, and that's easy to do once we --
10   A.  Understood.
11   Q.  -- once we start having a conversation, which
12       is natural.  But if I notice that happening,
13       I'm going to -- I'll give you a reminder to
14       wait until I'm done asking the question, and
15       I'll wait for you to give your answer.  Does
16       that sound good?
17   A.  Yes.
18   Q.  Okay.  And if there's something that I ask --
19       if I ask a question today that you don't
20       understand, please feel free to ask me for
21       clarification, and I'll do what I can to clear
22       it up.  If you don't ask, I'm going to assume
23       that you've understood the question.  Is that a
24       fair assumption?
25   A.  Yes.
```

Page 7

```
 1   Q.  Thank you.  And if at any point you need to
 2       take a break, let me know, and we'll try to
 3       accommodate that.  Okay?
 4   A.  (Indicating.)
 5   Q.  What, if anything, did you do to prepare for
 6       today's deposition?
 7   A.  Well, we discussed the incident with Jamie,
 8       took a written statement, discussed the
 9       incident with Charlie Schulz.  I believe he's
10       your rep or was or is still.  And then this
11       morning I sat with Mike and discussed the
12       upcoming deposition.
13   Q.  You -- when you mentioned giving a statement to
14       Jamie Lukehart, was that -- that wasn't just
15       recently; that was a while ago?
16   A.  It was very soon after the incident.
17   Q.  Okay.  Were there any documents that you
18       reviewed to prepare for your deposition today?
19   A.  I reviewed the statement that I left with UP,
20       and I reviewed the -- a couple of statements
21       that I had left with Charlie.
22   Q.  Okay.
23   A.  And -- and that's it, I guess.
24   Q.  Okay.  Do you have any documents in your
25       possession --
```

Page 8

```
 1   A.  No.
 2   Q.  -- that bear on the -- this lawsuit?
 3   A.  No.
 4   Q.  Okay.  Let me start by getting a little bit of
 5       just background information about you.  Where
 6       do you currently live?
 7   A.  Around the corner.
 8   Q.  In?
 9   A.  In Eau Claire.
10   Q.  In Eau Claire.  And how long have you lived
11       there?
12   A.  Since '88.
13   Q.  And what is the address there?
14   A.  2019 McKinley, M-C-K-I-N-L-E-Y, Road, Eau
15       Claire, 54703.
16   Q.  And do you live at that address with anyone?
17   A.  My wife.
18   Q.  And how long have you been married?
19   A.  Now you're asking.  50-plus years.
20   Q.  50-plus years.  Congratulations.  What is your
21       wife's name?
22   A.  Maureen Patricia Lux.
23   Q.  Do you have any plans to move from your current
24       address at any time in the next year?
25   A.  Not unless I win the lottery.
```

2 (Pages 5 to 8)

Page 9

1   Q.  Okay.
2   A.  I'd love to, but...
3   Q.  Best of luck to you on that point.  Just tell
4       me briefly -- I assume you're a high school
5       graduate?
6   A.  In '94 Control Data, 18 lawyers in the St. Paul
7       monster building there, working for Cray
8       Research and myself to obtain my permanent
9       residence beyond the Green Card.
10  Q.  Okay.  Where are you from originally?
11  A.  I'm a crazy Hungarian.
12  Q.  Okay.
13  A.  So at age 13 during the 56th revolution with
14      the Russians, we escaped to the west to Austria
15      and then lived in England for 12 years, saw a
16      fine veneer of British civilization.  I'm a mad
17      Hungarian.
18  Q.  Sure.  Where in England did you -- did you
19      live?
20  A.  Started off in Yorkshire.  They did not talk
21      proper like what I do.  And then moved to
22      Manchester.  That's Lancashire.
23  Q.  Okay.
24  A.  And that was 10 years.  And after that another
25      two, three years in London, England.

Page 10

1   Q.  Okay.  What -- after you graduate -- did you
2       graduate from high school?
3   A.  No.  From high school, yes.
4   Q.  Okay.  How about after high school, did you
5       have any formal education?
6   A.  According to my history with Honeywell, Control
7       Data, Cray Research, Silicon Graphics, in '94
8       these lawyers had assumed that my
9       six-and-a-half-years-plus end to end with no
10      vacations in between represented the equivalent
11      of a Master's.
12  Q.  Okay.
13  A.  So I have that in writing.  Doesn't do you any
14      good, by the way.
15  Q.  Sure.  You mentioned Honeywell, Control Data,
16      Silicon Graphics.
17  A.  Cray Research.
18  Q.  And Cray Research.  Just give me -- what were
19      you doing for those companies?
20  A.  With -- with Honeywell, I -- I start out --
21      started out as a physical -- as a -- as a field
22      service customer engineer, and so I was doing
23      that for two years.  And then we moved to
24      Canada, become crazy Canucks, eh.  And so after
25      a year of working for Honeywell again in

Page 11

1       Canada, Control Data was advertising.  And,
2       boy, Honeywell Systems -- because I was in
3       hardware science -- compared to the Control
4       Data at the time, the world's largest, most
5       powerful supercomputer you can have, was like
6       night and day.  So I worked for Control Data
7       until, oh, '86 from '68.  No.  From '71, so
8       there's three years of Honeywell in there.
9       Control Data I was, again, a site senior
10      customer engineer, tech support on many of
11      their equipment, moved into supervisory job,
12      and then district manager's job at which point
13      I had enough, and I went into training, which
14      is sanity.
15          So '80 we moved to Toronto from Montreal
16      and working for Control Data and Control Data
17      Institute until '86 when I got called by my old
18      colleagues I taught in Control Data who said,
19      You silly old fart -- word for word -- says,
20      Don't you know Control Data is dying, going
21      down the tubes, come on over, we need you bad.
22      So I became a Cray Research instructor almost
23      overnight, and they sent me down here for
24      training at Cray Research in Chippewa  And I
25      fell in love with the place, and I told the

Page 12

1       better half, who is a big city gal, I says,
2       Hon, we're going to farm country.  You have to
3       get some dungarees and a straw hat and big
4       beetle-crushing boots.  And she's never
5       forgiven me ever since.
6   Q.  Indeed.  So how long did you work for Cray?
7   A.  From '86 until basically '95, '96 when Silicon
8       Graphics came into town and bought them out.
9       Then because Silicon Graphics had no prepared
10      instructors for their stuff they said, You can
11      teach that, we need you.  So I come close to a
12      million miles flying out to Sun -- Sunnyvale,
13      Mountain View where their head office was at
14      the time and teaching at least a week there
15      each month.  And then part of that period I was
16      teaching all over Europe, most every country,
17      and it got as far as Beijing, even.
18  Q.  Okay.  And when did that end, Silicon Graphics?
19  A.  In 2003 they were about to be bought out, and
20      they were going down the tubes, and we
21      ex-Cray/Control Data people told them five
22      years before, You're making all the stupid
23      financial mistakes that Cray had, which is why
24      you could buy them out.  Anyways, Silicon
25      Graphics got bought out by -- I forget the

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 13

1    name.  Is it -- no.  It's Cray.  I forget the
2    name who bought them.
3 Q.  Okay.
4 A.  And at that point we were laid off of here by
5    the hundreds, thousands, you know.  And I had
6    the choice of early retirement, which I took,
7    you know, happily because I didn't want to look
8    at moving to the Bay area for housing situation
9    and back to the big-city-traffic night --
10   nightmare, so we quite happily stayed here.
11 Q.  What did you do after you took early retirement
12   from Silicon Graphics?
13 A.  I had fun for a couple of years.  I did some
14   traveling and some more, and I was ready to buy
15   a house -- a lot, actually, on which to build
16   in Costa Rica for our retirement.  And my
17   beloved being Scottish said, No way, that's too
18   hot, so I had to give up on that idea.  But she
19   being Scottish, she always wanted to have for
20   our retirement a little stone cottage up in the
21   Highlands they call the -- good memory, but
22   short.  What did they -- a but and ben, what
23   you see on TV these days, when unfortunately my
24   friend, an ex-Wall Street broker, cut it short.
25   He made millions in real estate between Chicago

Page 14

1    and Milwaukee, so he said to me, Chaz, first of
2    all, give me all your retirement funds because
3    I can double it for you of what you're getting.
4    I was with American Express.
5         He came with me to explore the Scotland
6    real estate market, and we were horrified.
7    This is '06-ish time frame.  What we had found
8    is the whole ex-British empire had come, money
9    people come to southern England and bought up
10   southern England.  So we got all these
11   Englishmen flush as can be, and they came up
12   and bought up Scotland, driving their prices up
13   equivalent to what happened to California,
14   which is like 5,000 immigrants every month and
15   with money.  So there was no way that he could
16   see me afford a Scottish property.  So the
17   unmentionable -- I'll come to that in a
18   second -- talked me into refinancing my
19   already-paid-off house and investing that also
20   to catch up with the housing situation in
21   Scotland.
22         And then I went on a vacation with my
23   beloved to Glasgow, got a call in the middle of
24   the night, Mr. Lux, this is the FBI, we caught
25   him.  Do you know such and such?  The such and

Page 15

1    such is Dwayne Bettler (ph).  He's in jail for
2    15 years, about to come out.  But what he did
3    very quickly was took a lot of retirees', old
4    folks', money, Bernie Madoff scheme.  He bought
5    80, $100,000 collector's coins, put them
6    amongst the change in his pocket and walked
7    through the bor -- border, and nobody can trace
8    that money.  FBI promised me that they're not
9    to give up, but they have after six months.
10   The guy that promised is in a different
11   department, so they have done nothing, which
12   boils down to, Victim, good luck, you know.
13   Some of the victims that were well-monied hired
14   a lawyer to try and re -- get some more money
15   out of the prisoner, but I don't know if
16   anybody's been successful.
17 Q.  So was it as a result of that that you began
18   working again?
19 A.  Yes.  I went to work for Bankers Life -- Life &
20   Health and walked away utterly disgusted with
21   the health-care-for-profit approach coming from
22   Europe.
23 Q.  Sure.
24 A.  The American health care system sucks.  They
25   think they are top of the world, but they're

Page 16

1    like number 37 worldwide in how good you -- you
2    provide health care.
3 Q.  So what did you do after Bankers Life & Health?
4 A.  I was torturing a tennis ball with a partner
5    who said, Do you know these Bankers products,
6    we're opening a new department in Pavek Brokers
7    for fixed products, and you can start the
8    department up.  We have a database of a few
9    thousand Wisconsin union members that are in
10   the process of retiring.  And, of course,
11   what -- I wasn't allowed.  And he had a break
12   up with the lawyer that were -- they were
13   sharing supposedly the database, and he just
14   took his people, never told me anything, and
15   left me there.  So I'm just sitting in this
16   empty office saying, What's going on?  And the
17   broker came up to me and said, Chaz, we love
18   you, but you're no good to us unless you get
19   your securities license, so I got my securities
20   license.
21         And for the next year I was trying to
22   sell -- this is '07, '08 -- guess what?  Real
23   estate-based products that were the cause for
24   the financial disaster in '07, '08, and I sold
25   nothing.  I had no income.  So I had to start

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 17

1  looking for something immediate, and I've been
2  one sort or another of a driver for many
3  different companies, including PTI.
4  Q.  So when did you first start working for PTI?
5  A.  You tell me.  I don't remember.  Because
6  shortly after -- so within the last five years,
7  I've been through cancer treatments, and so I
8  think an ex-PTI employee, who it was a manager
9  at -- good memory, but short.  I should have
10  all this written down.  I do, but I -- I didn't
11  think I'd need it -- invited me to come and
12  drive for them.  Oh, Medical Logistics Systems,
13  Network Global Systems, whatever, was the
14  company and couple bucks more a month and a
15  much better company than PTI at the time.  So
16  then I had to go into the first treatment,
17  which was like six months of misery, followed
18  by some hospitalization, whatever.
19     And then I started driving again, I think,
20  back to PTI for another -- I don't know how
21  long -- two months.  No.  That's when I was off
22  at the job with Medical Logistics.  And so that
23  meant driving 300 miles a day through central
24  Wisconsin, stopping at farms, picking up milk,
25  and carrying some heavy totes, and it wasn't

Page 18

1  really my -- my speed, so I gladly went to
2  Medical Logistics.
3  Q.  And I just want to be sure that I have the --
4  the time frame in mind, so --
5  A.  I'm sorry, but --
6  Q.  Yeah.
7  A.  -- I know my mind is mush when it comes to
8  timing, duration, exactly what years.
9  Q.  Sure.
10  A.  I have it written down.
11  Q.  Yeah.  But I just want to get a ballpark idea.
12  A.  Right.
13  Q.  So it sounds like --
14  A.  So I would say -- I would say '07 I came back
15  to being embezzled, no money whatsoever,
16  started working for Bankers for six to nine
17  months, so that would be taking me into '08
18  time frame.  And then '08 went to Pavek
19  Brokers.  And Precision Retirement Group is the
20  friend of my friend's company, and they were
21  sharing office with Pavek Brokers.  So in '09
22  Pavek disappeared down south somewhere and
23  closed up shop here.  I didn't mind because I
24  had no income from them anyhow.  So then I
25  started driving, so I got my commercial driving

Page 19

1  license.  Don't ever drive for -- oh, what's
2  their name?  It's an English company, family
3  owned, and where -- they treat their drivers
4  the worst to the point where one of the family
5  members so disgusted that he went and
6  started -- C.R. England -- another driving
7  company called Prime.
8  Q.  But -- so if I understand what you're saying,
9  that starting in '09 you began to do some
10  commercial driving for --
11  A.  Yes.
12  Q.  -- a number of companies --
13  A.  Yes.
14  Q.  -- including PTI?
15  A.  Yes.
16  Q.  And that you went --
17  A.  To --
18  Q.  -- back and forth between them and --
19  A.  And during that time, I had six months at a
20  time, three treatments of chemo.
21  Q.  Okay.
22  A.  Okay.
23  Q.  And I -- I wanted to follow up on that.  You'd
24  mentioned that you'd been having some cancer
25  treatments.

Page 20

1  A.  Um-hum.
2  Q.  What -- what are the cancer treatments for?
3  A.  Waldenstrom macroglobulinemia.  It's a form of
4  non -- multiple myeloma or -- or non-Hodgkin's.
5  Q.  And what is the status of that?  Is that in
6  remission right now, or are you in a treatment
7  for that?
8  A.  They tell me that it'll never be in remission.
9  It will always be present, and it has to be
10  monitored every two, three months, which is
11  where I am right now.
12  Q.  And is that -- is the chemotherapy, that's
13  over?
14  A.  Yes.
15  Q.  Okay.  What I'd like to do is focus you on
16  August 12th, 2017.
17  A.  Okay.
18  Q.  And in particular that day because of an
19  incident involving Jacob Tischer.
20  A.  What was -- what was the date for his in --
21  incident?
22  Q.  August 12th, 2017.
23  A.  So the same day that -- it couldn't have been
24  the same date.  It had to be earlier, his --
25  Q.  Tell us what you mean.

5 (Pages 17 to 20)

```
                                                  Page 21
 1   A.  -- incident.  Well, when did he fall on the
 2        ground, and I -- I took him to the depot and...
 3   Q.  Well, I'm going to ask you some questions about
 4        that, so --
 5   A.  Okay.
 6   Q.  And see what you remember.  So I don't --
 7   A.  Sure.
 8   Q.  I'm not going to tell you a bunch of facts.
 9        I'm just going to ask you some questions.
10   A.  Fine.
11   Q.  I'm going to start by saying I want to focus on
12        August 12th, 2017.  Do you remember an incident
13        involving Jacob Tischer?
14   A.  Absolutely.
15   Q.  Do you remember the day that that happened?
16   A.  I don't know of the date.
17   Q.  Okay.  If I represent to you that it's
18        August 12th, 2017, do you have any reason to
19        disagree?
20   A.  None.
21   Q.  Okay.  So I want to -- I want to focus on that
22        day in particular.  Were you working for PTI at
23        the time?
24   A.  Is this the date of the incident?
25   Q.  Yes.  I mean to be talking about the date of
```

```
                                                  Page 22
 1        the incident.
 2   A.  Okay.  Then I was, absolutely.  Yes.
 3   Q.  Okay.  What were you doing for PTI on the --
 4   A.  I was a van driver in the yards for P -- for
 5        UP.
 6   Q.  And when you say "the yards," what do you mean?
 7   A.  Altoona yard, Norma in Chippewa, and there is
 8        about 10 other places where we had to
 9        chauffeur, taxi the UP employees back and
10        forth.
11   Q.  Before August 12th of 2017, how long had you
12        been doing that van driving job for UP around
13        Altoona?
14   A.  Well, that was my second employment time with
15        PTI, and so the second time I was, I believe,
16        around two, three months with PTI.
17   Q.  And had you been doing that route, chauffeuring
18        people around Altoona and --
19   A.  Yes.
20   Q.  -- and Norma, for about two, three months?
21   A.  Yes.
22   Q.  Okay.
23   A.  Plus the previous time I worked for them, and
24        I'm not sure how long I worked for them.
25        Possibly up to a year.
```

```
                                                  Page 23
 1   Q.  But you had also done that route when you --
 2   A.  Exactly.
 3   Q.  -- previously worked for them?
 4   A.  Yes.
 5   Q.  Okay.  Before August 12th, 2017, did you know
 6        Jacob Tischer?
 7   A.  I couldn't remember.  At the most I worked with
 8        him maybe one month during that time frame.
 9   Q.  In the one month leading up to August 12th --
10   A.  The incident, yes.
11   Q.  -- 2017?  And when you say you worked with him,
12        what do you mean?  Do you mean as a --
13   A.  I chauffeured him between Altoona yard and
14        where he needed to go.  Most of the time that
15        was the yard at Norma in Chippewa Falls.
16   Q.  So when you say you worked with him over a
17        period of a month --
18   A.  No, no.  There were -- one day drive him to
19        Norma and back, and then months later go to
20        Norma or drive him to Norma and bring him back.
21   Q.  Okay.  So what you're saying is there had been
22        one previous time that you worked with him?
23   A.  As far as I can tell.
24   Q.  Okay.  In -- plus the date of the incident?
25   A.  Yes.
```

```
                                                  Page 24
 1   Q.  Okay.  And when you were doing that
 2        chauffeuring and driving, were -- was that all
 3        that you were doing?
 4   A.  Yes.
 5   Q.  And so tell me -- tell me the first time that
 6        you drove Mr. Tischer or chauffeured Mr.
 7        Tischer, what exactly did that consist of?
 8   A.  I'm not clear -- freely admit -- but every time
 9        I took somebody to Norma, they would have to
10        assemble, brake test, etc. a train, which may
11        go to Minneapolis or to -- back to here on to
12        somewhere else.
13   Q.  And we talked kind of about your career
14        history.  Have you ever had any employment in
15        the railroad industry other --
16   A.  No.
17   Q.  -- than driving for PTI?
18   A.  No.
19   Q.  Okay.  So I take it you were not participating
20        in any of the actual operations activities that
21        the crews --
22   A.  I'm just a taxi driver that takes the crew to
23        the train where they'll do whatever they have
24        to do.
25   Q.  Okay.  And so what sort of -- when you say that
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 25

1    they're going up to --
2  A.  Norma.
3  Q.  -- Norma, are you -- I -- I take it that the
4      crew is traveling on the --
5  A.  Sometimes I would drive them because the train
6      was already there, or I'd follow the train up
7      to Norma because they had to take a train up
8      there.
9  Q.  Okay.  So how about focusing specifically on
10     the date of the incident, August 12th, 2017.  I
11     want to walk through that --
12 A.  Sure.
13 Q.  -- your memory of that day.  So let's start
14     with when did you come on duty that day?
15 A.  I assume it was a day shift, which starts at 6
16     a.m.
17 Q.  And did you -- were you working regularly on
18     the day shift at that time?
19 A.  Yes.
20 Q.  And was that a -- like a five-day-a-week,
21     two-day off sort of schedule?
22 A.  Yes.
23 Q.  What was the first con -- well, let me -- what
24     did you do between, say, 6 a.m. and 2 p.m.?
25 A.  Handled other crews in the yard.  So as a yard

Page 26

1      taxi for any UP crew, I would -- I would take
2      them from one train to another, whatever.
3  Q.  How would you get your instructions about what
4      your job assignment was?
5  A.  We have radio, so -- and the phone.  And so I
6      would be radioed or phoned asking me to become
7      a yard driver for the rest of the day or
8      whatever.  So I'm -- I'd be sitting next to a
9      train that they are assembling, preparing for
10     elsewhere.
11 Q.  Okay.  So let's start at 2 p.m. on August 12th,
12     2017.
13 A.  Um-hum.
14 Q.  When did you first have any contact with Mr.
15     Tischer?
16 A.  I can't remember if I drove him to Norma or
17     they were taking a train up to Norma, but I
18     ended up at Norma watching him working on a
19     train.
20 Q.  Tell me what you remember about watching Mr.
21     Tischer in Norma.
22 A.  He had to get from one end to the other end of
23     train and off there in between for all the
24     tests that they do with the train.  And so all
25     that time there was no indication that he was

Page 27

1      not well.
2  Q.  Are you sitting in the vehicle as --
3  A.  Yes.
4  Q.  -- you're making these observations?
5  A.  Yes.
6  Q.  Okay.  Do you know what time it was that you
7      got to Norma?
8  A.  It's a 15-minute drive, so whenever they asked
9      me.  If it was around 2 o'clock, it would be
10     soon after 2 I'd be in Norma.
11 Q.  Let me -- let me back up and -- and cover
12     something I skipped over.  So the -- the PTI
13     vehicle that you're driving, do you remember
14     what kind of vehicle that was?
15 A.  The choices were Ford Explorer or some kind of
16     a minivan.  Probably a Chrysler or Dodge.
17 Q.  Do you keep -- did you keep at that time any
18     sort of log book about what you're --
19 A.  Daily, constantly, hourly, yes.
20 Q.  Okay.  And was that to record kind of the job
21     assignments you'd been given?
22 A.  Absolutely.  And also to check my wages.
23 Q.  Okay.
24 A.  That they would pay me for everything I worked.
25 Q.  It would -- somehow your recordkeeping would

Page 28

1      tie into the -- to the payroll system?
2  A.  Yes.
3  Q.  Okay.  What did you do with the log book after
4      it was -- after you filled it out?
5  A.  It was a paper copy of what was entered into
6      the computerized system inside the cars.
7  Q.  Okay.
8  A.  So that was an automatic transfer to head
9      office, wherever.
10 Q.  So when you say a "computerized system," are we
11     talking like a laptop or a tablet?
12 A.  It's not -- it's a tablet-size specialized
13     computer for entry of your driving records.
14     Now most semis have that today.
15 Q.  So you would keep a paper copy and at the end
16     of the day enter it into the computer?
17 A.  The entering into the computer I think started
18     at the time I started to move or start a job --
19 Q.  Okay.
20 A.  -- for PTI.
21 Q.  Did you -- what did you then do with the paper
22     copy after you'd entered the data into --
23 A.  Oh, I had it at home for a while, like all
24     other evaluations, etc.  Finally ends up being
25     shredded.

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 29

1  Q.  Okay.  Did you ever see a report back from PTI
2      about the data that you entered into the
3      computer?
4  A.  No.  I had online wages defining what is the
5      result of my entries.
6  Q.  Okay.  Do you know whether the -- the PTI
7      vehicle that you were operating on August 12th,
8      2017, was equipped with any sort of GPS system?
9  A.  Yes.
10 Q.  Do you --
11 A.  All these tablet-size minicomputers have GPSs.
12 Q.  And do you know what sort of -- whether that
13     GPS data is reported or recorded in any way?
14 A.  As far as I know, PTI could tell you to the
15     yard where you were at the time.
16 Q.  Okay.  Have you ever seen a report for a
17     particular vehicle from PTI for where a car or
18     a --
19 A.  No.
20 Q.  -- a van has been?
21 A.  No.
22 Q.  Do you have a specific recollection -- now
23     we're switching back to kind of the chronology.
24     Do you have a specific recollection of what
25     time of day it was that you got to Norma?

Page 30

1  A.  I would say shortly after two, and then the
2      crew, that's Jake and his engineer Neil, were
3      asked, and so they asked me to transport them
4      back -- or back to Altoona yard.
5  Q.  Let me just stop you there.  You mentioned a
6      name Neil.  Who is Neil?
7  A.  Neil -- I'm not sure of his last name,
8      Franchuk -- is the engineer that Jake worked
9      with, so Neil is the engine -- the driver.
10 Q.  Okay.  So you were observing Mr. Tischer in
11     Norma do his job?
12 A.  Yes.
13 Q.  And I think you'd said you didn't notice
14     anything wrong with him --
15 A.  True.
16 Q.  -- at that point.  So let's pick the story up
17     there.  What happened next?
18 A.  Well, I was asked to bring them or meet them
19     with the train at Altoona yard.  Now, I
20     remember when the train got into Altoona.  It
21     was around -- I don't remember the time
22     exactly.  I would think around 4 p.m.-ish.  And
23     so I met Jake -- or dropped Jake at the west
24     end of the train that they were going to work
25     on further, and I watched him walking down the

Page 31

1      train and checking brakes and whatever.
2  Q.  And I -- just to interrupt, are we in Altoona
3      at this --
4  A.  We're in Altoona yard.
5  Q.  Okay.  So we've --
6  A.  West end.
7  Q.  We've been to Norma, and we've come back to
8      Altoona?
9  A.  Correct.
10 Q.  And you're on the west end of the yard?
11 A.  Right.
12 Q.  Okay.  So what -- what did -- what happened
13     next?
14 A.  Well, so he did a lot of work with the train,
15     but then he had to come back into the van and
16     go to another part of the train.  And when I
17     took him there, he got out fine and worked some
18     more.  And at this point we're at the east end,
19     which is where their yard depot is, called
20     shanty, at which time he tried to undo his seat
21     belt with his left hand and had some trouble,
22     so he used his right hand to open the seat belt
23     and then open the door and went into the
24     portable on-the-spot Johnny.
25 Q.  And let me ask you a question there.  So at the

Page 32

1      point when Mr. Tischer gets back into the van
2      to go to the east end of the yard, were you
3      talking with him at all at that point?
4  A.  No.
5  Q.  Okay.  So you're just driving him --
6  A.  Correct.
7  Q.  -- down to the east end of the yard?  You
8      talked about watching him have some trouble
9      with his seat belt.  Can you --
10 A.  Yes.
11 Q.  -- tell me -- I want to focus in on that.  I
12     mean, when you say trouble with the seat belt,
13     what kind of trouble are we talking about?
14 A.  Well, if you can understand, I would have
15     trouble undoing my seat belt because I'm in a
16     different van with different seat belt buttons
17     and locations, so I -- I thought nothing of
18     that.
19 Q.  Okay.  So what happened next?  He got out to --
20 A.  He went into the potty.
21 Q.  Okay.
22 A.  Portable potty.  And when he came back out, he
23     started stumbling on the uneven gravel that the
24     yard consists of, which I found kind of -- you
25     know, what's wrong with him, why is he

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 33

1  stumbling.  And he came back to the van at the
2  same time his engineer came back having talked
3  with the yard master, Marvin, and they were
4  telling me that they are asked to go back to
5  Norma to continue working on a train there.  So
6  Marvin expected Jake to go back with me to
7  Norma along with Neil, the engineer.  And at
8  that time I'm saying to Marvin, He's not well,
9  he's stumbling around, do not send him.
10 Q.  Let me ask you a question there.  So you've
11     mentioned Marvin.  Do you -- is that a first
12     name or a last name?
13 A.  I think it's his last name.  He's the Altoona
14     yard manager of the day -- of --
15 Q.  Okay.
16 A.  -- the shift.
17 Q.  Did you know him before August 12th --
18 A.  Yes.
19 Q.  -- 2017?  Do you know what his first name was?
20 A.  Mark, I believe.
21 Q.  And at the point of this conversation that
22     you're describing about going back to Norma,
23     had you spoken at all to the engineer,
24     Mr. Franchuk?
25 A.  Well, he and Jake came up to my cab ready to

Page 34

1  transport back to Norma, and I -- at which
2  point I said, No, no, Jake is not well, you --
3  you shouldn't send him.
4  Q.  And so to that particular point, who are you
5      saying that to?
6  A.  Marvin.  Marvin and the group of other UP
7      employees.
8  Q.  Okay.  So I want to make sure I understand the
9      scene.  Are you inside or outside of your van?
10 A.  I'm sitting in my van.
11 Q.  And Mr. Tischer and Mr. Franchuk come up to the
12     van?
13 A.  The driver's window, yeah.
14 Q.  And they tell you they're going back to Norma?
15 A.  Right.
16 Q.  And Mr. Marvin is there as well?
17 A.  He stood with another group of engineers -- I
18     forget the name -- conductors in a circle maybe
19     20, at the most, yards from me.
20 Q.  Okay.  So they're a little ways away?
21 A.  Yeah.
22 Q.  And do you know who else was standing with
23     Mr. Marvin?
24 A.  I don't remember.
25 Q.  And then you said to Mr. Marvin when he's 20 or

Page 35

1  so yards away, No --
2  A.  No, no, don't send him, he's not well.
3  Q.  Okay.  So are you --
4  A.  I'm -- I'm shaking my hands like this
5      (indicating) to him --
6  Q.  Okay.
7  A.  -- saying, He's not well, don't send him.
8  Q.  And so are you having to shout to communicate
9      that over that distance, or how is he -- how is
10     that -- how are you getting your message
11     across?
12 A.  I guess I shouted, yeah.
13 Q.  Okay.  And at some point did he come closer to
14     talk to you?
15 A.  No.
16 Q.  Okay.  So what -- what happened next after you
17     say to Marvin, No, no, he's -- he -- and the --
18 A.  Well --
19 Q.  -- he being Mr. Tischer -- is not well?
20 A.  They both went back to talk to Marvin, and then
21     Marvin, I assume, asked Neil, the engineer, to
22     take him back to the depot, which is outside
23     the yard.
24 Q.  Now, are you able to say when -- what time this
25     is taking -- this conversation is taking place?

Page 36

1  A.  This is where I -- my memory of the time at the
2      -- the timing at this point has, you know,
3      became irrelevant to me.
4  Q.  Sure.
5  A.  So I would say between 4 and 5 p.m.  6 p.m. at
6      the most.  I don't know.
7  Q.  Okay.  But so was it -- was the only
8      communication that you had with Marvin, which
9      you've described where you said -- you know,
10     waved your hands as Marvin's 20 yards away and
11     you said, No, Tischer -- Tischer is not well?
12 A.  Correct.
13 Q.  So did you have any other conversations with
14     either Tischer or with Franchuk?
15 A.  No, I did not.
16 Q.  Okay.  So if I understand what you're saying
17     then, Franchuk and Tischer went to talk to
18     Marvin?
19 A.  And then came back ask -- and telling me that
20     Marvin wants me to take him back to the Altoona
21     depot where his family will pick him up.
22 Q.  And so what I want to get a sense of is how
23     long did this conversation -- I understand
24     you're not able to say exactly what time of day
25     it started.  But once it started, how long did

Page 37

1      the conversation last?
2   A.   One, two minutes.
3   Q.   From the point that you waved your hands?
4   A.   Correct.  Well, actually -- yes.
5   Q.   Okay.  What happened next?
6   A.   So Neil stayed behind, and I took Jake back to
7      the depot.
8   Q.   Now, were you able to make any observations of
9      Mr. Tischer -- let's start with the point that
10     he comes out of the porta potty where he's
11     stumbling.
12  A.   Right.
13  Q.   Did you make any further observations of him?
14  A.   No.
15  Q.   Okay.  So did you have any chance to speak with
16     him during that time?
17  A.   Yes.
18  Q.   Tell me about that.
19  A.   We didn't have anything to say.
20  Q.   Okay.
21  A.   I was just about to drive him back to the
22     depot.
23  Q.   Okay.  So you do that, I take it?
24  A.   Yes.
25  Q.   Tell me what happened next.

Page 38

1   A.   Well, within site of the depot in the streets
2      of Altoona -- actually, right next to the post
3      office there, if you know where it is, he
4      spewed a volcanic on the inside of the car, so
5      I stopped the car next to the curb, and he
6      opened the door and finished being sick
7      outside.  At which point I said, Okay, shall --
8      shall we go back, and he said fine.  Because we
9      were inside of the -- in sight of the depot, I
10     drove him straight to the entrance door of the
11     depot, and he tried to again undo his seat
12     belt.  It didn't work too well, but then he
13     tried to open the door and get out, and he
14     couldn't.  So I said, Stay put in the
15     passenger's seat, I'm going to go inside the
16     depot and bring some help.  I went inside the
17     depot, and there was nobody there.
18  Q.   Let me just back up a step.  So when you're --
19     when you're on the east end of the yard where
20     the porta potty is, how far of a drive is that
21     from --
22  A.   Two to three miles.
23  Q.   -- there to the depot?
24  A.   Yes.
25  Q.   Two to three miles?

Page 39

1   A.   Yes.
2   Q.   Okay.
3   A.   Not even that.
4   Q.   Okay.  So now we're at the depot.  You've gone
5      inside.  There's nobody there.  You're looking
6      for help.  What happens next?
7   A.   Well, once I was certain there was nobody to
8      help, I went back to the van to talk to Jake.
9   Q.   And what happened?
10  A.   I found him lying around the rear wheel on the
11     passenger's side on the floor, so he managed to
12     get out, and he was lying on the floor.  At
13     which stage I tried to pick him up, bring him
14     back to the passenger door.
15  Q.   And you said found him lying on the --
16  A.   Floor --
17  Q.   -- floor --
18  A.   -- on his back.
19  Q.   Do you mean the ground outside the --
20  A.   On the ground outside the van, yes.
21  Q.   Okay.
22  A.   In the parking lot.
23  Q.   You tried to pick him up.  What happened next?
24  A.   Well, he was deadweight, and I could not.
25  Q.   So what did you do next?

Page 40

1   A.   Within a minute of my scratching my head, What
2      shall I do with him, Marvin arrived and helped
3      me to -- try to help me to lift him back into
4      the passenger's seat.  We couldn't.
5   Q.   Was -- were you speaking with Mr. Tischer at
6      this point when he's -- when he's on the
7      ground?
8   A.   I don't believe so.
9   Q.   Okay.  How about when he was -- when he was
10     sick inside the car, were you able to speak
11     with him then?
12  A.   Oh, yes.
13  Q.   And what -- what was -- what was he saying?
14  A.   He wasn't saying anything.  He was being sick.
15  Q.   Okay.
16  A.   And I said, Well, just hang on.  We're --
17     there's the depot.  We'll drive there and get
18     some help.
19  Q.   Okay.  So when Mr. Marvin arrives at the depot,
20     do you have a conversation with him?
21  A.   Oh, absolutely.
22  Q.   Tell me about that.
23  A.   Well, he saw me trying to lift Jake off the
24     ground, and I said, Marvin, come and help me,
25     please, he's too heavy.

10 (Pages 37 to 40)

Page 41

1 Q. Sure.
2 A. And the two of us, we could not lift him. At
3    which point, within a minute or two, two
4    policemen came on the scene.
5 Q. Okay. So what happened next?
6 A. Well, they started asking him innumerable --
7    in -- questions to which, lying on his back
8    unable to stand up, he was very coherently
9    answering all the questions, and that surprised
10   the heck out of me. I mean, you know, I never
11   thought of anything major other than, Boy, is
12   he heavy.
13 Q. Sure. What happened next?
14 A. The two policemen tried to pick him up, put him
15   in my van, but could not. So after they had
16   finished questioning him, they said, Well, the
17   ambulance is on the way, we got to go back to
18   the police station, or some -- something like
19   that. I don't remember them being present at
20   the time -- time the ambulance crew came out
21   and tried to lift him and could not with my
22   help. So now there's four of us trying to lift
23   him. Deadweight is bad. The ambulance crew
24   asked him the same questions the policemen had
25   and at least 10 to 20 questions to which he

Page 42

1    replied amazingly still coherently.
2 Q. Okay. What happened next?
3 A. Well, the two ambulance crew could not put him
4    on a stretcher, lift him onto a stretcher,
5    until almost immediately a 6-foot-17 (as
6    spoken) ambulance member came and helped them
7    put him onto a stretcher into the ambulance.
8 Q. Okay. Are you talking with the ambulance crew
9    at all?
10 A. No.
11 Q. Is Mr. -- are you with Mr. Marvin at that
12   point?
13 A. I believe he waited until the ambulance took
14   him away.
15 Q. Is Mr. Marvin talking at all with the ambulance
16   crew or the police?
17 A. He was present.
18 Q. Sure. But sitting here today, you don't recall
19   --
20 A. No.
21 Q. -- anything? So in terms of the explanation to
22   the police and the ambulance crew, that's all
23   coming from Mr. Tischer?
24 A. The answers to their questions, yes.
25 Q. Okay. Was there anyone else there at that time

Page 43

1    other than you, Mr. Marvin, Mr. Tischer and the
2    first responders?
3 A. No.
4 Q. What happened after they got Mr. Tischer on the
5    stretcher?
6 A. They put him in the ambulance and drove away.
7 Q. Okay. What did you do next?
8 A. Well, I was past my shift time, so I made sure
9    that I can go and went home.
10 Q. Okay. Did you ever hear anything more about
11   this?
12 A. Well, the -- the office at the depot told me
13   that I would be interviewed by Jamie, which I
14   was.
15 Q. Okay. And when did that take place?
16 A. I don't remember.
17 Q. Was it shortly after the incident of the --
18   August 12th?
19 A. I think there were days in between.
20 Q. And what did the interview consist of?
21 A. Basically what you're doing right now. I was
22   speaking into a microphone to be recorded.
23      THE WITNESS: True?
24 A. And when they heard my story, that was it.
25 BY MR. BANKER:

Page 44

1 Q. Okay.
2 A. I could go.
3 Q. Did you ever receive a copy of that statement?
4 A. I don't think so. I'm not sure.
5 Q. Okay. Beyond giving that statement, did you
6    ever have any conversations with anyone about
7    this?
8 A. Yes.
9 Q. Who did you talk with?
10 A. Charlie Schulz is the Tischer family lawyer,
11   representative, assistant, whatever.
12 Q. Okay. When was that?
13 A. Weeks after the incident.
14 Q. Okay. Other than the two contacts you've
15   described, did you ever have any conversations
16   with anyone else about this?
17 A. Just Mike this morning. That's it.
18 Q. Okay. Did you ever speak with Mr. Franchuk
19   about it?
20 A. Neil, we may have bumped into each other. At
21   which point I just questioning if Jake is all
22   right and found out that, no, he had died.
23 Q. Sure. How about Mr. Marvin, did you ever have
24   any other conversations with --
25 A. No.

11 (Pages 41 to 44)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 45

1  Q.  -- Mr. Marvin?  Other than the waving to him
2      that you did from the car when you were out by
3      the porta potty and asking him to help pick
4      Jake up off the ground when he's by the depot,
5      did you ever have any other conversations with
6      Mr. Marvin?
7  A.  Not that I remember.
8  Q.  Okay.  Did you make any other -- you know,
9      we've talked kind of -- I think we've talked
10     through the chronology of kind of how you were
11     involved.  But during that time that you were
12     involved and in contact with Mr. Tischer, did
13     you make any other observations of him or
14     symptoms that he was exhibiting?
15 A.  Well, after I got home and thought it all out,
16     I was wondering to myself if -- is this some
17     form of a stroke, but never discussed it with
18     anybody.  I had a colleague -- several
19     colleagues at Cray Research that went similar
20     ways.
21 Q.  Had you had any previous experience in your
22     personal life with people having strokes while
23     you were with them?
24 A.  No.
25 Q.  Have you ever had any first-aid or medical

Page 46

1      training about recognizing signs --
2  A.  No.
3  Q.  -- of distress?  No?
4  A.  No.
5  Q.  In particular working for PTI, was there any
6      sort of training, first-aid training or --
7  A.  Absolutely.
8  Q.  Okay.  Well --
9  A.  First aid, CPR, and emergencies, what you do in
10     case of emergencies and so on, yeah.
11 Q.  Okay.  Was that training that you got when you
12     first started driving for PTI?
13 A.  Yes.
14 Q.  Did that --
15 A.  Both times.
16 Q.  Both times.  Did that cover issues like
17     strokes?
18 A.  I don't recollect.  I doubt it.
19 Q.  How did you receive that training?
20 A.  In a classroom at the same building as the
21     Altoona Police are, and they're all PTI drivers
22     being given the same training.
23 Q.  Was it like a classroom with an instructor at
24     --
25 A.  Yes.

Page 47

1  Q.  -- the front --
2  A.  Yes.
3  Q.  -- teaching a class?
4  A.  One of the managers.
5  Q.  Were there any paper materials that were
6      provided to people who were taking the class?
7  A.  I believe so.
8  Q.  Do you still have a copy of that?
9  A.  Probably not.  Actually, they -- they were --
10     I'm not sure if part of the drivers' or
11     employees' handbook at the back where you
12     filled out stuff, questions.  But besides that,
13     I don't remember.
14 Q.  Was there a test of any kind at the end of this
15     class?
16 A.  Yes, there are multiple questions that you had
17     to answer for sure.
18 Q.  To sort of make sure that you were tracking the
19     information?
20 A.  Yes.
21 Q.  And do you know whether that test was scored or
22     pass/fail?
23 A.  I don't remember.  I -- I don't think any of us
24     had any trouble because most of these questions
25     are common sense.

Page 48

1  Q.  Sure.  Was there at any -- any point when you
2      were in contact with Mr. Tischer on
3      August 12th, 2017, when you felt that he was in
4      need of medical assistance?
5  A.  At the time I said to Marvin, Don't send him to
6      Norma, he's stumbling around, he's not well, I
7      hadn't come past that point.
8  Q.  Hadn't gone past the point of just saying,
9      Don't send him back to Norma?
10 A.  Right.
11 Q.  Okay.  Did that change at any point as you went
12     on from there?
13 A.  Well, following his being sick arriving at the
14     depot almost and then falling out of the van
15     while I was inside the depot, he's now lying on
16     the ground, and I'm not sure what's going on.
17 Q.  Sure.  I take it that you did not call 911?
18 A.  No.
19 Q.  Did you know that 911 was being called for Mr.
20     Tischer?
21 A.  No.
22 Q.  So when the police arrived, that was sort of
23     your first understanding that someone had --
24     had called for help?
25 A.  Well, what I understood was that Marvin had

12  (Pages 45 to 48)

Page 49

```
 1      called the family, and the wife was going to
 2      come pick him up at the depot.
 3   Q.  How did you -- how did you develop that
 4      understanding?
 5   A.  I don't know if Marvin or Neil or even Jake
 6      told me.  One of them told me that his wife is
 7      coming to pick him up at the depot.
 8   Q.  And so that was the reason for going back to
 9      the depot?
10   A.  Correct.
11   Q.  Did you at any point before you -- between
12      leaving the porta potty area on the east end of
13      the Altoona yard and getting -- when the police
14      arrived at the depot, did you at any point
15      think about calling 911?
16   A.  No.  To me that decision belongs to Marvin, the
17      manager.
18   Q.  Okay.
19   A.  I'm just a cab driver.
20   Q.  Sure.  I want to touch upon a couple things,
21      and we'll jump around in the chronology a
22      little bit.  You mentioned you were doing some
23      driving of crews between the Altoona yard and
24      Norma.  Where is Norma relative to Altoona?
25   A.  About 15 minutes away in Chippewa Falls.
```

Page 50

```
 1   Q.  And is that east?  West?  North?  South?
 2   A.  Northeast.
 3   Q.  Did you participate in -- or were you in a
 4      position to watch any of the work that either
 5      Mr. Franchuk or Mr. Tischer did when they were
 6      in the Altoona yard before they left for Norma?
 7   A.  I don't remember.
 8   Q.  Okay.  Because as we were kind of going through
 9      it, you had a recollection of -- of seeing Mr.
10      Tischer in Norma, and I'm just wondering do you
11      have an early -- earlier recollection that day
12      of watching him work.
13   A.  I cannot remember if I drove them to Norma to
14      the train or they took the train to Norma.
15   Q.  Did you have, based on prior encounters with
16      Mr. Tischer, any way of comparing how he was
17      acting on August 12th, 2017, to how he'd acted
18      previously?
19   A.  No.  He showed no sign of any kind of ill
20      effects until we got to the east end in
21      Altoona.
22   Q.  Okay.  So the -- kind of the porta potty is
23      where you --
24   A.  It starts in my mind.
25   Q.  It starts in your mind?
```

Page 51

```
 1   A.  Yes.
 2   Q.  Okay.  Other than the -- you know, so you've
 3      talked about having some trouble with the seat
 4      belt.  Did you observe Mr. Tischer having any
 5      other problems with either his hands or his --
 6   A.  No.
 7   Q.  And you've also kind of described coming out of
 8      the porta potty and stumbling.
 9   A.  No, that was the first time.
10   Q.  Did you observe any other problems with his
11      arms or his legs?
12   A.  No.
13   Q.  Did you observe any problems with his speaking
14      ability?
15   A.  No.
16   Q.  Did you observe any problems with his facial
17      expression and muscles drooping?
18   A.  No.
19   Q.  When you were at Norma on August 12th, 2017,
20      did you observe Mr. Tischer making his
21      inspection of the railcars he was working on?
22   A.  I was watching him.  I was driving him from one
23      end to the other end.
24   Q.  Was he making the inspection on foot, or was he
25      doing it --
```

Page 52

```
 1   A.  On foot.
 2   Q.  -- from the vehicle?
 3   A.  Yes.
 4   Q.  He was on foot?
 5   A.  Yes.
 6   Q.  And so when you were driving him, it was just
 7      from point to point, and then --
 8   A.  Right.
 9   Q.  -- he would get out --
10   A.  Right.
11   Q.  -- and do his work?  Do you know where Mr. --
12      when you got back to Altoona after being at
13      Norma, do you know where Franchuk was as Mr.
14      Tischer is riding in your car?
15   A.  He may have been in the engine that he's
16      responsible for, or he may have gotten out and
17      started talking with Marvin.  I'm not sure.
18   Q.  So you didn't have a chance to observe where he
19      was and what he was doing?
20   A.  No.
21   Q.  Okay.  Did you have any conversation with
22      Mr. Franchuk after you got back to the Altoona
23      yard but before you waved your hands to
24      Mr. Marvin?
25   A.  I believe the only thing that happened was that
```

13 (Pages 49 to 52)

Page 53

```
 1    he came to my cab and said we -- being asked to
 2    go back to Norma.
 3  Q.  Okay.  Did you ever communicate anything to
 4    Mr. Franchuk about Mr. Tischer having problems
 5    with his seat belt or anything else before you
 6    waved your hands at Mr. Marvin?
 7  A.  I think he and I saw together Jake coming out
 8    of the port -- porta potty and stumbling, so he
 9    was aware about the same time I was.  Keep in
10    mind that from the west end of the train
11    towards the east end of the train he had walked
12    many cars and tested brakes and so on.
13  Q.  Mr. Tischer had?
14  A.  Yes.
15  Q.  Okay.
16  A.  At that point he didn't stumble.
17  Q.  Sure.  And you were observing him?
18  A.  I saw him on and off, yes.
19  Q.  Did you ever hear anyone offer Mr. Tischer
20    medical assistance?
21  A.  At what time?
22  Q.  Say before you -- from the time you saw Mr.
23    Tischer come out of the porta potty until the
24    time you took him to the depot, did you ever
25    hear anyone offer medical assistance?
```

Page 54

```
 1  A.  No.
 2  Q.  Have you ever heard anyone talk about how it
 3    was that 911 got called?
 4  A.  No.
 5  Q.  Do you know who called --
 6  A.  No.
 7  Q.  -- 911?  Do you know when they called 911?
 8  A.  Well, I assume that that would be after -- I
 9    don't know if they called -- think about it.
10    Marvin says, Take him back to the depot, wife
11    will come pick him up.  So at this point I
12    don't know if 911 has been called at all.
13  Q.  Sure.  And I don't want you to speculate.
14  A.  I don't know.
15  Q.  I'm just asking for what knowledge you have as
16    you sit here today.  At any point was Mr.
17    Tischer offered a bottle of water?
18  A.  Water?
19  Q.  Yeah.
20  A.  No.
21  Q.  To your recollection.
22  A.  My recollection.  But the shanty, which is
23    the -- within the yard, depot, had cases and
24    cases of water, so you helped yourself if you
25    needed some.
```

Page 55

```
 1  Q.  Is the shanty something different from the
 2    depot?
 3  A.  Absolutely.
 4  Q.  So what is -- the shanty is out --
 5  A.  The shanty is a small room-size yard depot
 6    which is where they had a computer, lots of
 7    water stacked, and printed out stuff that they
 8    needed to print out.
 9  Q.  Okay.  Did you hear -- did you -- were you able
10    to directly overhear any communication from
11    Mr. Marvin to either Mr. Franchuk or Mr.
12    Tischer about going back to Norma?
13  A.  I don't believe so.
14  Q.  So what you know about that is from -- coming
15    from conversations between you and either
16    Franchuk or Tischer?
17  A.  Correct.
18  Q.  Okay.  You had mentioned that you have a -- a
19    radio in this PTI vehicle that you're using.
20  A.  Rarely used because --
21  Q.  When you say "radio," are we talking about like
22    a handheld walkie-talkie?
23  A.  Correct.
24  Q.  Or a CB radio that runs off --
25  A.  It's a built-in CD -- CB-type radio.
```

Page 56

```
 1  Q.  Type radio.
 2  A.  Yep.
 3  Q.  And who are -- when you use that radio, who are
 4    you communicating with?
 5  A.  Usually I would use that only when they've
 6    asked me to go to an out-of-town yard and do --
 7    do something with the crew or the train that
 8    hasn't showed up.  Then I would go on the radio
 9    and say, Hello, I'm here, when are you
10    arriving.
11  Q.  And when you say, Hello, I'm here, who are you
12    hoping to talk to?
13  A.  I'm the -- oh, to the engineer, usually.
14  Q.  Okay.  So that's a communication --
15  A.  For the train that I'm meeting, yes.
16  Q.  That's a communication to the train crew?
17  A.  Right.
18  Q.  How about when you're using your phone, who are
19    you using the phone to communicate with?
20  A.  PTI or their employees might call me for
21    whatever reason.
22  Q.  And was that a personal phone or a corporate
23    phone?
24  A.  Both.
25  Q.  Did you make any communications either by phone
```

14 (Pages 53 to 56)

Page 57

```
 1    or by radio with respect to the Mr. Tischer
 2    incident?
 3  A.  No.
 4  Q.  Is there a -- in the PTI vehicle is there any
 5    capability -- any video recording capability?
 6  A.  Well, if you exceed their expectations, you get
 7    to be on camera, which then lights up saying
 8    it's active and taking a photograph of whatever
 9    you're doing.
10  Q.  Okay.
11  A.  So if you hit a bump and it jars the vehicle,
12    the camera might go off, in which case you go
13    (indicating) because you don't know who's at
14    the other end of the camera.
15  Q.  Sure.  When you say the camera goes off, is
16    there something that happens to tell you that
17    the camera has gone off?
18  A.  It has a red LED light that says it's live.
19  Q.  Okay.  Did the camera in the PTI vehicle at any
20    point go live?  Did it ever -- did the red LED
21    light ever come on and say that --
22  A.  During this incident?
23  Q.  During this incident.
24  A.  No.
25  Q.  Okay.  Other than what you've described, you
```

Page 58

```
 1    know, giving a statement to Ms. Lukehart, did
 2    you have any involvement after August 12th,
 3    2017, in terms of investigation into what had
 4    happened here?
 5  A.  If I understand the question -- could you
 6    repeat it, please?
 7  Q.  Sure.  I'm just trying -- you know, so you --
 8    you sort of described the timeline,
 9    August 12th, 2017, at the end of your shift
10    after Mr. Tischer had been loaded into an
11    ambulance and taken away.  You eventually
12    signed out and went home?
13  A.  Right.
14  Q.  Then after that, other than what you've told us
15    about with Ms. Lukehart and giving a statement,
16    did you have any involvement into any
17    investigation about what had gone on with Mr.
18    Tischer?
19  A.  No official investigation that I'm aware of
20    other than asking Neil, How is Charlie -- how
21    is Jake.
22  Q.  Sure.  And when was it -- so do you recall when
23    it was that you next ran into Mr. Franchuk
24    after August 12th, 2017?
25  A.  It may have been weeks.
```

Page 59

```
 1  Q.  Okay.  That was the first that you'd heard?
 2  A.  Well, from other employees.  I think UP
 3    employees may have told me first that he got
 4    helicoptered to Mayo in Rochester, and they did
 5    a brain surgery on him, and he died soon after.
 6  Q.  But when you talked with Mr. Franchuk, that was
 7    the first person who was confirming that for
 8    you, or you already knew that?
 9  A.  I don't know if he -- I think I already knew
10    that from UP employees, yes.
11  Q.  Do you know Josh Tischer?
12  A.  Don't think so.
13  Q.  Okay.  Do you know who Mike Swetnik is?
14  A.  Mike?
15  Q.  Swetnik, S-W -- or I'm sorry.  Swentik,
16    S-W-E-N-T-I-K.
17  A.  Don't believe so.
18  Q.  Do you know John Thomas, T-H-O-M-A-S?
19  A.  Only from verses.
20  Q.  Okay.  How about Harold Lowe, L-O-W-E?
21  A.  I don't think so.
22  Q.  How about Erik Erickson, E-R-I-C-K-S-O-N?
23  A.  Well, I know many Ericksons, so I'm not sure.
24    Was he a UP employee?
25  Q.  A UP employee.
```

Page 60

```
 1  A.  So I -- I was familiar with a lot of the UP
 2    employees because I spent hours with them
 3    daily, but from one day to the next, it could
 4    be totally different crew.
 5  Q.  Sure.
 6  A.  Or even from hour to hour.
 7  Q.  So I take it the name Erik Erickson doesn't
 8    stand out as a --
 9  A.  No.
10  Q.  -- particular UP employee to you?
11  A.  (Indicating.)
12  Q.  How about Tim Dold, D-O-L-D?
13  A.  (Indicating.)
14  Q.  Did you ever fill out --
15  A.  Most of the UP employees that I would be
16    friends with and talking with sitting in my
17    van, I never knew their surnames, first of all.
18  Q.  Sure.  Because you just didn't -- you didn't
19    need to.
20  A.  Well, because they were temporary
21    acquaintances.
22  Q.  Sure.  Did you ever make any report to PTI that
23    this incident had occurred?
24  A.  I'm sure I have.
25  Q.  Do you know how you would have done that?
```

15 (Pages 57 to 60)

Page 61

1   A.  Our local manager, Jeff somebody -- very hard
2       to get ahold of -- I reported to.
3   Q.  And was that a phone call, or was that --
4   A.  It would be a phone call.
5   Q.  Did you ever make any document to record --
6   A.  Not related to the incident.
7   Q.  Okay.  And PTI never asked you to do that?
8   A.  No.
9   Q.  Did -- well, so let me -- August 12th, 2017,
10      how much longer did you drive for PTI?
11  A.  I think I was usurped by Medical Logistics
12      Systems, who was being run at the time by a --
13      locally by an ex-PTI colleague.
14  Q.  So is that a -- is that another driving
15      company?
16  A.  Yes.
17  Q.  And so at some point after August 12th, 2017,
18      they started to drive UP employees instead of
19      PTI?
20  A.  No, nothing like that.
21  Q.  Okay.
22  A.  They had nothing to do with UP.  It's just that
23      Medical Logistics, Network Global Systems,
24      another name for them, had a local manager
25      called -- supervisor called Donna such and

Page 62

1       such, who was an ex-PTI employee.
2   Q.  So I -- so after this incident, August 12th,
3       2017, did you go to work for MLS?
4   A.  Yes.
5   Q.  I see.  So you changed employer, basically?
6   A.  Right.
7   Q.  And do you recall when it was relative to
8       August 12th, 2017, that that happened?
9   A.  Well, at least a month later.
10  Q.  Okay.
11  A.  Maybe more.  I'm not sure.
12  Q.  And are you currently working for MLS?
13  A.  No.
14  Q.  Or how long did that go on?
15  A.  Until my cancer took me off the road.
16  Q.  Okay.  And has that been the case ever since
17      you stopped working for MLS?
18  A.  Yes.
19          MR. BANKER:  Okay.  How are you doing?
20      I'm about to shift gears, and I've got some
21      documents to show you.
22          THE WITNESS:  Go for it.
23          MR. BANKER:  Okay.
24          (Exhibit 1 marked for identification.)
25  BY MR. BANKER:

Page 63

1   Q.  Showing you what's been marked for
2       identification as Exhibit 1.  Let me just first
3       ask you, do you recognize this document?
4   A.  Yes.
5   Q.  What do you recognize it as being?
6   A.  The majority of my statement, but somewhat
7       added to.
8   Q.  Okay.  On the second page of Exhibit 1 do you
9       see the handwriting there?
10  A.  Yes.
11  Q.  Is that your signature?
12  A.  Yes.
13  Q.  And it's dated September 6th, 2017?
14  A.  Yes.
15  Q.  Is that when you signed this document?
16  A.  Don't remember.
17  Q.  Okay.  Do you have any reason to -- to believe
18      you didn't sign it on that date?
19  A.  No.
20  Q.  Okay.  And I want to understand what you're
21      saying.  So when you say this is the majority
22      of my statement but somewhat added to it --
23  A.  Yes.
24  Q.  -- what do you mean by that?
25  A.  Well, for example, the last paragraph, beefy

Page 64

1       one, says, To me, Jake needed --
2           MR. COHEN:  I'm going to -- hold on a
3       second.  I'm going to make a running objection
4       to this document on the basis of foundation and
5       hearsay.  Go ahead.
6   BY MR. BANKER:
7   Q.  Yeah.  Go ahead.
8   A.  Jake needed medical treatment early on to me.
9       This -- this is not my words.
10  Q.  Okay.  So whose words --
11  A.  This -- I don't know.  Whoever typed this up.
12  Q.  Okay.  So maybe the way to -- to approach this
13      is take them -- take as long as you need to
14      read this.  I'd like to ask you some questions
15      about it after you've had a chance to review
16      it.
17  A.  (Complying.)
18          MR. HAYDEN:  Can we go off the record?
19          MR. BANKER:  Sure.
20          VIDEOGRAPHER:  Off record.  The time is
21      2:28.
22          (A break was taken.)
23          (Exhibit 2 marked for identification.)
24          VIDEOGRAPHER:  We're back on the record.
25      The time is 2:34.

16  (Pages 61 to 64)

1   BY MR. BANKER:
2   Q. Okay. Mr. Lux, have you had a chance to review
3       Exhibit --
4   A. Yes.
5   Q. -- 1? First question, in reviewing Exhibit 1
6       is there anything that you feel is incorrect in
7       that statement?
8   A. There is nothing I feel that is incorrect other
9       than what I underlined as not my words added.
10  Q. Okay. Have you made markings on Exhibit 1 --
11  A. Yes.
12  Q. -- to indicate that certain things that are not
13      --
14  A. Yes.
15  Q. -- your words? Okay. Let me come at it from a
16      different direction. Having reviewed Exhibit
17      1, has it -- that done anything to refresh your
18      recollection about the incident that adds
19      anything to what we've already --
20  A. It says --
21  Q. -- talked about?
22  A. It says I remember except, you know, the
23      additional statement that I felt that he
24      needed. That wasn't the case.
25  Q. And you're talking about the last paragraph on

1       Page 2?
2   A. Well, for example, the last paragraph, but 1 --
3       on Page 1, third sentence up -- actually, about
4       five sentences up, Jake needs medical
5       attention. I had no idea what was wrong at the
6       time.
7   Q. Okay.
8   A. Jake just sat around waiting for a decision
9       from the trainmaster. I thought a clear sign
10      of a stroke. I did no such thing.
11  Q. Okay. Anything -- where else have you made
12      marks on this document? Why don't we just talk
13      about those.
14  A. Well, the use of the word "eventually" here and
15      there to me were a case of one to five minutes
16      max.
17  Q. Okay. And to come back to the -- to the
18      question I wanted to be clear on. Has this --
19      reading this done anything to refresh your
20      memory on any of the details of the incident?
21  A. I don't need refreshing other than the times,
22      which I was not paying attention to. That's
23      why I'm uncertain.
24  Q. Okay. Let me show you what's been marked for
25      identification as Exhibit 2. Do you recognize

1       this document?
2   A. Yes.
3           MR. COHEN: At this point I just want to
4       make a running objection to the use of this
5       document or questioning regarding this document
6       on the basis of hearsay. Go ahead.
7   BY MR. BANKER:
8   Q. What do you recognize this document to be?
9   A. I think this is what Jamie and I in the UP
10      Altoona office created.
11          THE WITNESS: Is that true?
12          MR. BANKER: Well, you can't -- actually,
13      the way this works is you can't actually ask
14      her questions even though she's right here. It
15      has to be based on what you --
16          THE WITNESS: Well, that's my
17      understanding. Okay.
18  BY MR. BANKER:
19  Q. Okay. So if you'd like -- and you can take as
20      long as you need -- we can go off the record
21      while you do it. Would you like a chance to
22      review this statement before I ask you
23      questions?
24  A. Not really.
25  Q. Okay. Have you had a chance to review this

1       recently?
2   A. I think this morning with Mike.
3   Q. Okay. When you reviewed it this morning, was
4       there anything in this Exhibit 2 statement that
5       you felt was incorrect?
6   A. No.
7   Q. And when you read it this morning, did it do
8       anything to refresh your recollection about
9       details about this incident beyond what we've
10      already talked about?
11          MR. COHEN: I just want to object. It's
12      not an improper -- not a proper re --
13      refreshment of recollection. Go ahead.
14  A. So do I have a question outstanding?
15  BY MR. BANKER:
16  Q. Yes. Did it -- did it do any -- did reviewing
17      this this morning do anything to refresh your
18      recollection?
19  A. Yes.
20  Q. Okay. And what did it -- what part of your
21      recollection did it refresh?
22  A. (Reading document.) Okay.
23  Q. Okay. I think what -- what I -- the question
24      that I had asked was what, if any, part of your
25      recollect -- did -- did reading that refresh

Q & A COURT REPORTERS, INC.
(715) 834-9812

1    any part of your recollection?
2    A.  It just confirmed my recollection.
3    Q.  Okay.  Showing you what's been marked --
4        MR. BANKER:  Or actually we haven't done
5    it yet.
6        (Exhibit 3 marked for identification.)
7    BY MR. BANKER:
8    Q.  Showing you what's been marked for
9        identification as Exhibit 3.  Have you seen
10       this document before?
11   A.  No, I haven't.
12   Q.  Okay.  I'll represent to you that it was a
13       document produced in this lawsuit by Union
14       Pacific in response to written requests.  I
15       interpret it to be GPS data regarding a PTI
16       vehicle.  But I take it you don't understand it
17       to be that?
18   A.  I assume that's what it is.
19   Q.  Do you -- there's a -- there's a -- on Page 1
20       of Exhibit 3 there's a Mobile Device where it
21       says 419-C15381.  Do you see that?
22   A.  Yes.
23   Q.  Do you know what the -- what, if any,
24       designation the GPS device in the PTI vehicle
25       had?

1    A.  No.
2    Q.  Was there another PTI vehicle that was in close
3        proximity to you on August 12th, 2017, that was
4        driving alongside you?
5    A.  Not driving alongside me, no, but --
6    Q.  Okay.
7    A.  -- we may have passed each other.
8    Q.  So I want you to assume for these questions
9        that this is some sort of report about the
10       movement of the PTI vehicle that --
11   A.  Okay.
12   Q.  -- that you were driving and ask some questions
13       based on that assumption.  You had said, I
14       believe, that you thought you started work at
15       about 6 o'clock in the morning on August 12th,
16       2017.
17   A.  Right.
18   Q.  And if you go to Page 4 of Exhibit 3, between
19       the fourth row and the fifth row this vehicle
20       that is reporting data here appears to be
21       parked for 9 hours and 37 minutes, from 5:30 in
22       the morning until 3 o'clock in the afternoon in
23       Altoona.
24   A.  Okay.
25   Q.  Do you know whether you had operated more than

1    one PTI vehicle on August 12th, 2017?
2    A.  No recollection.  Very rarely did you switch
3        vans for any other reason than a flat tire or
4        your -- I don't know.
5    Q.  So your practice was to be assigned a vehicle
6        for a shift and --
7    A.  Yes.
8    Q.  -- continue driving it --
9    A.  Yes.
10   Q.  -- throughout the day?  Do you recall whether
11       there was -- that you didn't do any driving
12       that day, August 12th, 2017, until 3 o'clock in
13       the afternoon?
14   A.  No, I don't.  See --
15   Q.  Would that have ever happened while you were
16       working for PTI?
17   A.  As a yard van you would sit next to a train and
18       wait for the crew to ask you to take them
19       somewhere else.
20   Q.  Sure.
21   A.  So I could be nine hours of sitting there.  So
22       I read a lot of good books.
23   Q.  Okay.  So that's -- that's a possible --
24   A.  It is possible, yes.
25   Q.  But you don't have a specific recollection --

1    A.  No.
2    Q.  -- sitting here today?  If we look at that
3        entry that is one, two, three, four -- the
4        fifth row, it looks like that at 3:07 p.m. this
5        vehicle was in Altoona, Wisconsin.
6    A.  Right.
7    Q.  And then if you -- if you read down, the
8        vehicle begins to move after 3:07 p.m. through
9        the end of Page 4 going on to Page 5 all the
10       way down to the third row of the bottom of Page
11       5 of Exhibit 3.  And the two entries that I
12       want to kind of have you hold in mind is the
13       entry at 3:07 p.m. where it starts in Altoona
14       and then it is making its way through Eau
15       Claire into Chippewa until it comes at
16       6:48 p.m. to a landmark in Norma.
17   A.  Is there a question?
18   Q.  Yeah.  Are you -- are you following what --
19       what I'm --
20   A.  I accept what I see.  I don't remember the
21       times.
22   Q.  Sure.  Seeing that this vehicle is reporting
23       data of being in Norma at 6:48 p.m., does that
24       do anything to refresh your recollection as to
25       the timelines that we talked --

18  (Pages 69 to 72)

1  A.  No.
2  Q.  -- about earlier?  Okay.  Would you have any
3      reason to disagree with a GPS report from the
4      PTI vehicle?
5  A.  No, I'll take it as it says.
6  Q.  Okay.  And then if we continue on through the
7      bottom of Page 5 going on to Page 6, you can
8      see that the vehicle is moving from Norma back
9      into Eau Claire, and it reaches a landmark in
10     Altoona at 7:15 p.m.
11 A.  Okay.
12 Q.  Do you see that?
13 A.  Yes.
14 Q.  Does that do anything to refresh your
15     recollection as to the time?
16 A.  I accept the times.  I just...
17 Q.  Okay.  And then if we go on to Page 7, and the
18     last entry there shows the vehicle in Altoona
19     at 8:53 p.m. where it's then parked for three
20     hours and six minutes.  Do you see that?
21 A.  Um-hum.
22 Q.  Does that do anything to refresh your
23     recollection of the timeline?
24 A.  What it's helping me recollect is that the time
25     of day was a lot later than what I thought --

1      remembered.
2  Q.  Sure.
3  A.  But I -- it also brings back to my mind that
4      when I got home probably around 9, after 9
5      p.m., that I thought, Hey, that's -- that's a
6      long day.
7  Q.  Sure.  Because you had started at 6 o'clock in
8      the morning?
9  A.  Right.
10 Q.  How long did your shifts usually last?
11 A.  Eight hours.
12 Q.  Eight hours.  So --
13 A.  On the weekends they may have been 12, or some
14     of the day shift may have been 12 hours.
15 Q.  Okay.  So a 12-hour day was -- was within the
16     realm of possibility?
17 A.  Yes.
18        (Exhibit 4 marked for identification.)
19 BY MR. BANKER:
20 Q.  Showing you what's been marked for
21     identification as Exhibit 4.
22 A.  Very out-of-date.
23 Q.  So --
24 A.  Out-of-date.
25 Q.  Out-of-date.  Okay.  What -- well, first of

1      all, what are we -- what are we looking at
2      here?
3  A.  These are the tracks through the Altoona yard
4      in Altoona.
5  Q.  Okay.  Have you ever seen a document like this
6      before?
7  A.  Oh, yes.
8  Q.  When you say "very out-of-date" --
9  A.  Well, I might be wrong too.  I may be jumping
10     the gun because I see the -- the new tracks
11     also, but I thought there were more new tracks
12     than this is showing.
13 Q.  Okay.  What I -- and this maybe isn't the best
14     document to do it, but I wanted to sort of ask
15     you are you able to use this Exhibit 4 to
16     orient us to when you mentioned the east end
17     and the west end of the yard?
18 A.  Absolutely.
19 Q.  Okay.
20 A.  Except the distances shown are not real.
21 Q.  Okay.  So this isn't necessarily to scale.
22 A.  Not to scale, no.
23 Q.  But -- so using Exhibit 4 when you mentioned
24     that the train had come back from Norma into
25     Altoona --

1  A.  Right.
2  Q.  -- where -- where would you have been on this
3      Exhibit 4 track chart?
4  A.  Probably Track 2 at the west end.
5  Q.  Okay.
6  A.  Mile Marker 90.
7  Q.  And could you make a mark of some sort.
8      Let's -- let's use a 1 with a circle around it
9      --
10 A.  Okay.
11 Q.  -- to represent the point you were at when the
12     train came back from Norma to Altoona.
13 A.  Okay.  (Indicating.)
14 Q.  And then when you said you had to go to the
15     west end of the
16 A.  East end.
17 Q.  -- yard --
18 A.  This is the west end (indicating).
19 Q.  I'm sorry.  I got that --
20 A.  Okay.
21 Q.  That's -- that's -- that's the confusing part.
22     So we're starting on the west end coming back
23     from Norma to Altoona.
24 A.  Um-hum.
25 Q.  That's what you've marked as 1, that's where

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 77

1    you first --
2    A.  Yes.
3    Q.  -- were with the van?  Then you moved to the
4        west end of the yard.  Are you able to make a
5        mark on Exhibit 4 to indicate generally where
6        you were when you went to the west end of the
7        yard?
8    A.  We're coming from the west end.
9    Q.  I'm sorry.  I did it again.
10   A.  That's all right.
11   Q.  On the east end of the yard.
12   A.  The other left.
13   Q.  Yes, the other left.
14   A.  I -- when I used to teach -- just a quick
15       giggle -- I would say on Page 41 at top left on
16       corner you'll see such and such a signal, and
17       everybody is over on the right-hand side.  I'd
18       say, The other left.  Okay.  So you're asking
19       me where the depot and the shanty are.  You can
20       see the depot --
21   Q.  Yeah.
22   A.  -- kind of in the bottom of the -- center of
23       the bottom.
24   Q.  Yes.
25   A.  The shanty would be -- I would put it up

Page 78

1    around -- I would put it up around 12.
2    Q.  Okay.
3    A.  From the east end.
4    Q.  So why don't you mark that with a 2 and a
5        circle.
6    A.  (Indicating.)  I just did.
7    Q.  Okay.
8    A.  That's a guess, by the way.
9    Q.  Sure.  And then the third place that you
10       mentioned was when you went to the depot after
11       you were at the shanty.
12   A.  Right.
13   Q.  And am I right that the porta potty is at the
14       shanty?
15   A.  Yes.
16   Q.  So the third place you went was the depot?
17   A.  Right.
18   Q.  And you mentioned that being on this document.
19       Could you just mark that with a 3 and a circle.
20   A.  Well, it's not on this document.
21   Q.  The depot?
22   A.  Well, yeah, this -- this is the depot
23       (indicating).  Excuse me.  So what you had to
24       do was go outside the yard.
25   Q.  Okay.

Page 79

1    A.  Public roads for at least a half a mile, then
2        cross the train tracks on the bridge, and then
3        come back on the south side of the tracks --
4    Q.  Okay.
5    A.  -- to the depot.
6    Q.  And none of the public roads are reflected;
7        this is just a track --
8    A.  No.
9    Q.  -- chart; it doesn't show the roads?
10   A.  Yeah.
11   Q.  But as to the location, just for orientation
12       purposes, the depot, the third place that you
13       went to, could you mark that with a 3 and
14       circle it.
15   A.  (Indicating.)
16       MR. BANKER:  Okay.
17       THE WITNESS:  Gadzooks.  See what happens
18   when you get fat?
19       MR. BANKER:  Why don't we just take, like,
20   a quick five-minute break.  I want to review my
21   notes, make sure I don't have any other
22   questions.
23       THE WITNESS:  Sure.
24       MR. BANKER:  And then I will wrap up.
25       VIDEOGRAPHER:  This marks the end of Media

Page 80

1    No. 1 in the deposition of Chaz Lux.  We are
2    off the record at 3:01.
3        (A break was taken.)
4        VIDEOGRAPHER:  This is the beginning of
5    Media No. 2 in the deposition of Chaz Lux.  We
6    are back on the record at 3:08.
7    BY MR. BANKER:
8    Q.  So I just -- one last question, I guess.  You
9        know, looking back on this incident of
10       August 12th, 2017, is there anything that you
11       wish you had done differently that day?
12   A.  No.
13       MR. BANKER:  Okay.  I don't have any
14   further questions at this time.
15       THE WITNESS:  Okay.
16       MR. HAYDEN:  Want me to go?
17       MR. COHEN:  (Indicating.)
18       MR. HAYDEN:  Okay.
19   BY MR. HAYDEN:
20   Q.  Sir, I'm Tom Hayden.  I represent the Union
21       Pacific Railroad in this lawsuit.  I have some
22       questions for you.  Let's look at Exhibit 3,
23       the GPS data --
24   A.  Um-hum.
25   Q.  -- if you -- if you could.  You know what?

20 (Pages 77 to 80)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 81

1    Before that, there's a couple things that I
2    wrote down that I wasn't clear of just about
3    general stuff as you went through before I get
4    into those documents.  Very early on you said
5    that in preparation for the case you gave
6    statements, and you mentioned Jamie Lukehart
7    here, who is with us, and Charlie Schulz.  And
8    I think I heard you say you gave two statements
9    to Mr. Schulz and then to Ms. Lukehart Hobbs.
10 A.  Right.
11 Q.  Can you tell us -- and we've talked about one
12    of the statements you gave to Mr. Schulz, the
13    handwritten one that's Exhibit 1; is that
14    correct?
15 A.  Um-hum.
16 Q.  By the way, you didn't type that up; right?
17 A.  No.
18 Q.  Mr. Schulz did?
19 A.  I assume so.
20 Q.  Presumably.  When did that take place that
21    you -- well, we have the date of it that you
22    signed it, but is that the date that the
23    document was prepared, if you know?
24 A.  It's one of the two meetings that took place at
25    Perkins over a cup of coffee and...

Page 82

1 Q.  Perkins, the fine dining establishment here --
2 A.  Right.
3 Q.  -- in town?  Okay.
4 A.  Yes.
5 Q.  So let's -- let's look at Exhibit 1 then again
6    just to get the dates so we're clear -- we're
7    both clear.  This is signed by you on
8    September 6th of 2017?
9 A.  Yep.
10 Q.  Is what happened that you met Mr. Schulz maybe
11    some days before that and --
12 A.  It would have to be.
13 Q.  -- and then he came back and met you again with
14    this --
15 A.  Right.
16 Q.  -- handwritten --
17 A.  Right.
18 Q.  -- document that you then signed?
19 A.  Yes.
20 Q.  Is that -- I don't want to put words in your
21    mouth.  Is that --
22 A.  Yes.
23 Q.  -- how that happened?
24 A.  That's how I remember it, yes.
25 Q.  When did the first meeting with Mr. Schulz

Page 83

1    occur?
2 A.  Now you're asking.
3 Q.  Couple of days?  Weeks?
4 A.  I think maybe one to four weeks between him
5    giving this back.
6 Q.  Okay.  When you -- where did you meet
7    Mr. Schulz the first time?
8 A.  At Perkins.
9 Q.  And the second time?
10 A.  Perkins.
11 Q.  Okay.  And the first time that you met
12    Mr. Schulz, was that recorded, the --
13 A.  Not as far as I know.  I -- not as far as I
14    remember.
15 Q.  Was there --
16 A.  Neither of them were recorded.
17 Q.  Was there anybody else with you when you met
18    with Mr. Schulz at Perkins the first time?
19 A.  I don't believe on the first time.  My wife
20    came with me one of those two meetings.
21 Q.  Can't remember which one it was?
22 A.  No.
23 Q.  Was there ever anyone other than Mr. Schulz,
24    your wife, and yourself sitting down at Perkins
25    discussing the events at issue here?

Page 84

1 A.  I'm trying to think if we met Neil there at a
2    different time or he was present on the first
3    meeting.  I think he may have been present on
4    the first meeting.
5 Q.  By Neil you mean Neil Franchuk?
6 A.  Yes.
7 Q.  So your best recollection here today is that
8    you -- that Mr. Franchuk and Mr. Schulz met you
9    at the Perkins?
10 A.  Right.  I think so.  That was the case, yeah.
11 Q.  And how did you -- how did you know to meet at
12    the Perkins?  How were the arrangements made?
13 A.  Well, they asked where -- where I preferred,
14    and I said, Well, Perkins is a nice, good cup
15    of coffee.
16 Q.  At a good price.
17 A.  At a good price?  No, not-so-good price.
18 Q.  Did somebody reach out to you by phone?
19 A.  Yes.
20 Q.  Who did -- who did that?
21 A.  Charlie.
22 Q.  Had you known Charlie Schulz before --
23 A.  No.
24 Q.  -- he called you?  And he introduced himself as
25    somebody working for Mr. LeNeave's law firm?

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 85

1    A.  I believe so.
2    Q.  Okay.  And did you talk to Neil Franchuk before
3        you sat down with him --
4    A.  No.
5    Q.  -- and Mr. Schulz?  And is there anybody else
6        now who you can recall being with you when you
7        sat with those two --
8    A.  Absolutely not.
9    Q.  -- fellows?  Was anything written down?  Any
10       notes taken by you or Mr. Franchuk or Mr.
11       Schulz?
12   A.  I know I and Neil did not.  I think Charlie
13       took a lot of notes.
14   Q.  Did you bring any documents or materials or
15       information to the meeting?
16   A.  No.
17   Q.  Did Mr. Franchuk bring anything to the meeting?
18   A.  No.
19   Q.  Did you understand the purposes of that meeting
20       to be ultimately a statement being prepared on
21       your behalf?
22   A.  I don't think that was emphasized.  I think it
23       was simply put your heads together and come up
24       with the -- a story.
25   Q.  A story.  Okay.  Did you say a good story?  A

Page 86

1        story?
2    A.  The story.
3    Q.  Okay.  And so you relied in part on
4        Mr. Franchuk's recollection in sharing with
5        Mr. Schulz the events as you --
6    A.  I believe I asked Neil to confirm my statement,
7        you know, to the question.
8    Q.  So would you -- would you view this sort of as
9        a group effort between you, Mr. Franchuk, and
10       Mr. Schulz to come up with the story?
11   A.  (Indicating.)
12   Q.  Is that correct?
13   A.  Recollect the incident, yes.
14   Q.  Okay.  And then after -- how -- about how long
15       did you guys spend together?
16   A.  About a half to one hour.
17   Q.  After that, did you -- did you then -- were you
18       then --
19   A.  We went our separate ways.
20   Q.  You went your separate ways.  All three of you?
21   A.  Um-hum.
22   Q.  When did you next hear from anybody, either
23       Neil or Mr. Schulz?
24   A.  I didn't hear from Neil.  I think I bumped into
25       Neil once.

Page 87

1    Q.  Whereabouts?
2    A.  In the yard as I was working.
3    Q.  Okay.  Did you speak to -- to Mr. Franchuk?
4    A.  Well, I asked him to confirm what I heard about
5        the UP guys telling me that Jake had died.
6    Q.  And he did confirm that?
7    A.  Yes.
8    Q.  And did -- do you recall any other
9        conversation -- or any other parts of that
10       conversation with Mr. Franchuk?
11   A.  Not really.
12   Q.  And then when did you next talk to Mr. Franchuk
13       after that chance meeting in the yard?
14   A.  Didn't.
15   Q.  Did you ride with Mr. Franchuk that day or just
16       saw him in the yard?
17   A.  He's part of the crew.  He's the engineer that
18       moved the train on which Jake was working.
19   Q.  I -- oh, yes.  I'm sorry.  I -- I -- I -- I
20       understood that.  But the day that you ran into
21       him after the first Perkins meeting, was he --
22       were you driving him anywhere or you just --
23   A.  No, I don't think so.  No.
24   Q.  I understand.  How about -- when did you next
25       see him again, Mr. --

Page 88

1    A.  I don't believe I did.
2    Q.  And then Mr. Schulz, when was your next
3        communication with him?
4    A.  Well, af -- he called again saying, I have the
5        written-up document, I want you to confirm and
6        sign.
7    Q.  Okay.  And -- and then you made arrangements to
8        meet him at the same Perkins?
9    A.  Yes.
10   Q.  And was Mr. Franchuk there that second time?
11   A.  No.
12   Q.  How long was that second meeting with
13       Mr. Schulz?
14   A.  Again, between a half to one hour.
15   Q.  And at any time prior to -- well, really at any
16       time prior to today, have you spoken with
17       lawyers at the law firm Mr. Schulz works?
18   A.  He called me Monday or Tuesday.  I don't know
19       what day it is today.
20   Q.  Of this --
21   A.  Thursday?
22   Q.  Of this week?
23   A.  Yeah.
24   Q.  Okay.
25   A.  Thirsty --

22  (Pages 85 to 88)

Page 89

```
 1              (Cross-talk.)
 2   A.    Thirsty Thursdays.  Okay.  So he called saying
 3         that the -- this would take place at my house,
 4         and I asked how many people, and I said, No, my
 5         wife is not well, and so he rearranged this
 6         location.
 7   BY MR. HAYDEN:
 8   Q.    Okay.  And was it just Mr. Schulz you talked to
 9         or anyone else?
10   A.    No, that's it.
11   Q.    Have you talked to anyone else at the firm that
12         Mr. Schulz works at?
13   A.    No.
14   Q.    Okay.  So you sat down at Perkins, and
15         Mr. Schulz showed you what's -- we -- now been
16         marked as Exhibit 1.  Is that the same --
17   A.    Right.
18   Q.    -- document he showed you?
19   A.    Right.
20   Q.    Did he show you a draft of this document, or
21         did he just show you as it appears now written
22         up?
23   A.    There may have been a draft on the first
24         meeting.  I'm not sure.  But in what I had
25         signed, I've explained to Mike that the stuff
```

Page 90

```
 1         that I have underlined are additions.
 2         They're -- I don't remember them being my
 3         words.
 4   Q.    Okay.
 5   A.    Because I -- I resent the implication that I
 6         should have been medically aware that this is a
 7         stroke.  There's no way.  I challenge anybody
 8         without any medical training to come up with
 9         that unless you are really familiar with stroke
10         symptoms.
11   Q.    And so you feel like Mr. Schulz put those words
12         on this paper, and you were compelled to sign
13         it?
14   A.    I wasn't compelled.  I was con -- convinced.
15   Q.    Okay.  Explain that for us.
16   A.    That's hard.  I -- I'm a sucker.  What can I
17         tell you?
18   Q.    Because you knew when you saw it drafted up in
19         this typed form that there were things in there
20         that you disagreed with that weren't your
21         words?
22   A.    That were not my words.  They were kind of
23         overemphasizing what I was saying, and --
24   Q.    Drawing --
25   A.    -- I didn't think there was a need for that.
```

Page 91

```
 1   Q.    He was drawing conclusions that were not your
 2         own; is that right?
 3   A.    Yeah.  For example, that I thought was clear
 4         signs of a stroke.  Absolutely not.  That's not
 5         my words.
 6   Q.    Well, let's go -- let's go through it in more
 7         detail.  But before we do that, you say that
 8         there was possibly a draft that was shown to
 9         you the first meeting at Perkins.  Is that your
10         recollection?
11   A.    I believe so.
12   Q.    Was it a typewritten draft like this?
13   A.    No, it was handwritten --
14   Q.    Handwritten?
15   A.    -- I believe, yeah.
16   Q.    Okay.  And that was not in your handwriting;
17         right?
18   A.    No.
19   Q.    And you never provided any handwriting or any
20         written notes or written statement or anything
21         like that --
22   A.    I don't believe so.
23   Q.    -- to Mr. Schulz; is that correct?
24   A.    Yes.
25   Q.    Okay.  All right.  Let's take a look then at
```

Page 92

```
 1         Exhibit 1.  Let's look at the third paragraph
 2         down where the paragraph starts, At Altoona,
 3         the train stopped at the Kennedy Road Crossing.
 4         Do you see that, sir?
 5   A.    Yes.
 6   Q.    Second sentence -- sentence goes on to say, The
 7         train pulled into one of the yard tracks, and I
 8         drove Jake to the rear of the train.  Do you
 9         see that, sir?
10   A.    Right.
11   Q.    And you testified about that already today;
12         right?
13   A.    Yes.
14   Q.    But the next thing that happened, according to
15         what you testified to earlier today, was that
16         Mr. Tischer then went on to work, and I think
17         you said did a lot of work there at that point
18         after you dropped him off.
19   A.    A lot.  Some work.
20   Q.    Okay.  He had walked the length of the train
21         from the east end to --
22   A.    At least half the length of the train.
23   Q.    From the west end -- starting on the west end
24         towards the east end?
25   A.    Right.
```

23 (Pages 89 to 92)

Page 93

1 Q.  And if we look at Exhibit 3, sir, that's the
2    GPS data.  If you turn now to Page 6 of that
3    document, as Mr. Banker went through with you
4    at 7:15 this -- this document, the GPS data,
5    says that you arrived back at that landmark
6    Altoona and parked for six minutes.  Do you see
7    that?
8 A.  Yes.
9 Q.  Now, was that likely to be the -- that moment
10   when you arrived back at Altoona on the west
11   end of the yard?
12 A.  Yes.
13 Q.  And then the six minutes of parking would have
14   been some initial work that Mr. Tischer
15   performed as you waited for him?
16 A.  I would say so, yes.
17 Q.  And then at 7:29 there's a 16-minute time
18   period during which you're parked, and that too
19   would have been some additional work that Mr.
20   Tischer was performing from the west end to the
21   east --
22 A.  Yes.
23 Q.  -- end of that yard?  Work that you observed
24   him doing and --
25 A.  Yes.

Page 94

1 Q.  -- and him --
2 A.  With no problems.
3 Q.  With no problems.  And then 8 -- 8:07 you're
4    parked -- 8:07 p.m. you're parked for one
5    minute -- one minute, the time period.  What
6    would that have been, sir?  Remember in the
7    sequence?
8 A.  Typically when you're assisting sitting next to
9    a train that is parked being tested or
10   disassembled or assembled, whatever, you're
11   just waiting for them to tell you what -- which
12   end of the train to go to.
13 Q.  Sure.  So that was just normal waiting time
14   during --
15 A.  Sure.
16 Q.  -- Mr. Tischer performing his work?
17 A.  Right.
18 Q.  With no problems; is that correct?
19 A.  Yes.
20 Q.  And the next time you're parked is at 8:15, and
21   this is for a 20-minute period of time.  Do you
22   see that one there, sir, on --
23 A.  Yes.
24 Q.  -- Page 6?  And from what you testified to
25   already today, that would be that time period

Page 95

1    when you were in your truck -- in your van
2    observing Mr. Marvin, Mr. Tischer, and Mr.
3    Franchuk having a conversation some 20 yards
4    away from your van; is that -- is that fair?
5 A.  I have no proof, so I -- I'm not sure.
6 Q.  Okay.  But that's -- that's the only -- if
7    you -- if you look forward with me beyond the
8    one-minute park -- parking time at 8:07, at
9    8:15 there's a 20-minute parking time, at
10   8:38 p.m. there's another one-minute stop, and
11   then at 8:49 there's a -- another one-minute
12   stop.  Do you see all those, sir?
13 A.  Yes.
14 Q.  Culminating in the three-hour-and-six-minute
15   parking commencing at 8:53 p.m.; is that -- is
16   that --
17 A.  Yes.
18 Q.  -- true?
19 A.  Yes.
20 Q.  Okay.  So then if the one-minute stop at 8:07
21   is part of the normal work that you described,
22   you have no reason to doubt that it's at 8:15
23   p.m. during those -- that 20-minute stop that
24   the conversation you observed among Mr. Marvin,
25   Mr. Franchuk, and Mr. Tischer occurs; correct?

Page 96

1 A.  I guess so, yes.
2 Q.  Because it was longer than one minute?
3 A.  Right.
4 Q.  And so probably most likely it was in that
5    20-minute period; correct?
6 A.  Right.
7 Q.  Okay.  And that's also during the time that he
8    was -- he, Mr. Tischer, was using the restroom
9    would have been in that same period of time?
10 A.  Yes.
11 Q.  Or the porta potty, just so we're using the
12   same language; is that correct?
13 A.  Um-hum.
14 Q.  Okay.  So now back to Exhibit No. -- well, now
15   while we're looking at this, let's just finish
16   this thing.  We can put this aside.  So then at
17   8:38 -- or at -- let's go back even further.
18   At 8:35, following the 20-minute parking or
19   parked period, you then recommence traveling
20   between 8:35 and 8:38 p.m.  Do you see that?
21 A.  Yes.
22 Q.  Then there's a one-minute stop.  Do you see
23   that?
24 A.  I think that's where I stopped next to the post
25   office to let him finish his --

24  (Pages 93 to 96)

Page 97

1  Q.  Vomit --
2  A.  -- vomiting, yeah.
3  Q.  Okay.  And then that would mean -- that would
4      put us back in the yard -- I'm sorry.  That
5      would put us at the depot, according to this
6      document, at 8:49 p.m., is that correct, or is
7      that --
8  A.  Well, that shows one minute again, so...
9  Q.  And that wouldn't be long enough for you to
10     have parked at the depot; correct?
11 A.  I -- there -- so there's two one-minute --
12 Q.  Did Mr. --
13 A.  -- parks --
14 Q.  Dr. Mr. --
15 A.  -- 10 minutes apart.
16 Q.  Did you stop Mr. -- did you stop for Mr.
17     Tischer to vomit twice?
18 A.  No.
19 Q.  Okay.
20 A.  So what I'm guessing is that the second one
21     minute I had switched the van off having got
22     back to the depot and then went and checked for
23     people to help us in the depot.
24 Q.  But that would have taken longer than one
25     minute or not because at 8:50 there shows

Page 98

1      movement again.
2  A.  True.  I don't understand that.
3  Q.  So most -- most likely it wasn't until 8:53
4      that you arrived and parked your car at the
5      depot where you then, as it says there, powered
6      off; is that correct?
7  A.  Yes, that seems logical.  Although why there
8      were two one-minute parking is -- is -- doesn't
9      make sense.
10 Q.  But putting that aside, you know that your time
11     at the depot was longer than one minute?
12 A.  Absolutely.
13 Q.  And your vehicle ended up staying there in its
14     parked position at the depot after Mr. Tischer
15     was attended to and after he was taken to the
16     hospital from 8:53 onward for three hours and
17     six minutes; is that correct?
18 A.  Um-hum.
19 Q.  Because you left -- you left the vehicle there?
20 A.  Yes.
21 Q.  When you -- when you finally arrived at the
22     depot and then described to us --
23 A.  I would have had to move the -- the vehicle
24     from outside the depot to either the parking
25     spot outside the depot or just down the road in

Page 99

1      the depot's parking lot.  So that --
2  Q.  Where it then rested or stayed?
3  A.  Well, I was done.  I walked away.  So I don't
4      know if they had another driver taking it over
5      or it sat for a while.
6  Q.  Let me be perfectly clear then or let us be
7      perfectly clear.  When you left the vehicle at
8      the depot, where was it parked?
9  A.  As I said, either if there was another driver
10     coming to take the -- take over the shift in
11     the van, it would be just outside the depot's
12     front door or 50 yards down in the parking lot.
13 Q.  Just can't remember?
14 A.  Can't remember.
15 Q.  And it was just outside the depot's front door
16     where you testified earlier that Jake had
17     fallen next to the vehicle, and you and Mr.
18     Marvin were attempting to move him or to get
19     him up?
20 A.  True.  But then across the parking lot from
21     the -- from the front door where Jake fell out
22     is where I would switch or out of the van.  You
23     with me?
24 Q.  I am.  So is it possible -- is it still
25     possible that that one minute was you arriving

Page 100

1      at the depot's front door, you getting out,
2      going in?
3  A.  I would have switched it off while I was going
4      inside the office to make sure that he didn't
5      do anything silly and, you know, I could get
6      somebody to help.
7  Q.  And that's why -- because that 8:53 parking
8      period includes the notation that the ILM was
9      powered off, that means that it's most likely
10     that at 8:53 is when you arrived at the depot's
11     front door, turned it off, and went inside for
12     help; is that correct?
13 A.  Possible.
14 Q.  Okay.  But you have no reason to -- you have no
15     other options on this printout of GPS data that
16     makes sense other than that 8:53 p.m. time
17     period?
18 A.  I -- I think so, yes.
19 Q.  That's consistent with what you would have
20     done; you would have, quote/unquote, powered
21     off, gone in to look for help, etc. --
22 A.  Right.
23 Q.  -- correct?
24 A.  Right.
25 Q.  Okay.  So now let's go back to Exhibit No. 1,

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 101

1  the handwritten -- or I'm sorry -- the
2  typewritten statement. The fourth paragraph,
3  sir, begins, I was concerned because Jake had
4  difficulty getting out of the seat belt and was
5  limping. This was very unusual for Jake.
6  You -- to the best of your recollection, you
7  had only worked with him one other time prior
8  to this day --
9  A. Right.
10 Q. -- correct?
11 A. But I also worked with him for hours in Norma
12    and when I -- when they came back to the
13    Altoona yard.
14 Q. On this same day?
15 A. On this same day. There was no indication of
16    limping or difficulties.
17 Q. So when you're -- when you say, This was very
18    unusual for Jake, in this Exhibit 1, you're
19    meaning that it was unusual for him on that day
20    as what you observed that day?
21 A. Correct.
22 Q. Relative to what he had --
23 A. Yes.
24 Q. -- been earlier in the day; is that fair?
25 A. Yes.

Page 102

1  Q. Let's see. The one, two, three more sentences
2     down there, the one that -- in that paragraph
3     begins, In my opinion, there was something
4     wrong with Jake's thinking process. Do you see
5     that --
6  A. Not yet.
7  Q. -- statement?
8  A. Not yet.
9  Q. Sorry. It's one, two, three --
10 A. Now, I do. Yes.
11 Q. -- four lines down.
12 A. Okay. Yes.
13 Q. Sir, is that -- is that a sentence that's not
14    your words, that --
15 A. Yes.
16 Q. Because that was not your opinion, and it's not
17    your opinion now?
18 A. True.
19 Q. The next sentence says, He seemed confused, not
20    making good decisions, weakness in his left
21    hand and limping. That too isn't your
22    language, isn't it?
23 A. Well, he didn't make any decisions. He was
24    just ready to go back to Norma, if asked.
25 Q. And you didn't -- you didn't -- let me just ask

Page 103

1  it a different way based on what's been written
2  here. And, by the way, this sentence is not
3  your words; right?
4  A. No.
5  Q. Okay. But just looking at it for what it is,
6     when you say -- or when this document says, He
7     seemed confused, you testified earlier that at
8     no point you -- that Mr. Tischer exhibited any
9     confusion or any lack of coherence in his --
10 A. No. He was --
11 Q. -- communication.
12 A. -- pretty quiet and ready to do as told.
13 Q. Okay. And then the next statement or phrase,
14    Is not making good decisions. Same thing, you
15    have no reason to base that on --
16 A. No.
17 Q. -- or no -- because he --
18 A. Not my words.
19 Q. Yeah, not your words. And the weakness in his
20    left hand and limping were things that you at
21    that point hadn't observed; correct?
22 A. Well, I started observing as he was coming back
23    out of the porta potty.
24 Q. Out of the porta potty. Okay. You said that
25    earlier. Then you go on to say -- or this

Page 104

1  document goes on to say, He was clearly not
2  himself. Those again -- that's, again, not
3  your words; right?
4  A. Not my words, no.
5  Q. Okay. And then the next sentence says, I heard
6     the trainmaster in -- instruct Jake to go back.
7     Now, that's not your words because you
8     testified earlier that you did not hear Mr.
9     Marvin say anything; is that correct?
10 A. Where are you?
11 Q. The next sentence. It starts, I heard the
12    trainmaster instruct Jake to go back, comma, I
13    immediately waved both hands --
14 A. Well, that is true. I heard the trainmaster
15    and whoever else tell me that they wanted the
16    crew to go back to Norma.
17 Q. Well, let's -- let's be clear about that.
18    Earlier on today you testified that what
19    happened was that Mr. Tischer and Mr. Franchuk
20    came back to the van. And, again, you --
21 A. Um-hum.
22 Q. -- you had not left the van; correct?
23 A. No.
24 Q. And as you testified to Mr. Banker earlier,
25    the -- that conversation was some 20 --

26 (Pages 101 to 104)

Page 105

```
1    20 yards away from the front of your van; is
2    that correct?
3  A.  Yes.
4  Q.  So you're looking through the windshield at the
5    conversation that --
6  A.  Well, I got the open window, and they're over
7    there.
8  Q.  Okay.  But earlier you testified that it was
9    Mr. Tischer and Mr. Franchuk who actually came
10   back and said about going back to Norma.
11 A.  Right.
12 Q.  You did not hear that from Mr. Marvin's word --
13   mouth; correct?
14 A.  I'm not sure.
15 Q.  Okay.  So that would be an incorrect statement
16   to have that say emphatically, I heard the
17   trainmaster instruct Jake to go back, because
18   you did not hear that?  You don't recall
19   hearing that; correct?
20 A.  Correct.
21 Q.  Then there's a sentence that begins, There is
22   something wrong -- I'm sorry.  Yeah.  There is
23   something wrong with Jake.  Next sentence, The
24   engineer agreed with me.  That's Mr. Franchuk?
25 A.  Yes.
```

Page 106

```
1  Q.  Then the next sentence says, Jake was not fit
2    for duty and needed medical treatment.  I think
3    you --
4  A.  That's not -- not mine.
5  Q.  Took the words out of my mouth.  That's one you
6    identified earlier as just a statement that is
7    not yours, and that's not correct, as you sit
8    here today -- strike that.  It's not a correct
9    --
10 A.  It's not my words.
11 Q.  It's not your -- your -- your words?
12 A.  It's open to debate whether he needed medical
13   attent -- attention or not.
14 Q.  So you don't adopt that statement as your own;
15   correct?
16 A.  No.
17 Q.  And you don't -- and, therefore, that is not an
18   opinion you hold -- held then and nor is it one
19   you hold today; is that correct?
20 A.  It is correct to the time when I found him on
21   the floor.
22 Q.  But not at the time where it appears in this
23   document?
24 A.  Right.
25 Q.  Okay.  Because if that was what you believed at
```

Page 107

```
1    that -- that time that it appears in this
2    document, you would have called 911 yourself?
3  A.  I would have called my manager if -- I would
4    have asked Marvin --
5  Q.  Yeah.
6  A.  -- do you want no medical attention, or do --
7    or are you insistent that he go back.  Because
8    that's why I shook my hands saying, Do not send
9    him back to Norma.
10 Q.  But you didn't say -- just to be clear, you
11   didn't say to Mr. Marvin that Mr. -- at this
12   point in time in this document as we are in the
13   third -- fourth paragraph here, at that point
14   after Mr. Franchuk and Mr. Tischer came back to
15   tell you they're going -- they -- they needed
16   to go back to Norma, you waved your hands no.
17   You did not, to be clear, say to Mr. Marvin
18   that, This man needs medical attention;
19   correct?
20 A.  No.  What I said was, He is not well.
21 Q.  Okay.  You didn't -- and you said you hollered
22   the word "no;" correct?
23 A.  True.
24 Q.  But you didn't holler to Mr. Marvin to call
25   911; correct?
```

Page 108

```
1  A.  No.
2  Q.  You didn't holler or even speak at any voice to
3    Mr. Franchuk to call 911; correct?
4  A.  No.
5  Q.  And you didn't -- and you didn't call 911
6    yourself; is that --
7  A.  No.
8  Q.  Okay.  And you could have because you had a
9    radio?
10 A.  I shouldn't have.
11 Q.  That's --
12 A.  In my way of thinking that decision was
13   Marvin's.
14 Q.  Okay.
15 A.  No one else's.
16 Q.  Nevertheless, you did not tell Mr. Marvin, ask
17   Mr. Marvin, or instruct Mr. --
18 A.  Anymore than, No, he's not well, do not send
19   him to Norma.
20 Q.  Okay.  Then the next sentence says, The
21   trainmaster convinced Jake to just sit down and
22   have a bottle of water.  That's not your words
23   either; correct?
24 A.  I don't remember.
25 Q.  The next sentence says, Jake could not use his
```

27 (Pages 105 to 108)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 109

```
 1    left hand to open the bottle and needed help to
 2    unscrew the lid.  That's not -- those are not
 3    your words because you were not in the shanty
 4    at any time; correct?
 5  A.  Correct.
 6  Q.  And that's where the -- the bottle of water was
 7    allegedly opened; correct?
 8  A.  Yes.
 9  Q.  Next sentence, Jake should have been taken to
10    the hospital at that point.  Those aren't your
11    words either?
12  A.  Nope.
13  Q.  Because certainly if you believed that at the
14    time, you would have spoken up and said not
15    just that he was not well, you would have said,
16    He needs to go to the hospital.  There's two
17    different things; right?
18  A.  He needs a doctor's attention.
19  Q.  Yeah.  And you didn't say that at the time?
20  A.  No.
21  Q.  Because you didn't believe he needed -- you
22    just knew he was -- you had a feeling that he
23    was sick?
24  A.  Yes.
25  Q.  But not necessarily that he needed to go to a
```

Page 110

```
 1    doctor or a hospital?
 2  A.  I have no medical training, so hence no
 3    decision.
 4  Q.  Okay.  Then it goes on to say, that sentence,
 5    Jake just sat around waiting for a decision
 6    from the trainmaster.  Those aren't your words
 7    either; correct?
 8  A.  Well, that's what happened, so they might be.
 9  Q.  Well, you observed -- in fairness, you observed
10    Mr. Tischer resting until, as you testified,
11    what happened next; is that correct?
12  A.  Yes.
13  Q.  But you don't know whether there was a decision
14    pending from Mr. Marvin; you don't know that
15    because you weren't communicating directly with
16    Mr. Marvin?
17  A.  Well, we were waiting for what to do, do we go
18    to Norma or what.
19  Q.  Then next it says, The trainmaster refused to
20    get Jake treatment and ignored his symptoms,
21    that I thought was clear signs of -- of a
22    stroke.  That entire sentence, I think as you
23    pointed out earlier, is not your words, and
24    it's not something you agree with; is that
25    correct?
```

Page 111

```
 1  A.  Well, from the second half of the sentence that
 2    I thought was clear sign of stroke is not me.
 3  Q.  Well, and -- okay.  And then let's look at the
 4    first part of the sentence, The trainmaster
 5    refused to get treat -- get Jake treatment.
 6  A.  I -- I wouldn't say refused to get, and I
 7    wouldn't have used that expression.
 8  Q.  So it's --
 9  A.  I would have said, We've been waiting for quite
10    a while on Marvin to make a decision.
11  Q.  Okay.  And you -- again, you had not spoken to
12    Mr. Marvin nor had you suggested to Mr. Marvin
13    that he, that -- that he, Mr. Tischer, should
14    receive medical treatment; correct?
15  A.  I believe so.
16  Q.  And then you say that Mr. -- moving on in that
17    sentence that Mr. Marvin, the trainmaster,
18    ignored Mr. Tischer's symptoms.  You -- you
19    don't know that?
20  A.  I don't know that.  That's not my words.
21  Q.  And that --
22  A.  He just took his time making a -- a decision.
23  Q.  And how much time?  You don't know?
24  A.  What seems to me no more than five to ten
25    minutes, max.  But, again, time is relative,
```

Page 112

```
 1    so...
 2  Q.  And having not had any conversations with Mr.
 3    Marvin, you do not know what was in his head or
 4    what he was discussing with --
 5  A.  Well --
 6  Q.  -- others, or what he was --
 7  A.  Well, remember, he was surrounded by several
 8    other crew members from other trains.
 9  Q.  Right.
10  A.  So --
11  Q.  Whose names you don't know?
12  A.  I don't know.
13  Q.  Okay.  Then that last short sentence in that
14    paragraph says, He wanted the work done.  I
15    assume you meant that's --
16  A.  Jake was ready to go and do whatever he was
17    asked.
18  Q.  So that's -- that sentence is referring to Mr.
19    Tischer, that --
20  A.  Yes.
21  Q.  -- want -- wanting to do the work; is that
22    correct?
23  A.  Yes.  But I wouldn't use the word "wanted."  I
24    would say -- I would say that he was ready to
25    be given a task and -- and take it up on it --
```

28 (Pages 109 to 112)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 113

1  Q.  Okay.
2  A.  -- take up on it.
3  Q.  All right.  Just a few more on this, sir.  The
4     next paragraph starts, Eventually, the
5     trainmaster told me to drive Jake to the depot.
6     That's inconsistent with what you testified to
7     earlier today.  Mr. Marvin did not specifically
8     ask you; it was Mr. Franchuk who relayed that
9     information to you; correct?
10  A.  It was a relayed information, yes.
11  Q.  You hand -- you -- you indicated that any use
12     of the word "eventually" in this document is --
13     is, I think you said, generally meant to be a
14     couple of minutes?
15  A.  Exactly.
16  Q.  The -- the -- the next page, sir, Page 2 of
17     Exhibit 1, the first full paragraph begins, To
18     me, Jake needed medical treatment early on.
19     That's -- those aren't your words?
20  A.  No.
21  Q.  You didn't believe that now, and it's not an
22     opinion looking back that you would have
23     adopted at that time; correct?
24  A.  Well, this is where the -- this is not neither
25     black or white, you know.  When you're seeing

Page 114

1     someone stumble and having difficulty with his
2     left side, I -- I -- I offer that to debate
3     because I am not going to make a decision that
4     he needs medical treatment earlier on.
5  Q.  Or at any time because that's --
6  A.  Or at any time.
7  Q.  -- because that's not something that you --
8  A.  I'm not trained for it.
9  Q.  And it's not something you even thought of at
10     the time?
11  A.  No.
12  Q.  So those aren't your words, and they should be
13     stricken from this document?
14  A.  I think so.
15  Q.  Then the next sentence, same thing, The train
16     crew were trying to get the trainmaster to get
17     him treatment, but the trainmaster was
18     concerned about finishing the job.  That's not
19     your sentence?  Those aren't your words;
20     correct?
21  A.  Seemingly that's what was happening, but --
22  Q.  You don't know that for -- for --
23  A.  I don't know for sure.
24  Q.  You don't know any of that for certain in that
25     sentence; correct?  Correct?

Page 115

1  A.  Correct.
2  Q.  Next sentence, Jake showed signs of a serious
3     medical problem when the train arrived at
4     Altoona.  Well, that's not --
5  A.  That's not true.
6  Q.  -- that's not true?
7  A.  No.
8  Q.  And it goes on to say, And should have been
9     taken to the hospital or at least an ambulance
10     should have been called.  Again, not true as --
11  A.  Not my words.
12  Q.  Not your words.  Last sentence, It was evident
13     Jake's reasoning was flawed, his judgment was
14     impaired when the trainmaster was first asking
15     him to go back to -- to Norma.  Those aren't
16     your words because you were in the van, you did
17     not hear that conversation; isn't that correct?
18     Because you testified earlier that your -- your
19     recollection was that Mr. Tischer was actually
20     coherent and answering --
21  A.  Yes.
22  Q.  -- very clearly anyone's questions; isn't that
23     correct?
24  A.  Yes.
25  Q.  So that makes that sentence, again, false and

Page 116

1     not something you would have adopted; correct?
2  A.  Again, it's not my opinion, not my thinking.
3  Q.  And then that last sentence, same thing, quote,
4     He was confused and disoriented and not
5     thinking straight.  That's just not true,
6     correct, because you testified earlier that you
7     --
8  A.  He answered the questions coherently at the
9     depot once I took him back.
10  Q.  And clearly?
11  A.  And clearly.
12  Q.  Okay.  So that's not true?
13  A.  (Indicating.)
14  Q.  And that's -- is that correct?
15  A.  I don't know if he was confused, and I don't
16     know if he was disoriented and limping and --
17     and stumbling around is a sign of that.  I know
18     I didn't say that.  Okay.
19  Q.  So that's a sentence you would disavow?
20  A.  Yeah.  Some of these embellishments are not
21     mine.
22  Q.  Do you appreciate that somebody would take your
23     version of a story and turn it upside down like
24     this?
25  A.  I wouldn't call it turning it upside down.  I

29 (Pages 113 to 116)

Q & A COURT REPORTERS, INC.
(715) 834-9812

| | Page 117 |
|---|---|

```
 1     would just -- saying adding more than is
 2     required or adding more than is accurate.
 3     Don't forget I'm an accurate, precise person.
 4  Q. Right.  And that's all the more -- I -- I would
 5     imagine that would be all the more troubling to
 6     you and frustrating to you that someone would
 7     take --
 8  A. This is what I pointed out, and after some
 9     discussion, you know, I let it ride.  I didn't
10     expect this kind of grueling.
11  Q. You just wanted to be -- to move on and be done
12     and then -- well, strike that.  That's -- so
13     just to be clear about a few things, and I do
14     want to ask you about the statement, few --
15     less -- less questions about the statement that
16     you provided to Ms. Lukehart.  Just to be
17     clear, at any time during that day in question,
18     Mr. Tischer never asked you to take him to a
19     hospital?
20  A. No.  That's true.
21  Q. Mr. Tischer never asked you to take him to a
22     doctor for medical care?
23  A. True.
24  Q. Mr. Tischer never asked you to call 911 on his
25     behalf?
```

| | Page 118 |
|---|---|

```
 1  A. True.
 2  Q. Mr. Tischer was never unable to speak?
 3  A. That's not true.  He answered questions
 4     coherently and clearly.
 5  Q. Let me ask the -- there was a double negative.
 6     Mr. Tischer at all times was able to speak
 7     throughout the -- your interactions with him
 8     that day in a clear and co -- coherent manner,
 9     as you observed?
10  A. Yes.
11  Q. Let's look at Exhibit 2 then, sir, the -- the
12     statement that you provided to Ms. Lukehart
13     Hobbs.  That was a statement you gave on
14     September 29 of 2017; is that correct?  It's
15     either at the top --
16  A. Yes, I see it.  I'm not certain of the date.
17     You can --
18  Q. Oh, sure, sure.
19  A. Okay.
20  Q. I understand that.  No reason to believe it
21     wasn't that date; is that right?
22  A. (Indicating.)
23  Q. Okay.  You had a chance today -- well, this
24     morning with -- with your -- with Mr. Cohen and
25     then again here today during the deposition,
```

| | Page 119 |
|---|---|

```
 1     you had a chance to review the entirety of the
 2     document; right?
 3  A. Yes.
 4  Q. Is that a more accurate description of your
 5     words -- strike that.  Is that a more accurate
 6     telling of your recollection of events?
 7  A. You say "is that."  What is "that"?
 8  Q. Is that statement, Exhibit 2, that you provided
 9     Ms. --
10  A. Oh.
11  Q. -- Lukehart Hobbs, is that more of a more
12     accurate telling of the story as compared to
13     Exhibit 1?
14  A. I would think so.
15  Q. On Page 2 you indicated to Ms. Lukehart Hobbs
16     that you -- that Mr. Tischer was riding with
17     you in the passenger's seat of the van; is that
18     correct?  The one in 11 there on Page 2.
19  A. Yes.
20  Q. And that was typical of that day, at any time
21     he was always --
22  A. A conductor is typically sitting next to the
23     driver, and the engineer sits in the back.
24  Q. And you're not familiar with the work that
25     is -- that's done by a conductor specifically?
```

| | Page 120 |
|---|---|

```
 1  A. Well, I'm very familiar in observing what's
 2     being done.
 3  Q. But you --
 4  A. So I can answer questions on that.
 5  Q. Okay.  But you're not -- you've obviously never
 6     worked for a railroad; you've never been a
 7     conductor, so you don't --
 8  A. True.
 9  Q. -- understand the details of what's done and
10     when --
11  A. True.
12  Q. Okay.  And on Page 4 you indicate that the
13     first thing you noticed -- see at Line 6 you're
14     asked, When was the -- your sort of first
15     notice of something -- something happening with
16     Mr. Tischer, and you answered, His left hand.
17     He had trouble undoing his seat belt.  Do you
18     see that?
19  A. Yes, true.
20  Q. And you go on to answer a question about, That
21     was getting out and around the shanty area, and
22     you said, Yes; is that correct?
23  A. Yes.
24  Q. Consistent with what you said today, that's the
25     first time you noticed any symptoms that caught
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 121

1    your attention?
2  A.  Yes.
3  Q.  And at the time you noticed that particular
4     issue with the seat belt, it was only you and
5     he, you, Mr. --
6  A.  In the van, yes.
7  Q.  You and Mr. Tischer were the only ones in the
8     van; is that correct?
9  A.  Yes.
10 Q.  Okay.  Mr. Franchuk was down at the other end
11    of the yard?
12 A.  In the engine.
13 Q.  In the engine at -- still at that time.  When
14    you observed Mr. Tischer going to the porta
15    potty, there again, were you the only one who
16    was observing Mr. Tischer walk towards the
17    porta potty?
18 A.  Walking towards the potty, I'm not sure.  The
19    crowd was already there.  Coming out for sure
20    many people saw him stumbling.
21 Q.  But going in -- certainly him leaving the van,
22    you were the only one to observe that; correct?
23 A.  Yes.
24 Q.  And then you're just not sure about that --
25    that time walking from the van to the porta

Page 122

1     potty, whether you were the only witness or
2     whether there was someone else?
3  A.  There was no stumbling on the way there.
4  Q.  On the way in.  You only noticed that on the
5     way out?
6  A.  Yes.
7  Q.  So other than the seat belt --
8  A.  Problem.
9  Q.  -- problem, you didn't notice any other
10    problems with Mr. Tischer until he --
11 A.  Was coming out of the potty, yep.
12 Q.  It was at that time you saw Mr. Tischer talking
13    with Mr. Franchuk and Mr. Marvin when he --
14 A.  Right.
15 Q.  -- after he got out of the porta potty --
16 A.  Right.
17 Q.  -- is that right?  Any estimate as to how long
18    he was in the porta potty?
19 A.  No.  Whatever it takes.  I don't know.
20 Q.  Sure.  As you told Ms. Lukehart Hobbs on Page
21    5, Line 17, at -- at no point did you say to
22    anyone or even in your own head consider that
23    Mr. Tischer was having a stroke?
24 A.  True.
25 Q.  You said, It hadn't occurred to me yet.  And

Page 123

1     that's a -- that's a correct statement even --
2  A.  Yes.
3  Q.  -- even as today; correct?
4  A.  Yes.  Well, I mean --
5  Q.  I mean, at the time it was a correct statement.
6  A.  At the time, correct, yes.
7  Q.  You estimated that -- on Page 6 you estimated
8     that that conversation among Mr. Franchuk, Mr.
9     Tischer, and Mr. Marvin took about 10 minutes.
10    That's Line 18 through 22.  Is that correct?
11 A.  Yeah, I would say about 10 minutes.
12 Q.  So from the time you first saw Mr. Tischer come
13    out of the bathroom until Mr. Marvin -- you
14    heard from Mr. Franchuk that Mr. Marvin would
15    like you to take Mr. Tischer back to the depot
16    --
17 A.  Yes.
18 Q.  -- that elapsed time was about 10 to 15 minutes
19    at most; is that correct?
20 A.  Best of my knowledge.
21 Q.  And if we allow for five minutes or four
22    minutes for Mr. Tischer to be in the porta
23    potty, that would then total the 20 minutes
24    that we see on the GPS --
25 A.  Looks like it, yes.

Page 124

1  Q.  -- document, Exhibit 3 --
2  A.  Um-hum.
3  Q.  -- occurring at 8:30 -- I'm sorry -- 8:15 p.m.;
4     is that correct?
5  A.  (Indicating.)
6  Q.  Is that correct?
7  A.  I believe so.
8  Q.  Okay.
9  A.  My -- my uncertainty of the timing is written
10    in stone.  You can ask me over and over.
11 Q.  Well, that's why the GPS data is -- is very --
12 A.  Comes in handy, yes.
13 Q.  Yes.  Just getting -- rounding the bend here,
14    sir, with my questioning.  So as you were
15    driving Mr. Tischer back to the depot, he had
16    this what you described as an explosive
17    vomiting event?
18 A.  Right.
19 Q.  That didn't make you think he was having a
20    stroke; correct?
21 A.  It didn't make me think he was having a stroke,
22    true.
23 Q.  Didn't cause you to call 911?
24 A.  No.
25 Q.  Didn't cause you to -- drive Mr. -- to turn

31 (Pages 121 to 124)

Page 125

1    around and just take Mr. --
2  A.  We were within sight of the depot, so my goal
3     was to get him to the depot.
4  Q.  But it --
5  A.  Where he would have more help.
6  Q.  And it didn't cause you -- the explosive
7     vomiting event did not cause you to take Mr.
8     Tischer straight to the hospital and avoid the
9     depot; correct?
10 A.  No.
11 Q.  And you were the only one with him in the van
12    when he was --
13 A.  True.
14 Q.  -- having this vomiting event --
15 A.  Right.
16 Q.  -- correct?  You say on Page 8 of the
17    statement, which is Exhibit 2, sir, that --
18    looking at Page -- at Line 15 -- starting at
19    Line 14, I suppose, all the way down to Line
20    19, you were asked about how long it took
21    from -- you to drive from the shanty to the
22    depot, including the time it took to allow Mr.
23    Tischer to -- to -- to vomit, and you
24    estimated, Well, it's a couple minutes --
25    quoting you here on Line 15, It's a couple of

Page 126

1     miles drive from the shanty to here, so with
2     the stop for his vomiting, maybe another minute
3     or two, but it wasn't that long.  You were then
4     asked to -- to agree whether that was under 10
5     minutes, and you said yes; is that correct?
6  A.  Yes.
7  Q.  Okay.  If we look back at Exhibit 3 then, sir,
8     if you -- if it's -- if you left the shanty at
9     8:35 p.m., there -- that's on Page 6 of this
10    document.  If you left at 8:35 p.m., parked for
11    one minute at 8:38 p.m. so that Mr. Tischer
12    could finish vomiting with the open door,
13    recommenced your trip at 8:39 -- and then
14    flipping the page -- arrived back -- arrived to
15    the depot at 8:49 p.m., that's consistent with
16    what your general recollection was when you
17    gave the statement to Ms. Lukehart; correct?
18 A.  Well, this -- there are two one-minute stops,
19    and they're only a few minutes apart.  So there
20    is a one-minute stop at 8:38, there's a
21    one-minute stop at 8:49, so that to me says I
22    left the depot -- I left the yard at
23    8:30-something.  39?
24 Q.  8:39.
25 A.  Okay.  And 8 -- gadzooks.

Page 127

1  Q.  And you arrived at the depot at 8:53,
2     ultimately?
3  A.  Right.
4  Q.  So that's a 15-minute -- I'm sorry -- 18
5     minutes.  And is that -- now looking at this
6     GPS data, is that a better understanding for us
7     about the time between the time you left the
8     shanty and --
9  A.  Very likely.  Though I -- at this point if I
10    got to the shanty at 8:53, then at 8:49, four
11    minutes prior to that, is when I stopped for
12    him to finish his vomiting.
13 Q.  Okay.  So then when you arrive at the depot --
14    back to Exhibit 2, the statement, the recorded
15    statement.  On Page 9 when you arrive back to
16    the depot, you told Ms. Lukehart Hobbs that --
17    that Mr. Tischer tried -- starting on Line 2 --
18    he tried to undo his seat belt, he couldn't.
19    He reached over and undid it with his right
20    hand, and he tried to get out, but his left
21    foot was stuck on the floor.  He was dragging
22    it, so I said, Stay, I'll get help.  I came in
23    here, and there's nobody there.  Is that
24    correct?
25 A.  True.

Page 128

1  Q.  And none of that caused you to call 911, is
2     that correct, yourself?
3  A.  True.
4  Q.  You didn't instruct or ask or plead with anyone
5     to call 911 on your --
6  A.  No.
7  Q.  -- on your behalf or his behalf; correct?  Is
8     that correct?  Is that correct, sir?
9  A.  Yes.
10 Q.  And you didn't get back in the vehicle and
11    drive Mr. Tischer to the hospital; is that
12    correct?
13 A.  He was lying on the floor when I came out of
14    the depot.
15 Q.  Okay.
16 A.  I could not lift him.  Nobody else could.
17 Q.  I don't want to be more redundant than I may
18    have been already, but I just wanted to make
19    sure from Exhibit 2 that your statements made
20    to Ms. Lukehart Hobbs were those that you made
21    today and still your -- still what is an
22    accurate recollection.  You say on Page 10 that
23    Mr. Tischer was, quote, Coherent all the way.
24    That's Lines 8 and 9.  Is that correct?
25 A.  Where are you?

32 (Pages 125 to 128)

Page 129

1   Q.  Page 10, Lines 8 and 9.  This is --
2   A.  I think so, yes.
3   Q.  Okay.  And then after the -- turning to Page --
4       still on Page 10.  After the EMTs and police
5       arrived, they asked Mr. Tischer questions, and
6       it's your testimony that Mr. Tischer was
7       responding clearly; is that correct?
8   A.  Yes.
9   Q.  On Page 14 -- Page 14, Line 3, Ms. Lukehart
10      Hobbs asked you that -- you had mentioned
11      before we got on the record that at least at
12      some point Jake had wanted to go take the
13      second trip to Norma; in other words, he wanted
14      to go make --
15  A.  Well --
16  Q.  -- that trip, and then --
17  A.  -- he was willing to.
18  Q.  Sure.
19  A.  If asked.
20  Q.  Okay.
21  A.  So in that difference between wanting to and
22      willing to is --
23  Q.  Well, let me -- let me read your answer and
24      just ask -- I'm going to ask you if that's
25      still your testimony.  At Line 6 your answer to

Page 130

1       that question was, I don't think he realized
2       that he wasn't feeling well.
3   A.  True.
4   Q.  And then at Line 14 your answer -- your further
5       answer was, quote, He just -- he was okay with
6       going back to work; is that correct?
7   A.  He was -- he was ready to go back if asked,
8       yes.
9   Q.  And then in Line 16, He didn't protest in any
10      sense; is that correct?
11  A.  True.
12  Q.  And that's still your recollection today;
13      correct?
14  A.  Yes.
15  Q.  And then at the very end Ms. Lukehart Hobbs
16      asked you, Has everything you've told me during
17      the taking of this statement been true and
18      complete to the best of your recollection, and
19      you answered, Absolutely.
20  A.  Yes.
21  Q.  And in looking at it again today, you would
22      again agree with that; correct?
23  A.  Yes.
24  Q.  When were you diagnosed with the lymphoma, sir?
25  A.  About five years back.

Page 131

1   Q.  And when did you begin your chemotherapy
2       treatments, if you can recall?
3   A.  Within a month or two or three.  I'm not sure.
4   Q.  And you're -- you've finished the course of
5       treatment?
6   A.  Three.
7   Q.  Three different sets of --
8   A.  Three different courses in five years, yeah.
9   Q.  What prognosis have you been given, if any?
10  A.  None.  We're being monitored.
11  Q.  Good, good.
12  A.  So I may live to 120 or may not live to
13      tomorrow.  I don't know.
14  Q.  Let's hope it's the first.  Just give me a
15      second to look at my other notes.  Oh, you
16      testified earlier that you -- you heard the
17      ambulance crew speaking with Mr. Tischer and
18      Mr. Tischer responding.
19  A.  Yes.
20  Q.  Do you remember the questions -- if -- if you
21      -- if you can, do you remember any of the
22      questions they were asking Mr. Tischer and what
23      his responses to them were?
24  A.  No, I could only guess now.
25  Q.  Okay.

Page 132

1   A.  But they were the same questions that the
2       police asked him prior to the ambulance
3       arriving.
4   Q.  Did they ask him when his -- when his symptoms
5       began?  Do you remember that at all?  You may
6       not.
7   A.  I -- it may have been one of the questions, and
8       he didn't know, and I didn't know until he
9       started stumbling out of the potty.
10  Q.  Do you remember specifically, though, to be
11      clear --
12  A.  No.
13  Q.  -- what Mr. Tischer --
14  A.  No.
15  Q.  -- responded to to that question?
16  A.  No.
17  Q.  I -- you were asked if whether you had a cell
18      phone with you in your van and you --
19  A.  Yes.
20  Q.  -- said -- I think the question was was it a
21      personal or a --
22  A.  Both.
23  Q.  -- corporate phone.
24  A.  There's a company phone and my own phone.
25  Q.  So you had two different cell phones?

33 (Pages 129 to 132)

Page 133

1  A.  Yes.
2  Q.  And then the radio?
3  A.  Right.
4  Q.  Any other means of communication, outward
5      communication --
6  A.  No.
7  Q.  -- audio communication?  None?
8  A.  (Indicating.)
9  Q.  Okay.
10  A.  Not besides shouting.
11  Q.  Sure.  And then I was unclear at the very
12      beginning when you said you enter your time,
13      you keep maybe a handwritten --
14  A.  Yes.
15  Q.  -- log of your time and --
16  A.  Yes.
17  Q.  -- what you were doing.  And then you enter
18      your time.  Did you do -- on that day do you
19      have a recollection of entering your time on
20      the tablet that was provided to you in -- in
21      the van?
22  A.  It was required of you as one of your job
23      functions.
24  Q.  Or else you don't get paid?
25  A.  Otherwise, you get no money --

Page 134

1  Q.  Right.
2  A.  -- yes.
3  Q.  And in that -- just help me out.  I'm trying to
4      visualize this.  When you're entering that
5      time, is it a point to point, you know, I did
6      this from this time to this time, then I did
7      the next task, or is it just more of a I -- I
8      clocked in and I clock out and that makes my
9      day?
10  A.  Let me give you an example.
11  Q.  Yeah.
12  A.  I'm driving them up to Norma, and they need a
13      cup of coffee on the way.
14  Q.  Sure.
15  A.  So I got to stop at Kwik Trip.  I got to log my
16      stop at Kwik Trip.  Okay.  Which you'll
17      probably see in that verbose GPS recordings.
18  Q.  And you got paid that day, I take it?  You got
19      paid for your work that day?
20  A.  I believe so.
21  Q.  And it was accurate?
22  A.  I haven't bothered, you know, because it was so
23      low priority compared to my illness to
24      double-check.
25      MR. HAYDEN:  I understand.  Thank you,

Page 135

1      sir.
2      MR. COHEN:  Take a five-minute break.
3      MR. BANKER:  Sure.
4      VIDEOGRAPHER:  Off record.  The time is
5  4:12.
6      (A break was taken.)
7      VIDEOGRAPHER:  We're back on the record.
8  The time is 4:19.
9  BY MR. COHEN:
10  Q.  Good afternoon, Mr. Lux.  My name is Michael
11      Cohen, and I represent PTI.  Mr. Lux, I want to
12      go through your employment history with PTI a
13      bit first.  Do you recall around when your
14      first round of employment with PTI first began?
15  A.  I'm guesstimating around 2007, '08.  Something
16      like that.  No.  It would be '08 -- '08 or '09.
17      I'm not sure.
18  Q.  Okay.  And do you recall approximately how long
19      you were employed by PTI during that time
20      frame?
21  A.  Again, I'm not sure.  I would say maximum one
22      year.
23  Q.  Okay.  And when you became employed by PTI that
24      first time around, did PTI provide you with
25      training?

Page 136

1  A.  Yes.
2  Q.  Okay.  Did they provide you with training
3      regarding how to drive a van?
4  A.  Yes.
5  Q.  And did they provide you with training
6      regarding first aid?
7  A.  Not even CPR, if I remember correctly.  But
8      most of us had CPR from prior experience.
9  Q.  Okay.  And -- and did you have first-aid
10      training from prior experience?
11  A.  Just CPR.
12  Q.  Okay.  And do you recall when -- approximately
13      when you became employed by PTI that second
14      time around?
15  A.  It would be after a chemotherapy session, so I
16      have zero idea.  Let me just think.  I would
17      guesstimate around 2014 or so.
18      (Exhibit 5 marked for identification.)
19      MR. COHEN:  Okay.  I'm handing you what's
20      been marked as Exhibit 5 for identification
21      purposes.  Okay.  Could you take a look through
22      those documents, and let me know when you've
23      reviewed them.
24      MR. BANKER:  Before you ask this witness
25      any questions about it, I guess I would object

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 137

1    to the extent this document hasn't been
2    produced in discovery.  Unless I'm mistaken, I
3    haven't seen this document before.
4    BY MR. COHEN:
5    Q.  Okay.  Please take a look, and let me know when
6        you've re --
7    A.  Will do.
8        MR. BANKER:  Well, before we ask him any
9    questions, has it been produced in discovery?
10       MR. COHEN:  I'm happy to discuss this off
11   the record, if you wish.
12       MR. BANKER:  I'd rather discuss it on the
13   record, actually, because I've never seen this
14   document before.  So you're putting a document
15   in front of the witness asking questions about
16   it when it hasn't been disclosed, so I --
17       MR. COHEN:  I believe we received some
18   document requests from your office
19   approximately a week ago.
20       MR. BANKER:  You have initial disclosures
21   that have never been made in this case, to my
22   knowledge.
23       MR. COHEN:  Nor do I believe they're due
24   at this point.
25       MR. BANKER:  Really?  When do you believe

Page 138

1    they're due?
2        MR. COHEN:  I believe they're due next
3    week.
4        MR. BANKER:  Okay.  And so is it your
5    position that these will be produced in the
6    course of discovery?
7        MR. COHEN:  These documents are being
8    produced right now and will be produced again
9    when our discovery is due and will -- and they
10   will bear Bates Stamps, in fact.
11       MR. BANKER:  Okay.
12   BY MR. COHEN:
13   Q.  Please go ahead and review these, and let me
14       know when your review is complete.
15   A.  Well, how thorough a job do you want me to do?
16   Q.  Just so -- to familiarize yourself with the
17       documents.
18   A.  Okay.  I have familiarized myself.
19   Q.  Okay.  Can you tell me what the first three
20       pages are?
21   A.  Open-ended questions, I love them.
22   Q.  Sure.  Can you tell me what the first three --
23   A.  How long do you have?
24   Q.  Can you tell me what the title of the first
25       three pages are.

Page 139

1    A.  Well, it's an application of employment.
2    Q.  Is this an application of employment for
3        employment with PTI?
4    A.  Looks like it.
5    Q.  Is this your application for employment?
6    A.  It's my writing.
7    Q.  Okay.  And is the third page of this exhibit
8        signed by you?
9    A.  Yes.
10   Q.  And is it dated?
11   A.  Yes.
12   Q.  What's the date?
13   A.  '17.
14   Q.  Okay.  And is that September?
15   A.  July.
16   Q.  I'm sorry.  July 15th of 2017?
17   A.  Looks like it.
18   Q.  Okay.  Would it be fair to say that your second
19       round of employment with PTI, at least you
20       applied for that position on that date?
21   A.  I think so, yes.
22   Q.  Okay.  On the second page of this document did
23       you list your employment history?
24   A.  Looks like some of it, partial.
25   Q.  Okay.  And it looks back to 2014?

Page 140

1    A.  Well, if at the very top of Page -- whatever --
2        2 is Honeywell, London, England, and that would
3        be 1965.
4    Q.  Is it the -- where it says Employer Name:  Per
5        Mar --
6    A.  Yes.
7    Q.  -- what is Per Mar?
8    A.  Per Mar is a security company employed by large
9        companies.  And for a while I was a security
10       officer at the veterans office in Chippewa and
11       also Menards.
12   Q.  And were you employed for Per Mar from 2016 --
13       just during the year 2016?
14   A.  There's the first sign of cancer, yeah.  And
15       then followed by U-Bid, which is a company
16       owned by Bill Northcott and --
17   Q.  Was that in 2015?
18   A.  Looks like it, yes.  So they would come before
19       Per Mar.
20   Q.  Okay.  And were you a driver for U-Bid?
21   A.  Yes.
22   Q.  All right.  And how about before U-Bid?
23   A.  Well, Renzenberger I was a driver for.
24   Q.  Okay.  Going --
25   A.  And that was 2014.  Okay.  Going back --

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 141

1  Q.  Going back to Per Mar in 2016, for how long
2      approximately, if you can recall, did you work
3      for Per Mar?  Was it a matter of months?
4  A.  It would be close to a year.  I -- I think the
5      cancer stopped it.  See, the starting I assume
6      is a month.  Oh, no.  That's -- no, no.  That's
7      the hourly wage.  Okay.  So I don't know.
8  Q.  Okay.  Did you receive any training from Per
9      Mar either before you began your employment
10     duties or during the course of your employment
11     duties?
12 A.  Just classroom-type.
13 Q.  What kind of classroom-type training did you
14     receive?
15 A.  Well, what are the employee's responsibility as
16     a security officer.
17 Q.  Okay.  Did you receive any first-aid-type
18     training or emergency training --
19 A.  No.
20 Q.  -- from Per Mar?  Did you receive any training
21     from Per Mar regarding how to identify the
22     signs of a stroke?
23 A.  No.
24 Q.  Going to U-Bid, you were -- it -- it appears
25     that you were a driver during 2015; is that

Page 142

1      correct?
2  A.  Yes.
3  Q.  Okay.  Did you receive any training from U-Bid
4      either during or before your employment?
5  A.  No.
6  Q.  They provided you with no training?
7  A.  No.  I could drive, and that's all they
8      required.
9  Q.  Okay.  Did they provide you with any first-aid
10     training?
11 A.  This is where I'm shaky, you know, in my
12     memory.  They may have, but it was -- it being
13     a duplicate, how strongly do you pay attention.
14 Q.  Sure.  Do you specifically recall that they
15     provided you with any training regarding how to
16     identify the signs of a stroke?
17 A.  No.
18 Q.  Let's go to Renzenberger.  Did they provide you
19     with any first-aid training --
20 A.  No.
21 Q.  -- before or during your employment with them?
22 A.  No.
23 Q.  Okay.  Are you sure they didn't or --
24 A.  I'm positive.
25 Q.  All right.

Page 143

1  A.  The reason I'm positive is the guy came in --
2      the manager came in from Chicago, and within
3      two hours we were done and hired and ready to
4      drive, so...
5  Q.  Okay.  All right.  I am going to -- well, do
6      you recall when you began your second round
7      of -- started your employment duties sec -- the
8      second time around with PTI?
9  A.  Following U-Bid and before Per Mar, I worked
10     for Walco with U-Bid, which is again a
11     different route through northern Wisconsin.
12     Again, somewhere in there --
13 Q.  Let me stop you for a second.  You -- you
14     applied for employment the second time around
15     on July 15th, 2017?
16 A.  Yes.
17 Q.  Okay.  Do you recall approximately how long
18     after you submitted your application you
19     actually began your employment duties?
20 A.  Probably right away.
21 Q.  Okay.  Before you began your employment duties,
22     did PTA provide you -- PTI provide you with any
23     training the second time around?
24 A.  There was classroom training on what's required
25     of a driver, especially near trains.

Page 144

1  Q.  Okay.
2  A.  So lots of safety measures.
3  Q.  All right.  And could you -- and did you --
4      were you provided a driver's manual --
5  A.  Yes.
6  Q.  -- upon your hiring by --
7  A.  Yes.
8  Q.  -- PTI?  And was that during the course of your
9      classroom training?
10 A.  Or prior.
11 Q.  Prior.  And this is all before you hit the
12     road?
13 A.  Yeah.  I'm not certain as to what time you get
14     the driver's --
15 Q.  Okay.
16 A.  -- handbook.
17 Q.  Could you turn to the third page -- the fourth
18     page of Exhibit 5.  Is this a document entitled
19     Driver Operating Requirements?
20 A.  Yes.
21 Q.  And does this bear your signature at the
22     bottom?
23 A.  Yes.
24 Q.  And what's the date of your signature?
25 A.  7/15/17.

36 (Pages 141 to 144)

Page 145

1  Q.  Okay.  And does this provide a non-exhaustive
2     list of your -- of your obligations and
3     operating requirements as a PTI driver?
4  A.  The whole book is -- you have a copy of it --
5     half-an-inch thick.
6  Q.  Is this part of the driver's --
7  A.  Yes.
8  Q.  -- manual?
9  A.  Yes.
10 Q.  Okay.  And could you turn to the next page.
11 A.  Yep.
12 Q.  And is this a document entitled Employee
13    Acknowledgment?
14 A.  Yes.
15 Q.  And does this bear your signature?
16 A.  Yes.
17 Q.  And is it dated July 16th, 2017?
18 A.  Yes.
19 Q.  And whose signature is below yours?
20 A.  At the time the local supervisor was Jeff
21    somebody.  I forget.  I don't remember his
22    name.
23 Q.  Okay.  And is this form acknowledging that you
24    were provided with a copy of PTI's driver's
25    manual, you read it, and understand the

Page 146

1     contents of the same, including the railroad
2     radio rules, the employee safety and health
3     guidelines, and other policies of PTI?
4  A.  Yes.
5  Q.  And you acknowledge that PTI is committed to
6     providing a safe and healthful workplace, a
7     safe and healthful workplace is one of the
8     highest priorities of PTI?
9  A.  Whatever it says, that -- I assume that --
10    that's what it says.
11 Q.  Okay.  And if you look at the third paragraph
12    of this employee acknowledgment, can you just
13    read that out loud.
14 A.  The information in this manual constitutes a
15    written injury and illness program.  White --
16    while PTI cannot anticipate every -- anticipate
17    every workplace hazard, the general principles
18    in this manual should guide your conduct.  To
19    be safe, you must never stop being safety
20    conscious.  Yeah.
21 Q.  Okay.  And you understood that sentence, and
22    you agreed with it?
23 A.  Yes.
24 Q.  Okay.  And then the next paragraph, Paragraph
25    4, you acknowledge that you understand what to

Page 147

1     do in the case of an accident or emergency?
2  A.  Yes.
3  Q.  You understood the -- the safe working
4     procedures you were to follow and the
5     precautions to be taken when working,
6     especially with regard to vehicle hazards,
7     slips and fall hazards, as well as any other
8     unsafe conditions; right?
9  A.  Oh, there it is.  Okay.  Slips and falls
10    hazards, yes.
11 Q.  Okay.  Could you just read the next sentence.
12 A.  I understand that this manual cannot cover
13    every possible job-related hazard or exposure
14    to injury and it is intended to identify the
15    most common work-related hazards and list safe
16    work procedures to address these hazards.  I
17    understand whom I am to ask if I have any
18    questions on any of these concerns.  Yes.
19 Q.  Okay.  And -- and who did -- who were you to
20    ask if you had any questions or concerns?
21 A.  Jeff, the immediate supervisor.
22        MR. COHEN:  Okay.
23        (Exhibit 6 marked for identification.)
24 BY MR. COHEN:
25 Q.  I'm showing you what I've marked as Exhibit 6

Page 148

1     for identification.
2  A.  Okay.
3  Q.  Is this the PTI Driver's Manual that you
4     received from PTI in -- during your -- or
5     before your -- you began your employment?
6  A.  At first glance --
7        MR. BANKER:  Before he answers that
8     question, I would again object to the use of
9     any document that has not been produced in
10    discovery as an exhibit to this deposition or
11    asking any questions about it.
12 BY MR. COHEN:
13 Q.  Go ahead.
14 A.  I seem to recognize it as the one handed to
15    every employee in -- in a yellow form binder.
16 Q.  Okay.  If you could turn your attention to the
17    last page of this exhibit.  Is this the
18    Employee Acknowledgment you signed and your
19    supervisor signed?
20 A.  I assume so.
21 Q.  Okay.  Do you have any reason to believe that
22    it's -- it's not the --
23 A.  At first glance, no.
24 Q.  Okay.  If you could turn your attention to Page
25    7.  What, according to the handbook, is the --

37 (Pages 145 to 148)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 149

1    the safety mission of PTI?
2  A.  It's to ensure we have safe, efficient,
3    well-trained drivers who serve the needs of our
4    customers and reduce, eliminate accidents and
5    injuries.
6  Q.  Okay.  Do you agree with that statement?
7  A.  Sure.
8  Q.  All right.  If you could review Pages 11 and
9    12, and could you tell -- is it fair to say
10   that you had your job to do as a driver, and
11   the employees of UP had their jobs to do, and
12   you weren't to -- to help them with their job?
13 A.  They're two distinct jobs.  We were not allowed
14   to think in terms of UP employee activities
15   other than to make sure that they didn't need
16   our help.
17 Q.  Okay.  When you say --
18 A.  You're a cab driver.
19 Q.  Was your job to help them in any other way than
20   being their cab driver?
21 A.  I don't know where to start and where to end on
22   this one.
23 Q.  Let me -- let me rephrase the question.  What
24   did you see your job as being as a -- a driver
25   for PTI?

Page 150

1  A.  You're responsible for transporting the crew to
2    wherever they're asking you to go.
3  Q.  Okay.  And would it be fair to say turning to
4    Page 12, Item 34, that you're not to assist the
5    railroad crews in the performance of their
6    duties?
7  A.  Oh, absolutely.
8  Q.  Okay.  And -- and you weren't supervising the
9    railroad crews; is that correct?
10 A.  Absolutely.
11 Q.  And you didn't -- did you see yourself as being
12   responsible for their conduct or their safety?
13 A.  No.  Well, their safety maybe, but...
14 Q.  Insofar as they were in your -- in your van?
15 A.  True.
16 Q.  Okay.  Were you responsible for the safety of
17   UP's employees when they were outside your van?
18 A.  No.
19 Q.  I want to turn your attention to Page 22 of
20   this exhibit.  And is this a section of the
21   manual entitled Safety and Health Guidelines,
22   Illness and Injury Prevention Program?
23 A.  Okay.
24 Q.  Is that correct?
25 A.  Yes.

Page 151

1  Q.  Turning your attention to Item No. 1 in the
2    bolded sentence at the end where it --
3  A.  Awareness, common sense.
4  Q.  Yes.  Could you please read it.
5  A.  And caution can prevent most accidents from
6    occurring.
7  Q.  Relative to the incident we've been talking
8    all -- about all day, was that an accident?
9  A.  No.
10 Q.  Okay.  Do you consider that to be an injury at
11   all?
12 A.  No.
13 Q.  All right.  Turning your attention to Page 24,
14   Section 7, Safety Rules for All Employees.
15   Does this provide some enumerated safety rules?
16 A.  Absolutely.  Employees must observe and obey
17   all safety rules and regulations.  Disciplinary
18   action may result from violation of those
19   safety rules and so on.  Sure.
20 Q.  Okay.  And Item A is that all employees shall
21   follow the safe practices and rules contained
22   in this manual and such other rules and
23   practices communicated from time to time by
24   T -- PTI management; is that --
25 A.  True.

Page 152

1  Q.  -- correct?  Okay.  Do you believe you followed
2    all of the safety rules that were provided to
3    you by PTI?
4  A.  Always.
5  Q.  Okay.  Item B directs you to report all unsafe
6    conditions or practices to their man -- to your
7    manager; is that correct?
8  A.  Yes.
9  Q.  Okay.  Are you aware of any unsafe conditions
10   or practices relative to anything we've been
11   talking to today in respect to PTI?
12 A.  The only thing that comes to mind with respect
13   to unsafe is people that get within four feet
14   of a train standing or moving.
15 Q.  Okay.  And we haven't talked of anything -- we
16   haven't talked about that at all today, have
17   we?
18 A.  Well, that to me is a major safety
19   consideration for myself and the UP employees.
20 Q.  Okay.  And turning your attention to Page 26,
21   Paragraph 10, the second section of that
22   paragraph, could you read that.
23 A.  The information in this manual consists --
24   constitutes a written injury and illness
25   program.  While PTI cannot anticipate every

38 (Pages 149 to 152)

Page 153

```
 1    workplace hazard, the general principals (as
 2    written) in this manual should guide your
 3    conduct.  To be safe, you must never stop being
 4    safety conscious.
 5  Q.  Okay.  Turning your attention to Paragraph 11,
 6    the last sentence of the first -- I'm sorry --
 7    Section 11, the last paragraph of the first
 8    section.  Starting with All Employees, could
 9    you read that.
10  A.  Should start safety training by reading this
11    manual and discussing any problems or safety
12    concerns with your branch manager.
13  Q.  Okay.  And what did you understand that to
14    mean?
15  A.  Well, being a smart, old fart, I had no
16    questions regarding what it stated because to
17    me I've seen it too many times, not just with
18    PTI.
19  Q.  And what do you mean by that?
20  A.  Experience has no substitute.
21  Q.  And would that be true with -- as to common
22    sense as well?
23  A.  Most people don't have common sense today.
24  Q.  Okay.  Turning your attention to Page 27,
25    Paragraph 12.  And does it state, If you see
```

Page 154

```
 1    managers do something unsafe, please tell that
 2    person?
 3  A.  Yes.
 4  Q.  Okay.  And would you say that you -- you
 5    followed that guidance?
 6  A.  Absolutely.  We have not seen PTI managers in
 7    eons.
 8  Q.  I'm going to turn your attention to Page 28 and
 9    the section regarding first-aid kits.  And
10    what's the -- do you see where it states,
11    General first-aid techniques include?
12  A.  Um-hum.
13  Q.  Okay.  And what's the first item?
14  A.  Where?  Where does --
15  Q.  Under A.
16  A.  Under A.  Call for medical help with any
17    incident that appears serious.
18  Q.  Okay.  And if you turn to the next page,
19    there's a section about slip and falls -- slips
20    and falls; correct?
21  A.  Yes.
22  Q.  All right.  And then after that is -- is
23    vehicle safety?
24  A.  And where is that?
25  Q.  The next page.
```

Page 155

```
 1  A.  Okay.
 2  Q.  All right.  Okay.  And we've talked about this
 3    a little bit, but turning your attention to
 4    what you've previously told Mr. Banker and Mr.
 5    Hayden.  When is the first time relative to Mr.
 6    -- Mr. Tischer that you in your own mind
 7    believed that there was a serious medical
 8    issue?
 9  A.  The first time I would say when the ambulance
10    decided to take him away.
11  Q.  And why did you -- why did you think at that
12    point there was a serious medical issue?
13  A.  Well, because they're obviously going to take
14    him to a higher medical, you know --
15  Q.  Okay.
16  A.  -- attention.
17  Q.  And did you believe that the persons manning
18    that ambulance had medical training?
19  A.  Hopefully they all do.
20  Q.  Did you have any medical training?
21  A.  None --
22  Q.  Okay.
23  A.  -- such.
24  Q.  Now, Mr. Hayden led you through your
25    observations as to Mr. Tischer.  Do you recall
```

Page 156

```
 1    that?
 2  A.  Yes.
 3  Q.  And your first observation was that he was
 4    having trouble with his seat belt; is that
 5    correct?
 6  A.  Yes.
 7  Q.  All right.  At that time did you believe that
 8    Mr. Tischer was having trouble with his seat
 9    belt because he was subject to a serious
10    medical condition that required medical
11    assistance?
12  A.  No.
13  Q.  Okay.  The second observation that Mr. Hayden
14    led you through is when you saw Mr. Tischer
15    stumbling on his way back from the porta potty
16    --
17  A.  True.
18  Q.  -- is that correct?
19  A.  Yes.
20  Q.  Okay.  And you noted that many people saw him
21    stumbling; is that correct?
22  A.  Yes.
23  Q.  All right.  Who are those people that also saw
24    him stumbling?
25  A.  You'll have to ask Marvin because I don't
```

39 (Pages 153 to 156)

Page 157

1    remember anybody present besides Neil.
2  Q.  Okay.
3  A.  His engineer.
4  Q.  All right.
5  A.  Okay.  But the other crew members stood around
6       Marvin.  I don't know how many there were.
7       There were several.
8  Q.  You mentioned earlier that the gravel was
9       uneven.
10 A.  Yes.
11 Q.  You noticed that?
12 A.  Oh, yes.
13 Q.  Okay.  Did you believe that Mr. Tischer having
14      stumbled on his way back from the porta potty
15      was a serious medical condition or -- or
16      indicated a serious medical condition that
17      required immediate medical assistance?
18 A.  No.
19 Q.  Okay.  The next incident or observation that
20      Mr. Hayden noted to you was when Mr. Tischer
21      vomited while he was in your van; is that
22      correct?
23 A.  Yes.
24 Q.  And we went through Exhibit 3 quite a bit,
25      which is the GPS timeline; right?

Page 158

1  A.  Um-hum.
2  Q.  And you noted that at the point that you
3       observed Mr. Tischer vomiting you were in sight
4       of the depot; is that right?
5  A.  True.
6  Q.  Okay.  And there was some question as to which
7       notation corresponded with that event; right?
8  A.  Yes.
9  Q.  There were two parked notations in --
10 A.  Well, working backwards time-wise because the
11      depot is a hundred yards from where he was
12      finishing his vomiting, it -- it could only be
13      the last minute of stop.
14 Q.  And that's exactly what I was going to go
15      through with you.  I want you to take a look at
16      Exhibit 3.  I want you to look at the first
17      page of Exhibit 3.  Do you see the column
18      labeled Distance M?
19 A.  100.9.  Is that what it says?
20 Q.  No.  The actual labels on the columns on top.
21 A.  Oh, okay.  So what was the question again?
22 Q.  Do you see the column labeled --
23 A.  Distance, yes, I see it.
24 Q.  Okay.  And I want you to turn to Page 6 of this
25      exhibit, and under the Distance column what is

Page 159

1    the notation for the entry at 8:38 p.m.?  Is it
2    98 --
3  A.  .4, yes.
4  Q.  -- .4?  And would that be 98.4 miles?
5  A.  No.
6  Q.  Okay.  Turning back to the first page, the
7       column headings, does it say Distance M?
8  A.  Yes.
9  Q.  And would that mean distance in miles?
10 A.  I assume so.
11 Q.  Okay.  And at the top where it says Total
12      Distance in mi -- M, would that mean total
13      distance in miles?
14 A.  I would think so, yes.
15 Q.  Okay.  And is the -- is the notation 100.9?
16 A.  Well, that might be for -- for what?  For 12
17      a.m. to 11:59 p.m.
18 Q.  This is under the -- I'm sorry.  Go ahead.
19 A.  Up top.
20 Q.  Yes.  And this is under a summary tab; is that
21      correct?
22 A.  Yes.
23 Q.  Okay.  And is it fair to say that that meant
24      that the van drove 100.9 miles during the given
25      time frame?

Page 160

1  A.  Yes.
2  Q.  Okay.  Now turning back to Page 6 -- I -- I'm
3       sorry.  Strike that.  Go -- if you could turn
4       to Page 7, the last notation under the Distance
5       column is 100.9 miles.  That's the last stop;
6       correct?
7  A.  Right.
8  Q.  Okay.  The second-to-last parked notation
9       occurred at 8:38 p.m. on Page 6, and the
10      Distance column states 98.4 miles; correct?
11 A.  Yes.
12 Q.  Okay.  So is it fair to say then when the van
13      was parked at that point at 8:38 p.m., it was
14      approximately two miles away from the depot?
15 A.  Yes.
16 Q.  Okay.  The last parked notation before -- at
17      8:49 p.m., would it be fair to say that that
18      parked notation occurred when the van was .2
19      miles away from the depot?
20 A.  Yes.
21 Q.  And that would be --
22 A.  This is where he was finishing his vomiting.
23 Q.  Because that would be in sight of the depot?
24 A.  Right.  .2 miles.  Yeah.
25 Q.  All right.  Now, Mr. Hayden, when he was going

Page 161

1    through the various observations you made,
2    noted that you had observed Mr. Tischer at that
3    point explosively vomiting; is that correct?
4  A.  Um-hum.
5  Q.  Did you think that at that point in time that
6    Mr. Tischer explosively vomiting indicated a
7    serious medical condition that required
8    immediate -- immediate medical help?
9  A.  Not necessarily.  I've -- I've been there many
10   a time, and, you know, I'm still smiling and
11   walking, so --
12  Q.  Okay.
13  A.  -- it's not an indication in my mind of a
14   serious medical condition.
15  Q.  Okay.
16  A.  It may have been something he ate.  I don't
17   know.
18  Q.  All right.  And Mr. Hayden said -- asked you
19   why -- you know, confirmed with you that you
20   didn't call 911 at that point; is that correct?
21  A.  Well, because I knew that Marvin was behind me,
22   and I was within 2 -- .2 miles of the depot.
23  Q.  Okay.  And you knew that Marvin -- how far
24   behind you was Marvin?
25  A.  Okay.  I parked in front of the depot front

Page 162

1    entrance, unlocked the door, went inside,
2    checked the management side, checked the
3    employee side, nobody there, came back out.  At
4    which time Marvin was arriving, so that's no
5    more than a minute or two.
6  Q.  Okay.  And how long did it take after Marvin
7    arrived after a minute or two that the police
8    arrived?
9  A.  Now you're -- now you're testing my
10   understanding of the detail because Marvin and
11   I were struggling with Jake, trying to get him
12   back into the van off the floor.  And as we
13   were wondering what to do next, the police
14   arrived, so that's, what, two to five minutes.
15  Q.  Okay.
16  A.  Something like that.
17  Q.  So one to two minutes until Marv arrived --
18   Marvin arrived, and two to five minutes until
19   the police arrived?
20  A.  My guesstimate, yes.
21  Q.  Okay.  Now, Mr. Hayden also noted that when you
22   arrived back from the depot after not finding
23   anybody there, you noted that Mr. Tischer was
24   on the ground; correct?
25  A.  Outside -- outside the vehicle, yeah.

Page 163

1  Q.  Okay.  And is that the first time you believed
2    at that point in time that Mr. Tischer had a
3    serious medical condition?
4  A.  I still wasn't certain.  When the ambulance
5    came and examined him and then took him away,
6    at that point, you know, I was hoping that
7    there's nothing serious, but I had no idea what
8    was occurring to him.
9  Q.  Okay.  And you -- you noted that Mr. Tischer
10   was speaking normally?
11  A.  Yes.
12  Q.  And you didn't observe his face drooping;
13   correct?
14  A.  As far as I can remember, no.
15  Q.  Okay.  And, to your knowledge, are those signs
16   of a stroke?
17  A.  Face drooping might be, yes.
18  Q.  Okay.  And PTI didn't have to give you any
19   specific training as to what would be signs of
20   a -- signs of a stroke that would require you
21   to call for an ambulance or take him to the
22   hospital; is that right?
23  A.  When you -- the way you started the question I
24   had -- can you repeat it, please?
25  Q.  Sure.  PTI didn't need to give you training as

Page 164

1    to when you needed to take --
2  A.  Well, if I asked you that, didn't need to give
3    me training, what would you say?  Training is
4    always required in my mind.
5  Q.  Okay.
6  A.  So, yeah, they should have, but they didn't.
7  Q.  Okay.  Did -- you're not a medical
8    professional; correct?
9  A.  No.
10  Q.  Okay.
11  A.  True.
12  Q.  And you acknowledge that PTI can't train you
13   for -- for every medical --
14  A.  Well --
15  Q.  -- situation that can arise?
16  A.  -- PTI, if you look at my employment history,
17   is only one of many companies that had not
18   given, you know, what do you do in a case of a
19   stroke --
20  Q.  Sure.
21  A.  -- type training.  And so it didn't send out in
22   my mind as, you know, necessary, but it wasn't.
23  Q.  And they didn't give you training, for
24   instance, what to do in -- in case of having
25   noticed a diabetic emergency; right?

41 (Pages 161 to 164)

Page 165

1  A.  Absolutely not, no.
2  Q.  Okay.
3  A.  Or even a heart attack.
4  Q.  All right.  Would it be fair to say that they
5      gave you training regarding what might be
6      common -- common workplace emergencies and
7      injuries and accidents?
8  A.  Well, that to me is obviously visible for which
9      you don't need training.  If you stand within
10     four feet of or less than four feet of a moving
11     train, you're asking to be knocked down.  Okay.
12     So as an example.
13 Q.  I understand.  Is what occurred to Mr. Tischer
14     a workplace injury?
15 A.  Not in my mind.
16 Q.  Okay.  Was it a workplace accident?
17 A.  It was not an accident in my mind.
18 Q.  Okay.  And your -- your understanding is that
19     people -- it is your understanding that you now
20     know that Mr. -- Mr. Tischer had a stroke?
21 A.  Yes.
22 Q.  And I think you mentioned before that you know
23     people that have had strokes before?
24 A.  Yes.
25 Q.  And strokes can occur at a workplace or --

Page 166

1  A.  All the -- it can occur anywhere anytime to
2      anybody no matter what age.
3  Q.  Right, right.  It's not necessarily something
4      that occurs --
5  A.  It's not predictable.
6  Q.  Right.  And I believe it was your testimony
7      that you -- you haven't actually ever seen a
8      person have a stroke; is that correct?
9  A.  True.
10 Q.  All right.
11 A.  I've met them after their treatment and had
12     difficulty speaking.
13 Q.  Okay.  You mentioned that you made a report to
14     Jeff, the local manager, by phone?
15 A.  Yes.
16 Q.  What did you tell him?
17 A.  Well, just a very short version of what we've
18     been saying here, discussing, to which he had,
19     you know, no comment, as far as I can remember,
20     because he was taken to -- by ambulance to
21     wherever.
22 Q.  Okay.  Is it fair to say that when you noticed
23     that there was an issue with Mr. Tischer, you
24     told Mr. Marvin?
25 A.  At the time he was ready to send them back to

Page 167

1      Norma, I said, No, he's not well, don't send
2      Tischer.
3  Q.  Okay.  And did you consider your obligation to
4      be fulfilled at that point to Mr. Tischer?
5  A.  Well, as a cab driver and the manager present,
6      I would not step on his authority in making a
7      decision that he -- was purely his in my mind.
8  Q.  Okay.  And what decision is that?
9  A.  Well, what to do with a questionable person
10     who's obviously not well.
11         MR. COHEN:  Okay.  I don't have any
12     further questions.
13 BY MR. BANKER:
14 Q.  Just one point of clarification.  I want to
15     make sure I understand.  So this Exhibit 3, the
16     GPS report, you know, you've -- you've been
17     asked a number of questions by all of the
18     counsel here.  But when I was asking the
19     questions, I -- I don't know what this report
20     is, so I asked you to assume --
21 A.  First time I've seen it.
22 Q.  Sure.  I asked you to assume for the purpose of
23     my questions that let's assume that this is a
24     GPS report for the PTI vehicle --
25 A.  Exactly, yeah.

Page 168

1  Q.  -- at issue.  And in answering Mr. Hayden's
2      questions and Mr. Cohen's questions, have you
3      proceeded with that same assumption that
4      we're --
5  A.  Which is?
6  Q.  -- we're assuming that this is a GPS report for
7      the PTI vehicle that you were driving?
8  A.  The word "assume," you're familiar with what it
9      stands for?
10 Q.  I am.
11 A.  Okay.  I don't need to emphasize.  But looking
12     at the heading, I'm assuming that this is a
13     day's activity report.
14 Q.  Sure.  But I'm -- no one has provided you any
15     additional --
16 A.  First time I'm seeing it.
17 Q.  -- information in terms of their asking
18     questions?  And so if it is, in fact, the PTI
19     report, you've been asked questions about it;
20     if it turns out that it's not the PTI report,
21     then we've all assumed something and gone down
22     this path.
23 A.  Right.
24 Q.  And you're not -- sitting here today, you're
25     not able to say whether it is or isn't a

42 (Pages 165 to 168)

1   meaningful document relating to the PTI vehicle
2   that you were operating that day?
3   A.   True.
4   Q.   Do you know how -- if -- if you were to take
5        that document and try to verify, do you know
6        how you'd go about that with PTI?
7   A.   Verified in what sense?
8   Q.   If I wanted to figure out whether this is a GPS
9        report for the PTI --
10  A.   Well, I'd have to be assured that this is a
11       genuine PTI article.
12  Q.   Sure.  But --
13  A.   Once having been assured, I can then look at
14       the details and say, I can see.  Yeah.
15  Q.   And all I'm asking is do you know what
16       information on this Exhibit 3 you might use to
17       tie it in to the particular vehicle that you
18       were operating that day?
19  A.   Other than the mobile device, which may be the
20       company phone or the tablet or what else, I
21       don't know.
22  Q.   Okay.  So sitting here today, you're not able
23       to shed any light on that?
24  A.   I'm not.
25       MR. BANKER:  Okay.  I don't have any

1        further questions.
2   BY MR. HAYDEN:
3   Q.   Just a follow-up on -- on that line --
4   A.   Sure.
5   Q.   -- of questioning.  When I was asking you the
6        questions and -- and walking you through the
7        timeline, it was consistent -- the -- the data
8        in the GPS report is consistent with your
9        testimony about the relative stops and the
10       duration of those stops --
11  A.   Right.
12  Q.   -- isn't that correct?  Okay.  Thank you.
13  A.   So to use this for my purposes, we would have
14       to go backwards from the end.  Because up top
15       it starts at 12 a.m., so there is a shift or
16       more activity before my starting on here.
17  Q.   So if we looked -- if -- and -- and we sort of
18       did that a little bit.  We looked at the last
19       parking event, which was at 8:53 p.m., and
20       looked at those details on the balance of Page
21       7 and all of Page 6 leading up to it, and that
22       8:53 stop is consistent with the time at which
23       you got to the --
24  A.   Seems to be, yes.
25       MR. HAYDEN:  Okay.  Thank you, sir.

1        THE WITNESS:  Sure.
2        MR. COHEN:  I just have one further
3        question.
4   BY MR. COHEN:
5   Q.   Going back to Page -- Exhibit 5, the last page.
6        This is a document entitled CTCA Acknowledgment
7        of Training Form.
8   A.   Um-hum.
9   Q.   And does this bear your signature at the end?
10  A.   Yes.
11  Q.   And does this list some of the training you
12       received from PTI?
13  A.   Defensive driving course, yes; fatigue
14       management, yes; operation lifesaver; whatever,
15       RI -- RYS is; operation lifesaver, I don't
16       remember the details of that.
17  Q.   Intermodal training?
18  A.   Yes.
19  Q.   Crew safety briefing?
20  A.   Yes.
21  Q.   And it looks like all this training occurred at
22       two points during 2017?
23  A.   I have a question in my mind is why does it
24       start with date 7/31 up top and ends with 7/31,
25       but in between the classroom activities are

1        8/1?
2   Q.   But it does bear your initials under each
3        training; is that correct?
4   A.   Yes.
5   Q.   All right.  And all this training occurred
6        before the incident we've been discussing
7        today?
8   A.   Yes.
9        MR. COHEN:  All right.  No further
10       questions.
11       MR. BANKER:  Do you want to advise him
12       about reading and signing or...
13       MR. COHEN:  Sure.  You can either sign
14       the -- reserve signature to today's deposition,
15       in which case the court reporter will send you
16       a transcript, and you can review it to make
17       sure that everything is accurate, or you can
18       waive your signature.  That's up to you.
19       THE WITNESS:  Well, I'd like to see
20       because we -- from experience, we've seen some
21       embellishment.  So, yes, I will sign it when I
22       see it.
23       MR. COHEN:  You'd like to reserve your
24       signature?
25       THE WITNESS:  Sure.

43 (Pages 169 to 172)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 173

```
 1        VIDEOGRAPHER:  This concludes today's
 2   deposition of Chaz Lux consisting of two media.
 3   We are off the record at 5:06 p.m.
 4        (Proceedings concluded at approximately
 5   5:06 p.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 174

```
 1   STATE OF WISCONSIN   )
                          )ss
 2   COUNTY OF EAU CLAIRE )
 3
 4       I, Stephanie Peil, Notary Public in and for the
 5   State of Wisconsin, certify there came before me the
 6   deponent herein, namely Chaz Lux, who was by me duly
 7   sworn to testify to the truth and
 8   nothing but the truth concerning the matters in this
 9   cause.
10       I further certify that the foregoing transcript
11   is a true and correct transcript of my original
12   stenographic notes.
13       I further certify that I am neither attorney or
14   counsel for, nor related to or employed by any of
15   the parties to the action in which this deposition
16   is taken; furthermore, that I am not a relative or
17   employee of any attorney or counsel employed by the
18   parties hereto or financially interested in the
19   action.
20       IN WITNESS WHEREOF, I have unto set my hand and
21   affixed my Notarial Seal this 1st day of August,
22   2019.
23
24   _____
25   Stephanie J. Peil, Notary Public
```

Q & A COURT REPORTERS, INC.
(715) 834-9812