## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
----------------------------------------
JESSICA TISCHER, individually and
as Personal Representative For the
Spouse and Children of Jacob Tischer,
Decedent,

      Plaintiff,        DEPOSITION
                      Case No.
      vs.            3:19-cv-00166-jdp
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,

      Defendant.
----------------------------------------
UNION PACIFIC RAILROAD COMPANY,
a Delaware corporation,
      Defendant/Third-Party Plaintiff,
      vs.
PROFESSIONAL TRANSPORTATION, INC.,
      Third-Party Defendant.
----------------------------------------

The deposition of STEPHEN MARK MARVIN, taken
under and pursuant to the provisions of Chapter 804
of the Wisconsin Statutes and the acts amendatory
thereof and supplementary thereto, before Stephanie
J. Peil, Notary Public in and for the State of
Wisconsin, at Q & A Court Reporters, Inc., 303 Main
Street, Eau Claire, Wisconsin, on the 19th day of
July, 2019, commencing at approximately 12:57 p.m.

ORIGINAL TRANSCRIPT FILED AT THE

## Page 2

             APPEARANCES:
1
2     Paul Banker, Esq., of Hunegs, LeNeave & Kvas,
3  1000 Twelve Oaks Center Drive, Suite 101, Wayzata,
4  Minnesota, 55391, appeared representing the
5  Plaintiff.
6     Thomas A.P. Hayden, Esq., of Union Pacific
7  Railroad Corporation, 101 North Wacker Drive, Room
8  1920, Chicago, Illinois, 60606, appeared
9  representing the Defendant and Third-Party
10  Plaintiff, Union Pacific Railroad Corporation.
11     Michael B. Cohen, Esq., of Quintairos, Prieto,
12  Wood & Boyer, P.A., 233 South Wacker Drive, 70th
13  Floor, Chicago, Illinois, 60606, appeared
14  representing the Third-Party Defendant, Professional
15  Transportation, Inc.
16     Also present:  Jamie Lukehart Hobbs and Jessica
17  Tischer.

## Page 3

1         EXAMINATION INDEX
2  STEPHEN MARK MARVIN:
3  By Mr. Banker          4
4  By Mr. Hayden       92,106
5  By Mr. Cohen         100
6
7
8          EXHIBITS
9  Marked for
   Identification          Page
10
  14 - 8/14/17 Carson Email      83
11
  15 - Tischer Off Duty Time Between Trips
12    and On Duty Time Between Trips
     Spreadsheet      88
13
14  ORIGINAL EXHIBITS WITH ORIGINAL TRANSCRIPT
   COPIES SUPPLIED TO THE ATTORNEYS
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1       P R O C E E D I N G S
2      STEPHEN MARK MARVIN,
3  being first duly sworn, testified as follows:
4         EXAMINATION
5  BY MR. BANKER:
6  Q.  Good afternoon.
7  A.  Good afternoon.
8  Q.  Could you state your name for the record,
9     please.
10  A.  My full name Stephen Mark Marvin.  I go by
11    Mark.  That's why when Neil was talking, he
12    said he talked to Mark.
13  Q.  Is the -- how do you spell the Stephen part of
14    it?
15  A.  S-T-E-P-H-E-N.
16  Q.  Okay.  Have you had your deposition taken
17    before?
18  A.  No, sir.
19  Q.  You were here during the deposition of Mr.
20    Franchuk.  You heard me go over kind of the
21    ground rules of the process?
22  A.  Yes, sir.
23  Q.  You got to answer out loud, can't talk over,
24    and if you don't understand, ask.
25  A.  Yes, sir.

OFFICES OF ATTORNEY PAUL BANKER
Q & A COURT REPORTERS, INC.

Page 5

1  Q.  Are you comfortable with those ground rules?
2  A.  Yes, sir.
3  Q.  And if you need to take a break at some point,
4      let me know, and we'll -- we'll accommodate
5      that.  What, if anything, did you do to prepare
6      for your deposition today?
7  A.  We had a conversation last night.  He was going
8      to -- he basically explained to me my --
9          MR. HAYDEN:  You don't have to tell him,
10     but just generally.
11 A.  Generally.  Just general information of how
12     it's going to go.  I've never been through one
13     of these, so I was just curious as to how the
14     proceedings were going to take place.
15 BY MR. BANKER:
16 Q.  When you say "he," you're referring to Mr.
17     Hayden?
18 A.  Yes, sir.
19 Q.  Let me start with just a little background,
20     biographical information.  How old are you?
21 A.  I'm 51.
22 Q.  Where do you currently live?
23 A.  N48797 Koxlien, K-O-X-L-I-E-N, in Strum,
24     S-T-R-U-M, Wisconsin.
25 Q.  And do you rent there or own?

Page 6

1  A.  We own.
2  Q.  And do you live there at that address with
3      anyone else?
4  A.  My wife, four dogs, and a cat.
5  Q.  And do you have any plans to move from there in
6      the next 12 months?
7  A.  No, sir.
8  Q.  Let's just talk briefly about your education.
9      Did you graduate from high school?
10 A.  Yes, sir.
11 Q.  And then after -- what year did you graduate
12     from high school?
13 A.  1986.
14 Q.  After high school, did you attend any college?
15 A.  Yes, sir.
16 Q.  Where did you go?
17 A.  University of Nebraska at Lincoln for two
18     years, and I transferred to the University of
19     Nebraska at Kearney where I received a
20     Bachelor's Degree in secondary education.
21 Q.  What year was that?
22 A.  1994.
23 Q.  And do you -- have you had any formal education
24     since then?
25 A.  No, sir.

Page 7

1  Q.  Do you hold any certifications?  You mentioned
2      secondary education Bachelor's Degree.  Do you
3      hold a teaching certification?
4  A.  I did, sir.
5  Q.  For what time?
6  A.  Up -- the first six years after high -- after
7      college it's valid, and then after that -- I
8      only taught for one year, so after that it
9      became inactive.
10 Q.  Are you currently employed?
11 A.  Yes, sir.
12 Q.  By whom?
13 A.  Union Pacific Railroad.
14 Q.  How long have you worked for Union Pacific?
15 A.  Since 2014.
16 Q.  What do you do currently for Union Pacific?
17 A.  I'm a manager of yard operations in Altoona,
18     Wisconsin.
19 Q.  How long have you been the manager of yard
20     operations in Altoona?
21 A.  Two-and-a-half years.
22 Q.  What did you do before that?
23 A.  I was in Itasca as the manager up there for two
24     years.
25 A.  A manager of a yard operation in --

Page 8

1  A.  Yes, sir.
2  Q.  -- Itasca?  How about before that?
3  A.  Before that, I worked for the ROTC program at
4      Creighton University.
5  Q.  What did you do for the ROTC program at
6      Creighton?
7  A.  I was a recruiting and retention officer, and I
8      also taught a freshman class.
9  Q.  Have you ever served in the United States
10     Military?
11 A.  Yes, sir.
12 Q.  When did you -- when did you start that?
13 A.  1993.  I retired after 25 years of military
14     service.
15 Q.  Okay.  What branch were you with?
16 A.  Nebraska National Guard, Army.
17 Q.  And what did you do for the Nebraska National
18     Guard?
19 A.  I started off as an enlisted soldier, went
20     through officer candidate school.  I retired as
21     a major.
22 Q.  And that -- that was in -- let's see.  Started
23     in 1993, so 25 years -- help me with the math
24     on that.  23 --
25 A.  It was around 2014 that I retired.

2 (Pages 5 to 8)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 9

1  Q.  What did you do after you retired from the
2  military?
3  A.  I was working at -- for the railroad at the
4  time.
5  Q.  So it --
6  A.  So it was -- it was dual -- since I was
7  National Guard, it was part time, so I would
8  serve one weekend a month, two weeks in the
9  summer of annual training.
10  Q.  I see.  So maybe I should ask it this way.
11  When did you first start working for UP?
12  A.  In 2014.
13  Q.  And what was the first work that you did for
14  UP?
15  A.  The -- up in Itasca.
16  Q.  So we've -- we've kind of covered that.
17  A.  Yes, sir.
18  Q.  You worked in Itasca as the --
19  A.  The first year was training --
20  Q.  Okay.
21  A.  -- was my OMT -- OMT training, so I actually
22  worked out of Council Bluffs, Iowa, and
23  Missouri Valley, Iowa.  And then I got -- my
24  first duty position was in Itasca.
25  Q.  What does OMT stand for?

Page 10

1  A.  A management trainee.  I can't remember what
2  the O stands for, but it's a management trainee
3  program.  I think it's operational management
4  training.
5  Q.  Did you have a task specialty in the Nebraska
6  National Guard?
7  A.  Yeah, I was an armor officer.
8  Q.  What does an armor officer do?
9  A.  I'm in charge of, at the time, a platoon of
10  tanks, so four tanks, which each tank has four
11  crew members.  I didn't -- I've done many
12  things.  The last -- the last position I held
13  was an operations officer.  So, yeah, a variety
14  of different tasks.
15  Q.  Were you ever deployed with the National --
16  Nebraska National Guard as a --
17  A.  Yes, sir.  I was deployed twice.
18  Q.  To where?
19  A.  I was in Iraq in 2003, 2004, and I was in
20  Afghanistan in 2007, 2008.
21  Q.  I want to shift gears and talk about Jacob
22  Tischer.  Before August 12th, 2017, did you
23  know Jacob Tischer?
24  A.  Yes, sir.
25  Q.  How did you know him?

Page 11

1  A.  He was a conductor up in Itasca.
2  Q.  And as a manager of yard operations -- is that
3  also referred to by the abbreviation MYO?
4  A.  Yes, sir.
5  Q.  So as an MYO what, if any -- were you in a
6  supervisory capacity over Mr. Tischer when --
7  A.  Yes, sir.
8  Q.  -- when he was in Itasca?
9  A.  Yes, sir.
10  Q.  And just as we're talking here, we got to make
11  sure that I finish and you start.  I know it's
12  easy to do, but we don't get a clear record
13  unless we -- we can't talk over each other.
14  Okay?
15  A.  Correct.
16  Q.  So as an MYO you were -- you were a supervisor
17  of Mr. Tischer in Itasca?
18  A.  Yes, sir.
19  Q.  At some point did he move from Itasca to
20  Altoona?
21  A.  Yes, sir.  I don't know when.
22  Q.  Were -- when you were an MY -- were you also an
23  MYO in Altoona?
24  A.  I still am, yes.
25  Q.  Still am.  And so in both Itasca and Altoona as

Page 12

1  an MYO you were a supervisor of Mr. Tischer?
2  A.  Yes, sir.
3  Q.  When we say "a supervisor," you know, how much
4  contact did you have with him on a day-to-day
5  basis?
6  A.  Whenever he came on duty for whatever job he
7  was working, I would give them instructions on
8  what was to be done that day.  We talked, you
9  know, casually -- casually too.
10  Q.  And so in the deposition of Mr. Franchuk, he
11  was explaining how when a crew comes on duty,
12  they get some paperwork.  Is what you're
13  describing in terms of giving tasks, do you
14  make that paperwork, or are you -- how does
15  that fit into the mix?
16  A.  Part of it.  I get the instructions from -- for
17  this -- in this case I -- I give -- got the
18  instructions from the WN up at Norma as to
19  what -- which tracks needed to be pulled, and
20  then I would print off the list of cars that
21  they were to pick up.  I also instructed him on
22  what tracks needed to go up.
23  Q.  What is a W-N up at Norma?
24  A.  Wisconsin Northern.  Wisconsin Northern
25  Railroad is the WN.  They would contact me to

3 (Pages 9 to 12)

Page 13

1      let me know which tracks were available to
2      pull.
3    Q.   And they are -- what you're doing between
4      Altoona and Norma is taking empties up and full
5      cars back, for the most part?
6    A.   For the most part.
7    Q.   Did you, from your experience having contact
8      with Mr. Tischer, develop an impression of how
9      he normally behaved?
10   A.   He was a good worker.  I liked him a lot.  He
11     would always talk about fishing, so we would
12     discuss fishing stories.
13   Q.   Are you a fisherman as well?
14   A.   I used to be.  I don't have time anymore.
15   Q.   Did you have any issues with Mr. Tischer before
16     August 12th, 2017, from a safety perspective?
17   A.   No, sir.
18   Q.   Or from an operations standpoint?
19   A.   No, sir.  He was a good worker.
20   Q.   So I want to focus specifically on August 12th,
21     2017, the day of Mr. Tischer's incident.  Do
22     you recall that date?
23   A.   Yes, sir.
24   Q.   How -- what -- in what capacity were you
25     working on that day?

Page 14

1    A.   I was -- I'm a manager.  I was the one that
2      gave him the instructions as to what they're
3      doing that day.
4    Q.   So you were on duty when Mr. Tischer and Mr.
5      Franchuk came on duty?
6    A.   Yes, sir.
7    Q.   Do you remember what time that was?
8    A.   No, I do not, sir.
9    Q.   Was that a regular job that they were working;
10     they would go out at the same time every day,
11     or did it vary?
12   A.   Well, no.  That job normally starts at 9 a.m.
13     in the morning, but they didn't start at 9 a.m.
14     I'm the night manager.  So they started -- you
15     know, it was -- it was irregular time of start
16     for that -- that job.
17   Q.   What time did you come on duty on August 12th,
18     2017, or had it been the day before?
19   A.   It was that -- that afternoon I came on duty.
20   Q.   So you were coming on duty that afternoon to
21     work into the night?
22   A.   Yes, sir.
23   Q.   So what time does the night shift start in
24     Altoona?
25   A.   Normally it starts at 6.  So I --

Page 15

1    Q.   6 p.m.?
2    A.   6 p.m., yes, sir.  But, like I said, I was
3      on -- on duty for that day.  It was -- I
4      believe it was a Friday, so I actually had to
5      work 24-hour coverage that day because we only
6      at the time -- I can't think straight.  I'm
7      sorry.  Chess was off -- it was his days off,
8      so I was covering 24-hour coverage.
9    Q.   Who is Chess?
10   A.   Jerome Chess, the other manager, the other MYO.
11   Q.   And is that something you would have to do from
12     time to time is work 24-hour coverage?
13   A.   Yes, sir.
14   Q.   So Mr. Tischer and Mr. Franchuk come on duty.
15     You're giving them their work assignment for
16     the day?
17   A.   Yes, sir.
18   Q.   What was their work assignment for the day?
19   A.   Their work assignment was to take empties up,
20     and they were to pull two loads back.  So they
21     were to go up with empties, come back with
22     loads.  And then they were going to go up light
23     power, which just means the engines, and they
24     were going to pull back another track.  I told
25     them that at the beginning of their shift.

Page 16

1    Q.   Did you participate in any job safety review
2      that day?
3    A.   No, sir.
4    Q.   Would that be your ordinary practice, or is
5      that something the crews handle themselves?
6    A.   They handle that themselves.
7    Q.   And you gave them some paperwork?
8    A.   Yes, sir.
9    Q.   What did the paperwork consist of, to your
10     recollection?
11   A.   Paperwork consisted of the cars on the track
12     that they were to pull and I believe the
13     consists they were going to take up and also
14     the -- the cars from Altoona that they were
15     going to take.
16   Q.   So are they -- are they actually assembling --
17     is the train that they're going up to Norma
18     with, is that already assembled?
19   A.   Yes, sir.
20   Q.   And so they're not having to do any switching
21     or assembly; it's ready to go?
22   A.   Correct.
23   Q.   And how is -- that outbound train headed to
24     Norma, how is -- you mentioned light power.
25     How is it configured in terms of power?

Page 17

1  A. Well, like I said, they'll have -- and, again,
2     I don't remember if it was two or three, but
3     since it was so busy, I'm guessing it was
4     three, three units. And then they would
5     take -- they would tack into those -- those
6     empties, take them up to the WN, and then they
7     would take that same set of power, grab a track
8     from the WN and pull it down. Then their next
9     job would have been to take just the engines
10    back up to the WN, grab a second track of
11    loads, and bring them back down. That was what
12    task was -- they were supposed to do that day.
13 Q. And was that something you communicated to them
14    at the beginning of the shift?
15 A. Yes, sir.
16 Q. So what happens next in your awareness with
17    respect to Mr. Tischer and Mr. Franchuk?
18 A. Once I've given them their instructions, I have
19    other tasks and duties I have to do. So once I
20    saw them heading out the door to get on to
21    their power, I went on to other things.
22 Q. Okay. And so did you have any more contact
23    with Mr. Franchuk or Mr. Tischer before they
24    returned back from Norma to Altoona?
25 A. No, sir.

Page 18

1  Q. Did you have any communications from them one
2     way or another before that point when they
3     returned back to Altoona?
4  A. No, sir. I was monitoring the radio. I heard
5     that they were on the way back. That's when I
6     grabbed the paperwork for their second pull,
7     was heading out -- heading out to the -- the
8     yard to get it to them.
9  Q. I want to -- I want to be sure I understand
10    what you're saying about the second pull. I
11    thought I heard you say a moment ago that from
12    the beginning of the shift it was always the
13    understanding that they've got to go up twice?
14 A. Correct.
15 Q. But when you heard them coming back on the --
16    you heard on the radio that they were coming
17    back, there was some paperwork for the second
18    pull that you were getting?
19 A. Correct. I didn't want to give them both
20    tracks at the same time because I didn't want
21    to confuse them.
22 Q. Sure.
23 A. I gave them only what they needed to know right
24    then and there. And then when they were coming
25    back, I was going to give them the second set

Page 19

1     so they knew exactly what to do then.
2  Q. So do you know what time it was that you first
3     heard that they're coming back so that you
4     would grab the paperwork for the second pull?
5  A. No, sir. I did not look at my watch when the
6     radio -- when I talked to them -- or heard them
7     on the radio.
8  Q. If you wanted to find out where the train was
9     at a given point, is there any recordkeeping
10    that you're aware of that UP maintains?
11 A. All I know is the AEI readers, and those are
12    vague at best. It tells them when they cross
13    those certain points, but, you know, I don't
14    know how fast or how slow they were going or if
15    they got delayed by the dispatcher or anything.
16 Q. Sure. What is an AEI reader?
17 A. I don't know what the acronym stands for.
18    Basically what it does is each car on each
19    engine has a -- has a chip on the side of it
20    that when it crosses that reader, it goes into
21    the computer system saying that this car
22    crossed this point at this time.
23 Q. So am I right in presuming that there are
24    multiple AEI readers out in the -- on the rail?
25 A. There are, but between here and -- and

Page 20

1     Chippewa, there's only two.
2  Q. Do you have access to the AEI data in real time
3     as it's -- as it's reading?
4  A. I -- I can -- as I -- I can log into it, and as
5     of the time I log in, it would register when --
6     if and when a train crosses that AEI reader.
7  Q. And then after the data is created, is it -- is
8     it maintained in some place?
9  A. I do not know. I'm assuming it is, but I do
10    not know exactly where it is maintained.
11 Q. And what -- what would one see in terms of AEI
12    data? Would we see that a particular
13    locomotive and particular cars passed a sensor?
14 A. Yes, sir.
15 Q. And, like, a time?
16 A. It will have a time stamp on it.
17 Q. Have you had an opportunity to look at any AEI
18    data pertaining to this --
19 A. This train?
20 Q. Yes.
21 A. No, sir.
22 Q. And I don't -- maybe I forgot to ask this at
23    the beginning. But going back to the
24    preparation issue. In preparing for this
25    deposition today, did you look at documents to

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 21

```
 1      prepare for your deposition?
 2   A. No, sir.
 3   Q. Okay. So you hear on the radio that Mr.
 4      Franchuk and Mr. Tischer are coming back; you
 5      grab some paperwork for the second pull. What
 6      happens next?
 7   A. I drive out to the yard.
 8   Q. So where are you driving from? Where are you
 9      --
10   A. I'm driving from the Altoona yard around the
11      eastern end of the yard into the yard.
12   Q. Okay. Where are you starting that journey?
13      Are you in the --
14   A. I'm in the -- I'm in my office in the Itasca
15      (sic) yard -- in the -- in the yard office.
16   Q. And is that the same as the depot?
17   A. Yes.
18   Q. So there's a depot building that has some
19      office space?
20   A. Correct.
21   Q. You start there, grab the paperwork for the
22      second pull. And then to drive to where you're
23      going to go, you have to leave the yard and
24      come back into the yard?
25   A. Correct. The only way in and out of the actual
```

Page 22

```
 1      yard is on the north end, and there's two
 2      entrances: one on the east end, one on the
 3      west end.
 4   Q. So what kind of vehicle are you getting into to
 5      drive out to the yard?
 6   A. A Ford Explorer.
 7   Q. Is that a company vehicle?
 8   A. Yes, sir.
 9   Q. Does that company vehicle have any sort of GPS
10      tracking system?
11   A. I do not know if it does or not.
12   Q. Do you know what time it was that you got into
13      that Ford Explorer and drove out to --
14   A. The -- the only time I remember is I -- I
15      arrived in the yard sometime after 8 p.m.
16   Q. And why do you have a recollection of that
17      particular time?
18   A. Because I -- I glanced at my watch as I was
19      leaving, and it was right around -- sometime
20      after 8 p.m. is when I got there.
21   Q. So as you're traveling into the yard in the
22      Ford Explorer, where are you headed?
23   A. Please define the question.
24   Q. Sure. So you leave the depot with the
25      paperwork, you get into the Ford Explorer, you
```

Page 23

```
 1      drive out of the yard and back into the yard.
 2      What's your destination?
 3   A. The destination is the shack, the shanty.
 4   Q. On the --
 5   A. East.
 6   Q. -- east end of the yard?
 7   A. That's why I went to the east because I knew
 8      that's where they were going to end up.
 9   Q. And did you know that by listening to the
10      radio?
11   A. Well, they -- the general direction of travel
12      for that train, they're coming in from the
13      west, and so the power is going to be on the
14      east end.
15   Q. Okay.
16   A. So I know if I went to the west end, I would
17      still have to drive through the entire yard to
18      get to the east end to talk to them, so I just
19      went in through the east end of the yard.
20   Q. Because you're going to meet the crew at the
21      east end?
22   A. Correct.
23   Q. That's just how things work?
24   A. Um-hum.
25   Q. So you're driving to the east end to the
```

Page 24

```
 1      shanty. What happens next?
 2   A. I -- I pull in. I park east of the shanty
 3      because Mr. Franchuk is -- is waving at me
 4      to -- he wanted to talk to me.
 5   Q. And I asked this question about Mr. Tischer.
 6      But did you also know Mr. Franchuk before
 7      August 12th, 2017?
 8   A. Just from working in the yard, just, you know,
 9      me being manager I've seen him on severals
10      occasions working because they work almost
11      every day.
12   Q. So kind of an acquaintance?
13   A. Yes, sir.
14   Q. He's waving you down. What happens next?
15   A. He waves me down, I park the truck, turn it
16      off. I walk over to Mr. Franchuk. He
17      expresses concern that he says that he don't --
18      he doesn't think Tischer is feeling very well
19      and if I would go and talk to him. I said I
20      would.
21   Q. When you're having this conversation with Mr.
22      Franchuk, where are you located?
23   A. I am standing next to him next to the engines
24      on Track 5.
25   Q. And when he says, Go talk to Mr. Tischer, do
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 25

1    you know where Mr. Tischer is?
2    A.  He never told me to go talk to Tischer.  He
3        asked me if I would talk to him.
4    Q.  So when he asked you to go talk to Tischer, did
5        you have an understanding of where Tischer was?
6    A.  I -- at the time I did not know.  I turned
7        around and I saw him, and then I went over and
8        talked to him.
9    Q.  So when you turned around and you saw Tischer,
10       where was Tischer?
11   A.  He was standing over by the PTI vehicle.
12   Q.  Outside of it?
13   A.  Outside of it.
14   Q.  So you walked over to him?
15   A.  Yes, sir.
16   Q.  What happened next?
17   A.  I walked over to him.  I asked if he was
18       feeling okay.  He said he was.  I said, Are you
19       sure?  Neil has expressed concern that you're
20       not feeling well.  Are you okay?  He says, Yes,
21       I'm fine.
22   Q.  What happened next?
23   A.  What happened next?  He -- from -- from my
24       visual of him, he didn't -- he looked like he
25       was sick.  He didn't -- he looked like he may

Page 26

1    have the flu or something like that.  I didn't
2    know for sure, but he wasn't -- he didn't look
3    like his normal self.  He didn't look well.  I
4    said, Are you sure you don't need help, you
5    don't need any medical attention.  He goes, No,
6    I'm fine, I'm fine.  And I said, Okay, let
7    me -- let me go talk to somebody.  So I went
8    back to my vehicle, got in the vehicle, and I
9    called Mike Swentik, who is my boss, and I told
10   him, I said, I don't think Tischer is feeling
11   well.  I'm going to send him home.  So I got
12   back out of the vehicle, went back, talked to
13   Tischer.  I said, You're not feeling well.  I
14   said, I don't want you driving home.  I want
15   you to call your wife when you get back to the
16   office to have her come pick you up, and stay
17   there until I get back.
18   Q.  Now, you mentioned when you first got to the
19       yard before you talked to Franchuk, before he
20       waved you down, that you looked at your watch
21       and it was a little bit after eight?
22   A.  Yes, sir.
23   Q.  Did you look at your watch again at any point
24       in what -- you know, from that point up to what
25       you've just said about --

Page 27

1    A.  No, sir.
2    Q.  -- Tischer calling his wife?
3    A.  No, sir.
4    Q.  Are you able to make any estimate of the amount
5        of time that passed between first hearing from
6        Mr. Franchuk that there was an issue to where
7        you told Mr. Tischer, Go back -- go to the
8        depot and call your wife, you're going home?
9    A.  I do not know.  I mean, you can check my phone
10       logs as to when I called Mike Swentik because
11       I -- I told him to go back to the office right
12       after I told Mike that I was sending him home.
13   Q.  Was it a personal phone or company phone?
14   A.  Company phone.
15   Q.  Did you -- when you say "phone logs," do you
16       mean a separate log that you've maintained, or
17       do you mean --
18   A.  No, I mean just the phone log from the phone.
19   Q.  Whatever the phone has?
20   A.  Right.
21   Q.  Do you know whether your phone currently has
22       logs that go back two years?
23   A.  I do not know.  It's the same phone number I've
24       always had.
25   Q.  So you talked to Mr. Tischer, you're near the

Page 28

1    shanty, you tell him you're sending him home,
2    call your wife, go to the office and wait.
3    What happens next?
4    A.  I -- I was talking to Franchuk and those guys,
5        and I thought maybe he might be having a --
6        like a diabetic attack or something like that.
7        I know he never said anything about diabetes,
8        but just from the way he was acting to me
9        seemed like he was -- he was going through --
10       he needed some sugar.  So while he was getting
11       in the cab to come back to the office, I got in
12       my vehicle, drove to the gas station, bought a
13       Gatorade and a candy bar and headed back to
14       the -- back to the office.
15   Q.  Let me just back up a step.  So when you say
16       one of the ideas that you have in your head is
17       some sort of diabetic attack, do you have any
18       personal experience with that, or what -- what
19       is that based on?
20   A.  I have -- don't have anybody in my family that
21       has diabetes, but, you know, I've seen TV shows
22       about it.  I've -- judging from his -- his
23       vehicle, he had a lot of fast-food containers
24       in there, so I don't -- he -- and he didn't
25       seem like he was eating that healthy.  But it

7 (Pages 25 to 28)

Page 29

1    just -- from the way he was acting, it seemed
2    like he was lethargic, and that's one of the
3    signs I know of diabetes.
4    Q.  Let me back up a step.  So, you know, you've
5        spent a long time in the Nebraska National
6        Guard.  As part of your training with the
7        National Guard, did you receive any first-aid
8        training?
9    A.  Yes, we received first-aid training.
10   Q.  Is it kind of the basic first-aid training
11       everybody gets in basic first-aid training?
12   A.  Yes, sir.
13   Q.  Did that inform your impression that this might
14       be a diabetic attack of some sort, or are we
15       just talking about general life experience?
16   A.  Just general life experience.
17   Q.  Did you have any first-aid training that was
18       provided by Union Pacific when you started to
19       work for Union Pacific?
20   A.  Yes, sir.
21   Q.  Was that different than what you'd received
22       from the Nebraska National Guard?
23   A.  Yes, sir.
24   Q.  In what way?
25   A.  The training for the Union Pacific Railroad was

Page 30

1    mostly on CPR and then just basic first aid.
2    My military training is based on heat
3    casualties, cold casualties, wound -- wound
4    dressings, sucking chest wounds, you know,
5    combat-type issues.
6    Q.  Sure.  Okay.  So you mentioned that when you
7        were talking to Franchuk and you said "those
8        guys," that you thought this might be a
9        diabetic attack, who is the -- who is the
10       "those guys" that --
11   A.  That would be the -- the switch crew that was
12       there.
13   Q.  Do you remember their names?
14   A.  That would be Lowe and -- I don't know the
15       other guy.  I can't remember his name.  Just
16       drew a blank.  John.
17   Q.  John Thomas?
18   A.  Yeah, John Thomas.
19   Q.  So John Thomas and Harold Lowe are at the
20       shanty as this is --
21   A.  They're mulling around.  I'm -- I'm not
22       really -- don't really know exactly where
23       they're at because I'm focused on Jake.
24   Q.  Jake is there.  Is Franchuk there?
25   A.  No.  He's on the power because he has to

Page 31

1    maintain control of the power, so he's there.
2    Q.  So when you first came into the yard, you're
3        talking with Franchuk near the power?
4    A.  Yeah.  He was -- he had just gotten off the
5        steps, and I -- I talked to him right there at
6        the power because I know he couldn't stray from
7        the power.
8    Q.  So he stays there?
9    A.  Yes, sir.
10   Q.  You go to the shanty where you're talking with
11       Tischer?
12   A.  Yes, sir.
13   Q.  Is there anybody else there at that point?
14   A.  Again, I don't know where they were at, but I
15       know that the -- the switch crew was around
16       there.
17   Q.  Thomas and Lowe?
18   A.  Correct.
19   Q.  How about -- do you know who Chaz Lux is?
20   A.  Yes, sir.  He's the PTI driver.
21   Q.  Was Mr. -- Mr. Lux there at the shanty at that
22       time?
23   A.  I believe he was in his vehicle.
24   Q.  So when you say you're sending -- when you tell
25       Mr. Tischer you're sending him home, call your

Page 32

1    wife, and go to the office, what does Mr.
2    Tischer do next?
3    A.  He -- he gets in the cab and goes to the
4        office.
5    Q.  The cab driven by --
6    A.  The PTI cab, yes, sir.
7    Q.  And -- and are you immediately then -- when Mr.
8        Tischer gets into the cab and goes, are you
9        immediately getting into your car and going?
10   A.  Well, like I said, I had a discussion about the
11       diabetes, and then as soon as that discussion
12       was done, I got in the cab -- in my vehicle and
13       drove to the gas station and then back to the
14       office.
15   Q.  And the office being the depot?
16   A.  Correct.
17   Q.  So what happens next after you got the Gatorade
18       and the candy bar?
19   A.  I drive back to the depot.  As I'm pulling into
20       the parking lot, I notice the passenger's side
21       door is open, and I get out, and I walk around
22       the back of the PTI vehicle and see Jake on the
23       ground with his left leg still in the vehicle.
24   Q.  As though he had fallen?
25   A.  He had fallen out, yes, sir.

8 (Pages 29 to 32)

Page 33

```
 1   Q.  So what did you do?
 2   A.  What did I do?  I immediately went over to him
 3       and asked if he was okay.  At that point I saw
 4       that his left -- left side of his face was
 5       drooping.  I went to go pick him up.  He
 6       couldn't move his left arm, and he couldn't
 7       push with his left leg.  It was just dragging.
 8       At this point Chaz comes out.  I asked Chaz if
 9       he would grab his jacket and use it as a pillow
10       to support Jake's head.  So while he was doing
11       that, that's when I contacted 911.
12   Q.  I want to go back just a step here.  You said
13       the left side of Mr. Tischer's face was
14       drooping?
15   A.  Yes, sir.
16   Q.  What is that -- what did you see?
17   A.  That was -- that's the signs of stroke.
18   Q.  What do you base that statement on?
19   A.  My training through the UP.  We had -- again,
20       along with our CPR, there was a little bit of
21       training on -- on stroke.
22   Q.  When you say left side of his face was
23       drooping, what does that actually look like?
24   A.  Well, the mouth sags down, the cheek goes down.
25       Like when I went to help him, when I went to
```

Page 34

```
 1       pick him up, he couldn't move his left arm.
 2       His left arm was just there, but his right arm
 3       was wrapped around me this way (indicating).
 4   Q.  Okay.
 5   A.  And then when he went to try and get up, he
 6       went to push off with his right foot, but his
 7       left foot didn't move.  Because normally when
 8       you would get up, you would push off with both
 9       your feet.
10   Q.  Sure.
11   A.  He couldn't move his left leg either.
12   Q.  Had you ever -- before August 12th, 2017, had
13       you ever seen facial drooping before?
14   A.  No, sir, not on a -- I have never seen a stroke
15       victim before.
16   Q.  So when you're seeing Mr. Tischer display this
17       facial drooping at the depot, you made an
18       association in your mind between what you were
19       seeing really for the first time and your prior
20       training about strokes and made a connection
21       that --
22   A.  Yes, he was having a stroke.
23   Q.  -- maybe it's a stroke?
24   A.  Yes, sir.
25   Q.  Had you seen the facial drooping that you saw
```

Page 35

```
 1       at the depot prior to the depot?
 2   A.  No, sir.
 3   Q.  And then you called 911?
 4   A.  Yes, sir.
 5   Q.  Did you use your mobile phone for that?
 6   A.  I used my work phone, yes, sir.
 7   Q.  How did you make the determination to call 911
 8       at that point?
 9   A.  Well, it's obvious when he was on the ground
10       and he can't -- can't move the left side of his
11       body, he's in serious trouble, so that's why I
12       called 911.
13   Q.  Was he -- had his condition changed from when
14       you last saw him at the shanty?
15   A.  Well, when I left the shanty, he was still
16       walking, coherent, and cognitive.  When he was
17       at the depot, he was on the ground and couldn't
18       move, but he was still coherent.  I could still
19       understand what he was saying.
20   Q.  Sure.  I just want to make sure I get all the
21       perspectives on this.  So Mr. Tischer is --
22       he's on the ground.  You're trying to help him
23       up, but he's -- he's unable -- his left arm
24       isn't helping, his left leg isn't helping.  At
25       some point Mr. Lux comes out of the depot, and
```

Page 36

```
 1       you're trying to get him to help too?
 2   A.  Yes, sir.
 3   Q.  Is there any conversation at that point between
 4       you and Mr. Tischer?
 5   A.  I -- I'm just talking to him, Hey, are you
 6       okay, are you okay, and he says -- he was
 7       saying to me, I -- you know, I couldn't move my
 8       left side.
 9   Q.  As he spoke, did you observe or did you hear
10       any slurring of his words?
11   A.  No, sir.
12   Q.  Did you have any conversation beyond that his
13       left side wasn't moving?
14   A.  No, sir.  We tried once to pick him up, and
15       he -- it was -- he was like -- he was
16       deadweight.  He couldn't move.  And then I
17       didn't want to move him anymore, so I said --
18       that's when I had Chaz put something under his
19       head as a pillow, and that's when I called 911.
20   Q.  Was there any conversation between Mr. Lux and
21       Mr. Tischer after you arrived?
22   A.  No, I do not know that.
23   Q.  Was there any conversation between you and Mr.
24       Lux after you arrived?
25   A.  No, sir.
```

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 37

1   Q.  So you call 911.  What is the substance of the
2       call with 911?
3   A.  Called 911, gave them my location, told them
4       that I had an employee that was in need of
5       assistance and that he may have had a stroke.
6       And then they started to talk to me, asking me
7       questions to ask Mr. Tischer, and so I would
8       relay the questions to Mr. Tischer.  He would
9       respond, and I would relay those back to the
10      911 caller (sic).
11  Q.  So what questions did the 911 dispatcher ask of
12      you to ask of Mr. Tischer?
13  A.  I do not remember.
14  Q.  What was the general subject matter?  Were they
15      asking kind of --
16  A.  They were diagnostic questions to determine the
17      ailment or whatever is wrong with Mr. Tischer.
18  Q.  Was there any questions asked of Mr. Tischer at
19      that point as to when this incident started?
20  A.  No, sir.
21  Q.  Did you have any information at that point as
22      to when this incident started?
23  A.  No, sir.
24  Q.  Were you able -- was Mr. Tischer able to answer
25      all of the questions that you relayed from the

Page 38

1       dispatcher?
2   A.  Yes, sir.
3   Q.  How long did it take after you called 911
4       before there was some sort of first responder?
5   A.  I do not know.
6   Q.  Who was the first person to arrive on the
7       scene?
8   A.  The police.  The police, their offices are
9       about three blocks down.
10  Q.  So the police arrive on scene?
11  A.  Yes, sir.
12  Q.  What happens next?
13  A.  I -- the police pull up.  I -- I tell them
14      what's going on.  They say, There's an
15      ambulance en route.  At that point, I get a
16      call from Jake's brother on the -- on my phone
17      asking what's going on.  I explained to him
18      that he's on the ground, I've called the
19      paramedics, they're on the way.
20  Q.  Who is Jake's brother?
21  A.  Josh.
22  Q.  Was that someone that had previously worked for
23      the railroad?
24  A.  Yes, sir.
25  Q.  Was that a contact that you already had in your

Page 39

1       phone, or was it an unknown caller calling in?
2   A.  Honestly, I don't remember.  But when he
3       identified himself as Josh, I knew who he was
4       because he was also a manager for the -- the
5       CN, Canadian National Railroad, and we would --
6       we had a lot of conversations and discussions
7       with each other when I worked up in Itasca.
8   Q.  And so when the call came in from Josh Tischer,
9       do you remember any other specifics of that
10      conversation?
11  A.  Yes, sir.  He asked if I would relay to the
12      paramedics to take him to Mayo, which I did.
13      And I had to cut the conversation short because
14      that was when the paramedics were coming.  I
15      said, I gotta go, I gotta flag down the
16      paramedic.
17  Q.  Is there a Mayo Clinic in Altoona?
18  A.  It's in Eau Claire.
19  Q.  In Eau Claire.  Okay.  So the police came
20      first.  Are the police still there when the
21      paramedics arrive?
22  A.  Yes, sir.
23  Q.  The paramedics arrive with an -- with an
24      ambulance?
25  A.  Yes, sir.

Page 40

1   Q.  Was there any other kind of first responder
2       there?
3   A.  No, sir.  There was just the -- the two police
4       officers and the two paramedics.
5   Q.  So no fire truck?
6   A.  No fire truck.
7   Q.  So the paramedics arrive.  What happens next?
8   A.  Paramedics get out, I show them where he's at,
9       I explain what's going on, and then they go and
10      assist Mr. Tischer.  I back away because I
11      don't want to get in their way.
12  Q.  Where is Mr. Lux while this is happening?
13  A.  I do not know.  I'm not really concerned about
14      that.  My focus is Tischer.
15  Q.  Is anybody else there other than the police and
16      the paramedics?
17  A.  No, sir.
18  Q.  What happens next?
19  A.  The paramedics start talking to Mr. Tischer,
20      they put him on a gurney, they haul him away
21      and take him to Mayo Clinic.
22  Q.  How long were the paramedics on scene attending
23      to Mr. Tischer?
24  A.  I -- I do not know.
25  Q.  So the paramedics leave.  What do you do next?

10 (Pages 37 to 40)

Page 41

1  A.  I go back in the office.  I don't remember
2  exactly what -- what I did.  I -- I don't want
3  to speculate because I don't remember.  I do
4  know later on that night when my boss, George
5  (sic) Swentik, comes in, we both go down to the
6  hospital and try to find out how Tischer is
7  doing, and then we were asked to leave.
8  Q.  Is the hospital the same thing as the Mayo
9  Clinic?
10  A.  Yes, sir.
11  Q.  And so you and Mr. Swentik go to the hospital.
12  Who asked you to leave the hospital?
13  A.  We were talking to the receptionist, and the
14  receptionist told us on behalf of the family we
15  were asked to leave.
16  Q.  Do you know what time that was?
17  A.  No.  It was -- I don't remember.  It was really
18  late.
19  Q.  What did you do after that?
20  A.  Well, I was actually off duty.  I went home.
21  Q.  Did you have any other conversations with
22  anyone that night of August 12th that we
23  haven't talked about?
24  A.  No, sir.
25  Q.  Did you prepare any notes regarding this

Page 42

1  incident on August 12th?
2  A.  No, sir.
3  Q.  How about after?
4  A.  No, sir.
5  Q.  Did you prepare any electronic documents
6  regarding this incident --
7  A.  No, sir.
8  Q.  -- either on August 12th or after?
9  A.  No, sir.
10  Q.  Did you have to fill out any sort of incident
11  report or supervisor's report?
12  A.  I did -- I did talk to Jamie Lukehart.
13  Q.  What do you understand Ms. Lukehart's role to
14  be?
15  A.  She was just wanting to know the facts of what
16  happened.  I explained to her exactly the same
17  thing I'm talking to you about.
18  Q.  Sure.  But what -- what is her role for UP?
19  A.  I can't remember her exact title.
20  Q.  Had you known her before August 12th?
21  A.  I've -- I've known who she was, yes, sir.
22  Q.  And are -- you're having this communication
23  with her on August 12th?
24  A.  I don't remember if it was the 12th or if it
25  was afterwards because that was late and in the

Page 43

1  evening, so it would probably be the next day,
2  I'm assuming.
3  Q.  Did you have any further involvement in this
4  incident after you went off duty on the 12th of
5  August --
6  A.  No, sir.
7  Q.  -- 2017?  Did you ever learn what became of Mr.
8  Tischer?
9  A.  I would ask the crews, and they would -- they
10  would tell me what's going on.  But other than
11  that, that's all I knew was just -- was just
12  hearsay.
13  Q.  What was the hearsay?
14  A.  Hearsay was that he was in the hospital, and at
15  first he was doing well, and then I had heard
16  that he had passed away.
17  Q.  So do you know -- so I want to -- now I'm going
18  to jump around and ask some follow-up questions
19  on the -- kind of the overall timeline.  Do you
20  know whether the -- well, first of all, are you
21  familiar with the technology by which
22  locomotives will sometimes have inward-facing
23  cameras?
24  A.  Yes, sir.
25  Q.  Are you aware of whether any of the power that

Page 44

1  was involved in Mr. Tischer or Mr. Franchuk's
2  work on August 12th, 2017, had inward-facing --
3  A.  No, sir.  There's no way for me to identify
4  locomotives, which ones do not or do have
5  inward-facing cameras.
6  Q.  Is it -- is it true that some do and some
7  don't?
8  A.  They -- at that time they were starting to
9  institute them more, so, like I said, I did not
10  know which ones did and which ones did not.
11  Q.  Have you had an opportunity to view any
12  locomotive -- inward-facing locomotive video
13  from August 12th, 2017 --
14  A.  No, sir.
15  Q.  -- pertaining to Mr. Franchuk or Mr. Tischer?
16  A.  No, sir.  Sorry.  I didn't mean to interrupt.
17  Q.  Sure.  Did Mr. Tischer say anything to you at
18  the beginning of his shift that he wasn't
19  feeling well?
20  A.  No, sir.
21  Q.  Did Mr. Franchuk say anything to you about Mr.
22  Tischer not feeling well at the beginning of
23  his shift?
24  A.  No, sir.
25  Q.  Are you aware of the circumstances leading up

11 (Pages 41 to 44)

Page 45

1     to Mr. Tischer beginning work at 1402 that day?
2  A.  Say again. I'm sorry.
3  Q.  Sure. So Mr. Tischer began work at 1402.
4  A.  Um-hum.
5  Q.  Are you aware of how it was that he was called
6     up to report for work that day?
7  A.  Not until today about the -- the canceled call.
8     I don't -- I didn't remember that.
9  Q.  Is that something that you would have been
10    aware of at the time or not?
11  A.  Yes, sir, I would have been aware of that, that
12    his call was busted at the time, and then he --
13    he called later on when the engineer was on
14    duty.
15  Q.  And I -- tell me in your own words what does a
16    busted call mean.
17  A.  Busted call means that he was called for the
18    job before they called the engineer. There was
19    no engineer available, so they called him back
20    and said, Don't come to work yet, there's no
21    engineer to come to work at this time. So
22    that's a busted call.
23  Q.  So that's a busted call. And so then did he --
24    when they call him back and say, We don't have
25    an engineer, are they able to say when they

Page 46

1     will have an engineer?
2  A.  Yes, sir.
3  Q.  So in what sense is it busted, or is that --
4  A.  Busted means -- it just means that they -- for
5    timekeeping purposes, the -- the clock stops
6    there, so he doesn't actually start time
7    until -- because he would have started his day
8    at 9, so when they bust the call, that means
9    his time doesn't start at 9. The time he
10    starts working is, since you said 1402, is when
11    the clock starts for him.
12  Q.  I see. Does UP have an attendance policy for
13    conductors?
14  A.  They -- they do for all employees.
15  Q.  How does -- how does that work with a busted
16    call?
17  A.  It's just -- there's -- there's no
18    repercussions. There's nothing because it's
19    just saying -- just telling the conductor, Hey,
20    you're not going to come on duty at this time,
21    you're going to come on duty at this time.
22  Q.  So do you -- if your call is busted, do you
23    have to come on duty at the later time or is
24    that optional?
25  A.  Honestly, I don't remember.

Page 47

1  Q.  What -- what is the attendance policy, if you
2    could explain that?
3  A.  The attendance policy is based on habits of
4    layoffs. If they lay off multiple times in a
5    week or multiple weekends in a row, it's to try
6    and maintain crew base and not having everybody
7    laying off at the same time.
8  Q.  So that there's always --
9  A.  And if -- if they determine a pattern of
10    violating that policy, then they can be brought
11    up on -- on -- with -- with a letter of
12    reprimand.
13  Q.  So you're trying to maintain a --
14  A.  Trying to maintain a crew base and make sure
15    that everybody gets days off.
16  Q.  So you're trying to maintain a high level of
17    availability, basically?
18  A.  No. We're trying to make sure that everyone is
19    available to work when they're supposed to work
20    and that everybody gets days off when they're
21    supposed to get days off.
22  Q.  How do the -- how do the days off work? Is it
23    set?
24  A.  No, not for him. He was, I think, on -- I
25    believe he was on the extra board. The extra

Page 48

1     board only works when the normal crew isn't
2    available to work.
3  Q.  So by --
4  A.  So they get -- they get called in random times
5    at random days. He could go every day for five
6    days, or he'd go one day and then have three
7    days off, and then he'd come back again the
8    next -- the fourth day.
9  Q.  So extra board is sort of you're on call --
10  A.  Yeah, they're on call.
11  Q.  -- to work when needed?
12  A.  Um-hum.
13  Q.  And when you get a call when you're on the
14    extra -- extra board, you're expected to be
15    available?
16  A.  Yes, sir.
17  Q.  And how do you -- do you have any -- when
18    you're working the extra board and you're on
19    call like that, do you have any ability to plan
20    for not working, or how does that work?
21  A.  If they know where they're at on the list --
22    it's called being first out. If they're at the
23    top of the list, they're first out. That means
24    that the next train that needs a conductor,
25    they would get called for that train. So if

12 (Pages 45 to 48)

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 49

1    they are, like, second or third out, if they
2    know they have something to do that day and
3    they don't want to get called, they can always
4    lay off sick or take a personal day or
5    whatever.  They -- they have some say in -- in
6    where -- when they work.
7  Q.  Was there -- was there an issue on August 12th,
8    2017, where Mr. Tischer got bumped up on the
9    list because someone called out in front of
10    him?
11  A.  I do not know that information.
12  Q.  Would you have known it at the time?
13  A.  At the time I would have, yes, sir.
14  Q.  But I take it that's -- that's the reason for
15    having a list of people is that sometimes that
16    will happen --
17  A.  Yeah.
18  Q.  -- someone -- someone will call in sick?
19  A.  And that's -- and that's out of my control.
20    The people that call crews to come on duty is
21    CMS.  I didn't -- can't remember what the
22    acronym stands for.  But they're the --
23    they're -- crew management systems.  Excuse me.
24    They're the ones that call conductors and
25    engineers to come on duty.  I have no say in

Page 50

1    that.
2  Q.  So is that like --
3  A.  That's -- they're in Omaha.  That's a ways away
4    from me.
5  Q.  So they are calling up crews to work and making
6    sure that there's --
7  A.  Right.  And they go straight off the boards.
8    The next one on the list gets called.
9  Q.  So you had talked about knowing Tischer well
10    enough as an acquaintance at least to have a
11    sense of how -- what normal was for him?
12  A.  Yes, sir.
13  Q.  And that -- so, I mean, where would you put the
14    line as when you would say, I first noticed
15    that something wasn't right with Jacob Tischer?
16  A.  When I was talking to him by the shanty, I
17    could tell something was not right with him.
18    He looked ill, and that's when I determined to
19    send him home.
20  Q.  Was there -- so focusing on the time when you
21    come into the yard after Franchuk and Tischer
22    have come into Track 5.  Okay?
23  A.  Um-hum.
24  Q.  You get out of your car, and you talk to
25    Franchuk, and he tells you Mr. Tischer is sick.

Page 51

1    Was there any disagreement between the two of
2    you about whether you were going to send him
3    back up to Norma?
4  A.  I hadn't discussed that with him yet.
5  Q.  You were here when Mr. Franchuk was testifying
6    earlier today?
7  A.  Yes, sir.
8  Q.  You heard him say that you were trying to send
9    the crew back up to Norma despite the fact that
10    he was saying Mr. Tischer is sick and that you
11    had offered as an explanation that you were
12    feeling a lot of pressure from Mr. Martinez.
13    Would you agree with that or disagree with
14    that?
15  A.  I told them at the beginning of their shift
16    they were doing two pulls.
17  Q.  Okay.
18  A.  Their -- at the time we were running a lot of
19    sand, so there was a need for us to do two
20    pulls that day.
21  Q.  Sure.
22  A.  But the safety of my crew members comes first,
23    and I didn't send them the second time because
24    of the safety issue.
25  Q.  But I just want to -- I want to focus very

Page 52

1    specifically on when you first learned from Mr.
2    Franchuk that Mr. Tischer is sick.  Was there
3    any discussion or pushback or disagreement
4    between the two of you about whether or not
5    they were going back to --
6  A.  No, sir.
7  Q.  Did you at any time express to Mr. Franchuk
8    that you were having -- you were under pressure
9    from Mr. Martinez?
10  A.  I do not believe so.
11  Q.  Who is Mr. Martinez?
12  A.  Mr. Martinez is director of terminal
13    operations.  He is basically Mike Swentik's
14    boss.  So he's two levels above me.
15  Q.  What's his first name?
16  A.  Paul.
17  Q.  The chain of command is Martinez --
18  A.  Paul Martinez, George Swentik, and then me.
19  Q.  So understanding that you don't recall it, is
20    it your testimony that it is not even possible
21    that you said that when you listened to Mr.
22    Franchuk's account of this?
23  A.  Say again.
24  Q.  Sure.  So Mr. Franchuk testified, Mr. Marvin
25    told me he was getting a lot of pressure to

13 (Pages 49 to 52)

Page 53

1  send us back up to Norma, and I told him that
2  Mr. Tischer was sick. You say, I don't recall
3  that. And what I'm asking is does that sound
4  like a possible conversation that you would
5  have had.
6  A.  I -- I don't want to make a speculation. I
7  don't remember.
8  Q.  Did you ever -- have you ever had pressure put
9  on you by Mr. Martinez to move trains?
10 A.  There's always pressure for every manager on
11 the trains. I mean, that's our job. Our job
12 is to make sure trains get out on time, and we
13 move freight. That's our job.
14 Q.  Was there any -- did you talk to Mr. Martinez
15 at all on August 12th, 2017?
16 A.  No, sir.
17 Q.  Did you talk to Mr. Swentik -- is it Swentik?
18 A.  Swentik, yes. S-W-E-N-T-I-K, Swentik.
19 Q.  Did you talk to Mr. Swentik at any point before
20 Mr. Tischer was transported by ambulance from
21 the depot?
22 A.  I talked to him right before I sent Tischer
23 back to the office to tell him we weren't doing
24 two pulls and I was sending him home.
25 Q.  Where was Mr. Swentik at the time?

Page 54

1  A.  At home.
2  Q.  So he wasn't on duty?
3  A.  No, sir.
4  Q.  Was he -- was that a regular time off for him?
5  A.  Yes, sir. He works during the day.
6  Q.  So you called him at home while you're at the
7  shanty?
8  A.  In my car in the -- at the shanty, yes, sir.
9  Q.  Why are you -- why are you calling Mr. Swentik
10 at that point when he's at home?
11 A.  To let him know that I'm sending the crew home
12 without doing two pulls.
13 Q.  Why would your boss need to know that when he's
14 not on duty?
15 A.  So in the morning, when he was on the morning
16 call, if they asked why we didn't do two pulls,
17 he would -- he would know that I sent the crew
18 member home because he was ill.
19 Q.  But was it your usual practice to call him when
20 he's at home, or would you have some other way
21 of communicating that to him in the ordinary
22 course?
23 A.  I -- I talk to him not every night but most
24 nights when I'm on duty. If I have an issue
25 that concerns him, I would -- I would call him.

Page 55

1  Q.  Did you have any other reason to call him on
2  the night of August 12th, 2017, other than the
3  Jacob Tischer --
4  A.  No, sir.
5  Q.  -- issue? What did he say when you talked to
6  him while you're at the shanty?
7  A.  He said, Okay, that's fine.
8  Q.  Did you -- when was the next time you talked to
9  Mr. Swentik?
10 A.  When he came in that night after the paramedics
11 had already taken Jake to the hospital.
12 Q.  Was Mr. Swentik coming in solely for the
13 purpose of following up on the Tischer
14 incident?
15 A.  Yes, sir.
16 Q.  What was his role in -- once he arrived on
17 scene?
18 A.  Again, Tischer was already at the hospital at
19 that time, and then we both got in the vehicle
20 and went down to the hospital to inquire about
21 how Jake was doing, and that's when we were
22 told to leave.
23 Q.  So is Swentik just coming to the depot to meet
24 up with you so then the two of you are going to
25 the hospital?

Page 56

1  A.  Yes, sir.
2  Q.  Did you know he was coming in to do that before
3  he showed up?
4  A.  No, sir.
5  Q.  Was that your usual practice to -- when an
6  employee has been transported to the hospital
7  to then go to the hospital?
8  A.  No, sir. I did that because I -- I like Jake,
9  and I wanted to make sure he was okay.
10 Q.  And did you -- in the course of communicating
11 with Mr. Swentik -- I take it you didn't talk
12 to Mr. Martinez that night?
13 A.  No, sir.
14 Q.  Did you ever talk to Mr. Martinez about the
15 Tischer issue?
16 A.  No, sir.
17 Q.  Do you know whether Mr. Swentik talked to Mr.
18 Martinez about the Tischer incident?
19 A.  I do not know his conversations with anybody
20 else besides me.
21 Q.  So is it your testimony that as soon as Mr.
22 Franchuk told you that Jake Tischer was sick
23 that you immediately backed off the idea of
24 sending him to the Norma sand plant?
25 A.  I was going to determine how -- how severe his

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 57

1    illness was.
2    Q.  Okay.  So --
3    A.  If it was just, you know, he was lightheaded,
4        well, yeah, I probably would have had them go
5        up again.  But when I determined that his
6        illness was more than that, I made the
7        determination to send him home.
8    Q.  So after you talked to Mr. Franchuk, you wanted
9        more information from Mr. Tischer?
10   A.  Correct, since it was all about Mr. Tischer.
11   Q.  And you go and you talk to Mr. Tischer, and Mr.
12       Tischer says, I'm fine?
13   A.  He says, I'm fine, I'm fine, I'm fine.
14   Q.  So stop right there.  What is your thought
15       process about going back to Norma after Mr.
16       Tischer says, I'm fine?
17   A.  Well, judging from my visualization of how he
18       looks and -- and all, I determined that he was
19       sick enough to send him home.
20   Q.  So even though he's saying he's fine, you have
21       made your determination in your mind as of that
22       point he's not fine?
23   A.  Correct.
24   Q.  He's going home?
25   A.  Yes, sir.

Page 58

1    Q.  And is that -- in your mind is that a safety
2        issue at that point, or why not --
3    A.  It's a --
4    Q.  -- send him --
5    A.  I'm sorry.
6    Q.  Why not send him if he's -- if he -- if he
7        looks a little sick but he says he's fine, why
8        not send him?
9    A.  Because he -- he'd looked not well enough to --
10       to go up a second time, and it was a safety
11       issue, and I didn't feel right sending him up
12       for a second pull.
13   Q.  Would you agree that there's a spectrum of
14       sickness, that a person could be sick and still
15       able to do their job safely; and then there's
16       the other end of the spectrum is they're sick,
17       and they're unable to do the job safely?
18   A.  Correct.
19   Q.  And so in talking with Mr. Tischer, you were
20       trying to make that evaluation, like how sick
21       is he?
22   A.  Correct.
23   Q.  And even though Mr. Tischer said, I'm okay, you
24       didn't think he was okay?
25   A.  Correct.

Page 59

1    Q.  And Mr. Franchuk didn't think he was okay?
2    A.  Correct.
3    Q.  Did you have anybody else's input as of that
4        point that you decided to send him home?  Was
5        it just you and Franchuk, or was there anybody
6        else who was weighing into that process?
7    A.  I honestly -- I didn't -- I wasn't thinking of
8        anybody else or trying to listen to anybody
9        else.  I was focused on Mr. Tischer.
10   Q.  And so the sending-him-home part, is -- is Mr.
11       Tischer calling to get a ride home?
12   A.  I told him to call his wife to come pick him
13       up.
14   Q.  Is that out of the ordinary?  I'm assuming Mr.
15       Tischer drove to work that day.
16   A.  Correct.
17   Q.  Do you know that to be true?
18   A.  Yes, sir.  His -- his car was there.
19   Q.  So his car is there.  How did you make the
20       determination that you don't want him driving
21       home?
22   A.  Well, again, like what Mr. Franchuk said, he --
23       I did see him stumble, and he leaned on his
24       brake stick heavily.  And from that, I
25       determined that he wasn't suitable to drive

Page 60

1        because of -- I guess of those issues.
2    Q.  So, I mean, on the spectrum between a little
3        bit sick, able to work safely; and very sick,
4        not able to work safely, calling someone else
5        to come get you to drive you home seems like
6        you're closer to the --
7    A.  Yes, sir.
8    Q.  -- sick end of the spectrum?
9    A.  Correct.
10   Q.  Had you done that previously with employees
11       where you say, You know what, I'm going to send
12       you home and I want you to call for a ride?
13   A.  No, sir, I haven't said to actually call for a
14       ride.  I have had people who have been sick
15       enough to where I said, Go home.
16   Q.  Sure.
17   A.  But not, No, you're not driving yourself home,
18       no.
19   Q.  So deciding that not only are you sending Mr.
20       Tischer home but that he's not driving himself
21       is an unusual event?
22   A.  Yes, sir.
23   Q.  Do you know where Mr. Tischer lived relative to
24       the depot?
25   A.  No, sir.

15 (Pages 57 to 60)

Page 61

1  Q.  Or how long -- you know how long a drive it
2     was?
3  A.  No, sir.
4  Q.  Did you ever come to an understanding of how
5     far away that was or how long it would take for
6     someone to get there?
7  A.  No, sir.
8  Q.  Was your thought that Mr. Tischer would make
9     that call, though, to get someone to drive him?
10 A.  Yes, sir.  I instructed him to.
11 Q.  Did you see him do that?
12 A.  No, sir, because when he got in -- in the PTI
13    van, they're not allowed to have their cell
14    phones on them, so he would have had to have
15    waited until he got back to the office to call.
16 Q.  I'm not sure I follow.  Say that again.
17 A.  So one of UP's rules is they're not allowed to
18    have their cell phones on them.
19 Q.  Okay.
20 A.  So he wouldn't have had it on him until he got
21    back to the office or until he grabbed his grip
22    from -- from the -- from the cab of the engine.
23 Q.  Because -- are they -- they're storing their
24    cell phones in?
25 A.  In bags in the -- in the locomotive.

Page 62

1  Q.  So how does Mr. Tischer get from the shanty to
2     his grip on the locomotive?
3  A.  I do not know.  Like I said, he got in.  He may
4     have had it already in the -- in the PTI cab
5     with him.  I do not know.
6  Q.  So at that point you're at the shanty, did
7     you ever hear Mr. Thomas make any observations?
8  A.  No, sir.
9  Q.  Did you ever hear Mr. Thomas say, I think Mr.
10    Tischer is having a stroke?
11 A.  No, sir.
12 Q.  Had anyone said something to that effect that,
13    He's having a stroke, or, I think he's having a
14    stroke?
15 A.  No, sir.  The word "stroke" was never
16    mentioned.
17 Q.  At least in your mind stroke is not in your
18    head until you get to the depot and you see the
19    facial drooping?
20 A.  Correct.  When I saw the symptoms of a stroke
21    at the depot is when I called in the
22    paramedics.
23 Q.  So you had mentioned previously perhaps a
24    diabetic issue.  I'm just wondering at the
25    point when you said, You -- you're going home

Page 63

1     and you're too sick to drive, so call for a
2     ride, did you have in mind a theory about what
3     sickness was that he was experiencing?
4  A.  No, sir.  I just thought maybe he had the flu
5     or he was very ill.  I knew he -- like I said,
6     we had the discussion.  He was lethargic, and I
7     thought maybe it might be diabetes, and
8     everyone said, you know, maybe.  And so --
9     because I know he didn't have diabetes, but it
10    could have been undiagnosed.  I don't know.
11 Q.  What became of the Gatorade and the candy bar?
12    Did he ever eat that or drink that?
13 A.  No.  Because by the time I had gotten to the
14    yard office, he was already on the ground.
15 Q.  Did you ever see anyone offer Mr. Tischer water
16    when you were at the shanty?
17 A.  No, sir.  I do not recall.
18 Q.  Did you ever observe him having trouble opening
19    a water bottle?
20 A.  No, sir.
21 Q.  You weren't here for Mr. Lux's deposition,
22    which was yesterday, but I will represent to
23    you that he said he -- at the point that you're
24    at the shanty, he was in the PTI vehicle, and
25    he waved his arms and shouted "no" to the issue

Page 64

1     of whether the crew was going to go back up to
2     Norma.  Do you have any recollection of that?
3  A.  No, I do not.
4  Q.  Did you have any conversation with Mr. Lux at
5     any time before you went to the depot?
6  A.  I do not recall, no.
7  Q.  Did you see -- at the shanty did you see Mr.
8     Tischer use the portable -- first of all, is
9     there a portable restroom at the shanty?
10 A.  Yes, there is.
11 Q.  Did you see Mr. Tischer go into that portable
12    restroom?
13 A.  I did not see him go in.  I saw him come out.
14 Q.  You saw him come out.  And when he came out,
15    that's when you saw him stumble?
16 A.  Yes, sir.
17 Q.  Did you see him stumble at any other point
18    other than coming out of the portable bathroom?
19 A.  No, sir.
20 Q.  Did you offer medical care to Mr. Tischer at
21    any point on July (sic) 12th, 2017, that he
22    refused?
23 A.  I asked him if he needed medical attention, and
24    he told me no.
25 Q.  But you also asked him if he was okay, and he

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 65

1     said yes, and you concluded that he wasn't;
2     correct?
3  A.  Correct.
4  Q.  So when he -- when you asked him if he needed
5     medical attention and he said he didn't, did
6     you take him at his word at that point?
7  A.  Yes, I did.
8  Q.  And how did you differentiate between being
9     okay -- him saying that he's okay and your
10    concluding that he's not versus him saying he
11    doesn't need medical attention and you agreeing
12    with him?
13 A.  Because I believed the nature of his illness
14    didn't require medical attention at that time.
15    I just thought he was ill, but I knew he was --
16    he wasn't well enough to continue working.
17 Q.  Was there any -- was there any talk about
18    sending someone as a substitute for Mr. Tischer
19    up to the Norma sand plant after you decided
20    Mr. Tischer couldn't work anymore?
21 A.  No, sir.
22 Q.  Was that even a possibility?
23 A.  It was a possibility, but it was unfeasible
24    because by the time I would have got another
25    conductor here, Mr. Franchuk would have expired

Page 66

1     on his hours.  So it was basically an
2     impossible task to take a second pull with a
3     different conductor.
4  Q.  And, you know, I -- I'm unfamiliar with exactly
5     how the rules work for that.  But if you've got
6     other people -- you have Mr. Thomas and you
7     have Mr. Lowe standing at the shanty.  Was it
8     impossible to put them into the conductor role
9     for the job with Mr. Franchuk?
10 A.  Correct, it's impossible to do that because
11    they were assigned to the yard job, not the
12    loco.
13 Q.  So you couldn't just mix and match?
14 A.  I can't mix and match, no, sir.
15 Q.  So what you're saying is to substitute out for
16    Mr. Tischer you got to call someone up fresh?
17 A.  Correct.  And that would be an hour and a half
18    call for them to get there, and then -- so, in
19    other words, it would have been possibly two
20    more hours after I determined to make a call to
21    get someone there before they -- he would be
22    able to go back up.
23 Q.  And you're running short on Mr. Franchuk's time
24    because he's been on duty --
25 A.  Right.  So it's not feasible to call a second

Page 67

1     conductor up.
2  Q.  So it's either Mr. Tischer and Mr. Franchuk or
3     there's no second pull from the Norma sand
4     plant --
5  A.  Correct.
6  Q.  -- that night?
7  A.  Correct.
8  Q.  At the point when you showed up at the depot --
9     so you left the shanty, you come to the
10    depot -- were you aware that Mr. Tischer had
11    thrown up en route to the depot?
12 A.  Not until I arrived there at the -- at the
13    depot myself.
14 Q.  So your determination to call 911 was based on
15    your observations of Mr. Tischer on the ground
16    and the facial drooping?
17 A.  Yes, sir.
18 Q.  And the left side paralysis?
19 A.  Yes, sir.
20 Q.  While you're talking to Mr. Tischer at the
21    shanty, was he coherent, to your thinking?
22 A.  Yes, sir.
23 Q.  Was he slurring his words at all?
24 A.  No, sir.
25 Q.  Did that change when you got to the depot?

Page 68

1  A.  No, sir.  He was still coherent.
2  Q.  So he was always coherent?
3  A.  Yes, sir.
4  Q.  And never slurring his words?
5  A.  No, sir.
6  Q.  Did you ever talk with -- did you ever talk
7     with anyone else from Mr. Tischer's family
8     beyond his brother --
9  A.  Josh.
10 Q.  -- Josh?
11 A.  No, sir.  He's the only family member I talked
12    to.
13 Q.  Did you answer any -- when the police arrived,
14    did you answer any questions for the police?
15 A.  Yes, sir.  I don't remember what those
16    questions were, but it was just general
17    information as to what the situation was.
18 Q.  Did you provide any information to the
19    paramedics when they arrived?
20 A.  Yes, sir.  They asked me questions about his
21    situation, and I answered them.  I also told
22    them what the 911 caller (sic) had asked.
23 Q.  Was Mr. Tischer providing information to the
24    police?
25 A.  Yes, sir.

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 69

1    Q.  Was he providing information to the paramedics?
2    A.  Yes, sir.
3    Q.  Was there anyone else other than you and Mr.
4         Tischer talking to the police or the
5         paramedics?
6    A.  No, sir.
7    Q.  You mentioned listening to the radio
8         communications, so that's one -- that's the way
9         you knew the train was coming back from Norma
10        to Altoona.  Do you know whether those radio
11        communications are recorded?
12   A.  I believe they are, sir.
13   Q.  Have you listened to any of those radio
14        communications since August 12th, 2017?
15   A.  No, sir.  I've never listened to any radio
16        communication that's been recorded.
17   Q.  Other than listening to it in real time as it's
18        happening?
19   A.  Correct.
20   Q.  So you're monitoring the radio communications
21        while you're working, but you haven't gone back
22        and revisited anything outside of real time?
23   A.  No, sir.
24   Q.  Do you know whether there are any video
25        recording devices in the vicinity of the shanty

Page 70

1         that record -- that record video images of
2         anything?
3    A.  There are no yard cameras, no, sir.
4    Q.  Are there any yard cameras anywhere in the
5         Altoona yard?
6    A.  No, sir.
7    Q.  How about at the depot itself?
8    A.  No, sir.  There's no -- no recording cameras
9         anywhere in -- in the Altoona depot, Altoona
10        yard area.
11   Q.  Are there any yard cameras up at Norma?
12   A.  No, sir.
13   Q.  Is that a yard -- yard proper?
14   A.  It is a yard, yes, sir.  It's the -- but it's
15        for the Wisconsin -- the WP or -- yeah.  It's
16        the -- we own it, but they rent it from us.  So
17        it's their yard, and they do not have cameras
18        either.
19   Q.  But it's -- it's -- it's UP's infrastructure?
20   A.  It's UP infrastructure, but they rent it from
21        us.
22   Q.  So if -- if there were cameras, it would be
23        UP's cameras?
24   A.  Unless they've installed them themselves.
25   Q.  But you don't know that?

Page 71

1    A.  And I do not know that.
2    Q.  But it is essentially they are a tenant on UP
3         infrastructure up at Norma?
4    A.  Correct.
5    Q.  After August 12th, 2017, did you have any
6         involvement into the -- into an investigation
7         about what had happened to Mr. Tischer?
8    A.  No, sir.
9    Q.  So you were here earlier today when Mr.
10        Franchuk related an account of a conversation
11        with Erik Erickson?
12   A.  Yes, sir, I was here for that.
13   Q.  Were you present during that conversation with
14        Erik Erickson?
15   A.  I do not even recall being at the Menomonie
16        terminal with them.
17   Q.  Have you ever had a conversation with
18        Mr. Erickson about this incident?
19   A.  I have, yes, sir.
20   Q.  About this incident?
21   A.  Yes, sir.
22   Q.  What is the conversation that you've had with
23        Mr. Erickson about this?
24   A.  He basically told me I did nothing wrong, that
25        they -- that the company would basically fight

Page 72

1         on my behalf to say that I did nothing wrong.
2    Q.  And did he actually use that word, "fight"?
3    A.  He said he would -- I don't -- no, he didn't
4         use that exact word, but I was paraphrasing.
5    Q.  Do you recall what -- how he specifically
6         described it?
7    A.  He basically said that they were going to --
8         they -- they knew I did nothing wrong, and they
9         were going to make sure that everyone knew that
10        I did nothing wrong.
11   Q.  Do you think that you did nothing wrong?
12   A.  I did nothing wrong.
13   Q.  So when Mr. Erickson says that to you, he is
14        confirming a belief that you already hold?
15   A.  Yes, sir.
16   Q.  Has he said anything else to you?
17   A.  No, sir.
18   Q.  Do you know -- there was another name mentioned
19        in the context of that Erik Erickson
20        conversation, someone by the name of Sam Shinn.
21   A.  Yes, sir.
22   Q.  Do you know who he is?
23   A.  I do.
24   Q.  Who -- is it S-H-I-N?
25   A.  Two Ns.

18  (Pages 69 to 72)

Page 73

1   Q.   Two --
2   A.   S-H-I-N-N.
3   Q.   And who is Sam Shinn?
4   A.   He was an MOP, a manager of operating
5        practices.  He has since gone back to his -- I
6        think an engineer.  He's down in, I think it's,
7        either Texas, New Mexico, Arizona, so he's down
8        south somewhere.
9   Q.   What does an MOP do versus an MYO?
10  A.   An MOP, is he from the craft, which means he
11       was an engineer, so he is basically in charge
12       of the engineers.  He does downloads on
13       engines.  He makes sure that all the engineers
14       are doing things correctly.
15  Q.   Would he handle like ops testing for engineers?
16  A.   Yes.  We all -- we all do testing.
17  Q.   But would he particularly focus on locomotive
18       engineers?
19  A.   Correct.
20  Q.   So are you saying that you just don't recall
21       the conversation between Erickson and Franchuk,
22       or are you saying you have a specific
23       recollection that it did not happen?
24  A.   I was not present for that conversation.
25  Q.   Do you recall going with Sam Shinn and Erik

Page 74

1        Erickson to speak with Mr. Franchuk?
2   A.   I -- no, I do not remember that situation.
3        When he mentioned it today, I was like -- I did
4        not remember that.
5   Q.   We've talked a little bit about Mike Swentik,
6        S-W-E-N-T-I-K.  Have you had any other
7        conversations with Mike Swentik about this
8        incident other than what you've already
9        described?
10  A.   No, sir.
11  Q.   How about with John Thomas?
12  A.   No, sir.  He no longer works for the company.
13       I don't have any conversations with him
14       anymore.
15  Q.   How about Harold Lowe?
16  A.   Harold Lowe works the 10 job.  But, no, we
17       don't -- I haven't discussed this since the
18       incident happened.
19  Q.   Did you provide any sort of statement, either
20       written or oral, to Ms. Lukehart?
21  A.   Yes, we talked about it.
22  Q.   And is there anything that you related in that
23       statement different than what you've described
24       today?
25  A.   No, sir.

Page 75

1   Q.   Do you know who Tim Dold, D-O-L-D, is?
2   A.   Yes, sir.
3   Q.   Who is he?
4   A.   He's an engineer.  Sometimes he's a conductor.
5        Depends on whether they set him back or not.
6   Q.   Was he present at any point on August 12th,
7        2017?
8   A.   I do not remember.
9   Q.   Do you have any criticism of anything that Mr.
10       Franchuk did on August 12th, 2017?
11  A.   No, sir.
12  Q.   Do you have any criticism of anything that Mr.
13       Tischer did on that day?
14  A.   No, sir.
15  Q.   How about Mr. Lux?
16  A.   No, sir.
17       MR. BANKER:  So I'm going to switch gears
18       now and show you a couple documents.  How are
19       you doing?
20       THE WITNESS:  I'm fine.
21       MR. BANKER:  Need a break or keep going?
22       THE WITNESS:  I just need some water.
23       COURT REPORTER:  I would like just a
24       couple minutes.
25       (A break was taken.)

Page 76

1   BY MR. BANKER:
2   Q.   I want to show you some documents and ask you a
3        couple of questions about them.  So first I'm
4        going to show you what's been previously marked
5        as Deposition Exhibit 3.  Are you familiar with
6        the form of this document?
7   A.   No, sir.
8   Q.   Have you ever seen a GPS report on a PTI
9        vehicle?
10  A.   No.  I do know they log stuff in, but I
11       don't -- I've never seen a document.
12  Q.   Turning to Page 6 of 7 of this document, the
13       first time the vehicle stops -- and if you
14       start from the beginning of the document,
15       it's -- it's -- the movement of this vehicle is
16       from 12 a.m. on.  And so the point where the
17       crew is actually on duty doesn't attach until
18       Page 4 of 7 at 3:07.  And then this vehicle is
19       moving from Altoona up to Norma, and then it's
20       parked at Norma for about five minutes at
21       6:48 p.m.  And then on Page 6 of 7 it makes its
22       way back to Altoona, and it hits an Altoona
23       landmark where it parks for six minutes at
24       7:15 p.m.  You'll see an entry on Page 6 of 7,
25       7:15 p.m., and you read area across, parked six

Page 77

1    minutes, Landmark: Altoona. Do you see that?
2  A. Yes, sir.
3  Q. Does that do anything to refresh your
4    recollection as to the time when this train got
5    back to Altoona from Norma?
6  A. No, sir.
7  Q. Or do anything to bracket the time when you
8    would have gone from the depot out to meet the
9    train on the east end of Track 5?
10  A. No, sir. Because once he's released from
11    Chippewa, it's up to him as to when he gets
12    back into the Altoona yard, and he -- he'll get
13    back there a lot sooner than the train will.
14    So he'll go and he'll park down at the other
15    end and wait.
16  Q. Another entry that's been the focus of some
17    testimony is that at 8:15 p.m. this vehicle
18    parked in Altoona for a space of 20 minutes.
19    Do you see that?
20  A. Yes, sir.
21  Q. Does that do anything to refresh your
22    recollection about the time when you would have
23    been talking at the shanty?
24  A. That's right about the same time I would have
25    gotten to the shanty, yes, sir.

Page 78

1  Q. And then if you turn to Page 7, this vehicle
2    goes to somewhere in Altoona where it remains
3    parked for three hours and six minutes starting
4    at 8:53 p.m. Does that do anything to help you
5    refresh your memory about when you were at the
6    depot?
7  A. It would be about the same time I got there
8    because he was still in the vehicle. His leg
9    was still in the vehicle when I arrived.
10  Q. Can I have you look at -- why don't we set that
11    aside and put it here so I don't mix it up.
12    Showing you what's been previously marked as
13    Exhibit 9. Have you ever seen this document
14    before?
15  A. No, sir, I have not seen this document.
16  Q. And I'll represent to you that this is a
17    document that was produced by UP in discovery
18    as a larger book, and so I have taken out of
19    that book the first page, the table of
20    contents, and then a couple pages that have
21    some information about strokes. So if you look
22    in the bottom right-hand corner, there's a
23    little number that starts UP --
24  A. Yes, sir.
25  Q. -- 001306. The stroke page that I'd like you

Page 79

1    to take a look at is UP001392, and there's a --
2    there's a section with the heading that says
3    Stroke. It starts on that Page 1392 and goes
4    to the next page, 1393. Can I ask you to just
5    read that, and then I have a question or two
6    about it.
7  A. (Reading document.) Okay.
8  Q. Is that information about strokes on those two
9    pages information that you've ever received
10    from UP before?
11  A. Yes, sir. Not in paper form, but when we were
12    going through our CPR class, there was a slide
13    on this through -- I mean, we did all the CPR
14    stuff, and they had a slide on strokes and
15    stuff, so we have had training on it, yes, sir.
16  Q. Have you heard of this FAST acronym --
17  A. Yes, sir.
18  Q. -- before? And so had you heard of the FAST
19    acronym before August 12th, 2017?
20  A. When I went through this class, yes, sir.
21  Q. When do you think you went through this
22    first-aid class from UP?
23  A. My CPR class when I hired on in '14.
24  Q. Is that something that you periodically do
25    refreshers on?

Page 80

1  A. We're supposed to do annual refreshers.
2  Q. Have you done annual refreshers?
3  A. I am currently not -- not certified.
4  Q. For first aid or CPR?
5  A. For CPR.
6  Q. When was the last time that you took a
7    first-aid or CPR refresher class?
8  A. I do not recall. I was still up in Itasca, so
9    it was a couple years ago.
10  Q. What is the reason for not taking it on an
11    annual basis if you're supposed to take it on a
12    annual basis?
13  A. Normally we do them at our -- it's AOT annual
14    training, and we do that in Omaha. But the
15    last couple of years they haven't had us go to
16    AOT, and they've had other classes when we've
17    gone, so I haven't picked it up.
18  Q. So do you get to select from a menu of options
19    about which courses you want to take?
20  A. Yes, sir.
21  Q. And so --
22  A. It was never one of the options.
23  Q. The first-aid refresher was never one of the
24    options?
25  A. Correct.

20  (Pages 77 to 80)

Page 81

1  Q.  Showing you what's been marked -- set that one
2      aside.  Showing you what's been previously
3      marked as Deposition Exhibit 8.  Have you ever
4      seen that document before?
5  A.  No, sir.
6  Q.  Do you know what the type of -- what type of
7      document it is?
8  A.  I'm assuming it's probably duties and
9      responsibilities, but Mr. Ryan Shafer does not
10     work in Altoona.  He works in Adams in Itasca,
11     and he has no -- no responsibility for Altoona.
12  Q.  What is a -- what is a -- you mentioned duties
13     and responsibilities.  Is that a term of art
14     that you use?
15  A.  It says duties right here (indicating).
16  Q.  So you're looking at Page 3 of Exhibit 8?
17  A.  Right.  It says duties right there.
18  Q.  But, you know, I thought I heard you say duties
19     and responsibilities.
20  A.  Sorry.  That's military term, duties and
21     responsibilities.  I'm used to saying it that
22     way.  This is -- this is duties, basically what
23     they're responsible for.
24  Q.  And do you know where documents like this are
25     maintained?

Page 82

1  A.  They're -- if -- if this was something that I
2      would have made, I would have put it on our
3      shared drive.
4  Q.  What is your shared drive?
5  A.  It's a -- it's a shared space on the UP system
6      where anybody can access -- actually, let me
7      rephrase that.  Any manager can access.  The
8      crews don't have access to this unless they
9      ask -- ask us for it or we print it off and
10     give it to them.
11  Q.  So because -- you know, it says LTS83, which
12     is -- as I understand it, was the designation
13     of the job that Mr. Franchuk and Mr. Marvin --
14     or you're Mr. Marvin -- Mr. Franchuk and Mr.
15     Tischer were doing on August 12th, 2017.
16  A.  Yes, sir.  But, like I said, it's not his
17     responsibility.  Mr. Ryan Shafer does not work
18     in Altoona.
19  Q.  But, in any event, if this was on a shared
20     drive, that's not something Mr. Tischer or Mr.
21     Franchuk would access; this is the sort of
22     document that a manager would use to -- to
23     what? -- teach them about what their job is?
24  A.  This would be the sort of document we would use
25     for a crew that has never done the job before

Page 83

1      to give them an idea of what they need to do.
2  Q.  Have you done -- have you used documents like
3      this to educate --
4  A.  I have used documents similar to this, yes,
5      sir.
6  Q.  And so that would be for a crew that is
7      unfamiliar with the route or the job or what
8      industries they're servicing to sort of brief
9      them before they go on the trip?
10  A.  Yes, sir.
11  Q.  As part of the pre-trip paperwork?
12  A.  Yes, sir.  If it's -- if they have never done
13     the job before, I would go over a document like
14     this just so they -- we're clear on what
15     their -- their job entailed.
16          MR. BANKER:  Okay.  Set that one aside.
17          (Exhibit 14 marked for identification.)
18  BY MR. BANKER:
19  Q.  Showing you what's been marked for
20     identification as Exhibit 14.  Take a moment,
21     if you would, to review it, and then I'll have
22     a question for you.
23  A.  (Complying.)  Okay.
24  Q.  First, is this a document that you've seen
25     before?

Page 84

1  A.  I do not remember it, but I do see it's an
2      email from the nurse.
3  Q.  Do you know Jessica Carson?
4  A.  Yes, sir.
5  Q.  Who is Jessica Carson?
6  A.  She is our -- our -- the nurse for our region.
7  Q.  And is she located in Altoona?
8  A.  No, sir.
9  Q.  Where is she located?
10  A.  St. Paul.  No, I think she's down in -- she's
11     down in Mason City, I believe.
12  Q.  Have you ever met her in person before?
13  A.  Yes, sir.
14  Q.  At some sort of training function or --
15  A.  She comes up periodically to Altoona.  She
16     makes regular visits.
17  Q.  And then this appears to be an email from her
18     to TCSU Manager Contacts, dash, All.  Do you
19     see that?
20  A.  Yes, sir.
21  Q.  What is -- what is -- do you know what TCSU
22     stands for?
23  A.  Twin Cities Service Unit.
24  Q.  Is Altoona in the Twin Cities Service Unit for
25     the UP?

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 85

1  A.  It was at the time, yes, sir.
2  Q.  So at the time you mean when it's sent,
3      August 14th, 2017?
4  A.  Correct.  We are now part of the Great Lakes
5      Service Unit.
6  Q.  When did that change?
7  A.  This last year.
8  Q.  So August 14, 2017, the email sent to Twin
9      Cities Service Manager Unit Contacts, is that a
10     list of addresses?
11 A.  It's a generic list of addresses for all
12     managers in the Twin Cities Service Unit.
13 Q.  Would you have been on that list on
14     August 14th, 2017?
15 A.  Yes, sir.
16 Q.  But sitting here today, you're not able to say
17     whether you received this email or saw it
18     before?
19 A.  I do not remember the email, no, sir.
20 Q.  Did you ever have a conversation with Jessica
21     Carson about the Tischer incident?
22 A.  No, sir.
23 Q.  Did you ever have any conversation with
24     Mr. Swentik about the stroke protocol, the FAST
25     protocol, after Mr. Tischer's incident?

Page 86

1  A.  No, sir.
2  Q.  Was there any discussion with UP employees
3      after August 12th, 2017, about this FAST
4      protocol?
5          MR. HAYDEN:  If you know.  You can't speak
6      for --
7  A.  I -- I -- I can't tell for certain.  I only
8      know what I -- what I know.
9  BY MR. BANKER:
10 Q.  So on the second page of this email, it says,
11     Good job to all involved in recognizing the
12     signs and symptoms of stroke in our recent
13     issue and acting quickly on behalf of the
14     employee, followed by four exclamation points.
15     Do you see that?
16 A.  Yes, sir.
17 Q.  Other than you, were there any other managers
18     in the Twin Cities Service Unit who were
19     involved in recognizing the signs and symptoms
20     of a stroke relating to Mr. Tischer?
21 A.  No, sir.  I was the only manager present.
22 Q.  Were there any other UP employees that you're
23     aware of in the Twin Cities Service Unit on or
24     about August 14th, 2017, that could have been
25     the subject of Ms. Carson's email?

Page 87

1          MR. HAYDEN:  Objection.  Speculation.
2  A.  I -- I do not know.
3  BY MR. BANKER:
4  Q.  To the best of your knowledge.
5  A.  I do not know.
6  Q.  If you were the only manager involved in
7      recognizing the signs and symptoms of Mr.
8      Tischer's stroke, I would interpret this as an
9      email congratulating you on your actions that
10     day.
11         MR. HAYDEN:  Calls for speculation.
12 A.  That's not a question.  What -- what's the
13     question?
14 BY MR. BANKER:
15 Q.  Well, do you recognize it as such?
16 A.  No, sir.
17 Q.  Were you ever congratulated by anyone for your
18     actions that day?
19 A.  No, sir.
20 Q.  Have you ever -- is Ms. Carson part of a larger
21     medical department at UP?
22 A.  She's one of the nurses.  There's a bunch of
23     different -- they -- each service unit has a
24     nurse.
25 Q.  Who does Ms. Carson report to as a nurse?

Page 88

1  A.  I do not know that information.
2  Q.  Have you ever talked with someone up the chain
3      from Ms. Carson about Mr. Tischer's incident?
4  A.  No, sir.
5  Q.  Have you ever talked with anyone who is
6      connected with the medical department about Mr.
7      Tischer's incident?
8  A.  No, sir.
9      (Exhibit 15 marked for identification.)
10 BY MR. BANKER:
11 Q.  Showing you what's been marked as Exhibit 15.
12     Are you familiar with the form of this
13     document?
14 A.  Yes, sir.  It's a log of all of the jobs that
15     Tischer worked and what days he worked them.
16 Q.  If you see in the lower right-hand corner,
17     there's again that UP with a number after it on
18     each page?
19 A.  Yes, sir.
20 Q.  And on Page UP00774 it appears to start another
21     kind of information.  Do you see that?
22 A.  What are you wanting me to look at?
23 Q.  So the header at the top of the page.
24 A.  On duty times.
25 Q.  So on the first page of Exhibit 15 it's Off

Q & A COURT REPORTERS, INC.
(715) 834-9812

Page 89

1    Duty Time Between Trips, and then on the
2    internal Page 774 it's On Duty Time for
3    Tischer.  Do you see that?
4  A.  Yes, sir.
5  Q.  What information is being documented by these
6    two reports?
7  A.  Well, the first part of the document is telling
8    how much time he has between times he works,
9    and the second part shows actual -- on his duty
10    time how long he worked on each specific job.
11  Q.  So do you make any use of an off duty time
12    report as MYO for UP?
13  A.  No, sir.
14  Q.  Are you able to look at the last page of the
15    off duty time, which has a Bates Stamp
16    UP000773, and the last entry there for
17    August 12th and tell me how much off duty time
18    there was for Mr. Tischer?
19  A.  Well, on this it shows he had 19 hours off, 19
20    hours and 20 minutes.
21  Q.  How much time is he required to have?
22  A.  10 hours off.
23  Q.  10 hours off in between jobs?
24  A.  Yes, sir.
25  Q.  And then on the on duty time, really focusing

Page 90

1    on the last page of Exhibit 15 for the entry of
2    August 12, 2017, what is that communicating to
3    us about Mr. Tischer's work?
4  A.  It shows he was on duty for 8 hours and 48
5    minutes.
6  Q.  And so he began work at 2:02 p.m.?
7  A.  Yes, sir.
8  Q.  And he is off work at 10:50 p.m.?
9  A.  Yes, sir.
10  Q.  And how does this information get created?  Is
11    this information that Mr. Tischer is creating
12    by punching into a system on a computer or...
13  A.  The way it works with conductors and engineers
14    is the CMS manager puts them on duty at a
15    specific time, so the CMS manager would have
16    put him on duty at 2:02 p.m.
17  Q.  Okay.
18  A.  And then it's up to the crews to log in the
19    time they complete their job.
20  Q.  Okay.  Do you know whether it was Mr. Tischer
21    who logged out of the system at 10:50 p.m.?
22  A.  I do not know who logged him out.
23  Q.  I take it you did not?
24  A.  No, I'm not a -- I have -- I have no privileges
25    in doing that.  I cannot do it for anybody.

Page 91

1  Q.  Can Mr. Franchuk do it on behalf of Mr.
2    Tischer?
3  A.  No, because that would require him to know his
4    password to get into his personal system.
5  Q.  So it's tied into the individual?
6  A.  Yes, sir.
7  Q.  And no individuals can do that on behalf of
8    anybody else?
9  A.  The only thing I can think of would be if one
10    of the CMS managers would have did it because
11    of the situation just to tie him up to get --
12    to get him off the clock because otherwise he'd
13    still be continue -- he'd still be on duty
14    right now.
15  Q.  But you don't have any recollection of being
16    involved in that or --
17  A.  There's -- there's no possible way myself or
18    Franchuk could have logged him out --
19  Q.  Sure.
20  A.  -- unless we knew his password.
21  Q.  But how about contacting the CMS folks and
22    saying, Hey, we had just had a --
23  A.  I never discussed anything with CMS managers.
24    I never had discussions with CMS managers.
25  Q.  So looking back at August 12th of 2017 and Mr.

Page 92

1    Tischer's incident, as you sit here today, do
2    you wish that you'd done anything differently?
3  A.  No, sir.  I did everything within my power I
4    could at that time.
5  Q.  Do you feel that you should have called 911
6    before you did?
7  A.  No, sir.  As soon as I identified the symptoms
8    of a stroke, I made the phone call.
9        MR. BANKER:  I have no further questions.
10  BY MR. HAYDEN:
11  Q.  I just have a few.  Bounce around a lot.  My
12    apologies.  Kind of pick up where Mr. Banker
13    left off.  I think this was Exhibit 15.
14    Showing you Exhibit 15 on Page UP000773.  You
15    see that?
16  A.  Yes, sir.
17  Q.  Now, this is -- I think you were asked about
18    the last entry there that indicates -- this is,
19    again, just to reorient you --
20  A.  Yeah.  It was off duty.
21  Q.  Off Duty Time Between Trips.  Okay.  In the
22    last one -- the last entry there on that page
23    was -- you were asked about that, and that's
24    the 19 hours and 21 minutes starting on
25    August 11th at 1841 hours until he tied up

23  (Pages 89 to 92)

Page 93

```
 1    on -- or sorry -- until he started his shift on
 2    August 12th, 2017, at 1400 and 2 hours;
 3    correct?
 4  A.  Correct.
 5  Q.  I'm interested in the one before that.  Does --
 6    does the entry right above that from -- that
 7    shows an off duty time from August 6th of 2017
 8    to August 11th of 2017.  Am I reading that
 9    right because that totals 110 hours and 36
10    minutes?
11  A.  That's correct.
12  Q.  Okay.  So he -- he did not work during that
13    period of time?
14  A.  Correct.  He had 110 hours and 36 minutes of
15    off duty time.
16  Q.  Any idea just by recollection or by anything on
17    these documents about why he was off for those,
18    I guess, that's five days or so?
19  A.  Again, he was on the extra board, so it just
20    depends on when he was on -- next in line to be
21    called.
22  Q.  Okay.  Looking next -- I'll show you my copy of
23    Exhibit -- I forget which one it is.
24        MR. HAYDEN:  Which exhibit is the booklet?
25        MR. COHEN:  9.
```

Page 94

```
 1        MR. HAYDEN:  9.  Thank you.
 2  BY MR. HAYDEN:
 3  Q.  Showing you Exhibit 9, and I'm referring to
 4    UP001392, the section about strokes.  Do you
 5    see that?
 6  A.  Yes, sir.
 7  Q.  And there's an embedded video there.  Do you
 8    remember seeing this video as part of your
 9    training?
10  A.  Yes, sir.
11  Q.  The -- the -- is that a still photo from the
12    video that you --
13  A.  That is.  And on the next page is another still
14    from that video.
15  Q.  And do you remember that to be sort of a
16    dramatization of a gentleman displaying
17    stroke-like symptoms?
18  A.  Yes, sir.
19  Q.  Just to be clear, there was nobody that day,
20    any -- any fellow employees or anyone, really,
21    or Mr. Lux even, who told you about their
22    observations that Mr. Tischer had any face
23    drooping?
24  A.  No, sir.
25  Q.  Or any problems speaking?
```

Page 95

```
 1  A.  No, sir.
 2  Q.  Or any -- be specific.  Any lack of coherence
 3    or lack of clarity in their speech?
 4  A.  No, sir.
 5  Q.  Nobody told you anything about that?
 6  A.  No, sir.
 7  Q.  Nobody told you that he was having a stroke in
 8    their -- in their opinion?
 9  A.  No, sir.
10  Q.  Nobody told you that they observed Mr. Tischer
11    experiencing weakness or paralysis in his left
12    arm or leg?
13  A.  No, sir.
14  Q.  When you told Mr. Tischer that -- well, first
15    of all, did Mr. Franchuk indicate to you --
16    strike that.  Let me try it a third time.  You
17    were here when Mr. Franchuk testified earlier
18    today that he expressed to you his opinion that
19    Mr. Tischer should be sent home?
20  A.  He told me that he was ill.  He said he -- he
21    looked sick.
22  Q.  And that he thought that it would be best if he
23    was sent home?
24  A.  He had said that, yes, sir.
25  Q.  That's when you and Mr. Franchuk were talking
```

Page 96

```
 1    over by the unit?
 2  A.  Correct.
 3  Q.  And after that conversation that you had with
 4    Mr. Franchuk, did Mr. Franchuk go back up into
 5    the unit?
 6  A.  Yes, sir.  He had -- he had to keep in control
 7    of his -- his engines.
 8  Q.  And is that where he stayed, in the engine in
 9    the locomotive, for the rest of the time that
10    you were there near the shanty?
11  A.  As far as I know, because that was his
12    responsibility.
13  Q.  Did you talk to Mr. Franchuk about the
14    possibility or suspicion you had that maybe Mr.
15    Tischer was suffering from a diabetic reaction?
16  A.  It was -- yes, sir.  It was him and -- and the
17    switch crew that was there.  We all kind of
18    talked about it.
19  Q.  And, again, referring you to Exhibit 9.  In
20    this training that Union Pacific provided to
21    you, there was also training on hypoglycemia.
22    Do you see that on Page 1393?
23  A.  I do.
24  Q.  And that -- that's another word, it says there,
25    for diabetes; right?
```

24  (Pages 93 to 96)

Page 97

1   A.  Yes, sir.
2   Q.  And that to, Suspect hypoglycemia with anyone
3       who begins to act oddly or becomes confused.
4       Do you see that?
5   A.  Yes, sir, I see that.
6   Q.  Was that something -- did you observe Mr.
7       Tischer acting oddly?
8   A.  Yes, sir.
9   Q.  And did you observe him being pale in -- in
10      face with his skin?
11  A.  He was.
12  Q.  Is that one of the reasons that you went to get
13      him a candy bar and Gatorade after you sent him
14      home?
15  A.  Yes, sir.
16  Q.  Not only talked to Ms. Lukehart, but did you
17      provide her a typewritten -- short typewritten
18      statement of your recollection of events that
19      day?
20  A.  I -- I believe so.  I don't remember for
21      certain.
22  Q.  Was it -- I think you were asked this already.
23      But was your -- the information you shared with
24      Ms. Lukehart consistent with what you testified
25      to today?

Page 98

1   A.  Absolutely.
2   Q.  You offered -- did you offer Mr. Tischer
3       medical care?  Did you ask him if he needed it?
4   A.  I asked him if he needed medical care, yes,
5       sir.
6   Q.  What did he say?
7   A.  A couple different times he said he was fine
8       every single time I asked him.
9   Q.  Mr. Tischer -- flip side.  Reverse question.
10      Did Mr. Tischer ever ask you to provide -- to
11      take him to medical care?
12  A.  No, sir.
13  Q.  To take him to the emergency room?
14  A.  No, sir.
15  Q.  Did Mr. Tischer ever ask you to call 911?
16  A.  No, sir.
17  Q.  Did Mr. Tischer -- did you ever hear --
18      overhear Mr. Tischer saying to anyone when you
19      guys were at the shanty that he -- that someone
20      should call 911 on his behalf?
21  A.  No, sir.
22  Q.  Or that someone -- or that he would like
23      medical care, he would -- desired medical
24      treatments?
25  A.  No, sir.  If he did, I would have provided it.

Page 99

1   Q.  The train -- if you remember the train that was
2       made up that was pulled back from Norma that
3       arrived in Altoona, do you know how long that
4       train was?
5   A.  I do not recall.
6   Q.  Typically at the time the sand trains were how
7       long?
8   A.  It depended.  They're really heavy, so they
9       can't be very long.  Track 5 isn't a very long
10      track.  It's -- don't quote me on this, but
11      it's roughly around 3,000 feet long.  Something
12      like that.  I have to look it up.  But it's,
13      you know, 3,000 feet, which is not a very long
14      train.
15  Q.  First time -- is the first time you saw any of
16      the signs of or symptoms of a stroke the --
17      when you saw Mr. Tischer at the depot on the
18      ground next to the PTI van?
19  A.  Yes, sir.
20  Q.  And that's why you called 911?
21  A.  Yes, sir.
22  Q.  The decision to not send Mr. Tischer and -- and
23      Mr. Franchuk, for that matter, back up to -- on
24      -- on the late power back up to get the -- your own
25      more -- the second pull, was that your own

Page 100

1       decision?
2   A.  That was my decision.
3   Q.  When you talked to Mr. Swentik, did he
4       challenge you at all on that decision?
5   A.  No, sir.
6   Q.  Did you have to run it by Mr. Swentik?
7   A.  No, sir.  I just called to let him know what
8       was going on, that I was sending him home.
9   Q.  And you were never disciplined for that or --
10  A.  No, sir.
11  Q.  -- challenged by anybody above you in
12      hierarchy?
13  A.  No, sir.
14  Q.  There's a term in the railroad, taking someone
15      out of service.  Are you familiar with that?
16  A.  Yes, sir.
17  Q.  Is that what you did on the 12th of August 2017
18      with respect to Mr. Tischer?
19  A.  In effect, yes.
20          MR. HAYDEN:  Those are my questions.
21          MR. COHEN:  Good afternoon.  My name is
22      Mike Cohen.  I represent PTI.
23  BY MR. COHEN:
24  Q.  I'm going to skip around a little bit.  Could
25      you put Exhibit 9 in front of you and

25  (Pages 97 to 100)

1    specifically the page Bates Stamped UP1392.
2  A.  I'm there.
3  Q.  And I'm calling your attention to that page and
4      the page after that under the heading Stroke.
5      Do these training materials list vomiting as a
6      sign of a stroke?
7  A.  Doesn't say vomiting, no, sir.
8  Q.  Thank you.  Okay.  What is the relationship
9      between UP and PTI, if you know?
10 A.  PTI provides services to the UP in transporting
11     personnel, conductors and engineers, to and
12     from their power and to and from their vehicles
13     and to and from -- like up in Norma, from the
14     head end and the rear end of the train.
15 Q.  Was Mr. Lux a driver for PTI on the day we've
16     been talking about?
17 A.  Yes, sir.
18 Q.  And who delineates where -- strike that.  Who
19     decided where Mr. Lux is to drive his van?
20 A.  We have two vans normally on duty on a 20 -- 24
21     hours a day.  There's an 8-hour van and a
22     12-hour van.  Mr. Lux was the 12-hour van.  And
23     the 12-hour van's responsibilities are to
24     assist the 83 job and to assist whenever needed
25     in the yard.

1  Q.  Who specifically directs Mr. Lux where to go
2      and when to do it?
3  A.  I went out and told him to help 83, and then
4      once I've told him, then it's up to the
5      conductor to tell him where he needs him.
6  Q.  And I'm talking more generally.  Is it the UP
7      employees' responsibility to tell Mr. Lux where
8      to go?
9  A.  Yes, sir.
10 Q.  Is Mr. Lux permitted to go where he wants to
11     go?
12 A.  No, sir.
13 Q.  If Mr. Lux decided to go drive to Wisconsin
14     Dells, I take it that you would be unhappy with
15     that decision because he wouldn't be available
16     to provide the services that PTI is supposed to
17     provide; is that correct?
18 A.  Correct.
19 Q.  Has Mr. Lux ever failed to follow your
20     directions or the directions of any PTI --
21     strike that -- any UP conductor, to your
22     knowledge?
23 A.  No, sir.  He was a good driver.
24 Q.  Thank you.  You mentioned earlier that you were
25     not aware that Mr. Tischer had thrown up until

1      you arrived at the depot.  Do you remember
2      saying that?
3  A.  Yes, sir.
4  Q.  How did you become aware that Mr. Tischer had
5      thrown up?
6  A.  I -- I believe Mr. Lux told me, and then I
7      looked in the vehicle to see, and it was just a
8      lot of fluid.  There wasn't any type of mass or
9      anything involved.
10 Q.  And did Mr. Lux tell you that Mr. Tischer had
11     thrown up immediately upon your arrival?
12 A.  I don't know if it was immediately upon
13     arrival, but he did notify me of the -- of the
14     vomit.
15 Q.  Was -- did he tell you that Mr. Tischer had
16     thrown up soon after he saw you?
17 A.  He said it was just on the way back from the
18     shanty to the depot is when he threw up.
19 Q.  How long approximately was it from the time
20     that you arrived at the shanty until Mr. Lux
21     told you that Mr. Tischer had thrown up?
22 A.  Well, the shanty is the beginning of the whole
23     scenario.
24 Q.  I apologize.  You're right.  Strike that.  How
25     long between the time you arrived at the depot

1      and the time -- strike that again.  I'm sorry.
2      I'm not phrasing this correctly.  How long was
3      it between the time you arrived at the depot
4      and the time Mr. Lux told you that Mr. Tischer
5      had thrown up?
6  A.  I do not recall because at that time I was
7      focused on Mr. Tischer and -- because he was
8      having a stroke.
9  Q.  Fair to say it was a short amount of time?
10 A.  Yeah, it was very short.
11 Q.  You mentioned before that you don't have any
12     criticism of Mr. Lux in relation to this
13     incident; is that correct?
14 A.  Correct.
15 Q.  Is it fair to say you also don't have any
16     criticism of PTI in relation to the incident
17     with Mr. Tischer?
18 A.  That's correct.
19 Q.  All right.  And you don't believe that Mr.
20     Tischer -- I'm sorry.  Strike that.  You don't
21     believe that Mr. Lux or PTI failed to provide
22     Jacob Tischer with aid and assistance as
23     reasonable persons would render under similar
24     circumstances?
25 A.  Correct.

Page 105

1  Q.  It's not your belief?
2  A.  It's not my belief.
3  Q.  It's not your belief, is it, that PTI or Mr.
4      Lux failed to recognize medical conditions and
5      provide or obtain medical treatment despite
6      observations requiring the same; correct?
7  A.  Correct.
8  Q.  It's not your belief, is it, that Mr. Lux --
9      well, strike that.  It's not your belief, is
10     it, that PTI failed to properly train employees
11     regarding recognizing and handling medical --
12     medical emergencies on the transport vans;
13     correct?
14 A.  I do not know what the type of training that
15     PTI drivers get.
16 Q.  Fair enough.  Not your belief, is it, that PTI
17     failed to follow or establish reasonably safe
18     protocols regarding medical emergencies;
19     correct?
20 A.  I -- again, I do not know their policies or
21     procedures.
22 Q.  Okay.  It's not your belief, is it, that PTI
23     failed and neglected to provide and implement
24     emergency action plans and otherwise causing
25     delay in response -- in the response of

Page 106

1      emergency responders; correct?
2  A.  Again, there's nothing published.  There's -- I
3      do not know any of their policies.
4  Q.  You have no reason to believe, do you, that Mr.
5      Lux caused a delay in the response of emergency
6      responders; correct?
7  A.  No, he did not.
8          MR. COHEN:  Thank you very much.  I have
9      no further questions.
10         MR. BANKER:  Nothing further for me.
11         MR. HAYDEN:  Just one follow-up for me.
12 BY MR. HAYDEN:
13 Q.  I think you testified earlier you -- you -- let
14     me -- you never were in the van with Mr. Lux
15     and Mr. Tischer?
16 A.  No, sir.
17 Q.  Tell us the extent of your conversations with
18     Mr. Lux other than the one you just described
19     about the vomiting incident back in the --
20 A.  I -- we never had any discussions except for
21     when we were back at the depot, and then he
22     told me he vomited.  And that's -- I don't
23     remember any -- and after me instructing him
24     to -- to put a pillow or something underneath
25     his head to support his head.  That's all I

Page 107

1      remember saying.
2  Q.  Mr. Lux never approached you about calling 911
3      or -- or getting Mr. Tischer any medical care?
4  A.  No, sir.
5          MR. HAYDEN:  Okay.  No further questions.
6          MR. COHEN:  No further questions.
7          MR. BANKER:  None.
8          MR. HAYDEN:  All right.  We're done.
9          (Proceedings concluded at approximately
10     3:06 p.m.)

Page 108

1  STATE OF WISCONSIN    )
                         )ss
2  COUNTY OF EAU CLAIRE  )
3
4      I, Stephanie Peil, Notary Public in and for the
5  State of Wisconsin, certify there came before me the
6  deponent herein, namely Stephen Mark Marvin, who was
7  by me duly sworn to testify to the truth and
8  nothing but the truth concerning the matters in this
9  cause.
10     I further certify that the foregoing transcript
11 is a true and correct transcript of my original
12 stenographic notes.
13     I further certify that I am neither attorney or
14 counsel for, nor related to or employed by any of
15 the parties to the action in which this deposition
16 is taken; furthermore, that I am not a relative or
17 employee of any attorney or counsel employed by the
18 parties hereto or financially interested in the
19 action.
20     IN WITNESS WHEREOF, I have unto set my hand and
21 affixed my Notarial Seal this 1st day of August,
22 2019.
23
24 _____
25 Stephanie J. Peil, Notary Public

27 (Pages 105 to 108)