```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF WISCONSIN
 2

 3   JESSICA TISCHER,              ) CASE NO.
     individually and as          ) 3:19-cv-00166-jdp
 4   Personal Representative for  )
     the Spouse and Children of    )
 5   Jacob Tischer, Decedent,      )
                                   )
 6              PLAINTIFF,         ) VIDEOTAPED
                                   ) DEPOSITION OF
 7       VS.                       ) JOHN P. HOLLAND, M.D.
                                   )
 8   UNION PACIFIC RAILROAD        )
     COMPANY, a Delaware           )
 9   corporation,                  )
                                   )
10              DEFENDANT.         )
     - - - - - - - - - - - - - - -)
11                                 )
     UNION PACIFIC RAILROAD        )
12   COMPANY, a Delaware           )
     corporation,                  )
13                                 )
                DEFENDANT/THIRD-   )
14              PARTY PLAINTIFF,   )
                                   )
15       VS.                       )
                                   )
16   PROFESSIONAL                  )
     TRANSPORTATION, INC.,         )
17                                 )
                THIRD-PARTY        )
18              DEFENDANT.         )
     - - - - - - - - - - - - - - -
19           VIDEOTAPED DEPOSITION OF JOHN P. HOLLAND,

20   M.D., taken before Brianne L. Starkey, RPR, CRR,

21   General Notary Public within and for the State of

22   Nebraska, beginning at 11:05 a.m., on October 21,

23   2019, at the offices of Thomas & Thomas Court

24   Reporters and Certified Legal Video, L.L.C.,

25   1321 Jones Street, Omaha, Nebraska.
```

```
 1                    A P P E A R A N C E S

 2     FOR THE PLAINTIFF:
       MR. PAUL A. BANKER
 3     HUNEGS LENEAVE & KVAS, P.A.
       1000 Twelve Oaks Center Drive, Suite 101
 4     Wayzata, Minnesota 55391
       (612)339-4511 FAX (612)339-5150
 5
       pbanker@hlklaw.com
 6

 7     FOR THE DEFENDANT:
       MR. THOMAS A.P. HAYDEN
 8     UNION PACIFIC RAILROAD CORPORATION
       101 North Wacker Drive, Room 1920
 9     Chicago, Illinois 60606
       (312)777-2062 FAX (877)213-4433
10
       tahayden@up.com
11

12     FOR THE THIRD-PARTY DEFENDANT:
       MR. MICHAEL B. COHEN
13     QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
       233 South Wacker Drive, 70th Floor
14     (312)566-0700 FAX (312)566-0041

15     michael.cohen@qpwblaw.com

16

17

18                  A L S O   P R E S E N T

19     VIDEOGRAPHER:
       MS. LISA OLSEN
20     Thomas & Thomas Court Reporters &
       Certified Legal Video, L.L.C.
21     1321 Jones Street
       Omaha, Nebraska 68102
22     (402)556-5000 FAX (402)556-2037

23

24

25
```

```
1                          I N D E X

2   CASE CAPTION ........................... Page      1
    APPEARANCES ............................ Page      2
3   INDEX .................................. Page      3
    EXHIBITS ............................... Page      4
4   TESTIMONY .............................. Page      6
    REPORTER CERTIFICATE ................... Page    130
5

6   DIRECT EXAMINATION:
        By Mr. Banker .................... Page      6
7
    CROSS-EXAMINATION:
8       By Mr. Cohen ..................... Page    115

9   CROSS-EXAMINATION:
        By Mr. Hayden .................... Page    125
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        E X H I B I T S

 2     EXHIBIT NO.                                        MARKED

 3     Exhibit 27.  Notice of Deposition                       7

 4     Exhibit 28.  Union Pacific Medical Rules               47

 5     Exhibit 29.  Complete Training History -              98
                    Neil A. Franchuk
 6
       Exhibit 30.  Complete Training History -             100
 7                  Stephen M. Marvin

 8

 9     EXHIBIT PREVIOUSLY MARKED                       IDENTIFIED

10     Exhibit 9.   BasicPlus - CPR, AED, and First          9
                    Aid for Adults
11
       Exhibit 16.  Email Correspondence                     89
12
       Exhibit 19.  Incident Spreadsheet                     91
13
       Exhibit 20.  Supplemental Rule 26(a)(1)               80
14                  Disclosure

15     Exhibit 21.  DVD Screen Shots                         10

16     Exhibit 22.  Letter Dated November 14, 2017           85

17

18

19

20

21

22

23

24

25
```

John Holland, M.D.
10/21/2019

Page 5

1    (Whereupon, the following proceedings were
2  had, to-wit:)
3      VIDEOGRAPHER:  This is the videotaped
4  deposition of John Holland, M.D., taken in the case
5  entitled Jessica Tischer, et al., versus Union
6  Pacific Railroad Company, et al.
7      This deposition is being held at the
8  offices of Thomas & Thomas Court Reporters.  Today's
9  date is October 21st, 2019, and the approximate time
10  is 11:05 a.m.
11      My name is Lisa Olsen, the videotape
12  specialist from Thomas & Thomas Court Reporters.
13  The court reporter is Brianne Starkey.
14      Will counsel please introduce themselves
15  for the record.
16      THE WITNESS:  John Paul Holland.
17      MR. BANKER:  Paul Banker,
18  B-A-N-K-E-R, on behalf of plaintiff.
19      MR. HAYDEN:  Thomas Hayden,
20  H-A-Y-D-E-N, on behalf of defendant, Union Pacific.
21      MR. COHEN:  Michael Cohen, C-O-H-E-N,
22  on behalf of third-party defendant Professional
23  Transportation, Incorporated.
24
25

Page 6

1      JOHN P. HOLLAND, M.D.
2      having been first duly sworn,
3      was examined and testified as follows:
4      DIRECT EXAMINATION
5  BY MR. BANKER:
6      Q.  Good morning, Dr. Holland.  Have you had
7  your deposition taken before?
8      A.  Yes.
9      Q.  I would expect probably a number of times?
10      A.  Yes.
11      Q.  So you're -- I take it you're familiar
12  with the process?
13      A.  Yes, I am.
14      Q.  The court reporter is going to be taking
15  down everything that gets said, so it's important
16  just as a reminder to answer audibly as opposed to
17  saying uh-huh or huh-uh or nodding your head.  Do
18  you understand?
19      A.  Yes.
20      Q.  And it's also important so that we have a
21  clear record that we not talk over one another, so
22  I'll try to finish my question and then pause and
23  give you a chance to answer.
24      If you could do the same, we'll get a
25  clearer record out of that.  Okay?

Page 7

1      A.  Yes.
2      Q.  And if I ask a question today that you
3  don't understand, feel free to ask me for
4  clarification, and I'll do what I can to clarify the
5  question.
6      If you don't do that, I'm going to assume
7  that you've understood the question.  Is that a fair
8  assumption?
9      A.  Yes.
10      Q.  And if you need to take a break at some
11  point, let me know and we'll try to accommodate
12  that.
13      Just before we leave the topic of -- how
14  many times would you expect that you've been deposed
15  previously?
16      A.  Probably somewhere 50 or more.
17      Q.  In your capacity as a -- as the medical
18  officer for Union Pacific Railroad?
19      A.  Well, I -- I don't know for sure, but I
20  would imagine at least probably 30 or 40 times.
21      Q.  In that capacity?
22      A.  Yes.
23      Q.  Okay.
24      (Exhibit 27
25      marked for identification.)

Page 8

1  BY MR. BANKER:
2      Q.  Let me show you what's been marked for
3  identification as Exhibit 27.  Have you seen this
4  document before?
5      MR. HAYDEN:  Thank you.
6      MR. COHEN:  Thanks.
7      THE WITNESS:  No.
8  BY MR. BANKER:
9      Q.  I'll represent to you that this is a
10  notice of deposition in this case, both -- for your
11  deposition, both in your individual capacity as well
12  as in your corporate representative capacity.
13      And I want to point your attention to
14  Page 2.  And at the end of the text but above the
15  signature line, you'll see that there are two topics
16  laid out there that you've been -- that UP has been
17  asked to designate a witness to testify about.
18      Have you seen those topics previously?
19      A.  No.
20      Q.  Okay.  Let me approach it this way:  Other
21  than conversations with your attorney, what, if
22  anything, have you done to prepare for your
23  deposition today?
24      A.  I reviewed the Union Pacific first aid
25  training brochure that was applicable in 2017.

Thomas & Thomas Court Reporters
and Certified Legal Video, LLC

1321 Jones Street, Omaha, NE 68102
Tel: (402) 556-5000 | Fax: (402) 556-2037

John Holland, M.D.                                                          6 (9 - 12)
10/21/2019

Page 9

1    Q.  Okay.  Anything else that you've done to
2  prepare for your deposition today?
3    A.  No.
4    MR. HAYDEN:  I want to object here
5  just because I -- I apologize.  I did not see this
6  before, so I was going on an email that you and I
7  were exchanging.
8    So having seen this, I will represent he
9  will be the designee for No. 2; but as I understand
10  No. 1, probably not.
11    MR. BANKER:  Okay.  Well, I guess
12  we'll see how far we get with it, and --
13    MR. HAYDEN:  Yeah.  It could -- I
14  think I know what you're talking about there with
15  No. 1, but I'm just not sure, so he may be able to
16  help.
17    MR. BANKER:  Okay.
18    (Exhibit 9 previously marked in
19    a prior deposition.)
20  BY MR. BANKER:
21    Q.  Let me jump -- I want to show you -- you
22  referenced a first aid training brochure.  Let me
23  just show you that.
24    I'm showing you what's been previously
25  marked as Deposition Exhibit 9.  I'll represent to

Page 10

1  you that this is an excerpt from a book that was
2  produced in discovery in this case by UP, a
3  BasicPlus student book.  And what I've excerpted out
4  here is the table of contents as well as some
5  information pertaining to altered mental status and
6  strokes.
7    Do you recognize this as being the
8  training brochure that you reviewed?
9    A.  Yes, I do.
10    Q.  Okay.  And let me also show you this.
11    (Exhibit 21 previously marked in
12    a prior deposition.)
13  BY MR. BANKER:
14    Q.  Showing you what's been previously marked
15  as Deposition Exhibit 21.
16    Is there a companion DVD to the BasicPlus
17  student book?
18    A.  I'm not sure.
19    Q.  Okay.  I'll represent to you that
20  Exhibit 21 are screen shots from a DVD -- training
21  DVD that was produced to us in discovery in this
22  case, and the screen shots that have been excerpted
23  out into Exhibit 21 related to altered mental status
24  and stroke.
25    But if I understand what you -- your

Page 11

1  testimony this morning, what you looked at in
2  preparation was the -- the student BasicPlus book
3  that is excerpts of or contained in Exhibit 9?
4    A.  Yes.  I looked at the book.
5    Q.  Okay.  Let me just get -- switch gears
6  here and get just a little bit of background
7  information about you.
8    Where do you currently live?
9    A.  Well, I live in Washington state and I
10  also have a condominium downtown here in Omaha, so I
11  go back and forth.
12    Q.  Where do you consider yourself to be a
13  permanent resident of?
14    A.  Washington state.
15    Q.  Okay.  And where in Washington state do
16  you live?
17    A.  Puiallup.
18    Q.  How do you spell that?
19    A.  P-U-I-A-L-L-U-P.
20    Q.  I assume that you are a medical doctor?
21    A.  Yes.
22    Q.  Where did you attend medical school?
23    A.  I received my medical degree at the
24  University of Nebraska College of Medicine here in
25  Omaha, Nebraska.

Page 12

1    Q.  And when was that?
2    A.  1977.
3    Q.  And did you do any formal training after
4  that?
5    A.  Yes.
6    Q.  Kind of walk me through, if you would,
7  your background as a medical doctor.
8    A.  I did a year of internal medicine
9  internship.  It was in San Francisco, Pacific
10  Medical Center.
11    Then I did postgraduate -- second
12  postgraduate year as a resident in psychiatry at
13  Oregon Health Sciences University in Portland.
14    I left that residency after one year, and
15  then I was in practice in an occupational medicine
16  clinic in Portland for five years.
17    And then I went to the University of
18  Washington where I completed a residency in
19  occupational medicine and received a master of
20  public health degree.
21    Q.  Okay.  Other than -- so you are a licensed
22  medical doctor in what state?
23    A.  I'm licensed in Washington, and I have an
24  inactive license in Oregon.
25    Q.  Do you have any other professional

John Holland, M.D.                                                                    7 (13 - 16)
10/21/2019

Page 13

1  licenses or certifications?
2      A.  I'm board-certified in occupational
3  medicine by the American Board of Preventive
4  Medicine.
5      Q.  And what does -- just from a layperson's
6  perspective, what does that mean exactly?
7      A.  Well, occupational environmental medicine
8  is a discipline that deals with all aspects of
9  health related to work and also health related to
10  environmental issues, particularly chemical
11  exposures in the environment.
12          On a practical basis, a lot of
13  occupational medicine is dealing with preventive
14  health of workers, is dealing with determining
15  medical fitness for duty for people in safety
16  critical activities or activities where there's
17  specific functional requirements, dealing with
18  assessment and treatments of injuries, illnesses,
19  and exposures that may happen at work.
20          And then a lot of our discipline also has
21  to do with working to make the workplace safer and
22  working on environmental issues with others,
23  colleagues and safety and other disciplines.
24      Q.  Okay.  And what does it mean -- what does
25  it entail in being board-certified in occupational

Page 14

1  medicine exactly?
2      A.  Well, it's a medical board that's
3  recognized by the American Board of Medical
4  Specialties.  It involves a certain type of formal
5  training and practical experience and then extensive
6  examination.
7      Q.  Okay.  Are you currently employed?
8      A.  Yes.
9      Q.  By whom?
10      A.  Union Pacific Railroad.
11      Q.  What do you do for Union Pacific Railroad?
12      A.  I am the chief medical officer.
13      Q.  And how long have you been doing that?
14      A.  I've worked with Union Pacific Railroad
15  since 2003, and I've been chief medical officer
16  since March 2010.
17      Q.  What did you do for Union Pacific before
18  you became -- from 2003 to 2010 before you became
19  the chief medical officer?
20      A.  From 2003 to 2010, I worked as a
21  consultant to the health and medical services
22  department and also worked with the law department
23  and a variety of different assignments.
24          Some of them had to do with developing
25  programs.  Some of them had to do with reviewing

Page 15

1  certain cases in terms of fitness for duty.
2          So this is, you know, basically whatever I
3  was directed to do by the chief medical officer.
4      Q.  Okay.  You mentioned a concept that I want
5  to make sure I understand.  You mentioned the health
6  and medical services department.
7          So is that -- when you say you're the
8  chief medical officer, is it the chief medical
9  officer within the health and medical services
10  department?
11      A.  Well, I'm the chief medical officer for
12  the company, for Union Pacific Railroad.
13      Q.  Okay.
14      A.  And my -- I work within -- I mean, I'm in
15  that department, health and medical services, which
16  then is a subdepartment within workforce resources.
17      Q.  So as the chief medical officer of Union
18  Pacific Railroad from 2010 to present, what are your
19  principal duties and responsibilities?
20      A.  Well, I assist the department along with
21  other colleagues in helping to develop our policies
22  and procedures for dealing with fitness for duty for
23  our workers in safety critical positions.
24          Also for working with other departments,
25  such as safety in operations in terms of safety and

Page 16

1  health issues in general, either both working on
2  policies and responding to specific situations.
3      Q.  Okay.  Would you consider a conductor
4  working for UP, is that a safety critical position?
5      A.  Yes.
6      Q.  Let me -- let me change gears and sort of
7  reorient us a little bit.
8          So I want to take your deposition both in
9  your personal capacity as well as in -- capacity as
10  a corporate representative.  Let's focus first on
11  your personal capacity.
12          Do you have any awareness -- personal
13  knowledge regarding an incident involving a UP
14  conductor, Jacob Tischer, August 12, 2017, at the
15  Altoona depot?
16      A.  No.  I was not -- I don't recall having
17  any personal involvement or personal knowledge of
18  this, I mean, other than what we talked about prior
19  to the deposition today.
20      Q.  Okay.  And so by personal knowledge, I
21  mean you weren't personally involved in the incident
22  itself at Altoona?
23      A.  That's correct, that I was not.
24      Q.  And I'm going to go over a number of names
25  and see if you recognize any of them to ask you,

Page 17

1  have you had conversations with any of these people?
2  Have you had any conversations with, for example,
3  Mark Marvin?
4      A.  You mean conversations related to this
5  case or --
6      Q.  Yes.
7      A.  -- conversations -- okay.  No.
8      Q.  Related -- relating to the Tischer
9  incident?
10     A.  No, I have not.
11     Q.  Do you know Mark Marvin?
12     A.  I don't believe so.  It's possible I
13  could've talked to him.
14     Q.  Okay.
15     A.  But I don't believe I know him.
16     Q.  How about is the name Neil Franchuk,
17  F-R-A-N-C-H-U-K, do you know Mr. Franchuk?
18     A.  I don't believe so.
19     Q.  And to follow up on that, have you had any
20  conversations with Mr. Franchuk about the Tischer
21  incident?
22     A.  No.
23     Q.  Okay.  How about a gentleman by the name
24  of Chaz, C-H-A-Z, Lux, L-U-X?
25     A.  I do not recall his name, and I don't --

Page 18

1  didn't have any conversations with him about this
2  incident.
3      Q.  Okay.  How about Mike Swentik,
4  S-W-E-N-T-I-K?
5      A.  Again, I don't recall his name.  I don't
6  recall talking to him about this incident.
7      Q.  Okay.  How about Eric Erickson,
8  E-R-I-C-K-S-O-N?
9      A.  Once again, I don't recall talking to him
10  about this incident.  I don't know -- and I don't
11  know him.
12     Q.  Okay.  So prior -- other than talking in
13  preparation for your deposition today, did you have
14  any awareness that there had been an employee
15  incident in August of 2017 involving a stroke?
16     A.  I don't have any recollection of that, no.
17         MR. BANKER:  Okay.  Why don't we go
18  off the record for a moment.
19         VIDEOGRAPHER:  The time is 11:24 a.m.
20  Counsel, we're off the record.
21         (Discussion had off the record.)
22         MR. BANKER:  The time is 11:26 a.m.
23  Counsel, we're back on the record.
24  BY MR. BANKER:
25     Q.  Just before we leave the subject of any

Page 19

1  personal knowledge that you might have regarding the
2  Tischer incident, we've talked about conversations
3  and communications.
4         Have you looked at any documents regarding
5  the Tischer incident other than what you've
6  described in your -- this morning in terms of
7  preparation for this deposition when you reviewed
8  the BasicPlus first aid student book?
9      A.  So other than the first aid book,
10  BasicPlus, I have not looked at any documents
11  related to this incident.
12     Q.  Okay.  So let me think about the best
13  way -- you know, what I'd like to do now is shift
14  and talk with you as a corporate representative on
15  the topics that were laid out in Exhibit 27.
16         And the first topic is UP railroad --
17  "UP's railroad operations policies and procedures
18  applicable to Jacob Tischer's work as a conductor on
19  August 12, 2017, and pertaining to his illness,
20  altered consciousness, or incapacitation."
21         Do you see that?
22     A.  Yes, I see you're reading this question.
23     Q.  Sure.
24     A.  What...
25     Q.  So that's the topic to sort of frame

Page 20

1  our -- frame our discussion.
2         It sounds like you don't have independent
3  knowledge of the Jacob Tischer incident, so I guess
4  what I'm going to do to set the stage is provide you
5  as best I can with what has been testified about in
6  this case and then ask you some questions.
7         So Mr. Tischer was working as a conductor
8  out of the Altoona yard on August 12th, 2017.  He
9  received a call from home from a crew management
10  service, a CMS system.  Are you familiar with CMS?
11     A.  Yes.
12     Q.  How does it work when someone is called
13  off an extraboard to work as a conductor and they're
14  ill?
15         MR. HAYDEN:  If you know.
16         THE WITNESS:  Well, we -- regardless
17  of whether people are reporting to work at their
18  regular work shift or they're called by the crew
19  management service to come in, if someone is ill, we
20  expect them to -- if -- to make a judgment about
21  whether they are capable of working, you know,
22  physically capable of working safely before they
23  come to work.
24         And if they don't, then they're supposed
25  to notify their supervisor, you know, that they're

John Holland, M.D.                                    9 (21 - 24)
10/21/2019

Page 21

1  ill and they can't come into work.  So that's
2  expected of all of our -- all of our employees.
3  BY MR. BANKER:
4      Q.  Is that policy written down anywhere?
5      A.  Yes.
6      Q.  Where would I find that?
7      A.  So Union Pacific has medical rules, and
8  the current medical rules have been in place since
9  2014.  There were medical rules before that, but the
10 last revision was 2014.
11         And it says in the medical rules that
12 employees are responsible to make sure they're
13 physically fit for duty before they report for work.
14     Q.  Okay.  So is the term "busted call"
15 meaningful to you?
16     A.  No.
17     Q.  Okay.  The testimony that's been given in
18 this case sort of sets the stage as on the morning
19 of the 12th of 2017, Mr. Tischer received a call to
20 report to work.  And then he had another
21 communication that told him the crew wasn't ready,
22 and so he -- he was going to be called to work
23 later.  So his day at Altoona starts at
24 approximately 2 p.m. in the afternoon.
25         Is there anything in the medical rules

Page 22

1  that addresses -- I understand what you're saying
2  about a judgment about a physical capacity to work
3  safely, but is there anything in the medical rules
4  that addresses, you know, kind of common cold or
5  flu, the usual sickness that people kind of have and
6  work through?
7      A.  No.  The statement is just what I said.
8  It's more of a general statement, that you have a
9  responsibility to be fit for duty physically,
10 medically when you report for work.
11     Q.  Okay.  When someone has reported to work,
12 do the medical rules address the situation where
13 that person's condition changes over time?
14     A.  Not really.  The medical rules don't --
15 aren't dealing with these day-to-day specific
16 things.
17     Q.  Okay.  More of a general principle?
18     A.  Yes.  It's more of a general principle.
19         There are some reportable -- there are --
20 in the medical rules, there is a part of the medical
21 rules called Appendix B where there is some listed
22 reportable health events; and if these occur, that
23 the employee is supposed to notify their manager and
24 notify health and medical services and stay off work
25 until they're evaluated.

Page 23

1         So -- so they're primarily things that
2  would be significant like someone goes into the
3  emergency room with chest pain.  You're supposed to
4  then not go to work but notify your manager that you
5  need to have a fitness-for-duty evaluation and
6  notify health and medical services too so that we
7  can do a fitness-for-duty evaluation to determine if
8  you're safe to return.  And those are, as I said, in
9  Appendix B of the medical rules.
10     Q.  Do you know what the -- what the
11 reportable health events are?
12     A.  Well, I -- to be specific, you know, it's
13 one page.  I would have to read them off, but
14 they're in five major categories.
15     Q.  Okay.
16     A.  The first one is cardiovascular issues.
17         The next one is neurological, mainly
18 seizures or loss of consciousness, unexplained loss
19 of consciousness.
20         There's some things related to diabetes
21 with insulin, being -- what we call insulin reaction
22 or hypo- -- severe hypoglycemic event.
23         There's issues related to sleep disorders,
24 particularly obstructive sleep apnea and loss of
25 consciousness related to that.

Page 24

1         There's issues related to vision, vision
2  changes.
3         And there's issues related to hearing,
4  certain hearing changes.
5      Q.  Okay.  That's a helpful overview for me.
6         Am I understanding you right to say that
7  if an employee has an event that falls into one of
8  those categories, that's a reportable event and
9  they're not to work until they get a
10 fitness-for-duty evaluation?
11     A.  That's correct.  And they're -- there's --
12 they're supposed to do three things.  They're
13 supposed to notify their manager that they need --
14 that they have an event that requires a
15 fitness-for-duty evaluation.
16         They're supposed to notify our department,
17 health and medical services, and they're supposed to
18 stay off work until we've cleared them to go back to
19 work from health and medical services.
20     Q.  And just so I understand the nuts and
21 bolts of it, notifying a manager I would presume an
22 employee would have contact information for a
23 manager.
24         How does an employee notify health and
25 medical services about a reportable health events?

Page 25

1    A.  Well, the medical rules, first of all, are
2    something that all the employees are not just safety
3    critical employees, but all employees are required
4    to know about and understand.
5        You know, the primary important thing here
6    is not reporting to work until this condition is
7    evaluated, so they will usually mention it to their
8    supervisor.  Maybe their supervisor will call us or
9    direct them to call us, but you know, it could
10   happen various ways, or they may know to just call
11   it from the medical rules.
12       But the primary thing in terms of safety
13   for them and others is to make sure they are not
14   reporting to work until this is evaluated.
15   Q.  Okay.
16   A.  So, I mean, our -- I think employees
17   generally know how to reach our department.
18   Q.  Okay.  I want to focus -- you know, so you
19   gave me a list of reportable health events by
20   category.  I want to focus on the -- well, there's
21   two categories I want to ask questions about.
22       The first was a cardiovascular category,
23   and I think you described it as maybe chest pains --
24   having chest pains and going to the ER?
25   A.  Well, could you tell me your question

Page 26

1    again?
2    Q.  Sure.
3        I'm just -- I want to make sure I
4    understand what falls into this cardiovascular
5    category.
6    A.  Well, again, it would be -- it would be
7    easier if I had it here to read it because there's
8    specific wording that we put in it.
9        But what it is is something that is -- if
10   we're focusing on myocardial infarction or heart
11   attack or having had a heart attack, having been
12   hospitalized or gone to an emergency room for a
13   possible heart attack, whether or not that was
14   confirmed, or having certain diagnostic procedures,
15   you know, that would be done related to evaluating a
16   serious cardiac condition.
17   Q.  Okay.  So let's set that category aside.
18       I want to understand this -- the next
19   category, the neurological seizures or unexplained
20   loss of consciousness category.
21       What falls into that category?
22   A.  If someone's had a seizure or has been
23   diagnosed with epilepsy, we put in that category
24   loss of consciousness of unknown or unclear cause.
25       Now that isn't just neurological.  It

Page 27

1    could also be cardiac.  It could be an insulin
2    reaction.  It could be a number of things.
3        So we -- we just group that together as a
4    convenient place to put it, but it's any loss of
5    consciousness event that happens.
6    Q.  So there's been testimony in the case
7    about the morning of August 12th, 2017, to the
8    effect that -- and the times aren't crystal clear in
9    the testimony, but that -- assume for the sake of
10   argument that Mr. Tischer received a call from CMS
11   sometime before 8:30, that within a half hour of
12   receiving that call and accepting the call, he
13   collapsed in his kitchen and his wife was there
14   observing him.
15       And for ten or fifteen seconds, he was
16   nonresponsive on the floor.  And she was considering
17   calling 911 because she couldn't get him to respond.
18   And then he came around and they talked about it and
19   said what happened and he said, you know, I don't
20   know.
21       Based on that description, do you believe
22   that that would fall into this seizure category or
23   unexplained loss of consciousness, or what
24   additional information would you want to know about
25   that?

Page 28

1    A.  So I would consider that in the category
2    of unexplained loss of consciousness.
3    Q.  Okay.  Whether or not his eyes remained
4    open, just the fact that he fell to the ground?
5    A.  Well, the way you described it, I mean,
6    you described that his -- apparently his wife had
7    said he was unconscious or unresponsive for
8    15 seconds.
9    Q.  Well, I think the testimony was that he
10   was -- his eyes were open, he's looking up at the
11   ceiling, and he's not responding as she's talking to
12   him with increasing volume trying to get a response
13   out of him.  So he's unresponsive.
14   A.  Yeah.  So I think that's -- I think that
15   fits into this category of unexplained loss of
16   consciousness.
17   Q.  Okay.  And what is indicated -- you know,
18   just based on the limited information I've provided
19   to you about this based on the testimony, would that
20   be enough to trigger in your mind the reportable
21   health event, that you would then notify the
22   manager, you would notify health and medical
23   services, and you would need a fitness-for-duty
24   evaluation?
25   A.  Yes.  I would consider this a reportable

John Holland, M.D.
10/21/2019

11 (29 - 32)

Page 29

1  health event that would require those notifications
2  and where he should stay off work until it's
3  evaluated.
4      Q.  Okay.  Even if they didn't call 911 or go
5  to the doctor beforehand, just the fact of being
6  unresponsive would be enough in your mind?
7      A.  Well, I'm going on what you described --
8      Q.  Sure.
9      A.  -- where he was in the kitchen and he
10 apparently collapsed and was unresponsive for ten or
11 fifteen seconds, despite the wife's trying to get a
12 response from him, so yes.
13     I would consider that a loss of
14 consciousness event that does require someone to
15 stay off work until they're evaluated appropriately,
16 and then we decide if they're safe to return.
17     Q.  What does that -- thinking about the third
18 part, you know, so you notify your manager and you
19 notify health and medical services, and then there's
20 a fitness-for-duty evaluation.
21     What does the fitness-for-duty evaluation,
22 what does that look like in this scenario that I've
23 described to you?
24     A.  Okay.  So this is a term commonly used in
25 occupational medicine, transportation medicine, even

Page 30

1  in regulations where they say fitness for duty is
2  doing a medical evaluation to determine -- to make a
3  judgment or a determination if a person's health
4  conditions or perhaps their treatment may pose a
5  safety risk for themselves or others if they return
6  to safety critical work.
7      So what we're concerned about with loss of
8  consciousness is if the person has an underlying
9  health condition that's either going to be resulting
10 in some functional impairment that's going to affect
11 their safety in doing their job, or if they have a
12 risk for recurrent loss of consciousness -- or
13 sudden incapacitation, which could be -- which could
14 be loss of consciousness or sudden loss of physical
15 or mental functioning.  And so those are the kind of
16 things we look at in a fitness-for-duty
17 determination.
18     And then we, of course, do an
19 individualized evaluation of the employee, which
20 often involves getting medical records from their
21 own health-care providers or we could do -- we can
22 also do additional evaluations ourself.  And then we
23 also look at the essential functions of their job --
24 and safety concerns of their jobs.
25     We put all this together, it's an

Page 31

1  individualized evaluation, and make a determination
2  of whether they can return to work with or without
3  work restrictions or accommodations.
4      Q.  And I want to drill down to one of the
5  things you mentioned there.
6      So a fitness-for-duty evaluation, it
7  sounds like that can be performed either by an
8  employee's own doctor or by the employer's doctor?
9      A.  Well, it's not exactly either of those.
10 The fitness-for-duty evaluation is really looking at
11 all the relevant information.
12     So it isn't just, you know, one particular
13 physical examination.  It's when an individual, for
14 instance, has a loss of consciousness event.
15 They're typically evaluated by their own doctor.
16 They may have multiple tests.  They may see multiple
17 specialties.  They may go in the emergency room.
18 They may even be hospitalized.  And so what we'll
19 require is all that -- all those medical records.
20     That often has a report of a fairly
21 detailed evaluation, and we don't feel the need to
22 have an additional evaluation of our own, but that's
23 always an option if we need it.
24     We take all that information, we look at
25 it to determine what the health condition seems to

Page 32

1  be, you know, and then we know from looking at the
2  medical literature if there -- if that health
3  condition is associated in the medical literature
4  with risk for recurrent problems, recurrent sudden
5  incapacitation or impairment, and we'll then look at
6  the job duties and we'll make a determination about
7  whether the person can safely come back.
8      Sometimes we'll put work restrictions on
9  them that would allow them to be safe, and, you
10 know, then often there -- it also works through the
11 accommodation process to see if they can be
12 accommodated.
13     So it's -- just to summarize,
14 fitness-for-duty evaluation is the whole process.
15 It's not just a single examination.
16     Q.  Okay.  Let me -- so if I understand what
17 you're saying here, the -- what I've described to
18 you of Mr. Tischer losing consciousness or falling
19 to the ground and becoming unresponsive for ten or
20 fifteen seconds, that -- at least that description
21 alone creates a red flag for you for triggering this
22 reportable health event protocol?
23     A.  Yes.  We -- well, to be more precise, we
24 consider that a reportable health event --
25     Q.  Yeah.

Page 33

1     A.   -- that loss of consciousness, that would
2  then require the person to go through this process
3  of staying off work until it was evaluated,
4  informing us, and the manager.
5     Q.   How does a -- how would an employee know
6  that -- what the reportable health event protocol
7  is?  Are they trained on these medical rules?  Are
8  they tested on them?
9     A.   So the medical rules, first of all, are
10 available on the UP website, and there's a lot of
11 training of all employees that they know about the
12 medical rules.
13     They have to -- all employees have to sign
14 I think it's either -- I think it's called an
15 affirmation, that they understand the medical rules.
16 And that's something we have had in place for four
17 or five years now.  I'm not sure if it's affirmation
18 or -- it's something like that.
19     Q.   So just as far as we've gotten in the --
20 in the story about the loss of consciousness or loss
21 of balance and falling to the ground and being
22 unresponsive, is there any way from that posture
23 that an employee could just shake that off and say,
24 you know, no, I'm fine, or is the die cast at that
25 point from your perspective?

Page 34

1     A.   Well, according to the medical records,
2  they would need to be evaluated and we would have --
3  someone who was a conductor, we certainly wouldn't
4  want them to go out and do their safety critical
5  work on the train or in the train yard until it was
6  evaluated, because we're concerned, of course, that
7  there may be -- there may be a recurrence.  There
8  may be something going on that's going to cause it
9  again.
10     And if -- we want them to get medical
11 attention in any case.  I mean, I think even if you
12 weren't at work, it's something you would want to
13 get medical attention for, but we want to make sure
14 they're safe at work.
15     So there isn't any way -- the medical
16 rules would require them to go through this process.
17 There isn't any way that you could follow the
18 medical rules without doing that.
19     Q.   Okay.  And, I mean, to the conversation
20 that has been related to us between Mr. Tischer and
21 his wife in the kitchen of their home that morning,
22 she was wanting to call 911 and he said, no, no, I'm
23 fine, you don't need to call 911 and so she didn't.
24     But your thought is as of that point, you
25 can't just shake that off, that's a reportable

Page 35

1  medical event as I've described it?
2     A.   Yes.
3     Q.   Let me add -- let me add a feature to it.
4     So he begins talking to his wife again, he
5  doesn't want her to call 911, and then within a
6  couple of minutes, he goes into the bathroom and he
7  throws up.
8     Does that add or subtract anything to the
9  story in your mind in terms of a reportable medical
10 event?
11     MR. HAYDEN:  I'll just object there.
12 I think there's part of that that's not in evidence.
13     But you're -- you can answer.
14     THE WITNESS:  So now I think we're
15 dealing with two different issues.  I mean, if -- if
16 someone is called to go to work and they're throwing
17 up, I mean, they have the ability to say I'm not
18 feeling well, I don't think I should come into work.
19 BY MR. BANKER:
20     Q.   Uh-huh.
21     A.   But vomiting is not a reportable health
22 event.
23     Q.   Okay.
24     A.   And it was the loss of consciousness and
25 unresponsiveness that's a reportable health event,

Page 36

1  that, you know, based on the medical rules, he --
2  you should not report to work, you should inform us
3  and the supervisor that there's something that needs
4  to be evaluated.
5     So they're two different issues.  I mean,
6  two different kind of situations.  Whether they're
7  related or not, it's the same health event.
8     Q.   Sure.
9     A.   I mean, it's possible, but I think -- I
10 think the vomiting independently is not a reportable
11 health event.
12     Q.   Okay.  How about if, you know -- and we
13 don't have the benefit of his testimony on this
14 point, but if Mr. Tischer is not aware of the fact
15 that he has fallen to the floor and lost
16 consciousness or become unresponsive, how then does
17 it -- how, then, does the employee become aware that
18 there's a reportable medical event?
19     MR. HAYDEN:  Calls for speculation.
20     But go ahead.
21     THE WITNESS:  Okay.  Well, with
22 this -- again, you know, does involve some
23 speculation.
24     But I think it's not really plausible that
25 somebody who is awake and conscious and suddenly

Page 37

1  falls to the floor doesn't know that happens.
2      I mean, I think it's -- you may wake up on
3  the floor and not know how you got there, you know,
4  but I think this is -- I can't think of a plausible
5  situation where that happens where you didn't know
6  you fell down, hit the floor, and you were
7  unconscious.
8  BY MR. BANKER:
9      Q.  So the triggering point in your mind,
10 regardless of what level of awareness you have,
11 would be if you're standing in the kitchen one
12 moment and the next moment you're looking at the
13 ceiling, you know something happened?
14     A.  Yes.  In this case, what you described,
15 apparently he and the wife talked about it.  So, I
16 mean, I assume what they talked about is she said
17 you were unconscious.  I couldn't get you to be
18 responsive.  You need to go in the emergency room or
19 let's call 911.  And he said, no, let's not do it.
20     So I think it was maybe two things here.
21 First of all, if he was by himself, you know, a
22 person is going to know.  Suddenly they're on the
23 floor, how did I get here.  So they're going to know
24 that -- that they lost consciousness.
25     And second of all, he's got another person

Page 38

1  there telling him he lost consciousness in this
2  case.  So I think he's -- he was aware of it.
3      Q.  Okay.  So we move forward in the time line
4  from there to about 2 o'clock, Altoona yard.
5  Mr. Tischer comes on duty, and he's got a job that
6  day of hauling railcars with an engineer from
7  Altoona to Norma, which is a nearby town, sand plant
8  there.
9      And it's been described by his engineer
10 that he -- Mr. Tischer told Mr. Franchuk,
11 Mr. Franchuk was the engineer, that he wasn't
12 feeling well that day, that he thought he had a cold
13 or a flu, but didn't really think anything of it.
14     And so Mr. Tischer goes out with
15 Mr. Franchuk on the locomotive up to Norma and they
16 do work up there.  And what Mr. Franchuk describes
17 on the trip back from Norma to Altoona as they're
18 coming into the Altoona yard, that on the trip back
19 he had noticed Mr. Tischer's condition changing for
20 the worse but thought he was just tired, sick, not
21 feeling well.
22     But there was a point in his mind when
23 they were coming into Altoona and needed -- the
24 conductor needed to change radio stations from one
25 channel to another and that Mr. Tischer was not able

Page 39

1  to do that based on Mr. Franchuk's observations.
2      Does that change this scenario in any way
3  for you beyond what we've already established?  A
4  reportable event just based on the fall in the
5  kitchen, but now coming into the Altoona yard, the
6  engineer thinks the conductor can't change radio
7  channels, and he's worked with him enough to know
8  what his usual capabilities are and so he thinks
9  this is out of the ordinary, this is unusual.
10     Does that change -- does his inabilities
11 to operate the radio change the scenario for you at
12 all?
13     MR. HAYDEN:  Objection to form, lacks
14 foundation, calls for speculation.
15     Go ahead.
16     THE WITNESS:  Well, I mean, nothing
17 you described in this scenario changes the fact that
18 he had the loss of consciousness episode in the
19 morning, was unresponsive, and that's an event which
20 would be a reportable health event.
21 BY MR. BANKER:
22     Q.  Sure.
23     A.  You know, I don't have any independent
24 knowledge of it.  I didn't observe it.  You know, I
25 think that you're -- you're stating that his

Page 40

1  coworker was saying he was not feeling well and that
2  he was feeling worse as they came back.
3      And I think that -- again, the employee,
4  if they're not feeling well and they feel they need
5  to go home even in the middle of the shift, you
6  know, they have the right to do that and report it
7  to the dispatcher and their manager and do that.
8      And so I don't know that this changes --
9  it doesn't -- nothing you described changes the
10 prior determination that there was a reportable
11 health event, and I guess I'll leave it at that.
12     Q.  Okay.  So is there a UP policy regarding
13 operating crews, a locomotive and conductor crew who
14 are operating a train that provides any guidance for
15 this scenario?
16     A.  Well, the -- the one policy that I talked
17 about is a medical rule, that's a policy, or that
18 applies to all employees.
19     And as I said, there are two things that
20 were relevant to this scenario.  One is the general
21 instruction to employees that you're to be
22 physically fit, you know, when you report to work.
23     And then the other is the direction to
24 them that if they have a reportable health event,
25 they're to stay off work until it's evaluated.

John Holland, M.D.                                                    14 (41 - 44)
10/21/2019

Page 41

1   There aren't other subtle details about,
2   you know, what to do, who to call if you're feeling
3   ill during a work shift. Whether there are other
4   policies at Union Pacific, more operational policies
5   that speak to that, I don't know, but the medical
6   rules are mainly those two issues that I talked
7   about.
8       Q. Okay. And let me add a detail that I
9   overlooked in kind of relating this story. So at
10  every point thus far, starting with talking to his
11  wife in the kitchen, Mr. Tischer has said, I don't
12  feel great, but I'm okay. I don't need you to call
13  911.
14      When he gets to work and talks with
15  Mr. Franchuk, they talk about he's not feeling well,
16  but he says I can do the job.
17      When he goes up to Norma, he does his work
18  as best people are able to observe. And coming back
19  along the way, the conversation such as it was
20  between him and Mr. Franchuk was to the extent of
21  yeah, I'm fine, I'm okay.
22      Does the fact of Mr. Franchuk observing
23  Mr. Tischer unable to change radio channels when
24  needed to, does that do anything to overrule an
25  employee like Mr. Tischer who is saying I'm fine,

Page 42

1   I'm okay?
2       MR. HAYDEN: Objection to form.
3       Go ahead.
4       THE WITNESS: Well, again, when you
5   say unable to change radio channels, I mean, I
6   wasn't -- I don't know exactly, you know, why he
7   was -- if that's the case why he was having
8   difficulty doing it.
9       There could be various reasons. I don't
10  know if there were other things he was complaining
11  about at that time. I mean, it's -- I don't know
12  what -- you know, I don't know what to make of it,
13  you know.
14      Again, the -- the employee, you know, at
15  any time has the ability to say I don't feel well, I
16  need to leave work or need to go seek medical
17  attention.
18      So I -- I don't know that I can make much
19  out of this one instance. I don't know what other
20  things -- if there were other things he couldn't do
21  or just he was having some difficulty with the radio
22  or --
23  BY MR. BANKER:
24      Q. Sure.
25      A. I don't know why.

Page 43

1       Q. We'll take it in steps, and I will provide
2   you additional details as we go along.
3       But so what Mr. Franchuk described to the
4   best of my recollection was that Mr. Tischer needed
5   to change radio channels, and he was just staring at
6   the radio not doing it.
7       And when Mr. Franchuk asked him about it,
8   he didn't have any explanation for why it was that
9   he couldn't, and so that struck Mr. Franchuk as odd.
10      Is there a safety concern with a conductor
11  unable to change radio channels that would create a
12  need for someone like Mr. Franchuk to do something
13  about it?
14      MR. HAYDEN: Objection to form. It's
15  an incomplete hypothetical. Calls for speculation.
16      He's not an -- he's not a safety rules guy
17  as well.
18      THE WITNESS: Okay. So this is --
19  you are describing to me a situation, you know.
20  Again, I -- I'm not there in the cab. I'm not sure
21  exactly why he's having problems with it, if there
22  are other things that he's having difficulty doing,
23  you know, or is complaining of or --
24      And I think, you know, in terms of --
25  actually, I don't know if that answered your

Page 44

1   question or not. If not, you can ask me --
2   BY MR. BANKER:
3       Q. Sure.
4       A. -- again.
5       Q. So let me take it to the next step and
6   maybe that'll help. So Mr. Franchuk -- so they get
7   back to Altoona and there's work to be done putting
8   the train away. And Mr. Franchuk asked Mr. Tischer
9   is he okay to do the work, and Mr. Tischer says,
10  yeah, I can do the work, I'm okay to do the work,
11  and he proceeds to do it.
12      And by this point, I would say we're at
13  about -- we're somewhere between 7:38 and 8 o'clock
14  at night. So the shift started at 2 p.m. Now we're
15  in the -- approaching the 8 o'clock hour.
16      Mr. Franchuk -- notwithstanding the fact
17  that Mr. Tischer says he can do the work,
18  Mr. Franchuk is concerned about Mr. Tischer at this
19  point and decides he's going to raise this with his
20  supervisor, Mr. Marvin.
21      Is there a policy or procedure in terms of
22  when an employee is saying that they're fine but
23  other people have questioned that, is there a
24  protocol or a procedure for that that UP has?
25      A. Well, it's got -- it's kind of a broad

John Holland, M.D.                                    15 (45 - 48)
10/21/2019

Page 45

1  question.  I mean, there are a lot of operating
2  rules that I'm not familiar with.
3        I mean, I think part of this is is dealing
4  with common sense.  If you have someone who is an
5  employee or a coworker and you ask them, you know,
6  if they're all right to continue working or if
7  they're feeling like they are sick or they need
8  medical attention or need to go home.
9        And I think that this is just, you know --
10 to some extent, there's some common sense here or
11 things that you don't always write down about what
12 you're going to do with a coworker or somebody that
13 you care about and seeing if they get medical
14 attention.
15       The -- I don't know of any -- you know, I
16 think a supervisor can always ask someone to go get
17 medical attention or to go home, and I think it's
18 reasonable for them to ask the person if they're
19 feeling ill, if they feel they can continue.
20       But I don't know of any operating rules
21 that provide more specificity than that.
22    Q.  Okay.
23       THE WITNESS:  Do you mind if I take a
24 brief break?
25       MR. BANKER:  Sure.

Page 46

1        THE WITNESS:  Okay.  Thank you.
2        VIDEOGRAPHER:  The time is 12:04 p.m.
3  Counsel, we're off the record.
4        (12:04 p.m. - Recess.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 47

1        (At 12:13 p.m., with parties present as
2  before, the following proceedings were had, to-wit:)
3        VIDEOGRAPHER:  The time is 12:13 p.m.
4  Counsel, we're back on the record.
5        MR. HAYDEN:  This is that list of
6  claims I had --
7        MR. BANKER:  Oh, sure.
8        MR. HAYDEN:  -- to tack on the back
9  of it, so I took that off; otherwise, yeah, it looks
10 inclusive.
11       (Exhibit 28
12        marked for identification.)
13 BY MR. BANKER:
14    Q.  Showing you what's been marked for
15 identification as Exhibit 28.
16       We were just starting to have a discussion
17 during the break, and I thought we would go back on
18 and have the discussion on the record.
19       But can you tell me what Exhibit 28 is?
20    A.  Yes.  Exhibit 28 are some shots of Power
21 Point slides and text.  It's an E-learning course on
22 the Union Pacific medical rules.
23    Q.  And we had started to talk about, you
24 know, is there an underlying book that is the Union
25 Pacific medical rules?

Page 48

1    A.  So there isn't a book.  There are -- in
2  addition to this E-learning, if you go on to the
3  Union Pacific website, employees can pull up
4  individual pages about the medical rules.
5        And there are, I don't know exactly,
6  probably about six to eight pages, which is just
7  text that explains different parts of them.
8    Q.  Okay.  So focusing on particularly --
9        MR. COHEN:  Paul, sorry to interrupt.
10       Can you just tell what the beginning
11 Bates stamp number is on that exhibit?
12       MR. BANKER:  I have it as UP 1436.
13       MR. COHEN:  Thank you.
14 BY MR. BANKER:
15    Q.  We've spent some time talking about the
16 reportable health events, and in particular
17 neurological seizures or unexplained loss of
18 consciousness.
19       Is that addressed at all in this
20 E-learning study guide that is Exhibit 28?
21    A.  Well, do you mind asking me that again?
22    Q.  Sure.
23       So I'm just -- I'm looking -- I'm
24 wondering if this E-learning study guide for the
25 medical rules has any specific information about the

Thomas & Thomas Court Reporters                 1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                  Tel: (402) 556-5000 | Fax: (402) 556-2037

John Holland, M.D.                                                16 (49 - 52)
10/21/2019

Page 49

1  neurological seizures or unexplained loss of
2  consciousness as a subcategory of reportable medical
3  events?
4      A.  Yes, it does.
5      Q.  And is there a particular page that you're
6  looking at?  There's a identification in the lower
7  right-hand corner that starts with a UP prefix?
8      A.  Yes.  So UP 001441, that is a page that
9  gives a screen shot of the medical rules.  It tells
10 what they are, and then it lists -- if you're on the
11 website, it lists seven different pages that --
12 specific pages you can go to.  And one of the pages,
13 the last page is Appendix B reportable health
14 events.
15      And then further on -- okay.
16 Page UP001454 is a page where it says what do I have
17 to report and it says -- this page says seizure or
18 loss of consciousness, and then it lists in the
19 subbox, seizure of any kind, epilepsy, treatment
20 with antiseizure medicine to prevent seizures, and
21 then loss of consciousness.
22      Q.  Okay.  And then you were describing -- so
23 that's the study guide that an employee would
24 presumably follow through to -- is it to be
25 tested -- before a test on the medical rules or just

Page 50

1  to review the medical rules or how does that work?
2      A.  Well, it's informational.  It tells them
3  this is how you find the medical rules on the
4  website.  It does say some specific things about the
5  reportable health conditions that you have to
6  report.
7      It has a bit of a test.  It has a
8  knowledge check where you can -- where it asks you
9  some questions you need to respond to.
10      And then as I mentioned before, it has
11 something where you have to say -- you have to
12 acknowledge yes or no.  "I understand my obligation
13 to know the medical rules and comply," and that's a
14 box you have to click on at the end before it says
15 you've completed the training.
16      Q.  Okay.  When an employee takes that
17 training on the medical rules at the end of it,
18 there's a box for them to check, which I'm assuming
19 takes -- creates some sort of record that the person
20 took the training on such and such a date and time?
21      A.  Yes.  So this is Page UP001465, and what
22 it says -- it says, "I understand my obligation to
23 know the medical rules and comply," and you have to
24 hit yes or no.
25      And then there's a box hereunder which

Page 51

1  says you will complete -- "You will receive a course
2  completion only after you confirm that you
3  understand what was taught.  If you still do not
4  understand, contact us for more help."
5      So yes, it's required for them to complete
6  this required training for them to -- to answer that
7  box.
8      Q.  And you sort of anticipated my next
9  question.
10      Is the medical rules training required
11 training for all UP employees?
12      A.  So I -- I don't know I can answer that
13 question specifically.  My -- it's my general
14 understanding that it is required for employees that
15 need to -- that are required to report under
16 Appendix B.
17      Q.  Okay.
18      A.  And to clarify that, Appendix B mainly
19 applies to what I consider safety critical
20 employees.  That's not a formal term used in
21 defining these things, but it does -- Appendix B
22 does apply to all transportation department
23 employees, both agreement and nonagreement, which
24 would include conductors.
25      So it is my understanding that this is

Page 52

1  required training for conductors.
2      Q.  And that -- I guess my question was --
3  could have been more precise, that was where I was
4  heading with it is it is required -- the medical
5  rules training is required training for all UP
6  conductors?
7      A.  That's my understanding, yes.
8      Q.  Okay.  And so then assuming that
9  Mr. Tischer went through that training as a UP
10 conductor, if he had wanted to consult the medical
11 rules, for example, after he had this incident in
12 his kitchen on the morning of August 12th, if I'm
13 understanding your testimony, he would then go to
14 the UP website to find the medical rules and
15 whatever guidance they provide on that?
16      A.  Well, that's correct.  On the UP website,
17 if we -- we will tell people just in the search box
18 to type in medical rules, and they'll pop up and you
19 can refer to them.
20      Q.  But, if, for example, Mr. Tischer had
21 wanted to refresh his recollection about what a --
22 what this neurological seizure category of
23 reportable events was or how it's described in the
24 medical rules, that would be something that would
25 have been available to him on the UP website?

Page 53

1    A.  Yes, it is -- it was and is available on
2  the UP website.
3    Q.  Okay.  I want to come back to where we
4  were just before the break.
5      So we were talking about the idea of when
6  an employee says that they're okay to do the job,
7  but other people began to have a different view of
8  it.
9      When we were talking about Mr. Franchuk
10  growing concerns by the 8 o'clock hour that
11  something was not right with Mr. Tischer, and we
12  were talking about, well, are there any rules that
13  guide that analysis.
14      And as I understood it, you were saying
15  there was some general principles that employees
16  need to be physically capable -- they have to
17  exercise their judgment to ensure that they're
18  physically capable of doing their job, but at some
19  level, common sense comes into play and, you know,
20  it may not be written out specifically in a rule
21  about when another coworker could overrule an
22  employee's judgment.
23      Am I tracking that correctly?
24    A.  Well, you said several things.
25    Q.  Sure.

Page 54

1    A.  And I know you were -- maybe you could
2  break it down for me --
3    Q.  Sure.
4    A.  -- into parts.
5    Q.  So, you know, what I'm most wanting to
6  focus on is the situation where an employee says,
7  no, no, I'm fine, I'm fine to do the job, I'm
8  physically capable of doing the job, and people
9  around that employee saying, I don't agree.
10      And I understand what you were saying
11  before the break is that there's not necessarily a
12  written rule that gives you any guidance about that
13  situation.
14      Am I understanding that correctly?
15    A.  Well, you are in a sense.  I mean, you're
16  asking sort of a broad hypothetical about a
17  situation that isn't even a specific situation.
18      I think we have -- we have a general
19  understanding that we're all supposed to be safe at
20  work, and we have a general understanding that
21  people have their own responsibility to say when
22  they don't -- when they feel an illness is affecting
23  them.  I think that -- and so I think other than
24  that, there's a lot of things in the middle.
25      I think common sense would be if somebody

Page 55

1  is clearly confused, if someone is clearly impaired
2  or if they have some sudden event, you know, sudden
3  loss of consciousness, then I think the response is
4  mainly going to be from the coworkers to call and
5  get some medical attention for them, like calling
6  911, calling a supervisor, you know.
7      So I think that -- so I think -- I think
8  and this situation is, our medical rules are
9  reasonable, you know.  They apply mainly to the
10  individual themselves taking responsibility.
11      And I think beyond that, if there's a
12  situation regarding a coworker, I think we have to
13  use common sense.
14    Q.  Okay.  So in the time line, we're at about
15  8 o'clock p.m. on August 12th, 2017.  Mr. Tischer
16  has returned to the Altoona yard and gotten off the
17  locomotive and proceeded to do work that
18  Mr. Franchuk was not able to observe.
19      Mr. Franchuk wants -- as his next step, he
20  wants to make contact with the manager, Mr. Mark
21  Marvin, to talk about Mr. Tischer's situation.
22      But before we focus on that, I want to
23  come back to something you said about calling either
24  911.
25      So what -- what ability does a locomotive

Page 56

1  engineer have to initiate a medical response
2  themselves?
3    A.  Well, they're constantly -- locomotive
4  engineers are constantly in contact with by radio
5  with both the dispatcher and can at any time ask the
6  dispatcher to call emergency response, which is we
7  have an internal emergency response center.
8      And then they would call -- for instance,
9  if there's a medical emergency, if a coworker passed
10  out at work or was -- if there was an injury, they
11  would immediately have the dispatcher call the
12  emergency response center.  They would contact
13  whatever the local emergency responders would be.
14    Q.  So --
15    A.  And I think -- and also -- they can be in
16  contact with their -- through their radio with their
17  manager directly.
18    Q.  Okay.  The emergency response center that
19  you mentioned, is that a physical location?
20    A.  Here in Omaha in the central office
21  building.  It's essentially a 911 emergency response
22  center that responds to anything around the system.
23      And the reason that's important is it's,
24  you know, traveling from one location to another and
25  they will know precisely where the train is, for

Page 57

1  instance, we'll know what the -- what the
2  appropriate emergency response organization is and,
3  you know, will be able to also coordinate any
4  response with managers.
5        So I think that's -- so that's why we have
6  our own emergency response center.
7        Q.  And so when operations employees --
8  operations employees wouldn't call the emergency
9  response center directly, it would be contacting a
10  dispatcher who then contacts the --
11       A.  I think -- I think they can.  I mean, I'm
12  not sure -- I'm not sure how it would actually work
13  if you're an engineer sitting on the train, if you
14  would go through the dispatcher, if you'd call them
15  directly.  I'm not sure.
16       But I know they could get -- I know they
17  contact and talk to RMCC or get in contact with them
18  over their radio.
19       Q.  You mentioned RMCC.  What is RMCC?
20       A.  I knew you were going to ask me that.
21  It's emergency response center.  I can't remember.
22       Q.  Okay.
23       A.  I can't remember the acronym.
24       Q.  So that -- so it's available -- for an
25  example, a locomotive engineer could contact a

Page 58

1  dispatcher to initiate an emergency response.
2        Is there a policy or procedure regarding
3  the use of cell phones on a locomotive in -- to
4  initiate an emergency response?
5        MR. HAYDEN:  If you know.
6        THE WITNESS:  I don't know that.  I
7  know there are some policies which are from -- both
8  company policies and FRA policies about when cell
9  phones can be used on locomotives, but I'm not an
10  expert on that.
11  BY MR. BANKER:
12       Q.  Okay.  So coming back to kind of the time
13  line of events, Mr. Franchuk knows that Mr. Marvin
14  wants to send him and Mr. Tischer back to Norma on
15  another run that night.  They have more cars to deal
16  with.
17       And Mr. Franchuk, despite Mr. Tischer's
18  protestations that he's fine, doesn't believe that
19  he is fine.  He believes he's sick, and so he wants
20  to raise that issue with Mr. Marvin.
21       Is that the appropriate handling of that
22  issue in terms of policies and procedures for
23  dealing with an employee or a coworker whose
24  condition is changing?
25       A.  I don't know if there is a policy and

Page 59

1  procedure that deals specifically with this.  It
2  seems like a reasonable approach.  It seems like
3  that's quite reasonable to talk to the manager and,
4  you know, get his impression and sort of jointly
5  decide what to do or have him decide what to do.
6        So it sounds -- sounds like a reasonable
7  approach.
8        Q.  Is there any policy or procedure that
9  gives guidance to someone like a locomotive engineer
10  about when to initiate a 911 call themselves?
11       A.  I don't know.
12       Q.  Okay.  So at this point, I want to
13  return -- we're just past 8 o'clock now, and
14  Mr. Tischer gets into a PTI vehicle -- let me start
15  with this.
16       Are you familiar with the Altoona yard and
17  its physical layout at all?
18       A.  No.
19       Q.  Okay.  So it's been described that there
20  is a location on the east end of the Altoona yard
21  that has a shanty and a portable toilet where people
22  can gather, and it makes logical sense for them to
23  do so because of how the yard is oriented.  And so
24  Mr. Tischer gets into a PTI vehicle to be
25  transported to the shanty area.

Page 60

1        Are you at all familiar with PTI and what
2  they do for UP?
3        A.  I am familiar enough to know that they're
4  a van service, and we have van services to transport
5  train crews in particular, you know, from -- well,
6  from the terminal to wherever the train is they need
7  to get on and back and forth.
8        Q.  Sure.
9        So at this point, Mr. Tischer is in the
10  PTI vehicle, and Mr. Lux, the driver of the PTI
11  vehicle, they've come to the shanty.  And Mr. Lux
12  observes that Mr. Tischer is having some trouble
13  undoing his seat belt, but he doesn't think anything
14  of it.
15       Does that add anything to this developing
16  scenario from your perspective in terms of
17  observations of Mr. Tischer?  So this is the first
18  one past can't change the channels on the radio to
19  having trouble with seat belt.
20       MR. HAYDEN:  Objection to --
21       MR. COHEN:  Object to the form of the
22  question and foundation.
23       THE WITNESS:  Well, again, now I'm
24  hearing it sort of second or thirdhand here, and I
25  didn't observe it.

John Holland, M.D.
10/21/2019

19 (61 - 64)

Page 61

1    And I think -- I don't think that by
2 itself, you know, it would be something people would
3 think much of.  I mean, sometimes people -- you
4 know, we all have difficulty getting the seat belts
5 on or off sometimes, so...
6 BY MR. BANKER:
7    Q.  Under the best circumstances sometimes.
8    A.  Yeah, yes.
9    Q.  So Mr. Franchuk, the engineer, has told
10 Mr. Marvin he thinks Mr. Tischer is ill, he doesn't
11 think he can do the job, and he doesn't think he can
12 go back to Norma.  In fact, he won't go back to
13 Norma with him, and he wants Mr. Marvin to go talk
14 to Mr. Tischer at the shanty.  And Mr. Marvin does
15 that.  Okay?
16    Now, Mr. Marvin talks with Mr. Tischer at
17 the shanty and says Mr. Franchuk has expressed
18 concern, how are you doing, are you okay, to which
19 Mr. Marvin -- or Mr. Tischer says I'm fine, I'm
20 okay, I'm okay.  I can do the job.
21    Is there any policy or procedure that
22 provides any guidance at that point where the
23 engineer has one view of his coworker's capabilities
24 and the coworker says no, no, I'm fine, how do you
25 resolve that dispute?

Page 62

1    MR. HAYDEN:  Objection:  Form and
2 lacks foundation.
3    Go ahead.
4    THE WITNESS:  Well, again, I wasn't
5 there.  I mean, I think -- I think that -- I think
6 these kind of issues come up all the time to
7 managers, you know, or to employees.
8    And I think, again, you have to use common
9 sense, you know, about what -- what decision you
10 make about -- about these issues.
11    So I mean, I -- as far as I know, there's
12 no specific policy that deals with this.
13 BY MR. BANKER:
14    Q.  Okay.
15    A.  -- specific question.
16    Q.  So by about 8:35 at the shanty as
17 Mr. Marvin is talking with Mr. Tischer, he
18 determines -- Mr. Marvin determines that Mr. Tischer
19 is sicker than he says he is and that he's not going
20 to send Mr. Tischer back up to Norma.
21    In fact, he's going to send him home for
22 the night.  And that means that the job isn't going
23 to get done because of the hours of service and crew
24 staffing.  So Mr. Tischer is going home.
25    But Mr. Marvin determines at that point

Page 63

1 that Mr. Tischer is so sick that he doesn't want
2 him -- doesn't want Mr. Tischer to drive himself
3 home.
4    Is there any policy or procedure that
5 guides when an employee can or can't drive
6 themselves home from work?
7    A.  Not that I know of.
8    Q.  Okay.  Having made the determination that
9 Mr. Tischer can't drive himself home from work based
10 on what I've described to you thus far, do you
11 believe anything else is called for in terms of a
12 medical response?
13    MR. HAYDEN:  Objection in terms of
14 the lack of foundation for that.
15    But given what you've -- been represented
16 to you, you can answer.
17    THE WITNESS:  Well, I think what --
18 what's being proposed that -- you're going to have
19 to ask me the question again.
20 BY MR. BANKER:
21    Q.  Sure.
22    So having determined that the --
23 Mr. Tischer is ill enough that he -- that Mr. Marvin
24 doesn't want him driving home by himself, is there
25 anything more that is indicated at that point from a

Page 64

1 medical policy or procedure standpoint?
2    A.  Well, from what I understand, the way
3 you've described it to me, I think that was a
4 appropriate and reasonable thing to do.  And I
5 don't -- he's describing that he doesn't feel well,
6 you know.
7    And, well, he had described he didn't feel
8 well to his coworker.  And I think that the manager
9 made a decision that he should go home and he
10 shouldn't drive himself.  I think it sounds
11 reasonable.  I don't think there's any -- don't find
12 any fault in that.
13    Q.  Okay.  Now, as a medical doctor, I take it
14 you have some general training in strokes and
15 neurological conditions?
16    A.  Yes.
17    Q.  What would be an indication to you that
18 someone is possibly having a stroke?
19    A.  Well, I mean, what you see with a stroke
20 is you see a sudden rapid change in some function,
21 you know, some mental or physical function.
22    So depending on the location of the
23 stroke, often there will be speech impairment, sort
24 of mumbling or maybe getting sounds out but, you
25 know, definitely doesn't sound normal.  That's one,

Page 65

1   a certain part of the brain.
2         It may be physical weakness or numbness or
3   paralysis of a certain part of the body, usually on
4   one side.
5         It may be a alteration in consciousness,
6   so there may be confusion.  There may be -- may be
7   collapse.  There may be loss of consciousness.
8         And those would be -- or maybe confusion
9   is -- is sort of a broad term, but there may be some
10  real impairment in specific mental functioning, you
11  know, that may be a little more subtle.
12        But I think that -- the big hallmark would
13  be that it happened suddenly and the person was
14  suddenly changed from what they were previously and
15  have some kind of, again, mental and/or functional
16  impairment.
17     Q.  So let me take us -- with that kind of
18  understanding, let me take us back into the time
19  line.
20        And here we're at about -- we're somewhere
21  between 8:15 and 8:35.  We're at the shanty where
22  various people are gathered talking about this.  And
23  Mr. Tischer goes into the portable toilet, and when
24  he comes out, several people see him stumble and
25  have trouble walking.  The left side of his -- his

Page 66

1   left leg is -- doesn't appear to be working properly
2   anymore.
3         Does that observation, is that what you're
4   talking about in terms of weakness?
5         MR. HAYDEN:  Objection.  That
6   misstates the testimony that's in evidence, so lacks
7   foundation, it's an incomplete hypothetical,
8   misstates testimony.  It's also objectionable as to
9   form.
10        MR. COHEN:  I'm going to join in that
11  objection -- those objections.
12        THE WITNESS:  Okay.  Well, now you
13  mentioned the one difference is he goes into the
14  toilet and he comes out and he's stumbling.
15  BY MR. BANKER:
16     Q.  Yeah.
17     A.  I mean, that's kind of nonspecific.  I
18  mean, people stumble because they trip over
19  something or, you know -- it's -- I think that can
20  happen to all of us sometimes.  So that's a pretty
21  nonspecific thing.
22        Really what we're looking for is not just
23  one event but something that really is more marked,
24  you know, like they just can't use the leg, you
25  know.

Page 67

1         If -- so I don't know.  Just what you
2   described, it wouldn't -- that in itself for
3   somebody that was feeling ill, they were stumbling a
4   little bit, I wouldn't.  I think it's -- it's pretty
5   nonspecific.
6      Q.  Okay.  So people observed this,
7   Mr. Tischer stumbling coming out of the porta potty,
8   and not being there, I don't have the benefit of
9   firsthand knowledge about this.
10        But the people there viewed it as a change
11  in his condition.  It was significant -- they felt
12  that was a significant event in terms of their
13  observations of him.
14        Mr. Tischer goes into the shanty and
15  someone offers him something to drink, and one of
16  the coworkers who was with him comes out and says, I
17  think he's having a stroke.
18        Does that change your perspective on this
19  at all?
20        MR. HAYDEN:  Objection.  It lacks
21  foundation, misstates testimony that's in evidence.
22  It's also objectionable to form, incomplete
23  hypothetical.
24        THE WITNESS:  Well, I mean, I don't
25  know -- I don't know from just your statement there

Page 68

1   if what caused the person to say that, if it was
2   just seeing him stumble or if it was some other
3   information.
4   BY MR. BANKER:
5      Q.  Sure.
6      A.  And I think, you know -- so, again, it's
7   kind of nonspecific.  I don't know what to make of
8   it other than that's what you say the person said.
9      Q.  Okay.  So by about 8:35, Mr. Tischer is
10  back in the PTI vehicle and the decision is made to
11  take him back to the Altoona depot which -- based on
12  the layout of the yard, I think you have to drive
13  out of the yard and back into the yard again.
14        But between 8:35 and roughly 8:50, the PTI
15  vehicle is making its way back to the -- to the
16  depot office.
17        While en route, Mr. Tischer vomits and
18  they have to stop the vehicle so he can get out and
19  finish vomiting.
20        Does the -- the vomiting add anything to
21  this scenario in terms of his medical condition?
22        MR. COHEN:  Objection:  Form and
23  foundation.
24        THE WITNESS:  Well, I think it -- you
25  know, it's some objective evidence he really is ill,

John Holland, M.D.                                                                    21 (69 - 72)
10/21/2019

Page 69

1 you know, something is going on, and I think have
2 him go home is, you know -- or at least leave work
3 is reasonable and it's pretty nonspecific, you know.
4        You -- you know, the first thing you would
5 think is some kind of viral illness or
6 gastroenteritis or, you know, something somebody
7 ate, and so that's about as specific as I could be.
8 BY MR. BANKER:
9    Q.   Okay.  So then the PTI vehicle gets to the
10 depot by about sometime probably between 8:50 and
11 8:56, and the driver of the PTI vehicle goes into
12 the depot to see if there's anyone else there to
13 provide help for Mr. Tischer.
14        In the meantime, Mr. Tischer tries to get
15 out of the vehicle and he falls to the ground and is
16 unable to get up.  He's found there by Mr. Marvin
17 who arrives shortly thereafter, sometime between
18 8:50 and 8:56, and finds Mr. Tischer on the ground
19 unable to move his left leg and left arm, unable to
20 get him -- he's deadweight, unable to get up off the
21 ground and get back into the vehicle.  And
22 Mr. Marvin observes left-sided facial drooping.
23        Does what I've just described add anything
24 to this scenario in your mind?
25    A.   Yes.

Page 70

1    Q.   Tell me what.
2    A.   Well, you described now he can't --
3 apparently can't move his left arm and leg.  He's
4 got drooping on the left side.  It does sound like
5 this is a sudden occurrence because he was walking
6 previously when he got in the van.
7        So this does sound like an acute event,
8 you know, and it has all the characteristics of a
9 stroke or would be consistent with that.
10    Q.   Okay.  So Mr. Marvin by about 8:56 calls
11 911, and the 911 dispatcher dispatches the
12 ambulance, and the ambulance comes and I -- let me
13 find it here.
14        And the ambulance departs at about 9:18,
15 so they were called at 8:56, they departed for the
16 hospital at 9:18.
17        If I'm understanding your testimony, do
18 you think that at the depot was the first time that
19 911 was -- a 911 call was indicated?
20    A.   Well, based on the scenario you described
21 to me, yes.
22    Q.   Okay.  Would there have been any reason to
23 call 911 earlier based on kind of altered mental
24 state where someone says, no, no, I'm fine to do the
25 job, but the people around him have concluded you're

Page 71

1 not fine?
2        MR. HAYDEN:  Objection:  Lacks
3 foundation.
4        THE WITNESS:  Well, prior to this
5 event when he gets to the depot and is on the
6 ground, you don't -- what you described to me
7 doesn't appear to me to be altered mental state, at
8 least it's not clear.
9        Just somebody saying I'm fine, they don't
10 want -- I don't want to get medical attention or I
11 don't want to leave work isn't necessarily altered
12 mental state at all.  It's just their -- just their
13 statement.
14 BY MR. BANKER:
15    Q.   Okay.  Is there any written policy or
16 procedure that provides guidance about when to
17 initiate a 911 call for Union Pacific?
18    A.   Well, there isn't any such guidance in the
19 medical rules.  I don't know what guidance there is
20 in other operating rules, so I'm not sure.
21    Q.   Okay.  Or to follow up on that point, as
22 to who is the proper person to initiate a 911 call,
23 is there any rule that specifies that?
24    A.   I do not -- as far as I know, there is no
25 rule that speaks to that.

Page 72

1    Q.   Okay.  Who is responsible for drafting the
2 medical rules generally?
3    A.   Well, the last time they were revised -- I
4 mean, they existed before I started working with
5 Union Pacific.
6        And the last time they were revised, it
7 was a group put together under the leadership of our
8 department, health and medical services, and there
9 are representatives -- I was on the committee, we
10 had some of our nurses on the committee, safety
11 people -- people from the safety department,
12 operating, labor relations, so it -- and law, so
13 it's a large group.
14        And -- that that all contributes to the
15 development, but it's under the leadership of health
16 and medical services.
17    Q.   Okay.  And then once health and medical
18 services has settled upon a set of medical rules,
19 who is responsible for implementing those medical
20 rules?
21    A.   Well, once they're formally adopted, the
22 medical rules really give responsibility to -- they
23 talk about the roles and responsibility of the
24 employee, you know.  So the roles and responsibility
25 of the manager and the roles and responsibility of

John Holland, M.D.                                                                22 (73 - 76)
10/21/2019

Page 73

1  our department, health and medical services.
2        So everybody has got some responsibility
3  for implementing certain parts, such as the
4  employees we talked about are responsible for making
5  sure they're fit for duty when they come to work.
6  They're responsible for reporting reportable health
7  conditions.
8        They have responsibilities if we do
9  initiate a fitness-for-duty determination --
10 evaluation process, they have responsibilities to
11 participate.
12       So that's really what the rules -- what
13 the medical rules talk about.
14    Q.  Okay.  I want to -- we've spent some time
15 talking about the first topic in the deposition
16 notice, and now I want to shift gears to the second
17 topic, and that is, "UP's policies and procedures
18 regarding employee first-aid training, including
19 stroke recognition and response, applicable to UP's
20 Altoona, Wisconsin, yard in 2017."
21       Do you have that topic in mind?
22    A.  Yes.
23    Q.  What -- what is UP's policy regarding
24 employee first aid training in the 2017 time frame
25 applicable to the Altoona yard?

Page 74

1     A.  So Union Pacific makes first aid training
2  available to all employees.  It's on a voluntary
3  basis, and it's encouraged, but it isn't required of
4  employees.
5     Q.  Why is it encouraged as opposed to
6  required?
7     A.  Well, the -- my understanding is there is
8  no legal requirement, you know, in any government
9  regulations for us to provide first aid training to
10 our employees.  We -- we think it's a good thing to
11 do.  You know, we -- again, it's voluntary.
12       We actually don't have many incidents, you
13 know, of injuries or illnesses where they come into
14 play.
15       And I think in general operations are
16 pretty safe, but I think -- it is a good thing not
17 only for employees, but everyone in the public, I
18 think, would benefit by first aid training.
19    Q.  And when we say first aid training,
20 what -- are we talking about, you know -- just as a
21 layperson, I think of first aid training as like
22 people bleeding, people who are too hot or too cold,
23 people who have lost consciousness, people who are
24 maybe having signs of heart attacks.
25       What is the UP first aid training

Page 75

1  essentially?
2     A.  Well, it's all of those things that you
3  discussed.  I mean, we've got -- as we talked about
4  before with this exhibit, you know, we have a
5  brochure or a booklet on first aid training.
6  There's courses that people can sign up for that go
7  through the booklet.
8        Much of it is CPR, cardiopulmonary
9  resuscitation, and use of the automatic electronic
10 defibrillator, AED.  And that -- that's a big
11 component of the first aid training.
12       The other components, there is a certain
13 amount about traumatic injuries, you know, cuts, you
14 know, crush injuries, first aid until, you know,
15 medical attention arrives that -- EMS or emergency
16 medical services or somebody else.
17       And then there's -- there's some general
18 things about other health conditions.
19       So -- so I don't know.  I guess I'm just
20 describing really what's in the book.
21    Q.  And so the book that you're referring to
22 is what we marked as Exhibit --
23       MR. HAYDEN:  9.
24 BY MR. BANKER:
25    Q.  -- 9?

Page 76

1     A.  Yes.
2        MR. BANKER:  Thank you.
3  BY MR. BANKER:
4     Q.  So is that the title of it, the BasicPlus,
5  that is the first aid training?
6     A.  Title is "BasicPlus CPR, AED, and First
7  Aid for Adults."
8     Q.  Okay.  And so how long has that been the
9  course material for the UP's first aid training?
10    A.  You know, I don't know.  This is -- this
11 one was the one -- my understanding was in effect in
12 2017.
13       But, you know, the -- periodically our
14 department and the safety department and others will
15 review the training material to see if we want to
16 continue with this or go with a different vendor.
17    Q.  You mentioned that UP makes first aid
18 training available on a voluntary basis.  How does
19 it make that training available to employees, say,
20 in the 2017 time frame, Altoona yard?
21    A.  You know, I don't know the different
22 mechanisms.  I know that some departments will have
23 annual safety meetings, you know, multi-day safety
24 meets and they'll make it a component of it.
25       And I'm not -- so I'm not sure different

Page 77

1  departments or different settings how it's
2  available.  But I do know that anybody that wants to
3  can sign up for the courses, the training courses.
4      Q.  How would an employee know that that
5  resource was available to them?
6      A.  I'm not sure of the answer.  I'm not sure
7  of the answer to that question.  I mean, we do have
8  various types of mandatory training programs, and it
9  may be mentioned in some of those, but I'm not sure.
10     Q.  I'm just trying to get an overall picture.
11  If -- you know, how frequently is this first aid
12  training offered for voluntary participation?
13     A.  I -- as I said, there's some work groups
14  that give it -- because they have annual safety
15  meetings incorporated as part of their annual safety
16  meetings, multi-day safety meetings.
17         And with other work groups, I'm not sure
18  of the specific mechanisms about how they -- you
19  know, how they offer it.
20     Q.  How about focused just on operations in
21  the Altoona -- the operations employees in the
22  Altoona yard?  How often as in the 2017 time frame
23  was that first aid training being offered to them?
24     A.  I don't know.
25     Q.  Okay.  Who would perform the training,

Page 78

1  UP's first aid training when it was offered?
2      A.  My understanding is that our preferred
3  method is sort of a train the trainer approach.  So
4  there will be some -- for this company or if we had
5  another vendor, you know, they'll have some of their
6  staff that would come out and train different people
7  within our organization to be trainers who then
8  would put on the courses.
9          There may be sometimes too where we had
10  staff from this Medic First Aid came out and do the
11  actual training, so I think there's -- my
12  understanding is both those might apply.
13     Q.  You know, you -- I want to just to follow
14  up, you mentioned that sometimes UP will use vendors
15  for its information or training.
16         Do you know for a fact whether the
17  BasicPlus is an in-house creation or whether that's
18  something that UP obtained through a vendor?
19     A.  Well, I know it's an outside company.
20     Q.  Okay.
21     A.  And, you know, they provided it and then
22  we, you know, we put our logo in the brochure.  But
23  this is something that the outside company
24  developed, and it says just -- not in this here, but
25  if you look at the -- well, I guess it does say on

Page 79

1  the second page.  It gives the name and address of
2  the company.
3      Q.  Oh, this Medic First Aid, that's the
4  vendor?
5      A.  Yes.
6      Q.  Okay.  So they prepare the materials in
7  the first instance and UP puts its own --
8      A.  My understanding, I think this is correct,
9  is this is -- this is their brochure, and because we
10  contracted with them to provide the services, they
11  put our logo on the front page; but, otherwise, it's
12  their standard brochure.
13     Q.  I see.
14         Does UP make any record of the employees
15  who receive the BasicPlus first aid training on the
16  voluntary basis?
17     A.  I don't know.
18     Q.  Okay.  There's been witnesses who have
19  testified both ways on this subject, so I'll just
20  ask you, do you know whether any employees are
21  required to have first aid training?
22     A.  It's my understanding that there
23  they're -- it's not required for any UP employees.
24     Q.  Okay.  I want to have you look at -- I
25  want to show you a couple of documents.

Page 80

1              (Exhibit 20 previously marked in
2               a prior deposition.)
3  BY MR. BANKER:
4      Q.  Showing you what's been previously marked
5  as Exhibit 20.
6          MR. HAYDEN:  Thank you.
7          MR. COHEN:  Thank you.
8  BY MR. BANKER:
9      Q.  I'll represent to that you that this is a
10  document that was produced and created by UP in this
11  litigation to provide various kinds of information.
12  And I want to have you look on Page 3 of the
13  document at numbered Paragraph 12.  There's a
14  paragraph about the information that you may or may
15  not have.
16         It says there that Dr. Holland will have
17  knowledge of the policies and procedures for
18  railroad operations and training for employees of
19  Union Pacific.
20         We've talked about the training for
21  employees of Union Pacific.  Do you have information
22  other than what we've talked about today regarding
23  policies and procedures for railroad operations?
24     A.  That's kind of a broad question.  I mean,
25  I did speak about the medical rules, which I'm very

John Holland, M.D.
10/21/2019

24 (81 - 84)

Page 81

1 familiar with.
2    Q.   Sure.
3    A.   There's another policy that's relevant to
4 medicine is our drug and alcohol rules, which I
5 don't think are applicable here.
6    Q.   Okay.
7    A.   Those are the two policies that I am most
8 familiar with and I deal with directly.  I mean,
9 other than that, there are many other policies and
10 procedures for railroad information -- railroad
11 operations that I don't deal with.
12    Q.   Sure.
13         But as relates to policies and procedures
14 for railroad operations pertaining to this
15 particular case and Mr. Tischer's scenario, have we
16 talked about your areas of where you have knowledge?
17    A.   Yes.
18    Q.   Do you know Jessica Carson?
19    A.   Yes.
20    Q.   Who is Jessica Carson?
21    A.   She is a nurse that's employed at Union
22 Pacific, designated as occupational health nurse
23 that's in the Twin Cities service unit.
24    Q.   And is the -- my understanding is that the
25 Twin Cities service unit encompasses the Altoona

Page 82

1 yard where Mr. Tischer was working on August 12th,
2 2017.  Is that your understanding?
3    A.   I believe so, yes.
4    Q.   Does Jessica Carson have any
5 different or additional information to your
6 knowledge about the Tischer incident?
7         MR. HAYDEN:  Calls for speculation.
8         THE WITNESS:  I don't know.
9 BY MR. BANKER:
10    Q.   Okay.  Have you ever spoken with
11 Ms. Carson about the Tischer incident?
12    A.   Not that I know of.
13    Q.   Okay.  Based on -- we talked at the
14 beginning of your deposition about you not having
15 any direct conversations with any of the fact
16 witnesses in particular on the evening that this was
17 playing out or thereafter.
18         Do you know whether anyone called health
19 and medical services about the Tischer incident on
20 August 12th, 2017?
21    A.   No.
22    Q.   Do you know whether anyone called health
23 and medical services after that date about the
24 tissue incident?
25    A.   No, I don't know.

Page 83

1    Q.   Would there be any reason to notify health
2 and medical services of the Tischer incident from a
3 medical standpoint?
4    A.   Well, I don't know.  I mean, it could've
5 happened.  The -- the occupational health nurse
6 might have contacted or wrote a note, but I don't
7 know.
8    Q.   Okay.  Do you know who the occupational
9 health nurse would have been who had oversight
10 responsibility for the Altoona yard in 2017?
11    A.   Well, I assumed it was Ms. Carson because
12 she's listed here.
13    Q.   You know what I did?  I went the wrong
14 direction with that.
15         Let me go back to Exhibit 20, and I want
16 to go to the paragraph above.  I was asking you
17 questions about Jessica Carson, and I appreciate
18 that.
19         What I meant to be asking you about was
20 Debra Gengler.  Do you know who Debra Gengler is?
21    A.   Yes.
22    Q.   Who is Debra Gengler?
23    A.   She's a nurse.  She's the director of
24 clinical services at Union Pacific, which is in our
25 department, health and medical services.  So she and

Page 84

1 I are colleagues.
2    Q.   Okay.  How do her responsibilities differ
3 from yours on a day-to-day basis?
4    A.   Well, at the current time, she has the
5 nurses in our department, both fitness-for-duty
6 nurses and -- that are under her direction.
7         She and I both participate in policy and
8 procedure development in the department along with
9 many others.  You know, on a day-to-day basis, we
10 work on fitness-for-duty cases together.
11    Q.   Okay.
12    A.   So I think we're really sort of a
13 integrated team in terms of doing this, and she and
14 I are at parallel levels within the department.
15    Q.   Is Debra Gengler a medical doctor?
16    A.   She is a nurse, and she has a master's in
17 occupational health nursing.
18    Q.   Okay.
19         THE WITNESS:  Can we take a short
20 break.
21         MR. BANKER:  Sure.  Certainly.
22         THE WITNESS:  Okay.  Thanks.
23         VIDEOGRAPHER:  The time is 1:10 p.m.
24 Counsel, we're off the record.
25         (1:10 p.m. - Recess.)

John Holland, M.D.                                                                          25 (85 - 88)
10/21/2019

Page 85

1    (At 1:21 p.m., with parties present as
2 before, the following proceedings were had, to-wit:)
3         VIDEOGRAPHER:  The time is 1:21 p.m.
4    Counsel, we're back on the record.
5         (Exhibit 22 previously marked in
6         a prior deposition.)
7 BY MR. BANKER:
8    Q.  I'm going to show you what's been
9 previously marked as Exhibit 22.
10    Have you had occasion to look at the EMT
11 records that were created in Mr. Tischer's ambulance
12 response?
13    A.  No.
14    Q.  I want to direct you to -- I'll represent
15 to you that Exhibit 22 has been identified as being
16 those EMT records.  And on the seventh page of the
17 exhibit, there's a section entitled "Patient Care
18 Report."
19    A.  What page?
20    Q.  On the -- it's actually on the bottom
21 right-hand corner.  It's got a Page 405, but it's
22 the seventh physical page of the exhibit.
23    A.  All right.
24    Q.  At the top, it says "Patient Care Report."
25    Do you see that?

Page 86

1    A.  Yes.
2    Q.  And so the EMTs in this case have
3 explained that the ACHART is an acronym that they
4 use for sort of writing up their report.
5    And in particular, I want to direct you to
6 the section -- the paragraph titled -- that starts
7 with an H, which they've explained stands for
8 "History."
9    Take a moment, if you would, and read
10 through that paragraph.
11    A.  All right.
12    Q.  Does reading that -- understanding that we
13 don't know who is having these things, we just have
14 what's stated there in the -- in the paragraph in
15 the EMT record, does reading that provide you any
16 different picture of the scenario that I have walked
17 you through today in terms of the time line and the
18 events that have been testified about, does that
19 history paragraph change your view of the event at
20 all?
21    MR. HAYDEN:  Objection:  Form.
22    THE WITNESS:  Well, some --
23    MR. HAYDEN:  Foundation.
24    Go ahead.
25    THE WITNESS:  Well, again, as you

Page 87

1 said, we don't know -- we don't really know who the
2 friend is or the patient's friends that are
3 reporting here.
4    And it does provide information you hadn't
5 mentioned before, you know, and maybe it -- this is
6 the first time I've seen that he stated he felt he
7 was having a bad headache.  Some of this was
8 mentioned before, you know, that he vomited earlier.
9    This thing that he stated before calling
10 911, about an hour before he was having bad leg and
11 arm weakness, I mean, many of these things in terms
12 of the time line, you know, description weren't
13 necessarily something we derived from what you had
14 mentioned before.  So there are some new things
15 here.
16 BY MR. BANKER:
17    Q.  Okay.  And are they salient to you as a --
18 as a medical doctor, or what do you make of the new
19 information?
20    MR. HAYDEN:  Objection:  Form.
21    THE WITNESS:  Well, I don't -- I
22 don't have any way of disputing the information or
23 confirming it.  I mean, it basically is just
24 information that the -- the EMS responders wrote
25 down, you know, that they said someone had told

Page 88

1 them.
2 BY MR. BANKER:
3    Q.  Okay.  Do you attribute any particular
4 significance to any of those symptoms?
5    MR. HAYDEN:  Objection to form,
6 foundation, calls for speculation.
7    THE WITNESS:  Sure.  I mean,
8 they're -- all of them -- provide information, you
9 know.
10    The -- from what you did tell me, you
11 know, that when the manager found him on the ground
12 when he got back to the terminal, he -- either the
13 manager or he reported he was having difficulty
14 moving his left arm and leg, so they talk about left
15 arm and leg weakness, you know.
16    If this came on suddenly or if it was
17 developing -- you know, it appears that it came on
18 suddenly because he could no longer stand, you know,
19 but I don't know how long it had -- he felt
20 something there.
21    And then the other thing is this is the
22 first indication of a headache.  A headache is --
23 like vomiting, is really nonspecific.  I mean, there
24 are a few type of strokes that are related to
25 headache.  Subarachnoid hemorrhage, I don't know if

John Holland, M.D.
10/21/2019

26 (89 - 92)

Page 89

1 that's what was happening here or not.
2     So I don't know -- you know, I don't know
3 what to make of it other than this is what EMS
4 reported someone told him at the scene.
5 BY MR. BANKER:
6   Q.   Okay.  Sitting here today, do you know
7 what kind of stroke Mr. Tischer had?
8   A.   No.
9   Q.   I guess I should've asked the first
10 question, do you know whether he had a stroke?
11   A.   I -- I'm assuming he had a stroke from
12 what we talked about.  I mean, that -- yes.
13   Q.   Okay.
14   A.   I mean, I have a general understanding
15 that he had a stroke, yeah.
16   Q.   But beyond that, you don't have a specific
17 understanding of what his treatment or diagnoses
18 were?
19   A.   No.
20   Q.   Okay.
21       (Exhibit 16 previously marked in
22       a prior deposition.)
23 BY MR. BANKER:
24   Q.   Handing you what's been previously marked
25 as Exhibit 16.

Page 90

1     MR. HAYDEN:  Thanks.
2 BY MR. BANKER:
3   Q.   This is -- I'll represent to you that this
4 is a collection of emails from Jessica Carson, who
5 we mentioned as the occupational health nurse for
6 the Twin Cities service unit, and I have a
7 particular question I want to ask you regarding the
8 third page of the document, which is Bates stamped
9 UP001048.
10     Ms. Carson has testified that she went --
11 after receiving information a day or two after this
12 incident, she went on the Internet and got some
13 information about strokes and cut and pasted it into
14 this email.
15     She relates a FAST, F-A-S-T, acronym,
16 which appears to correspond to the acronym that's
17 used in the BasicPlus student handbook.
18     I guess my question, below that where it
19 says FAST, below that she has a paragraph that
20 starts, "Minutes matter in treating stroke."
21     Do you see that?
22   A.   I'll have to read this.
23     Yes, I see what you're referring to.
24   Q.   Sure.
25     And would you agree with that statement,

Page 91

1 that minutes matter in treating stroke?
2   A.   Yes.
3   Q.   At the top of that page, second sentence,
4 she says, "You need treatment right away to lower
5 your chances of brain damage, disability, or even
6 death."
7     Do you see that?
8   A.   Yes.
9   Q.   Would you agree with that statement?
10   A.   The -- yes, I think it's generally
11 accepted that if someone's having a stroke, you
12 know, that the sooner that they get into care, it --
13 you get appropriate care in a hospital, the better
14 off they are.
15     (Exhibit 19 previously marked in
16     a prior deposition.)
17 BY MR. BANKER:
18   Q.   I'm showing you what's been previously
19 marked as Exhibit 19.  Have you ever seen this
20 document before?
21   A.   No.
22   Q.   I'll represent to you that this is a
23 document that was produced by UP in this case in
24 response to an inquiry about what, if any, prior
25 experience UP has had with employees having strokes

Page 92

1 on duty in a particular time frame and at least
2 between May of 2014 and August of 2017.  This was
3 the answer.
4     Let me ask you, are you familiar with UP
5 having incidents of employees who are on duty having
6 strokes other than Mr. Tischer?
7   A.   Well, it could've happened.  I don't
8 recall any other specific incidents.
9   Q.   Okay.  I'm just trying to get a sense of
10 the level of incidents with which -- UP has more
11 than 30,000 some employees, correct?
12   A.   Well, back in 2017, we probably had about
13 45,000 employees.
14   Q.   Okay.  And so I'm just trying to
15 understand within that population of employees, how
16 frequently do -- do employees experience strokes
17 while on duty?  Do you have any sense of that?
18   A.   Well, I would -- I would expect it to be
19 fairly similar to what the population frequency is
20 for the age groups we have, so it isn't -- isn't all
21 that common.  I can't give you a percentage.
22   Q.   Okay.  Suffice to say it happens and has
23 happened in the past and would be expected to happen
24 in the future?
25   A.   Yes.

Page 93

1    Q.  Just eyeballing it, it looks like we've
2    got -- over the course between 2014 and 2017, it
3    looks like it's -- on a pace for about twice a year
4    with the number of events listed there.
5    A.  Yes, yes, I agree.
6    Q.  Do you have any reason to believe it's
7    either more or less frequent than that?
8         MR. HAYDEN:  I'm just going to object
9    that this is a -- to be clear, this is a list of
10   every incident in which the word "stroke" was used,
11   and so there -- these are -- we don't know whether
12   these were confirmed strokes, suspected strokes, or
13   otherwise, so just with that caveat.
14        THE WITNESS:  You'll have to ask me
15   the question again.
16   BY MR. BANKER:
17   Q.  Sure.
18       I'm just eyeballing it and looking at it
19   and saying at least between 2014 and 2017, it looks
20   like these were occurring at a rate of about twice a
21   year, these incidents that are reported here.
22       Do you have any reason to believe it's
23   either more or less frequent than that in terms of
24   employees having strokes on duty?
25        MR. HAYDEN:  Same objection as this

Page 94

1    does not in and of itself indicate where these
2    employees suffered a stroke.
3         THE WITNESS:  So these are brief
4    notes.  I'm not sure what database they're taken
5    from, but it must be some internal Union Pacific
6    database.
7         And in some of these, they talk about
8    people being taken to the hospital or the emergency
9    room for evaluation of stroke symptoms.  Some of
10   them say they had a stroke.  There's not a lot of
11   details.
12        But if there were -- if over this
13   essentially four-year period, there were eight
14   incidents, if they were strokes, that would be two
15   per year.
16        And we -- out of our 45,000 employees in
17   2017, for instance, about 40,000 were in these
18   safety critical jobs, so we would hear about this.
19        So that would be a pretty low percentage,
20   you know.  It would be maybe one every
21   20,000 employees would be a pretty low rate of
22   events for any health event.
23   BY MR. BANKER:
24   Q.  Okay.  So I want to ask you a question.
25   We already looked at Exhibit 9, the BasicPlus

Page 95

1    student handbook, but I have a specific question I
2    want to ask you.
3         To my eyes, looking through the table of
4    contents, it looks like stroke is specifically
5    mentioned as a category of sudden illness that's
6    dealt with on Page 81 of the student book.
7         And so I've excerpted out here starting on
8    Page 80, and then going to Page 81 so that you can
9    follow the table of contents into the material
10   there, there's a mention of stroke that begins on
11   Page 81, Bates stamped UP139, and goes on to the
12   next page, Page 82, Bates stamp UP1393.
13        Are you tracking where I'm at?
14   A.  Yes, I see that.
15   Q.  Is there any other written information
16   that UP provides to its employees about strokes
17   other than what's contained in this student
18   BasicPlus student book?
19   A.  I don't recall that we have other
20   information besides this.
21   Q.  And if I understand your testimony on this
22   point, the BasicPlus first aid training is something
23   that is made available but not required of
24   employees, correct?
25   A.  That's correct.

Page 96

1    Q.  And so -- but if they took the training,
2    is it your belief that they would be -- then they
3    would cover the stroke training that's listed in the
4    student BasicPlus student handbook?
5    A.  You know, I don't know.  It is included in
6    the book.  I'm not sure if -- you know, in the
7    on-site training if they go through it or they just
8    refer people to read the books.  I'm not sure.
9    Q.  Okay.  On Page 82 of the BasicPlus student
10   book, the second paragraph on that page, it says,
11   "Early bystander recognition, along with rapid
12   transport to a hospital, is critical for limiting
13   damage, or even survival."
14        Would you agree with that statement?
15   A.  Well, yeah.  This implies certain types of
16   strokes.  I mean -- and that there's certain types
17   of strokes where it's really important to get in
18   because treatment may be able to limit effects.
19        But in general, I think getting to the
20   hospital, you know, if someone is having a stroke
21   is -- you know, is the proper approach.
22   Q.  Are there any kinds -- is there a variety
23   of strokes for which medical treatment is not
24   urgent?
25   A.  Well, no, that's not what I was implying.

John Holland, M.D.
10/21/2019

Page 97

1 I think medical -- I think medical attention when
2 you have a stroke is important.  Not all of them are
3 given treatment.
4       I mean, sometimes it's -- you know, you
5 should be evaluated.  You know, whether there's an
6 effective treatment for you or not, given the kind
7 of stroke, will depend on what's happening.
8       Q.  I see.
9       I was kind of keying off you used -- I
10 thought I heard you say that for certain types of
11 strokes.
12       A.  So -- okay.  Well, getting -- there's
13 certain strokes where even if you get to the
14 hospital right away, it's going to -- you're not
15 going to be able to necessarily limit the damage.
16       Q.  Okay.
17       A.  Because the damage has already been done
18 or it's something that there's no effective
19 treatment.
20       Q.  I see.
21       A.  So if you -- if you have a hemorrhagic
22 stroke and you're -- you know, a burst aneurysm or
23 something, you still should be in the hospital, you
24 know.
25       But you -- and you should be generally

Page 98

1 maintained, you know, supportive care.  And it --
2 you know, it may not -- there may not be anything
3 you can do to limit the effect of the stroke.  It's
4 already happened.
5       Q.  Okay.
6       A.  So I guess what I'm -- I was -- but
7 activating EMS is always the right thing to do.
8       Q.  Okay.  Showing you what's been previously
9 marked as Exhibit 24.  Well, let's see.  And I
10 apologize for -- why don't we do this.
11       It's been previously marked as Exhibit 24,
12 but I don't have a copy of that because that was
13 just last week.  So why don't we mark this as a new
14 exhibit if we could.
15             (Exhibit 29
16             marked for identification.)
17 BY MR. BANKER:
18       Q.  So showing you what's been marked for
19 identification as Exhibit 29.  Have you ever seen
20 this form of document before?
21       A.  Yes.
22       Q.  What do you recognize it as being?
23       A.  Well, this a report of training for
24 Mr. Franchuk.
25       Q.  Okay.  And if I could direct your

Page 99

1 attention to the second page of the document, which
2 has a Bates Stamp 1475 on it, on the January 7th,
3 2016, there's an entry for January 7th, 2016, where
4 the code is MEDRT, M-E-D-R-T, all caps, and then it
5 has got a further description as "Medical Rules
6 Training."
7       Do you see that?
8       A.  Yes.
9       Q.  Do you know what that is representing?
10       A.  Well, I assume -- I am going -- the
11 medical rules is what we talked about before.  We
12 looked at a exhibit which was a description of the
13 Power Point slides for medical rules training.
14       Q.  Yep.
15       A.  I would -- I'm going to assume that's what
16 this is.
17       Q.  So that -- what you're saying is that the
18 Exhibit 28 we looked at, the E-learning for medical
19 rules, corresponds to the training entry for
20 Mr. Franchuk on Exhibit 29 for January 7th, 2016?
21       A.  Well, let me modify that.  It talks about
22 medical rules training.  I mean, there maybe --
23 maybe there is other ways besides using the Power
24 Point of doing it.
25       Q.  Okay.

Page 100

1       A.  But it is something that is marked as a
2 training that was completed.  So if it was that form
3 or some other format, I don't know.
4       Q.  Okay.  Looking at Mr. Franchuk's complete
5 training history, are you able to tell whether he --
6 whether or not he received the BasicPlus first aid
7 training?
8       And there may be -- there might be an
9 easier way to do this, so let me put that question
10 on hold and let me show you another document.
11       Why don't we mark this as Exhibit 30.
12             (Exhibit 30
13             marked for identification.)
14 BY MR. BANKER:
15       Q.  And, again, I apologize.  This was
16 previously marked as Exhibit 25, but I don't have an
17 actual stamped copy of it yet, so we'll call this
18 Exhibit 30.
19       Showing you what I understand to be the
20 training history for Mr. Marvin.  And then directing
21 your attention to the second to last page of
22 Exhibit 30, which is Bates stamped UP1487.
23       And then on that page, there is a
24 January 7th, 2014, entry for a code PXD6, which has
25 a description, "Basic First Aid/CPR-V6."

Page 101

1      Do you see that entry there?
2      A.  Yes.
3      Q.  Do you know what that entry for
4  January 7th, 2014, is on Mr. Marvin's training
5  history that is Exhibit 30?
6      A.  Well, I mean, all -- I can read it.  It
7  says "Basic Medic First Aid and CPR."  So it appears
8  to be an indication that he completed that training.
9      Q.  And do you believe that would be the
10  voluntary BasicPlus first aid training we've talked
11  about here today?
12      A.  Well, I do, because it was 4.5 hours'
13  duration, so it would've -- it would have been
14  probably the CPR training, plus the other basic
15  first aid.
16      Q.  Okay.  So then looking at Mr. Marvin's
17  training history big picture, do you see that he
18  received any first aid training other than the
19  January 7th, 2014, training?
20      A.  No.
21      Q.  Okay.  And then I want to turn back to
22  Exhibit 29, which was Mr. Franchuk's complete
23  training history, and ask you, do you see any
24  indication on his training history that he received
25  the voluntary first aid training that UP offered?

Page 102

1      A.  Your question again.
2      Q.  Sure.
3          My question was looking at Mr. Franchuk's
4  complete training history, which is marked as
5  Exhibit 29, do you see any indication that he
6  received UP's first aid training?
7      A.  No.
8      Q.  Okay.  Setting that aside, you as the
9  chief medical officer for UP, I take it, are not --
10  do not have any information to take issue with the
11  time line of events established by other witnesses
12  as to Mr. Tischer's incident?
13          MR. HAYDEN:  Objection to foundation.
14  I'm not sure he knows what that means, but go ahead.
15          THE WITNESS:  Yeah, I'm not quite
16  sure what you're asking me.
17  BY MR. BANKER:
18      Q.  Sure.
19          As to GPS records about where vehicles
20  were at certain points, you don't have any
21  information about that?
22      A.  No, I don't.
23      Q.  As to where people were that night and
24  when they were having conversations, you don't have
25  any information about that?

Page 103

1      A.  No.
2      Q.  As to physically where these events played
3  out and where various things were positioned
4  relative to one another, you don't have any
5  information?
6      A.  Well, the information I have is what you
7  presented to me.
8      Q.  Sure.
9      A.  But I don't have any other independent
10  information about it.
11      Q.  Okay.
12      A.  Excuse me.  Other than exhibits we've
13  looked at, like the EMS exhibit.
14      Q.  Sure.
15          But you don't have any personal knowledge
16  of that?
17      A.  No.
18      Q.  Okay.  So UP has added PTI as a
19  third-party defendant to this lawsuit.  And in the
20  course of that, UP and its attorneys have made
21  certain allegations against PTI regarding PTI's
22  involvement in this matter.  Now I just want to ask
23  you a couple questions about that.
24          UP has alleged that PTI failed to provide
25  Jacob Tischer with aid and assistance as reasonable

Page 104

1  persons would render under similar circumstances.
2          Do you have any information about that?
3          MR. HAYDEN:  Objection.  That's not
4  what Union Pacific's alleging.  They're alleging in
5  the alternative, should there be -- well, strike
6  that.
7          It's an allegation in the alternative, and
8  he doesn't have information about that.
9          MR. BANKER:  Okay.  Well, it's
10  actually not an allegation in the alternative, if
11  you read the third-party complaint.
12          MR. HAYDEN:  The entire complaint is
13  in the alternative.
14          MR. BANKER:  Well, it's actually not
15  alleged in the alternative.
16          MR. HAYDEN:  It is a -- it is a
17  complaint for contribution, which is the alternative
18  by its definition.
19          MR. BANKER:  If you read it
20  carefully, you'll see that it's not alleged in the
21  alternative.
22  BY MR. BANKER:
23      Q.  I guess my question to you is do you have
24  any information that PTI failed to provide Jacob
25  Tischer with aid and assistance as reasonable

Page 105

1  persons would render under similar circumstances?
2     A.  I have no information about that.
3     Q.  Okay.  Do you believe that UP provided
4  Jacob Tischer with aid and assistance as reasonable
5  persons would render under similar circumstances?
6           MR. HAYDEN:  Objection.  He's not
7  going to answer the question.  I should have stopped
8  him before he answered the first one.
9           These are legal contentions.  It's
10  improper to ask -- that was going to be my response
11  to Mike's request for a PMK on legal contentions.
12  It's improper to ask a witness sitting in his shoes
13  a response to legal contentions.
14           MR. BANKER:  Well, he's a corporate
15  designee.
16           MR. HAYDEN:  Not on those subjects.
17  Not on those subjects.
18           MR. BANKER:  Well, he actually is.
19           MR. HAYDEN:  No, he's not.  You just
20  read what the subjects were.
21           MR. BANKER:  The first subject is
22  "UP" Railroad's -- "railroad operations policies and
23  procedures applicable to Jacob Tischer's work as a
24  conductor on August 12th, 2017, and pertaining to
25  his illness, altered consciousness, or

Page 106

1  incapacitation."
2           MR. HAYDEN:  Right.  Now you're
3  asking -- first of all, it's not -- your question is
4  not in that rubric, number one.
5           Number two, you're asking him an opinion.
6  Haven't designated him, I might, but I haven't
7  designated him as an expert.
8           MR. BANKER:  Okay.
9           MR. HAYDEN:  And it's a contention.
10           MR. BANKER:  So understanding your
11  objection, I guess my question stands.
12  BY MR. BANKER:
13     Q.  Do you have any information sitting here
14  today that PTI failed to provide assistance -- aid
15  and assistance to Jacob Tischer as a reasonable
16  persons would render under similar circumstances?
17           MR. HAYDEN:  Lacks foundation and to
18  the extent you have any information is the question.
19           THE WITNESS:  Can you just ask me the
20  question once more?
21  BY MR. BANKER:
22     Q.  Sure.
23           So do you have any information that PTI
24  failed to provide Jacob Tischer with aid and
25  assistance as reasonable persons would render under

Page 107

1  similar circumstances?
2     A.  No.
3     Q.  How about that PTI failed to recognize
4  medical conditions and provide or obtain medical
5  treatment despite observations requiring the same?
6           MR. HAYDEN:  The question is do you
7  have any information about that.
8           THE WITNESS:  No.
9  BY MR. BANKER:
10     Q.  Okay.  How about do you have any
11  information that PTI failed to properly train
12  employees regarding recognizing and handling medical
13  emergencies on its transport vans?
14     A.  I have no information about that.
15     Q.  Okay.  How about whether PTI failed to
16  follow or establish reasonably safe protocols
17  regarding medical emergencies?
18     A.  Again, I have no information about that.
19     Q.  How about that PTI failed and neglected to
20  provide and implement emergency action plans and
21  otherwise causing delay in the response of emergency
22  responders?
23     A.  So I have no information about that.
24     Q.  Okay.  I want to just understand the
25  reason for -- the thinking underlying the medical

Page 108

1  rules relating to reportable medical events for
2  employees in safety sensitive positions.  Okay?  So
3  that's the frame work for it.
4           What is the concern for employees in
5  safety sensitive conditions that have medical
6  conditions?
7           MR. HAYDEN:  Objection.  Form.
8           THE WITNESS:  Okay.  I -- is that
9  a -- a question?  I'm not quite sure what --
10  BY MR. BANKER:
11     Q.  Sure.
12           What is the -- what is the medical rule
13  for reportable medical events?  What is it trying to
14  get at?
15     A.  So what it's trying to get at is -- much
16  of it is trying to get at sudden -- medical
17  conditions that pose risk for sudden incapacitation,
18  which inherently cause significant safety risks for
19  certain safety critical employees.
20           And the whole concept of sudden
21  incapacitation posing a significant safety risk is
22  all throughout transportation medicine, whether
23  you're looking at aviation or commercial driving.
24           And the National Transportation Safety
25  Board specifically has given some recommendations to

John Holland, M.D.                                           31 (109 - 112)
10/21/2019

Page 109

1  the FRA, and therefore, indirectly to the railroads
2  that there are a number of medical conditions that
3  cause sudden incapacitation that have been
4  responsible for significant and fatal rail
5  accidents.
6          And so they recommend to the FRA that they
7  develop rules that require railroad employees to
8  report to their employers if they have certain
9  health conditions that pose significant risks for
10 sudden incapacitation.
11         An example would be seizure disorders.  So
12 that they can -- the employee can be appropriately
13 evaluated, and if need be, they can have work
14 restrictions to protect themselves and others
15 because of this safety risk.
16         So that is the guiding principle behind
17 the reportable health conditions.
18     Q.  Is part of the -- part of what's being
19 addressed is just the nature of the work in the
20 sense that it's not always at locations where there
21 are other people, that there's a remoteness to it?
22         MR. HAYDEN:  Objection:  Foundation.
23         THE WITNESS:  So the reportable
24 health conditions, this Appendix B, applies to
25 everyone essentially in field operation.

Page 110

1          So it's partly the nature -- the nature of
2  the work includes both what you're doing and your
3  work setting.  So if you're working in a rail yard,
4  for instance, that's inherently hazardous.  If
5  you're operating any type of mobile machinery,
6  vehicle on-track equipment, or you're working on
7  moving trains, there's some inherent hazards, or if
8  you're controlling those activities, such as a train
9  dispatcher.
10         And so the -- the guiding principle partly
11 has to do with the medical event, something that's
12 going to cause sudden incapacitation and partly has
13 to do with the work task or work environment where
14 if you have sudden incapacitation, it poses a
15 significant safety risk to you and others.
16         So that's -- again, that's the essential
17 purpose of the Appendix B, the reportable health
18 conditions.
19 BY MR. BANKER:
20     Q.  Okay.  Is there anything to the work rest
21 cycle of conductors that -- in terms of their
22 sleeping and resting that adds particular medical
23 issues to concern?
24         MR. HAYDEN:  Objection:  Form and
25 foundation.

Page 111

1          THE WITNESS:  So there isn't anything
2  in the reportable health conditions that deals with
3  sleep and fatigue and scheduling, you know, and that
4  isn't really part of the medical rules.
5          There are other policies and programs at
6  Union Pacific that deal with fatigue management and
7  which -- and there are regulations that deal with
8  minimum rest procedures for conductors, you know,
9  between shifts.
10         And so there are other sort of policies
11 and programs and even regulations that deal with
12 sleep cycles and rest, but it's not in the medical
13 rules.
14         And it's not something that the medical
15 department specifically -- what should I say, it's
16 not our program.  It's more on operations that deals
17 with --
18 BY MR. BANKER:
19     Q.  Okay.
20     A.  -- fatigue management.
21     Q.  And I'm more approaching it from a
22 perspective of circadian rhythms being disturbed.  I
23 mean, does that present any particular medical
24 concern?
25         MR. HAYDEN:  It presents a relevancy

Page 112

1  to this case.  So what's the -- my objection
2  formally is form and foundation.  And I'm wondering
3  aloud what the relevance of that is.
4          MR. BANKER:  I'm just trying to
5  understand how this ties in.
6          MR. HAYDEN:  Well, I'm understanding
7  how that -- I'm trying to understand how that ties
8  into the PMK notice that you made of the man.
9          MR. BANKER:  Well, so policies and
10 procedures applicable to Jacob Tischer's work as a
11 conductor on August 12th, 2017, pertaining to his
12 illness, altered consciousness, or incapacitation.
13 I'm just wondering --
14         MR. HAYDEN:  Well, ask him that.  Did
15 any lack of sleep, for which there's no foundation,
16 alter hid consciousness?
17         And by the way, No. 2 is the subject on
18 which I said he is not fully testifying to today,
19 but go ahead.  Please narrow it to a relevant
20 question.
21 BY MR. BANKER:
22     Q.  Do you remember the question?
23     A.  So -- no.
24     Q.  Okay.
25     A.  You'll have to ask again.

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                     Tel: (402) 556-5000 | Fax: (402) 556-2037

John Holland, M.D.                                              32 (113 - 116)
10/21/2019

Page 113

1    Q.  Sure.
2        I'm just -- you know, so I was -- in
3  asking that question about resting and work, I was
4  thinking about it from a circadian rhythms
5  standpoint.  Is that at all salient or pertinent in
6  your mind?
7        MR. HAYDEN:  In this case?
8  BY MR. BANKER:
9    Q.  In terms of the work or the medical rules
10 and the work setting and the work task?
11   A.  So as I said, the medical rules don't deal
12 with fatigue management.  There's other policies
13 that deal with that.
14       I don't see -- you know, in this
15 particular case, Union Pacific, I'm not sure what
16 the relevance is to the, you know -- to circadian
17 rhythms or sleep management.  So I don't really have
18 an opinion.
19   Q.  So looking at this Jacob Tischer event and
20 how it developed over time, is there any written
21 procedure that would give any guidance about how to
22 deal with an employee that the people around him are
23 questioning his ability to do his job?
24       MR. HAYDEN:  Objection:  Lack --
25 grossly lacks foundation, assumes facts not in

Page 114

1  evidence; it's, therefore, objectionable to form.
2        THE WITNESS:  So it's kind of a broad
3  question, you know.  I -- you know, I mentioned
4  before, I don't know that there is -- I don't know
5  that there's any specific regulations or policies
6  that deal with that situation.
7        I mean, I think a lot of this is dealt
8  with as what's reasonable, what's common sense in
9  the situation, and -- but I don't know of any
10 specific policy.
11 BY MR. BANKER:
12   Q.  Well -- and so I was approaching it very
13 broadly on that end.  Let me approach it from the
14 other end very narrowly.
15       Is there anything before Mr. Tischer is
16 laying on the ground outside the PTI vehicle at the
17 depot between 8:50 and 8:56 at night that indicates
18 something should be done for him by way of seeking
19 emergency -- an emergency medical response?
20       MR. HAYDEN:  Objection.  He testified
21 I think very early on in this deposition that he did
22 not read any of the materials, depositions, medical
23 records, et cetera.
24       So all he's -- your question is based on
25 your repeatedly incomplete hypotheticals.  So it's

Page 115

1  objectionable to foundation and form.
2        THE WITNESS:  Okay.  You know, based
3  on the information you presented to me about this
4  case, which, again, I don't have anything -- that's
5  all I know is what you presented to me.
6        The scenarios that you presented to me
7  prior to him being found on the ground after he got
8  out of the van, I don't see anything before that
9  which would -- which would be an indication for
10 calling emergency medical services unless he asked
11 for it, which he didn't.
12       I mean -- and so I don't see anything in
13 the hypotheticals or the situation that you
14 described to me before he was on the ground that
15 would be an indication to call emergency medical
16 services.
17       MR. BANKER:  Okay.  I don't have any
18 further questions.
19       CROSS-EXAMINATION
20 BY MR. COHEN:
21   Q.  Good afternoon, Doctor.  My name is
22 Michael Cohen, and I represent Professional
23 Transportation, Incorporated.
24       I hope you don't mind if I refer to
25 Professional Transportation incorporated as PTI.  Is

Page 116

1  that okay?
2    A.  Yes.
3    Q.  All right.  So I believe you said before
4  that you were familiar with PTI; is that correct?
5    A.  I know -- I'm not familiar with the
6  company.  I know -- I'm familiar with what our vans
7  do, our crew vans, which is one of the services they
8  provide.
9    Q.  Okay.  And that sort of answers my next
10 question, but I'm going to ask it anyway.
11       What is the relationship, if you know,
12 between PTI and Union Pacific?
13   A.  Well, my understanding is PTI is a
14 contracted vendor to Union Pacific, and one of the
15 services they provide is to drive employees,
16 particularly train crews, from a site of a train to
17 other locations, such as a terminal.
18   Q.  Okay.  Now, you talked a little bit
19 with -- quite a bit with Mr. Banker regarding Union
20 Pacific's medical or first aid training it provides
21 from time to time to its employees.  Do you recall
22 that?
23   A.  Yes.
24   Q.  And is that medical training program known
25 as BasicPlus, or how would you like to refer to

John Holland, M.D.                                                33 (117 - 120)
10/21/2019

Page 117

1  that?
2      A.   Medic First Aid training.
3      Q.   Medic First Aid training?
4      A.   Yes.
5      Q.   Just generally, how did UP develop its
6  Medic First Aid training?
7      A.   Well, there are -- there are a few
8  organizations that offer this type of training to
9  corporations such as ours, and this -- this company,
10  Medic First Aid, is one of those.
11         You know, others are National Safety
12  Council and American Red Cross also have training.
13      Q.   Okay.  And when you say Medic First Aid,
14  is that Medic First Aid International, Incorporated?
15      A.   I believe so, yes.
16      Q.   Do you know when Medic First Aid
17  International, Incorporated, developed Union
18  Pacific's training program?
19      A.   Well, no, I don't.
20      Q.   Okay.  Do you know the process by which
21  that first aid program was developed with UP?
22          MR. HAYDEN:  Objection:  Foundation.
23  He's testified already UP didn't develop this.
24          THE WITNESS:  My understanding is
25  this was a -- this was training that had already

Page 118

1  been developed by Medic First Aid, you know, and
2  then we reviewed it and then hired them as a vendor
3  to provide the training material and train our
4  trainers.  That would be -- it's my understanding of
5  how this process works.
6  BY MR. COHEN:
7      Q.   Okay.  So did UP review materials sent by
8  several vendors and just choosed (ph) one or is
9  there some other process that occurred?
10      A.   I don't know what happened when we chose
11  Medic First Aid.  That would be -- that would be a
12  typical process would be review proposals from
13  different vendors.
14      Q.   Okay.  And did UP have any input into what
15  would be provided in the materials that Union
16  Pacific ultimately chose?
17      A.   I don't know.
18      Q.   Is it sort of possible that UP had input
19  into the materials?
20          MR. HAYDEN:  Calls for speculation.
21          THE WITNESS:  Well, it's possible,
22  but I don't know.
23  BY MR. COHEN:
24      Q.   And your counsel makes a good point.  Let
25  me rephrase that.

Page 119

1         Do you have any reason to believe that UP
2  would not have had the ability to edit the materials
3  that were provided to its employees?
4      A.   Well, I -- I don't know.  I mean, I don't
5  know that Union Pacific did -- asked to edit them or
6  edited them.  I don't know.
7      Q.   You're saying as you sit here today you
8  don't know one way or the other whether Union
9  Pacific had the ability to make revisions or edit
10  the written policies -- the written training
11  materials that were provided to its employees?
12      A.   Yes.  We're talking about the Medic First
13  Aid materials, that's correct.  I do not know either
14  way.
15      Q.   Okay.  Do you know how Medic First Aid
16  International, Incorporated, selected which medical
17  issues or conditions to include in the training
18  materials it provided to Union Pacific?
19      A.   No.
20      Q.   Do you know whether the number or the type
21  of conditions that were included in the BasicPlus
22  training materials or the Medic First Aid training
23  materials were material to Union Pacific in deciding
24  which training materials to select?
25      A.   I don't know.  I wasn't -- I don't -- I

Page 120

1  don't recall that I was part of the process in
2  selecting them.
3      Q.   Okay.
4      A.   So I don't know what the decision making
5  was.
6      Q.   Do you know the position of the person or
7  persons who decided which training materials to
8  select?
9      A.   No.
10      Q.   Okay.  I think you mentioned before that
11  Union Pacific is not required to train its employees
12  or first aid or medic -- first aid training?
13      A.   What I mentioned was that I know of no
14  government regulations that require Union Pacific to
15  provide first aid training to its employees.
16      Q.   Okay.  Do you know of any governmental
17  regulations that requires anybody with whom UP
18  contracts to provide medical training to its
19  employees?
20      A.   I -- I don't know of any.
21      Q.   Okay.  Does Union Pacific require its
22  contractors to train its employees in medical -- in
23  first aid?
24      A.   I don't know.
25      Q.   Now, counsel for plaintiff stole my

Page 121

1   thunder a bit, but do you have any criticism
2   whatsoever of PTI in relation to Mr. Tischer?
3       A.   Well, all I know is what was provided to
4   me, you know, in these discussions today.  And I
5   don't have any criticism based on what I heard.
6       Q.   Okay.  Did you review the basic -- the
7   Medic First Aid training materials in preparation
8   for today?
9       A.   Yes.
10      Q.   Okay.  Are you familiar with the section
11  of those materials entitled "Other Legal
12  Considerations"?
13      A.   You know, I would have to look at it.  I'm
14  not sure I can recall.
15      Q.   Okay.
16      A.   Can you tell me what page that's on?
17      Q.   Sure.  It'll be on Page 8.
18      A.   All right.
19      Q.   And do you see the subsection entitled
20  "Duty to Act"?
21      A.   Yes.
22      Q.   Okay.  Why does UP provide training to its
23  employees regarding a duty to act?
24          MR. HAYDEN:  Objection:  Foundation.
25          THE WITNESS:  Okay.  This is a legal

Page 122

1   concept, you know.  And as I said before, the only
2   thing I can speak to is that it's my understanding
3   there is no legal regulation that requires UP to
4   provide the first aid training.
5          And if -- if you're asking me who does or
6   doesn't have a duty to act, I think that's a legal
7   question that I'm not prepared to answer.
8   BY MR. COHEN:
9       Q.   Okay.  And that would be the same -- same
10  would be true as to PTI, correct?
11      A.   Both of those issues, as I said before, I
12  do not know of regulations that would require PTI to
13  provide first aid training, and I'm not going to
14  give an opinion about duty to act because it's a
15  legal opinion.
16      Q.   Very good.
17          Next I want to talk about emergency action
18  plans.  Does UP have an emergency action plan?
19      A.   The -- I don't know.
20      Q.   Okay.  Who would know?
21      A.   If it was -- emergency action plan was --
22  well, you know, I really don't know who -- who I
23  would go to ask.
24          I think it -- if it deals with safety,
25  which it sort of implies, then the chief safety

Page 123

1   officer may know who would be -- who would be the --
2   able to discuss that.
3       Q.   And what is the name of the chief safety
4   officer?
5       A.   Aaron Britt, I think.  I may have that
6   wrong.
7       Q.   All right.  I want you to turn to Page 10
8   of the Medic First Aid training brochure or packet,
9   and I want to draw your attention to the box
10  entitled "Emergency Action Plans."
11          And my question is whether this changes
12  your testimony as to whether Union Pacific has an
13  emergency action plan?
14      A.   So I've read the sections of the emergency
15  action plan.  It doesn't change my answer.  I don't
16  know.
17      Q.   All right.  Suffice it to say if Union
18  Pacific does have an emergency action plan, you're
19  not aware of its contents; is that correct?
20      A.   Yes.
21      Q.   All right.  Okay.  If you could turn your
22  attention to either Exhibit 9 or the brochure you
23  have in front of you regarding the -- regarding the
24  first aid training UP provides to its employees on a
25  voluntary basis specifically regarding strokes,

Page 124

1   which in Exhibit 9 is contained on Page UP1392.
2       A.   All right.
3       Q.   Now, we discussed earlier that this
4   exhibit contains signs that tend to show up
5   suddenly.
6          Do you see where it says that?
7       A.   Yes.
8       Q.   All right.  Is vomiting on this list?
9       A.   No.
10      Q.   And you mentioned -- you were using the
11  phrase or the term "specific to a stroke."  What did
12  you mean by that earlier versus nonspecific?
13      A.   I don't know -- I can't remember the
14  context.
15      Q.   Fair enough.
16          Okay.  Does the fact that somebody is
17  vomiting necessarily mean that they're having a
18  stroke?
19      A.   No.
20      Q.   Okay.  Is it possible that somebody would
21  be vomiting without having a stroke?
22      A.   Yes.
23      Q.   Does vomiting by itself in your mind
24  require that emergency services be called?
25      A.   No.

John Holland, M.D.                                          35 (125 - 128)
10/21/2019

Page 125

1    Q.  Is the fact that a person is having
2  difficulty operating a seat belt necessarily
3  indicative of a stroke?
4        MR. HAYDEN:  I think asked and
5  answered.
6      But go ahead.
7      THE WITNESS:  No.
8  BY MR. COHEN:
9    Q.  Okay.  Does the fact that operating a seat
10  belt or has difficulty operating a seat belt
11  necessarily require in your mind that emergency
12  services be called?
13    A.  No.
14        MR. COHEN:  I don't have any further
15  questions.
16        MR. HAYDEN:  I just have I think
17  three.
18        CROSS-EXAMINATION
19  BY MR. HAYDEN:
20    Q.  Showing you -- or you have in your pack
21  there, Exhibit No. 16, it's the emails.  And if you
22  look, excuse me, at the page that's Bates labeled
23  UP001048.
24      So below the -- in large font, the FAST
25  protocol, right below there there's a paragraph that

Page 126

1  I think you were referred to earlier that starts,
2  "Minutes matter in treating stroke."
3      Do you see that?
4    A.  Yes.
5    Q.  Okay.  Going down a couple of sentences,
6  do you see where it says, "Depending on the type of
7  stroke, you may be given aspirin or powerful
8  clot-busting drugs."
9      Do you see that?
10    A.  Yes.
11    Q.  Then the next sentence says, "The best
12  results happen when you get this medication within
13  three hours of the symptom starting."
14      Do you agree with that statement?
15    A.  My understanding that that -- that's the
16  sort of standard protocol in stroke management, that
17  if you're going to use this, it needs to be done
18  at -- within about three -- I don't know if it's
19  three or four hours, but within that time period
20  after the first indication of a stroke.
21    Q.  And allowing that there's, medically
22  speaking, other reasons why the so-called
23  clot-busting drug may not be administered?
24    A.  Yes.  There are certain types of strokes,
25  such as a hemorrhagic stroke where you wouldn't use

Page 127

1  it.
2    Q.  Or a person's medical condition --
3  personal health --
4    A.  There may be other reasons too, yes.  It's
5  not always indicated.
6    Q.  You looked at the EMS records which were
7  identified just officially for the record as Exhibit
8  No. 22.
9      Did you see anything in those EMT records,
10  Doctor, that the FAST symptoms identified on
11  Page UP001048 were observed more than three hours
12  prior to the EMT's arrival?
13    A.  So the only one of the FAST symptoms that
14  really -- well, that are spoken to here are the left
15  leg and left arm weakness.
16      And this page of the EMT notes said the
17  patient stated about an hour before calling 911, he
18  was having really bad left leg and arm weakness.
19      So based on this page, there's -- none of
20  the FAST symptoms, so to speak, would have been
21  present more than three hours before this.
22    Q.  Regarding the question of when to call 911
23  for a fellow employee, what is it -- as a chief
24  medical officer, what is your expectation of when an
25  employee should call 911 on behalf of another

Page 128

1  employee?
2    A.  Well, I think there will be two
3  indications.  One is if the employee asks you to.
4  The employee asks you to call 911 for them, then, of
5  course, you should do that.
6      The other would be something dramatic.
7  Essentially if the person collapsed, if the person
8  was unconscious, if the person had some sudden
9  impairment.
10      So things that are -- we classify as
11  sudden incapacitation, sudden physical or mental
12  impairment which was major, and looked like it
13  represents a significant health event.
14        MR. HAYDEN:  Thank you, Doctor.
15  Anything else?
16        MR. BANKER:  I don't have any further
17  questions.
18        MR. COHEN:  Nothing here.
19        MR. HAYDEN:  Thank you.  We're done.
20        VIDEOGRAPHER:  The time is 2:32 p.m.
21  This is the end of the deposition.
22      Counsel, we're off the record.
23        COURT REPORTER:  (Requests transcript
24  orders.)
25        MR. BANKER:  Electronic full-sized

John Holland, M.D.                                          36 (129 - 129)
10/21/2019

Page 129

 1   and condensed with electronic exhibits.
 2              MR. COHEN:  Nothing right now.
 3              MR. HAYDEN:  Condensed PDF.
 4              (2:33 p.m. - Adjournment.)
 5          ** ** ** **
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

John Holland, M.D.                                                    37 (130)
10/21/2019

```
 1                    C E R T I F I C A T E

 2    STATE OF NEBRASKA      )
                             ) ss.
 3    COUNTY OF DOUGLAS      )

 4             I, Brianne L. Starkey, RPR, CRR, General

 5    Notary Public within and for the State of Nebraska,

 6    do hereby certify that the foregoing testimony of

 7    JOHN P. HOLLAND, M.D., was taken by me in shorthand

 8    and thereafter reduced to typewriting by use of

 9    Computer-Aided Transcription, and the foregoing one

10    hundred twenty-nine (129) pages contain a full, true

11    and correct transcription of all the testimony of

12    said witness, to the best of my ability;

13             That I am not a kin or in any way

14    associated with any of the parties to said cause of

15    action, or their counsel, and that I am not

16    interested in the event thereof.

17             IN WITNESS WHEREOF, I hereunto affix my

18    signature and seal this 7th day of November, 2019.

19

20             _____
                 BRIANNE L. STARKEY, RPR, CRR
21               GENERAL NOTARY PUBLIC

22

23    My Commission Expires:

24

25
```

## WORD INDEX

**< 0 >**
**001441**  49:*8*

**< 1 >**
**1**  3:2  4:*10*  9:*10*, 15
**1:10**  84:*23, 25*
**1:21**  85:*1, 3*
**10**  4:*15*  123:7
**100**  4:*5*
**1000**  2:*3*
**101**  2:*3, 8*
**11:05**  1:22  5:*10*
**11:24**  18:*19*
**11:26**  18:22
**115**  3:*8*
**12**  16:*14*  19:*19*
80:*13*
**12:04**  46:2, 4
**12:13**  47:*1, 3*
**125**  3:9
**129**  130:*10*
**12th**  20:8  21:*19*
27:7  52:12  55:15
82:*1, 20*  105:24
112:*11*
**130**  3:*4*
**1321**  1:*25*  2:21
**14**  4:*16*
**1436**  48:*12*
**1475**  99:2
**15**  28:8
**16**  4:*10*  89:*21, 25*
125:*21*
**19**  4:*10*  91:*15, 19*
**1920**  2:8
**1977**  12:2

**< 2 >**
**2**  3:2  8:*14*  9:9
21:*24*  38:4  44:*14*
112:*17*

**2:32**  128:*20*
**2:33**  129:*4*
**20**  4:*10*  80:*1, 5*
83:*15*
**20,000**  94:*21*
**2003**  14:*15, 18, 20*
**2010**  14:*16, 18, 20*
15:*18*
**2014**  21:9, *10*
92:2  93:*2, 19*
100:*24*  101:*4, 19*
**2016**  99:*3, 3, 20*
**2017**  4:*16*  8:25
16:*14*  18:*15*
19:*19*  20:8  21:*19*
27:7  55:*15*  73:*20*,
*24*  76:*12, 20*
77:22  82:*2, 20*
83:*10*  92:*2, 12*
93:*2, 19*  94:*17*
105:*24*  112:*11*
**2019**  1:*23*  5:9
130:*18*
**21**  1:*22*  4:*15*
10:*11, 15, 20, 23*
**213-4433**  2:9
**21st**  5:9
**22**  4:*16*  85:*5, 9,*
*15*  127:8
**233**  2:*13*
**24**  98:*9, 11*
**25**  100:*16*
**26**  4:*10*
**27**  4:*3*  7:*24*  8:*3*
19:*15*
**28**  4:4  47:*11, 15,*
*19, 20*  48:20  99:*18*
**29**  4:*5*  98:*15, 19*
99:*20*  101:22
102:*5*

**< 3 >**
**3**  3:*3*  80:*12*
**3:19-cv-00166-jdp**
1:*3*

**30**  4:*5*  7:*20*
100:*11, 12, 18, 22*
101:*5*
**30,000**  92:*11*
**312**  2:9, *14, 14*
**339-4511**  2:4
**339-5150**  2:4

**< 4 >**
**4**  3:*3*
**4.5**  101:*12*
**40**  7:*20*
**40,000**  94:*17*
**402**  2:*22, 22*
**405**  85:*21*
**45,000**  92:*13*
94:*16*
**47**  4:4

**< 5 >**
**50**  7:*16*
**55391**  2:4
**556-2037**  2:22
**556-5000**  2:22
**566-0041**  2:*14*
**566-0700**  2:*14*

**< 6 >**
**6**  3:*4, 6*
**60606**  2:9
**612**  2:*4, 4*
**68102**  2:21

**< 7 >**
**7**  4:*3*
**7:38**  44:*13*
**70th**  2:*13*
**777-2062**  2:9
**7th**  99:2, *3, 20*
100:*24*  101:*4, 19*
130:*18*

**< 8 >**

**8**  44:*13, 15*  53:*10*
55:*15*  59:*13*
121:*17*
**8:15**  65:*21*
**8:30**  27:*11*
**8:35**  62:*16*  65:*21*
68:*9, 14*
**8:50**  68:*14*  69:*10,*
*18*  114:*17*
**8:56**  69:*11, 18*
70:*10, 15*  114:*17*
**80**  4:*10*  95:*8*
**81**  95:*6, 8, 11*
**82**  95:*12*  96:9
**85**  4:*16*
**877**  2:9
**89**  4:*10*

**< 9 >**
**9**  4:*10, 10*  9:*18,*
*25*  11:*3*  75:*23, 25*
94:*25*  123:22
124:*1*
**9:18**  70:*14, 16*
**91**  4:*10*
**911**  27:*17*  29:*4*
34:*22, 23*  35:*5*
37:*19*  41:*13*  55:*6,*
*24*  56:*21*  59:*10*
70:*11, 11, 19, 19,*
*23*  71:*17, 22*
87:*10*  127:*17, 22,*
*25*  128:*4*
**98**  4:*5*

**< A >**
**a.m**  1:*22*  5:*10*
18:*19, 22*
**A.P**  2:7
**Aaron**  123:*5*
**ability**  35:*17*
42:*15*  55:25
113:*23*  119:2, *9*
130:*12*

John Holland, M.D.                                                                 39
10/21/2019

**able** 9:*15* 38:*25*
41:*18* 55:*18* 57:*3*
96:*18* 97:*15*
100:*5* 123:*2*
**about** 8:*17* 9:*14*
11:*7* 16:*18* 17:*16*,
*20, 23* 18:*1, 3, 6, 7,*
*10* 19:*2, 12* 20:*5,*
*20* 22:*2, 2* 24:*25*
25:*4, 21* 27:*7, 18,*
*24* 28:*19* 29:*17*
30:*7* 32:*6* 33:*11*,
*20* 36:*12* 37:*15*,
*16* 38:*4* 40:*17*
41:*1, 7, 15* 42:*11*
43:*7, 13* 44:*13, 18*
45:*11, 13* 47:*23*
48:*4, 6, 15, 25*
50:*4* 52:*21* 53:*5*,
*9, 12, 21* 54:*12, 16*
55:*14, 21, 23* 58:*8*
59:*10* 62:*9, 10, 10,*
*16* 65:*20, 22* 66:*4*
67:*9* 68:*9* 69:*7,*
*10* 70:*10, 14*
71:*16* 72:*23* 73:*4,*
*13, 15* 74:*20* 75:*3,*
*13, 18* 77:*18, 20*
80:*14, 20, 22, 25*
81:*16* 82:*6, 11, 14,*
*19, 23* 83:*17, 19*
86:*18* 87:*10*
88:*14* 89:*12*
90:*13* 91:*24*
92:*12* 93:*3, 20*
94:*7, 17, 18* 95:*16*
99:*11, 21* 101:*11*
102:*19, 21, 25*
103:*10, 23* 104:*2,*
*8* 105:*2* 107:*3, 7,*
*10, 14, 15, 18, 19,*
*23* 113:*3, 4, 21*
115:*3* 119:*12*
122:*14, 17* 126:*18*

127:*17*
**above** 8:*14* 83:*16*
**accepted** 91:*11*
**accepting** 27:*12*
**accidents** 109:*5*
**accommodate** 7:*11*
**accommodated**
32:*12*
**accommodation**
32:*11*
**accommodations**
31:*3*
**according** 34:*1*
**ACHART** 86:*3*
**acknowledge** 50:*12*
**acronym** 57:*23*
86:*3* 90:*15, 16*
**Act** 121:*20, 23*
122:*6, 14*
**action** 107:*20*
122:*17, 18, 21*
123:*10, 13, 15, 18*
130:*15*
**activating** 98:*7*
**activities** 13:*16, 16*
110:*8*
**actual** 78:*11*
100:*17*
**acute** 70:*7*
**add** 35:*3, 3, 8*
41:*8* 60:*15* 68:*20*
69:*23*
**added** 103:*18*
**addition** 48:*2*
**additional** 27:*24*
30:*22* 31:*22* 43:*2*
82:*5*
**address** 22:*12*
79:*1*
**addressed** 48:*19*
109:*19*
**addresses** 22:*1, 4*
**adds** 110:*22*
**Adjournment**
129:*4*

**administered**
126:*23*
**adopted** 72:*21*
**Adults** 4:*10* 76:*7*
**AED** 4:*10* 75:*10*
76:*6*
**affect** 30:*10*
**affecting** 54:*22*
**affirmation** 33:*15,*
*17*
**affix** 130:*17*
**after** 12:*3, 14*
51:*2* 52:*11* 82:*23*
90:*11, 11* 115:*7*
126:*20*
**afternoon** 21:*24*
115:*21*
**Again** 18:*5, 9*
26:*1, 6* 34:*9* 35:*4*
36:*22* 40:*3* 42:*4,*
*14* 43:*20* 44:*4*
48:*21* 60:*23* 62:*4,*
*8* 63:*19* 65:*15*
68:*6, 13* 74:*11*
86:*25* 93:*15*
100:*15* 102:*1*
107:*18* 110:*16*
112:*25* 115:*4*
**against** 103:*21*
**age** 92:*20*
**agree** 54:*9* 90:*25*
91:*9* 93:*5* 96:*14*
126:*14*
**agreement** 51:*23*
**ahead** 36:*20*
39:*15* 42:*3* 62:*3*
86:*24* 102:*14*
112:*19* 125:*6*
**Aid** 4:*10* 8:*24*
9:*22* 19:*8, 9*
73:*24* 74:*1, 9, 18,*
*19, 21, 25* 75:*5, 11,*
*14* 76:*5, 7, 9, 17*
77:*11, 23* 78:*1, 10*
79:*3, 15, 21* 95:*22*

100:*6, 25* 101:*7,*
*10, 15, 18, 25*
102:*6* 103:*25*
104:*25* 105:*4*
106:*14, 24* 116:*20*
117:*2, 3, 6, 10, 13,*
*14, 16, 21* 118:*1,*
*11* 119:*13, 15, 22*
120:*12, 12, 15, 23*
121:*7* 122:*4, 13*
123:*8, 24*
**al** 5:*5, 6*
**alcohol** 81:*4*
**allegation** 104:*7,*
*10*
**allegations** 103:*21*
**alleged** 103:*24*
104:*15, 20*
**alleging** 104:*4, 4*
**allow** 32:*9*
**allowing** 126:*21*
**alone** 32:*21*
**along** 15:*20*
41:*19* 43:*2* 84:*8*
96:*11*
**aloud** 112:*3*
**already** 39:*3*
94:*25* 97:*17* 98:*4*
117:*23, 25*
**alter** 112:*16*
**alteration** 65:*5*
**altered** 10:*5, 23*
19:*20* 70:*23* 71:*7,*
*11* 105:*25* 112:*12*
**alternative** 104:*5,*
*7, 10, 13, 15, 17, 21*
**Altoona** 16:*15, 22*
20:*8* 21:*23* 38:*4,*
*7, 17, 18, 23* 39:*5*
44:*7* 55:*16* 59:*16,*
*20* 68:*11* 73:*20,*
*25* 76:*20* 77:*21,*
*22* 81:*25* 83:*10*

**always** 31:*23*
45:*11*, *16* 98:*7*
109:*20* 127:*5*
**ambulance** 70:*12*,
*12*, *14* 85:*11*
**American** 13:*3*
14:*3* 117:*12*
**amount** 75:*13*
**analysis** 53:*13*
**aneurysm** 97:*22*
**annual** 76:*23*
77:*14*, *15*
**another** 6:*21*
21:*20* 37:*25*
38:*25* 53:*21*
56:*24* 58:*15* 78:*5*
81:*3* 100:*10*
103:*4* 127:*25*
**answer** 6:*16*, *23*
35:*13* 51:*6*, *12*
63:*16* 77:*6*, *7*
92:*3* 105:*7* 122:*7*
123:*15*
**answered** 43:*25*
105:*8* 125:*5*
**answers** 116:*9*
**anticipated** 51:*8*
**antiseizure** 49:*20*
**any** 12:*3*, *25*
16:*12*, *17*, *25* 17:*1*,
*2*, *19* 18:*1*, *14*, *16*,
*25* 19:*4*, *10* 27:*4*
33:*22* 34:*11*, *15*,
*17* 39:*2*, *23* 40:*14*
42:*15* 43:*8* 45:*15*,
*20* 48:*25* 49:*19*
53:*12* 54:*12* 56:*5*
57:*3* 59:*8* 61:*21*,
*22* 63:*4* 64:*11*, *12*
70:*22* 71:*15*, *18*,
*23* 74:*8* 79:*14*, *20*,
*23* 82:*4*, *15*, *15*
83:*1* 86:*15* 87:*22*
88:*3*, *4* 91:*24*
92:*8*, *17* 93:*6*, *22*

94:*22* 95:*15*
96:*22* 101:*18*, *23*
102:*5*, *10*, *20*, *25*
103:*4*, *9*, *15* 104:*2*,
*24* 106:*13*, *18*, *23*
107:*7*, *10* 110:*5*
111:*23* 112:*15*
113:*20*, *21* 114:*5*,
*9*, *22* 115:*17*
118:*14* 119:*1*
120:*16*, *20* 121:*1*,
*5* 125:*14* 128:*16*
130:*13*, *14*
**anybody** 77:*2*
120:*17*
**anymore** 66:*2*
**anyone** 69:*12*
82:*18*, *22*
**anything** 8:*22*
9:*1* 21:*25* 22:*3*
35:*8* 38:*13* 41:*24*
56:*22* 60:*13*, *15*
63:*11*, *25* 68:*20*
69:*23* 98:*2*
110:*20* 111:*1*
114:*15* 115:*4*, *8*,
*12* 127:*9* 128:*15*
**anyway** 116:*10*
**anywhere** 21:*4*
**apnea** 23:*24*
**apologize** 9:*5*
98:*10* 100:*15*
**apparently** 28:*6*
29:*10* 37:*15* 70:*3*
**appear** 66:*1* 71:*7*
**APPEARANCES**
3:*2*
**appears** 88:*17*
90:*16* 101:*7*
**Appendix** 22:*21*
23:*9* 49:*13* 51:*16*,
*18*, *21* 109:*24*
110:*17*
**applicable** 8:*25*
19:*18* 73:*19*, *25*

81:*5* 105:*23*
112:*10*
**applies** 40:*18*
51:*19* 109:*24*
**apply** 51:*22* 55:*9*
78:*12*
**appreciate** 83:*17*
**approach** 8:*20*
59:*2*, *7* 78:*3*
96:*21* 114:*13*
**approaching**
44:*15* 111:*21*
114:*12*
**appropriate** 57:*2*
58:*21* 64:*4* 91:*13*
**appropriately**
29:*15* 109:*12*
**approximate** 5:*9*
**approximately**
21:*24*
**are** 8:*15* 10:*20*
11:*20* 12:*21* 14:*7*
15:*18* 20:*10*, *17*,
*21* 21:*12* 22:*19*,
*19* 23:*8*, *11* 25:*1*,
*2*, *3*, *13* 30:*15*
33:*7*, *7*, *9* 39:*8*
40:*14*, *19* 41:*3*, *6*,
*18* 43:*19*, *22* 45:*1*,
*7* 47:*20* 48:*1*, *5*
49:*10* 51:*15*
53:*12* 54:*15* 55:*8*
56:*4* 58:*7*, *7*
59:*16* 60:*1* 61:*18*,
*18* 65:*22* 72:*9*
73:*4* 74:*15*, *20*, *22*,
*23* 79:*20* 81:*5*, *7*,
*9* 84:*1*, *6*, *14* 87:*2*,
*14*, *17* 88:*24*, *24*
91:*14* 92:*4*, *5*
93:*11*, *21* 94:*3*
95:*13* 96:*22* 97:*2*
100:*5* 102:*9*
105:*9* 109:*2*, *21*
111:*5*, *7*, *10*

113:*22* 117:*7*, *7*,
*11* 121:*10* 126:*24*
127:*14*, *14* 128:*10*
**area** 59:*25*
**areas** 81:*16*
**aren't** 22:*15* 27:*8*
41:*1*
**argument** 27:*10*
**arm** 69:*19* 70:*3*
87:*11* 88:*14*, *15*
127:*15*, *18*
**arrival** 127:*12*
**arrives** 69:*17*
75:*15*
**aside** 26:*17* 102:*8*
**asked** 8:*17* 43:*7*
44:*8* 89:*9* 115:*10*
119:*5* 125:*4*
**asking** 48:*21*
54:*16* 83:*16*, *19*
102:*16* 106:*3*, *5*
113:*3* 122:*5*
**asks** 50:*8* 128:*3*, *4*
**aspects** 13:*8*
**aspirin** 126:*7*
**assessment** 13:*18*
**assignments** 14:*23*
**assist** 15:*20*
**assistance** 103:*25*
104:*25* 105:*4*
106:*14*, *15*, *25*
**associated** 32:*3*
130:*14*
**assume** 7:*6* 11:*20*
27:*9* 37:*16* 99:*10*,
*15*
**assumed** 83:*11*
**assumes** 113:*25*
**assuming** 50:*18*
52:*8* 89:*11*
**assumption** 7:*8*
**ate** 69:*7*
**attack** 26:*11*, *11*,
*13*

John Holland, M.D.                                          41
10/21/2019

attacks 74:*24*
attend 11:*22*
attention 8:*13*
 34:*11, 13* 42:*17*
 45:*8, 14, 17* 55:*5*
 71:*10* 75:15 97:*1*
 99:*1* 100:*21*
 123:*9, 22*
attorney 8:*21*
attorneys 103:*20*
attribute 88:*3*
audibly 6:*16*
August 16:*14*
 18:*15* 19:*19* 20:*8*
 27:7 52:*12* 55:*15*
 82:*1, 20* 92:*2*
 105:*24* 112:*11*
automatic 75:*9*
available 33:*10*
 52:*25* 53:*1* 57:*24*
 74:2 76:*18, 19*
 77:*2, 5* 95:*23*
aviation 108:*23*
awake 36:*25*
aware 36:*14, 17*
 38:2 123:*19*
awareness 16:*12*
 18:*14* 37:*10*

< B >
back 11:*11* 18:*23*
 24:*18* 32:7 38:*17,*
 *18* 40:2 41:*18*
 44:7 47:*4, 8, 17*
 53:*3* 55:*23* 58:*12,*
 *14* 60:7 61:*12, 12*
 62:*20* 65:*18*
 68:*10, 11, 13, 15*
 69:*21* 83:*15* 85:*4*
 88:*12* 92:*12*
 101:*21*
background 11:*6*
 12:7
bad 87:*7, 10*

127:*18*
balance 33:*21*
BANKER 2:2
 3:6 5:*17, 17* 6:*5*
 8:*1, 8* 9:*11, 17, 20*
 10:*13* 18:*17, 22,*
 *24* 21:*3* 35:*19*
 37:8 39:*21* 42:*23*
 44:2 45:*25* 47:*7,*
 *13* 48:*12, 14*
 58:*11* 61:6 62:*13*
 63:*20* 66:*15* 68:*4*
 69:8 71:*14* 75:*24*
 76:*2, 3* 80:*3, 8*
 82:9 84:*21* 85:7
 87:*16* 88:2 89:*5,*
 *23* 90:2 91:*17*
 93:*16* 94:*23*
 98:*17* 100:*14*
 102:*17* 104:*9, 14,*
 *19, 22* 105:*14, 18,*
 *21* 106:*8, 10, 12,*
 *21* 107:9 108:*10*
 110:*19* 111:*18*
 112:*4, 9, 21* 113:*8*
 114:*11* 115:*17*
 116:*19* 128:*16, 25*
B-A-N-K-E-R 5:*18*
Based 27:*21*
 28:*18, 19* 36:*1*
 39:*1, 4* 63:*9*
 68:*11* 70:*20, 23*
 82:*13* 114:*24*
 115:2 121:*5*
 127:*19*
Basic 100:*25*
 101:*7, 14* 121:*6*
basically 15:2
 87:*23*
BasicPlus 4:*10*
 10:*3, 16* 11:2
 19:*8, 10* 76:*4, 6*
 78:*17* 79:*15*
 90:*17* 94:*25*
 95:*18, 22* 96:*4, 9*

100:*6* 101:*10*
 116:*25* 119:*21*
basis 13:*12* 74:*3*
 76:*18* 79:*16* 84:*3,*
 *9* 123:*25*
Bates 48:*11* 90:*8*
 95:*11, 12* 99:*2*
 100:*22* 125:*22*
bathroom 35:*6*
becoming 32:*19*
began 53:*7*
beginning 1:*22*
 48:*10* 82:*14*
begins 35:*4* 95:*10*
behalf 5:*18, 20, 22*
 127:*25*
belief 96:*2*
believe 17:*12, 15,*
 *18* 27:*21* 58:*18*
 63:*11* 82:*3* 93:*6,*
 *22* 101:9 105:*3*
 116:*3* 117:*15*
 119:*1*
believes 58:*19*
belt 60:*13, 19*
 125:*2, 10, 10*
belts 61:*4*
benefit 36:*13*
 67:*8* 74:*18*
best 19:*12* 20:*5*
 41:*18* 43:*4* 61:*7*
 126:*11* 130:*12*
better 91:*13*
beyond 39:*3*
 55:*11* 89:*16*
big 65:*12* 75:*10*
 101:*17*
bit 11:6 16:7
 50:7 67:*4* 116:*18,*
 *19* 121:*1*
bleeding 74:*22*
Board 13:*3* 14:2,
 *3* 108:*25*
board-certified

13:2, *25*
body 65:*3*
bolts 24:*21*
book 10:*1, 3, 17*
 11:2, *4* 19:*8, 9*
 47:*24* 48:*1* 75:*20,*
 *21* 95:*6, 18* 96:*6,*
 *10*
booklet 75:*5, 7*
books 96:*8*
bottom 85:*20*
box 50:*14, 18, 25*
 51:*7* 52:*17* 123:*9*
BOYER 2:*13*
brain 65:*1* 91:*5*
break 7:*10* 45:*24*
 47:*17* 53:*4* 54:2,
 *11* 84:*20*
Brianne 1:*20*
 5:*13* 130:*4, 20*
brief 45:*24* 94:*3*
Britt 123:*5*
broad 44:*25*
 54:*16* 65:9 80:*24*
 114:2
broadly 114:*13*
brochure 8:*25*
 9:*22* 10:*8* 75:*5*
 78:*22* 79:*9, 12*
 123:*8, 22*
building 56:*21*
burst 97:*22*
busted 21:*14*
bystander 96:*11*

< C >
cab 43:*20*
call 20:9 21:*14,*
 *19* 23:*21* 25:*8, 9,*
 *10* 27:*10, 12, 12*
 29:*4* 34:22, *23*
 35:*5* 37:*19* 41:2,
 *12* 55:*4* 56:*6, 8,*
 *11* 57:*8, 14* 59:*10*
 70:*19, 23* 71:*17,*

John Holland, M.D.                                                                                      42
10/21/2019

22  100:*17*  115:*15*
127:22, *25*  128:*4*
**called**  20:*12, 18*
21:22  22:*21*
33:*14*  35:*16*
63:*11*  70:*15*
82:*18, 22*  124:*24*
125:*12*
**calling**  27:*17*
55:*5, 6, 23*  87:*9*
115:*10*  127:*17*
**Calls**  36:*19*  39:*14*
43:*15*  70:*10*  82:*7*
88:*6*  118:*20*
**can**  7:*4*  20:*5*
23:*7*  30:*21*  31:*2,*
*7*  32:*7, 11*  35:*13*
41:*16*  42:*18*  44:*1,*
*10, 17*  45:*16, 19*
47:*19*  48:*3, 10*
49:*12*  50:*8*  51:*12*
52:*19*  56:*5, 15*
57:*11*  58:*9*  59:*22*
61:*11, 11, 20*  63:*5,*
*16*  66:*19*  68:*18*
75:*6*  77:*3*  84:*19*
95:*8*  98:*3*  101:*6*
106:*19*  109:*12, 12,*
*13*  121:*14, 16*
122:*2*
**can't**  21:*1*  34:*25*
37:*4*  39:*6*  57:*21,*
*23*  60:*18*  63:*5, 9*
66:*24*  70:*2, 3*
92:*21*  124:*13*
**capabilities**  39:*8*
61:*23*
**capable**  20:*21, 22*
53:*16, 18*  54:*8*
**capacity**  7:*17, 21*
8:*11, 12*  16:*9, 9,*
*11*  22:*2*
**caps**  99:*4*
**CAPTION**  3:*2*

**cardiac**  26:*16*
27:*1*
**cardiopulmonary**
75:*8*
**cardiovascular**
23:*16*  25:22  26:*4*
**care**  45:*13*  85:*17,*
*24*  91:*12, 13*  98:*1*
**carefully**  104:*20*
**cars**  58:*15*
**Carson**  81:*18, 20*
82:*4, 11*  83:*11, 17*
90:*4, 10*
**CASE**  1:*3*  3:*2*
5:*4*  8:*10*  10:2, *22*
17:*5*  20:*6*  21:*18*
27:*6*  34:*11*  37:*14*
38:*2*  42:*7*  81:*15*
86:*2*  91:*23*  112:*1*
113:*7, 15*  115:*4*
**cases**  15:*1*  84:*10*
**cast**  33:*24*
**categories**  23:*14*
24:*8*  25:*21*
**category**  25:*20, 22*
26:*5, 17, 19, 20, 21,*
*23*  27:22  28:*1, 15*
52:22  95:*5*
**cause**  26:24  34:*8*
108:*18*  109:*3*
110:*12*  130:*14*
**caused**  68:*1*
**causing**  107:*21*
**caveat**  93:*13*
**ceiling**  28:*11*
37:*13*
**cell**  58:*3, 8*
**Center**  2:*3*  12:*10*
56:*7, 12, 18, 22*
57:*6, 9, 21*
**central**  56:*20*
**certain**  14:*4*  15:*1*
24:*4*  26:*14*  65:*1,*
*3*  73:*3*  75:*12*
96:*15, 16*  97:*10,*

*13*  102:*20*  103:*21*
108:*19*  109:*8*
126:*24*
**certainly**  34:*3*
84:*21*
**CERTIFICATE**
3:*4*
**certifications**  13:*1*
**Certified**  1:*24*
2:*20*
**certify**  130:*6*
**cetera**  114:*23*
**chance**  6:*23*
**chances**  91:*5*
**change**  16:*6*
38:*24*  39:*2, 6, 10,*
*11*  41:*23*  42:*5*
43:*5, 11*  60:*18*
64:*20*  67:*10, 18*
86:*19*  123:*15*
**changed**  65:*14*
**changes**  22:*13*
24:*2, 4*  39:*17*
40:*8, 9*  123:*11*
**changing**  38:*19*
58:*24*
**channel**  38:*25*
**channels**  39:*7*
41:*23*  42:*5*  43:*5,*
*11*  60:*18*
**characteristics**
70:*8*
**Chaz**  17:*24*
**C-H-A-Z**  17:*24*
**check**  50:*8, 18*
**chemical**  13:*10*
**chest**  23:*3*  25:*23,*
*24*
**Chicago**  2:*9*
**chief**  14:*12, 15, 19*
15:*3, 8, 8, 11, 17*
102:*9*  122:*25*
123:*3*  127:*23*
**Children**  1:*4*

**choosed**  118:*8*
**chose**  118:*10, 16*
**circadian**  111:*22*
113:*4, 16*
**circumstances**
61:*7*  104:*1*  105:*1,*
*5*  106:*16*  107:*1*
**Cities**  81:*23, 25*
90:*6*
**claims**  47:*6*
**clarification**  7:*4*
**clarify**  7:*4*  51:*18*
**classify**  128:*10*
**clear**  6:*21*  27:*8*
71:*8*  93:*9*
**cleared**  24:*18*
**clearer**  6:*25*
**clearly**  55:*1, 1*
**click**  50:*14*
**clinic**  12:*16*
**clinical**  83:*24*
**clot-busting**  126:*8,*
*23*
**CMS**  20:*10, 10*
27:*10*
**code**  99:*4*  100:*24*
**COHEN**  2:*12*  3:*8*
5:*21, 21*  8:*6*  48:*9,*
*13*  60:*21*  66:*10*
68:*22*  80:*7*
115:*20, 22*  118:*6,*
*23*  122:*8*  125:*8,*
*14*  128:*18*  129:*2*
**C-O-H-E-N**  5:*21*
**cold**  22:*4*  38:*12*
74:*22*
**collapse**  65:*7*
**collapsed**  27:*13*
29:*10*  128:*7*
**colleagues**  13:*23*
15:*21*  84:*1*
**collection**  90:*4*
**College**  11:*24*
**come**  20:*19, 23*
21:*1*  32:*7*  35:*18*

53:*3*  55:*23*  60:*11*
62:*6*  73:*5*  74:*13*
78:*6*
**comes**  38:*5*  53:*19*
65:*24*  66:*14*
67:*16*  70:*12*
**coming**  38:*18, 23*
39:*5*  41:*18*  58:*12*
67:*7*
**commercial**  108:*23*
**Commission**
130:*23*
**committee**  72:*9, 10*
**common**  22:*4*
45:*4, 10*  53:*19*
54:*25*  55:*13*  62:*8*
92:*21*  114:*8*
**commonly**  29:*24*
**communication**
21:*21*
**communications**
19:*3*
**companion**  10:*16*
**COMPANY**  1:*8,*
*12*  5:*6*  15:*12*
58:*8*  78:*4, 19, 23*
79:*2*  116:*6*  117:*9*
**complaining**  42:*10*
43:*23*
**complaint**  104:*11,*
*12, 17*
**Complete**  4:*5, 5*
51:*1, 5*  100:*4*
101:*22*  102:*4*
**completed**  12:*18*
50:*15*  100:*2*
101:*8*
**completion**  51:*2*
**comply,**  50:*13, 23*
**component**  75:*11*
76:*24*
**components**  75:*12*
**Computer-Aided**
130:*9*

**concept**  15:*4*
108:*20*  122:*1*
**concern**  43:*10*
61:*18*  108:*4*
110:*23*  111:*24*
**concerned**  30:*7*
34:*6*  44:*18*
**concerns**  30:*24*
53:*10*
**concluded**  70:*25*
**condensed**  129:*1, 3*
**condition**  22:*13*
25:*6*  26:*16*  30:*9*
31:*25*  32:*3*  38:*19*
58:*24*  67:*11*
68:*21*  127:*2*
**conditions**  30:*4*
50:*5*  64:*15*  73:*7*
75:*18*  107:*4*
108:*5, 6, 17*  109:*2,*
*9, 17, 24*  110:*18*
111:*2*  119:*17, 21*
**condominium**
11:*10*
**conductor**  16:*3,*
*14*  19:*18*  20:*7, 13*
34:*3*  38:*24*  39:*6*
40:*13*  43:*10*
52:*10*  105:*24*
112:*11*
**conductors**  51:*24*
52:*1, 6*  110:*21*
111:*8*
**confirm**  51:*2*
**confirmed**  26:*14*
93:*12*
**confirming**  87:*23*
**confused**  55:*1*
**confusion**  65:*6, 8*
**conscious**  36:*25*
**consciousness**
19:*20*  23:*18, 19,*
*25*  26:*20, 24*  27:*5,*
*23*  28:*2, 16*  29:*14*
30:*8, 12, 14*  31:*14*

32:*18*  33:*1, 20*
35:*24*  36:*16*
37:*24*  38:*1*  39:*18*
48:*18*  49:*2, 18, 21*
55:*3*  65:*5, 7*
74:*23*  105:*25*
112:*12, 16*
**consider**  11:*12*
16:*3*  28:*1, 25*
29:*13*  32:*24*
51:*19*
**Considerations**
121:*12*
**considering**  27:*16*
**consistent**  70:*9*
**constantly**  56:*3, 4*
**consult**  52:*10*
**consultant**  14:*21*
**contact**  24:*22*
51:*4*  55:*20*  56:*4,*
*12, 16*  57:*17, 17, 25*
**contacted**  83:*6*
**contacting**  57:*9*
**contacts**  57:*10*
**contain**  130:*10*
**contained**  11:*3*
95:*17*  124:*1*
**contains**  124:*4*
**contention**  106:*9*
**contentions**  105:*9,*
*11, 13*
**contents**  10:*4*
95:*4, 9*  123:*19*
**context**  124:*14*
**continue**  45:*6, 19*
76:*16*
**contracted**  79:*10*
116:*14*
**contractors**  120:*22*
**contracts**  120:*18*
**contributes**  72:*14*
**contribution**
104:*17*
**controlling**  110:*8*
**convenient**  27:*4*

**conversation**
34:*19*  41:*19*
**conversations**
8:*21*  17:*1, 2, 4, 7,*
*20*  18:*1*  19:*2*
82:*15*  102:*24*
**coordinate**  57:*3*
**copy**  98:*12*  100:*17*
**corner**  49:*7*  85:*21*
**corporate**  8:*12*
16:*10*  19:*14*
105:*14*
**corporation**  1:*9,*
*12*  2:*8*
**corporations**  117:*9*
**correct**  16:*23*
24:*11*  52:*16*  79:*8*
92:*11*  95:*24, 25*
116:*4*  119:*13*
122:*10*  123:*19*
130:*11*
**correctly**  53:*23*
54:*14*
**correspond**  90:*16*
**Correspondence**
4:*10*
**corresponds**  99:*19*
**could**  6:*24*  9:*13*
25:*9, 25*  27:*1, 1, 2*
30:*13, 13, 21*
33:*23*  34:*17*  42:*9*
52:*3*  53:*21*  54:*1*
57:*16, 25*  69:*7*
88:*18*  98:*14, 25*
123:*21*
**couldn't**  27:*17*
37:*17*  42:*20*  43:*9*
**could've**  17:*13*
83:*4*  92:*7*
**Council**  117:*12*
**counsel**  5:*14*
18:*20, 23*  46:*3*
47:*4*  84:*24*  85:*4*
118:*24*  120:*25*

128:22 130:*15*
**COUNTY** 130:*3*
**couple** 35:*6*
79:*25* 103:*23*
126:*5*
**course** 30:*18* 34:*6*
47:*21* 51:*1* 76:*9*
93:*2* 103:*20*
128:*5*
**courses** 75:*6* 77:*3,
3* 78:*8*
**COURT** 1:*1, 23*
2:*20* 5:*8, 12, 13*
6:*14* 128:*23*
**cover** 96:*3*
**coworker** 40:*1*
45:*5, 12* 53:*21*
55:*12* 56:*9* 58:*23*
61:*24* 64:*8*
**coworkers** 55:*4*
67:*16*
**coworker's** 61:*23*
**CPR** 4:*10* 75:*8*
76:*6* 101:*7, 14*
**CPR-V6** 100:*25*
**create** 43:*11*
**created** 80:*10*
85:*11*
**creates** 32:*21*
50:*19*
**creation** 78:*17*
**crew** 20:*9, 18*
21:*21* 40:*13*
62:*23* 116:*7*
**crews** 40:*13* 60:*5*
116:*16*
**critical** 13:*16*
15:*23* 16:*4* 25:*3*
30:*6* 34:*4* 51:*19*
94:*18* 96:*12*
108:*19*
**criticism** 121:*1, 5*
**Cross** 117:*12*

**CROSS-EXAMINA**
**TION** 3:*6, 9*
115:*19* 125:*18*
**CRR** 1:*20* 130:*4,
20*
**crush** 75:*14*
**crystal** 27:*8*
**current** 21:*8* 84:*4*
**currently** 11:*8*
14:*7*
**cut** 90:*13*
**cuts** 75:*13*
**cycle** 110:*21*
**cycles** 111:*12*

**< D >**
**damage** 91:*5*
96:*13* 97:*15, 17*
**database** 94:*4, 6*
**date** 5:*9* 50:*20*
82:*23*
**Dated** 4:*16*
**day** 21:*23* 38:*6,
12* 90:*11* 130:*18*
**day-to-day** 22:*15*
84:*3, 9*
**deadweight** 69:*20*
**deal** 58:*15* 81:*8,
11* 111:*6, 7, 11*
113:*11, 13, 22*
114:*6*
**dealing** 13:*13, 14,
17* 15:*22* 22:*15*
35:*15* 45:*3* 58:*23*
**deals** 13:*8* 59:*1*
62:*12* 111:*2, 16*
122:*24*
**dealt** 95:*6* 114:*7*
**death** 91:*6*
**Debra** 83:*20, 20,
22* 84:*15*
**Decedent** 1:*5*
**decide** 29:*16* 59:*5,
5*

**decided** 120:*7*
**decides** 44:*19*
**deciding** 119:*23*
**decision** 62:*9*
64:*9* 68:*10* 120:*4*
**DEFENDANT**
1:*10, 13, 18* 2:*7,
12* 5:*20, 22* 103:*19*
**defibrillator** 75:*10*
**defining** 51:*21*
**definitely** 64:*25*
**definition** 104:*18*
**degree** 11:*23*
12:*20*
**Delaware** 1:*8, 12*
**delay** 107:*21*
**departed** 70:*15*
**department** 14:*22,
22* 15:*6, 10, 15, 20*
24:*16* 25:*17*
51:*22* 72:*8, 11*
73:*1* 76:*14, 14*
83:*25* 84:*5, 8, 14*
111:*15*
**departments**
15:*24* 76:*22* 77:*1*
**departs** 70:*14*
**depend** 97:*7*
**depending** 64:*22*
126:*6*
**deposed** 7:*14*
**DEPOSITION** 1:*6,
19* 4:*3* 5:*4, 7* 6:*7*
8:*10, 11, 23* 9:*2,
19, 25* 10:*12, 15*
16:*8, 19* 18:*13*
19:*7* 73:*15* 80:*2*
82:*14* 85:*6* 89:*22*
91:*16* 114:*21*
128:*21*
**depositions** 114:*22*
**depot** 16:*15*
68:*11, 16* 69:*10,
12* 70:*18* 71:*5*

114:*17*
**derived** 87:*13*
**described** 19:*6*
25:*23* 28:*5, 6*
29:*7, 23* 32:*17*
35:*1* 37:*14* 38:*9*
39:*17* 40:*9* 43:*3*
52:*23* 59:*19*
63:*10* 64:*3, 7*
67:*2* 69:*23* 70:*2,
20* 71:*6* 115:*14*
**describes** 38:*16*
**describing** 43:*19*
49:*22* 64:*5* 75:*20*
**description** 27:*21*
32:*20* 87:*12* 99:*5,
12* 100:*25*
**designate** 8:*17*
**designated** 81:*22*
106:*6, 7*
**designee** 9:*9*
105:*15*
**despite** 29:*11*
58:*17* 107:*5*
**detail** 41:*8*
**detailed** 31:*21*
**details** 41:*1* 43:*2*
94:*11*
**determination**
30:*3, 17* 31:*1*
32:*6* 40:*10* 63:*8*
73:*9*
**determine** 23:*7*
30:*2* 31:*25*
**determined** 63:*22*
**determines** 62:*18,
18, 25*
**determining** 13:*14*
**develop** 15:*21*
109:*7* 117:*5, 23*
**developed** 78:*24*
113:*20* 117:*17, 21*
118:*1*
**developing** 14:*24*
60:*15* 88:*17*

**development**
72:15  84:8
**diabetes**  23:20
**diagnosed**  26:23
**diagnoses**  89:17
**diagnostic**  26:14
**did**  9:5  11:22
12:3, 8, 11  14:17
18:13  37:23
80:25  83:13
88:10  112:14
114:21  117:5
118:7, 14  119:5
121:6  124:11
127:9
**didn't**  18:1  29:4
34:23  37:5  38:13
39:24  43:8  60:25
64:7  115:11
117:23
**die**  33:24
**differ**  84:2
**difference**  66:13
**different**  14:23
35:15  36:5, 6
48:7  49:11  53:7
76:16, 21, 25  77:1
78:6  82:5  86:16
118:13
**difficulty**  42:8, 21
43:22  61:4  88:13
125:2, 10
**DIRECT**  3:6  6:4
25:9  82:15  85:14
86:5  98:25
**directed**  15:3
**directing**  100:20
**direction**  40:23
83:14  84:6
**directly**  56:17
57:9, 15  81:8
**director**  83:23
**disability**  91:5
**discipline**  13:8, 20

**disciplines**  13:23
**Disclosure**  4:14
**discovery**  10:2, 21
**discuss**  123:2
**discussed**  75:3
124:3
**Discussion**  18:21
20:1  47:16, 18
**discussions**  121:4
**disorders**  23:23
109:11
**dispatcher**  40:7
56:5, 6, 11  57:10,
14  58:1  70:11
110:9
**dispatches**  70:11
**dispute**  61:25
**disputing**  87:22
**DISTRICT**  1:1, 1
**disturbed**  111:22
**Do**  6:17, 24  7:4, 6
10:7, 9  11:8, 12,
15, 18  12:3, 25
13:21  14:11, 11,
17, 24, 25  15:3
16:12  17:11, 17,
25  19:13, 21  20:4
22:12  23:7, 10
24:12  27:21
30:18, 21, 22  34:4
37:19  38:16  39:1
40:6, 7  41:2, 16,
24  42:20  43:12
44:9, 10, 10, 11, 17
45:12, 23  48:21
49:16  51:3  53:6
54:7  55:17  59:5,
5, 23  60:2  61:11,
20, 24  63:10  64:4
70:17, 24  71:24
73:8, 21  74:11
77:2, 7  78:10, 16
79:20  80:21
81:18  82:18, 22
83:8, 20  84:2

85:25  87:18  88:3
89:6, 10  90:21
91:7  92:16, 16, 17
93:6, 22  98:3, 7,
10, 22  99:7, 9
100:9  101:1, 3, 9,
12, 17, 23  102:5,
10  104:2, 23
105:3  106:13, 23
107:6, 10  110:11,
13  112:22  113:23
116:7, 21  117:16,
20  119:1, 13, 15,
20  120:6, 16
121:1, 19  122:12
124:6  126:3, 6, 9,
14  128:5  130:6
**doctor**  11:20  12:7,
22  29:5  31:8, 8,
15  64:13  84:15
87:18  115:21
127:10  128:14
**document**  8:4
80:10, 13  90:8
91:20, 23  98:20
99:1  100:10
**documents**  19:4,
10  79:25
**does**  13:5, 6, 24,
24  20:12  24:24
29:14, 17, 21, 22
33:5  35:8  36:16,
17, 22  39:2, 10, 10
41:17, 22, 24  49:4
50:1, 4  51:21, 22
55:25  60:15
61:14  66:3  67:18
68:20  69:23  70:4,
7  76:18  78:25
79:14  82:4  86:12,
15, 18  87:4  94:1
111:23  120:21
121:22  122:5, 18
123:18  124:16, 23
125:9

**doesn't**  35:5  37:1
40:9  58:18  60:13
61:10, 11  63:1, 2,
24  64:5, 25  66:1
71:7  104:8  122:6
123:15
**doing**  14:13  30:2,
11  34:18  42:8
43:6, 22  53:18
54:8  61:18  84:13
99:24  110:2
**done**  8:22  9:1
26:15  44:7  62:23
97:17  114:18
126:17  128:19
**don't**  7:3, 6, 19
16:16  17:12, 15,
18, 25  18:5, 5, 9,
10, 10, 16, 17  20:2,
24  22:14  27:19
31:21  34:23
35:18  36:13
39:23  40:8  41:5,
11, 12  42:6, 9, 11,
12, 15, 18, 19, 25
43:25  45:11, 15,
20  48:5  51:12
54:9, 22  58:6, 25
59:11  61:1  64:5,
11, 11  67:1, 8, 24,
25  68:7  71:6, 9,
10, 11, 19  74:12
75:19  76:10, 21
77:24  79:17  81:5,
11  82:8, 25  83:4,
6  86:13  87:1, 1,
21, 22  88:19, 25
89:2, 2, 16  92:7
93:11  95:19  96:5
98:10, 12, 13
100:3, 11, 16
102:20, 22, 24
103:4, 9, 15
113:11, 14, 17
114:4, 4, 9  115:4,

*8, 12, 17, 24*
117:*19*  118:*10, 17,
22*  119:*4, 4, 6, 8,
25, 25*  120:*1, 4, 20,
24*  121:*5*  122:*19,
22*  123:*15*  124:*13*
125:*14*  126:*18*
128:*16*
**DOUGLAS**  130:*3*
**down**  6:*15*  21:*4*
31:*4*  37:*6*  45:*11*
54:*2*  87:*25*  126:*5*
**downtown**  11:*10*
**Dr**  6:*6*  80:*16*
**drafting**  72:*1*
**dramatic**  128:*6*
**draw**  123:*9*
**drill**  31:*4*
**drink**  67:*15*
**Drive**  2:*3, 8, 13*
63:*2, 5, 9*  64:*10*
68:*12*  116:*15*
**driver**  60:*10*
69:*11*
**driving**  63:*24*
108:*23*
**drooping**  69:*22*
70:*4*
**drug**  81:*4*  126:*23*
**drugs**  126:*8*
**duly**  6:*2*
**duration**  101:*13*
**during**  41:*3*  47:*17*
**duties**  15:*19*  32:*6*
**duty**  13:*15*  15:*1,
22*  21:*13*  22:*9*
30:*1*  38:*5*  73:*5*
92:*1, 5, 17*  93:*24*
121:*20, 23*  122:*6,
14*
**DVD**  4:*15*  10:*16,
20, 21*

**< E >**

**earlier**  70:*23*
87:*8*  124:*3, 12*
126:*1*
**Early**  96:*11*
114:*21*
**easier**  26:*7*  100:*9*
**east**  59:*20*
**edit**  119:*2, 5, 9*
**edited**  119:*6*
**effect**  27:*8*  76:*11*
98:*3*
**effective**  97:*6, 18*
**effects**  96:*18*
**eight**  48:*6*  94:*13*
**either**  16:*1*  30:*9*
31:*7, 9*  33:*14*
55:*23*  88:*12*  93:*7,
23*  119:*13*  123:*22*
**E-learning**  47:*21*
48:*2, 20, 24*  99:*18*
**electronic**  75:*9*
128:*25*  129:*1*
**Email**  4:*10*  9:*6*
90:*14*
**emails**  90:*4*
125:*21*
**emergencies**
107:*13, 17*
**emergency**  23:*3*
26:*12*  31:*17*
37:*18*  56:*6, 7, 9,
12, 13, 18, 21*  57:*2,
6, 8, 21*  58:*1, 4*
75:*15*  94:*8*
107:*20, 21*  114:*19,
19*  115:*10, 15*
122:*17, 18, 21*
123:*10, 13, 14, 18*
124:*24*  125:*11*
**employed**  14:*7*
81:*21*
**employee**  18:*14*
22:*23*  24:*7, 22, 24*
30:*19*  33:*5, 23*
36:*17*  40:*3*  41:*25*

42:*14*  44:*22*  45:*5*
49:*23*  50:*16*  53:*6*
54:*6, 9*  58:*23*
63:*5*  72:*24*  73:*18,
24*  77:*4*  109:*12*
113:*22*  127:*23, 25*
128:*1, 3, 4*
**employees**  21:*2,
12*  25:*2, 3, 3, 16*
33:*11, 13*  40:*18,
21*  48:*3*  51:*11, 14,
20, 23*  53:*15*  57:*7,
8*  62:*7*  73:*4*  74:*2,
4, 10, 17*  76:*19*
77:*21*  79:*14, 20,
23*  80:*18, 21*
91:*25*  92:*5, 11, 13,
15, 16*  93:*24*  94:*2,
16, 21*  95:*16, 24*
107:*12*  108:*2, 4,
19*  109:*7*  116:*15,
21*  119:*3, 11*
120:*11, 15, 19, 22*
121:*23*  123:*24*
**employee's**  31:*8*
53:*22*
**employers**  109:*8*
**employer's**  31:*8*
**EMS**  75:*15*  87:*24*
89:*3*  98:*7*  103:*13*
127:*6*
**EMT**  85:*10, 16*
86:*15*  127:*9, 16*
**EMTs**  86:*2*
**EMT's**  127:*12*
**en**  68:*17*
**encompasses**  81:*25*
**encouraged**  74:*3, 5*
**engineer**  38:*6, 9,
11*  39:*6*  56:*1*
57:*13, 25*  59:*9*
61:*9, 23*
**engineers**  56:*4*
**ensure**  53:*17*

**entail**  13:*25*
**entire**  104:*12*
**entitled**  5:*5*  85:*17*
121:*11, 19*  123:*10*
**entry**  99:*3, 19*
100:*24*  101:*1, 3*
**environment**
13:*11*  110:*13*
**environmental**
13:*7, 10, 22*
**epilepsy**  26:*23*
49:*19*
**episode**  39:*18*
**equipment**  110:*6*
**ER**  25:*24*
**Eric**  18:*7*
**Erickson**  18:*7*
**E-R-I-C-K-S-O-N**
18:*8*
**essential**  30:*23*
110:*16*
**essentially**  56:*21*
75:*1*  94:*13*
109:*25*  128:*7*
**establish**  107:*16*
**established**  39:*3*
102:*11*
**et**  5:*5, 6*  114:*23*
**evaluated**  22:*25*
25:*7, 14*  29:*3, 15*
31:*15*  33:*3*  34:*2,
6*  36:*4*  40:*25*
97:*5*  109:*13*
**evaluating**  26:*15*
**evaluation**  23:*5, 7*
24:*10, 15*  28:*24*
29:*20, 21*  30:*2, 19*
31:*1, 6, 10, 21, 22*
32:*14*  73:*10*  94:*9*
**evaluations**  30:*22*
**evening**  82:*16*
**event**  23:*22*  24:*7,
8, 14*  27:*5*  28:*21*
29:*1, 14*  31:*14*
32:*22, 24*  33:*6*

John Holland, M.D.                                                                                    47
10/21/2019

35:*1*, *10*, 22, 25
36:7, *11*, *18*  39:*4*,
*19*, *20*  40:*11*, *24*
55:2  66:*23*  67:*12*
70:7  71:5  86:*19*
94:22  110:*11*
113:*19*  128:*13*
130:*16*
**events**  22:22
23:*11*  24:25
25:*19*  48:*16*  49:*3*,
*14*  52:*23*  58:*13*
86:*18*  93:*4*  94:22
102:*11*  103:2
108:*1*, *13*
**ever**  82:*10*  91:*19*
98:*19*
**every**  41:*10*
93:*10*  94:*20*
**everybody**  73:2
**everyone**  74:*17*
109:*25*
**everything**  6:*15*
**evidence**  35:*12*
66:6  67:*21*  68:25
114:*1*
**exactly**  13:6  14:*1*
31:9  42:6  43:*21*
48:5
**EXAMINATION**
3:6  6:*4*  14:6
31:*13*  32:15
**examined**  6:*3*
**example**  17:2
52:*11*, *20*  57:25
109:*11*
**excerpt**  10:*1*
**excerpted**  10:*3*, *22*
95:7
**excerpts**  11:*3*
**exchanging**  9:7
**Excuse**  103:*12*
125:22
**exercise**  53:*17*

**EXHIBIT**  4:*2*, *3*, *4*,
*5*, *5*, *9*, *10*, *10*, *10*,
*10*, *15*, *16*  7:*24*
8:*3*  9:*18*, *25*
10:*11*, *15*, *20*, *23*
11:*3*  19:*15*  47:*11*,
*15*, *19*, *20*  48:*11*,
*20*  75:*4*, *22*  80:*1*,
*5*  83:*15*  85:*5*, *9*,
*15*, *17*, *22*  89:*21*,
*25*  91:*15*, *19*
94:*25*  98:*9*, *11*, *14*,
*15*, *19*  99:*12*, *18*,
*20*  100:*11*, *12*, *16*,
*18*, *22*  101:*5*, *22*
102:*5*  103:*13*
123:*22*  124:*1*, *4*
125:*21*  127:*7*
**EXHIBITS**  3:*3*
103:*12*  129:*1*
**existed**  72:*4*
**expect**  6:9  7:*14*
20:*20*  92:*18*
**expectation**  127:*24*
**expected**  21:2
92:*23*
**experience**  14:*5*
91:*25*  92:*16*
**expert**  58:*10*
106:*7*
**Expires**  130:*23*
**explained**  86:*3*, *7*
**explains**  48:7
**explanation**  43:*8*
**exposures**  13:*11*,
*19*
**expressed**  61:*17*
**extensive**  14:*5*
**extent**  41:*20*
45:*10*  106:*18*
**extraboard**  20:*13*
**eyeballing**  93:*1*, *18*
**eyes**  28:*3*, *10*  95:*3*

< F >
**facial**  69:22
**fact**  28:*4*  29:*5*
36:*14*  39:*17*
41:22  44:*16*
61:*12*  62:*21*
78:*16*  82:*15*
124:*16*  125:*1*, *9*
**facts**  113:*25*
**failed**  103:*24*
104:*24*  106:*14*, *24*
107:*3*, *11*, *15*, *19*
**fair**  7:7  124:*15*
**fairly**  31:*20*  92:*19*
**fall**  27:22  39:*4*
**fallen**  36:*15*
**falling**  32:*18*
33:*21*
**falls**  24:7  26:*4*,
*21*  37:*1*  69:*15*
**familiar**  6:*11*
20:*10*  45:2  59:*16*
60:*1*, *3*  81:*1*, *8*
92:*4*  116:*4*, *5*, *6*
121:*10*
**far**  9:*12*  33:*19*
41:*10*  62:*11*
63:*10*  71:*24*
**FAST**  90:*15*, *19*
125:*24*  127:*10*, *13*,
*20*
**F-A-S-T**  90:*15*
**fatal**  109:*4*
**fatigue**  111:*3*, *6*,
*20*  113:*12*
**fault**  64:*12*
**FAX**  2:*4*, *9*, *14*, 22
**feature**  35:*3*
**feel**  7:*3*  31:*21*
40:*4*  41:*12*  42:*15*
45:*19*  54:22  64:*5*,
*7*
**feeling**  35:*18*
38:*12*, *21*  40:*1*, *2*,

*4*  41:*2*, *15*  45:*7*,
*19*  67:*3*
**fell**  28:*4*  37:*6*
**fellow**  127:*23*
**felt**  67:*11*  87:*6*
88:*19*
**field**  109:*25*
**fifteen**  27:*15*
29:*11*  32:*20*
**find**  21:*6*  50:*3*
52:*14*  64:*11*
70:*13*
**finds**  69:*18*
**fine**  33:*24*  34:*23*
41:*21*, *25*  44:22
54:*7*, *7*  58:*18*, *19*
61:*19*, *24*  70:*24*
71:*1*, *9*
**finish**  6:22  68:*19*
**First**  4:*10*  6:2
8:*24*  9:22  16:*10*
19:*8*, *9*, *16*  23:*16*
25:*1*, *22*  33:*9*
37:*21*  60:*17*  69:*4*
70:*18*  73:*15*, *24*
74:*1*, *9*, *18*, *19*, *21*,
*25*  75:*5*, *11*, *14*
76:*5*, *6*, *9*, *17*
77:*11*, *23*  78:*1*, *10*
79:*3*, *7*, *15*, *21*
87:*6*  88:22  89:*9*
95:22  100:*6*, *25*
101:*7*, *10*, *15*, *18*,
*25*  102:*6*  105:*8*,
*21*  106:*3*  116:*20*
117:*2*, *3*, *6*, *10*, *13*,
*14*, *16*, *21*  118:*1*,
*11*  119:*12*, *15*, 22
120:*12*, *12*, *15*, *23*
121:*7*  122:*4*, *13*
123:*8*, *24*  126:*20*
**first-aid**  73:*18*
**firsthand**  67:*9*
**fit**  21:*13*  22:*9*
40:22  73:*5*

fitness 13:*15* 15:*1,*
*22* 30:*1*
fitness-for-duty
23:*5, 7* 24:*10, 15*
28:*23* 29:*20, 21*
30:*16* 31:*6, 10*
32:*14* 73:*9* 84:*5,*
*10*
fits 28:*15*
five 12:*16* 23:*14*
33:*17*
flag 32:*21*
Floor 2:*13* 27:*16*
36:*15* 37:*1, 3, 6, 23*
flu 22:*5* 38:*13*
focus 16:*10* 25:*18,*
*20* 54:*6* 55:*22*
focused 77:*20*
focusing 26:*10*
48:*8*
follow 17:*19*
34:*17* 49:*24*
71:*21* 78:*13* 95:*9*
107:*16*
following 5:*1*
47:*2* 85:*2*
follows 6:*3*
font 125:*24*
foregoing 130:*6, 9*
form 39:*13* 42:*2*
43:*14* 60:*21* 62:*1*
66:*9* 67:*22* 68:*22*
86:*21* 87:*20* 88:*5*
98:*20* 100:*2*
108:*7* 110:*24*
112:*2* 114:*1*
115:*1*
formal 12:*3* 14:*4*
51:*20*
formally 72:*21*
112:*2*
format 100:*3*
forth 11:*11* 60:*7*
forward 38:*3*

found 69:*16*
88:*11* 115:*7*
foundation 39:*14*
60:*22* 62:*2* 63:*14*
66:*7* 67:*21* 68:*23*
71:*3* 86:*23* 88:*6*
102:*13* 106:*17*
109:*22* 110:*25*
112:*2, 15* 113:*25*
115:*1* 117:*22*
121:*24*
four 33:*16* 126:*19*
four-year 94:*13*
FRA 58:*8* 109:*1,*
*6*
frame 19:*25* 20:*1*
73:*24* 76:*20*
77:*22* 92:*1* 108:*3*
Franchuk 4:*5*
17:*16, 17, 20*
38:*10, 11, 15, 16*
41:*15, 20, 22* 43:*3,*
*7, 9, 12* 44:*6, 8, 16,*
*18* 53:*9* 55:*18, 19*
58:*13, 17* 61:*9, 17*
98:*24* 99:*20*
F-R-A-N-C-H-U-K
17:*17*
Franchuk's 39:*1*
100:*4* 101:*22*
102:*3*
Francisco 12:*9*
free 7:*3*
frequency 92:*19*
frequent 93:*7, 23*
frequently 77:*11*
92:*16*
friend 87:*2*
friends 87:*2*
front 79:*11*
123:*23*
full 130:*10*
full-sized 128:*25*
fully 112:*18*
function 64:*20, 21*

functional 13:*17*
30:*10* 65:*15*
functioning 30:*15*
65:*10*
functions 30:*23*
further 49:*15*
99:*5* 115:*18*
125:*14* 128:*16*
future 92:*24*

< G >
gastroenteritis
69:*6*
gather 59:*22*
gathered 65:*22*
gears 11:*5* 16:*6*
73:*16*
General 1:*21*
16:*1* 22:*8, 17, 18*
40:*20* 51:*13*
53:*15* 54:*18, 20*
64:*14* 74:*15*
75:*17* 89:*14*
96:*19* 130:*4, 21*
generally 25:*17*
72:*2* 91:*10* 97:*25*
117:*5*
Gengler 83:*20, 20,*
*22* 84:*15*
gentleman 17:*23*
getting 30:*20*
61:*4* 64:*24* 96:*19*
97:*12*
give 6:*23* 72:*22*
77:*14* 92:*21*
113:*21* 122:*14*
given 21:*17*
63:*15* 97:*3, 6*
108:*25* 126:*7*
gives 49:*9* 54:*12*
59:*9* 79:*1*
go 11:*11* 16:*24*
18:*17* 23:*4* 24:*18*
29:*4* 31:*17* 33:*2*
34:*4, 16* 35:*16*

36:*20* 37:*18*
39:*15* 40:*5* 42:*3,*
*16* 43:*2* 45:*8, 16,*
*17* 47:*17* 48:*2*
49:*12* 52:*13*
57:*14* 61:*12, 12,*
*13* 62:*3* 64:*9*
69:*2* 75:*6* 76:*16*
83:*15, 16* 86:*24*
96:*7* 102:*14*
112:*19* 122:*23*
125:*6*
goes 23:*2* 35:*6*
38:*14* 41:*17*
65:*23* 66:*13*
67:*14* 69:*11*
95:*11*
going 6:*14* 7:*6*
9:*6* 16:*24* 20:*4*
21:*22* 25:*24* 29:*7*
30:*9, 10* 34:*8, 8*
37:*22, 23* 44:*19*
45:*12* 55:*4* 57:*20*
62:*19, 21, 22, 24*
63:*18* 66:*10* 69:*1*
85:*8* 93:*8* 95:*8*
97:*14, 15* 99:*10,*
*15* 105:*7, 10*
110:*12* 116:*10*
122:*13* 126:*5, 17*
Good 6:*6* 74:*10,*
*16* 115:*21* 118:*24*
122:*16*
gotten 33:*19*
55:*16*
government 74:*8*
120:*14*
governmental
120:*16*
GPS 102:*19*
great 41:*12*
grossly 113:*25*
ground 28:*4*
32:*19* 33:*21*
69:*15, 18, 21* 71:*6*

John Holland, M.D.                                                49
10/21/2019

88:*11*  114:*16*
115:*7, 14*
**group**  27:*3*  72:7,
*13*
**groups**  77:*13, 17*
92:*20*
**growing**  53:*10*
**guess**  9:*11*  20:*3*
40:*11*  52:2  75:*19*
78:25  89:9  90:*18*
98:6  104:*23*
106:*11*
**guidance**  40:*14*
52:*15*  54:*12*  59:9
61:22  71:*16, 18,*
*19*  113:*21*
**guide**  48:*20, 24*
49:*23*  53:*13*
**guides**  63:*5*
**guiding**  109:*16*
110:*10*
**guy**  43:*16*

< H >
**had**  5:*2*  6:6
14:*24, 25*  17:*1, 2,*
*19*  18:*14, 21*
21:*20*  26:7, *11, 22*
28:6  33:*16*  38:*12,*
*19*  39:*18*  47:2, *6,*
*23*  52:*10, 11, 20*
64:7  72:*10*  78:*4,*
*9*  83:9  85:2, *10*
87:*13, 25*  88:*19*
89:7, *10, 11, 15*
91:25  92:*12*
94:*10*  117:25
118:*18*  119:2, *9*
128:8
**hadn't**  87:*4*
**half**  27:*11*
**hallmark**  65:*12*
**handbook**  90:*17*
95:*1*  96:*4*
**Handing**  89:*24*

**handling**  58:*21*
107:*12*
**happen**  13:*19*
25:*10*  66:*20*
92:23  126:*12*
**happened**  27:*19*
37:*13*  65:*13*  83:5
92:7, *23*  98:*4*
118:*10*
**happening**  89:*1*
97:7
**happens**  27:5
37:*1, 5*  92:22
**has**  8:*16*  13:*20*
20:5  21:7  22:*11*
24:7  26:22  30:8
31:*14, 20*  34:*20*
36:*15*  41:*11*
42:*15*  44:*24*
48:25  50:7, 7, *10*
55:*16*  59:*21*  61:*9,*
*17, 23*  70:8  72:*18*
73:2  76:8  84:*4,*
*16*  85:*15*  90:*10,*
*19*  91:25  92:*10,*
*22*  97:*17*  99:2, *5*
100:*24*  103:*18, 24*
108:25  110:*11, 12*
123:*12*  125:*10*
**hauling**  38:6
**Have**  6:6, *20*  8:*3,*
*18, 22*  10:22
11:*10*  12:*23, 25*
14:*13*  16:*12*  17:*1,*
*2, 10, 19*  18:*1, 13,*
*16*  19:*1, 4, 10*
20:2  21:8  22:5, *8*
23:5, *13*  24:*14, 22*
30:*11*  31:*16, 22*
33:*13, 13, 16*  34:2
35:*17*  36:*13*
37:*10*  39:*23*  40:*6,*
*24*  43:8  44:*23*
45:*4*  47:*16, 18*
48:*12*  49:*16*  50:*5,*

*11, 11, 14, 23*  52:*3,*
*25*  53:7, *16*  54:*18,*
*18, 20, 21*  55:2, *12*
56:*1, 7, 11*  57:5
58:*15*  59:5  60:*4*
61:*4*  62:8  63:*18*
64:*14*  65:*15, 25*
67:8  68:*12, 18*
69:*1*  70:22, *25*
73:*8, 10, 21*  74:*12,*
*23*  75:*4*  76:22
77:7, *14*  78:5
79:*18, 21, 24*
80:*12, 15, 16, 21*
81:*15, 16*  82:*4, 10*
83:6, *9*  85:*10*
86:2, *13, 16, 18*
87:22  89:*14, 16*
90:6, *22*  91:*19*
92:*17, 20*  93:6, *14,*
*22*  95:*1, 19*  97:*2,*
*21*  98:*12, 19*
100:*16*  101:*13*
102:*10, 20, 24*
103:*4, 6, 9, 15, 20*
104:2, *8, 23*  105:*2,*
*7*  106:*13, 18, 23*
107:*7, 10, 14, 18,*
*23*  108:5  109:*3, 8,*
*13*  110:*14*  112:25
113:*17*  115:*4, 17*
117:*12*  118:*14*
119:*1, 2*  121:*1, 5,*
*13*  122:6, *18*
123:5, *18, 23*
125:*14, 16, 20*
127:*20*  128:*16*
**haven't**  106:6, *6*
**HAYDEN**  2:*7*
3:*9*  5:*19, 19*  8:5
9:*4, 13*  20:*15*
35:*11*  36:*19*
39:*13*  42:2  43:*14*
47:5, *8*  58:5
60:*20*  62:*1*  63:*13*

66:5  67:*20*  71:2
75:23  80:6  82:7
86:*21, 23*  87:*20*
88:5  90:*1*  93:8,
*25*  102:*13*  104:*3,*
*12, 16*  105:6, *16,*
*19*  106:2, *9, 17*
107:6  108:*7*
109:22  110:*24*
111:25  112:6, *14*
113:7, *24*  114:*20*
117:22  118:*20*
121:*24*  125:*4, 16,*
*19*  128:*14, 19*
129:*3*
**H-A-Y-D-E-N**  5:*20*
**hazardous**  110:*4*
**hazards**  110:7
**he**  9:*8, 15*  20:*8*
21:*20, 22, 22*
27:*12, 15, 18, 19*
28:*4, 7, 9*  29:2, *9,*
*9*  34:22  35:*4, 4, 6,*
*6*  36:*1, 15*  37:*15,*
*19, 21*  38:*1, 2, 10,*
*11, 12, 12, 19, 20*
39:*8, 18*  40:*1, 2*
41:*14, 16, 17, 17*
42:6, 7, *10, 20, 21*
43:5, *8, 9*  44:*9, 11,*
*17*  52:*10, 11, 13*
55:*19*  58:*19, 19,*
*19*  60:*13*  61:*10,*
*10, 11, 11, 11, 12,*
*13*  62:*17, 19, 19*
63:*1, 23*  64:5, *7, 7,*
*9, 9*  65:24  66:*13,*
*14*  68:*18, 25*
69:*15*  70:2, *5, 6*
71:5  87:6, *6, 6, 8,*
*9, 10*  88:*12, 12, 13,*
*13, 18, 19*  89:*10,*
*11, 15*  100:5, *6*
101:8, *17, 24*
102:5, *14*  104:*8*

John Holland, M.D.
10/21/2019

50

105:8, 18  112:18
114:20, 21  115:7,
10, 11, 14  127:17
**head**  6:17
**headache**  87:7
88:22, 22, 25
**heading**  52:4
**Health**  12:13, 20
13:9, 9, 14  14:21
15:5, 9, 15  16:1
22:22, 24  23:6, 11
24:17, 19, 24, 25
25:19  28:21, 22
29:1, 19  30:3, 9
31:25  32:2, 22, 24
33:6  35:21, 25
36:7, 11  39:20
40:11, 24  48:16
49:13  50:5  72:8,
15, 17  73:1, 6
75:18  81:22
82:18, 22  83:1, 5,
9, 25  84:17  90:5
94:22  109:9, 17,
24  110:17  111:2
127:3  128:13
**health-care**  30:21
**hear**  94:18
**heard**  97:10  121:5
**hearing**  24:3, 4
60:24
**heart**  26:10, 11, 13
74:24
**held**  5:7
**help**  9:16  44:6
51:4  69:13
**helpful**  24:5
**helping**  15:21
**hemorrhage**  88:25
**hemorrhagic**
97:21  126:25
**her**  35:5  84:2, 6
**hereunder**  50:25
**hereunto**  130:17

**he's**  28:10, 11, 13
37:25  38:2, 5
39:7  41:15  43:16,
16, 21, 22  44:19
58:18, 19  62:19,
21  64:5  66:14
67:17  69:16, 20
70:3  105:6, 14, 19
114:24  117:23
**hid**  112:16
**him**  17:13, 15
18:1, 6, 9, 11
21:21  27:14, 17
28:12, 13  29:12
38:1  39:7  41:20
43:7  52:25  58:14
59:5  61:13  62:21
63:2, 24  65:24
67:13, 15, 16  68:2,
11  69:2, 20  70:25
88:11  89:4  105:8
106:5, 6, 7  112:14
113:22  114:18
115:7
**himself**  37:21
63:2, 9, 24  64:10
**hired**  118:2
**his**  17:25  18:5
19:19  21:23
27:13, 13  28:3, 6,
6, 10  34:21  35:4
36:13  38:9, 22
39:8, 10, 25  41:10,
17  44:19  52:12,
21  55:19  59:4
60:13  61:23  64:8
65:25, 25  67:11
68:21  69:19  70:3
88:14  89:17
101:24  105:12, 25
112:11  113:23, 23
**History**  4:5, 5
86:8, 19  100:5, 20
101:5, 17, 23, 24

102:4
**hit**  37:6  50:24
**hold**  100:10
**HOLLAND**  1:7,
19  5:4, 16  6:1, 6
80:16  130:7
**home**  20:9  34:21
40:5  45:8, 17
62:21, 24  63:3, 6,
9, 24  64:9  69:2
**hope**  115:24
**hospital**  70:16
91:13  94:8  96:12,
20  97:14, 23
**hospitalized**  26:12
31:18
**hot**  74:22
**hour**  27:11  44:15
53:10  87:10
127:17
**hours**  62:23
101:12  126:13, 19
127:11, 21
**huh-uh**  6:17
**hundred**  130:10
**HUNEGS**  2:3
**hypo**  23:22
**hypoglycemic**
23:22
**hypothetical**  43:15
54:16  66:7  67:23
**hypotheticals**
114:25  115:13

**< I >**
**idea**  53:5
**identification**  7:25
8:3  47:12, 15
49:6  98:16, 19
100:13
**IDENTIFIED**  4:9
85:15  127:7, 10
**If**  6:24  7:2, 6, 10
8:21  10:25  12:6
16:25  20:15, 19,

20, 24  22:22  23:7
24:7  26:7, 9, 22
29:4, 16  30:3, 5, 8,
11  31:23  32:2, 2,
11, 16  33:17
34:10, 11  35:15,
15  36:12, 14
37:11, 21  40:4, 24
41:2  42:7, 10, 20
43:21, 25  44:1
45:4, 6, 6, 13, 18,
19, 23  48:2, 24
49:10  51:3  52:10,
12, 17, 20  54:25
55:1, 2, 11  56:9, 9,
10  57:13, 13, 14
58:5, 25  67:1
68:1, 1, 2  69:12
70:17  73:8  76:15
77:11  78:4, 25
86:9  88:16, 16, 25
91:11, 24  94:12,
12, 14  95:21  96:1,
6, 7, 20  97:13, 21,
21  98:14, 25
100:2  104:10, 19
109:8, 13  110:3, 4,
7, 14  115:24
116:11  122:5, 5,
21, 24  123:17, 21
125:21  126:17, 18
128:3, 7, 7, 8
**ill**  20:14, 19  21:1
41:3  45:19  61:10
63:23  67:3  68:25
**Illinois**  2:9
**illness**  19:19
54:22  69:5  95:5
105:25  112:12
**illnesses**  13:18
74:13
**imagine**  7:20
**immediately**  56:11
**impaired**  55:1

impairment 30:*10*
32:*5* 64:*23* 65:*10*,
*16* 128:*9, 12*
implement 107:*20*
implementing
72:*19* 73:*3*
implies 96:*15*
122:*25*
implying 96:*25*
important 6:*15*,
*20* 25:*5* 56:*23*
96:*17* 97:*2*
impression 59:*4*
improper 105:*10*,
*12*
inabilities 39:*10*
inactive 12:*24*
incapacitation
19:*20* 30:*13* 32:*5*
106:*1* 108:*17, 21*
109:*3, 10* 110:*12,
14* 112:*12* 128:*11*
Incident 4:*10*
16:*13, 21* 17:*9, 21*
18:*2, 6, 10, 15*
19:*2, 5, 11* 20:*3*
52:*11* 82:*6, 11, 19,
24* 83:*2* 90:*12*
93:*10* 102:*12*
incidents 74:*12*
92:*5, 8, 10* 93:*21*
94:*14*
include 51:*24*
119:*17*
included 96:*5*
119:*21*
includes 110:*2*
including 73:*18*
inclusive 47:*10*
incomplete 43:*15*
66:*7* 67:*22*
114:*25*
Incorporated 5:*23*
77:*15* 115:*23, 25*

117:*14, 17* 119:*16*
increasing 28:*12*
independent 20:*2*
39:*23* 103:*9*
independently
36:*10*
INDEX 3:*3*
indicate 94:*1*
indicated 28:*17*
63:*25* 70:*19*
127:*5*
indicates 114:*17*
indication 64:*17*
88:*22* 101:*8, 24*
102:*5* 115:*9, 15*
126:*20*
indications 128:*3*
indicative 125:*3*
indirectly 109:*1*
individual 8:*11*
31:*13* 48:*4* 55:*10*
individualized
30:*19* 31:*1*
individually 1:*3*
infarction 26:*10*
inform 36:*2*
information 10:*5*
11:*7* 24:*22* 27:*24*
28:*18* 31:*11, 24*
48:*25* 68:*3* 78:*15*
80:*11, 14, 21*
81:*10* 82:*5* 87:*4,
19, 22, 24* 88:*8*
90:*11, 13* 95:*15,
20* 102:*10, 21, 25*
103:*5, 6, 10* 104:*2,
8, 24* 105:*2*
106:*13, 18, 23*
107:*7, 11, 14, 18,
23* 115:*3*
informational 50:*2*
informing 33:*4*
inherent 110:*7*
inherently 108:*18*

110:*4*
in-house 78:*17*
initiate 56:*1* 58:*1,
4* 59:*10* 71:*17, 22*
73:*9*
injuries 13:*18*
74:*13* 75:*13, 14*
injury 56:*10*
input 118:*14, 18*
inquiry 91:*24*
instance 31:*14*
42:*19* 56:*8* 57:*1*
79:*7* 94:*17* 110:*4*
instruction 40:*21*
insulin 23:*21, 21*
27:*1*
integrated 84:*13*
interested 130:*16*
internal 12:*8*
56:*7* 94:*5*
International
117:*14, 17* 119:*16*
Internet 90:*12*
internship 12:*9*
interrupt 48:*9*
introduce 5:*14*
involve 36:*22*
involved 16:*21*
involvement 16:*17*
103:*22*
involves 14:*4*
30:*20*
involving 16:*13*
18:*15*
issue 58:*20, 22*
102:*10*
issues 13:*10, 22*
16:*1* 23:*16, 23*
24:*1, 3* 35:*15*
36:*5* 41:*6* 62:*6,
10* 110:*23* 119:*17*
122:*11*
It'll 121:*17*
its 59:*17* 68:*15*
78:*15* 79:*7* 95:*16*

103:*20* 104:*18*
107:*13* 116:*21*
117:*5* 119:*3, 11*
120:*11, 15, 18, 21,
22* 121:*22* 123:*19,
24*

< J >
Jacob 1:*5* 16:*14*
19:*18* 20:*3*
103:*25* 104:*24*
105:*4, 23* 106:*15,
24* 112:*10* 113:*19*
January 99:*2, 3,
20* 100:*24* 101:*4,
19*
JESSICA 1:*3* 5:*5*
81:*18, 20* 82:*4*
83:*17* 90:*4*
job 30:*11, 23*
32:*6* 38:*5* 41:*16*
53:*6, 18* 54:*7, 8*
61:*11, 20* 62:*22*
70:*25* 113:*23*
jobs 30:*24* 94:*18*
JOHN 1:*7, 19*
5:*4, 16* 6:*1* 130:*7*
join 66:*10*
jointly 59:*4*
Jones 1:*25* 2:*21*
judgment 20:*20*
22:*2* 30:*3* 53:*17,
22*
jump 9:*21*

< K >
keying 97:*9*
kin 130:*13*
Kind 12:*6* 22:*4, 5*
30:*15* 36:*6* 41:*9*
44:*25* 49:*19*
58:*12* 62:*6* 65:*15,
17* 66:*17* 68:*7*
69:*5* 70:*23* 80:*24*

John Holland, M.D.                                                                 52
10/21/2019

89:7  97:6, *9*
*114:2*
**kinds**  80:*11*  96:*22*
**kitchen**  27:*13*
29:*9*  34:*21*  37:*11*
39:*5*  41:*11*  52:*12*
**knew**  57:*20*
**know**  7:*11, 19*
9:*14*  15:2  17:*11,
15, 17*  18:*10, 11*
19:*13*  20:*15, 21,
25*  22:*4*  23:*10, 12*
25:*4, 5, 9, 10, 17,
18*  26:*15*  27:*19,
20, 24*  28:*17*
29:*18*  31:*12*  32:*1,
1, 10*  33:5, *11, 24*
36:*1, 12, 22*  37:*1,
3, 3, 5, 13, 21, 22,
23*  39:*7, 23, 24*
40:*6, 8, 22*  41:*2, 5*
42:*6, 6, 10, 11, 12,
12, 13, 14, 18, 19,
25*  43:*19, 23, 24,
25*  45:*5, 9, 15, 15,
20*  47:*24*  48:*5*
50:*13, 23*  51:*12*
53:*19*  54:*1, 5*
55:*2, 6, 9*  56:*24,
25*  57:*1, 3, 16, 16*
58:*5, 6, 7, 25*  59:*4,
11*  60:*3, 5*  61:*2, 4*
62:*7, 9, 11*  63:*7*
64:*6, 21, 25*  65:*11*
66:*19, 24, 25*  67:*1,
25, 25*  68:*6, 7, 25*
69:*1, 2, 3, 4, 6*
70:*8*  71:*19, 24*
72:*24*  74:*8, 11, 13,
20*  75:*4, 13, 14, 14,
19*  76:*10, 10, 13,
21, 21, 22, 23*  77:*2,
4, 11, 19, 24*  78:*5,
13, 16, 19, 21, 22*
79:*17, 20*  81:*18*

82:*8, 12, 18, 22, 25*
83:*4, 7, 8, 13, 20*
84:*9*  86:*13*  87:*1,
1, 5, 8, 12, 25*  88:*9,
11, 15, 17, 18, 19,
25*  89:*2, 2, 2, 6, 10*
91:*12*  93:*11*
94:*20*  96:*5, 5, 6,
20, 21*  97:*4, 5, 22,
24*  98:*1, 2*  99:*9*
100:*3*  101:*3*
111:*3, 8*  113:*2, 14,
16*  114:*3, 3, 4, 4, 9*
115:*2, 5*  116:*5, 6,
11*  117:*11, 16, 20*
118:*1, 10, 17, 22*
119:*4, 5, 6, 8, 13,
15, 20, 25*  120:*4, 6,
13, 16, 20, 24*
121:*3, 4, 13*  122:*1,
12, 19, 20, 22, 22*
123:*1, 16*  124:*13*
126:*18*
**knowledge**  16:*13,
17, 20*  19:*1*  20:*3*
39:*24*  50:*8*  67:*9*
80:*17*  81:*16*  82:*6*
103:*15*
**known**  116:*24*
**knows**  58:*13*
102:*14*
**KVAS**  2:*3*

< L >
**L.L.C**  1:*24*  2:*20*
**labeled**  125:*22*
**labor**  72:*12*
**lack**  63:*14*
112:*15*  113:*24*
**lacks**  39:*13*  62:*2*
66:*6*  67:*20*  71:*2*
106:*17*  113:*25*
**laid**  8:*16*  19:*15*
**large**  72:*13*
125:*24*

**last**  21:*10*  49:*13*
72:*3, 6*  98:*13*
100:*21*
**law**  14:*22*  72:*12*
**lawsuit**  103:*19*
**laying**  114:*16*
**layout**  59:*17*
68:*12*
**layperson**  74:*21*
**layperson's**  13:*5*
**leadership**  72:*7, 15*
**leave**  7:*13*  18:*25*
40:*11*  42:*16*  69:*2*
71:*11*
**left**  12:*14*  65:*25*
66:*1*  69:*19, 19*
70:*3, 4*  88:*14, 14*
127:*14, 15, 18*
**left-sided**  69:*22*
**leg**  66:*1, 24*  69:*19*
70:*3*  87:*10*  88:*14,
15*  127:*15, 18*
**Legal**  1:*24*  2:*20*
74:*8*  105:*9, 11, 13*
121:*11, 25*  122:*3,
6, 15*
**LENEAVE**  2:*3*
**Letter**  4:*16*
**level**  37:*10*  53:*19*
92:*10*
**levels**  84:*14*
**license**  12:*24*
**licensed**  12:*21, 23*
**licenses**  13:*1*
**limit**  96:*18*  97:*15*
98:*3*
**limited**  28:*18*
**limiting**  96:*12*
**line**  8:*15*  38:*3*
55:*14*  58:*13*
65:*19*  86:*17*
87:*12*  102:*11*
**LISA**  2:*19*  5:*11*
**list**  25:*19*  47:*5*
93:*9*  124:*8*

**listed**  22:*21*
83:*12*  93:*4*  96:*3*
**lists**  49:*10, 11, 18*
**literature**  32:*2, 3*
**litigation**  80:*11*
**little**  11:*6*  16:*7*
65:*11*  67:*4*
116:*18*
**live**  11:*8, 9, 16*
**local**  56:*13*
**location**  56:*19, 24*
59:*20*  64:*22*
**locations**  109:*20*
116:*17*
**locomotive**  38:*15*
40:*13*  55:*17, 25*
56:*3*  57:*25*  58:*3*
59:*9*
**locomotives**  58:*9*
**logical**  59:*22*
**logo**  78:*22*  79:*11*
**long**  14:*13*  76:*8*
88:*19*
**longer**  88:*18*
**look**  29:*22*  30:*16,
23*  31:*24*  32:*5*
78:*25*  79:*24*
80:*12*  85:*10*
121:*13*  125:*22*
**looked**  11:*1, 4*
19:*4, 10*  94:*25*
99:*12, 18*  103:*13*
127:*6*  128:*12*
**looking**  28:*10*
31:*10*  32:*1*  37:*12*
48:*23*  49:*6*  66:*22*
93:*18*  95:*3*  100:*4*
101:*16*  102:*3*
108:*23*  113:*19*
**looks**  47:*9*  93:*1, 3,
19*  95:*4*
**losing**  32:*18*
**loss**  23:*18, 18, 24*
26:*20, 24*  27:*4, 23*
28:*2, 15*  29:*13*

John Holland, M.D.                                                                    53
10/21/2019

30:7, *12, 14, 14*
31:*14*   33:*1, 20, 20*
35:*24*   39:*18*
48:*17*   49:*1, 18, 21*
55:*3*   65:*7*
**lost**  36:*15*  37:*24*
38:*1*   74:*23*
**lot**  13:*12, 20*  45:*1*
54:*24*  94:*10*
114:*7*
**low**  94:*19, 21*
**lower**  49:*6*  91:*4*
**Lux**  17:*24*  60:*10,*
*11*
**L-U-X**  17:*24*

< M >
**M.D**  1:*7, 20*  5:*4*
6:*1*  130:*7*
**machinery**  110:*5*
**maintained**  98:*1*
**major**  23:*14*
128:*12*
**making**  68:*15*
73:*4*  120:*4*
**man**  112:*8*
**management**  20:*9,*
*19*  111:*6, 20*
113:*12, 17*  126:*16*
**manager**  22:*23*
23:*4*  24:*13, 21, 23*
28:22  29:*18*  33:4
40:*7*  55:20  56:*17*
59:*3*  64:*8*  72:*25*
88:*11, 13*
**managers**  57:*4*
62:*7*
**mandatory**  77:*8*
**March**  14:*16*
**Mark**  17:*3, 11*
55:20  98:*13*
100:*11*
**MARKED**  4:*2, 9*
7:*25*  8:*2*  9:*18, 25*
10:*11, 14*  47:*12,*

*14*  66:*23*  75:22
80:*1, 4*  85:*5, 9*
89:*21, 24*  91:*15,*
*19*  98:*9, 11, 16, 18*
100:*1, 13, 16*  102:*4*
**Marvin**  4:*7*  17:*3,*
*11*  44:20  55:*21*
58:*13, 20*  61:*10,*
*13, 14, 16, 19*
62:*17, 18, 25*
63:*23*  69:*16, 22*
70:*10*  100:*20*
**Marvin's**  101:*4, 16*
**master**  12:*19*
**master's**  84:*16*
**material**  76:*9, 15*
95:*9*  118:*3*
119:*23*
**materials**  79:*6*
114:22  118:*7, 15,*
*19*  119:*2, 11, 13,*
*18, 22, 23, 24*
120:*7*  121:*7, 11*
**matter**  90:*20*
91:*1*  103:22
126:*2*
**mean**  13:*6, 24*
15:*14*  16:*18, 21*
17:*4*  25:*16*  28:*5*
34:*11, 19*  35:*15,*
*17*  36:*5, 9*  37:*2,*
*16*  39:*16*  42:*5, 11*
45:*1, 3*  54:*15*
57:*11*  61:*3*  62:*5,*
*11*  64:*19*  66:*17,*
*18*  67:*24*  72:*4*
75:*3*  77:*7*  80:*24*
81:*8*  83:*4*  87:*11,*
*23*  88:*7, 23*  89:*12,*
*14*  96:*16*  97:*4*
99:22  101:*6*
111:*23*  114:*7*
115:*12*  119:*4*
124:*12, 17*
**meaningful**  21:*15*

**means**  62:22
102:*14*
**meant**  83:*19*
**mechanisms**  76:22
77:*18*
**Medic**  78:*10*  79:*3*
101:*7*  117:*2, 3, 6,*
*10, 13, 14, 16*
118:*1, 11*  119:*12,*
*15, 22*  120:*12*
121:*7*  123:*8*
**Medical**  4:*4*  7:*17*
11:20, *22, 23*  12:*7,*
*10, 22*  13:*15*  14:*2,*
*3, 12, 15, 19, 21*
15:*3, 6, 8, 8, 9, 11,*
*15, 17*  21:*7, 8, 9,*
*11, 25*  22:*3, 12, 14,*
*20, 20, 24*  23:*6, 9*
24:*17, 19, 25*  25:*1,*
*11*  28:22  29:*19*
30:*2, 20*  31:*19*
32:*2, 3*  33:*7, 9, 12,*
*15*  34:*1, 10, 13, 15,*
*18*  35:*1, 9*  36:*1,*
*18*  40:*17*  41:*5*
42:*16*  45:*8, 13, 17*
47:*22, 25*  48:*4, 25*
49:*2, 9, 25*  50:*1, 3,*
*13, 17, 23*  51:*10*
52:*4, 10, 14, 18, 24*
55:*5, 8*  56:*1, 9*
63:*12*  64:*1, 13*
68:*21*  71:*10, 19*
72:*2, 8, 16, 17, 18,*
*19, 22*  73:*1, 13*
75:*15, 16*  80:*25*
82:*19, 23*  83:*2, 3,*
*25*  84:*15*  87:*18*
96:*23*  97:*1, 1*
99:*5, 11, 13, 18, 22*
102:*9*  107:*4, 4, 12,*
*17, 25*  108:*1, 5, 12,*
*13, 16*  109:*2*
110:*11, 22*  111:*4,*

*12, 14, 23*  113:*9,*
*11*  114:*19, 22*
115:*10, 15*  116:*20,*
*24*  119:*16*  120:*18,*
*22*  127:*2, 24*
**medically**  22:*10*
126:*21*
**medication**  126:*12*
**Medicine**  11:*24*
12:*8, 15, 19*  13:*3,*
*4, 7, 13*  14:*1*
29:*25, 25*  49:*20*
81:*4*  108:*22*
**MEDRT**  99:*4*
**M-E-D-R-T**  99:*4*
**meetings**  76:*23*
77:*15, 16, 16*
**meets**  76:*24*
**mental**  10:*5, 23*
30:*15*  64:*21*
65:*10, 15*  70:*23*
71:*7, 12*  128:*11*
**mention**  25:*7*
95:*10*
**mentioned**  15:*4, 5*
31:*5*  50:*10*  56:*19*
57:*19*  66:*13*
76:*17*  77:*9*  78:*14*
87:*5, 8, 14*  90:*5*
95:*5*  114:*3*
120:*10, 13*  124:*10*
**method**  78:*3*
**MICHAEL**  2:*12*
5:*21*  115:22
**michael.cohen@qp**
**wblaw.com**  2:*15*
**middle**  40:*5*  54:*24*
**Mike**  18:*3*
**Mike's**  105:*11*
**mind**  28:*20*  29:*6*
35:*9*  37:*9*  38:22
45:*23*  48:*21*
69:*24*  73:*21*
113:*6*  115:*24*

124:*23* 125:*11*
**minimum** 111:*8*
**Minnesota** 2:*4*
**minutes** 35:*6*
90:*20* 91:*1* 126:2
**misstates** 66:6, *8*
67:*21*
**mobile** 110:*5*
**modify** 99:*21*
**moment** 18:*18*
37:*12, 12* 86:*9*
**morning** 6:6 11:*1*
19:*6* 21:*18* 27:7
34:*21* 39:*19*
52:12
**move** 38:*3* 69:*19*
70:*3*
**moving** 88:*14*
110:7
**multi-day** 76:*23*
77:16
**multiple** 31:*16, 16*
**mumbling** 64:*24*
**myocardial** 26:*10*

**< N >**
**name** 5:*11* 17:*16,*
*23, 25* 18:*5* 79:*1*
115:*21* 123:*3*
**names** 16:*24*
**narrow** 112:*19*
**narrowly** 114:*14*
**National** 108:*24*
117:*11*
**nature** 109:*19*
110:*1, 1*
**nearby** 38:*7*
**Nebraska** 1:*22, 25*
2:*21* 11:*24, 25*
130:2, *5*
**necessarily** 54:*11*
71:*11* 87:*13*
97:*15* 124:*17*
125:2, *11*

**need** 7:*10* 23:5
24:*13* 28:*23*
31:*21, 23* 34:2, *23*
37:*18* 40:*4* 41:*12*
42:*16, 16* 43:*12*
45:*7, 8* 50:9
51:*15* 53:*16* 60:6
91:*4* 109:*13*
**needed** 38:*23, 24*
41:*24* 43:*4*
**needs** 36:*3* 126:*17*
**neglected** 107:*19*
**Neil** 4:*5* 17:*16*
**neurological** 23:*17*
26:*19, 25* 48:*17*
49:*1* 52:*22* 64:*15*
**new** 87:*14, 18*
98:*13*
**night** 44:*14* 58:*15*
62:*22* 102:*23*
114:*17*
**NO** 1:*3* 4:2 8:*7,*
*19* 9:*3, 9, 10, 15*
16:*16* 17:*7, 10, 22*
18:*16* 21:*16* 22:7
33:*24* 34:*22, 22*
37:*19* 50:*12, 24*
54:*7, 7* 59:*18*
61:*24, 24* 62:*12*
70:*24, 24* 71:*24*
74:*8* 82:*21, 25*
85:*13* 88:*18* 89:*8,*
*19* 91:*21* 96:*25*
97:*18* 101:*20*
102:*7, 22* 103:*1,*
*17* 105:*2, 19*
107:*2, 8, 14, 18, 23*
112:*15, 17, 23*
117:*19* 119:*19*
120:*9, 13* 122:*3*
124:*9, 19, 25*
125:*7, 13, 21* 127:*8*
**nodding** 6:*17*
**nonagreement**
51:*23*

**nonresponsive**
27:*16*
**nonspecific** 66:*17,*
*21* 67:5 68:*7*
69:*3* 88:*23*
124:*12*
**Norma** 38:*7, 15,*
*17* 41:*17* 58:*14*
61:*12, 13* 62:*20*
**normal** 64:*25*
**North** 2:*8*
**Notary** 1:*21*
130:*5, 21*
**note** 83:*6*
**notes** 94:*4* 127:*16*
**Notice** 4:*3* 8:*10*
73:*16* 112:*8*
**noticed** 38:*19*
**notifications** 29:*1*
**notify** 20:*25*
22:*23, 24* 23:*4, 6*
24:*13, 16, 24*
28:*21, 22* 29:*18,*
*19* 83:*1*
**notifying** 24:*21*
**notwithstanding**
44:*16*
**November** 4:*16*
130:*18*
**number** 6:*9*
16:*24* 27:2 48:*11*
93:*4* 106:*4, 5*
109:2 119:*20*
**numbered** 80:*13*
**numbness** 65:2
**nurse** 81:*21, 22*
83:*5, 9, 23* 84:*16*
90:*5*
**nurses** 72:*10*
84:*5, 6*
**nursing** 84:*17*
**nuts** 24:*20*

**< O >**
**Oaks** 2:*3*

**object** 9:*4* 35:*11*
60:*21* 93:*8*
**Objection** 39:*13*
42:*2* 43:*14* 60:*20*
62:*1* 63:*13* 66:*5,*
*11* 67:*20* 68:*22*
71:*2* 86:*21* 87:*20*
88:*5* 93:*25*
102:*13* 104:*3*
105:*6* 106:*11*
108:*7* 109:*22*
110:*24* 112:*1*
113:*24* 114:*20*
117:*22* 121:*24*
**objectionable** 66:*8*
67:*22* 114:*1*
115:*1*
**objections** 66:*11*
**objective** 68:*25*
**obligation** 50:*12,*
*22*
**observation** 66:*3*
**observations** 39:*1*
60:*17* 67:*13*
107:*5*
**observe** 39:*24*
41:*18* 55:*18*
60:*25*
**observed** 67:*6*
127:*11*
**observes** 60:*12*
69:*22*
**observing** 27:*14*
41:*22*
**obstructive** 23:*24*
**obtain** 107:*4*
**obtained** 78:*18*
**occasion** 85:*10*
**occupational**
12:*15, 19* 13:2, *7,*
*13, 25* 29:*25*
81:*22* 83:*5, 8*
84:*17* 90:*5*
**occur** 22:*22*

John Holland, M.D.                                                                                  55
10/21/2019

occurred 118:9
occurrence 70:5
occurring 93:20
o'clock 38:4
  44:13, 15 53:10
  55:15 59:13
October 1:22 5:9
odd 43:9
off 18:18, 20, 21
  20:13 22:24
  23:13 24:18 29:2,
  15 33:3, 23 34:25
  40:25 46:3 47:9
  55:16 61:5 69:20
  84:24 91:14 97:9
  128:22
offer 77:19 117:8
offered 77:12, 23
  78:1 101:25
offers 67:15
office 56:20 68:16
officer 7:18 14:12,
  15, 19 15:3, 8, 9,
  11, 17 102:9
  123:1, 4 127:24
offices 1:23 5:8
officially 127:7
Oh 47:7 79:3
Okay 6:25 7:23
  8:20 9:1, 11, 17
  10:10, 19 11:5, 15
  12:21 13:24 14:7
  15:4, 13 16:3, 20
  17:7, 14, 23 18:3,
  7, 12, 17 19:12
  21:14, 17 22:11,
  17 23:15 24:5
  25:15, 18 26:17
  28:3, 17 29:4, 24
  32:16 34:19
  35:23 36:12, 21
  38:3 40:12 41:8,
  12, 21 42:1 43:18
  44:9, 10 45:22
  46:1 48:8 49:15,

22 50:16 51:17
  52:8 53:3, 6
  55:14 56:18
  57:22 58:12
  59:12, 19 61:15,
  18, 20, 20 62:14
  63:8 64:13 66:12
  67:6 68:9 69:9
  70:10, 22 71:15,
  21 72:1, 17 73:14
  76:8 77:25 78:20
  79:6, 18, 24 81:6
  82:4, 10, 13 83:8
  84:2, 11, 18, 22
  87:17 88:3 89:6,
  13, 20 92:9, 14, 22
  94:24 96:9 97:12,
  16 98:5, 8, 25
  99:25 100:4
  101:16, 21 102:8
  103:11, 18 104:9
  105:3 106:8
  107:10, 15, 24
  108:2, 8 110:20
  111:19 112:24
  115:2, 17 116:1, 9,
  18 117:13, 20
  118:7, 14 119:15
  120:3, 10, 16, 21
  121:6, 10, 15, 22,
  25 122:9, 20
  123:21 124:16, 20
  125:9 126:5
OLSEN 2:19 5:11
Omaha 1:25 2:21
  11:10, 25 56:20
Once 18:9 72:17,
  21 106:20
on-site 96:7
on-track 110:6
open 28:4, 10
operate 39:11
operating 40:13,
  14 45:1, 20 71:20

72:12 110:5
  125:2, 9, 10
operation 109:25
operational 41:4
operations 15:25
  19:17 57:7, 8
  74:15 77:20, 21
  80:18, 23 81:11,
  14 105:22 111:16
opinion 106:5
  113:18 122:14, 15
opposed 6:16 74:5
option 31:23
orders 128:24
ordinary 39:9
Oregon 12:13, 24
organization 57:2
  78:7
organizations
  117:8
oriented 59:23
ourself 30:22
outside 78:19, 23
  114:16
overall 77:10
overlooked 41:9
overrule 41:24
  53:21
oversight 83:9
overview 24:5

< P >
P.A 2:3, 13
p.m 21:24 44:14
  46:2, 4 47:1, 3
  55:15 84:23, 25
  85:1, 3 128:20
  129:4
pace 93:3
PACIFIC 1:8, 11
  2:8 4:4 5:6, 20
  7:18 8:24 12:9
  14:10, 11, 14, 17
  15:12, 18 21:7
  41:4 47:22, 25

48:3 71:17 72:5
  74:1 80:19, 21
  81:22 83:24 94:5
  111:6 113:15
  116:12, 14 118:16
  119:5, 9, 18, 23
  120:11, 14, 21
  123:12, 18
Pacific's 104:4
  116:20 117:18
pack 125:20
packet 123:8
Page 3:2, 2, 3, 3, 4,
  4, 6, 8, 9 8:14
  23:13 49:5, 8, 13,
  16, 16, 17 50:21
  79:1, 11 80:12
  85:16, 19, 21, 22
  90:8 91:3 95:6, 8,
  8, 11, 12, 12 96:9,
  10 99:1 100:21,
  23 121:16, 17
  123:7 124:1
  125:22 127:11, 16,
  19
pages 48:4, 6
  49:11, 12, 12
  130:10
pain 23:3
pains 25:23, 24
Paragraph 80:13,
  14 83:16 86:6, 10,
  14, 19 90:19
  96:10 125:25
parallel 84:14
paralysis 65:3
part 22:20 29:18
  33:10 35:12 45:3
  65:1, 3 77:15
  109:18, 18 111:4
  120:1
participate 73:11
  84:7
participation
  77:12

**particular** 31:*12*
48:*16* 49:5 60:5
81:*15* 82:*16* 86:5
88:*3* 90:7 92:*1*
110:*22* 111:*23*
113:*15*
**particularly** 13:*10*
23:*24* 48:8
116:16
**parties** 47:*1* 85:*1*
130:*14*
**partly** 110:*1, 10,*
*12*
**parts** 48:7 54:4
73:*3*
**PARTY** 1:*14*
**passed** 56:9
**pasted** 90:*13*
**Patient** 85:*17, 24*
127:*17*
**patient's** 87:2
**PAUL** 2:2 5:*16,*
*17* 48:9
**pause** 6:22
**pbanker@hlklaw.c**
**om** 2:*4*
**PDF** 129:*3*
**people** 13:*15*
17:*1* 20:*17* 22:5
41:*18* 44:*23*
52:*17* 53:7 54:*8,*
*21* 59:*21* 61:2, *3*
65:*22, 24* 66:*18*
67:*6, 10* 70:*25*
72:*11, 11* 74:*22,*
*22, 23, 23* 75:6
78:*6* 94:*8* 96:*8*
102:*23* 109:*21*
113:*22*
**percentage** 92:*21*
94:*19*
**perform** 77:*25*
**performed** 31:7
**period** 94:*13*

126:*19*
**periodically** 76:*13*
**permanent** 11:*13*
**person** 30:*8* 32:7
33:2 37:*22, 25*
45:*18* 50:*19*
65:*13* 68:*1, 8*
71:22 120:6
125:*1* 128:*7, 7, 8*
**Personal** 1:*4* 16:*9,*
*11, 12, 17, 17, 20*
19:*1* 103:*15*
127:*3*
**personally** 16:*21*
**persons** 104:*1*
105:*1, 5* 106:*16,*
*25* 120:7
**person's** 22:*13*
30:*3* 127:2
**perspective** 13:*6*
33:*25* 60:*16*
67:*18* 111:22
**pertaining** 10:5
19:*19* 81:*14*
105:*24* 112:*11*
**pertinent** 113:5
**ph** 118:*8*
**phones** 58:*3, 9*
**phrase** 124:*11*
**physical** 22:2
30:*14* 31:*13*
56:*19* 59:*17*
64:*21* 65:2 85:22
128:*11*
**physically** 20:22
21:*13* 22:9 40:22
53:*16, 18* 54:*8*
103:2
**picture** 77:*10*
86:*16* 101:*17*
**place** 21:*8* 27:*4*
33:*16*
**PLAINTIFF** 1:*6,*
*14* 2:2 5:*18*
120:*25*

**plan** 122:*18, 21*
123:*13, 15, 18*
**plans** 107:*20*
122:*18* 123:*10*
**plant** 38:7
**plausible** 36:*24*
37:*4*
**play** 53:*19* 74:*14*
**played** 103:2
**playing** 82:*17*
**please** 5:*14*
112:*19*
**plus** 101:*14*
**PMK** 105:*11*
112:8
**point** 7:*11* 8:*13*
33:25 34:*24*
36:*14* 37:9 38:22
41:*10* 44:*12, 19*
47:*21* 59:*12* 60:9
61:22 62:*25*
63:*25* 71:*21*
95:22 99:*13, 24*
118:*24*
**points** 102:*20*
**policies** 15:*21*
16:2 19:*17* 41:*4,*
*4* 58:7, *8, 8, 22*
73:*17* 80:*17, 23*
81:7, *9, 13* 105:22
111:5, *10* 112:9
113:*12* 114:5
119:*10*
**policy** 21:*4* 40:*12,*
*16, 17* 44:*21* 58:*2,*
*25* 59:*8* 61:*21*
62:*12* 63:*4* 64:*1*
71:*15* 73:*23* 81:*3*
84:7 114:*10*
**pop** 52:*18*
**population** 92:*15,*
*19*
**porta** 67:7
**portable** 59:*21*

65:*23*
**Portland** 12:*13, 16*
**pose** 30:*4* 108:*17*
109:*9*
**poses** 110:*14*
**posing** 108:*21*
**position** 16:*4*
120:*6*
**positioned** 103:*3*
**positions** 15:*23*
108:2
**possible** 17:*12*
26:*13* 36:*9*
118:*18, 21* 124:*20*
**possibly** 64:*18*
**postgraduate**
12:*11, 12*
**posture** 33:*22*
**potty** 67:7
**Power** 47:*20*
99:*13, 23*
**powerful** 126:7
**practical** 13:*12*
14:*5*
**practice** 12:*15*
**precise** 32:*23* 52:*3*
**precisely** 56:*25*
**preferred** 78:2
**prefix** 49:7
**preparation** 11:2
18:*13* 19:7 121:7
**prepare** 8:22 9:2
79:*6*
**prepared** 122:7
**present** 15:*18*
47:*1* 85:*1* 111:*23*
127:*21*
**presented** 103:7
115:*3, 5, 6*
**presents** 111:*25*
**presumably** 49:*24*
**presume** 24:*21*
**pretty** 66:*20* 67:*4*
69:*3* 74:*16* 94:*19,*

John Holland, M.D.                                                                                  57
10/21/2019

*21*
**prevent** 49:*20*
**Preventive** 13:*3, 13*
**PREVIOUSLY**
*4:9  7:15  8:18*
*9:18, 24  10:11, 14*
*65:14  70:6  80:1,*
*4  85:5, 9  89:21,*
*24  91:15, 18  98:8,*
*11  100:16*
**PRIETO** 2:*13*
**primarily** 23:*1*
**primary** 25:5, *12*
**principal** 15:*19*
**principle** 22:*17,*
*18  109:16  110:10*
**principles** 53:*15*
**prior** 9:*19  10:12*
*16:18  18:12*
*40:10  71:4  80:2*
*85:6  89:22  91:16,*
*24  115:7  127:12*
**probably** 6:*9*
*7:16, 20  9:10*
*48:6  69:10  92:12*
*101:14*
**problems** 32:*4*
*43:21*
**procedure** 44:*21,*
*24  58:2  59:1, 8*
*61:21  63:4  64:1*
*71:16  84:8*
*113:21*
**procedures** 15:*22*
*19:17  26:14*
*58:22  73:17*
*80:17, 23  81:10,*
*13  105:23  111:8*
*112:10*
**proceeded** 55:*17*
**proceedings** 5:*1*
*47:2  85:2*
**proceeds** 44:*11*
**process** 6:*12*
*32:11, 14  33:2*

*34:16  73:10*
*117:20  118:5, 9,*
*12  120:1*
**produced** 10:2, *21*
*80:10  91:23*
**PROFESSIONAL**
*1:16  5:22  12:25*
*115:22, 25*
**program** 111:*16*
*116:24  117:18, 21*
**programs** 14:*25*
*77:8  111:5, 11*
**proper** 71:*22*
*96:21*
**properly** 66:*1*
*107:11*
**proposals** 118:*12*
**proposed** 63:*18*
**protect** 109:*14*
**protestations** 58:*18*
**protocol** 32:*22*
*33:6  44:24*
*125:25  126:16*
**protocols** 107:*16*
**provide** 20:*4*
*43:1  45:21  52:15*
*69:13  74:9  79:10*
*80:11  86:15  87:4*
*88:8  103:24*
*104:24  106:14, 24*
*107:4, 20  116:8,*
*15  118:3  120:15,*
*18  121:22  122:4,*
*13*
**provided** 28:*18*
*78:21  105:3*
*118:15  119:3, 11,*
*18  121:3*
**providers** 30:*21*
**provides** 40:*14*
*61:22  71:16*
*95:16  116:20*
*123:24*
**psychiatry** 12:*12*

**PTI** 59:*14, 24*
*60:1, 10, 10  68:10,*
*14  69:9, 11*
*103:18, 21, 24*
*104:24  106:14, 23*
*107:3, 11, 15, 19*
*114:16  115:25*
*116:4, 12, 13*
*121:2  122:10, 12*
**PTI's** 103:*21*
**Public** 1:*21  12:20*
*74:17  130:5, 21*
**Puiallup** 11:*17*
**P-U-I-A-L-L-U-P**
*11:19*
**pull** 48:*3*
**purpose** 110:*17*
**put** 26:8, *23  27:4*
*30:25  32:8  72:7*
*78:8, 22  79:11*
*100:9*
**puts** 79:*7*
**putting** 44:*7*
**PXD6** 100:*24*

**< Q >**
**question** 6:*22  7:2,*
*5, 7  19:22  25:25*
*44:1  45:1  51:9,*
*13  52:2  60:22*
*62:15  63:19  77:7*
*80:24  89:10  90:7,*
*18  93:15  94:24*
*95:1  100:9  102:1,*
*3  104:23  105:7*
*106:3, 11, 18, 20*
*107:6  108:9*
*112:20, 22  113:3*
*114:3, 24  116:10*
*122:7  123:11*
*127:22*
**questioned** 44:*23*
**questioning** 113:*23*
**questions** 20:*6*
*25:21  50:9  83:17*

*103:23  115:18*
*125:15  128:17*
**QUINTAIROS**
*2:13*
**quite** 59:*3  102:15*
*108:9  116:19*

**< R >**
**radio** 38:*24  39:6,*
*11  41:23  42:5, 21*
*43:5, 6, 11  56:4,*
*16  57:18  60:18*
**rail** 109:*4  110:3*
**railcars** 38:*6*
**RAILROAD** 1:*8,*
*11  2:8  5:6  7:18*
*14:10, 11, 14*
*15:12, 18  19:16,*
*17  80:18, 23*
*81:10, 10, 14*
*105:22  109:7*
**railroads** 109:*1*
**Railroad's** 105:*22*
**raise** 44:*19  58:20*
**rapid** 64:*20  96:11*
**rate** 93:*20  94:21*
**reach** 25:*17*
**reaction** 23:*21*
*27:2*
**read** 23:*13  26:7*
*86:9  90:22  96:8*
*101:6  104:11, 19*
*105:20  114:22*
*123:14*
**reading** 19:*22*
*86:12, 15*
**ready** 21:*21*
**real** 65:*10*
**really** 22:*14*
*31:10  36:24*
*38:13  66:22, 23*
*68:25  72:22*
*73:12  75:20*
*84:12  87:1  88:23*
*96:17  111:4*

113:*17* 122:*22*
127:*14, 18*
**reason** 56:*23*
70:*22* 83:*1* 93:*6,
22* 107:*25* 119:*1*
**reasonable** 45:*18*
55:*9* 59:*2, 3, 6*
64:*4, 11* 69:*3*
103:*25* 104:*25*
105:*4* 106:*15, 25*
114:*8*
**reasonably** 107:*16*
**reasons** 42:*9*
126:*22* 127:*4*
**recall** 16:*16*
17:*25* 18:*5, 6, 9*
92:*8* 95:*19*
116:*21* 120:*1*
121:*14*
**receive** 51:*1* 79:*15*
**received** 11:*23*
12:*19* 20:*9* 21:*19*
27:*10* 100:*6*
101:*18, 24* 102:*6*
**receiving** 27:*12*
90:*11*
**Recess** 46:*4* 84:*25*
**recognition** 73:*19*
96:*11*
**recognize** 10:*7*
16:*25* 98:*22*
107:*3*
**recognized** 14:*3*
**recognizing** 107:*12*
**recollection** 18:*16*
43:*4* 52:*21*
**recommend** 109:*6*
**recommendations**
108:*25*
**record** 5:*15* 6:*21,
25* 18:*18, 20, 21,
23* 46:*3* 47:*4, 18*
50:*19* 79:*14*
84:*24* 85:*4* 86:*15*
127:*7* 128:*22*

**records** 30:*20*
31:*19* 34:*1* 85:*11,
16* 102:*19* 114:*23*
127:*6, 9*
**recurrence** 34:*7*
**recurrent** 30:*12*
32:*4, 4*
**red** 32:*21* 117:*12*
**reduced** 130:*8*
**refer** 52:*19* 96:*8*
115:*24* 116:*25*
**referenced** 9:*22*
**referred** 126:*1*
**referring** 75:*21*
90:*23*
**refresh** 52:*21*
**regarding** 16:*13*
19:*1, 4* 40:*12*
55:*12* 58:*2* 73:*18,
23* 80:*22* 90:*7*
103:*21* 107:*12, 17*
116:*19* 121:*23*
123:*23, 23, 25*
127:*22*
**regardless** 20:*16*
37:*10*
**regular** 20:*18*
**regulation** 122:*3*
**regulations** 30:*1*
74:*9* 111:*7, 11*
114:*5* 120:*14, 17*
122:*12*
**related** 10:*23*
13:*9, 9* 17:*4, 8*
19:*11* 23:*20, 23,
25* 24:*1, 3* 26:*15*
34:*20* 36:*7* 88:*24*
**relates** 81:*13*
90:*15*
**relating** 17:*8*
41:*9* 108:*1*
**relation** 121:*2*
**relations** 72:*12*
**relationship**

116:*11*
**relative** 103:*4*
**relevance** 112:*3*
113:*16*
**relevancy** 111:*25*
**relevant** 31:*11*
40:*20* 81:*3*
112:*19*
**remained** 28:*3*
**remember** 57:*21,
23* 112:*22* 124:*13*
**reminder** 6:*16*
**remoteness** 109:*21*
**render** 104:*1*
105:*1, 5* 106:*16, 25*
**reorient** 16:*7*
**repeatedly** 114:*25*
**rephrase** 118:*25*
**report** 21:*13, 20*
22:*10* 31:*20* 36:*2*
40:*6, 22* 49:*17*
50:*6* 51:*15* 85:*18,
24* 86:*4* 98:*23*
109:*8*
**reportable** 22:*19,
22* 23:*11* 24:*8, 25*
25:*19* 28:*20, 25*
32:*22, 24* 33:*6*
34:*25* 35:*9, 21, 25*
36:*10, 18* 39:*4, 20*
40:*10, 24* 48:*16*
49:*2, 13* 50:*5*
52:*23* 73:*6* 108:*1,
13* 109:*17, 23*
110:*17* 111:*2*
**reported** 22:*11*
88:*13* 89:*4* 93:*21*
**REPORTER** 3:*4*
5:*13* 6:*14* 128:*23*
**Reporters** 1:*24*
2:*20* 5:*8, 12*
**reporting** 20:*17*
25:*6, 14* 73:*6*
87:*3*

**represent** 8:*9* 9:*8,
25* 10:*19* 80:*9*
85:*14* 90:*3* 91:*22*
115:*22*
**Representative**
1:*4* 8:*12* 16:*10*
19:*14*
**representatives**
72:*9*
**represented** 63:*15*
**representing** 99:*9*
**represents** 128:*13*
**request** 105:*11*
**Requests** 128:*23*
**require** 29:*1, 14*
31:*19* 33:*2* 34:*16*
109:*7* 120:*14, 21*
122:*12* 124:*24*
125:*11*
**required** 25:*3*
51:*5, 6, 10, 14, 15*
52:*1, 4, 5* 74:*3, 6*
79:*21, 23* 95:*23*
120:*11*
**requirement** 74:*8*
**requirements**
13:*17*
**requires** 24:*14*
120:*17* 122:*3*
**requiring** 107:*5*
**residency** 12:*14, 18*
**resident** 11:*13*
12:*12*
**resolve** 61:*25*
**resource** 77:*5*
**resources** 15:*16*
**respond** 27:*17*
50:*9*
**responders** 56:*13*
87:*24* 107:*22*
**responding** 16:*2*
28:*11*
**responds** 56:*22*
**response** 28:*12*
29:*12* 55:*3* 56:*1,*

*6, 7, 12, 18, 21*
57:2, *4, 6, 9, 21*
58:*1, 4*  63:*12*
73:*19*  85:*12*
91:*24*  105:*10, 13*
107:*21*  114:*19*
**responsibilities**
15:*19*  73:8, *10*
84:2
**responsibility**  22:9
54:21  55:*10*
72:22, *23, 24, 25*
73:2  83:*10*
**responsible**  21:*12*
72:*1, 19*  73:*4, 6*
109:*4*
**responsive**  37:*18*
**rest**  110:*20*  111:8,
*12*
**resting**  110:22
113:*3*
**restrictions**  31:*3*
32:8  109:*14*
**resulting**  30:9
**results**  126:*12*
**resuscitation**  75:9
**return**  23:8  29:*16*
30:5  31:2  59:*13*
**returned**  55:*16*
**review**  50:*1*
76:*15*  118:7, *12*
121:*6*
**reviewed**  8:*24*
10:8  19:7  118:2
**reviewing**  14:*25*
**revised**  72:*3, 6*
**revision**  21:*10*
**revisions**  119:*9*
**rhythms**  111:22
113:*4, 17*
**right**  24:6  40:6
45:6  53:*11*  85:23
86:*11*  91:4  97:*14*
98:7  106:2  116:*3*
121:*18*  123:7, *17,*

*21*  124:2, *8*
125:25  129:2
**right-hand**  49:7
85:*21*
**risk**  30:5, *12*  32:4
108:*17, 21*  109:15
110:*15*
**risks**  108:*18*
109:9
**RMCC**  57:17, *19,*
*19*
**roles**  72:23, *24, 25*
**Room**  2:8  23:*3*
26:*12*  31:*17*
37:*18*  94:9
**roughly**  68:*14*
**route**  68:*17*
**RPR**  1:*20*  130:*4,*
*20*
**rubric**  106:*4*
**Rule**  4:*10*  40:*17*
53:*20*  54:*12*
71:*23, 25*  108:*12*
**Rules**  4:*4*  21:7, *8,*
*9, 11, 25*  22:*3, 12,*
*14, 20, 21*  23:9
25:*1, 11*  33:7, *9,*
*12, 15*  34:*16, 18*
36:*1*  41:6  43:*16*
45:2, *20*  47:22, *25*
48:*4, 25*  49:9, *25*
50:*1, 3, 13, 17, 23*
51:*10*  52:5, *11, 14,*
*18, 24*  53:*12*  55:8
71:*19, 20*  72:2, *18,*
*20, 22*  73:*12, 13*
80:25  81:*4*  99:*5,*
*11, 13, 19, 22*
108:*1*  109:*7*
111:*4, 13*  113:9, *11*
**run**  58:*15*

**< S >**

**safe**  23:8  29:*16*
32:9  34:*14*  54:*19*
74:*16*  107:*16*
**safely**  20:22  22:*3*
32:7
**safer**  13:*21*
**safety**  13:*15, 23*
15:*23, 25, 25*  16:4
25:2, *12*  30:5, *6,*
*11, 24*  34:4  43:*10,*
*16*  51:*19*  72:*10,*
*11*  76:*14, 23, 23*
77:*14, 15, 16*
94:*18*  108:2, *5, 18,*
*19, 21, 24*  109:15
110:*15*  117:*11*
122:24, *25*  123:*3*
**sake**  27:9
**salient**  87:*17*
113:*5*
**San**  12:9
**sand**  38:7
**saying**  6:*17*  22:*1*
32:*17*  40:*1*  41:25
44:22  53:*14*  54:9,
*10*  71:9  86:*13*
93:*19*  99:*17*
119:7
**says**  21:*11*  41:*16*
44:9, *17*  49:*16, 17,*
*17*  50:*14, 22, 22*
51:*1*  53:6  54:6
61:*17, 19, 24*
62:*19*  67:*16*
70:24  78:*24*
80:*16*  85:*24*
90:*19*  91:4  96:*10*
101:7  124:6
126:6, *11*
**scenario**  29:22
39:*2, 11, 17*  40:*15,*
*20*  60:*16*  68:*21*
69:*24*  70:*20*
81:*15*  86:*16*

**scenarios**  115:*6*
**scene**  89:*4*
**scheduling**  111:*3*
**school**  11:22
**Sciences**  12:*13*
**Screen**  4:*15*
10:*20, 22*  49:9
**seal**  130:*18*
**search**  52:*17*
**seat**  60:*13, 19*
61:*4*  125:2, *9, 10*
**second**  12:*11*
37:25  60:*24*
73:*16*  79:*1*  91:*3*
96:*10*  99:*1*
100:*21*
**seconds**  27:*15*
28:8  29:*11*  32:20
**section**  85:*17*
86:*6*  121:*10*
**sections**  123:*14*
**see**  8:*15*  9:5, *12*
16:*25*  19:*21, 22*
31:*16*  32:*11*
64:*19, 20*  65:24
69:*12*  76:*15*
79:*13*  85:25
90:*21, 23*  91:7
95:*14*  97:8, *20*
98:9  99:*17*  101:*1,*
*17, 23*  102:5
104:*20*  113:*14*
115:8, *12*  121:*19*
124:6  126:*3, 6, 9*
127:9
**seeing**  45:*13*  68:2
**seek**  42:*16*
**seeking**  114:*18*
**seen**  8:*3, 18*  9:8
87:6  91:*19*  98:*19*
**seizure**  26:22
27:22  49:*17, 19*
52:22  109:*11*

**seizures** 23:*18*
26:*19* 48:*17* 49:*1,
20*
**select** 119:*24*
120:*8*
**selected** 119:*16*
**selecting** 120:*2*
**send** 58:*14* 62:*20,
21*
**sense** 45:*4, 10*
53:*19* 54:*15, 25*
55:*13* 59:*22* 62:*9*
92:*9, 17* 109:*20*
114:*8*
**sensitive** 108:*2, 5*
**sent** 118:*7*
**sentence** 91:*3*
126:*11*
**sentences** 126:*5*
**serious** 26:*16*
**service** 20:*10, 19*
60:*4* 62:*23* 81:*23,
25* 90:*6*
**services** 14:*21*
15:*6, 9, 15* 22:*24*
23:*6* 24:*17, 19, 25*
28:*23* 29:*19* 60:*4*
72:*8, 16, 18* 73:*1*
75:*16* 79:*10*
82:*19, 23* 83:*2, 24,
25* 115:*10, 16*
116:*7, 15* 124:*24*
125:*12*
**set** 20:*4* 26:*17*
72:*18*
**sets** 21:*18*
**Setting** 102:*8*
110:*3* 113:*10*
**settings** 77:*1*
**settled** 72:*18*
**seven** 49:*11*
**seventh** 85:*16, 22*
**severe** 23:*22*
**shake** 33:*23* 34:*25*

**shanty** 59:*21, 25*
60:*11* 61:*14, 17*
62:*16* 65:*21*
67:*14*
**shift** 19:*13* 20:*18*
40:*5* 41:*3* 44:*14*
73:*16*
**shifts** 111:*9*
**shoes** 105:*12*
**short** 84:*19*
**shorthand** 130:*7*
**shortly** 69:*17*
**shot** 49:*9*
**Shots** 4:*15* 10:*20,
22* 47:*20*
**should** 29:*2*
35:*18* 36:*2, 2*
64:*9* 97:*5, 23, 25*
104:*5* 105:*7*
111:*15* 114:*18*
127:*25* 128:*5*
**shouldn't** 64:*10*
**should've** 89:*9*
**show** 8:*2* 9:*21, 23*
10:*10* 79:*25* 85:*8*
100:*10* 124:*4*
**showing** 9:*24*
10:*14* 47:*14* 80:*4*
91:*18* 98:*8, 18*
100:*19* 125:*20*
**sick** 38:*20* 45:*7*
58:*19* 63:*1*
**sicker** 62:*19*
**sickness** 22:*5*
**side** 65:*4, 25* 70:*4*
**sign** 33:*13* 75:*6*
77:*3*
**signature** 8:*15*
130:*18*
**significance** 88:*4*
**significant** 23:*2*
67:*11, 12* 108:*18,
21* 109:*4, 9*
110:*15* 128:*13*
**signs** 74:*24* 124:*4*

**similar** 92:*19*
104:*1* 105:*1, 5*
106:*16* 107:*1*
**single** 32:*15*
**sit** 119:*7*
**site** 116:*16*
**sitting** 57:*13* 89:*6*
105:*12* 106:*13*
**situation** 22:*12*
37:*5* 43:*19* 54:*6,
13, 17, 17* 55:*8, 12,
21* 114:*6, 9* 115:*13*
**situations** 16:*2*
36:*6*
**six** 48:*6*
**sleep** 23:*23, 24*
111:*3, 12* 112:*15*
113:*17*
**sleeping** 110:*22*
**slides** 47:*21* 99:*13*
**so-called** 126:*22*
**somebody** 36:*25*
45:*12* 54:*25* 67:*3*
69:*6* 71:*9* 75:*16*
124:*16, 20*
**someone's** 26:*22*
91:*11*
**sooner** 91:*12*
**sorry** 48:*9*
**sort** 16:*6* 19:*25*
21:*18* 50:*19* 51:*8*
54:*16* 59:*4* 60:*24*
64:*23* 65:*9* 78:*3*
84:*12* 86:*4*
111:*10* 116:*9*
118:*18* 122:*25*
126:*16*
**sound** 64:*25* 70:*4,
7*
**sounds** 20:*2* 31:*7*
59:*6, 6* 64:*10, 24*
**South** 2:*13*
**speak** 41:*5* 80:*25*
122:*2* 127:*20*

**speaking** 126:*22*
**speaks** 71:*25*
**specialist** 5:*12*
**Specialties** 14:*4*
31:*17*
**specific** 13:*17*
16:*2* 22:*15* 23:*12*
26:*8* 48:*25* 49:*12*
50:*4* 54:*17* 62:*12,
15* 65:*10* 69:*7*
77:*18* 89:*16* 92:*8*
95:*1* 114:*5, 10*
124:*11*
**specifically** 51:*13*
53:*20* 59:*1* 95:*4*
108:*25* 111:*15*
123:*25*
**specificity** 45:*21*
**specifies** 71:*23*
**speculation** 36:*19,
23* 39:*14* 43:*15*
82:*7* 88:*6* 118:*20*
**speech** 64:*23*
**spell** 11:*18*
**spent** 48:*15* 73:*14*
**spoken** 82:*10*
127:*14*
**Spouse** 1:*4*
**Spreadsheet** 4:*10*
**ss** 130:*2*
**staff** 78:*6, 10*
**staffing** 62:*24*
**stage** 20:*4* 21:*18*
**stamp** 48:*11*
95:*12* 99:*2*
**stamped** 90:*8*
95:*11* 100:*17, 22*
**stand** 88:*18*
**standard** 79:*12*
126:*16*
**standing** 37:*11*
**standpoint** 64:*1*
83:*3* 113:*5*
**stands** 86:*7*

John Holland, M.D.
10/21/2019

61

106:*11*
**staring** 43:*5*
**Starkey** 1:*20*
5:*13* 130:*4, 20*
**start** 59:*14*
**started** 44:*14*
47:*23* 72:*4*
**starting** 41:*10*
47:*16* 95:*7*
126:*13*
**starts** 21:*23* 49:*7*
86:*6* 90:*20* 126:*1*
**State** 1:*21* 11:*9,*
*14, 15* 12:*22*
70:*24* 71:*7, 12*
130:*2, 5*
**stated** 86:*14* 87:*6,*
*9* 127:*17*
**statement** 22:*7, 8*
67:*25* 71:*13*
90:*25* 91:*9* 96:*14*
126:*14*
**STATES** 1:*1*
**stating** 39:*25*
**stations** 38:*24*
**status** 10:*5, 23*
**stay** 22:*24* 24:*18*
29:*2, 15* 40:*25*
**staying** 33:*3*
**step** 44:*5* 55:*19*
**Stephen** 4:*7*
**steps** 43:*1*
**stole** 120:*25*
**stop** 68:*18*
**stopped** 105:*7*
**story** 33:*20* 35:*9*
41:*9*
**Street** 1:*25* 2:*21*
**strike** 104:*5*
**stroke** 10:*24*
18:*15* 64:*18, 19,*
*23* 67:*17* 70:*9*
73:*19* 89:*7, 10, 11,*
*15* 90:*20* 91:*1, 11*
93:*10* 94:*2, 9, 10*

95:*4, 10* 96:*3, 20*
97:*2, 7, 22* 98:*3*
124:*11, 18, 21*
125:*3* 126:*2, 7, 16,*
*20, 25*
**strokes** 10:*6*
64:*14* 88:*24*
90:*13* 91:*25* 92:*6,*
*16* 93:*12, 12, 24*
94:*14* 95:*16*
96:*16, 17, 23*
97:*11, 13* 123:*25*
126:*24*
**struck** 43:*9*
**student** 10:*3, 17*
11:*2* 19:*8* 90:*17*
95:*1, 6, 17, 18*
96:*4, 4, 9*
**study** 48:*20, 24*
49:*23*
**stumble** 65:*24*
66:*18* 68:*2*
**stumbling** 66:*14*
67:*3, 7*
**Subarachnoid**
88:*25*
**subbox** 49:*19*
**subcategory** 49:*2*
**subdepartment**
15:*16*
**subject** 18:*25*
79:*19* 105:*21*
112:*17*
**subjects** 105:*16,*
*17, 20*
**subsection** 121:*19*
**subtle** 41:*1* 65:*11*
**subtract** 35:*8*
**sudden** 30:*13, 14*
32:*4* 55:*2, 2*
64:*20* 70:*5* 95:*5*
108:*16, 17, 20*
109:*3, 10* 110:*12,*
*14* 128:*8, 11, 11*

**suddenly** 36:*25*
37:*22* 65:*13, 14*
88:*16, 18* 124:*5*
**suffered** 94:*2*
**Suffice** 92:*22*
123:*17*
**Suite** 2:*3*
**summarize** 32:*13*
**supervisor** 20:*25*
25:*8, 8* 36:*3*
44:*20* 45:*16* 55:*6*
**Supplemental** 4:*10*
**supportive** 98:*1*
**supposed** 20:*24*
22:*23* 23:*3* 24:*12,*
*13, 16, 17* 54:*19*
**sure** 7:*19* 9:*15*
10:*18* 15:*5* 19:*23*
21:*12* 25:*13* 26:*2,*
*3* 29:*8* 33:*17*
34:*13* 36:*8* 39:*22*
42:*24* 43:*20* 44:*3*
45:*25* 47:*7* 48:*22*
53:*25* 54:*3* 57:*12,*
*12, 15* 60:*8* 63:*21*
68:*5* 71:*20* 73:*5*
76:*25* 77:*6, 6, 9,*
*17* 81:*2, 12* 84:*21*
88:*7* 90:*24* 93:*17*
94:*4* 96:*6, 8*
102:*2, 14, 16, 18*
103:*8, 14* 106:*22*
108:*9, 11* 113:*1,*
*15* 121:*14, 17*
**survival** 96:*13*
**suspected** 93:*12*
**Swentik** 18:*3*
**S-W-E-N-T-I-K**
18:*4*
**switch** 11:*5*
**sworn** 6:*2*
**symptom** 126:*13*
**symptoms** 88:*4*
94:*9* 127:*10, 13, 20*

**system** 20:*10*
56:*22*

**< T >**
**table** 10:*4* 95:*3, 9*
**tack** 47:*8*
**tahayden@up.com**
2:*9*
**take** 6:*11* 7:*10*
16:*8* 31:*24* 43:*1*
44:*5* 45:*23* 64:*13*
65:*17, 18* 68:*11*
84:*19* 86:*9* 102:*9,*
*10*
**taken** 1:*20* 5:*4*
6:*7* 94:*4, 8* 130:*7*
**takes** 50:*16, 19*
**talk** 6:*21* 19:*14*
41:*15* 47:*23*
55:*21* 57:*17* 59:*3*
61:*13* 72:*23*
73:*13* 88:*14* 94:*7*
122:*17*
**talked** 16:*18*
17:*13* 19:*2* 27:*18*
37:*15, 16* 40:*16*
41:*6* 73:*4* 75:*3*
80:*20, 22* 81:*16*
82:*13* 89:*12*
99:*11* 101:*10*
116:*18*
**talking** 9:*14* 18:*6,*
*9, 12* 28:*11* 35:*4*
41:*10* 48:*15* 53:*5,*
*9, 12* 62:*17* 65:*22*
66:*4* 73:*15* 74:*20*
119:*12*
**talks** 41:*14* 61:*16*
99:*21*
**task** 110:*13*
113:*10*
**taught** 51:*3*
**team** 84:*13*
**tell** 25:*25* 47:*19*
48:*10* 52:*17* 70:*1*

**88:***10*  **100:***5*
**121:***16*
**telling**  38:*1*
**tells**  49:9  50:2
**ten**  27:*15*  29:*10*
32:*19*
**tend**  124:*4*
**term**  21:*14*  29:24
51:*20*  65:9
124:*11*
**terminal**  60:6
88:*12*  116:*17*
**terms**  15:*1, 25*
19:6  25:*12*  35:9
43:24  44:21
58:22  60:*16*
63:*11, 13*  66:4
67:12  68:21
84:13  86:17
87:*11*  93:23
110:2*1*  113:9
**test**  49:25  50:7
**tested**  33:8  49:25
**testified**  6:3  20:5
79:19  86:*18*
90:*10*  114:*20*
117:*23*
**testify**  8:*17*
**testifying**  112:*18*
**TESTIMONY**  3:*4*
11:*1*  21:*17*  27:6,
*9*  28:9, *19*  36:*13*
52:*13*  66:6, 8
67:21  70:*17*
95:*21*  123:*12*
130:6, *11*
**tests**  31:*16*
**text**  8:*14*  47:2*1*
48:7
**Thank**  8:5  46:*1*
48:*13*  76:2  80:6,
*7*  128:*14, 19*
**Thanks**  8:6  84:22
90:*1*
**thereof**  130:*16*

**thing**  25:*5, 12*
64:4  66:21  69:4
74:*10, 16*  87:9
88:2*1*  98:7  122:2
**things**  22:*16*  23:*1,
20*  24:*12*  27:2
30:*16*  31:5  37:*20*
40:*19*  42:*10, 20,
20*  43:22  45:*11*
50:*4*  51:2*1*  53:24
54:24  75:2, *18*
86:*13*  87:*11, 14*
103:*3*  128:*10*
**think**  9:*14*  19:*12*
25:*16, 23*  28:9, *14,
14*  33:*14, 14*
34:*11*  35:*12, 14,
18*  36:9, *10, 24*
37:2, *4, 4, 20*  38:2,
*13*  39:25  40:*3*
43:2*4*  45:*3, 9, 16,
17*  54:*18, 23, 23,
25*  55:*3, 7, 7, 7, 11,
12*  56:*15*  57:*5, 11,
11*  60:*13*  61:*1, 1,
3, 11, 11*  62:*5, 5, 5,
8*  63:*17*  64:*3, 8,
10, 11*  65:*12*
66:*19*  67:*4, 17*
68:*6, 12, 24*  69:*1,
5*  70:*18*  74:*10, 15,
16, 18, 21*  78:*11*
79:*8*  81:5  84:*12*
91:*10*  96:*19*  97:*1,
1*  114:*7, 21*
120:*10*  122:6, *24*
123:*5*  125:*4, 16*
126:*1*  128:2
**thinking**  29:*17*
107:*25*  113:*4*
**thinks**  39:6, 8
61:*10*
**THIRD**  1:*13*
29:*17*  90:8
**thirdhand**  60:24

**THIRD-PARTY**
1:*17*  2:*12*  5:22
103:*19*  104:*11*
**Thomas**  1:*23, 23*
2:*7, 20, 20*  5:8, 8,
12, 12, 19*
**thought**  34:2*4*
38:*12, 20*  47:*17*
97:*10*
**three**  24:*12*
125:*17*  126:*13, 18,
19*  127:*11, 21*
**throwing**  35:*16*
**throws**  35:7
**thunder**  121:*1*
**ties**  112:5, 7
**time**  5:9  18:*19,
22*  22:*13*  38:*3*
42:*11, 15*  46:2
47:*3*  48:*15*  50:20
55:*14*  56:5  58:*12*
62:6  65:*18*  70:*18*
72:*3, 6*  73:*14, 24*
76:20  77:22  84:*4,
23*  85:*3*  86:*17*
87:6, *12*  92:*1*
102:*11*  113:*20*
116:2*1, 21*  126:*19*
128:*20*
**times**  6:9  7:*14, 20*
27:*8*
**tired**  38:*20*
**TISCHER**  1:*3, 5*
5:5  16:*14*  17:8,
20*  19:*2, 5*  20:*3, 7*
21:*19*  27:*10*
32:*18*  34:20
36:*14*  38:5, *10, 14,
25*  41:*11, 23, 25*
43:*4*  44:8, *9, 17,
18*  52:9, *20*  53:*11*
55:*15*  58:*14*
59:*14, 24*  60:9, *12,
17*  61:*10, 14, 16,
19*  62:*17, 18, 20,*

*24*  63:*1, 2, 9, 23*
65:23  67:7, *14*
68:9, *17*  69:*13, 14,
18*  82:*1, 6, 11, 19*
83:2  89:7  92:6
103:25  104:25
105:*4*  106:*15, 24*
113:*19*  114:*15*
121:2
**Tischer's**  19:*18*
38:19  55:2*1*
58:*17*  81:*15*
85:*11*  102:*12*
105:2*3*  112:*10*
**tissue**  82:2*4*
**title**  76:*4, 6*
**titled**  86:6
**today**  7:2  8:23
9:2  16:*19*  18:*13*
80:22  86:*17*  89:6
101:*11*  106:*14*
112:*18*  119:7
121:*4, 8*
**Today's**  5:8
**toilet**  59:2*1*  65:23
66:*14*
**told**  21:2*1*  38:*10*
61:9  87:25  89:*4*
**top**  85:2*4*  91:*3*
**topic**  7:*13*  19:*16,
25*  73:*15, 17, 21*
**topics**  8:*15, 18*
19:*15*
**to-wit:**  5:2  47:2
85:2
**town**  38:7
**tracking**  53:2*3*
95:*13*
**train**  34:5, *5*
40:*14*  44:8  56:25
57:*13*  60:*5, 6*
78:*3, 6*  107:*11*
110:8  116:*16, 16*
118:*3*  120:*11, 22*

**trained** 33:7
**trainer** 78:3
**trainers** 78:7
 118:4
**Training** 4:5, 5
 8:25 9:22 10:8,
 20 12:3 14:5
 33:11 50:15, 17,
 20 51:6, 10, 11
 52:1, 5, 5, 9 64:14
 73:18, 24 74:1, 9,
 18, 19, 21, 25 75:5,
 11 76:5, 9, 15, 18,
 19 77:3, 8, 12, 23,
 25 78:1, 11, 15
 79:15, 21 80:18,
 20 95:22 96:1, 3,
 7 98:23 99:6, 13,
 19, 22 100:2, 5, 7,
 20 101:4, 8, 10, 14,
 17, 18, 19, 23, 24,
 25 102:4, 6
 116:20, 24 117:2,
 3, 6, 8, 12, 18, 25
 118:3 119:10, 17,
 22, 22, 24 120:7,
 12, 15, 18 121:7,
 22 122:4, 13
 123:8, 24
**trains** 110:7
**transcript** 128:23
**Transcription**
 130:9, 11
**transport** 60:4
 96:12 107:13
**TRANSPORTATI
 ON** 1:16 5:23
 29:25 51:22
 108:22, 24 115:23,
 25
**transported** 59:25
**traumatic** 75:13
**traveling** 56:24
**treating** 90:20
 91:1 126:2

**treatment** 30:4
 49:19 89:17 91:4
 96:18, 23 97:3, 6,
 19 107:5
**treatments** 13:18
**tries** 69:14
**trigger** 28:20
**triggering** 32:21
 37:9
**trip** 38:17, 18
 66:18
**trouble** 60:12, 19
 65:25
**true** 122:10
 130:10
**try** 6:22 7:11
**trying** 28:12
 29:11 77:10 92:9,
 14 108:13, 15, 16
 112:4, 7
**turn** 101:21
 123:7, 21
**Twelve** 2:3
**twenty-nine** 130:10
**twice** 93:3, 20
**Twin** 81:23, 25
 90:6
**two** 8:15 25:21
 35:15 36:5, 6
 37:20 40:19 41:6
 81:7 90:11 94:14
 106:5 128:2
**type** 14:4 52:18
 88:24 110:5
 117:8 119:20
 126:6
**types** 77:8 96:15,
 16 97:10 126:24
**typewriting** 130:8
**typical** 118:12
**typically** 31:15

**< U >**
**uh-huh** 6:17

 35:20
**ultimately** 118:16
**unable** 41:23
 42:5 43:11 69:16,
 19, 19, 20
**unclear** 26:24
**unconscious** 28:7
 37:7, 17 128:8
**underlying** 30:8
 47:24 107:25
**understand** 6:18
 7:3 9:9 10:25
 15:5 22:1 24:20
 25:4 26:4, 18
 32:16 33:15
 50:12, 22 51:3, 4
 54:10 64:2 92:15
 95:21 100:19
 107:24 112:5, 7
**understanding**
 24:6 51:14, 25
 52:7, 13 54:14, 19,
 20 65:18 70:17
 74:7 76:11 78:2,
 12 79:8, 22 81:24
 82:2 86:12 89:14,
 17 106:10 112:6
 116:13 117:24
 118:4 122:2
 126:15
**understood** 7:7
 53:14
**undoing** 60:13
**unexplained** 23:18
 26:19 27:23 28:2,
 15 48:17 49:1
**UNION** 1:8, 11
 2:8 4:4 5:5, 20
 7:18 8:24 14:10,
 11, 14, 17 15:12,
 17 21:7 41:4
 47:22, 24 48:3
 71:17 72:5 74:1
 80:19, 21 81:21
 83:24 94:5 104:4

 111:6 113:15
 116:12, 14, 19
 117:17 118:15
 119:5, 8, 18, 23
 120:11, 14, 21
 123:12, 17
**unit** 81:23, 25
 90:6
**UNITED** 1:1
**University** 11:24
 12:13, 17
**unknown** 26:24
**unresponsive** 28:7,
 13 29:6, 10 32:19
 33:22 36:16
 39:19
**unresponsiveness**
 35:25
**unusual** 39:9
**UP001048** 90:9
 125:23 127:11
**UP001454** 49:16
**UP001465** 50:21
**UP139** 95:11
**UP1392** 124:1
**UP1393** 95:12
**UP1487** 100:22
**UP's** 19:17 73:17,
 19, 23 76:9 78:1
 102:6
**urgent** 96:24
**use** 55:13 58:3
 62:8 66:24 75:9
 78:14 86:4
 126:17, 25 130:8
**usual** 22:5 39:8
**usually** 25:7 65:3

**< V >**
**van** 60:4, 4 70:6
 115:8
**vans** 107:13
 116:6, 7
**variety** 14:23
 96:22

various  25:*10*
42:*9*  65:*22*  77:*8*
80:*11*  103:*3*
vehicle  59:*14, 24*
60:*10, 11*  68:*10,*
*15, 18*  69:*9, 11, 15,*
*21*  110:*6*  114:*16*
vehicles  102:*19*
vendor  76:*16*
78:*5, 18*  79:*4*
116:*14*  118:*2*
vendors  78:*14*
118:*8, 13*
versus  5:*5*  124:*12*
Video  1:*24*  2:*20*
VIDEOGRAPHER
2:*19*  5:*3*  18:*19*
46:*2*  47:*3*  84:*23*
85:*3*  128:*20*
videotape  5:*11*
VIDEOTAPED
1:*6, 19*  5:*3*
view  53:*7*  61:*23*
86:*19*
viewed  67:*10*
viral  69:*5*
vision  24:*1, 1*
volume  28:*12*
voluntary  74:*2, 11*
76:*18*  77:*12*
79:*16*  101:*10, 25*
123:*25*
vomited  87:*8*
vomiting  35:*21*
36:*10*  68:*19, 20*
88:*23*  124:*8, 17,*
*21, 23*
vomits  68:*17*
VS  1:*7, 15*

< W >
Wacker  2:*8, 13*
wake  37:*2*
walk  12:*6*
walked  86:*16*

walking  65:*25*
70:*5*
want  8:*13*  9:*4, 21*
15:*4*  16:*8*  25:*18,*
*20, 21*  26:*3, 18*
27:*24*  31:*4*  34:*4,*
*10, 12, 13*  35:*5*
53:*3*  55:*22*  59:*12*
63:*1, 2, 24*  71:*10,*
*10, 11*  73:*14, 16*
76:*15*  78:*13*
79:*24, 25*  80:*12*
83:*15*  85:*14*  86:*5*
90:*7*  94:*24*  95:*2*
101:*21*  103:*22*
107:*24*  122:*17*
123:*7, 9*
wanted  52:*10, 21*
wanting  34:*22*
54:*5*
wants  55:*19, 20*
58:*14, 19*  61:*13*
77:*2*
Washington  11:*9,*
*14, 15*  12:*18, 23*
way  8:*20*  19:*13*
28:*5*  33:*22*  34:*15,*
*17*  39:*2*  41:*19*
64:*2*  68:*15*  87:*22*
100:*9*  112:*17*
114:*18*  119:*8, 14*
130:*13*
ways  25:*10*  79:*19*
99:*23*
Wayzata  2:*4*
weakness  65:*2*
66:*4*  87:*11*  88:*15*
127:*15, 18*
website  33:*10*
48:*3*  49:*11*  50:*4*
52:*14, 16, 25*  53:*2*
week  98:*13*
Well  7:*19*  8:*11*
9:*11*  10:*4*  11:*9*
13:*7*  14:*2*  15:*11,*

20  16:*9*  20:*16*
23:*12*  25:*1, 20, 25*
26:*6*  28:*5, 9*  29:*7*
31:*9*  32:*23*  34:*1*
35:*18*  36:*21*
38:*12, 21*  39:*16*
40:*1, 4, 16*  41:*15*
42:*4, 15*  43:*17*
44:*25*  48:*21*  50:*2*
52:*16*  53:*12, 24*
54:*15*  56:*3*  60:*5,*
*23*  62:*4*  63:*17*
64:*2, 5, 7, 8, 19*
66:*12*  67:*24*
68:*24*  70:*2, 20*
71:*4, 18*  72:*3, 21*
74:*7*  75:*2*  78:*19,*
*25*  83:*4, 11*  84:*4*
86:*22, 25*  87:*21*
92:*7, 12, 18*  96:*15,*
*25*  97:*12*  98:*9, 23*
99:*10, 21*  101:*6,*
*12*  103:*6*  104:*5, 9,*
*14*  105:*14, 18*
112:*6, 9, 14*
114:*12*  116:*13*
117:*7, 19*  118:*21*
119:*4*  121:*3*
122:*22*  127:*14*
128:*2*
went  12:*17*  52:*9*
83:*13*  90:*10, 12*
we're  18:*20, 23*
26:*10*  30:*7*  34:*6*
35:*14*  44:*12, 13,*
*14*  46:*3*  47:*4*
54:*19*  55:*14*
59:*13*  65:*20, 20,*
*21*  66:*22*  84:*12,*
*24*  85:*4*  119:*12*
128:*19, 22*
WESTERN  1:*1*
we've  19:*2*  24:*18*
33:*19*  39:*3*  48:*15*
73:*14*  75:*3*  80:*20,*

22  93:*1*  101:*10*
103:*12*
whatsoever  121:*2*
WHEREOF
130:*17*
wife  27:*13*  28:*6*
34:*21*  35:*4*  37:*15*
41:*11*
wife's  29:*11*
WISCONSIN  1:*1*
73:*20*
within  1:*21*  15:*9,*
*14, 16*  27:*11*  35:*5*
78:*7*  84:*14*  92:*15*
126:*12, 18, 19*
130:*5*
without  31:*2*
34:*18*  124:*21*
WITNESS  5:*16*
8:*7, 17*  20:*16*
35:*14*  36:*21*
39:*16*  42:*4*  43:*18*
45:*23*  46:*1*  58:*6*
60:*23*  62:*4*  63:*17*
66:*12*  67:*24*
68:*24*  71:*4*  82:*8*
84:*19, 22*  86:*22,*
*25*  87:*21*  88:*7*
93:*14*  94:*3*
102:*15*  105:*12*
106:*19*  107:*8*
108:*8*  109:*23*
111:*1*  114:*2*
115:*2*  117:*24*
118:*21*  121:*25*
125:*7*  130:*12, 17*
witnesses  79:*18*
82:*16*  102:*11*
wondering  48:*24*
112:*2, 13*
won't  61:*12*
WOOD  2:*13*
word  93:*10*
wording  26:*8*

**work**  13:9, *19*
15:*14*  19:*18*
20:*12*, *13*, *17*, *18*,
*23*  21:*1*, *13*, *20*, 22
22:2, *6*, *10*, 11, 24
23:4  24:9, *18*, *19*
25:*6*, *14*  29:2, *15*
30:6  31:2, *3*  32:8
33:*3*  34:*5*, *12*, *14*
35:*16*, *18*  36:2
38:*16*  40:22, 25
41:*3*, *14*, *17*  42:*16*
44:7, *9*, *10*, 10, *17*
50:*1*  54:20  55:*17*
56:*10*  57:*12*  63:6,
*9*  69:2  71:*11*
73:5  77:*13*, *17*
84:*10*  105:*23*
108:*3*  109:*13*, *19*
110:2, *3*, *13*, *13*, 20
112:*10*  113:*3*, 9,
*10*, *10*
**worked**  14:*14*, 20,
22  39:7
**workers**  13:*14*
15:*23*
**workforce**  15:*16*
**working**  13:*21*, 22
15:*24*  16:*1*, 4
20:7, *21*, 22  45:6
66:*1*  72:4  82:*1*
110:*3*, 6
**workplace**  13:*21*
**works**  32:*10*
118:*5*
**worse**  38:*20*  40:2
**would**  6:9  7:*14*,
*20*  12:6  16:*3*
21:6  23:2, *13*
24:*21*, 22  26:6, *6*,
*15*  27:22, 24  28:*1*,
*19*, 21, 22, 23, 25
29:*1*, *6*, *13*  32:9
33:*1*, *5*  34:2, 2, *12*,
*16*  37:*11*  39:20

43:*11*  44:*12*
47:*17*  49:*23*
51:*24*  52:*13*, *24*,
*24*  54:*25*  56:8, *11*,
*12*, *13*  57:9, *12*, *14*
61:2, 2  64:*17*
65:8, *12*  69:4
70:9, 22  74:*18*
77:4, *25*  78:6, *8*
83:*1*, 9  86:9
90:*25*  91:9  92:*18*,
*18*, *23*  94:*14*, *18*,
*19*, *20*, *21*  96:2, *3*,
*14*  99:*15*  101:9,
*13*  104:*1*  105:*1*, *5*
106:*16*, *25*  109:*11*
113:*21*  115:9, 9,
*15*  116:*25*  118:*4*,
*11*, *11*, *12*, *15*
119:2  121:*13*
122:9, *10*, *12*, *20*,
*23*  123:*1*, *1*
124:*20*  127:*20*
128:6
**wouldn't**  34:*3*
57:8  67:2, *4*
126:*25*
**would've**  101:*13*
**write**  45:*11*
**writing**  86:*4*
**written**  21:*4*
53:*20*  54:*12*
71:*15*  95:*15*
113:*20*  119:*10*, *10*
**wrong**  83:*13*
123:6
**wrote**  83:6  87:*24*

**< Y >**
**yard**  20:*8*  34:*5*
38:*4*, *18*  39:*5*
55:*16*  59:*16*, *20*,
*23*  68:*12*, *13*, *13*
73:*20*, *25*  76:*20*

77:*22*  82:*1*  83:*10*
110:*3*
**Yeah**  9:*13*  28:*14*
32:*25*  41:*21*
44:*10*  47:9  61:*8*
66:*16*  89:*15*
96:*15*  102:*15*
**year**  12:*8*, *12*, *14*
93:*3*, *21*  94:*15*
**years**  12:*16*  33:*17*
**Yep**  99:*14*
**Yes**  6:*8*, *10*, *13*, *19*
7:*1*, 9, *22*  10:9
11:4, *21*  12:5
14:*8*  16:*5*  17:*6*
19:22  20:*11*  21:*5*
22:*18*  28:*25*
29:*12*  32:*23*  35:2
37:*14*  47:*20*  49:*4*,
*8*  50:*12*, *21*, *24*
51:*5*  52:7  53:*1*
61:*8*  64:*16*  69:*25*
70:*21*  73:22  76:*1*
79:5  81:*17*, *19*
82:*3*  83:*21*  86:*1*
89:*12*  90:*23*  91:*2*,
*8*, *10*  92:*25*  93:*5*,
*5*  95:*14*  98:*21*
99:*8*  101:2  116:*2*,
*23*  117:*4*, *15*
119:*12*  121:9, *21*
123:*20*  124:7, 22
126:*4*, *10*, *24*  127:*4*