# Steven F Noran, M.D., IMO, LLC

P.O. BOX 168
5021 Vernon Ave. S.
Edina, MN 55436

November 15, 2019

Cortney LeNeave, Esq.
1000 Twelve Oaks Center Drive
Suite 101
Wayzata MN 55391

    **RE: Jacob Tischer**

Dear Mr. LeNeave:

I have performed an independent medical examination on Mr. Jacob Tischer using the large volume of records you provided which included a number of depositions that have been reviewed. I will also include a chronological narrative of Mr. Tischer's medical problems.

My CV will be included for your information and to summarize that, I am a graduate of the University of Minnesota and went on to do my medical school training at Trinity College, Dublin, Ireland, finishing there in 1970, after which I returned to Minneapolis to do an internship at Hennepin County General Hospital, finishing there in 1971. I then went on to do a neurology residency at the University of Minnesota Hospitals, finishing there in 1974. I took my neurology board examinations given by the American Board of Psychiatry and Neurology and passed both the written and oral exams at the earliest possible dates following my training and was board certified in 1976. I have remained board certified since that time. I have also been licensed as a physician in the State of Minnesota since 1973. Related to my education and connection with the University of Minnesota Medical School, I have been involved in instruction and teaching of medical students and residents throughout my 43 year career as a private general neurologist, finishing my teaching and mentoring of medical students and residents as a clinical emeritus professor. Additionally, I was chief of staff of Unity Hospital in Fridley, Minnesota for one year in 1979, which included, of course service before and after. I also have been a member of many different committees in my career, including Select Committee, Clinical Review Committee, Credentialing Committee and Pharmacy Committee. As a service to my community, I served on a community chemical advisory board. I have been a member of numerous hospitals in the metropolitan area of Minneapolis/St. Paul and I have had my last hospital affiliation with Abbott Northwestern Hospital.

I include now a list of the records I have reviewed for this independent medical exam:

1

- Numerous pertinent records and films – both pre and post stroke
- Chaz Lux Statement dated 9/6/17
- Timeline of events prepared by Paul Banker
- Chaz Lux Deposition and Exhibits
- Summary of Chaz Lux Deposition
- Neil Franchuk Deposition and Exhibits
- Summary of Neil Franchuk Deposition
- Mark Marvin Deposition and Exhibits
- Summary of Mark Marvin Deposition
- Jessica Carson Deposition and Exhibits
- Summary of Jessica Carson Deposition
- Todd Nutter Deposition
- Summary of Todd Nutter Deposition
- Jessica Tischer Deposition
- Summary of Jessica Tischer Deposition
- Michael Linstedt Deposition and Exhibits
- Summary of Michael Linstedt Deposition
- CD of Essentia films and reports
- John Thomas Deposition and Exhibits
- John Holland Deposition and Exhibits

I also am including a chronological narrative of Mr. Tischer's history from 8/11/2017 through his evolution of illness to being transported by emergency services to the Eau Claire Mayo Clinic Hospital facility.

**CHRONOLOGICAL NARRATIVE**

**1.    8/11/17**

Tischer worked on August 11, 2017.  He returned home from work and was tired.  He complained to Jessica Tischer that he'd had a leg cramp.

**2.    8/12/17 – morning**

Tischer got up the next morning, August 12, 2017, not expecting to have to work.  He received a call from UP's Crew Management Service ("CMS") at approximately 8:00 a.m. which informed him that he had to work.  Tischer's wife, Jessica, was awake by that point. Tischer told her that he wasn't feeling well but that because he took the CMS call, he had to go to work.

Within 30 minutes of the CMS call, Tischer collapsed to the floor of his kitchen while he was making a smoothie. Jessica was standing next to him when this happened. Tischer was unresponsive to her for 10-15 seconds.  Just as she was about to call 911, he started talking to her.  He told her that he didn't know what had happened.  When Tischer got up, he told Jessica that he felt nauseous.  Shortly thereafter, he went into the bathroom to vomit.  The vomit was red, but Tischer and Jessica were both convinced that was because he had just eaten watermelon.

Jessica wanted Tischer to go to the doctor before he went to work. But Tischer didn't think he had time; he just wanted to take a nap with the time he had. He left for work about 45 minutes after he collapsed in the kitchen. Jessica called Tischer mid-morning to check on him. He told her that his call was busted and that he was napping at the Kwik Trip until he had to work.

### 3.    8/12/17 – afternoon and evening

Tischer started work in Altoona at 2:02 p.m. Tischer told his engineer, Neil Franchuk, that he wasn't feeling well and that he thought he might have the flu. Franchuk believes that Tischer was essentially normal on their outbound trip to Norma, doing work in Norma, and on the way back to Altoona.

### 4.    8/12/17 – Altoona

Tischer's train arrived back in Altoona at approximately 7:40 p.m. As the train is pulling into Altoona, Franchuk notices that Tischer is unable to change the channel on his radio. This strikes Franchuk as unusual. Franchuk asked Tischer whether he can finish their work; Tischer said that he could. Franchuk, though, knew that their supervisor, Mark Marvin, intended to send Franchuk and Tischer back to Norma for another run that night. But Franchuk thought Tischer was too sick to go at that point.

By approximately 8:00 p.m., Franchuk waved Marvin down on track 5 on the east end of the Altoona yard. Franchuk told Marvin that Tischer was sick and asked Marvin to talk to Tischer. Marvin told Franchuk that he was under a lot of pressure from his boss to get another trip up to Norma that night.

While Franchuk and Marvin were talking, the PTI cab driver, Chaz Lux, had driven Tischer to the shanty in the east end of the Altoona yard. Lux saw Tischer having some trouble unbuckling his seatbelt but didn't think anything of it.

Marvin then went to the shanty to talk to Tischer at approximately 8:15 p.m. He asked Tischer if Tischer was ok. Tischer said he was. Marvin asked Tischer if he needed medical attention. Tischer said he didn't. Marvin, though, doesn't think that Tischer is ok.

Thomas heard over the radio that Franchuk and Tischer were returning to Altoona. Thomas was at the shanty. Franchuk approached him at the shanty sometime after 8:00 p.m. and told him Tischer wasn't acting like his normal self and wanted Thomas to talk to him. When Tischer arrived at the shanty in the PTI vehicle shortly thereafter, Thomas talked to him and agreed that Tischer was acting off. Marvin then arrived at the shanty and went inside to print off paperwork to send Tischer and Franchuk back to Norma. When Marvin came out of the shanty, Thomas, Franchuk, and Marvin all talked to Tischer about whether he was too sick to work. Marvin said he was under a lot of pressure to send them back to Norma. Thomas offered to go in Tischer's place, but Marvin refused.

Tischer went into the portable toilet near the shanty. When he came out of the toilet, he stumbled and dropped his brake stick. Marvin, Lux, and others saw this. A co-worker, John Thomas, took Tischer into the shanty. Lux heard that Marvin was considering sending Tischer back to Norma; Lux shouted at Marvin, "He's not well, he's stumbling around, do not send him!"

3

When Thomas saw Tischer stumble when he came out of the portable toilet, he also observed that Tischer's face was drooping and that he was slurring his words. He also watched Tischer struggle to open a bottle of water with his left hand. Thomas thought Tischer might be having a stroke. He expressed this to Marvin, and also told Marvin that they needed to get Tischer to a hospital. Marvin's response was to tell Thomas and the others to get Tischer back into the PTI vehicle and take him to the depot.

Marvin called his boss, Mike Swentik, to tell him that Tischer is sick and that he's going to send him home. When Marvin got off the phone with Swentik, he told Tischer that he was sending Tischer home. Moreover, Marvin told Tischer that Tischer needed to call for a ride because Marvin didn't think Tischer was ok to drive himself. Tischer got into the PTI cab with Lux to travel to the depot office.

At approximately 8:35 p.m., Lux started to drive Tischer to the depot office. During that trip, Lux had to stop the car because Tischer was throwing up. Meanwhile, Marvin drove to a convenience store to get Gatorade and a candy bar for Tischer because he thought he might have low blood sugar. Tischer called his wife for a ride home at approximately 8:40 p.m.

At approximately 8:53 p.m., Lux arrived at the depot office and went inside to get help for Tischer. Marvin arrived sometime thereafter and found Tischer laying on the ground outside the PTI vehicle. Marvin tried to get Tischer back in the PTI vehicle, but he couldn't – even with Lux's help. Marvin at that point noticed that the left side of Tischer's face was drooping and that Tischer was unable to move his left arm or leg.

At approximately 8:56 p.m., Marvin called 911. The 911 operator dispatched an ambulance.

By approximately 9:07 p.m., the EMTs reached Tischer at the depot office. Tischer told them that about an hour before the 911 call he had been having really bad left leg and arm weakness. One of Tischer's friends told the EMTs that he'd been concerned that Tischer was having a stroke. Another friend told the EMTs that Tischer had last been seen normal at 7:00 p.m. The ambulance arrived at the hospital with Tischer at approximately 9:24 p.m.

The significance of time, diagnosis and treatment is of paramount importance to the questions you have addressed. As a neurologist and with my background and training in the field of neurology, stroke problems are a major issue and, fortunately, over the last 10 years or more, we have made significant strides in being able to treat people with stroke. Stroke is generally a condition where blood supply is lost to some part of the nervous system; the nervous system generally consisting of the brain and spinal cord and the structures that branch off of this. The stroke that Mr. Tischer suffered and that we deal with predominantly would be loss of blood supply to the brain. There are many causes for strokes including high blood pressure, blood clots breaking off from distant areas and being carried by blood supply to the brain where smaller vessels are clogged by these emboli, as we refer to them. Stroke can occur because of other issues, as it turns out in this case, including blood clots in legs coming to the heart and lungs or from holes in the heart where blood and clots can pass from one side of the heart to the other in an abnormal, or what we call paradoxical or unexpected route.

Stroke or appearance of stroke also occurs with leaking blood vessels or ruptured blood vessels, change in caliber or size of arteries. Tumors and other structures that can cause pressure on blood

4

vessels can give the appearance of a stroke occurring. Systemic causes additionally occur with inflammatory processes including infection or autoimmune diseases. We can see stroke occur where the body's immune system may attack blood vessels or the brain itself and appear to be stroke-like. Important in the evaluation of stroke and the knowledge of stroke is the realization that once a condition such as loss of neurologic function with facial drooping, arm weakness, numbness or tingling, time becomes of the essence and that has been an issue involving this particular case. The sooner a person having a stroke is evaluated and found to have clotting of blood causing the stroke, the better the potential outcome is. Patients initially are generally considered to be treatable with special medication that breaks up clots if diagnosed before 4-1/2 hours. The importance of time for early diagnosis and treatment is a major factor. In a person of Mr. Tischer's age, 4-1/2 hours is considered a maximum amount of time before these special "clot busters" can be given. After that, a blood clot can be removed up to 24 hours. This treatment was eventually performed in Mr. Tischer's case to re-establish blood flow.

Mr. Tischer's records from the emergency medical technicians that attended him at work and transported him to Eau Claire, Wisconsin Mayo Clinic Hospital, were available and reviewed. In addition, records from that hospital and from the Mayo Clinic Rochester were reviewed. He was transferred by helicopter to Rochester where he was hospitalized until his demise. At Rochester, in attempts to correct his problem, the clot was removed from the artery supplying the right side of his brain. Upon removal of the clot allowing blood flow, he developed swelling of his brain, which is a known complication of this procedure. He did not have bleeding *per se* but because of the swelling of the brain and the inability to stop the swelling with medication, he underwent a craniectomy, which is removing the skull on the right side of his head to give space for the brain to swell.

Also during his hospitalization, it was discovered that he had clots in his legs and he had a special device inserted in the main blood channel that returns blood from the lower body and legs to the heart. An umbrella or a filter was inserted to try and prevent clots from being able to access the lungs and heart. Eventually he survived long enough and became well enough to be transferred from the acute medical facility to a rehab part of the Mayo Clinic where eventually he passed away due to a pulmonary embolus. Following that, eventually an autopsy was performed. There was question as to possible familial coagulopathy or abnormal blood clotting that was never established in his case. Additionally, there was consideration of an abnormal carotid artery or main channel blood supply to the right side of the brain that was never established and the autopsy report notes that the right carotid artery was not available for examination at autopsy.

There are many other neurologic conditions that can appear to be stroke-like in nature. The study of neurology basically is the study of the nerve system in health and in disease. That includes, of course, once again the brain, spinal cord and the branches of those structures, being the cranial nerves and peripheral nerves. Therefore, with that knowledge and history of a problem, as neurologists we are equipped to make diagnoses or come up with lists of diagnoses and the probabilities of what these are. Mr. Tischer, once arriving at Eau Claire, underwent a standard neurologic exam including looking at his brain with CT scans and at the arteries supplying his brain to help determine whether or not to give him clot busters. It was decided on conference with the Mayo Clinic Neurology Stroke Team not to give him the clot busters because of a history as noted above of trauma or injury.

You have given me numerous medical records that I have listed above. It is my opinion that the delay in getting Mr. Tischer treatment earlier and his transportation to the hospital earlier played a significant role in the eventual evolution of his stroke. This in my opinion eventually contributed to his demise. Attempts at resuscitation on August 26, 2017 were unsuccessful. His paralysis would have been a contributing factor to the development of clots in his legs. This in my opinion led to the pulmonary embolism and pulmonary cardiac arrest.

You have also asked whether or not Mr. Tischer suffered as a result of his illness. My opinion is that he very definitely did suffer. He suffered pain and discomfort from his stroke and from surgery. He also suffered emotionally, being unable to communicate and I believe on review of records that he was aware of his surroundings and what was going on.

Sincerely,

Steven F. Noran, M.D.

sfn/maj
Enclosure