```
                    IN THE UNITED DISTRICT COURT
                FOR THE WESTERN DISTRICT OF WISCONSIN

    - - - - - - - - - - - - - - - X
    JESSICA TISCHER,              :
    individually and as           :
    Personal Representative       :
    For the Spouse and            :
    Children of JACOB TISCHER,    :
    Decedent,                     :   Case No.
                                  :   3:19-cv-00166-jdp
              Plaintiff,          :
                                  :   Magistrate Judge
    vs.                           :   Stephen L. Crocker
                                  :
    UNION PACIFIC RAILROAD        :
    COMPANY, a Delaware           :
    corporation,                  :
                                  :
              Defendant.          :
    - - - - - - - - - - - - - - - X
    UNION PACIFIC RAILROAD        :
    COMPANY,                      :
                                  :
              Third-Party         :
              Plaintiff,          :
                                  :
    v.                            :
                                  :
    PROFESSIONAL                  :
    TRANSPORTATION, INC.,         :
                                  :
              Third-Party         :
              Defendant.          :
    - - - - - - - - - - - - - - - X

           VIDEO DEPOSITION OF JESSICA CARSON,

    taken by the Plaintiff before Melissa A. Burns,

    Certified Shorthand Reporter of the State of Iowa, at

    300 Walnut Street, Des Moines, Iowa, commencing at

    10:09 a.m., Tuesday, September 24, 2019.


       MELISSA A. BURNS - CERTIFIED SHORTHAND REPORTER
```

[COPY]

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3        PAUL A. BANKER, ESQ.
          (Appearing via RingCentral Videoconference)
 4        Hunegs, LeNeave & Kvas, PA
          1000 Twelve Oaks Center Drive
 5        Suite 101
          Wayzata, MN 55391
 6
     For Defendant Union Pacific Railroad Company:
 7
          THOMAS A.P. HAYDEN, ESQ.
 8        Union Pacific Railroad Corporation
          101 North Wacker Drive
 9        Room 1920
          Chicago, IL 60606
10
     For Third-Party Defendant Professional Transportation
11   Corporation:
12        MICHAEL B. COHEN, ESQ.
          (Appearing via RingCentral videoconference)
13        Quintairos, Prieto, Wood & Boyer, PA
          233 South Wacker Drive
14        70th Floor
          Chicago, IL 60606
15
     Also Present:
16
          JESSICA TISCHER
17        (Present via RingCentral videoconference)
18   Videographer:
19        AMY COOPER, CLVS
20
21
22
23
24
25
```

Page 3

```
 1                     I N D E X
 2   WITNESS:  JESSICA CARSON                     PAGE
 3   By Mr. Banker...................................   5
 4   By Mr. Cohen....................................  57
 5   By Mr. Hayden...................................  62
 6
 7   EXHIBITS:                    MARKED/FIRST REFERENCED
 8   16 - Various emails sent on 8-14-17 (UP001046
             through UP001053)..........................4,35
 9
     17 - Email chain beginning with Carson to
10        TCSU Manager Contacts, 8-14-17 (UP001089
             through UP001090)..........................4,46
11
     18 - Communication sent through MyUP from
12        Carson, 8-14 (UP001022 through UP001023)....4,46
13   19 - List of UP stroke events
             (UP001306/UP001469).........................4,49
14
     20 - Union Pacific Railroad Company's
15        Supplemental Rule 26(a)(1) Disclosure.......4,50
16   21 - Selected screen shots from BasicPlus DVD....4,52
17
18   REPORTER'S NOTE:  ALL ORIGINAL EXHIBITS WERE RETURNED
     TO PAUL A. BANKER, ESQ.
19
20
21
22
23
24
25
```

Page 4

```
 1                   P R O C E E D I N G S
 2            (Deposition Exhibits 16 through 21 were
 3   marked for identification.)
 4            THE VIDEOGRAPHER:  On the record beginning
 5   the video deposition of Jessica Carson requested by
 6   the plaintiff in the matter of Jessica Tischer,
 7   et al., Plaintiffs versus Union Pacific Railroad
 8   Company, Defendant, in the United States District
 9   Court for the Western District of Wisconsin, Case
10   No. 3:19-cv-00166.
11            Today's date is September 24, 2019, and the
12   approximate time is 10:10 a.m.
13            This deposition is being held in the
14   offices of Susan Frye Court Reporting, 300 Walnut
15   Street, Des Moines, Iowa.
16            My name is Amy Cooper, Certified Legal
17   Videographer, of Fidelity Video Services,
18   Incorporated, West Des Moines, Iowa.
19            Counsel will please identify themselves for
20   the record.
21            MR. BANKER:  Paul Banker, B-a-n-k-e-r, for
22   the plaintiff.
23            MR. HAYDEN:  Thomas Hayden, H-a-y-d-e-n,
24   for Defendant Union Pacific.
25            THE VIDEOGRAPHER:  The oath will now --
```

Page 5

```
 1            MR. COHEN:  Michael Cohen --
 2            THE VIDEOGRAPHER:  Sorry.
 3            MR. COHEN:  -- C-o-h-e-n, on behalf of
 4   Third-Party Defendant Professional Transportation,
 5   Incorporated.
 6            THE VIDEOGRAPHER:  The oath will now be
 7   administered by Melissa Burns, Certified Shorthand
 8   Reporter, of Susan Frye Court Reporting, Des Moines,
 9   Iowa.
10                    JESSICA CARSON,
11   called as a witness by the Plaintiff, being first duly
12   sworn by the Certified Shorthand Reporter, was
13   examined and testified as follows:
14                       EXAMINATION
15   BY MR. BANKER:
16       Q.   Good morning, Ms. Carson.
17       A.   Good morning.
18       Q.   Could you please state your name for the
19   record?
20       A.   Jessica Carson.
21       Q.   Ms. Carson, have you ever had your
22   deposition taken before?
23       A.   No.
24       Q.   Okay.  Let me just go over a couple of
25   ground rules for what we're going to be doing today
```

Page 6

 1  just so we are clear about the process.
 2          The court reporter -- both the videographer
 3  and the stenographer are taking down everything that
 4  gets said here.  And so as I ask questions, it's
 5  important that you answer audibly with words as
 6  opposed to nodding your head or saying uh-huh or
 7  huh-uh.  Because if you do that, we're aren't going to
 8  get a clear record.
 9          Do you understand?
10     A.   I do.
11     Q.   Okay.  Also, it's important that we don't
12  talk over one another as this deposition takes place.
13  And that's even compounded a little bit, because as we
14  talked about before the deposition began, I'm on the
15  telephone and through a video link here and there's a
16  little bit of a delay.
17          But I'll make an effort to clearly finish
18  my questions and then pause for you to give an answer,
19  and if you could do the same, that will help us to get
20  a clear record.
21          Okay?
22     A.   Okay.
23     Q.   If at some point I ask a question, feel
24  free -- and you don't understand it, feel free to ask
25  me for clarification and I'll do what I can to clarify

Page 7

 1  it.
 2          If you don't do that, I'm going to assume
 3  that you've understood the question and are able to
 4  answer.
 5          Is that a fair assumption?
 6     A.   Yes.
 7     Q.   Okay.  And if at any point today you need
 8  to take a break, let me know and we'll see what we can
 9  do to accommodate that.
10          Okay?
11     A.   Okay.
12     Q.   And I should add as a further caveat, if at
13  any point either the video or the audio kind of goes
14  haywire and you're not able to hear me or understand
15  me, let me know and we'll see what we can do to fix
16  that.
17     A.   Okay.
18     Q.   Great.
19          So what, if anything, did you do to prepare
20  for your deposition today?
21     A.   A short conversation just before we came
22  here.
23     Q.   A conversation with who?
24     A.   With Tom.
25     Q.   Okay.  Mr. Hayden?

Page 8

 1     A.   Correct.
 2     Q.   Okay.  So other than your conversation with
 3  Mr. Hayden, did you have any conversations with anyone
 4  else to prepare for this deposition?
 5     A.   No.
 6     Q.   Did you review any documents in preparation
 7  for this deposition?
 8     A.   With Tom prior, yes.
 9     Q.   What documents did you review?
10     A.   An email and a first aid book.
11     Q.   Okay.  Anything else that you reviewed?
12     A.   Not that I remember.
13     Q.   Okay.  Do you have any documents pertaining
14  to the Tischer v. UP lawsuit?
15     A.   No.
16     Q.   Let me just get a little bit -- switch
17  gears here and get a little bit of background
18  information on you.
19          Where do you currently live?
20     A.   Osage, Iowa.
21     Q.   And what is the address there?
22     A.   902 State Street.
23     Q.   And how long have you lived there?
24     A.   Roughly two years.
25     Q.   Do you have any plans to move in the next

Page 9

 1  12 months?
 2     A.   Not that I know of.
 3     Q.   Okay.  Do you live with anyone at that
 4  address?
 5     A.   Yes.
 6     Q.   Who?
 7          MR. HAYDEN:  Relevance.  I'm not sure what
 8  that -- what that makes -- how that makes a
 9  difference.  We'll accept service of any subpoena or
10  any notice for her to appear at trial.
11          MR. BANKER:  Sure.
12  BY MR. BANKER:
13     Q.   And I'm just wondering who do you live with
14  at that address?
15          MR. HAYDEN:  It doesn't matter who she
16  lives with at that address.
17          MR. BANKER:  And that's not a proper
18  objection.  So if the witness could answer my question
19  without interruption for improper relevance
20  objections, that would be great.
21          MR. HAYDEN:  It's not probative of any
22  issue in the case.
23          MR. BANKER:  You've made your objection.
24  So if the witness could answer my question, that would
25  be great.

Page 10

```
 1        MR. HAYDEN:  Go ahead.
 2     A. Two children.
 3  BY MR. BANKER:
 4     Q. And how old are they?
 5        MR. HAYDEN:  Same objection.  Move on.  I'm
 6  instructing the witness not to answer.  It's invading
 7  her privacy.  It's completely irrelevant as to what
 8  the ages of her children are in this lawsuit.
 9        Please continue.
10        MR. BANKER:  Well, I'm trying to determine
11  what ability, if any, I would have to serve a subpoena
12  in this case if I need to.
13        MR. HAYDEN:  I just said we'll accept
14  service of subpoena, send it to me.  I just said that.
15        MR. BANKER:  Right.  And that's new
16  information that I'm hearing for the first time.  So
17  I'd like to know in case you change your mind --
18        MR. HAYDEN:  You're going to -- move on.
19  She's not answering the question.  I understand now
20  why you're asking the question.  I've cured it.  So
21  let's move on.
22  BY MR. BANKER:
23     Q. The children that you live with, I take it,
24  are under the age of 18?
25     A. Yes.
```

Page 11

```
 1     Q. Okay.  Are you a high school graduate?
 2     A. Yes.
 3     Q. When did you graduate?
 4     A. 2000.
 5     Q. And do you have any education post high
 6  school?
 7     A. I do.
 8     Q. Where -- what, if any, post high school
 9  education do you have?
10     A. An associate's degree.
11     Q. From where?
12     A. NIACC.  North Iowa Area Community College.
13     Q. And what is your degree?
14     A. Nursing.
15     Q. Was that a two-year degree?
16     A. Yes.
17     Q. And do you have any further formal
18  education since then?
19     A. Yes.
20     Q. What?
21     A. Several classes towards my BSN.
22     Q. Towards your what?
23     A. Bachelor of nursing sciences.
24     Q. Bachelor of nursing sciences?  Okay.  And
25  where are you taking those classes?
```

Page 12

```
 1     A. Jacksonville University.
 2     Q. And have you -- I take it you have not yet
 3  graduated from Jacksonville University?
 4     A. Correct.
 5     Q. Is it -- so it's a BS, bachelor of science,
 6  nursing?
 7     A. I believe so.
 8     Q. Okay.  Do you have any professional -- do
 9  you have any other post high school formal education
10  other than what you've already described?
11     A. No.
12     Q. Do you hold any formal professional
13  certifications?
14     A. Yes.
15     Q. What certifications do you hold?
16     A. Registered nurse.
17     Q. And is that in the State of Iowa?
18     A. Yes.
19     Q. How long have you been a registered nurse
20  in the State of Iowa?
21     A. Since 2009.
22     Q. And is that a -- tell me what is the --
23  just generally the process for becoming a registered
24  nurse.  I take it you have to complete an associate
25  degree and then is there some process you go through
```

Page 13

```
 1  with the State?
 2     A. An exam through the State.
 3     Q. Okay.  And then is there continuing
 4  education that you have to do periodically for that?
 5     A. Yes.
 6     Q. And you're current with that?
 7     A. Yes.
 8     Q. How often do you have to renew your license
 9  or recertify with the State?
10     A. It depends on what you purchased.
11     Q. Okay.  Have you maintained your RN
12  certification in the State of Iowa continuously since
13  2009?
14     A. Yes.
15     Q. Are you currently employed?
16     A. Yes.
17     Q. Who are you employed by?
18     A. Union Pacific.
19     Q. And what do you do for Union Pacific?
20     A. I am an occupational health nurse.
21     Q. And where or what physical location for UP
22  do you work at?
23     A. I have an office in Mason City.
24     Q. How long have you been an occupational
25  health nurse for UP?
```

Page 14

1   A.   Roughly two and a half years.
2   Q.   What does an occupational health nurse do
3   for UP?
4   A.   Wellness education, health promotion,
5   injury response.
6   Q.   Who is your supervisor at UP?
7   A.   Marcy Zauha.
8   Q.   How do you spell her last name?
9   A.   Z-a-u-h-a.
10  Q.   What did you -- I guess I asked how long
11  you had been an occupational health nurse, 2.5 years.
12  What did you do before that?
13  A.   Occupational nursing.
14  Q.   For UP?
15  A.   For a different company.
16  Q.   Okay.  What was the company you worked at
17  before you worked for UP?
18  A.   A10 Clinical Services.
19  Q.   So do you recall when it was that you
20  first -- the dates that you first began working for
21  UP?
22  A.   Not exactly.
23  Q.   Would it have been in 2017?
24  A.   Yes.
25  Q.   Okay.  What sorts of things did you do for

Page 15

1   A10 Clinical Services as an occupational nurse?
2   A.   The same things I listed previously.
3   Q.   How long did you do that job?
4   A.   Roughly three years.
5   Q.   And where did you work before that?
6   A.   Mitchell County Regional Health Center.
7   Q.   And what did you do there?
8   A.   ER charge nurse and med/surg charge nurse.
9   Q.   So you were working as an RN for them.
10  A.   Yes.
11  Q.   Other than the time you've worked as an
12  occupational health nurse for UP and as an
13  occupational nurse for A10 Clinical Services, do you
14  have any other experience as an occupational health
15  nurse?
16  A.   No.
17  Q.   How long did you work as an ER charge nurse
18  for the County?
19  A.   Four years.  Roughly.
20  Q.   And does that take us back to when you got
21  your registered nurse certification in 2009?
22  A.   No.
23  Q.   So where did you work before you worked at
24  the County?
25  A.   Osage Rehab.

Page 16

1   Q.   And what were you doing for them?
2   A.   Director of nursing, director of nursing
3   therapies, and floor RN.
4   Q.   And how long did you do that job?
5   A.   One year.
6   Q.   And does that take us back to when you got
7   your RN certification?
8   A.   Yes.
9   Q.   Okay.  So I represent Jessica Tischer in a
10  lawsuit brought as the representative of the Estate of
11  Jacob Tischer who was a UP employee who had a stroke
12  on August 12, 2017.
13       Prior to August 12, 2017, did you know
14  Jacob Tischer at all?
15  A.   No.
16  Q.   So how did you first learn that there had
17  been an incident involving Jacob Tischer on August 12,
18  2017?
19  A.   Management reached out to me.
20  Q.   Who in management reached out to you?
21  A.   Erik Erickson.
22  Q.   And who is Erik Erickson?
23  A.   He was the superintendent.
24  Q.   Did you know Erik Erickson before he
25  reached out to you?

Page 17

1   A.   Yes.
2   Q.   How did you know Erik Erickson?
3   A.   We worked on the same service unit.
4   Q.   Okay.  What service unit were you working
5   on at the time?
6   A.   The Twin Cities Service Unit.
7   Q.   And is that abbreviated TCSU?
8   A.   Yes.
9   Q.   Okay.  So when Mr. Erickson reached out to
10  you, how did he reach out to you?
11  A.   By phone.
12  Q.   And what did he tell you?
13  A.   That there was a medical event in Altoona
14  and that a young employee had symptoms of a stroke and
15  that the manager had recognized those symptoms and
16  called 9-1-1 right away.
17  Q.   When did this phone call between you and
18  Mr. Erickson take place relative to August 12, 2017?
19  A.   I don't recall.
20  Q.   And I guess what I'm looking for is was it
21  something where you were on call that night as it was
22  happening?  Would it have been the next day or within
23  a day or two?
24  A.   Within a day or two.
25  Q.   Did you make any notes of that

Page 18

1  conversation?
2      A.  How do you mean?
3      Q.  Did you make any handwritten notes of what
4  was discussed during that conversation?
5      A.  Not that I recall.
6      Q.  Did you make any electronic notes of what
7  was said during that conversation?
8      A.  Not dictating the conversation, no.
9      Q.  How about just any of the things that were
10 discussed or takeaways from the conversation.
11     A.  Yes.
12     Q.  Where were those notes made?
13     A.  Electronically.
14     Q.  And is there a particular system that you
15 use for electronic notes?
16     A.  There are.
17     Q.  So what system were you using to make these
18 notes?
19     A.  MyUP.
20     Q.  MyUP?  Like M-y-U-P?
21     A.  Correct.
22     Q.  And what is M-y-U-P?
23     A.  A communication system.
24     Q.  Is it something that you use regularly in
25 the course of your job?

Page 19

1      A.  Yes.
2      Q.  What were you -- so were you making notes
3  under a Jacob Tischer file or how were you making
4  notes in the MyUP system?
5      A.  A broad communication.
6      Q.  A broad communication to whom?
7      A.  People on the service unit.
8      Q.  So after you talked with Mr. Erickson, you
9  went into the MyUP tool and made some further
10 communications to the Twin Cities Service Unit?
11     A.  Correct.
12     Q.  And is that -- does that take the form
13 ultimately of an email or what form does that
14 communication take?
15     A.  Essentially.
16     Q.  Okay.  Do you know why Mr. Erickson was
17 contacting you in the first place?
18     A.  To notify me that a medical event had
19 occurred.
20     Q.  Is that something that was part of your
21 portfolio of responsibilities on August 12, 2017?
22         MR. HAYDEN:  Objection.  Form and
23 foundation.  She's testified she wasn't notified on
24 the 12th.
25

Page 20

1  BY MR. BANKER:
2      Q.  Let me try again.  When you received the
3  communication from Mr. Erickson, what was your
4  understanding about why it was that he was notifying
5  you?
6          MR. HAYDEN:  If you know.
7      A.  That a traumatic event had occurred.
8  BY MR. BANKER:
9      Q.  But were you receiving those notifications
10 for any sort of traumatic event on the Twin Cities
11 Service Unit at that time?
12     A.  Can you say that again?
13     Q.  Yes.  Were you receiving notifications of
14 traumatic events on the Twin Cities Service Unit at
15 that time?
16     A.  Generally.
17     Q.  Okay.  And what then would you do with that
18 information?  Other than go to MyUP.
19     A.  It would be based on the situation.
20     Q.  Okay.  What was your usual practice?
21     A.  Again, based on the situation.
22     Q.  Okay.  So let's focus on the Jacob Tischer
23 situation.  Other than going to the MyUP portal and
24 providing some broad communication, did you do
25 anything else as a result of Mr. Erickson's call to

Page 21

1  you?
2      A.  Yes.
3      Q.  What did you do?
4      A.  I believe there was some administrative
5  function to -- that it was an event within the
6  company.
7      Q.  What administrative functions were there?
8  Could you explain that?
9      A.  Recording what status the employee should
10 be in.
11     Q.  And what do you mean by "what status the
12 employee should be in"?  What are the possible
13 statuses?
14     A.  Medical leave, light duty, reportable
15 health condition would be some examples.
16     Q.  What status did Mr. Tischer go into as a
17 result of Erik Erickson's call to you?
18     A.  Medical leave.
19     Q.  What is the administrative significance, in
20 your mind, of medical leave?  What does that mean
21 exactly?
22     A.  They are off of work due to medical
23 reasons.
24     Q.  And is that something that you changed the
25 status in the computer system?

Page 22

1  A.  I did not.
2  Q.  Would you ask someone else to?
3  A.  Yes.
4  Q.  So in the case of Mr. Tischer, who did you
5  communicate with about changing his status to medical
6  leave?
7  A.  There -- the fit-for-duty nurse.
8  Q.  Who was the fit-for-duty nurse on or about
9  August 12, 2017, for the Twin Cities Service Unit?
10 A.  I believe Lisa Tracey.
11 Q.  Okay.  Did you do anything else other than
12 what you've described as a result of your call from
13 Erik Erickson about Mr. Tischer's incident?
14 A.  Not that I recall.
15 Q.  Okay.  Did you ever receive any more
16 information about the incident other than what
17 Mr. Erickson communicated to you in that call?
18 A.  Can you clarify that?
19 Q.  Sure.  So if I'm understanding what you're
20 saying, the first you heard that there had been an
21 incident was when Mr. Erickson called you.
22     Correct?
23 A.  Yes.
24 Q.  And then did you have any more information
25 come to you about the incident other than what

Page 23

1  Mr. Erickson told you?
2  A.  Yes.
3  Q.  And where did that information come from?
4  A.  An employee.
5  Q.  Who was that employee?
6  A.  Neil.  And I don't remember his last name.
7  Q.  Neil Franchuk perhaps?
8  A.  Possibly.
9  Q.  Okay.  What information did you learn from
10 the employee Neil about Mr. Tischer's incident?
11 A.  He was -- that he had interaction with the
12 employee at the time -- or on the day that this had
13 happened.
14 Q.  Okay.  Let me just back up a step.
15     When did you have this conversation with
16 the employee Neil?
17 A.  Earlier part of summer of this year.
18 Q.  The summer of 2019.
19 A.  I believe so.
20 Q.  How was it that you were talking with the
21 employee Neil in the summer of 2019 about an incident
22 that happened in 2017?
23 A.  He brought it up.
24 Q.  Neil brought it up.
25 A.  Correct.

Page 24

1  Q.  How did you happen to be talking to Neil?
2  A.  I was at the depot.
3  Q.  So you were talking face-to-face with Neil
4  at the depot?
5  A.  Correct.
6  Q.  In Altoona.
7  A.  Correct.
8  Q.  And do you remember anything of the
9  specifics of that conversation?
10 A.  Yes.
11 Q.  What do you recall?
12 A.  He described the situation somewhat in that
13 the employee had some generic-type symptoms, and
14 mainly that the employee -- he noticed that the
15 employee was "off a little" is how he characterized
16 it.  And --
17 Q.  Okay.
18 A.  -- that he felt the manager was -- he
19 characterized that the manager was not a good manager.
20 Q.  And did he tell you who that manager was?
21 A.  Marvin.
22 Q.  Do you know a manager Marvin?
23 A.  I do.
24 Q.  Is his first name Mark?
25 A.  Yes.

Page 25

1  Q.  And -- well, let me go back.
2      Did he say any -- you were kind of going
3  through the specifics of what Mr. Franchuk said and I
4  somewhat interrupted you.
5      So did Mr. Franchuk say anything else to
6  you?
7  A.  Yes.
8  Q.  What did he say?
9  A.  That the employee didn't feel well but
10 wanted to continue working.
11 Q.  Okay.  Did Mr. Franchuk say anything else?
12 A.  Yes.
13 Q.  What else did he say?
14 A.  That he eventually had stroke-like
15 symptoms.
16 Q.  Did he say anything else?
17 A.  Yes.
18 Q.  What else did he say?
19 A.  That he had accused Marvin of not
20 responding appropriately.
21 Q.  Okay.  Did Mr. Franchuk say anything else?
22 A.  Not that I can recall.
23 Q.  Okay.  What was Mr. Franchuk's demeanor
24 during this conversation with you?
25 A.  How do you mean?

Page 26

1  Q. Oh. How do I mean? Like how was he
2  behaving. Was he calm? Was he agitated? Was he
3  happy? Was he sad?
4  A. Agitated.
5  Q. Okay. When you say "agitated," what do you
6  mean by "agitated"?
7  A. He had concern about the situation.
8  Q. What you have previously described to me as
9  the specifics of what he said?
10 A. Correct.
11 Q. Okay. So he had concerns. Was there
12 anything else that he was doing that made you believe
13 he was agitated?
14 A. Not that I can recall.
15 Q. Okay. What was his tone of voice? Was he
16 talking in a normal tone of voice? Was he yelling?
17 Was he being unusually quiet?
18 A. I would say his tone was elevated slightly
19 and aggressive.
20     THE REPORTER: I'm sorry?
21     THE WITNESS: Elevated slightly and
22 aggressive.
23 BY MR. BANKER:
24 Q. Was Mr. --
25     MR. BANKER: I'm sorry, there were two

Page 27

1  people talking there. I didn't hear that.
2      MR. HAYDEN: She was repeating her answer
3  to the court reporter.
4      MR. BANKER: Okay.
5  BY MR. BANKER:
6  Q. So let me go back to the top of that
7  conversation.
8      So you're having a conversation with
9  Mr. Franchuk at the Altoona terminal in the summer of
10 2019 and he's telling you these specific things.
11     What, if anything, did you say to him?
12 A. I asked if he had -- I asked if he
13 recognized that his friend was "off," why he didn't
14 call for help.
15 Q. Okay. Did Mr. Franchuk respond to that
16 question?
17 A. He did.
18 Q. What did he say?
19 A. He said it was the manager's job to do
20 that.
21 Q. Did you respond in any way?
22 A. How do you mean?
23 Q. Well, so you asked him a question, why
24 didn't he call for help, and he said it was the
25 manager's job to do that.

Page 28

1  Was there anything more said by you in
2  response to that?
3  A. Not in response to that, no.
4  Q. Okay. What else do you recall saying to
5  Mr. Franchuk as part of that conversation at the
6  Altoona Depot in the summer of 2019?
7  A. I don't recall.
8  Q. Okay. So he said the things -- the
9  specific things that you've described and you recall
10 asking him the question why didn't he call for help
11 and we've exhausted your recollection of that
12 conversation.
13 A. That portion, yes.
14 Q. Okay. Was there another portion of the
15 conversation that you're referring to?
16 A. Yes.
17 Q. Tell me about that.
18 A. I asked why the employee -- if he was
19 feeling "off" and feeling ill, why he had come to
20 work.
21 Q. You asked that of Mr. Franchuk?
22 A. Correct.
23 Q. And did Mr. Franchuk respond?
24 A. Yes.
25 Q. What did he say?

Page 29

1  A. The employee was a very studious worker.
2  Q. Did you make any response after
3  Mr. Franchuk said that?
4  A. No.
5  Q. Was there any more to the conversation
6  between you and Mr. Franchuk?
7  A. Yeah. He mentioned that he had
8  conversation with Erik Erickson.
9  Q. Mr. Franchuk mentioned that.
10 A. Correct.
11 Q. And what did he tell you about a
12 conversation with Mr. Erickson?
13 A. That he attempted to have a conversation
14 with Mr. Erickson and Erik didn't engage in that
15 conversation.
16 Q. And what -- did Mr. Franchuk explain what
17 he was attempting to talk to Mr. Erickson about?
18 A. Just about the event.
19 Q. Okay. And what, if anything, did you say
20 after Mr. Franchuk said that?
21 A. Nothing that I can recall.
22 Q. Okay. Was there any more to the
23 conversation between you and Mr. Franchuk?
24 A. Yes.
25 Q. Okay. Tell me about that.

Page 30

1  A.  He had disdain for the manager and to --
2  that he didn't like him personally.
3  Q.  And did you understand him to be talking
4  about Mr. Marvin?
5  A.  I did.
6  Q.  Okay.  And so after Mr. Franchuk said that,
7  what did you say, if anything?
8  A.  I don't recall.
9  Q.  Okay.  Do you recall any other specifics of
10 your conversation with Mr. Franchuk?
11 A.  I do not.
12 Q.  Okay.  So now, talking through it, we've
13 talked about the specifics of what you recall of what
14 Mr. Franchuk said and what you said to him and what he
15 said back.
16 A.  Okay.
17 Q.  Did you make any notes of this conversation
18 that you had with Mr. Franchuk?
19 A.  No.
20 Q.  Did you speak with anyone at UP about this
21 conversation with Mr. Franchuk?
22 A.  I did.
23 Q.  Who did you talk to about it?
24 A.  Josh Shaffer.
25 Q.  Who is Josh Shaffer?

Page 31

1  A.  He is a current superintendent.
2  Q.  And what did you tell Mr. Shaffer about
3  your conversation with Mr. Franchuk?
4  A.  That I felt uncomfortable with the
5  conversation, that I felt as if it was a conversation
6  meant to solicit legal information out of me, and that
7  I didn't entirely feel comfortable about my future
8  presence at the Altoona Depot.
9  Q.  What information did you believe
10 Mr. Franchuk was trying to elicit from you?
11 A.  My involvement in the event.  And knowledge
12 of it.
13 Q.  Who -- at the beginning of the conversation
14 with Mr. Franchuk, who approached who?  How did the
15 conversation start?
16 A.  He asked me what my knowledge of the
17 situation was.
18 Q.  Okay.  So he approached you and began a
19 conversation.
20 A.  Correct.
21 Q.  And then when you related your discomfort
22 to Mr. Shaffer, what, if anything, did he say in
23 response?
24 A.  I believe that I don't need to be there if
25 I feel uncomfortable.

Page 32

1  Q.  How often was it your practice to be at the
2  Altoona Depot?
3  A.  There's no standard.
4  Q.  How many times have you ever been to the
5  Altoona Depot?
6  A.  I would guesstimate under six in two and a
7  half years.
8  Q.  Okay.  So a couple times a year perhaps?
9  A.  Perhaps.
10 Q.  Okay.  And had you ever felt uncomfortable
11 at the Altoona Depot before this conversation with
12 Mr. Franchuk?
13 A.  No.
14 Q.  Have you ever been back to the Altoona
15 Depot since this conversation with Mr. Franchuk?
16 A.  I don't recall.  I believe I -- I believe
17 that I haven't, but I can't be sure.
18 Q.  Okay.  What -- what, if anything, more did
19 Mr. Shaffer say other than that you don't need to be
20 at the Altoona Depot if you're feeling uncomfortable?
21 A.  I don't recall anything.
22 Q.  Okay.  Did you have any further
23 involvement, other than what we've talked about, with
24 the Tischer incident?
25 A.  What have we talked about?  Can you re --

Page 33

1  Q.  What have we talked about?  Well, we've
2  talked about the conversation with Mr. Erickson; we've
3  talked about a conversation with the fitness-for-duty
4  nurse, Lisa Tracey; we've talked about a conversation
5  with an employee named Neil in the summer of 2019; and
6  a follow-up conversation with the current supervisor,
7  Mr. Josh Shaffer.
8  A.  I had a conversation with my boss at the
9  time.
10 Q.  And who was that?
11 A.  Jennifer Roberts.
12 Q.  And what is her title?
13 A.  She was our regional manager.
14 Q.  And is she out of the Mason City, Iowa,
15 office?
16 A.  No.
17 Q.  Where is she located?
18 A.  Omaha, Nebraska.
19 Q.  And when did you have this conversation
20 with her?
21 A.  Roughly within -- after I had been notified
22 by Erik.
23 Q.  I'm sorry.  I might have missed a word
24 there.  It was roughly within what of being notified
25 by Erik?

Page 34

1   A.   A day or so.
2   Q.   Okay.  So are we talking August of 2017?
3   A.   I believe so.
4   Q.   And what was the conversation that you had
5   with Ms. Roberts?
6   A.   Just the information that I had received
7   and that I had responded to it, and she agreed that
8   that was the appropriate response and that was it.
9   Q.   Okay.  Does that take us to the end of your
10  involvement in the Tischer incident, such as it was?
11  A.   Yes.
12  Q.   I want to go back for just a moment to this
13  conversation with Mr. Franchuk in the summer of 2019.
14       Did he provide you with additional
15  information that you didn't have in August of 2017
16  after talking with Mr. Erickson?
17  A.   He provided me with his account, which was
18  more than I was given initially, yes.
19  Q.   Okay.  Did that change your view at all,
20  listening to Mr. Franchuk, as to what had happened or
21  the response?
22  A.   Not at all.
23  Q.   Okay.  Did you ever have a conversation
24  with Mr. Marvin about the Tischer incident?
25  A.   No.

Page 35

1   Q.   Did you ever have a subsequent conversation
2   with Mr. Erickson after the phone call that you had
3   with him in August of 2017?
4   A.   No.
5   Q.   Okay.  I'd like to show you a couple of
6   documents here.  And if I could ask the court reporter
7   to hand you what's been marked as Exhibit 16.
8        MR. HAYDEN:  Let me just see the Bates
9   numbers on these.
10  BY MR. BANKER:
11  Q.   Do you have that in front of you now?
12  A.   I do.
13  Q.   So in the lower right-hand corner of the
14  document, there's what we call a Bates stamp which has
15  a UP001046.
16       Do you see that?
17  A.   I do.
18  Q.   Okay.  So I will be using that to help
19  direct us to particular pages within this document.
20       I'll represent to you that this is a --
21  this document is a series of emails that was produced
22  by UP in this litigation.  And perhaps if you want to
23  take a look through the pages of the exhibit just to
24  kind of familiarize yourself with what's there, that
25  might be a good idea.

Page 36

1   A.   Okay.
2   Q.   And just let me know when you're done and
3   then I have some particular questions I want to ask
4   you.
5        MR. HAYDEN:  Let me see it before you
6   answer anything.
7   BY MR. BANKER:
8   Q.   So have you had a chance to look through
9   Exhibit 16?
10  A.   I am currently still reviewing.
11  Q.   Okay.
12       Okay.  So you've had a chance to look
13  through Exhibit 16?
14       MR. HAYDEN:  Yes, and now I'm just making
15  sure to look myself.  Just one second.
16       MR. BANKER:  Okay.
17       MR. HAYDEN:  Okay.
18  BY MR. BANKER:
19  Q.   So first question, these appear to be
20  emails.  A collection of them.  Are they -- do you
21  recognize them as being emails?
22  A.   They are emails.
23  Q.   Okay.  We had talked earlier in your
24  deposition about the MyUP portal and making broad
25  communications.

Page 37

1        Are any of these emails from the MyUP
2   portal or are they more traditional emails from an
3   email program?
4   A.   I believe these are a more traditional
5   program.
6   Q.   Okay.  So I want to focus on the first page
7   of Exhibit 16 which has the Bates stamp UP1046.
8        Looking at the email at the top of the
9   page, which appears to be an email from you that's to
10  an address "FFD Northern," is FFD Northern an
11  abbreviation for Fitness-For-Duty Northern?
12  A.   Yes.
13  Q.   And you had described some of the
14  administrative processes that went on that you were
15  involved with in terms of getting a medical leave for
16  Mr. Tischer.
17       Is this email part of that communication
18  that you were describing?
19  A.   Yes.
20  Q.   In the email just below that, you're
21  writing an email to George Swentik on August 14, 2017,
22  at 9 a.m., which is two days after the August 12,
23  2017, incident.
24       Does that time of that email do anything to
25  refresh your recollection about when you would have

Page 38

1  communicated with Mr. Erickson by phone?
2      A.  No.
3      Q.  And the reason I'm wondering is because --
4  so this email is from you to Mr. Swentik as well as
5  carbon copying a number of people, including
6  Mr. Erickson.
7          Do you see that?
8      A.  Yes.
9      Q.  And so in this email you say in the first
10 sentence "This employee was transported to the
11 hospital by ambulance for a serious health condition
12 (not work related) Saturday night."
13         Do you see where I read that?
14     A.  I do.
15     Q.  And I'm just wondering, if not for
16 Mr. Erickson's phone call, where would you have gotten
17 that information from?
18     A.  From Mr. Erickson's phone call.  However,
19 this email chain is typical to the administrative
20 functions, and he would have been included on those
21 communications.
22     Q.  Okay.  So -- but your thought is that the
23 second email that we're talking about on the first
24 page of Exhibit 16 is an email after Mr. Erickson had
25 his phone conversation with you.

Page 39

1      A.  Yes, I would assume so.
2      Q.  Okay.  Did you have any other source of
3  information about the incident, other than
4  Mr. Erickson's phone call, in the August 12 to 14 time
5  frame?
6      A.  Not that I would recall, no.
7      Q.  Okay.  On the second page of Exhibit 16,
8  which has a Bates stamp UP1047, there's an email there
9  from Rebecca Patrick to you and Susan Smisek,
10 S-m-i-s-e-k, dated August 14, 2017.
11         Who is Rebecca Patrick?
12     A.  Manager of administration.
13     Q.  Was she someone that you had dealt with
14 before this email?
15     A.  Yes.
16     Q.  What does a manager of administration do so
17 far as you know?
18     A.  Administrative work.
19     Q.  Okay.
20         Who is Susan Smisek?
21     A.  She's an occupational health nurse.
22     Q.  Is she also in the Twin Cities Service
23 Unit?
24     A.  Yes.
25     Q.  Are the two of you at the same level or

Page 40

1  does one of you have more seniority than another?
2      A.  Same level.
3      Q.  On the third page of Exhibit 16, there's an
4  email, and it has a Bates stamp at the bottom of
5  UP1048.
6          This appears to be an email from you to
7  TCSU Manager Contacts.
8          Do you see that?
9      A.  Yes.
10     Q.  And is -- TCSU, is that an abbreviation for
11 Twin Cities Service Unit?
12     A.  Yes.
13     Q.  So is the addressee of this email, Twin
14 Cities -- TCSU Manager Contacts, is that an address
15 you have in your email program to communicate with all
16 of the managers of the Twin Cities Service Unit?
17     A.  Yes.
18     Q.  What is the purpose of your communication
19 in this email on August 14, 2017, to the Twin Cities
20 Service Unit Manager Contacts?  Why were you sending
21 this?
22     A.  As I understood it, the manager had
23 recognized signs and symptoms of a stroke and called
24 9-1-1 immediately, and I wanted to positively
25 reinforce that and saw it as a good opportunity to do

Page 41

1  some health promotion.
2      Q.  Okay.  And you understood -- what you just
3  described about your understanding, that came from
4  Mr. Erickson's phone call?
5      A.  Yes.
6      Q.  And then if you look in the email, after
7  the first paragraph, there's a sentence that begins
8  "Use the FAST test to check the most common symptoms
9  of a stroke in yourself or someone else."
10         Do you see where I read that?
11     A.  I do.
12     Q.  And the FAST is F-A-S-T.  And is that an
13 acronym?
14     A.  Yes.
15     Q.  Did you write the text of this email or
16 were you able to cut and paste it from some other
17 resource?
18     A.  I -- both.
19     Q.  So where did you get this text about the
20 FAST protocol?
21     A.  Another resource.  I copied and pasted.
22     Q.  What is that -- what is that resource?
23     A.  I don't recall.
24     Q.  Something that you have available as part
25 of your job?

Page 42

1  A.  I -- I assume so.
2  Q.  Prior to sending this email August 14,
3  2017, were you familiar with the FAST test?
4  A.  Yes.
5  Q.  How had you become familiar with it?
6  A.  Through my nursing education.
7  Q.  Is FAST, F-A-S-T, is that a protocol that
8  is unique to UP or is that a more commonly applicable
9  protocol?
10 A.  Commonly applicable.
11 Q.  So you had learned about FAST as part of
12 your nursing training.
13 A.  Yes.
14 Q.  Had you also learned about FAST as part of
15 your training at UP?
16 A.  I don't recall.
17 Q.  Do you know whether UP does any training on
18 the FAST protocol for its employees?
19 A.  I am not sure of any -- I'm just not sure.
20 Q.  Okay.  So you were sending this email to
21 the Twin Cities Service Unit Manager Contacts to
22 include some information about the FAST protocol as a
23 way of doing some positive reinforcement of the
24 protocol?
25 A.  What are you referring to as a "protocol"?

Page 43

1  Q.  The F-A-S-T that's described in this email.
2  A.  I believe that was --
3      MR. HAYDEN:  Lacks foundation that it's a
4  Union Pacific protocol.
5  BY MR. BANKER:
6  Q.  Did you understand my question?
7  A.  Can you repeat it?
8  Q.  Sure.  So you're sending this email on
9  August 14, 2017, that lays out the FAST protocol.  The
10 acronym and then what each letter stands for.
11     Right?
12 A.  It's not a protocol.  It's an acronym.
13 Q.  What would you call it then?  An acronym?
14 A.  An acronym.
15 Q.  Is that coming from -- are you cutting and
16 pasting that from internal UP materials?
17 A.  No.
18 Q.  Where are you getting that from to cut and
19 paste it from?
20     MR. HAYDEN:  Asked and answered.  She
21 testified she didn't know.
22     You can answer again.
23 A.  I don't recall.
24 BY MR. BANKER:
25 Q.  Okay.  And I'm just trying to understand is

Page 44

1  it coming from an UP internal document or is it just
2  coming off the Internet?
3  A.  The Internet.
4  Q.  Okay.  And so in sending this on to the
5  TCSU Manager Contacts, did you ever receive any
6  response to this email?
7  A.  Not that I recall.
8  Q.  Okay.  And then on the next page, which has
9  a Bates stamp UP001049, in the last paragraph there
10 you say "Good job to all involved in recognizing the
11 signs and symptoms of stroke in our recent issue and
12 acting quickly on behalf of the employee."
13     Do you see where I read that?
14 A.  I do.
15 Q.  And so when you say that, is the only
16 information you have about what happened coming to you
17 from Mr. Erickson's phone call?
18 A.  Yes.
19 Q.  Okay.  So on the next page of Exhibit 16,
20 which has a Bates stamp UP1050, there's an email from
21 Susan Smisek, S-m-i-s-e-k, to the CBSU Managers that
22 has a copy to her, herself, and also a copy to you.
23     Do you see that?
24 A.  Yes.
25 Q.  And it's dated August 14, 2017, at

Page 45

1  10:09:42 a.m.  So it comes after the email that we
2  just talked about that went to the TCSU Manager
3  Contacts.
4  A.  Yes.
5  Q.  Do you know -- do you know why Susan Smisek
6  was sending -- well, first of all, who are the CBSU
7  Managers?
8  A.  It's Council Bluffs Service Unit managers.
9  Q.  And forgive me if I am misremembering, but
10 Susan Smisek is also an occupational health nurse?
11 A.  Yes.
12 Q.  And so she's forwarding on this information
13 to another service unit that she interacts with?
14 A.  Correct.
15 Q.  And so she says in this email "Please Read.
16 This weekend, one of our employees/peers experienced a
17 stroke.  It's due to FAST response that he was
18 transported to the hospital right away."
19     Do you see that?
20 A.  I do.
21 Q.  And so what I'm wondering is, this FAST
22 acronym, does that do anything to refresh your
23 recollection as to whether that's a UP acronym or just
24 a general nursing acronym?
25 A.  It's not specific to UP.

Page 46

1   Q.   Okay.  On the next page of Exhibit 16,
2   there's an email -- and the Bates stamp on this is
3   UP1052.
4        It's an email from Mary Ellen Burri,
5   B-u-r-r-i, to a number of people.
6        Who is Mary Ellen Burri?
7   A.   I do not know.
8   Q.   Okay.  Let's set Exhibit 16 aside, and I
9   want to show you what's been marked for identification
10  as Exhibit 17.
11       And on this document it has a Bates stamp
12  in the lower right-hand corner UP1089.
13       Do you see that?
14  A.   I do.
15  Q.   And it seems to be an email from Susan
16  Smisek, S-m-i-s-e-k, to you, August 14, 2017, where
17  she is responding to your email that we've already
18  talked about to the TCSU Manager Contacts when you're
19  forwarding the FAST acronym, and she says "Awesome
20  information.  Good job."
21       Do you see that?
22  A.   I do.
23  Q.   Did you have any other -- did you have any
24  conversations with Susan Smisek about the Tischer
25  incident other than what's contained in emails here?

Page 47

1   A.   I don't recall.
2   Q.   Okay.  Let's set that aside and look at
3   what's been marked for identification as Exhibit 18,
4   which has a Bates stamp in the lower right-hand corner
5   UP1022.
6        It might help to compare this to
7   Exhibit 17.  As I look at Exhibit 18, it is similar to
8   the emails that we've already looked at communicating
9   the FAST acronym, but when I look at Exhibit 17, the
10  wording at the top is a little bit different.
11       Now the first paragraph says "Great job to
12  the coworkers of the employee who had a stroke this
13  weekend" as opposed to what it says on, for example,
14  Exhibit 17.  But looking at this I can't tell who this
15  is sent to.
16       Do you recall another email that you sent
17  on August 14?
18  A.   Yeah -- well, it's not another email,
19  but --
20  Q.   What are we looking at in Exhibit 18?
21  A.   It's just a different system.
22  Q.   Is this an example of the MyUP system?
23  A.   Yes.
24  Q.   Okay.  And so you had described going into
25  the MyUP system and using it for broad communication.

Page 48

1        Is this representative of that?
2   A.   Yes.
3   Q.   Okay.  And you're communicating a lot of
4   the same information about the -- word for word as far
5   as the FAST acronym.
6        Who gets the MyUP communication that is
7   Exhibit 18?
8   A.   I'm not sure exactly, but generally
9   employees on the service unit.
10  Q.   So it's like an all-employee communication?
11  A.   No --
12  Q.   How do they receive that --
13       MR. HAYDEN:  She wanted to finish her
14  answer.
15       Go ahead.
16  A.   To the people on the service unit.
17  BY MR. BANKER:
18  Q.   Okay.  So this is you -- Exhibit 18 is you
19  using the MyUP system to make a broad communication to
20  employees of the Twin Cities Service Unit on
21  August 14, 2017.
22  A.   Yes.
23  Q.   And how do employees on the Twin Cities
24  Service Unit get this?  Do they get it as email or do
25  they get it as a login to a web portal or how does the

Page 49

1   communication take place?
2   A.   A login through a web portal.
3   Q.   And is that something that employees log in
4   to regularly?
5   A.   I couldn't speak to that.
6   Q.   I'm sorry, what was that?
7   A.   I couldn't give you a factual answer on
8   that.
9   Q.   Okay, but when you log in to it, does it
10  tell you if you have a new message to read?
11  A.   It does.
12  Q.   Okay.  And so that was the purpose of that
13  communication.
14       Let's look at what's been marked for
15  identification as Exhibit 19.  Which has two Bates
16  stamps on it, but I'll use the top one, UP001306.
17       Have you ever seen this document before?
18  A.   No.
19  Q.   Prior to Mr. Tischer's incident in August
20  of 2017, had you had any experience with employees
21  having strokes while at work?
22  A.   Yes.
23  Q.   And was that experience while you were
24  working for UP?
25  A.   No.

Page 50

1  Q. Where was that experience? Was that at one
2  of your previous employers?
3  A. Yes.
4  Q. And how much experience had you had with
5  employees having strokes at work?
6  A. I couldn't gauge that.
7  Q. I'm sorry, I missed the beginning of that.
8  A. I don't know how to quantify that.
9  Q. Okay. Was it more than five incidents,
10 would you say?
11 A. Yes.
12 Q. More than ten?
13 A. I assume.
14 Q. Okay. And how were you involved in these
15 previous employer -- previous stroke incidents while
16 with another employer?
17 A. I was the nurse.
18 Q. So you were employed as a caregiver
19 providing primary care.
20 A. Yes.
21 Q. Okay. I want to turn to what's been marked
22 as Exhibit 20. Which I'll represent to you is a
23 document that gets exchanged by the parties in
24 litigation to communicate various kinds of
25 information.

Page 51

1       I want to direct you to page 3 of that
2  document. And in particular, the description
3  regarding you in paragraph 13.
4       Do you see that there?
5  A. I do.
6  Q. It says that "Union Pacific anticipates
7  that Ms. Carson will have knowledge of the incident."
8       Have we talked about all of your knowledge
9  of the incident?
10 A. Yes.
11 Q. And then it goes on to say "and knowledge
12 of the policies and procedures for railroad
13 operations, and training for employees of Union
14 Pacific."
15      Do you see that there?
16 A. I do.
17 Q. Let me break that up into two questions.
18      What knowledge do you have of the policies
19 and procedures for railroad operations as it pertains
20 to Mr. Tischer's incident?
21 A. Very little.
22 Q. When you say "very little," what do you
23 have in mind?
24 A. I'm not in operations. I'm in nursing.
25 Q. Okay. So you don't have anything specific

Page 52

1  in mind as to knowledge of policies and procedures for
2  railroad operations.
3  A. I don't.
4  Q. Okay. And then the second -- or the last
5  part of that says "and training for employees of Union
6  Pacific." And I thought we had talked about that.
7       Do you have any additional information
8  regarding training for employees of Union Pacific
9  other than what we've talked about?
10 A. Remind me what we talked about.
11 Q. I think I had asked you what you knew about
12 employee training and you said you didn't know.
13 A. Yeah, I don't know about that department.
14 Q. Okay. So you have nothing to add to what
15 we've already talked about.
16 A. I don't.
17 Q. Okay. Let's set that aside, and I have one
18 last exhibit that I'd like to ask you some questions
19 about. What's been marked for identification as
20 Exhibit 21.
21      And I'll represent to you that these are a
22 series of screen shots that are made off of a DVD that
23 we received from UP in the course of discovery in this
24 case. And in particular, these screen shots are taken
25 from Disk 2 of what on its cover is referred to as a

Page 53

1  "BasicPlus" DVD.
2       My question to you is are you familiar with
3  the BasicPlus DVD?
4  A. I am.
5  Q. Tell me how you are familiar with the
6  BasicPlus DVD.
7  A. I use it as a part of instruction.
8  Q. What kind of instruction were you doing for
9  the Twin Cities Service Unit in the August of 20 -- or
10 in the 2017 time frame?
11 A. CPR and basic first aid.
12 Q. Okay. Would you show this BasicPlus DVD to
13 the people that you were training on CPR and basic
14 first aid?
15 A. The videos.
16 Q. Okay. Was there also classroom instruction
17 that you would provide in addition to showing the
18 video?
19 A. Yes.
20 Q. Would there be a record of the people to
21 whom you had given this training?
22 A. Yes.
23 Q. How often did you offer this training in
24 the Twin Cities Service Unit in 2017?
25 A. I don't know.

Page 54

1  Q. Was it a mandatory training or was it an
2  opt-in training that people could select if they had a
3  particular interest in it?
4  A. It's optional.
5  Q. Okay. Would that be -- would the
6  attendance at that sort of CPR and first aid training
7  be reflected on an employee's training history?
8  A. Yes.
9  Q. On page 7 of Exhibit 21 -- I guess I should
10 back up a step.
11         On page 5 of Exhibit 21, there is a segment
12 of this BasicPlus video starting at 53 minutes and
13 48 seconds that pertains to stroke issues.
14         Is that your recollection as well?
15 A. I believe so.
16 Q. Was stroke training part of your first aid
17 and CPR training that you offered?
18 A. Not always.
19 Q. Not always? How would you decide to offer
20 stroke training or not offer stroke training?
21 A. Based on time, attendance, audience.
22 Q. So if there was time and the audience was
23 interested in hearing about it, you would offer stroke
24 training?
25 A. Correct.

Page 55

1  Q. Okay. And if not, you wouldn't?
2  A. There's any number of factors, I guess, as
3  to why --
4  Q. Okay.
5  A. -- not.
6  Q. And then on page 7 of Exhibit 21, there's a
7  reference to this FAST acronym that we've talked about
8  in the context of the emails that you sent after
9  Mr. Tischer's incident.
10         And then if you go to page 8 and page 9, it
11 goes through what the letters stand for in that
12 acronym.
13         Is that correct?
14 A. Yes.
15 Q. When you would address stroke issues as
16 part of your first aid or CPR training, would you talk
17 about anything other than what was in the video?
18 A. No.
19 Q. Did you have any notes or outline that you
20 would use to guide you through talking about stroke
21 issues?
22 A. There's a book.
23 Q. What is the book called?
24 A. I believe it's titled the same as the
25 video.

Page 56

1  Q. I'm sorry, I didn't catch the first part of
2  that.
3  A. I believe it's titled the same as the
4  video.
5  Q. Oh. A BasicPlus book?
6  A. Yes.
7  Q. Okay. And so that would give you talking
8  points for presenting to an audience that you were
9  trying to educate.
10 A. Yes.
11 Q. Like speaker's notes essentially.
12 A. Supporting what the video is saying.
13 Q. Okay.
14         Okay. We can set that aside.
15         MR. BANKER: Those are all the questions I
16 have.
17         MR. HAYDEN: Mike, are you going to have
18 any questions?
19         MR. COHEN: Yeah, just a few.
20         MR. HAYDEN: Give me a minute. I need to
21 take a restroom break.
22         THE VIDEOGRAPHER: Off the record at
23 11:40 a.m.
24         (Recess taken.)
25         THE VIDEOGRAPHER: On the record at

Page 57

1  11:45 a.m.
2                    EXAMINATION
3  BY MR. COHEN:
4  Q. Good afternoon, Ms. Carson, my name is
5  Michael Cohen, and as you might have heard earlier, I
6  represent Professional Transportation, Incorporated,
7  in this matter.
8         Are you familiar with Professional
9  Transportation, Incorporated?
10 A. I know of them.
11 Q. Okay. And how do you know of them?
12 A. I see them around.
13 Q. All right. Are you generally aware of the
14 relationship between Professional Transportation,
15 Incorporated, and Union Pacific?
16 A. Yes.
17 Q. Okay. And I should have asked at the
18 outset, are you -- can you hear me?
19 A. Yes.
20 Q. Okay. In relation to the incident
21 involving Mr. Tischer that we have been discussing
22 today, do you have any criticism whatsoever of
23 Professional Transportation, Incorporated?
24 A. No.
25 Q. Okay. You talked a little bit about the

Page 58

1  BasicPlus training materials.  It's my understanding
2  from your testimony that from time to time you train
3  Union Pacific employees in those BasicPlus materials;
4  is that correct?
5      A.  Correct.
6      Q.  Okay.  And my understanding from your
7  testimony is that the employees can either decide to
8  be trained in those materials or decide not to be
9  trained in those materials; is that correct?
10     A.  Correct.
11     Q.  Okay.  To put it another way, whether they
12 wish to be trained is completely voluntarily; is that
13 correct?
14     A.  Correct.
15     Q.  All right.  How often generally do you
16 train employees in the BasicPlus materials?
17     A.  Say that again.
18     Q.  I'm sorry, I missed that.
19     A.  Can you say that again?
20     Q.  Sure.  How often generally do you have
21 occasion to train employees in the BasicPlus
22 materials?  Is it once a year?  Once every two years?
23     A.  Well, can you define "employees"?
24     Q.  Any employees of Union Pacific.
25     A.  Well, four or five times a year.

Page 59

1      Q.  Okay.  And where does that training take
2  place?
3      A.  It varies.
4      Q.  All right.  How often do you train Union
5  employees, or have you had occasion to train Union
6  employees, Union Pacific employees, in or around the
7  Altoona Union Pacific yards?
8      A.  How far are you considering -- I've been up
9  in the area, I guess, offering it in the area multiple
10 times.
11     Q.  Do you offer it once a year?  Do you offer
12 it less than once a year?  More than once a year?
13     A.  More than once a year.
14     Q.  Okay.  And when you do train Union Pacific
15 employees in the Altoona yards on these BasicPlus
16 materials, what dictates what portions of the
17 BasicPlus materials you train on?
18     A.  Generally we follow the -- the course as
19 it's laid out in the book and the DVD.
20     Q.  Okay.  And you mentioned before that
21 sometimes you don't have enough time to train in all
22 these materials; is that correct?
23     A.  I wouldn't say that that's the norm at all,
24 but it's potentially possible.  Maybe once out of
25 probably, oh -- maybe once out of probably 15 courses,

Page 60

1  if that, that that would have been the case.
2      Q.  Okay.  I'm sorry, it's a little difficult
3  for me to hear you.
4          Did you say there's 15 courses?
5      A.  If I was to guesstimate the number of
6  courses that I have put on in my length of UP
7  employment, I would guesstimate probably 15, and I
8  would say maybe one of those times out of those 15
9  would have been a condition that -- where we may have
10 run out of time for whatever reason.
11     Q.  Okay.  And how are the Union Pacific
12 employees at the Altoona yards notified that you're
13 going to be performing that?
14     A.  I put out a schedule every month.
15     Q.  All right.  And then are they able to sign
16 up or can they just show up or is there some other way
17 that they go about receiving the training?
18     A.  My contact information is on the schedule,
19 and they're free to reach out to me and inquire about
20 signing up.
21     Q.  All right.  And how do they reach out to
22 you?  Is it via phone?  Via email?  How do they go
23 about reaching out to you?
24     A.  Multiple ways.
25     Q.  I'm sorry, I didn't hear you.

Page 61

1      A.  Multiple ways.
2      Q.  And is there a list of attendance that's
3  kept regarding who is receiving the training?
4      A.  If the nurse enters it correctly, yes.
5      Q.  And I apologize again, I'm sorry, I didn't
6  hear you.
7      A.  There would be a record.
8      Q.  Okay.  All right.  And is there a record of
9  what training was given in a particular session?
10     A.  It doesn't define it that way.
11     Q.  Okay.  What do you do -- you mentioned that
12 you show the video, or parts of the video, during the
13 training; is that correct?
14     A.  I did say that, yeah.
15     Q.  Okay.  And do you hand out any written
16 materials?
17     A.  Yes.
18     Q.  What's that?
19     A.  A book.
20     Q.  All right.  And what book do you hand out?
21     A.  The basic CPR/first aid book.
22         MR. COHEN:  Okay.  I don't have any further
23 questions.
24         MR. HAYDEN:  Thanks.  I just have a few of
25 my own.

Page 62

1    EXAMINATION
2   BY MR. HAYDEN:
3       Q.   When you testified about the conversation
4   you had with somebody named Neil back in the summer of
5   this year, 2019, in the Altoona Yard -- is that right?
6   Do you remember that?
7       A.   Yes.
8       Q.   What was the purpose of you being there
9   that day at the Altoona terminal?
10      A.   We call it Summer Spike.  It's general
11  health promotion.
12      Q.   What types of things do you do in a general
13  health promotion day at a particular terminal?
14      A.   Blood pressures, health screens, talk about
15  heat stress.
16      Q.   When Neil confronted you, was he intending
17  to get a blood pressure screening from you or was he
18  just intending to confront you with what you
19  described?
20      A.   He was intending to confront me with what I
21  had described.
22      Q.   You relayed the conversation -- what you
23  recall of the conversation that you had with him.  And
24  at any time during the conversation, did Mr. Franchuk
25  indicate to you that he had observed signs and

Page 63

1   symptoms of a stroke in Mr. Tischer that day?
2       A.   No.  He said it was very general and he was
3   "off."
4       Q.   And so none of the signs and symptoms that
5   you set forth in your various emails that we discussed
6   earlier in this deposition were those that were
7   identified by Mr. Franchuk, according to him, when he
8   spoke to you this summer; is that correct?
9       A.   They were not.
10      Q.   Did you come to understand that it was
11  Mr. Marvin who called 9-1-1 after he identified the
12  signs and symptoms of a stroke in Mr. Tischer on that
13  day in question?
14      A.   I did.
15      Q.   And did he act appropriately in your view?
16      A.   I believe he did.
17      Q.   In that he called 9-1-1 immediately after
18  observing signs and symptoms of a stroke?
19      A.   Correct.
20      Q.   He didn't call you, for example.
21      A.   Correct.
22      Q.   Do you happen to know one way or the other
23  whether Mr. Marvin was trained in the BasicPlus
24  training course or, for that matter, on the signs and
25  symptoms of a stroke?

Page 64

1       A.   Yes.
2       Q.   And lastly, you mentioned before -- I was a
3   bit confused when you were discussing your knowledge
4   of any prior strokes that occurred on your watch as an
5   employee.
6            Do you remember that line of questioning?
7       A.   I do.
8       Q.   I'm just going to break it down a little
9   further.
10           During the time you've been at Union
11  Pacific, other than Mr. Tischer, have you become aware
12  of any stroke -- any employee suffering a stroke while
13  on duty?
14      A.   Not that I can recall.
15      Q.   How about systemwide.  Would you be made
16  aware of those kinds of incidents if they occurred in
17  the Western Region or Southern Region?
18      A.   I would not be.
19      Q.   Certainly as it relates to the Northern
20  Region, the then Northern Region, you would say you
21  never recall any employee, other than Mr. Tischer,
22  suffering a stroke while on duty?
23      A.   Correct.
24      Q.   And the Northern Region includes the
25  headquarters building in Omaha where many, many people

Page 65

1   work; is that correct?
2       A.   Correct.
3       Q.   In addition to all the terminals that are
4   across the Northern Region.
5       A.   Yes.
6       Q.   Then -- the job just prior to your
7   employment with the railroad was with A10 Clinical
8   Services; is that correct?
9       A.   Yes.
10      Q.   During your time of three years or so with
11  A10 Clinical Services, did you ever observe -- or were
12  you ever aware of anyone suffering a -- an employee of
13  that company suffering a stroke?
14      A.   No.
15      Q.   When you were an RN at the county hospital
16  when you were the ER charge nurse for four years, is
17  that when you recall people suffering strokes?
18      A.   Yes.
19      Q.   Who were inpatient --
20      A.   Patients.
21      Q.   -- inpatients for some other injury or
22  disease that suffered strokes while under care?
23      A.   Yes.
24      Q.   So too with Osage Rehab in your time there?
25  Do you remember any stroke victims during your time as

Page 66

1  the director of nursing or floor RN at the Osage
2  Rehab?
3     A.   Patients.
4     Q.   Patients again?  Not employees.
5     A.   Correct.
6          MR. HAYDEN:  Thank you, ma'am.
7          MR. BANKER:  I don't have any further
8  questions.
9          MR. COHEN:  No further questions.
10         MR. HAYDEN:  Okay.  Well, thank you,
11 everybody.  We'll give the exhibits back to the court
12 reporter and we are all done.
13         THE VIDEOGRAPHER:  Off the record ending
14 the deposition at 11:59 a.m.
15         (Deposition concluded at 11:59 a.m.,
16 September 24, 2019.)

Page 67

1              C E R T I F I C A T E
2          I, the undersigned, a Certified Shorthand
3  Reporter of the State of Iowa, do hereby certify that
4  there came before me at the time, date, and place
5  hereinbefore indicated, the witness named on the
6  caption sheet hereof, who was by me duly sworn to
7  testify to the truth of said witness's knowledge, that
8  the witness was thereupon examined under oath, the
9  examination taken down by me in shorthand and later
10 reduced to a transcript through the use of a
11 computer-aided transcript device under my supervision
12 and direction, and that the deposition is a true
13 record of the testimony given and of all objections
14 interposed.
15         I further certify that I am neither
16 attorney or counsel for, nor related to or employed by
17 any of the parties to the action in which this
18 deposition is taken, and further that I am not a
19 relative or employee of any attorney or counsel
20 employed by the parties hereto, or financially
21 interested in the action.
22         Dated this 1st day of October, 2019.
23
24                 *Melissa A. Burns* (signature)
25              CERTIFIED SHORTHAND REPORTER