IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JESSICA TISCHER, individually and as personal
representative of JACOB TISCHER,

                       Plaintiff,

   v.

UNION PACIFIC RAILROAD COMPANY,          OPINION and ORDER

                   Defendant and                      19-cv-166-jdp
                   Third-Party Plaintiff,

   v.

PROFESSIONAL TRANSPORTATION INC.,

                   Third-Party Defendant.

---

Jacob Tischer suffered a stroke while on the job for his employer, defendant Union Pacific Railroad Company. He died in the hospital from stroke-related complications two weeks later. Jacob's wife, Jessica, sues Union Pacific under the Federal Employers' Liability Act (FELA), alleging that Union Pacific's employees and agents had been negligent in failing to summon medical assistance when Jacob first exhibited stroke symptoms. Union Pacific has filed a third-party complaint for contribution against Professional Transportation Inc. (PTI), one of its independent contractors, because one of the individuals present during Jacob's stroke was a PTI employee.

Two motions for summary judgment are before the court. First, PTI seeks summary judgment on Union Pacific's third-party claim, asserting that any claim for contribution fails as a matter of law. Dkt. 65. Union Pacific conceded the claim rather than filing a brief in opposition, Dkt. 80, so the court will grant PTI's motion as unopposed and dismiss PTI from the case.

Second, Union Pacific seeks summary judgment on all of Tischer's FELA claims on the grounds that (1) it didn't owe Jacob a duty of care; (2) there is no evidence that the alleged delay in summoning care contributed to Jacob's death; and (3) there is no evidence to support the other theories of liability that Tischer asserts in the complaint. Dkt. 40. The court will grant Union Pacific's motion. Union Pacific's duty to assist Jacob arose when its employees saw him showing signs of incapacitation at around 8:25 p.m. on the night of August 12, 2017. Union Pacific employees didn't call 911 until 8:56. But Tischer adduces no evidence that this half-hour delay exacerbated Jacob's stroke or contributed to his death. With no evidence of causation, all of Tischer's FELA claims fail. The court will dismiss the case and enter judgment for Union Pacific.

## UNDISPUTED FACTS

The following facts are undisputed, unless otherwise noted.

Jacob Tischer worked as a conductor for Union Pacific at a railyard located in Altoona, Wisconsin. On the morning of August 12, 2017, Jacob received an unexpected call from a railroad dispatcher notifying him that he was being called into work. Shortly after receiving that call, Jacob fell to the floor of his kitchen and was unresponsive for ten to fifteen seconds. When he came to, he went to the bathroom and vomited. Jacob's wife, Jessica, urged him to call in sick, or to at least stop in at a medical clinic before his shift, but Jacob insisted on going to work.

During Jacob's drive to the yard, he received another call notifying him that his start time had been pushed back. Jacob napped in his car for a few hours before showing up to work at 2:00 p.m. He and an engineer, Neil Franchuk, were tasked with delivering freight cars up to

Norma, Wisconsin and then returning to Altoona. Jacob didn't say anything to Franchuk about not feeling well, but on the ride up to Norma, Franchuk thought that Jacob seemed tired. On the way back to Altoona that evening, Jacob went from looking tired to looking sick. Although he continued to converse with Franchuk, Jacob seemed disoriented and, at one point, couldn't figure out how to change the channel on his radio. When Franchuk asked Jacob if he was okay, Jacob assured Franchuk that he was.

Jacob was able to perform his work tasks back at the Altoona yard around 8:00 p.m., including tying down hand brakes and counting down the cars over the radio to Franchuk. When the job was done, Chaz Lux, a driver for PTI, drove Jacob and Franchuk back to the crew shanty area. When they arrived at around 8:15, Lux noticed that Jacob had trouble undoing his seatbelt with his left hand and so used his right hand, although Lux didn't think anything of it at the time.

Franchuk was concerned about Jacob based on his earlier inability to change the channel on his radio, so he flagged down Mark Marvin, Jacob's supervisor, to let him know that Jacob seemed sick. Marvin had originally planned to have Jacob and Franchuk complete another run up to Norma that night, but he agreed to go speak with Jacob after hearing Franchuk's concerns. Jacob denied needing medical attention, but Marvin thought that he looked sick and decided to send him home.[1] *See* Dkt. 50 (Marvin Dep. 25:23–26:17).

Sometime around 8:25, Jacob emerged from a portable toilet that he had been using and staggered or stumbled, dropping his brake stick, in view of several witnesses. Dkt. 92,

---

[1] Franchuk and another Union Pacific employee, John Thomas, testified that Marvin was initially resistant to sending Jacob home because he wanted him to make another run up to Norma. *See* Dkt. 47 (Franchuk Dep. 59:1–15) and Dkt. 52 (Thomas Dep. 27:16–31:15). Marvin denies this. *See* Dkt. 50 (Marvin Dep. 51:5–58:12).

3

¶¶ 153, 156. One of the witnesses was Thomas, who testified that Jacob was limping, his face was drooping, and he was slurring his words and couldn't get the cap off of a water bottle. Dkt. 52 (Thomas Dep. 32:17–33:1). Thomas testified that he approached Marvin and told him, "I think [Jacob is] having a stroke. You need to call 911." *Id.* at 33:3–4. Franchuk testified that he remembers Thomas saying that Jacob's face was drooping, that he thought Jacob was having a stroke, and that they needed to get him to a hospital. Dkt. 47 (Franchuk Dep. 36:7–9, 60:22–23, 41:9–10). Marvin denies hearing anyone mention the possibility of a stroke, *see* Dkt. 50 (Marvin Dep. 62:9–11), but Union Pacific doesn't dispute Thomas and Franchuk's version of events for purposes of summary judgment. *See* Dkt. 92, ¶¶ 63–65, 153–54.

At approximately 8:35, Marvin sent Jacob back to the Altoona Depot in Lux's PTI van with instructions that Jacob call his wife to have her come pick him up. Jacob called Jessica and told her that she needed to come get him. Lux began driving Jacob the two to three miles from their location in the railyard to the Altoona Depot. When Lux and Jacob were a short distance from the depot, Jacob began vomiting. Lux pulled the van over, and Jacob opened the door and continued to vomit outside. Lux then drove Jacob the rest of the way to the depot, arriving at 8:53. Jacob was unable to unbuckle his seatbelt and open the door. Lux told Jacob to stay put while he went to get help. Lux went in the depot, but there was no one there. Lux came back outside and saw Jacob lying on the ground next to the van. Around the same time, Marvin arrived at the depot and saw Jacob on the ground. Marvin saw that Jacob's face was drooping and that he couldn't move his left arm or left leg. Recognizing the symptoms of a stroke, Marvin called 911 at 8:56. An ambulance was dispatched at 9:00 and arrived at the depot at 9:07. He arrived at a hospital in Eau Claire by ambulance at 9:24.

At the hospital, Jacob was diagnosed with an ischemic stroke in the right middle cerebral artery, meaning that his artery was blocked and his brain was deprived of blood flow. Hospital personnel determined that they couldn't administer tissue-plasminogen-activator medication—a clot-busting drug used to treat strokes—because it needs to be administered within 4.5 hours of the onset of symptoms, and in this instance it wasn't clear when Jacob's symptoms began.

Jacob spent two weeks in the hospital before dying suddenly on August 27, 2017 of stroke-related complications. Jessica, his widow, filed this suit against Union Pacific, alleging that its employees were negligent in failing to get Jacob to the hospital earlier, that their negligence contributed to Jacob's death, and that Union Pacific is therefore liable for damages under FELA. She also asserted ancillary negligence claims based on Union Pacific's alleged failure to (1) adopt reasonable or comply with existing safety rules and protocols; (2) properly train employees and supervisors regarding recognizing and handling medical emergencies; (3) adopt a reasonable sickness and attendance policy or comply with existing sickness and attendance policies; and (4) appropriately supervise and assign work. Dkt. 1, ¶ 20.

ANALYSIS

FELA provides compensation for the injuries and deaths caused by the physical dangers of railroad work. *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 555 (1994). Unlike a typical workers' compensation scheme, which provides relief without regard to fault, a FELA claim has the same elements as a claim for negligence. *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 165 (2007). To prevail under a FELA, a plaintiff must prove duty, breach, causation, and damages, although the quantum of evidence required to establish causation is much lower than in an ordinary negligence action. *See Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506 (1957) (under

5

FELA, the causation requirement is met if "employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought").

In this case, Union Pacific contends that it is entitled to summary judgment because: (1) it had no duty to provide medical care to Jacob prior to his collapse and incapacitation at the Altoona Depot; (2) there is no evidence that its delay caused Jacob to miss the 4.5-hour window in which the clot-busting drug could have been administered and therefore no evidence of causation; and (3) there is no evidence to support the other theories of negligence that Tischer asserts.

**A. Duty to provide medical care**

Tischer doesn't contend that negligence by Union Pacific played a role in triggering Jacob's stroke—just that Union Pacific was negligent in failing promptly summon medical assistance when Jacob began experiencing symptoms.[2] This case thus differs from a typical FELA case because it deals with the extent to which a railroad can be held liable for failing to intervene to address an injury it played no role in causing. Although FELA is to be liberally construed, it "does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur." *Gottschall*, 512 U.S. at 543 (citation and quotation marks omitted). A central question in this case, then, is whether and when Union Pacific had a duty to intervene on Tischer's behalf.

---

[2] In her opposition brief, Tischer contends that Jacob went into work on August 12, 2017 only because of he was afraid of losing his job given the harshness of Union Pacific's attendance policies. *See* Dkt. 82, at 5. She cites no admissible evidence to support this assertion. But even taking it as true, this fact wouldn't establish that the work Jacob was doing for Union Pacific played a role in causing the stroke. After all, Jacob was suffering from symptoms prior to reporting to work that day, and there is no allegation by Tischer that the work Jacob performed triggered or exacerbated his stroke.

"Duty is an essential element of negligence, and the determination of any question of duty—that is, whether the law imposed upon the defendant the obligation to protect the plaintiff against the consequences which occurred—is a question of law, and is not for the jury." *Fulk v. Illinois Cent. R. Co.*, 22 F.3d 120, 125 (7th Cir. 1994) (citation and quotation marks omitted). FELA's text doesn't address when a railroad's duty to assist a sick or injured employee arises, so the court looks to common-law principles for guidance. *See Gottschall*, 512 U.S. at 544 ("[A]lthough common-law principles are not necessarily dispositive of questions arising under FELA, unless they are expressly rejected in the text of the statute, they are entitled to great weight in our analysis.").

"The common law traditionally took a hard line, rejecting any legal duty to be a good Samaritan. If *A* saw that *B* was about to be struck on the head by a flowerpot . . . yet he did nothing and as a result *B* was killed," *A*'s inaction, though "reprehensible, would not be actionable." *Stockberger v. United States*, 332 F.3d 479, 480 (7th Cir. 2003). Courts have applied this rule in the FELA context, holding that "in the absence of either a contractual or statutory obligation an employer is not legally bound to render medical assistance or aid to an employee who, while on the job, becomes ill or suffers injury without the employer's fault." *S. Pac Co. v. Hendricks*, 339 P.2d 731, 733 (Ariz. 1959)); *see also* Annotation, "Master's Duty To Care For or To Furnish Medical Aid to Servant Stricken by Illness or Injury," 64 A.L.R.2d 1108 § 8(c) (1959) (collecting cases upholding this rule in the railroad context).

But there are common law exceptions to this common law rule. *See Stockburger*, 332 F.3d at 481–82 (summarizing some of these exceptions). As relevant here, there's a long line of cases holding that a railroad's duty to intervene arises when an employee (1) encounters life- or limb-threatening harm while on the job; and (2) the railroad knows or should know about that harm.

*See Randall v. Reading Co.*, 344 F. Supp. 879, 833 (M.D. Pa. 1971); *Rival v. Atchison, T. & S.F. Ry. Co.*, 62 N.M. 159, 163–64, 306 P.2d 648, 651 (1957); *Gypsy Oil Co. v. McNair,* 179 Okla. 182, 64 P.2d 885, 892 (1936).

Different courts have formulated this exception in different ways. For instance, in *Southern Pacific Co. v. Hendricks*, the Supreme Court of Arizona held that the emergency exception arises "when an employee, to the employer's knowledge, becomes so seriously ill while at work as to render him helpless to obtain medical aid or assistance for himself." 339 P.2d at 733. Relying on this language, Union Pacific argues that it didn't owe any duty to Jacob until sometime between 8:53 and 8:55 p.m., when Jacob became physically incapacitated on the ground at the depot, at which point Union Pacific's employee acted reasonably and promptly by dialing 911.

But other courts have phrased this exception in more lenient terms. In *Randall v. Reading Co.*, for instance, the district court for the Middle District of Pennsylvania held that the railroad had a duty to furnish emergency medical aid when "the railroad should have known or had reason to know that [the plaintiff] had been stricken with an incapacitating illness or had been seriously injured." 344 F. Supp. at 884. Tischer invokes this standard to argue that Union Pacific's duty to intervene arose when Franchuk saw Jacob starting to look sick on the ride from Norma to back Altoona. Dkt. 82, at 5 (asserting that "Franchuk could have and should have called 911 right then.").

Both sides assume that their articulation of the standard is correct without acknowledging the other view. But the court need not decide which standard is correct because under either formulation, Union Pacific's duty arose at the same point in time: when Thomas noticed and announced to the assembled employees that Jacob's face was drooping, that he

believed Jacob was having a stroke, and that they needed to get him to a hospital. In evaluating when a railroad's duty arises, courts consider the facts as they would have appeared to a reasonable person at that time. *See Hendricks*, 85 Ariz. at 379, 339 P.2d at 736 (in assessing existence of duty, the court considered the facts "as they would have appeared to an ordinarily prudent man standing then in the shoes of the foreman. Hindsight should play no part in it and it must also be recognized that the foreman was not a doctor but only a layman."). Thomas's supposition that Jacob was having a stroke is itself evidence that a reasonable person could (and did) comprehend the gravity of Jacob's situation at that moment. Even without medical training, a reasonable person would understand that a stroke is the kind of condition that requires immediate medical attention at a hospital, and that it would likely render Jacob "helpless to obtain medical aid or assistance for himself."

Union Pacific suggests that so long as Jacob could walk and talk he was capable of summoning help for himself. But one doesn't need to be paralyzed or mute to be unable to engage in self-help. A reasonable person could conclude that someone suffering from a probable stroke would not be competent to assess his own health status, understand his need for treatment, and articulate that need. That distinguishes this case from *Bell v. Norfolk Southern Railway*, on which Union Pacific relies.

In *Bell*, the plaintiff claimed that the railroad had failed to act reasonably to assist him when he was suffering from heat stroke that ended up permanently injuring him. The undisputed evidence showed that a foreman found the plaintiff "sitting on a crosstie, appearing a bit dizzy but coherent," and stating that he'd "had another of his spells." 222 Ga. App. 788, 790, 476 S.E.2d 3, 5 (1996). The foreman took the plaintiff to an air-conditioned office, where the plaintiff "stated he needed only water, that he felt he could return to work, that he could

drive himself home, and that the doctors did not know what caused these recurring episodes." *Id.* Citing *Hendricks* and cases following it, the Georgia Court of Appeals concluded that this evidence was insufficient to show that the plaintiff had been unable to help and care for himself.

The plaintiff in *Bell* was suffering from dizziness, disorientation, and weakness—symptoms that could result from a range of conditions, many of which aren't incapacitating or life-threatening. And that's why no duty was triggered by Franchuk's observation of Jacob on the train back to Altoona: Jacob looked ill, but not incapacitated and unable to look out for himself. But later, Jacob was witnessed with symptoms commonly and specifically associated with strokes. Once Jacob's colleagues saw or heard that his face was drooping, it didn't matter that Jacob was still able to stand and walk unassisted and answer when spoken to; a reasonable person could conclude that Jacob was suffering from an incapacitating medical condition and wasn't in a position to engage in self-help.

Union Pacific contends that any legal determination that it owed a duty to Jacob prior to his physical collapse at the depot would have the practical effect of requiring employers to "identify and recognize ambiguous symptoms of illness such as tiredness, weakness, or headaches, and then summon emergency services even though the employee is not incapacitated or unable to care for themselves." Dkt. 93, at 2. But that is not what this ruling requires. A railroad's duty to render medical assistance arises when it knows or should know that an employee is incapacitated and needs medical assistance to save his life or prevent further serious injury. In this case, that occurred when Jacob started exhibiting the telltale signs of stroke sometime around 8:25 p.m. Union Pacific is not entitled to judgment as a matter of law based on the absence of a duty.

### B. Causation

Union Pacific says that Tischer's FELA claim fails even if the court finds that it owed a duty to Jacob prior to his arrival at the depot because Tischer has no evidence that its delay in summoning medical assistance played any part in causing Jacob's death. On this point, the court agrees with Union Pacific. Although the quantum of evidence required to prove causation under FELA is slight, the plaintiff must nonetheless adduce *some* evidence from which a reasonable jury could find that the railroad's breach caused or contributed to the injury. *Green v. CSX Transp., Inc.*, 414 F.3d 758, 766 (7th Cir. 2005). In this case, Tischer has adduced no evidence that Union Pacific's half-hour delay in summoning medical assistance played any role in contributing to Jacob's stroke, causing his death, or exacerbating his pain and suffering.

Tischer relies on reports from two causation experts, Dr. Emily Duncanson and Dr. Steven Noran, both of whom opined that treatment delays generally make strokes worse and reduce the odds of recovery. But neither report establishes a causal link between Union Pacific's delay and Jacob's injuries. Duncanson offers the ultimate opinion that "a delay in seeking treatment contributed to the severity of [Jacob's] stroke and contributed to his death." Dkt. 60, at 3. But the basis she provided for this opinion did not link the increased severity of Jacob's stroke to the period of delay specifically attributable to Union Pacific. She said only that:

> Had Mr. Tischer been brought to medical attention earlier in the day before he collapsed, when his symptoms were milder (balance issues and headache), more timely treatment could have prevented his hemiplegia (paralysis of one side). Had he presented earlier, TPA or "clot busting" intravenous medications could have been administered and could have prevented or lessened his level of disability. TPA must be administered within a maximum of 4.5 hours of symptom onset. He was not given TPA at Eau Claire because the onset of symptoms was felt to be unclear.

11

*Id.* at 2–3. Duncanson does not say how much earlier in the day Jacob would have needed to arrive at the hospital to prevent his paralysis or administer the clot-busting drug. Indeed, viewed in light of the undisputed facts, Duncanson's opinion shows that by the time Union Pacific's duty to Jacob arose (around 8:25 p.m.), it was already too late to do either. After all, Tischer experienced his first symptoms on the morning of August 12, when he collapsed, unresponsive, in his kitchen.

Noran's opinion likewise provides no evidence that Union Pacific's delay contributed to Jacob's injuries. He opined that "the delay in getting Mr. Tischer treatment earlier and his transportation to the hospital earlier played a significant role in the eventual evolution of his stroke" and ultimately "contributed to his demise." Dkt. 58, at 6. He did not quantify the relevant period of delay, and like Duncanson, he failed to link Jacob's injury to the delay specifically attributable to Union Pacific. He merely stated that:

> The sooner a person having a stroke is evaluated and found to have clotting of blood causing the stroke, the better the potential outcome is. Patients initially are generally considered to be treatable with special medication that breaks up clots if diagnosed before 4-1/2 hours. The importance of time for early diagnosis and treatment is a major factor. In a person of Mr. Tischer's age, 4-1/2 hours is considered a maximum amount of time before these special "clot busters" can be given.

*Id.* at 5. He provided no assessment whether getting Jacob to the hospital half an hour earlier would have opened up additional treatment options, mitigated the severity of Jacob's symptoms, reduced his pain and suffering, or otherwise made a difference to the prognosis.

Neither of Tischer's causation experts identified a causal link between Union Pacific's delay and Jacob's injury. This is a fundamental shortcoming. Even if the court were to accept Tischer's view that Union Pacific's duty to call 911 arose when Jacob started looking sick on the train back to Altoona, these opinions wouldn't create a genuine dispute on the causation

issue: neither one shows that getting to the hospital an hour earlier would have made a difference, because Jacob was already outside the window for clot-busting medication. It is not enough for an expert to simply speculate that because time is of the essence when it comes to strokes that Union Pacific's delay therefore made Tischer's stroke worse. *See Heater v. Chesapeake & O. Ry. Co.*, 497 F.2d 1243, 1246 n.1 (7th Cir. 1974) (mere "speculation, conjecture and possibilities" are not sufficient to create a jury question on causation (citation omitted)); *see also Kopplin v. Wisconsin Cent. Ltd.*, 814 F.3d 1099, 1103 (7th Cir. 2019) (exclusion of FELA causation expert was warranted where his report "never explained how the [work activity in question] actually caused the disability"). To raise a genuine issue, Tischer needed evidence of some connection between Union Pacific's half-hour delay and Jacob's injury. Duncanson and Noran's opinions do not provide this evidence, and Tischer adduces no other evidence of causation. So Union Pacific is entitled to summary judgment on Tischer's claim based on the negligent delay in summoning medical assistance.

## C. Other negligence theories

Tischer pleaded several other theories of negligence in her complaint, *see* Dkt. 1, ¶ 20, including failure to (1) adopt reasonable or comply with existing safety rules and protocols; (2) properly train employees and supervisors regarding recognizing and handling medical emergencies; (3) adopt a reasonable sickness and attendance policy or comply with existing sickness and attendance policies; and (4) appropriately supervise and assign work. Union Pacific seeks summary judgment on all of these ancillary negligence claims. *See* Dkt. 53, at 20–28. The court concludes that all but one of these theories are forfeited, and the remaining claim merely duplicates the negligence claim discussed above and therefore fails for lack of causation evidence.

In her opposition brief, Tischer doesn't respond to Union Pacific's arguments about its sickness and attendance policies or its supervision and assignment of work, so the court will grant summary judgment to Union Pacific on those claims. *See Rogers by Rogers v. K2 Sports, LLC*, 348 F. Supp. 3d 892, 905 (W.D. Wis. 2018) (granting summary judgment to defendant on claims that plaintiffs failed to substantively discuss or defend in opposition brief). As for the failure-to-train claims, Tischer asserts in her opposition brief that her "theory of negligence does not directly implicate a duty to train," but rather "a duty to follow . . . internal rules." Dkt. 82, at 24. Tischer says that her claim about safety rules and protocols is based on Union Pacific's failure to follow its own (1) internal safety rules and (2) general code of operating rules. (Tischer doesn't discuss any alleged failure by Union Pacific to *adopt* additional rules, so that claim is also forfeited.)

Tischer points to various internal and operational rules that she says were violated when Jacob fell ill at work. For example, Union Pacific's internal safety rules say that it is Union Pacific's policy to "conduct its business in a manner that addresses the safety of employees" and to "respond quickly, effectively, and with care to emergencies." Dkt. 89, ¶¶ 262, 263. Similarly, Union Pacific's general code of operating rules state that employees must "[r]eport by first means of communication any accidents; personal injuries . . . or any unusual condition that may affect the safe and efficient operation of the railroad"; and provides that employees should "do everything reasonable to care" for employees who are injured. *Id.* ¶ 264. Tischer contends that these rules and policies impose a separate legal duty on Union Pacific, any breach of which gives rise to liability under FELA. But Tischer does not explain how Union Pacific violated any of its internal rules. None of these rules could reasonably be interpreted to mean that emergency care must be summoned at any sign of illness or fatigue. The only point at

14

which Jacob showed such distress as to implicate Union Pacific's general safety rules was when he first showed symptoms of stroke. And, once again, any claim of negligence based on Union Pacific employees' failure to follow those rules would fail for lack of causation evidence. Just as with her negligence claim, Tischer has adduced no evidence that any violation of Union Pacific internal rules played any part in causing or worsening Jacob's stroke.

### D. Conclusion

Tischer has failed to adduce evidence that Union Pacific's breach of its duty of care contributed to Jacob's injuries. Without such evidence, Tischer's claims fail as a matter of law. The court will grant Union Pacific's motion and dismiss the case.

### ORDER

IT IS ORDERED that:

1. Defendant Professional Transportation Inc.'s motion for summary judgment, Dkt. 65, is GRANTED as unopposed.
2. Defendant Union Pacific Railroad Company's motion for summary judgment, Dkt. 40, is GRANTED.
3. The clerk of court is directed to enter judgment in favor of defendants and close the case.

Entered September 30, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge